Samuel R. Maizel (CA Bar No. 189301)
Mary D. Lane (CA Bar No. 71592)
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 11th Floor
Los Angeles, California  90067-4100
Telephone: 310/277-6910
Facsimile:  310/201-0760
E-mail:        smaizel@pszjlaw.com
                    smcfarland@pszjlaw.com
                    mlane@pszjlaw.com

[Proposed] Attorneys for Victor Valley Community
Hospital, Debtor and Debtor in Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### RIVERSIDE DIVISION

| | |
|---|---|
| In re:<br><br>VICTOR VALLEY COMMUNITY HOSPITAL,[1]<br><br>　　　　　　　Debtor. | Case No.: 6:10-39537 CB<br><br>Chapter 11<br><br>**NOTICE OF EMERGENCY MOTION AND EMERGENCY MOTION OF DEBTOR FOR ORDERS (A) AUTHORIZING DEBTOR TO OBTAIN POSTPETITION FINANCING AND GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS PURSUANT TO 11 U.S.C. § 364; AND (B) SCHEDULING A FINAL HEARING AND ESTABLISHING RELATED NOTICE REQUIREMENTS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br><u>Interim Hearing</u>:<br>Date:　　　TBD<br>Time:　　　TBD<br>Place:　　　U.S. Bankruptcy Court<br>　　　　　　　3420 Twelfth Street<br>　　　　　　　Riverside, CA 92501-3819<br>Judge:　　　Catherine E. Bauer |

---

[1]　　　The Debtor is a California nonprofit public benefit corporation, Fed. Tax I.D. No. 95-2475762.  The Debtor's address is 15248 Eleventh Street, Victorville, CA  92395.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**TO THE HONORABLE CATHERINE BAUER, THE OFFICE OF THE UNITED STATES TRUSTEE, DEBTOR'S SECURED CREDITORS, THE TWENTY LARGEST UNSECURED CREDITORS, AND OTHER PARTIES IN INTEREST:**

**PLEASE TAKE NOTICE** that Victor Valley Community Hospital, the above-captioned debtor and debtor in possession (the "Debtor"), through its undersigned proposed counsel, hereby moves (the "Motion") the Court for the entry of an interim order substantially in the form attached to the Motion as **Exhibit A** (the "Proposed Interim Order" or "Interim Order") and a final order (the "Final Order"), pursuant to sections 105(a) and 364 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 4001(c) and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (i) authorizing the Debtor to incur up to $3.2 million in postpetition indebtedness through the first thirteen weeks of the Case as necessary (the "DIP Financing" or "DIP Facility"), (ii) granting liens in avoidance actions and subordinate liens in the Debtor's other assets securing the DIP Facility, and superpriority administrative expense claim status to the DIP Facility, and (iii) granting related relief as further set forth in the Proposed Interim Order.

**PLEASE TAKE FURTHER NOTICE** that, as set forth in the attached Memorandum, the Debtor has access to only limited operating funds, which will be inadequate for the Debtor to continue to manage its assets, pay the employees' payroll due Friday, September 17, 2010 and subsequent payrolls, and administer this case. While the Debtor believes that it will be able to raise substantial monies in the future through the proposed sale of substantially all its assets (the subject of a pending motion), the Debtor is at this point in urgent need of financing in order to continue to operate, pay its critical expenses (including postpetition employee wages and benefits and administrative obligations) and preserve and maximize its value for the benefit of the estate and its creditors. After arm's length negotiations undertaken in good faith by the Debtor and Prime Healthcare Services Foundation, Inc. ("Prime" or the "DIP Lender"), the Debtor has determined that the terms and conditions of the proposed DIP Financing are fair, reasonable and appropriate and that approval of the DIP Financing is in the best interest of the estate.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to Bankruptcy Rule 4001(c)(1)(B), the following chart summarizes and sets out the location with the relevant documents, of all material

provisions of the proposed credit agreement and form of order, including interest rate, maturity, events of default, etc…:[2]

| | |
|---|---|
| DIP Facility: | A superpriority expense claim credit facility in an aggregate amount of up to $3,200,000.00. |
| DIP Lender: | Prime Healthcare Services Foundation, Inc. or its designee |
| Purpose: | The DIP Facility will be used to finance Debtor's working capital and general corporate purposes through consummation of the sale of Debtor's asset to Prime or an over bidder. |
| Borrowing Conditions: | Amounts to be loaned are determined by Debtor's needs pursuant to a thirteen week budget |
| Interest: | Eight percent (8%) per annum ("Base Rate") with default rate interest at the Base Rate plus two percent (2%). |
| Liens/Superpriority Administrative Claim | (i)      A continuing first priority security interest in and lien, subject and subordinate to the Carve-Out, upon all of the Debtor's right, title and interest in any claims arising under Bankruptcy Code sections 502(d), 544, 545, 547, 548, 549, 550 or 553, other than such claims against the DIP Lender ("Avoidance Claims").<br><br>(ii)      A continuing security interest in and lien, subject and subordinate to all existing security, interests and liens and to the Carve-Out, upon all of the Debtor's right, title and interest in and to all of its other personal property and assets except for real property assets, whether now owned or hereafter acquired.<br><br>Subject to the Carve-Out, all DIP Obligations shall be an allowed superpriority administrative expense claim (the "DIP Super-Priority Claim" and, with the security interests and liens described above, the "DIP Protections") with priority (except as otherwise provided in the Interim Order) in Debtor's case under sections 364(b), 503(b), and 507(b) and otherwise over all administrative expense claims and unsecured claims against Debtor and its estate, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, except as otherwise provided in the Interim Order, administrative expenses of the kinds specified in, arising, or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 726(b), 1113, and 1114, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment. |
| Carve-Out: | The DIP Protections are subject and subordinate to the following (the "Carve-Out"): (a) allowed administrative expenses pursuant to 28 U.S.C. §1930(a)(6) (the "U.S. Trustee Fees"); and (b) allowed fees and expenses of attorneys and financial advisors employed by Debtor and the Creditors' Committee pursuant to sections 327 and 1103 (the "Case Professionals").  For purposes of clauses (b), (i) if at the time of reference, written notice of termination of the commitment to fund the DIP Facility (a "DIP Commitment Termination Notice") has not been provided by the DIP Lender in accordance with the DIP Financing Agreement and the Interim Order, the amount of the Carve-Out shall not be limited, except that no payment may be made to any Case Professional except as provided in the Budget and as authorized by order of the Bankruptcy Court allowing such payment (including pursuant to any fee procedures order entered by the Bankruptcy Court); and (ii) if, at the time of reference, a DIP Commitment Termination Notice has been given in accordance with the DIP Financing Agreement and this Interim Order , the amount of the Carve Out (the "Carve Out Amount") shall be limited to $50,000.00 plus, as |

---

[2]      This section contains a summary of the principal provisions of the DIP Facility; the Court and other parties in interest, however, are respectfully referred to the DIP Financing Agreement, and the Interim Order for a more extensive recitation of the terms and conditions of the DIP Facility.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| | |
|---|---|
| | of the Termination Date (as defined in the Interim Order), any fees and expenses of Case Professionals that are listed in the Budget and which have been as of that date actually incurred but have not yet been paid;  provided in such case such fees and expenses are ultimately approved by the Bankruptcy Court, or such lesser amount as so approved.  So long as the Termination Date has not occurred, Debtor shall, to the extent provided in the Budget, be permitted to pay fees, compensation, and reimbursement of expenses allowed and payable (including any such fees and expenses that are accrued but unpaid and ultimately allowed) under section 330, 331 or 503, as the same may be due and payable. |
| Term: | All obligations under the DIP Facility, accrued or otherwise, will be due and payable in full on the earliest to occur of (i) October 15, 2010, unless a Final Order has been entered by such date and if so entered, December 13, 2010; (ii) the occurrence and continuance of an Event of Default (as defined in the Interim Order) and delivery of a DIP Commitment Termination Notice; or (iii) the sale of all or substantially all of Debtor's assets. |
| Fees: | None, except the DIP Lender's out-of-pocket costs and expenses. |
| Events of Default | None |

**PLEASE TAKE FURTHER NOTICE** that the Motion is based on and supported by this Notice, the attached Memorandum of Points and Authorities, the Declaration of Edward Matthews, Chief Financial Officer of the Debtor filed concurrently herewith, and the record in this case.

**PLEASE TAKE FURTHER NOTICE** that the Debtor has sought to have a hearing on approval of the Motion on an interim basis and entry of the Proposed Interim Order held on an emergency basis pursuant to Local Bankruptcy Rules 2081-1(a)(9) and 9075-1(a) on or about September 15, 2010 at a time convenient to the Court, in light of the Debtor's urgent need for postpetition financing.  Upon the Court's setting of a hearing date, the Debtor shall provide, via facsimile, email, overnight/Express Mail delivery or hand delivery, separate notice of the hearing on the Motion to: (1) the Office of the United States Trustee (the "UST"); (2) the Debtor's secured creditors or their respective counsel; (3) the Twenty Largest Creditors; and (4) all parties who have requested special notice in this case (collectively, the "Notice Parties").

**WHEREFORE**, the Debtor respectfully requests that the Court (i) order a hearing on the proposed Interim Order on September 15, 2010 at a time convenient to the Court; (ii) enter the proposed Interim Order on September 15, 2010; (iii) schedule a final hearing on the Motion (the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    "Final Hearing") for on or about September 29, 2010; (iv) grant the Motion on a final basis at the

2    Final Hearing, and (v) grant such other and further relief as the Court deems just and proper.

3                                              PACHULSKI STANG ZIEHL & JONES LLP

4    Dated:      September 13, 2010

        By      _/s/ Samuel R. Maizel_____
5                Samuel R. Maizel (CA Bar No. 189301)
                 [Proposed ] Attorneys for Victor Valley
6                Community Hospital, Debtor and Debtor in
                 Possession

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................ 5

I. SUMMARY OF RELIEF REQUESTED HEREIN ...................................................... 5

II. JURISDICTION ......................................................................................................... 8

III. BACKGROUND ....................................................................................................... 8

    A.    General Description of the Debtor ................................................................ 8

    B.    The Debtor's Physical Plant ......................................................................... 8

    C.    The Debtor's Staff ........................................................................................ 9

    D.    The Debtor's Services .................................................................................. 9

    E.    The Debtor's Management ........................................................................... 9

    F.    The Debtor's Secured Debt ........................................................................ 10

        The 2000 Bonds ........................................................................................ 10

        The Desert Community Bank Obligations ................................................. 11

        The PHM Obligations ................................................................................ 12

        The Corwin Medical Group Obligations ................................................... 12

        Capitalized Leases ..................................................................................... 13

    G.    The Debtor's Unsecured Debt .................................................................... 13

        Trade Debts ................................................................................................ 13

        Employee Obligations ................................................................................ 13

        Obligations to Medi-Cal ............................................................................ 13

    H.    The Debtor's Revenues .............................................................................. 14

    I.    The Chapter 11 Filing ................................................................................ 15

IV. PROPOSED DEBTOR IN POSSESSION FINANCING ....................................... 17

    A.    The Critical Need for Postpetition Financing ............................................ 17

    B.    Overview of the Proposed DIP Facility ..................................................... 19

V. BASIS FOR APPROVAL OF THE DIP FACILITY AND THE GRANTING OF
    SUPERPRIORITY ADMINISTRATIVE CLAIMS IN CONNECTION
    THEREWITH ......................................................................................................... 21

    A.    The DIP Facility's Necessity to Bridge Debtor to the Proposed Auction
        Warrants Granting of Administrative Claims to the DIP Lender. .............. 21

    B.    Bankruptcy Rule 4001(c) and Local Bankruptcy Rule 4001-2 Disclosure ......... 22

    C.    Provisions that Potentially Implicate Local Bankruptcy Rule 4001-2 ............... 22

VI. REQUEST FOR IMMEDIATE INTERIM APPROVAL OF RELIEF REQUESTED
    HEREIN ................................................................................................................. 23

VII. NOTICE WITH RESPECT TO EMERGENCY INTERIM  FINANCING REQUEST
    AND FINAL HEARING ....................................................................................... 24

VIII. CONCLUSION ....................................................................................................... 25

# TABLE OF AUTHORITIES

## CASES

*Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.),*
   789 F.2d 1085 (4th Cir. 1986) ............................................................................... 21

*In re Ames Dep't Stores, Inc,.*
   115 B.R. 34 (Bankr. S.D.N.Y. 1990) ........................................................................ 21

## STATUTES

11 U.S.C. § 105 ............................................................................................................. 2, 19

11 U.S.C. § 105(a) .............................................................................................................. 1

11 U.S.C. § 1103 ........................................................................................................... 2, 19

11 U.S.C. § 1113 ........................................................................................................... 2, 19

11 U.S.C. § 1114 ........................................................................................................... 2, 19

11 U.S.C. § 326 ............................................................................................................. 2, 19

11 U.S.C. § 327 ............................................................................................................. 2, 19

11 U.S.C. § 328 ............................................................................................................. 2, 19

11 U.S.C. § 330 ............................................................................................................. 2, 19

11 U.S.C. § 331 ............................................................................................................. 2, 19

11 U.S.C. § 362 ..................................................................................................................... 7

11 U.S.C. § 364 ............................................................................................................. 1, 21

11 U.S.C. § 364(b) ..................................................................................................... passim

11 U.S.C. § 364(c) ...................................................................................................... 21, 22

11 U.S.C. § 502(d) ............................................................................................... 2, 5, 6, 19

11 U.S.C. § 503 ............................................................................................................. 2, 19

11 U.S.C. § 503(a) ........................................................................................................ 2, 19

11 U.S.C. § 503(b) ..................................................................................................... passim

11 U.S.C. § 503(b)(1) ........................................................................................................ 21

11 U.S.C. § 506(c) .................................................................................................. 2, 19, 22

11 U.S.C. § 507 ................................................................................................................. 5, 6

11 U.S.C. § 507(a) ........................................................................................................ 2, 19

11 U.S.C. § 507(b) ................................................................................................... 2, 19, 21

11 U.S.C. § 544 ................................................................................................... 2, 5, 6, 19

11 U.S.C. § 545 ................................................................................................... 2, 5, 6, 19

11 U.S.C. § 546(c) ........................................................................................................ 2, 19

11 U.S.C. § 546(d) ........................................................................................................ 2, 19

11 U.S.C. § 547 ................................................................................................... 2, 5, 6, 19

11 U.S.C. § 548 ................................................................................................... 2, 5, 6, 19

11 U.S.C. § 549 ......................................................................................................... passim

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

11 U.S.C. § 550 .................................................................................................. 2, 5, 6, 19

11 U.S.C. § 553 .................................................................................................. 2, 5, 6, 19

11 U.S.C. § 726(b) ................................................................................................... 2, 19

28 U.S.C. § 1334 ............................................................................................................ 8

28 U.S.C. § 1408 ............................................................................................................ 8

28 U.S.C. § 1409 ............................................................................................................ 8

28 U.S.C. § 157(b)(2)(A) ............................................................................................... 8

28 U.S.C. § 1930(a)(6) ............................................................................................ 2, 19

**RULES**

F.R.B.P. 2002 .............................................................................................................. 24

F.R.B.P. 4001(c) ..................................................................................................... 1, 24

F.R.B.P. 4001(c)(1)(B) ................................................................................................. 1

F.R.B.P. 4001(c)(2) ..................................................................................................... 23

F.R.B.P. 6003 .............................................................................................................. 24

F.R.B.P. 6004(a) .......................................................................................................... 24

L.B.R. 2081-1(a)(9) ...................................................................................................... 3

L.B.R. 4001(c)(1)(B)(i)-(xi) ....................................................................................... 22

L.B.R. 4001-2 ............................................................................................................. 22

L.B.R. 4001-2(a)(i) ..................................................................................................... 22

L.B.R. 9075-1(a) ........................................................................................................... 3

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

## MEMORANDUM OF POINTS AND AUTHORITIES

By this Motion (the "Motion"), Victor Valley Community Hospital, debtor and debtor in possession ("Debtor"), respectfully requests entry of an interim order substantially in the form annexed hereto as **Exhibit "A"** (the "Interim Order") and thereafter a final order (the "Final Order" and, together, the "DIP Financing Orders"), to avoid immediate and irreparable harm to the Debtor and its creditors which would result from the Debtor's failure to obtain postpetition financing.  This Motion seeks authority for the Debtor to incur up to $3.2 million in postpetition indebtedness over the first 13 weeks of the case in exchange for (A) a continuing first priority security interest in and lien, subject and subordinate to the Carve-Out, upon all of the Debtor's right, title and interest in any claims arising under Bankruptcy Code sections 502(d), 544, 545, 547, 548, 549, 550 or 553, other than such claims against the DIP Lender ("Avoidance Claims"), (B) a continuing security interest in and lien, subject and subordinate to all existing security, interests and liens and to the Carve-Out, upon all of the Debtor's right, title and interest in and to all of its other personal property and assets except for real property assets, whether now owned or hereafter acquired, and (C) subject to the Carve-Out, superpriority administrative expense claim status pursuant to sections 364(b), 503(b) and 507 as more fully described below and in the Interim Order a postpetition superpriority administrative expense claim to the proposed lender.  If the proposed lender is the successful bidder at the proposed auction of the Debtor's assets (sought by separate motion filed concurrently herewith) the DIP financing will be forgiven; if the proposed lender is not the successful bidder, the DIP financing obligation will be repaid as part of the purchase consideration from the successful over-bidder.  No other party will lend the Debtor, whose assets are otherwise fully encumbered, sufficient amounts without security, to allow the Debtor to stay in operation long enough to conduct an auction of its assets on a going concern basis and thereby maximize its return to creditors.

## I.

## SUMMARY OF RELIEF REQUESTED HEREIN

By this Motion, Debtor seeks an order:

a.        Authorizing, on an interim and permanent basis, the Debtor to:

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

(i)    Obtain, pursuant to Sections 364(b), (c) and (e),[3] postpetition financing in the form of a $3,200,000 debtor in possession credit facility (the "DIP Facility") pursuant to the terms of that certain Postpetition Revolving Credit and Security Agreement (the "DIP Financing Agreement"), a copy of which is annexed hereto as **Exhibit B**, by and among Prime Healthcare Services Foundation, Inc., as the DIP Lender; and

(ii)    Grant to the DIP Lender, as security for repayment of all obligations arising under the DIP Facility, (A) a continuing first priority security interest in and lien, subject and subordinate to the Carve-Out, upon all of the Debtor's right, title and interest in any claims arising under Bankruptcy Code sections 502(d), 544, 545, 547, 548, 549, 550 or 553, other than such claims against the DIP Lender ("Avoidance Claims"), (B) a continuing security interest in and lien, subject and subordinate to all existing security, interests and liens and to the Carve-Out, upon all of the Debtor's right, title and interest in and to all of its other personal property and assets except for real property assets, whether now owned or hereafter acquired, and (C) subject to the Carve-Out, superpriority administrative expense claim status pursuant to sections 364(b), 503(b) and 507 as more fully described below and in the Interim Order;

b.    Approving the terms and conditions of the DIP Financing Agreement and the documents to be executed in connection therewith, and authorizing Debtor to execute and deliver, from time to time, all such documents, instruments and agreements and perform such other acts as may be required, necessary or desirable in connection with the DIP Financing Agreement including, without limitation, the payment of all fees, interest and charges, if any, required under the DIP Financing Agreement;

c.    Authorizing, pursuant to the Interim Order, Debtor to borrow funds under the DIP Facility and in accordance with the Budget (as defined in the DIP Financing Agreement), in each case on an interim basis through and including the date of a final

---

[3]    Unless otherwise noted, all references to "Section" refer a section of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Code").  All references to "Rule" refer to the Federal Rules of Bankruptcy Procedure.   All references to "LBR" refer to the local rules of this Court.

1 hearing regarding the Motion (the "Final Hearing");

2  d. Authorizing Debtor, after entry of a Final Order, to borrow funds under the DIP

3   Facility on a permanent basis including to fund Debtor's working capital needs and

4   for other purposes as provided in the DIP Facility and in accordance with the Budget;

5  e. Modifying the automatic stay under section 362 to the extent necessary to permit the

6   DIP Lender to implement the terms and other provisions of the DIP Financing

7   Agreement and the DIP Financing Order; and

8  f. Scheduling and approving the form and manner of notice of the Final Hearing.

9 Debtor respectfully submits that the requested relief is critical to its ability to continue to sell

10 its assets to Prime, as purchaser, or an over-bidder, as set forth in the motions filed concurrently

11 herewith.  By facilitating that sale, Debtor will be able to pay secured creditors the full amount of

12 their prepetition secured claims, fund its administrative expenses and make a substantial distribution

13 to unsecured creditors.

14 To maximize the recovery to creditors, and to ensure the safety of its patients, the Debtor

15 must remain open.  As set forth in the Matthew Declaration filed concurrently herewith and exhibits,

16 funds advanced under the DIP Facility will allow Debtor to remain open through the end of

17 November, the projected date to close any sale of the Debtor's assets.  Absent the DIP Facility,

18 Debtor will be forced to close this week, putting hundreds of employees out of work, putting patients

19 at risk, and destroying the potential value to creditors from the proceeds of the sale as a going

20 concern, reducing the return, if any, to creditors.

21 Debtor requires immediate access to working capital to fund and support ordinary business

22 expenditures, including payroll and employee benefits, utilities, and other overhead expenses.

23 Absent immediate and uninterrupted access to adequate financing, Debtor will have insufficient

24 liquidity to sustain any level of business activity.  Debtor requires immediate funding specified in the

25 DIP Facility to preserve and maximize the value of its assets.

26 As more fully set forth below, Debtor submits that the financing arrangements proposed

27 herein are reasonable and necessary, serve the best interests of Debtor's creditors and estates, and

28 should be approved in all respects.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

## II.

## JURISDICTION

The Court has jurisdiction over this Motion under 28 U.S.C. § 1334.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A) in that it is a matter concerning the administration of Debtor's estate.  Venue of these proceedings is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## III.

## BACKGROUND

**A.**    **General Description of the Debtor**

The Debtor, a California nonprofit public benefit corporation, operates the Victor Valley Community Hospital (the "Debtor" or the "Hospital").  The Debtor was founded in 1967 and is the only non-profit community hospital in the California High Desert, a service area that includes the communities of Adelanto, Apple Valley, Hesperia and Victorville, serving a population of over 300,000 people.  The High Desert communities served by the Debtor are culturally and ethnically diverse.  They also are economically depressed, and suffer under unemployment rates that are higher than 20%.  The Debtor, therefore, serves a high volume of medically under served and indigent patients and has been designated as a Disproportionate Share Hospital.  As a result of this high volume of indigent patients, millions of dollars worth of the Debtor's services were expended on charity care in 2009, and, with a worsening economy and growing unemployment, the amount in uncompensated, charity care will increase significantly in 2010.

**B.**    **The Debtor's Physical Plant**

The Hospital is located at 15248 Eleventh Street, Victorville, California 92392.  The facility was designed and constructed as an acute care hospital, and over the years it has been renovated and expanded to accommodate the needs of its patients and the communities it serves.  Originally the facility was operated as a 115 bed facility, but the capacity was reduced in the mid-2000s to approximately 106 beds, and subsequently further reduced to its current 101 bed capacity.  The Debtor owns the main, two-story, hospital building and its adjacent modular office complex which houses its administrative offices.  The Debtor also leases two other facilities: (a) the Women's

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Center and Outpatient Imaging facility, along with the Debtor's human resources department, at 15203 Eleventh Street in Victorville, and (b) the Education Center, at 15366 Eleventh Street, Suite R, in Victorville.

**C.      The Debtor's Staff**

The Hospital is currently staffed to operate approximately 65 beds on a normal day, although it has access to visiting nurse registries, which allow it to quickly increase its staff to meet patient needs.  Approximately 257 doctors from the local community have privileges at the Hospital.  As of the Petition Date, the Debtor employed approximately 572 people.  Of this, approximately 160 are nurses.  The rest include, but are not limited to, office staff, technicians, maintenance staff, IT staff, human resources staff, and Quality Assurance staff.

**D.      The Debtor's Services**

As an acute care facility, the Debtor provides a full range of inpatient and outpatient specialty services, including, but not limited to, basic 24-hour emergency room services, surgical services, pediatric services, operating room services, physical therapy, respiratory therapy, outpatient ambulatory services, catheterization laboratory, diagnostic services, women's health center and outpatient imaging services, laboratory and pathology services, social and Medi-Cal eligibility services, physician referral service, and community wellness and education programs.  The Debtor treats approximately 2,900 patients per month in the Emergency Room, of which approximately 250 are eventually admitted to the Hospital.  Annually, the Debtor has approximately 6,600 patients admitted to the Hospital, not including newborns.  Doctors working in the Hospital perform approximately 2,500 out-patient surgeries and approximately 2,000 in-patient surgeries, and deliver approximately 1,400 babies annually.

**E.      The Debtor's Management**

The Debtor is governed by a Board of Directors (the "Board") that is comprised of six members who are leaders in the High Desert community: Kathy Davis, Chair (retired political consultant); Dennis G. Killion, Vice-Chair (educator);Thomas Brown (retired bank president); Michael Fermin (Deputy District Attorney); Tim Jasper (local business owner); and Herbert Williamson, III (Public Defender).

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

The Debtor's Chief Executive Officer is Cathy Pelley, who has served in this position since July 2009. Prior to that, she was a consultant for the Hospital for the previous four months; CEO at Glendale Memorial Hospital in Glendale, California; and CEO at St . Mary's Regional Medical Center in Apple Valley, California. She is a veteran, having served as an Army nurse during the Vietnam War. She has a Nursing Degree from Philadelphia General Hospital, a Bachelor of Science degree in Business Administration and a Master of Science degree in Organization Development, both from the University of San Francisco, and has worked in the hospital industry since approximately 1970, including more than 40 years as a CEO or equivalent position.

The Debtor's Chief Financial Officer ("CFO") and Chief Information Officer is Edward Matthews, who has served in this position since December 2008. Prior to that, he served as founder and principal manager for Neved Investments; CFO for St. Johns Regional Medical Center in Oxnard, California; as a principal with Healthcare Marketing Group, a healthcare industry investment banking group; and as CFO of Doctors' Hospital of Montclair, in Montclair, California. He served in the United States Army during the Vietnam War, including service in Vietnam, and was awarded the Bronze Star Medal. He has a degree in Business Administration, with a concentration in Accounting, and a Masters of Business Administration, both from the University of Texas at Arlington. He has worked in the hospital industry since 1975.

Additionally, the Debtor contracts, pursuant to a management agreement, with Physicians Hospital Management, LLC, a California limited liability company, (the "Manager") as contract administrator to provide a qualified professional senior management team for the Debtor that assists the Board in implementing measures necessary to improve the Debtor's fiscal and operational management. The management fee currently in effect pursuant to the management agreement is $30,000.00 per month. The Debtor intends to reject this agreement.

**F.    The Debtor's Secured Debt[4]**

**The 2000 Bonds**

---

[4]    The Debtor has not undertaken an exhaustive review to ascertain whether there is any defect in the security interest granted or the perfection of that security interest. For the purposes herein, the Debtor will assume that the security interests were in fact duly perfected, reserving all rights with regard to this issue.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

In 2000, the Debtor applied to the California Health Facilities Financing Authority ("HFFA") for financial assistance in refinancing its existing Insured Hospital Revenue Bonds (Victor Valley Community Hospital) 1984 Series A, and this application was approved.  In May 2000 the HFFA and the Treasurer of the State of California issued the California Health Facilities Financing Authority Insured Hospital Refunding Revenue Bonds (Victor Valley Community Hospital) Series 2000A (the "Bonds") in the amount of $8,470,000.  HFFA entered into an Indenture with Bank of New York West Trust Company as Trustee,[5] and the proceeds of the sale of the Bonds were loaned to the Debtor (the "HFFA Loan") pursuant to a Loan Agreement between HFFA and the Debtor dated May 1, 2000.  The Debtor gave HFFA a security interest in the Debtor's facilities, including real and personal property, to secure its repayment obligations under the Loan Agreement, and a Deed of Trust was duly entered into and subsequently filed.  The Office of Statewide Health Planning and Development of the State of California ("OSHPD") issued a Contract of Insurance to insure the repayment of the loan obligations and the Debtor entered into a Regulatory Agreement with HFFA and OSHPD under which OSHPD was given the rights to the security given by the Loan Agreement.

As of July 31, 2010, the Debtor owed a total of approximately $2.6 million on the Bonds; with approximately $2.1 million currently held at a Bank of New York Mellon Bank as a reserve account.  On or about September 2, 2010 Debtor made a payment into the reserve account of $81,225.00.

## The Desert Community Bank Obligations

In 2007 the Debtor desired to establish a revolving line of credit with Desert Community Bank, now a division of East West Bank (the "Bank") in the maximum amount of $4.9 million (the "Bank Loan"), which line of credit was authorized pursuant to a Note dated August 27, 2007 and a Loan Agreement, also dated August 27, 2007, between the Debtor and the Bank.  The Bank and the Debtor asked OSHPD to insure the Debtor's obligations to the Bank, and on or about August 30, 2007, the Debtor entered into an Amendment to Regulatory Agreement with OSHPD and HFFA ("the Amendment") under which Debtor obtained permission to enter into the line of credit with the

---

[5]       The indenture trustee's current name is Bank of New York Mellon Trust Company, N.A.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Bank to finance working capital and pay expenses related to the execution and issuance of the line of credit and related documents.

On or about August 27, 2007, the Debtor executed for the benefit of OSHPD a Deed of Trust with Fixture Filing and Security Agreement ("Trust Deed") which was duly recorded on August 30, 2007. The Trust Deed conveyed a security interest to secure both the HFFA Loan and the Bank Loan, in, among other things, all of Debtor's land, improvements, fixtures, equipment, leases, rentals, accounts, accounts receivable, and inventory, and replaced the earlier Deed of Trust which related only to the HFFA Loan.

As of July 31, 2010, the Debtor owed the Bank approximately $4.5 million on account of this obligation. This obligation is paid through an automatic withdrawal from the Hospital's general account of about $30,000 monthly; the last payment was made in August 2010.

### The PHM Obligations

As of February 2, 2005, Debtor entered into a Loan Agreement with Physicians Hospital Management, LLC ("PHM") that provided for a loan of $6 million, some funds of which had been previously provided and previously evidenced by other notes. Interest accrues and was to be paid monthly; the principal is due to be paid in 2012 in a balloon payment. The Debtor has not made a payment on this obligation in approximately 3 months and currently owes $91,822 of accrued interest on this obligation.

The Loan Agreement is secured by a trust deed on Debtor's real estate subordinate to the OSHPD Deed of Trust.

### The Corwin Medical Group Obligations

On or about September 1, 2010, Debtor borrowed $700,000.00 from Corwin Medical Group, Inc., IPA ("Corwin") in order to pay its September 3, 2010 payroll (the "Corwin Loan"). The promissory note evidencing the Corwin Loan provides that (a) the principal amount of the note will be due and payable on December 1, 2010, with interest at 5.00% annually; (b) that it is secured by the DSH adjustment receivable and by Medicare Settlement receivables; and (c) that the proceeds of either or both of these receivables shall be used to repay this note prior to satisfying other obligations of the Hospital.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**Capitalized Leases**

The Debtor has a lease with Radiometer America, Inc. for a radiometer, which is secured by an security interest in the radiometer. As of August 31, 2010, the Debtor owed approximately $ 58,579 on this lease. The monthly payment is $2,765.00.

**G.    The Debtor's Unsecured Debt**

The Debtor has approximately $16.5 million in total unsecured debt, comprised of obligations to vendors of goods and services, employees, and a significant obligation to Medi-Cal, which is being paid off over 40 years pursuant to an agreement with Medi-Cal.

**Trade Debts**

The Debtor owes approximately $1,308,000 in accrued but unpaid management fees to PHM. Additionally, the Debtor owes approximately $7 million to providers of goods and services to the Debtor, including Cerner, Medtronic, Stryker, J&J and others, as well as to the State of California for genetic testing for newborns.

**Employee Obligations**

The Debtor owes approximately $2 million to its current and former employees for wages and Paid Time Off ("PTO") including vacation and sick time.

**Obligations to Medi-Cal**

The Debtor currently owes approximately $6,008,000.00 for prior overpayments on Medi-Cal cost reports. At the end of a fiscal year, the Debtor must submit a "cost report" to the Centers for Medicare and Medi-caid services, which cost report shows a recap of all rights to payment owned by the entity submitting the report compared to the amounts already paid by the federal or state governments. The government audits these cost reports and decides whether the provider was overpaid or underpaid. If underpaid, the government pays the funds owed. If overpaid, the provider must reimburse the government. In this case, prior cost reports of the Debtor going back as far as 1994 have been audited and the audits revealed that the Debtor was overpaid.

On or about May 5, 2004, the Debtor entered into an extended repayment plan (the "First Repayment Plan") with the State of California Department of Health Care Services for overpayments for cost report years 1993-1997. The amount of the obligation covered by the First

Extended Repayment Plan was $6,027,255 and the balance under the First Extended Repayment Plan as of September 5, 2010 was $5,583,774. The monthly payments are $27,577 with the last payment being due on May 4, 2044.

The Debtor, on or about April 1, 2009, entered into another extended repayment plan (the "Second Extended Payment Plan") to cover the overpayments in the amount of $2,426,246.00 received in the cost report years of 2005-2007. The amount due under the Second Extended Payment Plan is being amortized over a period ending January 1, 2011 with monthly payments of $111,203. The monthly payments under the First Extended Payment Plan and the Second Extended Payment Plan, $138,780, are being offset by Medi-Cal from current remittance advices.

**H.    The Debtor's Revenues**

The primary source of the Debtor's revenues are payments for services provided to its patients from either health plans or from governmental programs such as Medicare and Medi-Cal (the California state version of the Medi-caid Program). The following are the approximate percentages of the Debtor's sources for payments for providing patient services: Medi-Cal and Medi-Cal Managed Care: 42.7%; Medicare and Medicare Managed Care: 29.1%; Managed Care Health Maintenance Organizations/Preferred Provider Organization ("HMO/PPO"), including Aetna, Blue Cross/Blue Shield, Cigna and United: 10.1%; Commercial Workers' Compensation Insurance: 8%; and County Indigent Programs: 4.6%; and Self-Pay: 5%. Thus, more than 75% of the Debtor's revenues come from governmental payors. Further, historically, the Hospital has collected only approximately 8% of the amount due from self-pay patients.

The Debtor, as a Disproportionate Share Hospital, also receives payments from the California state government to help cover the extraordinary costs of serving a particularly high number of indigent patients, whether Medi-Cal and Medicare eligible or not. For fiscal year 2009-2010 the Debtor received approximately $3.8 million in DSH payments, and is still owed two payments. However, what amount of DSH monies will be forthcoming and when it will be paid is unknown, because one payment, estimated at being over $750,000, is being withheld by the State pending resolution of a lawsuit brought against it by the Federal government; the last payment is not expected until October 2011 and will be a relatively small amount.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    Additionally, the Debtor qualifies for a new program called the Hospital Quality Assurance

2  Revenue Fund.  Although this program still awaits approval by the federal Center For Medicare and

3  Medicaid Services ("CMS"), a recent memo of the California Hospital Association  ("CHA") lists

4  the Debtor as being likely to receive several million dollars over the expected twenty-one month life

5  of the program.

6  **I.    The Chapter 11 Filing**

7    The current fiscal crisis for the Debtor is the result of the confluence of several factors.  First,

8  the Debtor provides millions of dollars per year in care to indigents, for which it is not compensated

9  at all or is inadequately compensated.  The percentage of the Debtor's resources expended on

10  indigent care is increasing because the Debtor serves a depressed community and the economic

11  condition of this community has worsened in the past few years.  As the unemployment rate has

12  risen, so has the number of uninsured patients.  Over the last year, the volume of patients has not

13  increased substantially, however, the number of Medi-Cal and self-pay patients increased by 7%.

14    Second, the Hospital's plant is approximately 45 years old and the maintenance costs for this

15  plant are substantial and increasing every year.  In addition to the maintenance costs, the costs of

16  bringing and keeping the hospital plant in compliance with the various governmental regulatory

17  requirements is also substantial.

18    Third, Medi-Cal arbitrarily reduced its payment rate by 10% in January 2010, and Medicare

19  payment rates will be reduced by 2.9% in October 2010.  These changes have caused a decline in the

20  Debtor's revenues without a corresponding reduction in the Debtor's obligations to provide patient

21  care.

22    Fourth, California's financial crisis and the inability of its legislature to pass a budget has

23  caused uncertainty in the timing and the amounts of the DSH Payments and a delay in the hoped for

24  Quality Assurance Fee payments.

25    Fifth, being a stand alone, small rural hospital in California is simply not an advantageous

26  financial situation.  Such hospitals, including the Hospital, suffer from a lack of economies of scale,

27  poor payor mix, high overhead costs, less high-margin specialty service lines, and an overall lower

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

revenue base.  Thus, the Hospital, like many rural small hospitals, struggles to meet even the

relatively small (1 - 3 %) profit margins that is the norm for most of the

not-for-profit hospital industry.

During the relatively short period of time that Ms. Pelley and Mr. Matthews have managed

the Hospital they have made extensive efforts to deal with the financial crisis, including, but not

limited to, laying off staff, changing to outsourcing for medical transcriptions, negotiating an

increase in payor rates from Inland Empire Health Plan, a public entity, and attempting to re-

negotiate commercial contracts, however, they lacked leverage and were not able to increase those

contract rates.  In any event, because 75% of the Debtor's payments come from governmental

payors, even an increase in payment rates from HMOs/PPOs would not make a significant difference

in the Hospital's cash flow.

The Debtor needs to generate approximately $150,000 to $200,000 per day in revenue to

cover its operating costs.  No appreciable cost savings are recognized by the Debtor when the patient

census drops below 65 beds a day, as the fixed costs remain fairly constant.  The Hospital has been

generating only approximately $100,000 per day in revenue.  Thus, the Debtor loses money every

month it operates, and could not have paid its employees their last pay period absent an emergency

loan from the Corwin Medical Group.  In light of this ongoing cash flow shortage, the Debtor was

forced to file this chapter 11 case.

Because the Debtor's CEO, CFO, and Board have concluded that the Debtor cannot survive

at its current cash flow levels and would have to close absent drastic measures, representatives of the

Board approached Prime Healthcare Services Foundation, Inc. ("Prime"), which had previously

expressed an interest in purchasing the Hospital, and negotiated the Asset Sale Agreement which is

being presented as part of the initial bankruptcy filings.  The proposed sale to Prime, a Delaware

non-stock corporation organized exclusively for charitable purposes under Section 501(c)(3) of the

Internal Revenue Code, or its permitted assignee, will allow the Debtor to pay all its secured

creditors, and provide a significant distribution to unsecured creditors.  The chapter 11 case will give

the Debtor the breathing room necessary to sell its assets either to Prime or an over-bidder at a

bankruptcy auction, allowing the Hospital to continue to provide its essential healthcare services to

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

the High Desert Communities and provide a recovery that will benefit all of its creditors.  The

proposed sale provides for Prime to acquire substantially all the Debtor's assets in exchange for $25

million in cash or assumption of debt, as well as up to an additional $3.2 million in Debtor in

Possession Financing to be provided postpetition and prior to the closing of the proposed sale to

allow the Hospital to continue to operate.

# IV.

## PROPOSED DEBTOR IN POSSESSION FINANCING

**A.**     **The Critical Need for Postpetition Financing**

The Debtor needs immediate postpetition financing under the DIP Facility to continue to

finance its postpetition operations and pay administrative expenses.  Such financing will preserve

Debtor's going concern value, and will enable the Debtor to remain open long enough to conduct an

auction of its assets as a going concern, thereby maximizing the returns to all creditors and

stakeholders.

Virtually all of  Debtor's assets are encumbered by the prepetition liens and security

interests.  OSHPD, PHM and Corwin (the "Secured Creditors") each asserts an interest in cash

collateral of the Debtor ("Cash Collateral"), and the Debtor has no unencumbered funds with which

to pay ongoing wages, salaries and day-to-day operating expenses vital to sustaining its business

operations.  By separate motion, the Debtor is seeking authority to use Cash Collateral in which the

Secured Creditors assert an interest.  Additionally, even with the use of Cash Collateral, the Debtor's

cash flow is insufficient to fund operations.

The Debtor's operations are dependent upon uninterrupted access to necessary working

capital.  Therefore, immediate access to the DIP Facility will prevent irreparable harm to Debtor's

estate.  The DIP Facility also is necessary to provide assurance to employees, utilities and other

parties that they will be paid on a timely basis for post-petition services. Without the DIP Facility,

Debtor's day-to-day operations would come to a halt, a result that would be devastating as the

Debtor attempts to maximize the value of its assets through the pursuit of a sale process to Prime or

an over-bidder.

The Debtor submits that the DIP Facility, under which only a lien in Avoidance Claims, a subordinate lien in the Debtor's other assets, and a superpriority administrative expense claim is granted to the DIP Lender, is on favorable and advantageous terms to the Debtor.

The Debtor also submits that, other than the DIP Facility, there are no viable or better financing alternatives available to them under the circumstances.  No other lender would loan funds to the Debtor without security.

Even if Debtor could find alternative financing on favorable terms and conditions, obtaining such financing in the time frame required to address Debtor's immediate liquidity needs through the closing of the sale to Prime would likely result in a protracted priming or other contest with the Secured Creditors, the results of which could not be predicted with certainty.  This uncertainty would doom Debtor to ceasing operations and an almost immediate piecemeal liquidation resulting in no distribution to unsecured creditors.  On the other, the DIP Financing provides a bridge in the truest sense of the word to allow Debtor to consummate the sale to Prime or an over-bidder and receive $25 million in cash in addition to this DIP Financing.

The Debtor cannot obtain alternative postpetition financing without granting the liens and superpriority administrative expense claim required by the DIP Lender.  In these circumstances, Debtor, in the exercise of its considered business judgment and in consultation with its professional advisors, has determined that the DIP Facility provides the most favorable alternative under the circumstances and the liquidity needed to get to the auction of its assets, which Debtor expects to take place in October.

The DIP Facility, which is the product of arm's length negotiations between Prime as DIP Lender and the Debtor, provides the Debtor with continued financing pursuant to (i) the terms of the DIP Financing Agreement, (ii) the operating Budget annexed hereto as **Exhibit "C"**, and (iii) the terms of the proposed Interim Order in the form annexed hereto as **Exhibit "A"** (pending approval of the DIP Facility on a permanent basis at the Final Hearing).

**B.**    **Overview of the Proposed DIP Facility**

The principal terms of the DIP Facility are as follows:[6]

| DIP Facility: | A superpriority expense claim credit facility in an aggregate amount of up to $3,200,000.00. |
| --- | --- |
| DIP Lender: | Prime Healthcare Services Foundation, Inc. or its designee |
| Purpose: | The DIP Facility will be used to finance Debtor's working capital and general corporate purposes through consummation of the sale of Debtor's asset to Prime or an over bidder. |
| Borrowing Conditions: | Amounts to be loaned are determined by Debtor's needs pursuant to a thirteen week budget |
| Interest: | Eight percent (8%) per annum ("Base Rate") with default rate interest at the Base Rate plus two percent (2%). |
| Liens/Superpriority Administrative Claim | (i)    A continuing first priority security interest in and lien, subject and subordinate to the Carve-Out, upon all of the Debtor's right, title and interest in any claims arising under Bankruptcy Code sections 502(d), 544, 545, 547, 548, 549, 550 or 553, other than such claims against the DIP Lender ("Avoidance Claims").<br><br>(ii)    A continuing security interest in and lien, subject and subordinate to all existing security, interests and liens and to the Carve-Out, upon all of the Debtor's right, title and interest in and to all of its other personal property and assets except for real property assets, whether now owned or hereafter acquired.<br><br>Subject to the Carve-Out, all DIP Obligations shall be an allowed superpriority administrative expense claim (the "DIP Super-Priority Claim" and, with the security interests and liens described above, the "DIP Protections") with priority (except as otherwise provided in the Interim Order) in Debtor's case under sections 364(b), 503(b), and 507(b) and otherwise over all administrative expense claims and unsecured claims against Debtor and its estate, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, except as otherwise provided in the Interim Order, administrative expenses of the kinds specified in, arising, or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 726(b), 1113, and 1114, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment. |
| Carve-Out: | The DIP Protections are subject and subordinate to the following (the "Carve-Out"): (a) allowed administrative expenses pursuant to 28 U.S.C. §1930(a)(6) (the "U.S. Trustee Fees"); and (b) allowed fees and expenses of attorneys and financial advisors employed by Debtor |

---

[6]    This section contains a summary of the principal provisions of the DIP Facility; the Court and other parties in interest, however, are respectfully referred to the DIP Financing Agreement, and the Interim Order for a more extensive recitation of the terms and conditions of the DIP Facility.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

|  |  |
|---|---|
|  | and the Creditors' Committee pursuant to sections 327 and 1103 (the "Case Professionals").  For purposes of clauses (b), (i) if at the time of reference, written notice of termination of the commitment to fund the DIP Facility (a "DIP Commitment Termination Notice") has not been provided by the DIP Lender in accordance with the DIP Financing Agreement and the Interim Order, the amount of the Carve-Out shall not be limited, except that no payment may be made to any Case Professional except as provided in the Budget and as authorized by order of the Bankruptcy Court allowing such payment (including pursuant to any fee procedures order entered by the Bankruptcy Court); and (ii) if, at the time of reference, a DIP Commitment Termination Notice has been given in accordance with the DIP Financing Agreement and this Interim Order , the amount of the Carve Out (the "Carve Out Amount") shall be limited to $50,000.00 plus, as of the Termination Date (as defined in the Interim Order), any fees and expenses of Case Professionals that are listed in the Budget and which have been as of that date actually incurred but have not yet been paid;  provided in such case such fees and expenses are ultimately approved by the Bankruptcy Court, or such lesser amount as so approved.  So long as the Termination Date has not occurred, Debtor shall, to the extent provided in the Budget, be permitted to pay fees, compensation, and reimbursement of expenses allowed and payable (including any such fees and expenses that are accrued but unpaid and ultimately allowed) under section 330, 331 or 503, as the same may be due and payable. |
| Term: | All obligations under the DIP Facility, accrued or otherwise, will be due and payable in full on the earliest to occur of (i) October 15, 2010, unless a Final Order has been entered by such date and if so entered, December 13, 2010; (ii) the occurrence and continuance of an Event of Default (as defined in the Interim Order) and delivery of a DIP Commitment Termination Notice; or (iii) the sale of all or substantially all of Debtor's assets. |
| Fees: | None, except the DIP Lender's out-of-pocket costs and expenses. |
| Events of Default | None |

The DIP Facility pursuant to the DIP Financing Agreement is reasonable and fair under the circumstances and, therefore, the financing provided under the DIP Facility serves the best interests of the Debtor, its creditors and its estate.

**V.**

**BASIS FOR APPROVAL OF THE DIP FACILITY AND THE GRANTING OF**

**SUPERPRIORITY ADMINISTRATIVE CLAIMS IN CONNECTION THEREWITH**

**A.    The DIP Facility's Necessity to Bridge Debtor to the Proposed Auction Warrants Granting of Administrative Claims to the DIP Lender.**

Section 364 authorizes the Court to allow Debtor to obtain postpetition financing from the DIP Lender as proposed herein.  As security for all borrowings under the DIP Facility, Debtor proposes to grant the DIP Lender the DIP Protections, consisting of the lien in Avoidance Actions, the subordinate liens in the Debtor's other assets, and a superpriority administrative expense claim.

The granting of the DIP Protections is governed by Section 364(c) which provides that "if the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expenses, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt--(1) with priority over any and all administrative expenses of the kind specified in section 503(b) and 507(b) of this title; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; (3) secured by a junior lien on property of the estate that is subject to a lien."

The Court should grant the DIP Lenders the DIP Protections as requested.  First, as discussed above, section 364 is satisfied because Debtor cannot obtain credit sufficient to sustain its day-to-day business operations or to maintain the going concern value of its assets other than by the granting to the DIP Lender the DIP Protections as provided in the Interim Order.  Debtor negotiated the DIP Financing Agreement at arm's length and has determined, in the exercise of its business judgment and in consultation with its professional advisors, that such financing is the best and most viable financing available under the circumstances.  Courts grant a debtor considerable deference in acting in accordance with its business judgment.  *See*, *e.g.*, *Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest").  Second, the DIP

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Facility is further secured only by property of the estate not subject to a lien, i.e., Avoidance Actions, and a junior lien on property of the Debtor's estate that is subject to a lien, and thus satisfies the requirements of Bankruptcy Code section 364(c). No priming liens are proposed to be granted.

Thus, for all of the reasons set forth above, the Debtor submits that the circumstances of this case requires Debtor to obtain financing pursuant to Sections 364(b). Debtor further submits that the terms of the DIP Facility and the Interim Order are fair, reasonable and necessary under the circumstances, and should be approved in their entirety.

**B.** **Bankruptcy Rule 4001(c) and Local Bankruptcy Rule 4001-2 Disclosure**

The provisions described in Bankruptcy Rule 4001(c)(1)(B)(i)-(xi) are set forth at the following sections of the DIP Financing Agreement and/or Interim Order, as applicable:

    a.    Grant of Priority or a Lien on Property of the Estate: DIP Financing Agreement § 2.10; Interim Order ¶¶ H and 8.

    b.    Adequate Protection for a Claim that Arose Before the Commencement of the Case: Not applicable.

    c.    Determination of the Validity, Enforceability, Priority, or Amount of a Claim that Arose before the Commencement of the Case, Subject to the Rights of a Creditors' Committee or Other Parties in Interest: Not applicable.

    d.    Waiver or Modification of the Automatic Stay: Interim Order ¶ 14.

    e.    Release, Waiver, or Limitation on Rights under Section 506(c) Under Final Order: Not applicable.

    f.    Lien Granted on Claims Arising under Chapter 5, Except for Section 549: DIP Financing Agreement § 2.10(i); Interim Order ¶¶ H and 8.

**C.** **Provisions that Potentially Implicate Local Bankruptcy Rule 4001-2**

Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Central District of California (the "Local Rules") requires that certain provisions contained in the DIP Financing Agreement be highlighted and that the Debtor provides justification for the inclusion of such highlighted provision(s).

Local Rule 4001-2(a)(i) provides:

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

_Provisions to be Highlighted._ All Financing Motions must (a) recite whether the proposed form of order and/or underlying cash collateral stipulation or loan agreement contains any provision of the type indicated below, (b) identify the location of any such provision in the proposed form of order, cash collateral stipulation and/or loan agreement and (c) justify the inclusion of such provision:

Provisions that grant cross-collateralization protection (other than replacement liens or other adequate protection) to the prepetition secured creditors (i.e., clauses that secure prepetition debt by postpetition assets in which the secured creditor would not otherwise have a security interest by virtue of its prepetition security agreement or applicable law);

Provisions or findings of fact that bind the estate or other parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor without first giving parties in interest at least seventy-five (75) days from the entry of the order and the creditors' committee, if formed, at least sixty (60) days from the date of its formation to investigate such matters;

Provisions that seek to waive, without notice, whatever rights the estate may have under 11 U.S.C. § 506(c);

Provisions that immediately grant to the prepetition secured creditor liens on the debtor's claims and causes of action arising under 11 U.S.C. §§ 544, 545, 547, 548 and 549;

Provisions that deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt, other than as provided in 11 U.S.C. § 552(b);

Provisions that provide disparate treatment for the professionals retained by a creditors' committee from those professionals retained by the debtor with respect to a professional fee carve-out; and

Provisions that prime any secured lien without the consent of that lienor.

None of these provisions are included in the proposed DIP Financing Agreement.

## VI.

## REQUEST FOR IMMEDIATE INTERIM APPROVAL OF RELIEF REQUESTED HEREIN

Pursuant to Rule 4001(c)(2), a minimum of fifteen days notice is required before a final hearing on this Motion may commence.  Upon request, however, the Court may conduct a preliminary expedited hearing on the Motion to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing. Fed. R. Bankr. P. 4001(c)(2).  In accordance

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

with Rule 4001(c), the Debtor respectfully requests that the Court conduct an expedited preliminary

hearing on the Motion and authorize the Debtor to borrow under the DIP Facility on an interim basis,

pending entry of a final order.

Debtor submits that such relief is vital in order to maintain and finance its ongoing

operations, preserve the going concern value of Debtor's assets pending the conclusion of the

proposed sale process, and, therefore, to prevent immediate and irreparable harm to the Debtor's

estate. Debtor further requests that the Court schedule a hearing to consider entry of a Final Order.

As discussed above, it is essential to the continued operation of its business that the Debtor

be authorized to obtain emergency financing under the DIP Facility on an interim basis pending the

Final Hearing. Funds are urgently needed to meet Debtor's immediate and considerable working

capital and other liquidity needs, and to complete the proposed sale. In the absence of emergency

access to interim financing, Debtor's sale efforts would be immediately and irreparably jeopardized,

resulting in significant harm to the Debtor's estate and creditors.

The Debtor further submits that because the relief requested in this Motion is necessary to

avoid immediate and irreparable harm, Bankruptcy Rule 6003 has been satisfied. Furthermore, to

successfully implement the foregoing, the Debtor requests a waiver of the notice requirements under

Bankruptcy Rule 6004(a) and the ten day stay under Bankruptcy Rule 6004(h).

## VII.

### NOTICE WITH RESPECT TO EMERGENCY INTERIM

### FINANCING REQUEST AND FINAL HEARING

Debtor submits that the exigencies of this case and Debtor's immediate need for financing do

not permit broad notice of Debtor's request for emergency interim financing pursuant to the Interim

Order. Therefore, Debtor has or will give notice of this Motion and the interim relief sought herein,

by hand delivery, fax or telephonic notice to (a) the Office of the United States Trustee; (b) all

Secured Creditors or their respective counsel; (c) Prime; (d) the Twenty Largest Creditors; and (e)

all persons requesting notice under Rule 2002 and all known parties holding secured claims

(collectively, the "Initial Notice Parties"). In light of the nature of the relief requested, the Debtor

submits that no other or further notice need be provided.

1    The Debtor further requests that the Court schedule the Final Hearing and authorize them to

2    mail copies of the signed Interim Order, which fixes the time, date and manner for the filing of

3    objections, to the Initial Notice Parties and (i) any party that has filed prior to such date a request for

4    notices with this Court; (ii) the twenty largest creditors or counsel for any official committee(s), if

5    any; (iii) the Securities and Exchange Commission, (iv) the Internal Revenue Service and (v) any

6    Secured Creditors or their respective counsel.

7    No previous request for the relief sought herein has been made by the Debtor to this or any

8    other Court.

9    **VIII.**

10    **CONCLUSION**

11    **WHEREFORE**, Debtor respectfully requests that the Court (i) enter the Interim Order

12    authorizing, *inter alia*, the Debtor to obtain financing pursuant to the DIP Facility on an emergency

13    interim basis through the conclusion of the Final Hearing on the terms set forth herein and in the DIP

14    Financing Agreement, (ii) set the date for a final hearing on the relief sought herein; (iii) enter a

15    Final Order authorizing the Debtor to obtain financing under the DIP Facility on a permanent basis

16    on the terms set forth herein and in the DIP Financing Agreement, (iv) grant all related relief

17    requested in this Motion, and (v) grant the Debtor such other or further relief as may be just and

18    proper.

19

20    Dated:    September 13, 2010

PACHULSKI STANG ZIEHL & JONES LLP

21    By    /s/ *Samuel R. Maizel*
Samuel R. Maizel (CA Bar No. 189301)

22    [Proposed ] Attorneys for Victor Valley
Community Hospital, Debtor and Debtor in
Possession

23

24

25

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# EXHIBIT A

1  | Samuel R. Maizel (CA Bar No. 189301)
   | Mary D. Lane (CA Bar No. 71592)
2  | PACHULSKI STANG ZIEHL & JONES LLP
   | 10100 Santa Monica Blvd., 11th Floor
3  | Los Angeles, California  90067-4100
   | Telephone: 310/277-6910
4  | Facsimile:  310/201-0760
5  | E-mail:      smaizel@pszjlaw.com
   |              mlane@pszjlaw.com
6
   | Proposed Attorneys for Victor Valley Community Hospital
7

8                    **UNITED STATES BANKRUPTCY COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10                            **RIVERSIDE DIVISION**

11

12  | In re                          | Case No.

13  | **VICTOR VALLEY COMMUNITY**     | Chapter 11
    | **HOSPITAL, a California non profit**
14  | **public benefit corporation.,**    | **INTERIM ORDER GRANTING DEBTOR'S**
    |                                 | **EMERGENCY MOTION FOR ORDERS (A)**
15  |                Debtor.          | **AUTHORIZING DEBTOR TO OBTAIN**
    |                                 | **POSTPETITION FINANCING AND**
16  |                                 | **GRANTING LIENS AND SUPERPRIORITY**
    |                                 | **ADMINISTRATIVE EXPENSE STATUS**
17  |                                 | **PURSUANT TO 11 U.S.C. § 364; AND (B)**
    |                                 | **SCHEDULING A FINAL HEARING AND**
18  |                                 | **ESTABLISHING RELATED NOTICE**
    |                                 | **REQUIREMENTS**
19

20  |                                 | Interim Hearing:
    |                                 | Date:      TBD
21  |                                 | Time:      TBD
    |                                 | Place:     U.S. Bankruptcy Court
22  |                                 |            3420 Twelfth Street
    |                                 |            Riverside, CA 92501-3819
23  |                                 | Judge:     TBD

24

25

26

27

28

SHULMAN HODGES &
BASTIAN LLP
26632 Towne Centre Drive
Suite 300
Foothill Ranch, CA 92610

1    This matter came before the Court on the "Emergency Motion for Orders (A)

2  Authorizing Debtor to Obtain Post-Petition Financing and Granting Super-Priority

3  Administrative Expense Status Pursuant to 11 U.S.C. § 364, and (B) Scheduling a Final Hearing

4  and Establishing Related Notice Requirements (the "DIP Financing Motion") filed by debtor and

5  debtor in possession Victor Valley Community Hospital ("Debtor").

6    Having reviewed the DIP Financing Motion, the Declaration of Edward T. Matthews, all

7  matters brought to the Court's attention at the preliminary hearing, which was held on September

8  15, 2010 (the "Interim Hearing"), and after due deliberation and consideration, the Court makes

9  the following findings of fact and conclusions of law:

10    **THE COURT HEREBY FINDS AND DETERMINES AS FOLLOWS:**

11    A.    On September 13, 2010 ("Petition Date") the Debtor filed a voluntary petition

12  with this Court for relief under chapter 11 of the Bankruptcy Code commencing this chapter 11

13  case (the "Chapter 11 Case").

14    B.    The Debtor has retained possession of its property, and continues the operation

15  and management of its businesses as debtor-in-possession pursuant to Bankruptcy Code sections

16  1107 and 1108.  No trustee or examiner has been appointed in the Chapter 11 Case.

17    C.    The Court has jurisdiction over the Chapter 11 Case, the parties and the Debtor's

18  property pursuant to 28 U.S.C. §§ 157(b) and 1334.  This is a core proceeding pursuant to 28

19  U.S.C. § 157(b)(2).  Venue for the Chapter 11 Case and the DIP Financing Motion is proper

20  under 28 U.S.C. §§ 1408 and 1409.

21    D.    An ongoing need exists for the Debtor to obtain financing of the type sought in

22  the DIP Financing Motion, to continue the operation of its business as debtor-in-possession

23  under chapter 11 of the Bankruptcy Code, to minimize the disruption of its operations as a

24  "going concern," and to reassure its vendors, customers, employees and other constituents,

25  including physicians and patients, of the Debtor's continued viability.

26    E.    Debtor has been unable to obtain financing in the form of unsecured credit

27  allowable under Bankruptcy Code section 503(b)(1) as an administrative expense, or solely in

28  exchange for the grant of a administrative expense priority pursuant to Bankruptcy Code section

364(c)(1). The Debtor is unable to obtain financing other than from Prime Healthcare Services Foundation, Inc. ("DIP Lender")in the form of a credit facility secured by liens in chapter 5 avoidance actions and liens in the Debtor's other assets junior to existing liens on property of its estate pursuant to Bankruptcy Code sections 364(c)(2) and (c)(3).  Within the timeframe required to avoid immediate and irreparable harm, the Debtor can obtain financing in the amounts required only by the grant of liens as hereinafter described.

G.    The Debtor has requested that DIP Lender make available to the Debtor a revolving credit facility (the "DIP Facility") in a maximum principal amount at any time outstanding of up to Three Million Two Hundred Thousand Dollars ($3,200,000), the proceeds of which shall be used by the Debtor only to the extent that the Debtor's receipts are insufficient to pay operating expenses of the Debtor and only to the extent permitted under that certain Post-Petition Revolving Credit and Security Agreement, a copy of which was attached to the DIP Financing Motion.  That agreement, together with all schedules, exhibits and annexes thereto, and as at any time amended or restated, is referred to herein as the "DIP Loan Agreement".

H.    A condition to the willingness of DIP Lender to establish the DIP Facility is that, as security for the prompt payment of all DIP loans, all interest, fees, costs, expenses, including attorneys' fees, and other charges at any time payable by the Debtor under the DIP Loan Agreement, Debtor shall provide DIP Lender  with:

(i)    a first priority security interest in and lien upon, and pledges to DIP Lender, all of Debtor's right, title and interest in any claims arising under Bankruptcy Code sections 502(d), 544, 545, 547, 548, 549, 550 or 553 ("Avoidance Claims");

(ii)    a second security interest in and lien upon, and pledge to DIP Lender of, all of Debtor's right, title and interest in and to all of its personal property and real property assets, whether now owned or hereafter acquired, including, without limitation, all of the Debtor's tangible personal property, all present and future Goods, Inventory, Equipment (including items of Equipment which are or become Fixtures), Computer Hardware and Software, now owned or

hereafter acquired; all of the Debtor's intangible personal property, including, without limitation all present and future Accounts, securities, contract rights, Permits, General Intangibles, Intellectual Property, Chattel Paper, Documents, Instruments, Deposit Accounts, Investment Property, Letter-of-Credit Rights and Supporting Obligations, rights to the payment of money or other forms of consideration of any kind, tax refunds and insurance proceeds (including, without limitation, the proceeds of any life insurance policy), now owned or hereafter acquired, all rights and interests in Distressed Hospital Funds, all rights and interests in Quality Assurance Fee funds; any and all additions and accessions to any of the foregoing, and any and all replacements, products and proceeds (including insurance proceeds) of any of the foregoing, and all intangible and tangible personal property relating to or arising out of any of the foregoing; all of the Debtor's present and future Government Contracts and rights thereunder and the related Government Accounts and proceeds thereof, now or hereafter owned or acquired by the Debtor; provided, however, that DIP Lender shall not have a security interest in any rights under any Government Contract of the Debtor or in the related Government Account where the taking of such security interest is a violation of an express prohibition contained in the Government Contract (for purposes of this limitation, the fact that a Government Contract is subject to, or otherwise refers to, Title 31, § 3727 or Title 41, § 15 of the United States Code shall not be deemed an express prohibition against assignment thereof) or is prohibited by applicable law, unless in any case consent is otherwise validly obtained. The foregoing collectively referred to as the "Collateral".

(iii) an allowed super-priority administrative expense claim (the "DIP Super-Priority Claim") with priority in the Debtor's case under Bankruptcy Code Sections 364(b), 503(b), and 507(b) and otherwise over all administrative expense claims and unsecured claims against the Debtor and its estate, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation,

1 administrative expenses of the kinds specified in, arising, or ordered pursuant to

2 sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to entry of the

3 Final Order), 507(a), 507(b), 546(c), 546(d), 726(b), 1113, and 1114, whether or

4 not such expenses or claims may become secured by a judgment lien or other non-

5 consensual lien, levy or attachment.

6   **NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED**,

7 as follows:

8   **1.**  **Disposition.** The DIP Financing Motion is hereby granted on an interim basis to

9 the extent and subject to the terms set forth herein, with the foregoing findings incorporated

10 herein by reference. Any objections to the DIP Financing Motion that have not previously been

11 withdrawn or resolved are hereby overruled. This Order shall be valid, binding on all parties-in-

12 interest and fully effective immediately upon entry.

13   **2.**  **Good Cause.** The ability of the Debtor to obtain sufficient working capital and

14 liquidity under the DIP Loan Agreement is vital to the Debtor's estate, the physicians and

15 patients that the Debtor serves, and the Debtor's creditors, so that the Debtor can continue to

16 operate its business in the ordinary course. The preservation of the going concern value of the

17 Debtor's business is critical to any successful reorganization. The continued operation of the

18 Debtor's hospital facility and emergency room benefits the community in which the Debtor

19 operates, as well as the physicians and patients that the Debtor serves. The Debtor's estate will be

20 immediately and irreparably harmed if this Order is not promptly entered. Accordingly, good

21 cause has been shown for the granting of the final relief sought in the DIP Financing Motion.

22   **3.**  **Good Faith.** Based upon the record before the Court, the DIP Loan Agreement

23 and this Order have been negotiated in good faith and at arm's-length between the Debtor and

24 DIP Lender. Any loans and/or other financial accommodations made to the Debtor by DIP

25 Lender thereunder shall be deemed to have been extended by DIP Lender in good faith, as that

26 term is used in Bankruptcy Code section 364(e), and DIP Lender shall be entitled to all

27 protections afforded by Bankruptcy Code section 364(e).

28

**SHULMAN HODGES &
BASTIAN LLP**
26632 Towne Centre Drive
Suite 300
Foothill Ranch, CA 92610

4. **Authorization of Interim Borrowing.** The Debtor's execution of the DIP Loan Agreement is hereby authorized. Upon entry of this Order, the Debtor is immediately authorized to (a) obtain credit extensions pursuant to the DIP Loan Agreement and to incur any and all liabilities and obligations thereunder and to pay all interest, fees, costs, expenses (including reasonable attorneys' fees) and other obligations provided for under the DIP Loan Agreement, and (b) satisfy all conditions precedent and perform all obligations hereunder and thereunder in accordance with the terms hereof and thereof. DIP Lender shall have no obligation or responsibility to monitor the Debtor's use of the DIP loans and may rely upon the Debtor's representations that the amount of credit extensions requested at any time, and the use thereof, are in accordance with the requirements of this Order, the DIP Loan Agreement and Bankruptcy Rule 4001(c)(2). All reasonable fees payable, expenses and/or costs reimbursable under the DIP Loan Agreement, this Order or otherwise by the Debtor to DIP Lender are approved. The Debtor is authorized and directed to pay all of the foregoing, in accordance with the terms of the DIP Loan Agreement and this Order, without the necessity of the Debtor or DIP Lender filing with the Court any further motion, notice or application for approval or payment thereof. Upon payment of such fees, such fees shall be deemed fully earned.

5. **Authority to Execute and Deliver Necessary Documents.** The DIP Loan Agreement constitutes a valid and binding obligation of the Debtor, enforceable against the Debtor in accordance with its terms. The Debtor is authorized to do and perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution of security agreements pledge agreements, mortgages, deeds of trust, financing statements and intellectual property filings), and to pay all filing and recording fees, in each case as may be necessary to give effect to any of the terms and conditions of the DIP Loan Agreement, to perfect the DIP Liens (as hereinafter defined) and as otherwise required or contemplated by the DIP Loan Agreement.

6. **Amendments.** The Debtor and DIP Lender are authorized to implement, in accordance with the terms of the DIP Loan Agreement, any amendments to and modifications of any of the DIP Loan Agreement without further order of the Court, subject to the following

1  conditions: (a) the amendment or modification must not constitute a material change (as

2  hereinafter defined) to the terms of the DIP Loan Agreement, (b) copies of the amendment or

3  modification must be served upon counsel for the Committee (if any), the U.S. Trustee, and other

4  interested parties that specifically make a written request for such notice to counsel for DIP

5  Lender, and (c) notice of the amendment must be filed with the Court. Any amendment or

6  modification that constitutes a material change must be approved by the Court (and, for purposes

7  hereof, a "material change" shall mean a change that operates to shorten the maturity of the DIP

8  Facility, increase the aggregate amount of the commitments under the DIP Facility, increase the

9  rate of interest other than as currently provided in or contemplated by the DIP Loan Agreement,

10  add specific Events of Default or enlarge the nature and extent of default remedies available to

11  DIP Lender following an Event of Default).  A modification to or extension of the Budget that

12  does not increase the $3.2 million aggregate amount of the commitments under the DIP Facility

13  shall not constitute a "material change" requiring Court approval.

14        **7.**    **Reimbursement of Expenses.**  All reasonable costs and expenses incurred by

15  DIP Lender in connection with the negotiation and drafting the DIP Loan Agreement or any

16  amendments or modifications thereto, the preservation, perfection, protection and enforcement of

17  DIP Lender's rights hereunder or under the DIP Loan Agreement, including, without limitation,

18  all filing and recording fees or taxes and fees and expenses of attorneys, accountants, appraisers

19  and other professionals incurred by DIP Lender in connection with any of the foregoing, whether

20  any of the foregoing were incurred prior to or after the Petition Date, shall be paid by the Debtor

21  in accordance with the terms of the DIP Loan Agreement and this Order.  No reasonable costs,

22  fees or expenses of the DIP Lender's professionals shall be subject to Court approval or U.S.

23  Trustee guidelines, and no recipient of any payment thereof shall be required to file with respect

24  thereto any interim or final fee application with the Court.

25        **8.**    **DIP Liens.**  All credit extensions, together with all interest, fees, expenses

26  (including attorneys' fees) and other charges, at any time or times payable by the Debtor to DIP

27  Lender in connection therewith or otherwise pursuant to the DIP Loan Agreement (collectively,

28  "Obligations,) shall be, and hereby are, secured by security interests and liens in favor of DIP

1  Lender with respect to all of the Collateral, as set forth in Section H above.  Pursuant to

2  Bankruptcy Code section 364(c)(3), DIP Lender shall have a perfected second priority security

3  interests in and liens upon all Collateral as defined above.  All of the security interests and liens

4  referred to above, together with those granted and conveyed pursuant to the DIP Loan

5  Agreement, are referred to herein as, the "DIP Liens."

6       **9.**    **Super priority Claim.**

7       (a)    DIP Lender shall be deemed to have an allowed super priority administrative

8  expense claim (the "Super-priority Claim") pursuant to Bankruptcy Code section 364(c) having

9  priority over all other administrative expenses in the Chapter 11 Cases of the kind specified in or

10  arising or ordered pursuant to Bankruptcy Code sections 105(a), 326, 328, 330, 331, 503(a),

11  503(b), 506(c) (upon entry of final order with respect to the DIP Financing Motion), 507(a),

12  507(b), 546(c), 726 or 1114, whether or not such expenses or claims may become secured by a

13  judgment lien or other non-consensual lien, levy, attachment or otherwise.

14       (b)    No lien or security interest granted to DIP Lender hereunder, including the DIP

15  Liens, shall (i) be subject to any post-petition lien or security interest that is (A) avoided and

16  preserved for the benefit of the Debtor's estate under Bankruptcy Code section 551, or (B)

17  subject to subordination under Bankruptcy Code section 510, or (ii) hereafter be subordinated to

18  or made pari passu with any other lien or security interest under Bankruptcy Code section

19  364(d).

20       (c)    The DIP Liens and the Super-priority Claim and other rights and remedies granted

21  to DIP Lender under this Order shall continue in this case notwithstanding any conversion

22  thereof, and such liens and security interests shall maintain their priority as provided in this

23  Order until the DIP Lender has been indefeasibly satisfied in full in cash and the commitment is

24  terminated in accordance with the terms of the DIP Loan Agreement.

25       **10.**    **No Surcharge.**  Subject to entry of a final order, in no event shall any costs or

26  expenses of administration be imposed upon DIP Lender or any of the Collateral pursuant to

27  Bankruptcy Code sections 506(c), 105(a), or otherwise, without the prior written consent of DIP

28  Lender, and no such consent shall be implied from any action, inaction or acquiescence by DIP

1    Lender. DIP Lender shall not be subject to the equitable doctrine of "marshaling" or any similar

2    doctrine with respect to the Collateral.

3        **11.**    **Repayment.**   The Debtor shall be liable to make payments pursuant to the DIP

4    Loan Agreement without any right of rescission, setoff, counterclaim or defense for any reason,

5    unless and to the extent expressly otherwise agreed to in writing by DIP Lender.

6        **12.**    **Preservation of Rights Granted Under This Order.**

7        (a)    During this Chapter 11 Case, or in any successor case, there shall not be entered

8    any order that authorizes the obtaining of credit or the incurrence of indebtedness by the Debtor

9    (or any trustee or examiner) that is (i) secured by a security, mortgage or collateral interest or

10   lien on all or any part of the Collateral, that is equal or senior to the DIP Liens, or (ii) entitled to

11   priority administrative status that is equal or senior to the Super-priority Claim granted to DIP

12   Lender herein.

13       (b)    If the Chapter 11 Case is dismissed, converted or substantively consolidated, then

14   neither the entry of this Order nor the dismissal, conversion or substantive consolidation of any

15   such Chapter 11 Case shall affect the rights of DIP Lender under the DIP Loan Agreement or

16   this Order, and all of the respective rights and remedies thereunder of DIP Lender shall remain in

17   full force and effect as if this Chapter 11 Case had been dismissed, converted, or substantively

18   consolidated. The Debtor shall not seek, and it shall constitute an Event of Default if the Debtor

19   seeks, or if there is entered, any order dismissing this Chapter 11 Case. If an order dismissing

20   this Chapter 11 Case is at any time entered then such order shall provide that the liens and

21   security interests granted to DIP Lender hereunder and in the DIP Loan Agreement, as the case

22   may be, shall continue in full force and effect, shall remain binding on all parties-in-interest and

23   shall maintain their priorities as provided in this Order.

24       (c)    The provisions of this Order, and any actions taken pursuant hereto, shall survive

25   the entry of any order confirming any plan of reorganization for the Debtor or converting the

26   Chapter 11 Case to chapter 7.  This Court shall not enter a confirmation order or dismissal order

27   that shall alter the terms of repayment from those set forth in the DIP Loan Agreement and this

28   Order, unless otherwise agreed to in writing by the DIP Lender.

1    (d)    The Post-Petition Debt shall not be discharged by the entry of any order

2 confirming a plan of reorganization in any of the Chapter 11 Cases and, pursuant to Bankruptcy

3 Code section 1141(d)(4), the Debtor has waived such discharge.

4    **13.**    **Automatic Perfection of Liens.**

5    (a)    The DIP Liens shall be deemed valid, binding, enforceable and perfected upon

6 entry of this Order.  DIP Lender shall not be required to file any UCC-1 financing statements

7 notices of lien or any similar document or take any other action (including possession of any of

8 the Collateral in order to perfect any of the DIP Liens.  If DIP Lender chooses, in its discretion,

9 to file any such UCC-1 financing statements, or take any other action to perfect any part of the

10 DIP Liens, the Debtor and its officers shall cooperate by executing any documents or instruments

11 that DIP Lender shall reasonably request, and all such documents and instruments shall be

12 deemed to have been filed or recorded at the time and on the date of entry of this Order.  DIP

13 Lender may, in its sole discretion, file a certified copy of this Order in any filing office in each

14 jurisdiction in which the Debtor is organized or has or maintains any Collateral or an office, and

15 each filing office is directed to accept such certified copy of either or both of such Order for

16 filing and recording without the imposition of any stamp, intangibles, recording or similar tax in

17 accordance with the provisions of Bankruptcy Code section 1146.

18    (b)    To the extent permitted by applicable law, upon entry of this Order, pursuant to

19 Bankruptcy Code sections 363(b)(1) and 364(c)(2), any provisions in any of the leases of

20 nonresidential real property under which the Debtor is a lessee (each, a "Lease" and collectively,

21 the "Leases") and any provisions in any of the license agreements under which the Debtor is a

22 licensee, that require the consent or approval of one or more of the Debtor's landlords or

23 licensors, as the case may be, in order for the Debtor to pledge or mortgage its interest in such

24 Lease or other agreement, are and shall be deemed inconsistent with the provisions of the

25 Bankruptcy Code and are and shall have no force and effect with respect to the transactions

26 granting liens, security interests and mortgages by the Debtor in accordance with the DIP Loan

27 Agreement.

28

**SHULMAN HODGES &**
**BASTIAN LLP**
26632 Towne Centre Drive
Suite 300
Foothill Ranch, CA 92610

1    **14.    Modification of Automatic Stay.**    The    automatic    stay    provisions    of

2    Bankruptcy Code section 362, to the extent applicable, are hereby lifted, vacated, modified

3    and/or terminated as to DIP Lender to the extent necessary to implement the provisions of this

4    Order and the DIP Loan Agreement.

5

6    **15.    Subsequent Reversal or Modification.**    Notwithstanding any reversal, stay,

7    modification or vacatur of this Order, any post-petition indebtedness, obligation or liability

8    incurred by the Debtor to DIP Lender under the DIP Loan Agreement prior to the effective date

9    of such action shall be governed in all respects by the original provisions of this Order, and DIP

10    Lender shall be entitled to all of the rights, remedies, privileges, benefits and priorities granted

11    herein and pursuant to the DIP Loan Agreement, with respect to any such indebtedness,

12    obligation or liability.

13    **16.    Successors and Assigns.**    The provisions of this Order shall be binding upon all

14    parties-in-interest in this Chapter 11 Case, including, without limitation, DIP Lender, the Debtor

15    and their respective successors and assigns and shall inure to the benefit of DIP Lender, the

16    Debtor and their respective successors and assigns, including, without limitation, any trustee,

17    examiner, responsible officer, estate administrator or representative, or similar person appointed

18    in a case for the Debtor under any chapter of the Bankruptcy Code or in any successor

19    proceeding, whether under the Bankruptcy Code or otherwise.  In no event shall DIP Lender

20    have any obligation to make credit extensions to any trustee appointed for the estate.

21    **17.    Priority of Terms.**    To the extent of any conflict between or among the express

22    terms or provisions of the DIP Loan Agreement, the DIP Financing Motion, any order of this

23    Court, or any other agreements, the terms and provisions of this Order shall govern and control.

24    **18.    Entry of Order.**  This Order shall take effect immediately upon execution hereof,

25    notwithstanding the possible application of Bankruptcy Rules 4001(a)(3), 6004(g), 7062. 9014,

26    or otherwise, and the Clerk of the Court is hereby directed to enter this Order on the Court's

27    docket in these Chapter 11 Cases.

28

# EXHIBIT B

# POSTPETITION REVOLVING CREDIT AND SECURITY AGREEMENT

**between**

## VICTOR VALLEY COMMUNITY HOSPITAL, a California non profit public benefit corporation
### as
### BORROWER

**and**

### Prime Healthcare Services Foundation, Inc.
### as LENDER

**Dated as of**
**_____, 2010**

POSTPETITION REVOLVING CREDIT AND SECURITY AGREEMENT

TABLE OF CONTENTS

Page(s)

I.      DEFINITIONS…………………………………………………………………….

II.     ADVANCES, PAYMENT AND INTEREST…………………………….................
        2.1     The Revolving Facility……………………………………………………......
        2.2     Maturity………………………………………………………………….....
        2.3     Interest on the Advances……………………………………………………
        2.4     Revolving Facility Disbursements; Requirement to Deliver Borrowing
                Certificate…………………………………………………………………..
        2.5     [Intentionally Deleted] …………………………………………………..
        2.6     Promise to Pay; Manner of Payment………………………………………......
        2.7     Repayment of Excess Advances……………………………………………
        2.8     Payments by Lender……………………………………………………..
        2.9     [Intentionally Deleted] ………………………………………….......
        2.10    Grant of Security Interest; Collateral……………………………………….
        2.11    Collateral Administration………………………………………………...
        2.12    [Intentionally Deleted] …………………………………………
        2.13    Evidence of Loans………………………………………………………….

III.    FEES AND OTHER CHARGES…………………………………………………….
        3.1     [Intentionally Deleted] ……………………………………………………
        3.2     [Intentionally Deleted] ……………………………………………………
        3.3     [Intentionally Deleted] …………………………………………….......
        3.4     [Intentionally Deleted] ……………………………………………………..
        3.5     [Intentionally Deleted]…………………………………………….
        3.6     Default Rate of Interest……………………………………………………..

IV.     CONDITIONS PRECEDENT………………………………………………………..
        4.1     Conditions Precedent to Initial Advance and Closing……………………….......
        4.2     Post-Closing Conditions……………………………………………………
        4.3     Conditions Precedent to Each Advance……………………………………….

V.      REPRESENTATIONS AND WARRANTIES……………………………………….
        5.1     Organization and Authority………………………………………………….......
        5.2     DIP Loan Documents……………………………………………………………
        5.3     Subsidiaries, Capitalization and Ownership Interests……………………………
        5.4     Properties………………………………………………………………………..
        5.5     Other Agreements………………………………………………………………..
        5.6     Litigation………………………………………………………………….......
        5.7     Hazardous Materials……………………………………………………………

5.8  Potential Tax Liability; Tax Returns; Governmental Reports……………………........
5.9  Medicare Cost Reports……………………………………………………………….......
5.10  Compliance with Law……………………………………………………………………
5.11  Intellectual Property…………………………………………………………………….......
5.12  Licenses and Permits; Labor…………………………………………………………..
5.13  No Default…………………………………………………………………………………..
5.14  No Withholding of Reimbursements…………………………………………………..
5.15  [Intentionally Deleted]…………………………………………………………………..
5.16  Healthcare Matters……………………………………………………………...............
5.17  Hospital Operations/Litigation………………………………………………………...
5.18  Insurance…………………………………………………………...............................
5.19  Names; Location of Offices, Records and Collateral……………………………………
5.20  [Intentionally Deleted] ……………………………………………
5.21  Accounts         …………………………………………………...............
5.22  [Intentionally Deleted] …………………………………………………...............
5.23  Survival………………………………………………...............................................

VI.  AFFIRMATIVE COVENANTS……………………………………………………...........
6.1  Financial Statements, Borrowing Certificate, Financial
Reports and Other Information…………………………………………………..
6.2  Payment of Obligations……………………………………………………...............
6.3  Conduct of Business and Maintenance of Existence and Assets…………………..
6.4  Compliance with Legal and Other Obligations…………………………………….
6.5  Insurance…………………………………………………………...............................
6.6  [Intentionally Deleted] ……………………………………………
6.7  Inspection; Periodic Audits……………………………………………………….......
6.8  Further Assurances; Post Closing……………………………………………………..
6.9  Payment of Indebtedness………………………………………………………...........
6.10  Lien Searches………………………………………………………….......................
6.11  Use of Proceeds  …………………………………………………...................
6.12  Collateral Documents; Security Interest in Collateral……………………………...
6.13  [Intentionally Deleted] …………………………………………………...............
6.14  Taxes and Other Charges……………………………………………………………..
6.15  [Intentionally Deleted] …………………………………………………...............
6.16  Payroll Taxes………………………………………………………….......................
6.17  [Intentionally Deleted] …………………………………………………..
6.18.  [Intentionally Deleted] …………………………………………………...............

VII.  NEGATIVE COVENANTS…………………………………………………...................
7.1  Financial Covenants………………………………………………………………….
7.2  Permitted Indebtedness……………………………………………………………….
7.3  Permitted Liens……………………………………………………………………….
7.4  Investments; New Facilities or Collateral; Subsidiaries……………………………
7.5  Dividends; Redemptions; Restricted Payments……………………………………
7.6  [Intentionally Deleted] ………………………………………………………...

3

7.7     Charter Documents; Fiscal Year; Name; Jurisdiction of Organization; Dissolution;
        Use of Proceeds…………………………………………………………………………..
7.8     Truth of Statements…………………………………………………………………
7.9     IRS Form……………………………………………………………………………
7.10    Transfer of Assets…………………………………………………………………..
7.11    Modification of Agreements………………………………………………………..
7.12    Payment on Permitted Subordinated Debt………………………………………….
7.13    Chapter 11 Claims………………………………………………………………….
7.14    Filing of Motions and Applications………………………………………………...
7.15.   [Intentionally Deleted]        ………………………………………………………...

VIII.   EVENTS OF DEFAULT……………………………………………………………………

IX.     RIGHTS AND REMEDIES AFTER DEFAULT………………………………………….
9.1     Rights and Remedies………………………………………………………………..
9.2     Application of Proceeds…………………………………………………………….
9.3     Rights and Remedies not Exclusive………………………………………………...

X.      WAIVERS AND JUDICIAL PROCEEDINGS…………………………………………….
10.1    [Intentionally Deleted]
………………………………………………………………………………..
10.2    Delay; No Waiver of Defaults……………………………………………………...
10.3    Jury Trial Waiver…………………………………………………………………...

XL      EFFECTIVE DATE AND TERMINATION……………………………………………….
11.1    Termination and Effective Date Thereof…………………………………………...
11.2    Survival……………………………………………………………………………..

XII.    MISCELLANEOUS………………………………………………………………………...
12.1    Governing Law; Jurisdiction; Service of Process; Venue………………………….
12.2    Successors and Assigns; Participations; New Lenders……………………………..
12.3    Application of Payments…………………………………………………………….
12.4    Indemnity…………………………………………………………………………...
12.5    Notice……………………………………………………………………………….
12.6    Severability; Captions; Counterparts; Facsimile Signatures………………………..
12.7    Expenses…………………………………………………………………………….
12.8    Entire Agreement…………………………………………………………………...
12.9    [Intentionally Deleted] ……………………………………………………..
12.10   Confidentiality and Publicity……………………………………………………….
12.11   Release of Lender…………………………………………………………………..
12.12   Acknowledgements…………………………………………………………………
12.13   Bankruptcy Court Orders Paramount……………………………………………….

XII     Forgiveness Upon Acquisition

4

**POSTPETITION REVOLVING CREDIT AND SECURITY AGREEMENT**

THIS POSTPETITION REVOLVING CREDIT AND SECURITY AGREEMENT (the "Agreement) dated as of _____ is entered into by and between VICTOR VALLEY COMMUNITY HOSPITAL, a California non profit public benefit corporation as debtor and debtor-in-possession (the "Borrower"), and Prime Healthcare Services Foundation, Inc. (the "Lender").

      **WHEREAS**, on the Petition Date Borrower commenced a case (the "**Bankruptcy Case**") under Chapter 11 of Title 11, United States Code (as amended, the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Central Distr.ict of California (together with any other court having Jurisdiction over the Bankruptcy Case or any proceedings therein from time to time, the "**Bankruptcy Court**") and Borrower is continuing to operate its business and manage its properties as a debtor and debtor-in-possession under Sections 1107 and 1108 of the Bankruptcy Code;

      **WHEREAS**, Borrower has requested that Lender make available to Borrower a revolving credit facility (the "**Revolving Facility**") in a maximum principal amount at any time outstanding of up to Three Million Two Hundred Thousand Dollars ($3,200,000) (the "**Facility Cap**"), the proceeds of which shall be used by Borrower, and Borrower alone, exclusively for the following purposes and only to the extent that Borrower's receipts are insufficient to pay operating expenses of the Borrower, for the generation of receivables, and for other lawful· purposes as permitted under this Agreement and in accordance with the Budget (set forth as Exhibit C hereof); and (b) to pay any of the Obligations; and

      **WHEREAS**, Lender is willing to make the Revolving Facility available to Borrower upon the terms and· subject to the conditions set forth in this Agreement, and subject to the terms and conditions· set forth in the Financing Order.

      NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, .the receipt and adequacy of which hereby are acknowledged, Borrower and Lender hereby agree as follows:

**I.**

**DEFINITIONS**

For purposes of this Agreement, in addition to the definitions above and elsewhere in this Agreement, the terms listed in <u>Appendix B</u> hereto shall have the meanings given such terms in <u>Appendix B</u>, which is incorporated herein and made a part hereof. All capitalized terms used herein that are not specifically defined herein (including, without limitation, Goods, Fixtures, General Intangibles, Chattel Paper, Investment Property, Documents, Commercial Tort Claims, Instruments, Deposit Accounts, Letter-of-Credit Rights and Supporting Obligations) shall have the meanings therefore provided in Article 9 of the UCC in effect on the date hereof (or as amended and in effect from time to time as approved by Lender) to the extent the same are used or defined therein. Unless otherwise specified herein or in <u>Appendix B</u>, any agreement or

5

contract referred to herein or in <u>Appendix B</u> shall mean such agreement as it may be, or have been modified, amended or supplemented from time to time in accordance with its terms. Unless otherwise specified, as used in the DIP Loan Documents or in any certificate, report, instrument or other document made or delivered pursuant to any of the DIP Loan Documents, all accounting terms not defined in <u>Appendix B</u> or elsewhere in this Agreement shall have the meanings given to such terms in and shall be interpreted in accordance with GAAP.

## II.
## ADVANCES, PAYMENT AND INTEREST

### 2.1    The Revolving Facility

Subject to the provisions of this Agreement and the Financing Orders, Lender shall make Advances to Borrower under the Revolving Facility from time to time during the Term, <u>provided that</u>, notwithstanding any other provision of this Agreement and the Financing Orders, the aggregate amount of all Advances at anyone time outstanding under the Revolving Facility shall not exceed the lesser of (a) the Facility Cap, or (b) the amount set forth for such period,. in the Budget; however; Borrower shall be permitted a variance of five percent (5%), on a rolling three-week, non-cumulative basis, with respect to each expense line item and Total Expenses and amounts not spent in any prior measurement period may be spent in any subsequent measurement period. The Revolving Facility is a revolving credit facility, which may be drawn, repaid and redrawn, from time to time as permitted under this Agreement-and the Financing Orders.  This Revolving Facility is for the purpose of meeting the short fall between Borrowers receipts and expenses as set forth on the Budget.  Borrower's right to draw hereby and Lender's obligation to make Advances hereunder is subject to the application by Borrower of all receipts to the payment of items as set forth in the Budget.  Advances under the Revolving Facility automatically shall be made for the payment of interest, reasonable fees of Lender as set forth herein, and other amounts owing with respect to the Obligations on the date when due to the extent available and as provided for herein.

### 2.2    Maturity

All Advances and all other outstanding. Obligations under the Revolving Facility shall be immediately due and payable in full in cash, if not earlier in accordance with the terms of this Agreement and the Financing Orders, without further application to or order of the Bankruptcy Court, on the earlier of (i)  the effective date· of a plan reorganization for the Borrower; (ii) acceleration ·of maturity of the Obligations upon the occurrence of an Event of Default; (iii) the sale or liquidation of all or substantially all of the assets of the Borrower; (iv) twenty (20) days after the Bankruptcy Court enters an order (a) confirming a plan of reorganization for the Borrower that has not been approved in writing by Lender; or (b) granting a motion to sell substantially all of Borrower's assets pursuant to a transaction not approved in writing by Lender; (v) the date on which a plan or sale referred to in the prior subsection (iv) becomes effective or is consummated; or (v) December 13, 2010 (the date upon which the first of the foregoing occurs is referred to herein as the "**Maturity Date**").  Borrower expressly acknowledges and agrees that under no circumstances shall Lender have any obligation to extend, and Lender has made no commitment to extend, the Maturity Date beyond the deadlines set forth herein.

### 2.3    Interest on the Advances

Subject to Section 3.5. interest on outstanding Advances under the Revolving Facility shall be payable monthly in arrears on the first day of each calendar month at an annual rate equal to eight percent (8%) calculated on the basis of a 360-day year and for the actual number of calendar days elapsed in each interest calculation period. Interest accrued on each Advance under the Revolving Facility shall be due and payable on the first day of each calendar month, in accordance with the procedures provided for in <u>Section 2.5</u> and <u>Section 2.6</u>, commencing the first Business Day of the first calendar month following the Closing Date, and continuing until the later of the expiration of the Term and the full performance and irrevocable payment in full in cash of the Obligations and termination of this Agreement.

### 2.4    Revolving Facility Disbursements; Requirement to Deliver Borrowing Certificate

So long as no Default or Event of Default shall have occurred and be continuing, Borrower may give Lender irrevocable written notice requesting an Advance under the Revolving. Facility by delivering to Lender not later than 11:00 a.m. (California time) at least one Business Day prior to the proposed Business Day on which such requested Advance is to be made (the "**Borrowing Date**"), a completed Borrowing Certificate and relevant supporting documentation satisfactory to Lender, which shall (i) specify the proposed Borrowing Date of such Advance which shall be a Business Day, (ii) specify the principal amount of such requested Advance and (iii) certify the matters contained in <u>Section 4.2</u>. The amount of each Advance shall not exceed the amount set forth in the Budget for the applicable time period, and no Advance or portion thereof may be used for any purpose not expressly set forth in the Budget for the applicable time period. Each time a request for an Advance is made, and, in any event and regardless of whether an Advance is being requested, as and when required in accordance with Appendix C, until the Obligations are indefeasibly paid in cash in full and this Agreement is terminated, Borrower shall deliver to Lender a Borrowing Certificate which contains a detailed itemization of the proposed uses of the Advance (including the variance, if any, between any proposed expenditure and the amount set forth in the Budget with respect thereto) accompanied by a detailed aging and categorizing of Borrower's accounts receivable and such other supporting documentation with respect to the figures and information in the Borrowing Certificate as Lender shall reasonably request from a credit or security perspective or otherwise. On each Borrowing Date, Borrower irrevocably authorizes Lender to disburse the proceeds of the requested Advance to the Borrower's account(s) as set forth on <u>Schedule 2.4</u>, in all cases for credit to the Borrower (or to such other account as to which the Borrower shall instruct Lender) via Federal funds wire transfer no later than 3:00 p.m. (California time).

### 2.5    [INTENTIONALLY DELETED]

### 2.6    Promise to Pay; Manner of Payment

Borrower absolutely and unconditionally promises to pay principal, interest and all other amounts and Obligations payable hereunder, or under any other DIP Loan Document, without

any right of rescission and without any deduction whatsoever, including any deduction for any setoff, counterclaim or recoupment, and notwithstanding any damage to, defects in or destruction of the Collateral or any other event, including obsolescence of any property or improvements. All payments made by Borrower (other than .payments automatically paid through Advances under the Revolving Facility as provided herein), shall be made only by wire transfer on the date when due, without offset or counterclaim, in U.S. Dollars, in immediately available funds to such. Account as may be indicated in writing by Lender to Borrower from time to time. Any such payment received after 2:00 p.m. (California time) on the date when due shall be deemed received on the following Business Day. Whenever any payment hereunder shall be stated to be due or shall become due and payable on a day other than a Business Day, the due date thereof shall be extended to, and such payment shall be made on, the next succeeding Business Day, and such extension of time in such case shall be included in the computation of payment of any interest (at the interest rate then in effect during such extension) and/or fees, as the case may be.

**2.7    Repayment of Excess Advances**

Any balance of Advances under the Revolving Facility outstanding at any time in excess of the Facility Cap then in effect, shall' be immediately due and payable by Borrower without the necessity of any demand, at the Payment Office, whether or not a Default or Event of Default has occurred or is continuing and shall be paid in the manner specified in <u>Section 2.6</u>.

**2.8    Payments by Lender**

Should any amount required to be paid under any DIP Loan Document be unpaid when due, such amount may be paid by Lender, which payment shall be deemed a request for an Advance under the Revolving Facility as of the date such payment is due, and Borrower irrevocably authorizes disbursement of any such funds to Lender by way of direct payment of the relevant amount, interest or Obligations without necessity of any demand. No payment or prepayment of any amount by Lender or any other Person shall entitle any Person to be subrogated to the rights of Lender under any DIP Loan Document unless and until the Obligations have been fully performed and paid irrevocably in cash and this Agreement has been terminated. Any sums expended by Lender as a result of any Borrower's or any Guarantor's failure to pay, perform or comply with any DIP Loan Document or any of the Obligations may be charged to Borrower's account as an Advance under the Revolving Facility and added to the Obligations.

**2.9    [INTENTIONALLY DELETED]**

**2.10    Grant of Security Interest; Collateral; Superpriority Claim**

(a) To secure the payment and performance of the Obligations, the Borrower, upon entry of the Final Financing Order, as applicable, by the Bankruptcy Court, hereby grants to Lender:

(i)    a continuing first priority security interest in and Lien upon, and pledges to Lender, all of its right, title and interest in any claims arising under Bankruptcy Code sections

502(d), 544, 545, 547, 548, 549, 550 or 553, other than such claims against Prime (**"Avoidance Claims"**); and

(ii)    a continuing subordinate security interest in and Lien upon, and pledges to Lender, all of its right, title and interest in and to all of its personal property and assets except for real property assets, whether now owned or hereafter acquired, including, without limitation, the following which Liens and security interests shall have the priorities set forth in the Financing Orders:

(A)    all of Borrower's tangible personal property, including, without limitation, all present and future Goods, Inventory, Equipment (including items of Equipment which are or become Fixtures), Real Property and Computer Hardware and Software, now owned or hereafter acquired;

(B)    all of Borrower's intangible personal property, including, without limitation all present and future Accounts, securities, contract rights, Permits, General Intangibles, Intellectual Property, Chattel Paper, Documents, Instruments, Deposit Accounts (including the Lockbox Account), Investment Property, Letter-of-Credit Rights and Supporting Obligations, rights to the payment of money or other forms of consideration of any kind, tax refunds and insurance proceeds (including, without limitation, the proceeds of any life insurance policy), now owned or hereafter acquired, and all intangible and tangible personal property relating to or arising out of any of the foregoing;

(C)    all of Borrower's present and future Government Contracts and rights thereunder and the related Government Accounts and proceeds thereof, now or hereafter owned or acquired by Borrower; provided, however, that Lender shall not have a security interest in any rights under any Government Contract of Borrower or in the related Government Account where the taking of such security interest is a violation of an express prohibition contained in the Government Contract (for purposes of this limitation, the fact that a Government Contract is subject to, or otherwise refers to, Title 31, § 3727 or Title 41, § 15 of the United States Code shall not be deemed an express prohibition against assignment thereof) or is prohibited by applicable law, unless in any case consent is otherwise validly obtained;

(D)    all other rights and interests in property of the "estate" (within the meaning of the Bankruptcy Code) except as otherwise set forth in the Financing Orders; provided, however, that until the Final Financing Order has been entered, the liens and security interests conveyed pursuant to the DIP Loan Documents shall not attach to Avoidance Claims or Avoidance Claim Proceeds;

(E)    all other rights and interests in Distressed Hospital Funds;

(F)    all other rights and interests in Quality Assurance Fee funds; and

(G)    any and all additions and accessions to any of the foregoing, and any and all replacements, products and proceeds (including insurance proceeds) of any of the foregoing.

The foregoing collectively referred to as the "**Collateral**".

(b)    Notwithstanding the foregoing provisions of this <u>Section 2.10</u>, such grant of a security interest shall not extend to, and the term "Collateral" shall not include the Carve-Out as set forth in the Financing Orders.

(c)    As to all Collateral, including without limitation, all cash, cash equivalents and Commercial Tort Claims the title to which is held by Borrower, or the possession of which is held by Borrower in the form of a leasehold interest, Borrower hereby assigns and conveys as security, grants a security interest in, hypothecates, mortgages, pledges and sets over unto Lender all of the right, title and interest of Borrower in all of such Collateral, including without limitation, all cash, cash equivalents and Commercial Tort Claims and in all such leasehold interests; together in each case with all of the right, title and interest of Borrower in and to all, any lease or sublease thereof, all general intangibles relating thereto and all proceeds thereof, Borrower acknowledges that, pursuant to the Financing Orders, the Liens granted in favor of Lender in all of the Collateral shall be perfected .without the recordation of any UCC financing statements, notices of Lien or other instruments of mortgage or assignment.. Borrower further agrees that Lender is authorized to file or record financing statements with respect to the Collateral without the signature of Borrower in such Form and in such offices as Lender reasonably determines appropriate to further evidence the perfection of the security interests of Lender under this Agreement and to use the collateral description "all assets of the Debtor" in any such financing statements.

Borrower shall promptly notify Lender of any Commercial Tort Claims arising after the Closing Date in which it has an interest and shall provide all necessary information concerning each such Commercial Tort Claim, or upon any and all Commercial Tort Claims upon request by Lender, and make all necessary filings with respect thereto to perfect Lender's security interest therein.

The Liens, lien priority, administrative priorities and other rights and remedies granted to Lender in the Financing Orders and the other DIP Loan Documents (specifically including, but not limited to, the existence, perfection and priority of the Liens and security interests provided therein, and the administrative priority provided therein) shall not be modified, altered or impaired in any manner by another financing or extension of credit or incurrence of debt by Borrower (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by any other act or omission whatsoever until the full performance and irrevocable payment in full in cash of the Obligations and termination of this Agreement.

(d)    Upon the entry of the Interim Financing Order and the Final Financing Order by the Bankruptcy Court, the Obligations of the Borrower will constitute allowed administrative expenses in the Bankruptcy Case, having priority in payment over all other administrative expenses and unsecured claims against the Borrower now existing or hereafter arising, of any kind or nature whatsoever, including without limitation, all administrative expenses of the kind specified in, or arising or ordered under, Bankruptcy Code Sections 105, 326, 328, 503(b), 506(c),.507(a), 507(b), 546(c), 726 and 1114, subject, as to priority, only to the Carve-Out having priority of payment over the Obligations to the extent set forth in the

Financing Orders; provided, that the no administrative claim of Lender shall extend to the proceeds of Avoidance Claims.

### 2.11    Collateral Administration

(a)    All tangible Collateral granted by Borrower to Lender (except Deposit Accounts) will at all times be kept by Borrower at one of the locations set forth on <u>Schedule 5.19B</u> hereto and shall not, without thirty (30) calendar days prior written notice to Lender, be moved therefrom, and in any case shall- not be moved outside the State of California.

(b)    Borrower shall keep accurate and complete records of its Accounts and all payments and collections thereon and shall submit such records to Lender on such periodic bases as Lender may request.

(c)    Whether or not an Event of Default has occurred, any of Lender's officers, employees, representatives or agents shall have the right, at any time during normal business hours, and upon reasonable notice, in the name of Lender, any designee of Lender or Borrower, to verify the validity, amount or any other matter relating to any Accounts of Borrower. Borrower shall cooperate fully with Lender in an effort to facilitate and. promptly conclude- such verification process.

(d)    As and when determined by Lender in its reasonable discretion, Lender will perform the searches described in clauses (i) and (ii) below against each Borrower (the results of which are to be consistent with Borrower's representations and warranties under this Agreement), all at Borrowers' expense: (i) UCC searches with the Secretary of State of the Jurisdiction of organization of Borrower and each Guarantor, the Secretary of State and local filing offices of each jurisdiction where Borrowers maintain their respective executive offices, a place of business or assets; and (ii) judgment, federal tax lien and state tax lien searches, in each jurisdiction searched under clause (i) above.

(f)    Borrower, upon Lender's request, shall: (1) take all actions that may be lawfully required by Lender to create and perfect Lender's Lien on any Collateral and effectuate the intentions of the DIP Loan Documents; and (ii) immediately deliver to Lender all items for which Lender must receive possession to obtain a perfected security interest and all notes, certificates, and documents of title, Chattel Paper, warehouse receipts, Instruments, and any other similar instruments constituting Collateral.

### 2.12    [INTENTIONALLY DELETED]

### 2.13    Evidence of Loans

(a)    Lender shall maintain, in accordance with its usual practice, electronic or written records evidencing the indebtedness and obligations to such Lender resulting from each Loan made by such Lender from time to time, including without limitation, the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.

(b)     The entries made in the electronic or written records maintained pursuant to subsection (a) of this Section 2.13 (the "**Register**") shall be prima facie evidence of the existence and amounts of the obligations and indebtedness therein recorded; provided, however, that the failure of the Lender to maintain such records or any error therein shall not in any manner affect the obligations of the Borrower to repay the Loans or Obligations in accordance with their terms.

(c)     Lender will account to Borrower monthly with a statement of Advances under the Revolving Facility, and any charges and payments made pursuant to this Agreement.

(d)     Borrower agrees that:

(i)     upon written notice by Lender to the Borrower that a promissory note or other evidence of indebtedness is requested by Lender to evidence the Loans and other Obligations owing or payable to, or to be made by, such Lender, the Borrower shall promptly (and in any event within three (3) Business Days of any such request) execute and deliver to Lender an appropriate promissory note or notes in form and substance reasonably acceptable to the Lender and Borrower, payable to the order of Lender or in a principal amount equal to the amount of the Loans owing or payable to Lender;

(ii)     all references to "Notes" in the DIP Loan Documents shall mean Notes, if any, to the extent issued (and not returned to the Borrower for cancellation) hereunder, as the same may be amended, modified, divided, supplemented and/or restated from time to time; and

(iii)     upon Lender1s written request, and in any event within three (3) Business Days of any such request, Borrower shall execute and deliver to Lender new Notes and/or divide the Notes in exchange for the existing Notes in such smaller amounts or denominations as Lender shall specify in its sole and absolute discretion (including, without limitation, new Notes as a result of the mutilation, destruction, loss or theft of any Notes); provided, that the aggregate principal amount of such new Notes shall not exceed the aggregate principal amount of the Notes outstanding at the time such request is made; and provided, further, that such notes that are to be replaced shall then be deemed no longer outstanding hereunder and replaced by such new notes and returned to the Borrower within a reasonable period of time after Lender's receipt of the replacement notes.

## III.
## FEES AND OTHER CHARGES

**3.1     [INTENTIONALLY DELETED]**

**3.2     [INTENTIONALLY DELETED]**

**3.3     [INTENTIONALLY DELETED]**

**3.4     [INTENTIONALLY DELETED]**

**3.5     [INTENTIONALLY DELETED]**

### 3.6    Default Rate of Interest

Upon the occurrence and during the continuation of an Event of Default, the Applicable Rate of interest in effect at such time with respect to the Obligations shall be increased by two percent (2%) per annum (the "**Default Rate**") or to the maximum legal rate whichever is the lesser.

## IV.
## CONDITIONS PRECEDENT

### 4.1    Conditions Precedent to Initial Advance and Closing

The obligations of Lender to make any advances in excess of the Initial Financing (the "Initial Advance") are subject, in each case, to the reasonable satisfaction of Lender, of the following:

(a)    Borrower shall have delivered to Lender: (i) the DIP Loan Documents to which it is a party, including all Schedules thereto (except to the extent permitted otherwise pursuant to Section 4.2(f) hereof), each duly executed by an authorized officer of Borrower and the other parties thereto, and (ii) a Borrowing Certificate for the each Advance under the Revolving Facility executed by an authorized officer of Borrower;

(b)    Lender shall have received all in form and substance satisfactory to Lender in its sole discretion; (i) each document (including, without limitation, any Uniform Commercial Code financing statement) required by any DIP Loan Document or under law or requested by Lender to be filed, registered or recorded to create in favor of Lender, a perfected security interest upon the Collateral and (ii) evidence of each such filing, registration or recordation and of the payment by Borrower of any necessary fee, tax or expense relating, thereto;

(c)    The Bankruptcy Court shall have entered, the Final Financing Order, and such order shall be in full force and effect and shall not have been vacated, reversed, modified or stayed in any respect and, if such order is the subject of a pending appeal, motion for reconsideration, motion for rehearing, etc., then no further performance of any obligation of any party to the order shall have been stayed pending the disposition of such appeal or motion;

(d)    Lender shall have received evidence of the provision for payment out of the proceeds of the Advance, of all fees, charges and expenses payable to Lender on or prior to the Closing Date, pursuant to the DIP Loan Documents and the Interim Financing Order;

(e)    No current principal or key management personnel of any such Person shall have been indicted or be under active investigation by any Governmental Authority for a felony crime;

(f)    Other than the filing of the Bankruptcy Case, there shall not have occurred any Material Adverse Change or Material Adverse Effect from that which was reflected on the Borrower's financial statements that were delivered to Lender, or any liabilities or obligations of any nature with respect to Borrower or any Guarantor which could reasonably be likely to have a Material Adverse Effect;

(g)    Borrower shall have executed and filed IRS Form 8821 in favor of Lender with the appropriate office of the Internal Revenue Service;

(h)    Lender shall have received a certificate of the corporate secretary or assistant secretary of Borrower (as applicable) dated as of the Closing Date, as to the incumbency and signature of the Persons executing the DIP Loan Documents, in form and substance acceptable to Lender;

(i)    Lender shall have received such other DIP Loan Documents, certificates, or information as Lender may reasonably request, all in form and substance reasonably satisfactory to Lender;

(j)    Borrower shall be in compliance with Section 6.5 hereof, and Lender shall have received· copies of Borrower's insurance declarations or other such evidence to establish to Lender's reasonable satisfaction that all required insurance policies are in place in sufficient amounts, and that Lender has been named as loss payee or additional insured, as appropriate.

**4.2    Post-Closing Conditions**

On or before the date that is fifteen (15) days after the Closing Date (except with respect to the conditions set forth in <u>Section 4.2(f),</u> which must be satisfied earlier), the following conditions subsequent shall be satisfied, in the sole judgment of Lender:

(a)    Lender shall have received (i) the Charter and Good Standing Documents, all in form and substance acceptable to Lender, and (ii) a certificate of the corporate secretary or assistant secretary of Borrower (as applicable) dated as of the date of the Charter and Good Standing Documents, as to the incumbency of and signature of the Persons executing the Charter and Good Standing Documents, all in form and substance acceptable to Lender;

(b)    Borrower shall be in compliance with <u>Section 6.5</u>, and Lender shall have received original certificates of all insurance policies of Borrower confirming that they are in effect and that the premiums due and owing with respect thereto have been paid in full and naming Lender a-s loss payee or additional insured, as appropriate;

(c)    Lender shall have received copies of all Permits required for Borrower to conduct the business in which it is currently engaged or is contemplated pursuant to the DIP Loan Documents, the absence of which could reasonably be expected to be, have or result in a Material Adverse Effect;

(d)    On or before the tenth (10th) day after the Closing Date, Borrower shall have delivered to Lender Schedules 5.4 and 5.11 to this Agreement, which shall be subject to Lender's review and approval, in its Permitted Discretion.

**4.3    Conditions Precedent to Each Advance**

The obligations of Lender to make any Advance (including, without limitation the Initial Advance) are, in each case, subject to the satisfaction, in the sale judgment of Lender, of the following additional conditions precedent:

(a)    In the case of an Advance, Borrower shall have delivered to Lender a Borrowing Certificate for the Advance executed by an authorized officer of Borrower, which shall constitute a representation and warranty by Borrower as of the Borrowing Date of such Advance that the conditions contained in this Section 4.3 have been satisfied;

(b)    Each of the representations and warranties made by Borrower in or pursuant to this Agreement shall be accurate, before and after giving effect to such Advance and no Default or Event of Default shall have occurred or be continuing or would exist after giving effect to the Advance under the Revolving Facility on such date;

(c)    Immediately after giving effect to the requested Advance, the sum of the aggregate outstanding principal amount of Advances under the Revolving Facility shall not exceed the lesser of (i) Facility Cap then in effect, minus the portion of the Carve Out not yet paid to professionals or (ii) the amount set ·forth as the "Combined Pre & Post Loan Balances" for such period in the Budget;

(d)    Lender shall have received all fees, charges and expenses payable to Lender on or prior to such date pursuant to the DIP Loan Documents, including without limitation, all unpaid audit fees and expenses, and attorneys' fees and expenses; and

(e)    There shall not have occurred or exist any Material Adverse Change or Material Adverse Effect.

**V.**
**REPRESENTATIONS AND WARRANTIES**

Borrower represents and warrants as of the date hereof, the Closing Date, and each Borrowing Date as follows:

**5.1    Organization and Authority**

Borrower is a corporation duly organized, validly existing and in good standing [is this true?] under the laws of its state of formation. Borrower (i) has all requisite corporate or entity power and authority to own its properties and assets and to carry on its business as now being conducted and as contemplated in the DIP Loan Documents, (ii) is duly qualified to do business in every jurisdiction in which failure so to qualify would reasonably be likely to have a Material

Adverse Effect, and (iii) subject to the entry of the Financing Orders, has all requisite power and authority (A) to execute, deliver and perform the DIP· Loan Documents to which it is a party, (8) to borrow hereunder, (C) to consummate the transactions contemplated under the DIP Loan Documents, and (D) to grant the Liens with regard to the Collateral pursuant to the DIP Loan Documents and the Financing Orders. Borrower is not an "investment company" registered or required to be registered under the Investment Company Act of 1940, as amended, or is controlled by such an "investment company."

### 5.2    DIP Loan Documents

Upon entry of the Interim Financing Order, the execution, delivery and performance by Borrower of the DIP Loan Documents to which it is a party, and the consummation of the transactions contemplated thereby, (i) have been duly authorized by all requisite action of Borrower and have been duly executed and delivered by or on behalf of Borrower; (ii) do not violate any provisions of (A) applicable law, statute, rule, regulation, ordinance or tariff, (B) any order of any Governmental Authority binding on Borrower or its properties, or (C) the certificate of incorporation or bylaws (or any other equivalent governing agreement or document) of Borrower; (iii) are not in conflict with, and do not result in a breach or default of or constitute an event of default, or an event, fact, condition or circumstance which, with notice or passage of time, or both, would constitute or result in a conflict, breach, default or event of default under, any indenture, agreement or other instrument to which Borrower is a party, or by which the properties or assets of Borrower are bound the effect of which could reasonably be expected to be, have or reflect in a Material Adverse Effect (other than conflicts, breaches, and defaults the enforcement of which is stayed by virtue of the filing of the Bankruptcy Case, or the Financing Orders); (iv) except as set forth herein and in the Financing Orders, will not result in the creation or imposition of any Lien of any nature upon any of the properties or assets of any such Borrower and (v) do not require the consent, approval or authorization of, or filing, registration or qualification with, any Governmental Authority or any other Person, except for the entry of the Interim Financing Order. When executed and delivered, and upon entry of the Interim Financing Order, each of the DIP Loan Documents to which Borrower is a party will constitute the legal, valid and binding obligation of Borrower, enforceable against Borrower in accordance with its terms.

### 5.3    Subsidiaries, Capitalization and Ownership Interests

Borrower has no Subsidiaries. Schedule 5.3 states the authorized and issued capitalization of Borrower, the number and class of equity securities and/or ownership, voting or partnership interests issued and outstanding of Borrower and the record and beneficial owners thereof (including options, warrants and other rights to acquire any of the foregoing). Borrower does not own an interest in, participates in or engages in any joint venture, partnership or similar arrangements with any Person.

### 5.4    Properties

Borrower (i) is the sole owner and has good, valid and marketable title to, or a valid leasehold interest in, all of its properties and assets, including the Collateral, subject to no

transfer restrictions or Liens of any kind except for Permitted Liens; and (ii) except as set forth on <u>Schedule 5.4</u>, is in compliance in all material respects with each lease to which it is a party or otherwise bound (other than breaches and defaults the enforcement of which is stayed by virtue of the filing of the Bankruptcy Case or leases for locations which will be rejected in the Bankruptcy Case).  <u>Schedule 5.4</u> lists all real properties (and their locations) owned or leased by or to, and all other assets or property that are leased or licensed by, Borrower and all leases (including leases of leased real property) covering or with respect to such properties and assets. Borrower enjoys peaceful and undisturbed possession under all such leases and such leases are all the leases necessary for the operation of such properties and assets, are valid and subsisting and are in full force and effect.

### 5.5    Other Agreements

Borrower is not (i) a party to any judgment, order or decree or any agreement, document or instrument, or subject to any restriction, which would affect its ability to execute and deliver, or perform under, any DIP Loan Document or to pay the Obligations (other than restrictions the enforcement of which is stayed by virtue of the filing of the Bankruptcy Case or the Financing Orders), (ii) in default in the performance, observance or fulfillment of any obligation, covenant or condition contained in any agreement, document or instrument to which it is a party or to which any of its properties or assets are subject, the enforcement of which default is not stayed by virtue of the filing of the Bankruptcy Case, and, if not remedied within any applicable grace or cure period would reasonably be likely to have a Material Adverse Effect, nor is there any event, fact, condition or circumstance which, with notice or passage of time or both, would constitute or result in a conflict, breach, default or event of default (other than conflicts, breaches, defaults or events of default, the enforcement of which is stayed by virtue of the filing of the Bankruptcy Case) under, any of the foregoing which, if not remedied within any applicable grace or cure period would reasonably be likely to have a Material Adverse Effect; or (iii) a party or subject to any agreement, document or instrument with respect to, or obligation to pay any, management or service fee with respect to, the ownership, operation, leasing or performance of its business, except as set forth in <u>Schedule 5.5(iii).</u>

### 5.6    Litigation

Excluding pre-Petition Date litigation which is stayed by the provisions of Section 362 of the Bankruptcy Code, there is no action, suit, proceeding or investigation pending against Borrower that (i) will prevent the validity of any of the DIP Loan Documents or the right of Borrower to enter into any DIP Loan Document or to consummate the transactions contemplated thereby, (ii) would reasonably be likely to be or have, either individually or in the aggregate, any Material Adverse Change or Material Adverse Effect, or (iii) would reasonably be likely to result in any Change of Control or other change in the current ownership, control or management of Borrower.   Borrower is not aware that there is any basis for the foregoing. Other than in connection with the Bankruptcy Case, Borrower is not a party or subject to any order, writ, injunction, Judgment or decree of any Governmental Authority.

17

### 5.7    Hazardous Materials

Borrower is in compliance in all material respects with an applicable Environmental Laws. Borrower has not been notified of any action, suit, proceeding or investigation (i) relating in any way to compliance by or liability of Borrower under any Environmental Laws, (ii) which otherwise deals with any Hazardous Substance or any Environmental Law, or (iii) which seeks to suspend, revoke or terminate any license, permit or approval necessary for the generation, handling, storage, treatment or disposal of any Hazardous Substance.

### 5.8    Potential Tax Liability; Tax Returns; Governmental Reports

(a)    Except as set forth in Schedule 5.8, Borrower has not (i) has received any oral or written· communication from the Internal Revenue Service with respect to any investigation or assessment relating to Borrower directly, or relating to any consolidated tax return which was filed on behalf of such Person, (ii) is not aware of any year which remains open pending tax examination or audit by the IRS (other than as automatically set forth under applicable regulations), and (iii) is not aware of any information that could give rise to an IRS tax liability or assessment.

(b)    Borrower (i) has filed all federal, state, foreign (if applicable) and local tax returns and other reports which are required by law to be filed by Borrower, (ii) has paid all taxes, assessments, fees and other governmental charges, including, without limitation, payroll and other employment related taxes, in each case that are due and payable, except only for items that Borrower is currently contesting in good faith with adequate reserves under GAAP, which contested items are described on Schedule 5.8, and (iii) are not aware of any information that could give rise to a tax assessment or Lien in favor of any Governmental Authority for delinquent taxes, assessments, fees or other governmental charges.

### 5.9    Medicare Cost Reports

Borrower has timely filed all Cost Reports required by third party payors, including, but not limited, to Medicare, Medi-Cal, and such other commercial payors, as applicable.

### 5.10    Compliance with Law

Borrower has been and is currently in compliance, and is presently taking and will continue to take all actions necessary to assure that it shall, on or before each applicable compliance date and continuously thereafter, comply with Public Law 104191 of August 21, 1996, known as the Health Insurance Portability and Accountability Act of 1996 ("**HIPAA**") and its implementing regulations, including, without limitation, the Standards for Electronic Transaction and Code Set (45 CFR Parts 160 and 162), the Standards for Privacy of Individually Identifiable Health Information (45 CFR Parts 160 and 164), and the Security Standards for the Protection of Electronic Protected Health Information (45 CFR Parts 160 and 164) and such other regulations that may, from time to time, be promulgated thereunder (collectively, the "**Standards**"), except for any noncompliance or violation that could not reasonably be expected to subject Borrower to penalties, monetary or otherwise, or other sanctions under or pursuant to

HIPAA, the Standards or other applicable law. As of the Closing Date, Borrower has not received any notice from any Governmental Authority that such Governmental Authority has imposed or intends to impose any enforcement actions, fines or penalties for any failure or alleged failure to comply with HIPAA or its implementing regulations. Borrower (i) is in compliance with all laws, statutes, rules, regulations, ordinances and tariffs of any Governmental Authority applicable to Borrower and/or Borrower's business, assets or operations, including, without limitation, the Worker Adjustment and Retraining Act (or similar law), ERISA and Healthcare Laws and any applicable requirements promulgated under any such law, and (ii) is not in violation of any order of any Governmental Authority or other board or tribunal, except in the case of clauses (i) and (ii), above, where noncompliance or violation could not reasonably be expected to have a Material Adverse Effect. There is no event, fact, condition or circumstance which, with notice or passage of time, or both, would constitute or result in any noncompliance with, or any violation of, any of the foregoing, in each case except where noncompliance or violation could not reasonably be expected to have a Material Adverse Effect. Borrower has not received any notice that Borrower is not in compliance in any respect with any of the requirements of any of the foregoing. Borrower has (a) not engaged in any Prohibited Transactions as defined in Section 406 of ERISA and Section 4975 of the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder, (b) not failed to meet any applicable minimum funding requirements under Section 302 of ERISA in respect of its plans and no funding requirements have been postponed or delayed, (c) no knowledge of any amounts due but unpaid to the Pension Benefit Guaranty Corporation, or of any event or occurrence which would cause the Pension Benefit Guaranty Corporation to institute proceedings under Title IV of ERISA to terminate any of the employee benefit plans, (d) fiduciary responsibility under ERISA for investments with respect to any plan existing for the benefit of Persons other than its employees or former employees, or (e) withdrawn, completely or partially, from any multi-employer pension plans so as to incur liability under the Multiemployer Pension Plan Amendments of 1980. With respect to Borrower, there exists no event described in Section 4043 of ERISA, excluding Subsections 4043(b)(2) and 4043(b)(3) thereof, for which the thirty (30) day notice period contained in 12 C.F.R. § 2615.3 have not been waived. Borrower has maintained in all material respects all records required to -be maintained by the Joint Commission on Accreditation of Healthcare Organizations ("**JCAHO**"), the Food and Drug Administration, Drug Enforcement Agency and State Boards of Pharmacy, all applicable federal and state licensing authorities and the Medicare, Medi-Cal and CHAMPUS/TRICARE programs as required by the Healthcare Laws, and there are no presently existing circumstances which likely would result in material violations of the Healthcare Laws. There is no Liability Event.

### 5.11    Intellectual Property

Except as set forth on <u>Schedule 5.11</u>, Borrower does not own, licenses or utilizes, and is not a party to, any patents, patent applications, trademarks, trademark applications, service marks, registered copyrights, copyright applications, copyrights, trade names, trade secrets, software, licenses or other Intellectual Property.

### 5.12    Licenses and Permits; Labor

Borrower is in compliance-with and has all Permits and Intellectual Property necessary or required by applicable law or Governmental Authority for the operation of Borrower's business. All of the foregoing are in full force and effect and not in known conflict with the rights of others.  Borrower is NOT: (i) in breach of or default under the provisions of any of the foregoing, nor is there any event, fact, condition or circumstance which with notice or passage of time or both, would constitute or result in a conflict, breach, default or event of default under, any of the foregoing which, if not remedied within any applicable grace or cure period would reasonably be likely to have a Material Adverse Effect, other than breaches, defaults or events of default the enforcement of which is stayed by virtue of the filing of the Bankruptcy Code, (ii) a party to or subject to any agreement, instrument or restriction that is so unusual or burdensome that it might have a Material Adverse Effect, and/or (iii) and has not been, involved in any labor dispute, strike, walkout or union organization which would reasonably be likely to have a Material Adverse Effect.

### 5.13    No Default

There does not exist any Default or Event of Default.

### 5.14    No Withholding of Reimbursements

No third-party payor, including any Governmental Authority, or any financial intermediary for any Governmental Authority, including, but not limited to, CMS, Medicare, Medicaid and Medi-Cal, is, or has in any way indicated in writing that it may begin, withholding, setting-off, recouping, or attempting to withhold, set-off, or recoup, any amounts alleged to be owed to such payor by the Borrower, against any amounts alleged to be due to the Borrower.

### 5.15    [Intentionally Deleted]

### 5.16    Healthcare Matters

(a)    Borrower has obtained from the (i) Medicare program, the provider numbers which will permit Borrower to bill the Medicare program with respect to the provision of general acute care and skilled nursing services to patients insured under the Medicare program, and (ii) Medi-Cal program, the provider numbers and in-patient service contracts which will permit Borrower to bill the Medi-Cal program with respect to the provision of general acute care and skilled nursing services to patients insured under the Medi-Cal program. Borrower is in material compliance with the conditions of participation in the Medicare and Medi-Cal programs.

(b)    Other than the CLIA/CMS investigation currently on appeal to the 9th Circuit Court of Appeals, there is no pending, there is no pending or threatened, proceeding or investigation of Borrower relative to the Emergency Medical Treatment or Active Labor Act ("**EMTALA**") nor are there any investigations or proceedings pending, or threatened by any

Governmental Authority with respect to the Medicare, Medi-Cal or CHAMPUS/TRICARE programs.

### 5.17    Hospital Operations/Litigation

Neither Borrower nor any of its respective directors, officers or management employees (in their respective capacities as directors, officers or management employees of Borrower) has been, (i) a party to a Corporate Integrity Agreement with the Office of Inspector General of the Department of Health and Human Services; (ii) subject to reporting obligations pursuant to any settlement agreement entered into with any Governmental Authority; (iii) the subject of any government payor program investigation conducted by any federal or state enforcement agency; (iv) a defendant in any qui tam/False Claims Act litigation; (v) the subject of any search warrant in any qui tam/False Claims Act litigation; (vi) the subject of any search warrant, subpoena, civil investigative demand, contact letter, or telephone or personal contact by or from any federal or state enforcement agency relating to an investigation; or (vii) to the Borrower's Knowledge, since the Petition Date, subject of any writing received by Borrower from any independent contractor, employee, vendor, physician, or any other person alleging that Borrower has violated any law or regulation in a material manner.

### 5.18    Insurance

Borrower has in full force and effect such insurance policies as are customary in its industry and as may be required pursuant to Section 6.5 hereof.  All such insurance policies are listed and described on Schedule 5.18.

### 5.19    Names; Location of Offices, Records and Collateral

During the preceding five years, Borrower has NOT conducted business under or used any name (whether corporate, partnership or assumed) other than as shown on Schedule 5.19A. Borrower is the sole owner of all of its names listed on Schedule 5.19A, and any and all business done and invoices issued in such names are such Person's sales, business and invoices. Each trade name of Borrower or, represents a division or trading style of Borrower. Borrower maintains its places of business and chief executive offices only at the locations set forth on Schedule 5.19B, and all Accounts of Borrower arise, originate and are located, and all of the Collateral granted by Borrower and all books and records in connection therewith or in any way relating thereto or evidencing such Collateral are located and shall only be located, in and at such locations of Borrower. All of the Collateral is located only in the continental United States.

### 5.20    [INTENTIONALLY DELETED]

### 5.21    [INTENTIONALLY DELETED]

### 5.22    [Intentionally Deleted]

### 5.23    Survival

Borrower makes the representations and warranties contained herein with the knowledge and intention that Lender is relying and will rely thereon. All such representations and warranties will survive the execution and delivery of this Agreement, the making of the Advances under the Revolving Facility.

**VI.**
**AFFIRMATIVE COVENANTS**

Borrower covenants and agrees that, until full performance and satisfaction, and indefeasible payment in full in cash, of all the Obligations and termination of this Agreement:

### 6. 1    Financial Statements, Borrowing Certificate, Financial Reports and Other Information

(a)    <u>Financial Reports</u>. In addition to providing the Borrowing Certificate in accordance with <u>Section 2.4</u>, Borrower shall furnish to Lender as soon as available and in any event within thirty (30) calendar days after the end of each calendar month, unaudited consolidated financial statements of Borrower, consisting of a balance sheet and statements of income, retained earnings, cash flows and owners' equity as of the end of the immediately preceding calendar month. With each such financial statement, Borrower shall also deliver a certificate of its chief financial officer stating that (A) such person has reviewed the relevant terms of the DIP Loan Documents and the condition of Borrower, (B) no Default or Event of Default has occurred or is continuing, or, if any of the foregoing has occurred or is continuing, specifying the nature and status and period of existence thereof and the steps taken or proposed to be taken with respect thereto, and (C) Borrower is in compliance with all financial covenants attached as Annex I hereto. Such certificate shall be accompanied by the calculations necessary to show compliance with the financial covenants in a form satisfactory to Lender.

(b)    <u>Other Materials</u>. Borrower shall furnish to Lender as soon as available, and in any event within ten (10) calendar days after the preparation or issuance thereof or at such other time as set forth below: (i) copies of such financial statements (other than those required to be delivered pursuant to <u>Section 6.1(a)</u> prepared by, for or on behalf of Borrower and any other notes, reports and other materials related thereto, including, without limitation, any pro forma financial statements) as may be reasonably requested by Lender, (ii) any reports, returns, information, notices and other materials that Borrower shall send to its stockholders, members, partners or other equity owners at any time, (iii) copies of licenses and permits required by any applicable federal, state, foreign or focal law, statute ordinance or regulation or Governmental Authority for the operation of its business, (iv) within fifteen (15) calendar days after the end of each calendar month for such month, a sales and collection report and accounts receivable and accounts payable aging schedule, including a report of sales, credits issued and collections received, and a schedule of Inventory, itemizing and describing the kind, type, quality and quantity of Inventory, all such reports showing a reconciliation to the amounts reported in the monthly financial statements, (v) promptly upon receipt thereof, copies of any reports submitted to Borrower by its independent accountants in connection with any interim audit of the books of Borrower and copies of each management control letter provided by such independent accountants, and (vi) copies of all reports and/or financial information provided to the

Bankruptcy Court, the United States Trustee and any statutorily appointed or ad hoc committee in the Bankruptcy Case, and (vii) such additional information, documents, statements, reports and other materials as Lender may reasonably request from a credit or security perspective or otherwise from time to time.

(c)      Consents. Borrower shall use commercially reasonable efforts to obtain and deliver from time to time all required consents, approvals and agreements from such third parties as required, with respect to effectuating the DIP Loan Documents and the transactions contemplated thereby.

### 6.2      Payment of Obligations

Borrower shall make full and timely indefeasible payment in cash of the principal of and interest on the Loans, Advances and all other Obligations.

### 6.3      Conduct of Business and Maintenance of Existence and Assets

Except with respect to rejections of leases or executory contracts, Borrower shall (i) conduct its business in accordance with good business practices customary to the industry, (ii) engage principally in the same or similar lines of business substantially as heretofore conducted, (iii) collect its Accounts in the ordinary course of business, (iv) maintain all of its material properties, assets and equipment used or useful in its business in good repair, working order and condition (normal wear and tear excepted and except as may be disposed of in the ordinary course of business and in accordance with the terms of the DIP loan Documents and otherwise as determined by Borrower using commercially reasonable business judgment), (v) from time to time to make all necessary or desirable repairs, renewals and replacements thereof, as determined by Borrower using commercially reasonable business judgment, (vi) maintain and keep in full force and effect its existence and all material Permits and qualifications to do business and good standing in each jurisdiction in which the ownership or lease of property or the nature of its business makes such Permits or qualification necessary and in which failure to maintain such Permits or qualification could reasonably be likely to have a Material Adverse Effect; and (vii) remain in good standing [is Borrower in good standing?]   and maintain operations in all jurisdictions in which currently located.

### 6.4      Compliance with Legal and Other Obligations

Borrower shall (a) comply with all laws, statutes, rules, regulations, ordinances and tariffs of all Governmental Authorities applicable to it or its business, assets or operations, including applicable requirements of the Healthcare Laws, the Standards for Privacy of Individually Identifiable Health information which were promulgated pursuant to HIPAA,(b) maintain and comply with all Permits necessary to conduct its business and comply with any new or additional requirements that may be imposed on it or its business, and (c) properly file all Medicare, Medi-Cal and, as applicable, CHAMPUS/TRICARE cost reports. Without limiting the foregoing, the Borrower is, and while this Agreement shall remain in effect shall remain, qualified for participation in the Medicare and Medi-Cal programs; Borrower has, and while this

23

Agreement shall remain in effect shall maintain, a current and valid provider contract with such programs; Borrower is, and while this Agreement shall remain in effect shall remain, in compliance with the conditions of participation in such programs; Borrower has, and while this Agreement shall remain in effect shall maintain, all approvals or qualification necessary for capital reimbursement for the Hospital; and Borrower has obtained, and while this Agreement shall remain in effect shall maintain, accreditation of the Hospital by JCAHO applicable to all of its patient care facilities/services. While this Agreement shall remain in effect, all billing practices of the Borrower with respect to the Hospital and all third party payors, including the Medicare, Medi-Cal and CHAMPUS/TRICARE programs and private insurance companies, shall remain in compliance with all applicable laws, regulations and policies of such third party payors and the Medicare, Medi-Cal and CHAMPUS/TRICARE programs.

### 6.5    Insurance

Borrower shall (i) keep all of its insurable properties and assets including without limitation Inventory that is in transit (whether by vessel, air or land) adequately insured in all material respects as at present against losses, damages and hazards as are customarily insured against by businesses engaging in similar activities or owning similar assets or properties and at least the minimum amount required by applicable law (and with respect to Inventory that is in transit, maintain insurance covering the same for its full replacement cost under all risk marine insurance policies endorsed to cover all risks and with such amounts of coverage and deductibles as at present, issued by such insurance carriers at present or as are reasonably acceptable to Lender), including, without limitation, professional liability insurance, as applicable; (ii) maintain general public liability insurance at all times against liability on account of damage to persons and property having such limits, deductibles, exclusions and co-insurance and other provisions as are customary for a business engaged in activities similar to those of Borrower; and (iii) maintain insurance under all applicable workers' compensation laws; all of the foregoing insurance policies to (A) name Lender as loss payee and additional insured thereunder, and (B) expressly provide that they cannot be altered, amended, modified or canceled without thirty (10) Business Days prior written notice to Lender and that they inure to the benefit of Lender notwithstanding any action or omission or negligence of or by Borrower thereunder.

### 6.6    [Intentionally Deleted.]

### 6.7    Inspection; Periodic Audits

Borrower shall permit the representatives of Lender, at the expense of Borrower, from time to time during normal business hours upon reasonable notice, to (i) visit and inspect any of its offices or properties or any other place where Collateral is located to inspect the Collateral and/or to examine or audit all of its books of account, records, reports and other papers, (ii) make copies and extracts therefrom, and (iii) discuss its business, operations, prospects, properties, assets, liabilities, condition and/or Accounts with its officers and independent public accountants (and by this provision such officers and accountants are authorized to discuss the foregoing).

### 6.8    Further Assurances; Post Closing

At Borrower's sole cost and expense, Borrower shall (i) take such further actions, obtain such consents and approvals and duly execute and deliver such further agreements, assignments, instructions or documents as Lender may reasonably request with respect to the purposes, terms and conditions of the DIP Loan Documents and the consummation of the transactions contemplated thereby, and (ii) without limiting and notwithstanding any other provision of any DIP Loan Document, execute and deliver, or cause to be executed and delivered, such agreements and documents, and take or cause to be taken such actions, and otherwise perform, observe and comply with such obligations, in each case, that to the extent such costs are not already included in the Budget, Lender shall advance the costs and expenses for any such action requested by Lender, and the expenditure of such funds shall not be considered an expense for Budget purposes, although the Facility Cap shall be reduced by the amount of any such advance.

### 6.9    Payment of Indebtedness

Except as otherwise prescribed in the DIP Loan Documents, or to the extent excused pursuant to the Bankruptcy Code, and, with respect to Subordinated Debt, subject to any applicable Subordination Agreement or subordination provisions, Borrower shall pay, discharge or otherwise satisfy at or before maturity (subject to applicable grace periods and, in the case of trade payables, to ordinary course payment practices) all of its material obligations and liabilities, except when the amount or validity thereof is being contested in good faith by appropriate proceedings and such reserves as Lender may deem proper and necessary in its sole discretion shall have been made.

### 6.10    Lien Searches

If Liens other than Permitted Liens exist, Borrower immediately shall take, execute and deliver all actions, documents and instruments necessary to release and terminate or subordinate such Liens.

### 6.11    Use of Proceeds

Borrower shall use the proceeds from the Revolving Facility only for the purposes, and at the times set forth in the Budget and as provided in the Financing Orders.

### 6.12    Collateral Documents; Security Interest in Collateral

Borrower shall (i) execute, obtain, deliver, file, register and/or record any and all financing statements, continuation statements, stock powers, instruments and other documents, or cause the execution, filing, registration, recording or delivery of any and all of the foregoing, that are necessary or required under law or otherwise or reasonably requested by Lender to be executed, filed, registered, obtained, delivered or recorded to create, maintain, perfect, preserve, validate or otherwise protect the pledge of the Collateral to Lender and Lender's perfected Lien on the Collateral, and Borrower irrevocably grants Lender the right, at Lender's option, to file any or all of the foregoing, (ii) immediately upon learning thereof, report to Lender any reclamation, return or repossession of goods in excess of $10,000 (individually or in the aggregate), and (iii) defend the Collateral and Lenders perfected Lien thereon against all claims

25

and demands of all Persons at any time claiming the same or any interest therein adverse to Lender, and pay all reasonable costs and expenses (including, without limitation, in-house documentation and diligence fees and legal expenses and reasonable attorneys' fees and expenses) in connection with such defense, which may at Lender's discretion be added to the Obligations; provided, in each case, that to the extent such costs are not already included in the Budget, Lender shall advance the costs and expenses for any such action requested by Lender, and the expenditure of such funds shall not be considered an expense for Budget purposes, although the Facility Cap shall be reduced by the amount of any such advance.

### 6.13    [Intentionally Deleted]

### 6.14    Taxes and Other Charges

Borrower shall promptly, and in any event within five (5) Business Days after Borrower or any authorized officer of Borrower obtains knowledge thereof, notify Lender in writing of any oral or written communication from the Internal Revenue Service or otherwise with respect to any (i) tax investigations, relating to the Borrower directly, or relating to any consolidated tax return which was filed on behalf of Borrower, (ii) notices of tax assessment or possible tax assessment, (iii) years that are designated open pending tax examination or audit, and (iv) information that could give rise to an IRS tax. liability or assessment.

### 6.15    [Intentionally Deleted]

### 6.16    Payroll Taxes

Without limiting or being limited by any other provision of any DIP Loan Document, Borrower at all times shall retain and use a Person to process, manage and pay its post-Petition Date payroll taxes and shall cause to be delivered to Lender within ten (10) business days after the end of each calendar month a report of its post-Petition Date payroll taxes for the immediately preceding calendar month and evidence of payment thereof.

### 6.17    [Intentionally Deleted]

### 6.18.    [Intentionally Deleted]

### VII.
### NEGATIVE COVENANTS

Borrower covenants and agrees that, until full performance and satisfaction, and indefeasible payment in full in cash, of all of the Obligations and termination of this Agreement:

### 7.1    Financial Covenants

Borrower shall not violate the financial covenants set forth on Appendix A to this Agreement, which is incorporated herein and made a part hereof.  Borrower shall demonstrate its

compliance with the financial covenants by submitting to Lender a compliance certificate in the form set forth in <u>Exhibit B</u> hereto at such times as compliance is measured.

### 7.2    Permitted Indebtedness

Borrower shall not create, incur, assume or suffer to exist any post-Petition Date Indebtedness, except the following (collectively, "**Permitted Indebtedness**"): (i) Indebtedness under the DIP Loan Documents, (ii) any Indebtedness not otherwise described in this <u>Section 7.2</u> and set forth on <u>Schedule 7.2</u>; (iii) accounts payable to trade creditors and current operating expenses (other than for borrowed money) incurred after the Petition Date which are not aged more than sixty (60) calendar days from the billing date or more than thirty (30) days from the due date, in each case incurred in the ordinary course of business and paid within such time period, unless the same are being contested in good faith and by appropriate and lawful proceedings and such reserves, if any, with respect thereto as are required by GAAP and deemed adequate by Borrower's independent accountants shall have been reserved; and (iv) Permitted Subordinated Debt. Borrower shall not make prepayments on any existing or future Indebtedness to any Person other than to Lender or to the extent specifically permitted by this Agreement or any subsequent agreement between Borrower and Lender.

### 7.3    Permitted Liens

Borrower shall not create, incur, or assume any Lien upon, in or against, or pledge of, any of the Collateral or any of its properties or assets or any of its shares, securities or other equity or ownership or partnership interests, whether now owned or hereafter acquired, except the following (collectively, "**Permitted Liens**"): (i) Liens under the DIP Loan Documents or otherwise arising in favor of Lender, (ii) Liens imposed by law for taxes (other than payroll taxes), assessments or charges of any Governmental Authority for claims not yet due or which are being contested in good faith by appropriate proceedings and with respect to which adequate reserves or other appropriate provisions are being maintained by such Person in accordance with GAAP to the satisfaction of Lender in its sale discretion, (iii) (A) statutory Liens of landlords and of carriers, warehousemen, mechanics or materialmen, and (B) other Liens imposed by law or that arise by operation of law in the ordinary course of business from the date of creation thereof, in each case only for amounts not yet due or which are being contested in good faith by appropriate proceedings and with respect to which adequate reserves or other appropriate provisions are being maintained by such Person in accordance with GAAP to the satisfaction of Lender in its sole discretion, (iv) Liens (A) incurred or deposits made in the ordinary course of business (including, without limitation, surety bonds and appeal bonds) in connection with workers' compensation, unemployment insurance and other types of social security benefits or to secure the performance of tenders, bids, leases, contracts (other than for the repayment of Indebtedness), statutory obligations and other similar obligations, or (B) arising as a result of progress payments under government contracts, and (v) other Liens in existence as of the Petition Date not otherwise described above and disclosed on <u>Schedule 7.3</u> .

### 7.4    Investments; New Facilities or Collateral; Subsidiaries

Borrower, directly or indirectly, shall not (i) merge with, purchase, own, hold, invest in or otherwise acquire obligations or stock or securities of, or any other interest in, or all or substantially all of the assets of, any Person or any joint venture or (ii) make or permit to exist any post-Petition Date loans, advances or guarantees to or for the benefit of any Person or assume, guarantee, endorse, contingently agree to purchase or otherwise become liable for or upon or incur any post-Petition Date obligation of any Person (other than those created by the DIP Loan Documents and Permitted Indebtedness and other than (A) trade credit extended in the ordinary course of business, (B) advances for business travel and similar temporary advances made in the ordinary course of business to officers, directors and employees, (C) the endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business), and (D) indebtedness and other obligations in the ordinary course of Borrower's business. Borrower, directly or indirectly, shall not purchase, own, operate, hold, invest in or otherwise acquire any facility, property or assets or any Collateral that is not located at the locations set forth on <u>Schedule 5.18B</u> unless Borrower shall provide to Lender at least thirty (30) Business Days prior written notice. Borrower shall have no Subsidiaries.

**7.5    Dividends; Redemptions; Restricted Payments**

Borrower shall not (i) declare, pay or make any dividend or Distribution on any shares of capital stock or other securities or interests, (ii) apply any of its funds, property or assets to the acquisition, redemption or other retirement of any capital stock or other securities or interests or of any options to purchase or acquire any of the foregoing, (iii) otherwise make any payments or Distributions to any stockholder, member, partner or other equity owner in such Person's capacity as such, or (iv) except as provided by the Budget, make any payment of any management, service, consulting or related or similar fee.

**7.6    [Intentionally Deleted]**

**7.7    Charter Documents; Fiscal Year; Name; Jurisdiction of Organization; Dissolution; Use of Proceeds**

Borrower shall not (i) amend, modify, restate or change its certificate of incorporation or formation or bylaws or similar charter documents in a manner that would be adverse to Lender, (ii) change its fiscal year unless Borrower demonstrates to Lender's satisfaction compliance with the covenants contained herein for both the fiscal year in effect prior to any change and the new fiscal year period by delivery to Lender of appropriate interim and annual pro forma, historical and current compliance certificates for such periods and such other information as Lender may reasonably request, (iii) change its name or change its jurisdiction of organization; (iv) amend, alter or suspend or terminate or make provisional in any material way, any Permit without the prior written consent of Lender, which consent shall not be unreasonably withheld, (v) other than the fi1ing of the Bankruptcy Case or commence or suffer any proceedings seeking or that would result in any of the foregoing, or (vi) use any proceeds of any Advance for "purchasing" or "carrying" "margin stock" as defined in Regulations U, T or X of the Board of Governors of the Federal Reserve System.

**7.8    Truth of Statements**

Borrower shall not after the date hereof, furnish to Lender any certificate or other document that contains any untrue statement of a material fact or that omits to state a material fact necessary to make it not misleading in light of the circumstances under which it was furnished.

### 7.9    IRS Form 8821

Borrower shall not alter, amend, restate, or otherwise modify, or withdraw, terminate or re-file the IRS Form 8821 required to be filed pursuant to the Conditions Precedent in Section 4.1 hereof.

### 7.10    Transfer of Assets

Borrower shall not sell, lease, transfer, assign or otherwise dispose of any interest in any properties or assets (other than (x) sales of Inventory in the ordinary course of business), (y) sales of excess, obsolete, unused or redundant assets in the aggregate amount not to exceed $25,000, regardless of the number of such sale transactions without Lender's express written consent, and (z) rejections of leases and executory contracts), or agree to do any of the foregoing at any future time, except that:

(a)    Borrower may lease (as lessee) real or personal property or surrender all or a portion of a lease of the same, in each case in the ordinary course of business (so long as such lease does not create or result in and is not otherwise a Capitalized Lease Obligation prohibited under this Agreement), provided that a Landlord Waiver and Consent and such other consents as are reasonably required by Lender are signed and delivered to Lender with respect to any lease of real or other property, as applicable; and

(b)    Borrower may license or sublicense Intellectual Property or customer lists from third parties in the ordinary course of business, provided, that such licenses or sublicenses shall not interfere with the business or other operations of such Person and such Person's rights, title and/or interest in or to such Intellectual Property and customer lists and interests therein are pledged to Lender as further security for the Obligations and included as part of the Collateral.

### 7.11    Modification of Agreements

Except with respect to rejected leases and executory contracts, Borrower shall not make, or agree to make, any modification, amendment or waiver of any of the terms or provisions of, and will not fail to enforce or diligently pursue its remedies under any and all agreements, documents, instruments and/or certificates executed in connection with any Permitted Subordinated Debt.

### 7.12    [Intentionally Deleted]

### 7.13    Chapter 11 Claims

29

Borrower shall not incur, create, assume, suffer to exist or permit any administrative expense or any Claim (now existing or hereafter arising, of any kind or nature whatsoever) which is superior to or pari passu with those granted to Lender by this Agreement or the Financing Orders other than the Carve-Out.

### 7.14    Filing of Motions and Applications

Borrower shall not apply to the Bankruptcy Court for authority to (a) take any action that is prohibited by the terms of any of the DIP Loan Documents, (b) refrain from taking any action that is required to be taken by the terms of any of the DIP Loan Documents or the Financing Orders, or (c) seek or consent to any amendment, supplement, or any other modification of any terms of the Financing Orders.

### 7.15.    [Intentionally Deleted]

## VIII.
## EVENTS OF DEFAULT

8.1 The occurrence of anyone or more of the following shall constitute an "Event of Default":

(a)    Borrower shall fail to pay when due any amount on the Obligations or provided for in any DIP Loan Document (whether on any payment date, at maturity, by reason of acceleration, by required prepayment or otherwise);

(b)    any representation, statement or warranty made or deemed made by Borrower or any other Person (other than Lender) in any DIP Loan Document or in any other certificate, document, report or opinion delivered in conjunction with any DIP Loan Document to which it is a party, shall not be true and correct in all material respects or shall have been false or misleading in any material respect on the date when made or deemed to have been made (except to the extent already qualified by materiality, dollar thresholds or Material Adverse Effect qualifiers, in which case it shall be true and correct in all respects and shall not be false or misleading in any respect);

(c)    Borrower or any other party thereto other than Lender, shall be in violation, breach or default of, or shall fail to perform, observe or comply with any covenant, obligation or agreement set forth in any DIP Loan Document or the Financing Orders, and such violation, breach, default or failure shall not be cured within the applicable period set forth in any DIP Loan Document or the Financing Orders, if any, provided that, with respect to the affirmative covenants set forth in Article VI (other than Sections 6.1, 6.2, 6.5, , 6.8, 6.9, 6.11 and 6.16 for which there shall be no cure period), there shall be a five (5) Business Day cure period commencing from the earlier of (i) Receipt by such Person of written notice of such breach, default, violation or failure, and (ii) the time at which such Person or any authorized officer thereof knew or became aware, or should have known or been aware, of such failure, violation, breach or default, but no Advances will be made during the cure period;

(d)     any of the DIP Loan Documents ceases to be in full force and effect, or (ii) any Lien created thereunder ceases to constitute a valid perfected Lien on the Collateral having the priority set forth in the Financing Orders in accordance with the terms thereof, or Lender ceases to have a valid perfected security interest in any of the Collateral or any securities pledged to Lender pursuant to the Security Documents, or the Financing Orders having the priority set forth in the Financing Orders;

(e)     one or more tax assessments, judgments or decrees for post-Petition Date obligations is rendered against Borrower in an amount in excess of $10,000 individually or $10,000 in the aggregate, which is/are not satisfied, vacated or discharged of record within thirty (30) calendar days of being rendered and due and payable;

(f)     an order is entered by the Bankruptcy Court in the Bankruptcy Case appointing, or the Borrower files a motion or application for an order seeking the appointment of, in either case, without express prior written consent of the Lender (i) a trustee under Section 1104 of the Bankruptcy Code, or (ii) an examiner with enlarged powers relating to the operation of the business (i.e., powers beyond those set forth in <u>Section 1106(a)(3) and (4)</u> of the Bankruptcy Code) under <u>Section 1106(b)</u> of the Bankruptcy Code;

(g)     without the prior written consent of the Lender, an order shall be entered by the Bankruptcy Court converting the Bankruptcy Case to a Chapter 7 case;

(h)     an order is entered by the Bankruptcy Court approving a disclosure statement or confirming a plan of reorganization in the Bankruptcy Case that does not (i) contain a provision for termination of the Agreement and payment in ful.lin cash of all Obligations of the Borrower hereunder and under the other DIP Loan Documents on or before the effective date of such plan, or (ii) provide for the continuation of the Liens and security interests granted to Lender and priorities until the effective date of such plan unless the Obligations have been paid in full and the Agreement has been terminated;

(i)     an order is entered by the Bankruptcy Court dismissing the Bankruptcy Case, which order does not contain a provision for termination of the Agreement, and payment in full in cash of all Obligations of the Borrower hereunder and under the other DIP Loan Documents prior to entry thereof;

(j)     an order is entered by the Bankruptcy Court in the Bankruptcy Case, without the prior written consent of the Lender (i) to revoke, reverse, stay modify, supplement or amend the Financing Orders, (ii) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to the Borrower equal or superior to the priority of the Lender in respect to the Obligations, except for the Carve Out, or (iii) to grant or permit the grant of a Lien on the Collateral other than a Permitted Lien;

(k)    an order is entered by the Bankruptcy Court that is not stayed pending appeal· granting relief from the automatic stay allowing secured creditor of Borrower to enforce its remedies to liquidate or obtain possession of the Collateral;

(l)    any action is commenced by Borrower that contests the validity, perfection, priority or enforceability of any of the Liens and security interests of the Lender or Prepetition Lender;

(m)    without the prior written consent of the Lender, the determination of Borrower, whether by vote of such Person's Board of Directors or otherwise, to suspend the operation of such Person's business in the ordinary course sell substantially all of either Borrower's assets, unless the proceeds of such sale will pay the Obligations in full, or the filing of a motion or other application in the Bankruptcy Case, seeking authority to do any of the foregoing;

(n)    (i) any Material Adverse Effect or Material Adverse Change occurs, or (ii) Borrower ceases its business operations as currently conducted;

(o)    an Event of Default occurs under any other DIP Loan Document;

(p)    Borrower is determined to have engaged in fraud in connection with the operation of Borrower's business, including, but not limited to, any matters relating to any of Borrower's Government Accounts, Government Contracts, or any Governmental Authority.

(q)    Borrower enters into or becomes a party to any agreement or commitment to do, or cause to be done, any of the things described in this Article VIII or otherwise prohibited by any DIP Loan Document (subject to any cure periods set forth therein);

(r)    (i) the subordination provisions of any Subordination Agreement and/or the subordination provisions contained in or otherwise pertaining to any other agreement or instrument governing any Subordinated Debt shall for any reason be revoked or invalidated, or otherwise cease to be in full force and effect, or (ii) the Obligations for any reason shall not have the priority contemplated by this Agreement;

(s)    reserved;

(t)    the healthcare facility operated by Borrower, or any material portion thereof, (i) become the subject of any proceedings by any Governmental. Authority for condemnation, seizure, appropriation, or similar action; or (ii) ceases operations, including the admission of patients, for a continuous period of more than five (5) days or, more than ten (10) days in the aggregate following the Closing Date.

then, and in any such event, notwithstanding any other provision of any Loan Document, Lender, on five (5) business days' notice to Borrower, in which period Borrower may contest the existence of any such Event of Default, may do any of the following:(i) terminate its obligations to make Advances hereunder, whereupon the same shall immediately terminate and (ii) declare

32

all or any of the Notes, all interest thereon and all other Obligations to be due and payable immediately

## IX.
## RIGHTS AND REMEDIES AFTER DEFAULT

**9.1 Rights and Remedies**

(a)      In addition to the acceleration provisions set forth in Article VIII above, upon the occurrence and continuation of an Event of Default, subject to the Financing Orders, Lender shall have the right to exercise any and all rights, options and remedies provided for in the DIP Loan Documents, under the UCC, the Bankruptcy Code, the Financing Orders or at law or in equity, including, without limitation, the right to in accordance with the procedures set forth in the Financing Orders (i) apply any property of Borrower held by Lender to reduce the Obligations, (ii) foreclose the Liens created under the Security Documents, (iii) realize upon, take possession of and/or sell any Collateral or securities pledged with or without Judicial process, (iv) exercise all rights and powers with respect to the Collateral as Borrower might exercise, (v) collect and send notices regarding the Collateral, with or without judicial process, (vi) by its own means or with Judicial assistance, enter any premises at which Collateral and/or pledged securities are located, or render any of the foregoing unusable or dispose of the Collateral and/or pledged securities on such premises without any liability for rent, storage, utilities, or other sums, and Borrower shall not resist or interfere with such action, (vii) require that all or any of the Collateral be assembled and made available to Lender at any place designated by Lender, (viii) reduce or otherwise change the Facility Cap, and/or (ix) relinquish or abandon any Collateral or securities pledged or any Lien thereon. Notwithstanding any provision of any DIP Loan Document, upon the occurrence and continuation of an Event of Default, subject to the Financing Orders, Lender, in its sole discretion, shall have the right, at anytime that Borrower fails to do so, and from time to time, without prior notice, to: (i) obtain insurance covering any of the Collateral to the extent required hereunder; (ii) pay for the performance of any of Obligations; (iii) to the extent not stayed by the filing of the Bankruptcy Case, discharge taxes or Liens on any of the Collateral that are in violation of any DIP Loan Document unless Borrower is in good faith with due diligence by appropriate proceedings contesting those items; and (iv) pay for the maintenance and preservation of the Collateral. Such expenses and advances shall be added to the Obligations until reimbursed to Lender and shall be secured by the Collateral, and such payments by Lender shall not be construed as a waiver by Lender of any Event of Default or any other rights or remedies of Lender.

(b)      Borrower agrees that notice received by it at least ten (10) calendar days before the time of any intended public sale, or the time after which any private sale or other disposition of Collateral is to be made, shall be deemed to be reasonable notice of such sale or other disposition. If permitted by applicable law, any perishable Collateral which threatens to speedily decline in value or which is sold on a recognized market may be sold immediately by Lender without prior notice to Borrower. At any sale or disposition of Collateral or securities pledged, Lender may (to the extent permitted by applicable law) purchase all or any part thereof free from any right of redemption by any Borrower which right is hereby waived and released. Borrower covenants and agrees not to, and not to permit or cause any of its Subsidiaries to, interfere with

33

or impose any obstacle to Lender's exercise of its rights and remedies with respect to the Collateral. 'Lender, in dealing with or disposing of the Collateral or any part thereof, shall not be required to give priority or preference to any item of Collateral or otherwise to marshal assets or to take possession or sell any' Collateral with judicial process.

(c)     Borrower hereby grants to Lender, after the occurrence and during the continuance of an Event of Default, an irrevocable, nonexclusive license (exercisable without payment of royally or other compensation to Borrower) to use, assign, license or sublicense any Intellectual Property now owned or hereafter acquired by Borrower, and wherever the same may be located, including in such license reasonable access as to all media in which any of the licensed items may be recorded or stored and to all computer programs and used for the compilation or printout thereof, in each case in connection with the exercise of Lender's remedies hereunder and under the other Loan Documents. All proceeds received by Lender in connection with such license will be used by Lender to satisfy the Obligations.

(d)     In addition to the acceleration provisions set forth in Article VIII above, upon the occurrence and continuation of an Event of Default, Borrower shall take any action that Lender may request in order to enable Lender to obtain and enjoy the full rights and benefits granted to Lender hereunder. Without limiting the generality of the foregoing, upon the occurrence and continuation of an Event of Default, at the request of Lender and at Borrower's sale cost and expense, Borrower shall execute all documents and take in other actions requested by Lender to enable Lender, its designee, any receiver, trustee or similar official or any purchaser of all or any part of the Collateral to obtain from any Person any required authority necessary to operate the business of Borrower.

### 9.2     Application of Proceeds

In addition to any other rights, options and remedies Lender has under the DIP Loan Documents, the Bankruptcy Code, the UCC, the Financing Orders, at law or in equity, all dividends, interest, rents, issues, profits, fees, revenues, income and other proceeds collected or received from collecting, holding, managing, renting, selling, or otherwise disposing of all or any part of the Collateral or any proceeds thereof upon exercise of its remedies hereunder shall be applied in the following order of priority: (i) first, to the payment of all costs and expenses of such collection, storage, lease, holding, operation, management, sale, disposition or delivery and of conducting Borrower's business and of maintenance, repairs, replacements, alterations, additions and improvements of or to the Collateral, and to the payment of all sums which Lender may be required or may elect to pay, if any, for taxes, assessments, insurance and other charges upon the Collateral or any part thereof, and all other payments that Lender may be required or authorized to make under any provision of this Agreement (including, without limitation, in each such case, in-house documentation and diligence fees and legal expenses, search, audit, recording, professional and filing fees and expenses and reasonable attorneys' fees and all expenses, liabilities and advances made or incurred in connection therewith); (ii) second, to the payment of all Obligations as provided herein; (iii) third, to the satisfaction of the Prepetition Debt; (iv) fourth, to the satisfaction of Indebtedness secured by any subordinate security interest of record in the Collateral if written notification of demand therefor is received before distribution of the proceeds is completed, provided, that, if requested by Lender, the holder of a

subordinate. security interest shall furnish reasonable proof of its interest, and unless it does so, Lender need not address its claims; and (iv) fifth, to the payment of any surplus then, remaining to Borrower, unless otherwise provided by law or directed by a court of competent jurisdiction, provided that Borrower shall be liable for any deficiency if such proceeds are insufficient to satisfy the Obligations or any of the other items referred to in this section.

**9.3    Rights and Remedies not Exclusive**

Lender shall have the right in its sole discretion to determine which rights, Liens and/or remedies Lender may at any time pursue, relinquish, subordinate or modify arid such determination will not in any way modify or affect any of Lenders rights, Liens or remedies under any DIP Loan Document, the Financing Orders, the Bankruptcy Code, applicable law or equity. The enumeration of any rights and remedies .in any DIP Loan Document or the Financing Orders is not intended to be exhaustive, and all rights and remedies of Lender described in any DIP Loan Document or Financing Orders are cumulative and are not alternative to or exclusive of any other rights or remedies which Lender otherwise may have. The partial or complete· exercise of any right or remedy shall not preclude any other further exercise of such or any other right or remedy.

# X.
## WAIVERS AND JUDICIAL PROCEEDINGS

**10.1 [Intentionally Omitted.]**

**10.2    Delay; No Waiver of Defaults**

No course of action or dealing, renewal, release or extension of any provision of any DIP Loan Document or the Financing Orders, or single or partial exercise of any such provision, or delay, failure or omission on Lender's part in enforcing any such provision shall affect the liability of Borrower or any Guarantor or operate as a waiver of such provision or affect the liability of Borrower or any Guarantor or preclude any other or further exercise of such provision. No waiver by any party to any DIP Loan Document of anyone or more defaults by any other party in the performance of any of the provisions of any DIP Loan Document shall operate or be construed as a waiver of any future default, whether of a like or different nature, and each such waiver shall be limited solely to the express terms and provisions of such waiver. Notwithstanding any other provision of any DIP Loan Document, by completing the Closing under this Agreement and/or by making Advances, Lender does not waive any breach of any representation or warranty under any DIP Loan Document, and all of Lender's claims and rights resulting from any such breach or misrepresentation are specifically reserved.

**10.3    Jury Trial ".Waiver**

EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION ARISING UNDER THE DIP LOAN DOCUMENTS OR IN ANY WAY CONNECTED WITH OR INCIDENTAL TO THE DEALINGS OF THE PARTIES WITH RESPECT TO THE DIP LOAN

35

DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENTS OF THE PARTIES TO THE WAIVER OF THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY.

## XI.
## EFFECTIVE DATE AND TERMINATION

### 11.1    Termination and Effective Date Thereof

Subject to Lender's right to terminate and cease making Advances upon or after any Event of Default, this Agreement shall continue in full force and effect until the full performance and indefeasible payment in cash of all Obligations, unless terminated sooner as provided in this Section 11.1. Borrower may terminate this Agreement at any time upon not less than fourteen calendar days' prior written notice to Lender and upon full performance and indefeasible payment in full in cash of all Obligations on or prior to such fourteenth calendar day after Receipt by Lender of such written notice. All of the Obligations shall be immediately due and payable upon any such termination on the termination date stated in any notice of termination (the "Termination Date"); provided that, notwithstanding any other provision of any DIP Loan Document, the Termination Date shall be effective no earlier than the first Business Day of the month following the expiration of the fourteen (14) calendar days' prior written notice period. Notwithstanding any other provision of any DIP Loan Document, no termination of this Agreement shall affect Lender's rights or any of the Obligations existing as of the effective date of such termination, and the provisions of the DIP Loan Documents shall continue to be fully operative until the Obligations have been fully performed and indefeasibly paid in cash in full. The Liens granted to Lender hereunder, under the Financing Orders, under the other Security Documents and the financing statements filed pursuant thereto and the rights and powers of Lender shall continue in full force and effect notwithstanding the fact that Borrower's borrowings hereunder may from time to time be in a zero credit position until all of the Obligations have been fully performed and indefeasibly paid in full in cash and all commitments to lend hereunder have terminated.

### 11.2 Survival

All obligations, covenants, agreements, representations, warranties, waivers and indemnities made by Borrower in any DIP Loan Document and Finance Orders shall survive the execution and delivery of the DIP Loan Documents, the Closing, the making of the Advances and any termination of this Agreement until all Obligations are fully performed and indefeasibly paid in full in cash. The obligations and provisions of Sections 3, 10.3, 11.1, 11.2. 12.4, 12.5, 12.7, 12.10 and 12.11 shall survive termination of the DIP Loan Documents and any payment, in full or in part, of ·the Obligations.

## XII.
## MISCELLAN·EOU5

### 12.1 Governing law; Jurisdiction; Service of Process; Venue

The DIP Loan Documents shall be governed by and construed in accordance with the internal laws of the State of California without giving effect to its choice of law provisions and, to the extent applicable, the Bankruptcy Code. Any judicial proceeding against Borrower with respect to the Obligations, any DIP Loan Document or any related agreement must be brought in the Bankruptcy Court or, if the Bankruptcy Court does not have jurisdiction, any federal or state court of competent jurisdiction located in the State of California. By execution and delivery of each DIP Loan Document to which it is a party, Borrower (i) accepts the non-exclusive jurisdiction of the aforesaid courts and irrevocably agrees to be bound by any judgment rendered thereby, (ii) waives personal service of process, (iii) agrees that service of process upon it may be made by certified or registered mail, return receipt requested, pursuant to Section 12.5 hereof, (iv) waives any objection to jurisdiction and venue of any action instituted hereunder and agrees not to assert any defense based on lack of jurisdiction, venue or convenience, and (v) agrees that this loan" was made in California, that Lender has accepted in California DIP Loan Documents executed by Borrower and has disbursed Advances under the. DIP Loan Documents in California. Nothing shall affect the right of Lender to serve process in any manner permitted by law or shall limit the right of Lender to bring proceedings against Borrower in the courts of any other jurisdiction having jurisdiction. Any judicial proceedings against Lender involving, directly or indirectly, the Obligations, any DIP Loan Document or any related agreement shall be brought only in the Bankruptcy Court, if the Bankruptcy Court has jurisdiction, or in a federal or state court located in the State of California. All parties acknowledge that they participated in the negotiation and drafting of this Agreement and that, accordingly, no party shall move or petition a court construing this Agreement to construe it more stringently against one party than against any other.

### 12.2    Successors and Assigns; Participations; New Lenders

The DIP Loan Documents shall inure to the benefit of Lender, Transferees and all future holders of the Loan, any Note, the obligations and/or any of the Collateral, and each of their respective successors and assigns. Each DIP Loan Document shall be binding upon the Persons' other than Lender that are parties thereto and their respective successors and assigns, and no such Person may assign, delegate or transfer any DIP Loan Document or any of its rights or obligations thereunder without the prior written consent of Lender. No rights are intended to be created under any DIP Loan Document for the benefit of any third party donee, creditor or incidental. Beneficiary of any Borrower or Guarantor, including, but not limited to, any trustee or examiner succeeding to the rights of Borrower pursuant to Chapter 11 of the Bankruptcy Code or pursuant to any conversion to a case under Chapter 7 of the Bankruptcy Code. Nothing contained in any DIP Loan Document shall be construed as a delegation to Lender of any other Person's duty of performance. BORROWER ACKNOWLEDGES AND AGREES THAT LENDER AT ANY TIME AND FROM TIME TO TIME MAY (I) DIVIDE AND RESTATE ANY NOTE, AND/OR (II) SELL, ASSIGN OR GRANT PARTICIPATING INTERESTS IN OR

TRANSFER ALL OR ANY PART OF ITS RIGHTS OR OBLIGATIONS UNDER ANY DIP LOAN DOCUMENT, LOANS, ANY NOTE, THE OBLIGATIONS AND/OR THE COLLATERAL TO OTHER PERSONS (EACH SUCH TRANSFEREE, ASSIGNEE OR PURCHASER, A "TRANSFEREE"). Each Transferee shall have all of the rights and benefits with respect to the Financing Orders, Loans, Obligations, any Notes, Collateral and/or DIP Loan Documents held by it as fully as if the original holder thereof, and either Lender or any Transferee may be designated as the sale agent to manage the transactions and obligations contemplated therein; provided that, notwithstanding anything to the contrary in any DIP Loan Document, Borrower shall not be obligated to pay under this Agreement to any Transferee any sum in excess of the sum which Borrower would have been obligated to pay to Lender had such participation not been effected. Notwithstanding any other provision of any DIP Loan Document, Lender may disclose to any Transferee all information, reports, financial statements, certificates and documents obtained under any provision of any DIP Loan Document.

### 12.3    Application of Payments

To the extent that any payment made or received with respect to the Obligations is subsequently invalidated, determined to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor in possession, receiver, custodian, Committee or any other Person under any Debtor Relief Law, common law or equitable cause or any other law, then the Obligations intended to be satisfied by such payment shall be revived and shall continue as if such payment had not been received by Lender. Any payments with respect to the Obligations received shall be credited and applied in such manner and order as Lender shall decide in its sole discretion.

### 12.4    Indemnity

Borrower shall indemnify Lender, its Affiliates and its and their respective managers, members, officers, employees, Affiliates, agents, representatives, successors, assigns, accountants and attorneys (collectively, the "Indemnified Persons") from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, reasonable fees and disbursements of counsel and in-house documentation and diligence fees and legal expenses) which may be imposed. on, incurred by or asserted against any Indemnified Person with respect to or arising out of, or in any litigation, proceeding or investigation instituted or conducted by any Person with respect to any aspect of, or any transaction contemplated by or referred to in, or any matter related to, any DIP Loan Document or any agreement, document or transaction contemplated thereby, whether or not such Indemnified Person is a party thereto, except to the extent that any of the foregoing arises" out of the negligence or willful misconduct of such Indemnified Person. Lender agrees to give Borrower reasonable notice of any event of which Lender becomes aware for which indemnification may be required under this Section 12.4, and Lender may elect (but is not obligated) to direct the defense thereof, provided that the selection of counsel shall be subject to Borrower's consent, which consent "shall not be unreasonably withheld or delayed. Any Indemnified Person may, in its reasonable discretion, take such actions as it deems necessary and appropriate to investigate, defend or settle any event or take other remedial or corrective actions with respect thereto as may be necessary for the protection of such

Indemnified Person or the Collateral. Notwithstanding the foregoing, if any insurer agrees to undertake the defense of an event (an "Insured Event"), Lender agrees not to exercise its right to select counsel to defend the event if that would cause Borrower's insurer to deny coverage; provided, however, that Lender reserves the right to retain counsel to represent any Indemnified Person with respect to an Insured Event at its sole cost and expense. To the extent that Lender obtains recovery from a third party other than an Indemnified Person of any of the amounts that Borrower has paid to Lender pursuant to the indemnity set forth in this Section 12.4, then Lender shall promptly pay to Borrower the amount of such recovery.

**12.5    Notice**

Any notice or request under any DIP Loan Document shall be given to any party to this Agreement at such party's address set forth beneath its signature on the signature page to this Agreement, or at such other address as such party may hereafter specify in a notice given in the manner required under this <u>Section 12.5</u>.  Nothing in this Agreement or in any other DIP Loan Document shall be construed to limit or affect the obligation of the Borrower or any other Person to serve upon the Lender in the manner prescribed by the Bankruptcy Code any pleading or notice required to be given to Lender pursuant to the Bankruptcy Code.

**12.6    Severability; Captions; Counterparts; Facsimile Signatures**

If any provision of any DIP Loan Document is adjudicated to be invalid under applicable laws or regulations, such provision shall be inapplicable to the extent of such invalidity without affecting the validity or enforceability of the remainder of the DIP Loan Documents which shall be given effect so far as possible. The captions in the DIP Loan Documents are intended for convenience and reference only and shall not affect the meaning or interpretation of the DIP Loan Documents. The DIP Loan Documents may be executed in one or more counterparts (which taken together, as applicable, shall constitute one and the same instrument) and by facsimile transmission or email transmission via .pdf format, which facsimile or .pdf signatures shall be considered original executed counterparts. Each party to this Agreement agrees that it will be bound by its own facsimile or .pdf signature and that it accepts the facsimile signature of each other party.

**12.7    Expenses**

Borrower shall pay whether or not the Closing occurs, all reasonable and actual costs and expenses incurred by Lender and/or its Affiliates, including, without limitation, documentation and diligence fees and expenses, all search, audit, appraisal, recording, professional and filing fees and expenses and all other out-of-pocket charges and expenses (including, without limitation, UCC and judgment and tax lien searches and UCC filings and fees for post-Closing UCC and judgment and tax lien searches and wire transfer fees and audit expenses), and reasonable and actual attorneys' fees and expenses, (i) in any effort to enforce, protect or collect payment of any Obligation or to enforce any DIP Loan Document or any related agreement, document or instrument in which Lender prevails, (ii) in connection with entering into, negotiating, preparing, reviewing and executing the DIP Loan Documents and/or any related agreements, documents or instruments, (iii) arising in any way out of administration of the Obligations, (iv) in connection with instituting, maintaining, preserving, enforcing and/or foreclosing on Lender's Liens in any of the Collateral or securities pledged under the DIP Loan Documents, whether through judicial proceedings or otherwise, in which Lender prevails, (v) in defending or prosecuting any actions, claims or proceedings arising out of or relating to Lender's transactions with Borrower, in which Lender prevails, (vi) in seeking, obtaining or receiving any advice with respect to its rights and obligations under any DIP Loan Document and any related agreement, document or instrument, and/or (vii) in connection with any modification, restatement, supplement, amendment, waiver or extension of any DIP Loan Document and/or

any related agreement, document or instrument. All of the foregoing shall be charged to Borrower's account and shall be part of the Obligations. If Lender or any of its Affiliates uses in-house counsel for any purpose under any DIP Loan Document for which Borrower is responsible to payor indemnify, Borrower expressly agrees that its Obligations include the allocable reasonable costs of in-house counsel for the work performed. Without limiting the foregoing, Borrower shall pay all taxes (other than taxes based upon or measured by Lender's income or revenues or any personal property tax), if any, in connection with the issuance of any Note and the filing and/or recording of any documents and/or financing statements.

### 12.8   Entire Agreement

This Agreement, the Financing Orders and the other DIP Loan Documents to which Borrower is a party constitute the entire agreement between Borrower and Lender with respect to the subject matter hereof and thereof, and supersede all prior agreements and understandings, if any, relating to the subject matter hereof or thereof. Any promises, representations, warranties or guarantees not herein contained and hereinafter made shall have no force and effect unless in writing signed by Borrower and Lender. No provision of this Agreement may be changed, modified, amended, restated, waived, supplemented, discharged, canceled or terminated orally or by any course of dealing or in any other manner other than by an agreement in writing signed by Lender and Borrower. Each party hereto acknowledges that it has been advised by counsel in connection with the negotiation and execution of this Agreement and is not relying upon oral representations or statements inconsistent with the terms and provisions hereof.

### 12.9   [INTENTIONALLY DELETED]

### 12.10   Confidentiality and Publicity

Borrower hereby agrees that Lender or any Affiliate of Lender may (i) disclose a general description of transactions arising under the DIP Loan Documents for advertising, marketing or other similar purposes and (ii) use Borrower's name, logo or other indicia germane to such party in connection with such advertising, marketing or other similar purposes.

### 12.11   [INTENTIONALLY DELETED]

### 12.12   Acknowledgements

Borrower hereby acknowledges that:

(a)    it has been advised by counsel in the negotiation, execution and delivery of this Agreement, the other DIP Loan Documents, and the Financing Orders;

(b)    Lender has no fiduciary relationship to the Borrower, and the relationship between Borrower, and Lender is solely that of debtor and creditor; and

(c)    no joint venture exists between the Borrower and Lender.

41

**12.13 Bankruptcy Court Orders Paramount**

In the event of any direct conflict between the terms and conditions of this Agreement (and/or any DIP Loan Document) and the specific terms and conditions of the Financing Order, the terms and conditions of the Financing Orders shall prevail. Nothing set forth in this Agreement shall require the Borrower or any Guarantor to act or fail to act in a manner that would violate the Bankruptcy Code or any order of the Bankruptcy Court, without prejudice to Lender's ability to declare the occurrence of an Event of Default based upon such action or failure to act in the event of any inconsistency between this Agreement and any of the other DIP Loan Documents, the terms of this Agreement shall control.

## XII
## FORGIVENESS UPON ACQUISITION

In the event that during the term of this Loan the Lender, or an affiliate, successor or assignee of Lender acquires Borrower, or all or substantially all of the assets of Borrower, the Obligations hereunder shall be forgiven by Lender.  However; in the event of such acquisition by a party other than Lender or an affiliate or an affiliate, successor or assignee of Lender, the Obligations hereunder are required to be paid in full at the time of and as part of such acquisition.

*SIGNATURES ON FOLLOWING PAGE*

**IN WITNESS WHEREOF,** each of the parties has duly executed this Post petition Revolving Credit and Security Agreement as of the date first written above.

**VICTOR VALLEY COMMUNITY HOSPITAL**

By:
Name:
Its: Chief Executive Officer

Address for Notices:
Attention:
Telephone:
Fax:

Prime Healthcare Services Foundation, Inc.

By:
Name:
Its:
Address for Notices:
Prime Healthcare Services Foundation, Inc.
3300 E. Guasti Road, Suite 300
Ontario, CA 91761
Attention: Michael J. Sarrao, Esq
Telephone:  (909) 235-4307
Fax:  (909) 464-8887

**Exhibit A**

## BORROWING CERTIFICATE

Dated as of _____

VICTOR VALLEY COMMUNITY HOSPITAL, a California non profit public benefit corporation, the debtor in possession in bankruptcy case no. _____ (the "**Borrower**"), by the undersigned duly Authorized Officer, hereby certifies to Lender in accordance with the Postpetition Revolving Credit and Security Agreement dated as of _____, 2010 between Borrower and Lender (as amended, supplemented or modified from time to time, the "**DIP Loan Agreement;**" all capitalized terms not defined herein have the meanings given them in the Loan Agreement) and other DIP Loan Documents that:

A.    Borrowing Base and Compliance

(1)    . Attached hereto is Schedule 1 an update showing actual receipts and expenditures and comparison to the amounts set forth in the Budget, together with a report showing all cash receipts of Borrower. All are true and accurate and determined in accordance with GAAP.

(2)    [Borrower certifies to Lender that, as of the date hereof and the Borrowing Date (a) the DIP Loan Documents, other documents required pursuant thereto and security interests and Liens created thereby are in full force and effect, (b) each representation and warranty in the DIP Loan Documents is true and correct in all material respects as if made on and as of such date (except where such representation or warranty is otherwise expressly made as of a particular date, in which case it is or was true and correct on and as of such other date), (c) Borrower is in material compliance with all, and not in violation, breach or default of any, covenants, agreements and/or other provisions of or under any of the DIP Loan Documents which it is a party, and (d) no Default or Event of Default under any DIP Loan Document has occurred or is continuing or exists or, if applicable, will exist on such date or after giving effect to the Requested Advance (defined below).

B.    Borrowing Notice *(to be completed and effective only if Borrower is requesting an Advance)*

(1)    In accordance with Sections 2.4 and 4.3 of the DIP Loan Agreement, Borrower hereby irrevocably requests from Lender an Advance under the Revolving Facility pursuant to the DIP Loan Agreement in the aggregate principal amount of $_____ ("**Requested Advance**") to be made on _____ (the "**Borrowing Date**"), which day is a Business Day.

(2)    Immediately after giving effect to the Requested Advance, the aggregate outstanding principal amount of Advances will not exceed the lesser of (i) the Facility Cap, and (ii) the amount set forth for such period in the Budget.

(3)    Attached hereto are all consents, approvals and agreements from third parties necessary with respect to the requested Advance.

C.    <u>General Certifications</u>

Borrower further certifies to Lender that:  (a) the certifications, representations, calculations and statements herein will be true and correct as of the date hereof and on the Borrowing Date (if applicable); (b) all conditions and provisions of <u>Section 4.3</u> of the DIP Loan Agreement are as of the date hereof, and will be as of the Borrowing Date (if applicable), fully satisfied.

IN WITNESS WHEREOF, the undersigned has caused this certificate to be executed as of the day first written above.

VICTOR VALLEY COMMUNITY HOSPITAL, a California non profit public benefit corporation

Prepared by:                                Approved by:

_____        _____

Name:                                         Name:
Title:                                          Title:

EXHIBIT B

COMPLIANCE CERTIFICATE

VICTOR VALLEY COMMUNITY HOSPITAL,

DATED: _____

VICTOR VALLEY COMMUNITY HOSPITAL, a California non profit public benefit corporation, the debtor in possession in bankruptcy case no. _____ (the "**Borrower**"), by the undersigned duly Authorized Officer, hereby certifies to Lender in accordance with the Postpetition Revolving Credit and Security Agreement dated as of _____, 2010 between Borrower and Lender (as amended, supplemented or modified from time to time, the **"DIP Loan Agreement;"** all capitalized terms not defined herein have the meanings given them in the Loan Agreement) and other DIP Loan Documents that Borrower is in full compliance with all terms, covenants, conditions and agreements contained therein and that all representations and warranties made in the DIP Loan Agreement remain true and accurate.

In connection with the foregoing and not in limitation thereof the undersigned hereby certifies that as of the date hereof:

1  [Borrower is in compliance with the Financial Covenants set forth in the DIP Loan Agreement as Appendix A.
2  Except as set forth herein, Borrower's representations and warranties set forth in Article V of the DIP Loan Agreement are true and correct as of the date hereof.
3  Except as set forth herein, Borrower is in compliance with all of the affirmative covenants contained in Article VI of the DIP Loan Agreement.
4  Except as set forth herein, Borrower is in compliance with all of the negative covenants contained in Article VII of the DIP Loan Agreement.
5  Except as set forth herein, No Event of Default or event that with the passage of time or notice or both would constitute an Event of Default under the DIP Loan Agreement exists.

IN WITNESS WHEREOF, the undersigned has caused this certificate to be executed as of the day first written above.

VICTOR VALLEY COMMUNITY HOSPITAL, a California non profit public benefit corporation

Prepared by:                              Approved by:

_____        _____

Name:                                    Name:
Title:                    Title:

# <u>EXHIBIT C</u>

**VICTOR VALLEY COMMUNITY HOSPITAL**
**13 WEEK CASH FLOW PROJECTION**

| | 9/13/2010 Week 1 | 9/20/2010 Week 2 | 9/27/2010 Week 3 | 10/4/2010 Week 4 | 10/11/2010 Week 5 | 10/18/2010 Week 6 | 10/25/2010 Week 7 | 11/1/2010 Week 8 | 11/8/2010 Week 9 | 11/15/2010 Week 10 | 11/22/2010 Week 11 | 11/29/2010 Week 12 | 12/6/2010 Week 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **CASH RECEIPTS** | | | | | | | | | | | | | |
| Medicare | 178,942 | 182,000 | 175,000 | 125,000 | 40,000 | 175,000 | 155,000 | 145,000 | 40,000 | 175,000 | 155,000 | 135,000 | 145,000 |
| Medi-Cal | 103,164 | 73,000 | 155,000 | 155,000 | 173,891 | 203,000 | 150,000 | 150,000 | 173,891 | 203,000 | 125,000 | 125,000 | 41,944 |
| IEHP | 137,000 | 225,000 | 155,000 | 165,000 | 176,000 | 176,000 | 155,000 | 155,000 | 176,000 | 176,000 | 155,000 | 155,000 | 166,000 |
| Insurance | 516,843 | 243,000 | 487,000 | 460,000 | 410,000 | 487,000 | 510,000 | 498,000 | 410,000 | 487,000 | 510,000 | 510,000 | 498,000 |
| Miscellaneous | 3,600 | 3,600 | 3,600 | 3,600 | 3,600 | 3,600 | 3,600 | 3,600 | 3,600 | 3,600 | 3,600 | 3,600 | 3,600 |
| Loan Proceeds | | | | | | | | | | | | | |
| **TOTAL CASH RECEIPTS** | 938,449 | 706,600 | 975,600 | 788,444 | 802,391 | 1,023,600 | 973,600 | 853,444 | 802,391 | 1,023,600 | 973,600 | 928,600 | 853,444 |
| | | | | | | | | | | | | | |
| SALARIES AND WAGES | 535,423 | 535,423 | 520,424 | 520,424 | 510,424 | 510,424 | 511,523 | 511,523 | 508,504 | 508,504 | 510,321 | 510,321 | 506,103 |
| EMPLOYEE BENEFITS | 80,641 | 75,985 | 76,821 | 250,731 | 87,548 | 89,756 | 84,520 | 220,000 | 76,543 | 102,250 | 104,289 | 215,000 | 87,594 |
| PROFESSIONAL FEES - MEDICAL | 19,414 | 18,324 | 17,599 | 18,182 | 17,852 | 20,881 | 19,469 | 18,543 | 16,543 | 15,325 | 15,698 | 18,063 | 17,643 |
| PROFESSIONAL FEES - NON-MEDICAL | 20,845 | 23,524 | 25,843 | 21,825 | 20,957 | 25,687 | 23,862 | 24,825 | 18,699 | 20,365 | 21,697 | 24,893 | 23,985 |
| REGISTRY | 12,600 | 11,980 | 9,850 | 11,989 | 12,568 | 10,554 | 9,897 | 10,535 | 12,968 | 11,543 | 10,653 | 12,587 | 8,997 |
| MEDICAL SUPPLIES | 212,563 | 215,025 | 213,542 | 189,859 | 214,723 | 203,921 | 194,874 | 183,974 | 212,924 | 183,886 | 179,698 | 193,802 | 203,962 |
| LAUNDRY & LINEN | 11,250 | 10,996 | 12,668 | 9,867 | 10,525 | 11,365 | 12,569 | 10,223 | 9,879 | 9,687 | 10,358 | 13,658 | 11,365 |
| OFFICE SUPPLIES | 6,258 | 7,065 | 8,054 | 8,556 | 8,589 | 7,446 | 6,478 | 5,698 | 7,452 | 6,529 | 4,569 | 6,581 | 7,859 |
| MINOR EQUIPMENT | 2,500 | 1,250 | 560 | 800 | 2,125 | 988 | 854 | 1,899 | 2,489 | 3,689 | 1,594 | 549 | 633 |
| NON MEDICAL SUPPLIES | 28,658 | 23,548 | 25,684 | 21,998 | 27,880 | 28,996 | 24,789 | 21,559 | 20,554 | 24,550 | 23,223 | 21,445 | 26,114 |
| PURCHASED SERVICES (MEDICAL) | 18,543 | 17,985 | 18,643 | 15,989 | 18,655 | 14,555 | 17,559 | 18,669 | 18,799 | 15,544 | 16,335 | 18,447 | 15,778 |
| PURCHASED SERVICES (NON MEDICAL) | 37,995 | 35,897 | 33,697 | 39,654 | 36,899 | 34,878 | 35,884 | 33,447 | 34,527 | 38,990 | 35,498 | 38,221 | 37,595 |
| LEGAL FEES | 1,085 | 800 | 6,097 | 2,589 | 1,006 | 1,895 | 5,654 | 3,324 | 5,000 | 2,354 | 6,482 | 2,264 | 1,327 |
| REPAIRS & MAINTENANCE | 42,008 | 39,882 | 36,897 | 42,865 | 46,554 | 35,882 | 28,996 | 29,887 | 41,555 | 35,682 | 26,551 | 28,843 | 34,654 |
| RENTS & LEASES | 15,814 | 14,625 | 15,425 | 16,826 | 14,653 | 16,336 | 14,996 | 15,695 | 13,998 | 15,861 | 14,659 | 15,897 | 16,332 |
| UTILITIES & TELEPHONE | 26,589 | 24,852 | 22,952 | 27,465 | 27,155 | 23,956 | 24,875 | 25,445 | 25,003 | 22,888 | 24,886 | 23,992 | 25,112 |
| INSURANCE | 28,889 | 31,000 | 28,829 | 29,556 | 21,550 | 37,065 | 21,598 | 32,112 | 28,995 | 26,897 | 24,555 | 28,489 | 21,459 |
| LICENSES & TAXES | 2,471 | 1,050 | 2,876 | 1,235 | 2,589 | 989 | 1,000 | 459 | 1,165 | 1,132 | 1,125 | 886 | 997 |
| INTEREST EXPENSE | 10,664 | 14,253 | 19,843 | 16,642 | 10,668 | 15,848 | 10,865 | 19,665 | 15,532 | 9,854 | 10,642 | 20,553 | 10,845 |
| DUES & SUBSCRIPTIONS | 1,245 | 2,543 | 1,243 | 2,145 | 1,546 | 2,214 | 2,658 | 2,848 | 1,145 | 1,168 | 2,986 | 2,155 | 1,599 |
| TRAVEL & TRAINING | 200 | 324 | 150 | 125 | 105 | 162 | 132 | 206 | 362 | 325 | 109 | 224 | 295 |
| SETTLEMENTS | | | | | | 20,000 | | | | 20,000 | | | |
| OTHER OPERATING EXPENSES | 20,846 | 26,542 | 25,454 | 24,358 | 23,654 | 24,565 | 28,849 | 24,658 | 21,003 | 21,785 | 23,685 | 24,855 | 22,111 |
| **TOTAL OUTFLOWS** | 1,136,801 | 1,153,163 | 1,122,347 | 1,272,489 | 1,136,389 | 1,118,492 | 1,058,504 | 1,216,194 | 1,093,657 | 1,098,487 | 1,069,643 | 1,214,776 | 1,082,781 |
| | | | | | | | | | | | | | |
| **CASH FLOW CHANGE** | (198,352) | (446,663) | (146,747) | (487,015) | (333,998) | (94,992) | (85,004) | (341,760) | (291,266) | (74,187) | (96,063) | (286,276) | (229,307) |
| | | | | | | | | | | | | | |
| **CUMULATIVE CASH FLOW CHANGE** | (198,352) | (645,016) | (791,762) | (1,278,777) | (1,612,778) | (1,707,767) | (1,792,771) | (2,134,521) | (2,446,797) | (2,520,974) | (2,617,037) | (2,903,313) | (3,132,620) |