PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  Samuel R. Maizel (CA Bar No. 189301)
   Scotta E. McFarland (CA Bar No. 165391)
2  Mary D. Lane (CA Bar No. 071592)
   PACHULSKI STANG ZIEHL & JONES LLP
3  10100 Santa Monica Blvd., 11th Floor
   Los Angeles, California  90067-4100
4  Telephone: 310/277-6910
   Facsimile:  310/201-0760
5  E-mail:      smaizel@pszjlaw.com
6               smcfarland@pszjlaw.com
                mlane@pszjlaw.com
7

8  [Proposed] Attorneys for Debtor and Debtor in Possession,
   Victor Valley Community Hospital
9

10            **UNITED STATES BANKRUPTCY COURT**

11            **CENTRAL DISTRICT OF CALIFORNIA**

12                  **RIVERSIDE DIVISION**

13  In re:                                 Case No.: 6:10-39537 CB

14  VICTOR VALLEY COMMUNITY HOSPITAL,[1]    Chapter 11

15                                          **NOTICE OF EMERGENCY MOTION
                                            AND EMERGENCY MOTION BY
16                                          DEBTOR FOR ORDER (A)
                   Debtor.                  AUTHORIZING INTERIM USE OF
17                                          CASH COLLATERAL, (B) GRANTING
                                            ADEQUATE PROTECTION FOR USE
18                                          OF PREPETITION COLLATERAL,
                                            AND (C) GRANTING RELATED
19                                          RELIEF; MEMORANDUM OF
                                            POINTS AND AUTHORITIES IN
20                                          SUPPORT**

21                                          [Declaration of Edward T. Matthews Filed
                                            Concurrently Herewith]
22
                                            Interim Hearing:
23                                          Date:      TBD
                                            Time:      TBD
24                                          Place:     U.S. Bankruptcy Court
                                                       3420 Twelfth Street
25                                                     Riverside, CA 92501-3819
                                            Judge:     Catherine E. Bauer
26

27  _____

28  [1] The Debtor is a California nonprofit public benefit corporation, Fed. Tax I.D. No. 95-2475762.  The Debtor's address
    is 15248 Eleventh Street Victorville, CA  92395.

**TO THE HONORABLE CATHERINE E. BAUER, UNITED STATES BANKRUPTCY JUDGE, THE TWENTY LARGEST UNSECURED CREDITORS OF THE DEBTOR, ALL ALLEGED SECURED CREDITORS, PARTIES REQUESTING SPECIAL NOTICE AND THE OFFICE OF THE UNITED STATES TRUSTEE**:

**PLEASE TAKE NOTICE** that Victor Valley Community Hospital, the debtor and debtor in possession in the above referenced case (the "Debtor"), will and does hereby move the Court on an emergency basis for the entry of interim and final orders authorizing the Debtor to use cash collateral and granting related relief (the "Motion").  By the Motion, the Debtor seeks an order (1) approving the use of cash collateral on an emergency interim basis, subject to a budget and pending a final hearing, in such amounts necessary to enable the Debtor to operate its business and avoid immediate and irreparable harm; (2) granting adequate protection to Secured Creditors on an interim basis; and (3) scheduling and establishing deadlines regarding a final hearing on the Debtor's use of cash collateral.

**PLEASE TAKE FURTHER NOTICE** that the Motion is brought pursuant to section 363(c) of the Bankruptcy Code, 11 U.S.C. §§ 101-1530, as amended (the "Bankruptcy Code"), Rule 4001(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Rules 2081-1(9), 4001-2 and 9075-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Central District of California (the "Local Bankruptcy Rules").  As required by the Local Bankruptcy Rules, the Debtor has served notice of the Motion and the Motion itself on the following parties or counsel for parties in interest on September 14, 2010:  the United States Trustee, the twenty largest unsecured creditors and any secured creditor whose collateral includes cash collateral or whose lien(s) might be affected by the relief sought; as required by Local Bankruptcy Rule 9075-1(a)(4) service was made by facsimile, personal service or other electronic means (by consent) provided, however, that Express or Overnight Mail was used where the Debtor was unable to notify by facsimile, personal service or other electronic means.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**PLEASE TAKE FURTHER NOTICE** that a summary of the essential terms of Debtor's

proposed cash collateral use (pursuant to Local Bankruptcy Rule 4001-2(c)) are as follows:

- The Motion does <u>not</u> request approval of any of the items cited in Local Bankruptcy Rule 4001-2(b).

- The Motion seeks authorization to use cash currently on hand in the estate and funds generated from the operation of the Debtor's business pursuant to the Budget appended hereto as **Exhibit "A"** on an interim basis through October 15, 2010, and thereafter on a final basis through December 13, 2010.

- The Motion proposes to grant the Office of Statewide Health Planning and Development of the State of California ("OSHPD"), a replacement lien on its existing collateral and the proceeds thereof, excluding avoidance causes of action, as adequate protection if and only to the extent that (a) its prepetition security interests are valid, enforceable, properly perfected and non-avoidable, and (b) the Debtor's use of cash collateral results in a diminution in cash collateral.

**PLEASE TAKE FURTHER NOTICE** that the Motion is based on the attached

Memorandum of Points and Authorities, the *Declaration of Edward T. Matthews in Support of*

*Emergency Motions* that is being filed concurrently herewith and is incorporated by reference,

arguments of counsel, and other admissible evidence properly before this court at or before the

hearing on the Motion.  In addition, the Debtor requests that the Court take judicial notice of all

documents filed with the court in this Case.

**WHEREFORE**, for all the foregoing reasons, and such additional reasons as may be

advanced at or prior to the hearing on the Motion, the Debtor respectfully requests that this Court

enter an order (1) approving the use of cash collateral on an emergency interim basis, subject to a

budget and pending a final hearing, in such amounts necessary to enable the Debtor to operate its

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

business and avoid immediate and irreparable harm, (2) granting adequate protection to OSHPD on

an interim basis, (3) scheduling and establishing deadlines regarding a final hearing on the Debtor's

use of cash collateral, and (4) granting such other and further relief as is just and proper under the

circumstances.

PACHULSKI STANG ZIEHL & JONES LLP

Dated:    September 14, 2010

By    /s/ Samuel R. Maizel

Samuel R. Maizel (CA Bar No. 189301)
[Proposed ] Attorneys for Victor Valley
Community Hospital, Debtor and Debtor in
Possession

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................. i

I. JURISDICTION ...................................................................................................................... 1

II. BACKGROUND FACTS ...................................................................................................... 1

   A.   General Description of the Debtor .................................................................................. 1

   B.   The Debtor's Physical Plant .......................................................................................... 1

   C.   The Debtor's Staff ......................................................................................................... 2

   D.   The Debtor's Services .................................................................................................... 2

   E.   The Debtor's Management ............................................................................................. 2

   F.   The Debtor's Secured Debt ............................................................................................ 4

      1.   The 2000 Bonds ...................................................................................................... 4

      2.   The Desert Community Bank Obligations ............................................................... 4

      3.   The PHM Obligations .............................................................................................. 5

      4.   The Corwin Medical Group Obligations ................................................................. 5

      5.   Capitalized Leases ................................................................................................... 6

   G.   The Debtor's Unsecured Debt ....................................................................................... 6

      1.   Trade Debts .............................................................................................................. 6

      2.   Employee Obligations .............................................................................................. 6

      3.   Obligations to Medi-Cal .......................................................................................... 6

   H.   The Debtor's Revenues .................................................................................................. 7

   I.   The Chapter 11 Filing .................................................................................................... 8

III. RELIEF REQUESTED ....................................................................................................... 10

IV. ARGUMENT ...................................................................................................................... 11

   A.   The Debtor Has an Immediate Need for Use of Cash Collateral .................................. 11

   B.   The Secured Creditors Are Adequately Protected For The Debtor's Use Of Cash Collateral 12

      1.   General Standards of Adequate Protection .............................................................. 12

      2.   The Secured Creditors Are Protected By An Equity Cushion .................................. 14

      3.   The Debtor Will Provide Adequate Protection to The Secured Creditors Through the Granting of Replacement Liens and Monthly Payments ............................................. 15

      4.   The Preservation and Enhancement of the Collateral Resulting From the Debtor's Ongoing Operations Affords Further Adequate Protection to the Secured Creditors ............................... 16

   C.   Emergency Relief and Interim Approval of Debtor's Use of Cash Collateral Should Be Granted. ............................................................................................................................. 18

   D.   Notice Of This Motion Complies With This Court's Notice Requirements And Is Appropriate. ....................................................................................................................... 18

V. CONCLUSION .................................................................................................................... 19

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# TABLE OF AUTHORITIES

## Cases

*Deico Elecs., Inc. (In re Deico Elecs., Inc.),*
139 B.R. 945 (B.A.P. 9th Cir. 1992).............................................................. 13

*First Federal Bank of California v. Weinstein (In re Weinstein),*
227 B.R. 284 (B.A.P. 9th Cir. 1998)............................................................. 13

*General Electric Mortgage Corp. v. South Village, Inc. (In re South Village, Inc.),*
25 B.R. 987 (Bankr. D. Utah 1982)............................................................... 13

*Heritage Sav. & Loan Ass'n v. Rogers Dev. Corp. (In re Rogers Dev. Corp.),*
2 B.R. 679 (Bankr. E.D. Va. 1980)............................................................... 14

*In re 495 Cent. Park Ave. Corp.,*
136 B.R. 626 (Bankr. S.D.N.Y. 1992).......................................................... 14

*In re A&B Heating and Air Conditioning, Inc.,*
48 B.R. 401 (Bankr. N.D. Fla. 1985)............................................................ 17

*In re Automatic Voting Machines Corp.,*
26 B.R. 970 (Bankr. W.D.N.Y. 1983)........................................................... 15

*In re Beker Indus. Corp.,*
58 B.R. 725 (Bankr. S.D.N.Y. 1986)............................................................ 14

*In re Bonner Mall Partnership,*
2 F.3d 899 (9th Cir. 1993) ........................................................................... 16

*In re Carson,*
34 B.R. 502 (D. Kan. 1983) ......................................................................... 14

*In Re Colonial Ctr., Inc.,*
156 B.R. 452 (Bankr. E.D. Pa. 1993) ........................................................... 14

*In re Columbia Gas Sys., Inc.,*
146 B.R. 114 (Bankr. D. Del. 1992) ............................................................. 13

*In re Dynaco Corp.,*
162 B.R. 389 (Bankr. D. N.H. 1993) ............................................................ 16

*In re Heatron, Inc.,*
6 B.R. 493 (Bankr. W.D. Mo. 1980).............................................................. 17

*In re Hoffman,*
51 B.R. 42 (Bankr. W.D. Ark., 1985)............................................................ 16

*In re Martin,*
761 F.2d 472 (8th Cir. 1985) ....................................................................... 13

*In re McCombs Properties,*
88 B.R. 261 (Bankr. C.D. Cal. 1988)............................................................ 14

*In re Mellor,*
734 F.2d 1396 (9th Cir. 1984) ............................................................... 14, 15

*In re Mickler,*
9 B.R. 121 (Bankr. M.D. Fla. 1981) ............................................................. 12

*In re O'Connor,*
808 F.2d 1393 (10th Cir. 1987) ................................................................... 13

*In re OPL Components, Inc.,*
20 B.R. 342 (Bankr. E.D.N.Y. 1982)............................................................ 15

*In re Pine Lake Village Apt. Co.,*
16 B.R. 750 (Bankr. S.D.N.Y. 1982)............................................................ 17

*In re Pitts,*
2 B.R. 476 (Bankr. C.D. Ca. 1979)............................................................... 14

*In re Rogers Dev. Corp.,*
2 B.R. 679 (Bankr. E.D. Va. 1980)............................................................... 15

*In re Shaw Indus., Inc.,*
300 B.R. 861 (Bankr. W.D. Pa. 2003)........................................................... 13

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

*In re Shockley Forest Indus., Inc.*,
  5 B.R. 160 (Bankr. N.D. Ga. 1980) ............................................................................... 15
*In re Stein*,
  19 B.R. 458 (Bankr. E.D. Penn. 1982) .......................................................................... 17
*In re Swedeland Dev. Group, Inc.*,
  16 F.3d 552 (3d Cir. 1994)............................................................................................. 13
*Jay Vending, Inc. v. McGowan (In re McGowan)*,
  6 B.R.  241 (Bankr. E.D. Pa. 1980) ............................................................................... 14
*Maude v. Hawaiian Pac. Indus. (In re Hawaiian Pac. Indus.)*,
  17 B.R. 670 (Bankr. D. Haw. 1982) .............................................................................. 14
*MBank Dallas, N.A. v. O'Connor (In re O'Connor)*,
  808 F.2d 1393 (10th Cir. 1987) ..................................................................................... 17
*NLRB v. Bildisco and Bildisco*,
  465 U.S. 513 (1984)........................................................................................................ 16
*Toibb v. Radloff*,
  501 U.S. 157 (1991) ....................................................................................................... 16
*United Savings Assoc. of Texas v. Timbers of Inwood Forest Assoc., Ltd.*,
  484 U.S. 365, 108 S. Ct. 626, 98 L. Ed. 2d 740 (1988)............................................ 13, 17

**Statutes**

11 U.S.C. § 105 ..................................................................................................................... 15
11 U.S.C. § 361......................................................................................................................1, 13
11 U.S.C. § 361(2) ................................................................................................................. 15
11 U.S.C. § 363 (c)(2)(B) ........................................................................................................ 1
11 U.S.C. § 363(a) ................................................................................................................. 11
11 U.S.C. § 363(c) ................................................................................................................... 2
11 U.S.C. § 363(c)(2)(B) ....................................................................................................... 12
11 U.S.C. § 363(c)(3) ............................................................................................................ 18
11 U.S.C. § 363(e) ................................................................................................................. 13
11 U.S.C. § 506(a) ................................................................................................................. 13
11 U.S.C. § 506(c) ................................................................................................................. 15
11 U.S.C. § 542 ..................................................................................................................... 15
11 U.S.C. § 543 ..................................................................................................................... 15
11 U.S.C. § 544 ..................................................................................................................... 15
11 U.S.C. § 545 ..................................................................................................................... 15
11 U.S.C. § 547 ..................................................................................................................... 15
11 U.S.C. § 548 ..................................................................................................................... 15
11 U.S.C. § 549 ..................................................................................................................... 15
11 U.S.C. § 550 ..................................................................................................................... 15
11 U.S.C. § 551 ..................................................................................................................... 15
11 U.S.C. § 552 ..................................................................................................................... 15
11 U.S.C. § 553 ..................................................................................................................... 15
11 U.S.C. §§ 101-1530 ............................................................................................................ 2
28 U.S.C. § 1334 ..................................................................................................................... 1
28 U.S.C. § 1408 ..................................................................................................................... 1
28 U.S.C. § 1409 ..................................................................................................................... 1
28 U.S.C. § 157 ....................................................................................................................... 1
28 U.S.C. 157(b)(2) ................................................................................................................. 1

**Rules**

F.R.B.P. 2081-1(9) .................................................................................................................. 2
F.R.B.P. 4001 ......................................................................................................................... 1
F.R.B.P. 4001-2 ...................................................................................................................... 2
L.B.R. 4001-2(b) .................................................................................................................... 18
L.B.R. 4001-2(c) ..................................................................................................................... 3
L.B.R. 9075-1 ......................................................................................................................... 2

L.B.R. 9075-1(a)(4) .................................................................................................. 2, 19

L.B.R.4001(b)(2) ......................................................................................................... 18

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### JURISDICTION

This court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This proceeding is a core proceeding under 28 U.S.C. § 157(b)(2).  Venue is proper under 28 U.S.C. §§ 1408 and 1409.

The statutory predicates for the relief requested herein are 11 U.S.C. §§ 361, 363 (c)(2)(B) and (c)(3), and Bankruptcy Rule 4001.

### II.

### BACKGROUND FACTS

**A.    General Description of the Debtor**

The Debtor, a California nonprofit public benefit corporation, operates the Victor Valley Community Hospital (the "Debtor" or the "Hospital").  The Debtor was founded in 1967 and is the only non-profit community hospital in the California High Desert, a service area that includes the communities of Adelanto, Apple Valley, Hesperia and Victorville, serving a population of over 300,000 people.  The High Desert communities served by the Debtor are culturally and ethnically diverse.  They also are economically depressed, and suffer under unemployment rates that are higher than 20%.  The Debtor, therefore, serves a high volume of medically under served and indigent patients and has been designated as a Disproportionate Share Hospital.  As a result of this high volume of indigent patients, millions of dollars worth of the Debtor's services were expended on charity care in 2009, and, with a worsening economy and growing unemployment, the amount in uncompensated, charity care will increase significantly in 2010.

**B.    The Debtor's Physical Plant**

The Hospital is located at 15248 Eleventh Street, Victorville, California 92392.  The facility was designed and constructed as an acute care hospital, and over the years it has been renovated and expanded to accommodate the needs of its patients and the communities it serves.  Originally the facility was operated as a 115 bed facility, but the capacity was reduced in the mid-2000s to approximately 106 beds, and subsequently further reduced to its current 101 bed capacity.  The

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  Debtor owns the main, two-story, hospital building and its adjacent modular office complex which

2  houses its administrative offices.  The Debtor also leases two other facilities: (a) the Women's

3  Center and Outpatient Imaging facility, along with the Debtor's human resources department, at

4  15203 Eleventh Street in Victorville, and (b) the Education Center, at 15366 Eleventh Street,

5  Suite R, in Victorville.

6  **C.      The Debtor's Staff**

7           The Hospital is currently staffed to operate approximately 65 beds on a normal day, although

8  it has access to visiting nurse registries, which allow it to quickly increase its staff to meet patient

9  needs.  Approximately 257 doctors from the local community have privileges at the Hospital.  As of

10 the Petition Date, the Debtor employed approximately 572 people.  Of this, approximately 160 are

11 nurses.  The rest include, but are not limited to, office staff, technicians, maintenance staff, IT staff,

12 human resources staff, and Quality Assurance staff.

13 **D.      The Debtor's Services**

14          As an acute care facility, the Debtor provides a full range of inpatient and outpatient specialty

15 services, including, but not limited to, basic 24-hour emergency room services, surgical services,

16 pediatric services, operating room services, physical therapy, respiratory therapy, outpatient

17 ambulatory services, catheterization laboratory, diagnostic services, women's health center and

18 outpatient imaging services, laboratory and pathology services, social and Medi-Cal eligibility

19 services, physician referral service, and community wellness and education programs.  The Debtor

20 treats approximately 2,900 patients per month in the Emergency Room, of which approximately 250

21 are eventually admitted to the Hospital.  The Debtor has approximately 6,600 patients admitted to

22 the Hospital annually, not including newborns.  Doctors working in the Hospital perform

23 approximately 2,500 out-patient surgeries and approximately 2,000 in-patient surgeries and deliver

24 approximately 1,400 babies annually.

25 **E.      The Debtor's Management**

26          The Debtor is governed by a Board of Directors (the "Board") that is comprised of six

27 members who are leaders in the High Desert community: Kathy Davis, Chair (retired political

28 consultant); Dennis G. Killion, Vice-Chair (educator);Thomas Brown (retired bank president);

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    Michael Fermin (Deputy District Attorney); Tim Jasper (local business owner); and Herbert

2    Williamson, III (Public Defender).

3        The Debtor's Chief Executive Officer is Cathy Pelley, who has served in this position since

4    July 2009.  Prior to that, she was a consultant for the Hospital for the previous four months; CEO at

5    Glendale Memorial Hospital in Glendale, California; and CEO at St . Mary's Regional Medical

6    Center in Apple Valley, California.  She is a veteran, having served as an Army nurse during the

7    Vietnam War.  She has a Nursing Degree from Philadelphia General Hospital, a Bachelor of Science

8    degree in Business Administration and a Master of Science degree in Organization Development,

9    both from the University of San Francisco, and has worked in the hospital industry since

10   approximately 1970, including more than 40 years as a CEO or equivalent position.

11       The Debtor's Chief Financial Officer ("CFO") and Chief Information Officer is Edward

12   Matthews, who has served in this position since December 2008.  Prior to that, he served as founder

13   and principal manager for Neved Investments; CFO for St. Johns Regional Medical Center in

14   Oxnard, California; as a principal with Healthcare Marketing Group, a healthcare industry

15   investment banking group; and as CFO of Doctors' Hospital of Montclair, in Montclair, California.

16   He served in the United States Army during the Vietnam War, including service in Vietnam, and

17   was awarded the Bronze Star Medal.  He has a degree in Business Administration, with a

18   concentration in Accounting, and a Masters of Business Administration, both from the University of

19   Texas at Arlington.  He has worked in the hospital industry since 1975.

20       Additionally, the Debtor contracts, pursuant to a management agreement, with Physicians

21   Hospital Management, LLC, a California limited liability company, (the "Manager") as contract

22   administrator to provide a qualified professional senior management team for the Debtor that assists

23   the Board in implementing measures necessary to improve the Debtor's fiscal and operational

24   management.  The management fee currently in effect pursuant to the management agreement is

25   $30,000.00 per month.  The Debtor intends to reject this agreement.

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**F.    The Debtor's Secured Debt 2**

1.    The 2000 Bonds

In 2000, the Debtor applied to the California Health Facilities Financing Authority ("HFFA") for financial assistance in refinancing its existing Insured Hospital Revenue Bonds (Victor Valley Community Hospital) 1984 Series A, and this application was approved.  In May 2000 the HFFA and the Treasurer of the State of California issued the California Health Facilities Financing Authority Insured Hospital Refunding Revenue Bonds (Victor Valley Community Hospital) Series 2000A (the "Bonds") in the amount of $8,470,000.  HFFA entered into an Indenture with Bank of New York West Trust Company as Trustee,[3] and the proceeds of the sale of the Bonds were loaned to the Debtor (the "HFFA Loan") pursuant to a Loan Agreement between HFFA and the Debtor dated May 1, 2000.  The Debtor gave HFFA a security interest in the Debtor's facilities, including real and personal property, to secure its repayment obligations under the Loan Agreement, and a Deed of Trust was duly entered into and subsequently filed.  The Office of Statewide Health Planning and Development of the State of California ("OSHPD") issued a Contract of Insurance to insure the repayment of the loan obligations and the Debtor entered into a Regulatory Agreement with HFFA and OSHPD under which OSHPD was given the rights to the security given by the Loan Agreement.

As of July 31, 2010, the Debtor owed a total of approximately $2.6 million on the Bonds; with approximately $2.1 million currently held at a Bank of New York Mellon Bank as a reserve account.  On or about September 2, 2010 Debtor made a payment into the reserve account of $81,225.00.

2.    The Desert Community Bank Obligations

In 2007 the Debtor desired to establish a revolving line of credit with Desert Community Bank, now a division of East West Bank (the "Bank") in the maximum amount of $4.9 million (the "Bank Loan"), which line of credit was authorized pursuant to a Note dated August 27, 2007 and a

---

[2]    The Debtor has not undertaken an exhaustive review to ascertain whether there is any defect in the security interest granted or the perfection of that security interest.  For the purposes herein, the Debtor will assume that the security interests were in fact duly perfected, reserving all rights with regard to this issue.

[3]    The indenture trustee's current name is Bank of New York Mellon Trust Company, N.A.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Loan Agreement, also dated August 27, 2007, between the Debtor and the Bank. The Bank and the Debtor asked OSHPD to insure the Debtor's obligations to the Bank, and on or about August 30, 2007, the Debtor entered into an Amendment to Regulatory Agreement with OSHPD and HFFA ("the Amendment") under which Debtor obtained permission to enter into the line of credit with the Bank to finance working capital and pay expenses related to the execution and issuance of the line of credit and related documents.

On or about August 27, 2007, the Debtor executed for the benefit of OSHPD a Deed of Trust with Fixture Filing and Security Agreement ("Trust Deed") which was duly recorded on August 30, 2007. The Trust Deed conveyed a security interest to secure both the HFFA Loan and the Bank Loan, in, among other things, all of Debtor's land, improvements, fixtures, equipment, leases, rentals, accounts, accounts receivable, and inventory, and replaced the earlier Deed of Trust which related only to the HFFA Loan.

As of July 31, 2010, the Debtor owed the Bank approximately $4.5 million on account of this obligation. This obligation is paid through an automatic withdrawal from the Hospital's general account of about $30,000 monthly; the last payment was made in August 2010.

3.    The PHM Obligations

As of February 2, 2005, Debtor entered into a Loan Agreement with Physicians Hospital Management, LLC ("PHM") that provided for a loan of $6 million, some funds of which had been previously provided and previously evidenced by other notes. Interest accrues and was to be paid monthly; the principal is due to be paid in 2012 in a balloon payment. The Debtor has not made a payment on this obligation in approximately 3 months and currently owes $91,822 of accrued interest on this obligation.

The Loan Agreement is secured by a trust deed on Debtor's real estate subordinate to the OSHPD Deed of Trust.

4.    The Corwin Medical Group Obligations

On or about September 1, 2010, Debtor borrowed $700,000.00 from Corwin Medical Group, Inc., IPA (the "Corwin Loan") in order to pay its September 3, 2010 payroll. The promissory note

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

evidencing the Corwin Loan provides that (a) the principal amount of the note will be due and payable on December 1, 2010, with interest at 5.00% annually; (b) that it is secured by the DSH adjustment receivable and by Medicare Settlement receivables; and (c) that the proceeds of either or both of these receivables shall be used to repay this note prior to satisfying other obligations of the Hospital. OSHPD, PHM and the Corwin Medical Group are collectively referred to as the "Secured Creditors" hereafter.

    5.    Capitalized Leases

The Debtor has a lease with Radiometer America, Inc. for a radiometer, which is secured by an security interest in the radiometer. As of August 31, 2010, the Debtor owed approximately $ 58,579 on this lease. The monthly payment is $2,765.00.

**G.    The Debtor's Unsecured Debt**

The Debtor has approximately $16.5 million in total unsecured debt, comprised of obligations to vendors of goods and services, employees, and a significant obligation to Medi-Cal, which is being paid off over 40 years pursuant to an agreement with Medi-Cal.

    1.    Trade Debts

The Debtor owes approximately $1,308,000 in accrued but unpaid management fees to PHM. Additionally, the Debtor owes approximately $7 million to providers of goods and services to the Debtor, including Cerner, Medtronic, Stryker, J&J and others, as well as to the State of California for genetic testing for newborns.

    2.    Employee Obligations

The Debtor owes approximately $2 million to its current and former employees for wages and Paid Time Off ("PTO") including vacation and sick time.

    3.    Obligations to Medi-Cal

The Debtor currently owes approximately $6,008,000.00 for prior overpayments on Medi-Cal cost reports. At the end of a fiscal year, the Debtor must submit a "cost report" to the Centers for Medicare and Medi-caid services, which cost report shows a recap of all rights to payment owned by the entity submitting the report compared to the amounts already paid by the federal or

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

state governments.  The government audits these cost reports and decides whether the provider was overpaid or underpaid.  If underpaid, the government pays the funds owed.  If overpaid, the provider must reimburse the government.  In this case, prior cost reports of the Debtor going back as far as 1994 have been audited and the audits revealed that the Debtor was overpaid.

On or about May 5, 2004, the Debtor entered into an extended repayment plan (the "First Repayment Plan") with the State of California Department of Health Care Services for overpayments for cost report years 1993-1997.  The amount of the obligation covered by the First Extended Repayment Plan was $6,027,255 and the balance under the First Extended Repayment Plan as of September 5, 2010 was $5,583,774.  The monthly payments are $27,577 with the last payment being due on May 4, 2044.

The Debtor, on or about April 1, 2009, entered into another extended repayment plan (the "Second Extended Payment Plan") to cover the overpayments in the amount of $2,426,246.00 received in the cost report years of 2005-2007.  The amount due under the Second Extended Payment Plan is being amortized over a period ending January 1, 2011 with monthly payments of $111,203.  The monthly payments under the First Extended Payment Plan and the Second Extended Payment Plan, $138,780, are being offset by Medi-Cal from current remittance advices.

**H.    The Debtor's Revenues**

The primary source of the Debtor's revenues are payments for services provided to its patients from either health plans or from governmental programs such as Medicare and Medi-Cal (the California state version of the Medi-caid Program).  The following are the approximate percentages of the Debtor's sources for payments for providing patient services: Medi-Cal and Medi-Cal Managed Care: 42.7%; Medicare and Medicare Managed Care: 29.1%; Managed Care Health Maintenance Organizations/Preferred Provider Organization ("HMO/PPO"), including Aetna, Blue Cross/Blue Shield, Cigna and United: 10.1%; Commercial Workers' Compensation Insurance: 8%; and County Indigent Programs: 4.6%; and Self-Pay: 5%.  Thus, more than 75% of the Debtor's revenues come from governmental payors.  Further, historically, the Hospital has collected only approximately 8% of the amount due from self-pay patients.

1    The Debtor, as a Disproportionate Share Hospital, also receives payments from the California

2  state government to help cover the extraordinary costs of serving a particularly high number of

3  indigent patients, whether Medi-Cal and Medicare eligible or not.  For fiscal year 2009-2010 the

4  Debtor received approximately $3.8 million in DSH payments, and is still owed two payments.

5  However, what amount of DSH monies will be forthcoming and when it will be paid is unknown,

6  because one payment, estimated at being over $750,000, is being withheld by the State pending

7  resolution of a lawsuit brought against it by the Federal government; the last payment is not expected

8  until October 2011 and will be a relatively small amount.

9    Additionally, the Debtor qualifies for a new program called the Hospital Quality Assurance

10  Revenue Fund.  Although this program still awaits approval by the federal Center For Medicare and

11  Medicaid Services ("CMS"), a recent memo of the California Hospital Association  ("CHA") lists

12  the Debtor as being likely to receive several million dollars over the expected twenty-one month life

13  of the program.

14  **I.    The Chapter 11 Filing**

15    The current fiscal crisis for the Debtor is the result of the confluence of several factors.  First,

16  the Debtor provides millions of dollars per year in care to indigents, for which it is not compensated

17  at all or is inadequately compensated.  The percentage of the Debtor's resources expended on

18  indigent care is increasing because the Debtor serves a depressed community and the economic

19  condition of this community has worsened in the past few years.  As the unemployment rate has

20  risen, so has the number of uninsured patients.  Over the last year, the volume of patients has not

21  increased substantially, however, the number of Medi-Cal and self-pay patients increased by 7%.

22    Second, the Hospital's plant is approximately 45 years old and the maintenance costs for this

23  plant are substantial and increasing every year.  In addition to the maintenance costs, the costs of

24  bringing and keeping the hospital plant in compliance with the various governmental regulatory

25  requirements is also substantial.

26    Third, Medi-Cal arbitrarily reduced its payment rate by 10% in January 2010, and Medicare

27  payment rates will be reduced by 2.9% in October 2010.  These changes have caused a decline in the

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1   Debtor's revenues without a corresponding reduction in the Debtor's obligations to provide patient

2   care.

3        Fourth, California's financial crisis and the inability of its legislature to pass a budget has

4   caused uncertainty in the timing and the amounts of the DSH Payments and a delay in the hoped for

5   Quality Assurance Fee payments.

6        Fifth, being a stand alone, small rural hospital in California is simply not an advantageous

7   financial situation.  Such hospitals, including the Hospital, suffer from a lack of economies of scale,

8   poor payor mix, high overhead costs, less high-margin specialty service lines, and an overall lower

9   revenue base.  Thus, the Hospital, like many rural small hospitals, struggles to meet even the

10  relatively small (1 - 3 %) profit margins that is the norm for most of the

11  not-for-profit hospital industry.

12       During the relatively short period of time that Ms. Pelley and Mr. Matthews have managed

13  the Hospital they have made extensive efforts to deal with the financial crisis, including, but not

14  limited to, laying off staff, changing to outsourcing for medical transcriptions, negotiating an

15  increase in payor rates from Inland Empire Health Plan, a public entity, and attempting to re-

16  negotiate commercial contracts, however, they lacked leverage and were not able to increase those

17  contract rates.  In any event, because 75% of the Debtor's payments come from governmental

18  payors, even an increase in payment rates from HMOs/PPOs would not make a significant difference

19  in the Hospital's cash flow.

20       The Debtor needs to generate approximately $150,000 to $200,000 per day in revenue to

21  cover its operating costs.  No appreciable cost savings are recognized by the Debtor when the patient

22  census drops below 65 beds a day, as the fixed costs remain fairly constant.  The Hospital has been

23  generating only approximately $100,000 per day in revenue.  Thus, the Debtor loses money every

24  month it operates, and could not have paid its employees their last pay period absent an emergency

25  loan from the Corwin Medical Group.  In light of this ongoing cash flow shortage, the Debtor was

26  forced to file this chapter 11 case.

27       Because the Debtor's CEO, CFO, and Board have concluded that the Debtor cannot survive

28  at its current cash flow levels and would have to close absent drastic measures, representatives of the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Board approached Prime Healthcare Services Foundation, Inc. ("Prime"), which had previously expressed an interest in purchasing the Hospital, and negotiated the Asset Sale Agreement which is being presented as part of the initial bankruptcy filings. The proposed sale to Prime, a Delaware non-stock corporation organized exclusively for charitable purposes under Section 501(c)(3) of the Internal Revenue Code, or its permitted assignee, will allow the Debtor to pay all its secured creditors, and provide a significant distribution to unsecured creditors. The chapter 11 case will give the Debtor the breathing room necessary to sell its assets either to Prime or an over-bidder at a bankruptcy auction, allowing the Hospital to continue to provide its essential healthcare services to the High Desert Communities and provide a recovery that will benefit all of its creditors. The proposed sale provides for Prime to acquire substantially all the Debtor's assets in exchange for $25 million in cash or assumption of debt, as well as up to an additional $3.1 million in Debtor in Possession Financing to be provided postpetition and prior to the closing of the proposed sale to allow the Hospital to continue to operate. The proposed sale will result in all the Secured Creditors being paid in full to the extent that their security interests are not subject to attack.

### III.

### RELIEF REQUESTED

In order to address its working capital needs and fund its reorganization efforts, the Debtor requires the use of what may be the Cash Collateral of the Secured Creditors in accordance with the Budget (defined below) on an interim basis through October 15, 2010 or the final hearing on this Motion, and on a final basis through December 13, 2010. The use of Cash Collateral will provide the Debtor with the necessary capital with which to operate its business, pay its employees, maximize value, including the value of the Secured Creditors' existing collateral (the "Existing Collateral"), and pursue timely sales of its assets.

The Debtor seeks to use Cash Collateral and to grant to the Secured Creditors, as adequate protection of their interests in the Cash Collateral, solely to the extent of any diminution in value of the Cash Collateral, a replacement security interest in and lien upon the Existing Collateral and any proceeds thereof, as set forth below.

In anticipation of this Case, the Debtor has developed cashflow projections reflecting anticipated revenue and expenditures through the first 13 weeks of the case, contained in the proposed Operations Budget (the "Budget") attached hereto as **Exhibit "A"**, provided that Debtor seeks authority to exceed 15% of the aggregate of the weekly expenditures reflected on the Budget (the "Allowed Variance"), measured on a four-week rolling basis. The Budget, which was reviewed and approved by Edward Matthews, sets forth the amount of cash necessary for the Debtor to operate its business postpetition. The Budget takes into account the effect this bankruptcy filing may have on the Debtor's business and the expenses of the administration of this Case.

As set forth in the Budget, the Debtor seeks authority to use cash on hand (approximately as of the Petition Date) and funds generated from operation of its business. Such cash and receipts allegedly constitute the Secured Creditors' "cash collateral" within the meaning of section 363(a) of the Bankruptcy Code.

The Debtor requests that the Court conduct an interim hearing, pursuant to Bankruptcy Rule 4001(b), to consider the entry of the interim order in substantially the form of the attached **Exhibit "B":** (1) approving the use of Cash Collateral on an emergency interim basis, pending a final hearing, in accordance with the Budget, to enable the Debtor to operate its business and avoid immediate and irreparable harm to the estates, (2) granting adequate protection to the Secured Creditors on an interim basis, and (3) scheduling and establishing deadlines regarding a final hearing on the Debtor's use of Cash Collateral.

## IV.

## ARGUMENT

### A.    The Debtor Has an Immediate Need for Use of Cash Collateral

The Debtor has an immediate need for the use of Cash Collateral in order to maintain its business operations. The Debtor's expected use of Cash Collateral during the interim and final periods is reflected in the Budget. All payments described in the Budget are necessary to maintain and continue the Debtor's operations and preserve its going-concern value for the benefit of the Debtor's creditors. Specifically, the Debtor must have access to Cash Collateral to make payments to vendors for postpetition goods, employees, utilities, management fees, doctors, nurses, and other

1  pertinent, ordinary expenses of its business.  Failure to make payments in accordance with the

2  Budget would result in the cessation of the Debtor's business, causing immediate and irreparable

3  harm to the Debtor's estate.  Because the liquidation value of the Debtor's assets is substantially less

4  than the going concern value, creditors would likely receive substantially less in liquidation than

5  they would receive if the Debtor is allowed to operate and propose a plan of reorganization.  Put

6  simply, the Debtor cannot continue operations without the use of Cash Collateral, and if the Debtor

7  is unable to operate, all parties will be harmed.

**B.      The Secured Creditors Are Adequately Protected For
The Debtor's Use Of Cash Collateral**

1.      <u>General Standards of Adequate Protection</u>

It is universally acknowledged that the debtor's cash "is the life blood of the business" and

the bankruptcy court must assure that such life blood "is available for use even if to a limited

extent." *In re Mickler*, 9 B.R. 121, 123 (Bankr. M.D. Fla. 1981).  If a secured creditor does not

consent to the use of cash collateral, the Court can authorize the debtor in possession to use said cash

collateral under section 363(c)(2)(B) of the Bankruptcy Code if the Court determines that the debtor

has provided "adequate protection" of the secured creditor's interest in the cash collateral.

>      Section 363(e) of the Bankruptcy Code provides that, "on request of an
>      entity that has an interest in property used ... or proposed to be used ...
>      by [a debtor in possession], the court, with or without a hearing, shall
>      prohibit or condition such use ... as is necessary to provide adequate
>      protection of such interest." 11 U.S.C. §363(e).  Although the term
>      "adequate protection" is not explicitly defined by the bankruptcy
>      Code, section 361 of the Bankruptcy Code provides that when
>      adequate protection is required, it may be provided by:
>
>      (1) Requiring the trustee to make a cash payment or periodic cash
>      payments to such entity, to the extent that the … use … under section
>      363 of this title … results in a decrease in the value of such entity's
>      interest in such property;
>
>      (2) providing to such entity an additional or replacement lien to the
>      extent that such … use … results in a decrease in the value of such
>      entity's interest in such property; or
>
>      (3) Granting such other relief … as will result in the realizing by such
>      entity of the indubitable equivalent in such entity's interest in such
>      property.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    Neither section 361 nor any other provision of the Bankruptcy Code defines the nature and

2    extent of the "interest in property" of which a secured creditor is entitled to adequate protection

3    under section 361.  However, the statute plainly provides that a qualifying interest demands

4    protection only to the extent that the use of the creditor's collateral will result in a decrease in the

5    "value of such entity's interest in such property.  11 U.S.C.§§ 361, 363(e); *see First Federal Bank of*

6    *California v. Weinstein (In re Weinstein)*, 227 B.R. 284, 296 (B.A.P. 9th Cir. 1998); *Deico Elecs.,*

7    *Inc. (In re Deico Elecs., Inc.)*, 139 B.R. 945, 947 (B.A.P. 9th Cir. 1992); *General Electric Mortgage*

8    *Corp. v. South Village, Inc. (In re South Village, Inc.)*, 25 B.R. 987, 989-90 n.4 (Bankr. D. Utah

9    1982).

10    The phrase "value of such entity's interest" was addressed by the Supreme Court in the

11    landmark decision, *United Savings Assoc. of Texas v. Timbers of Inwood Forest Assoc., Ltd.,* 484

12    U.S. 365, 108 S. Ct. 626, 98 L. Ed. 2d 740 (1988).  For the meaning of  "value of such entity's

13    interest," the Supreme Court was guided by section 506(a) of the Bankruptcy Code which defines a

14    secured creditor's claim – "The phrase 'value of such creditor's interest in §506(a) means the value

15    of the collateral.'  We think the phrase 'value of such entity's interest' in §361(1) and (2), when

16    applied to secured creditors means the same."  *Id.* at 630 (internal citations omitted).  *Timbers*

17    instructs that a secured creditor is entitled to adequate protection only against the diminution in the

18    value of the collateral securing the creditor's allowed secured claim.  Under *Timbers,* therefore,

19    where the value of the Collateral is not diminishing by its use, sale, or lease, the creditor's interest is

20    adequately protected.  This conclusion flows from the notion that the "value of such entity's

21    interests" is the equivalent to "value of the collateral."

22    What constitutes adequate protection must be decided on a case-by-case basis.  *See In re*

23    *Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re O'Connor*, 808 F.2d 1393, 1396

24    (10th Cir. 1987); *In re Martin*, 761 F.2d 472 (8th Cir. 1985); *In re Shaw Indus., Inc.*, 300 B.R. 861,

25    865 (Bankr. W.D. Pa. 2003); *In re Columbia Gas Sys., Inc.*, 146 B.R. 114 (Bankr. D. Del. 1992).

26    The focus of the requirement is to protect a secured creditor from diminution in the value of its

27    interest in the particular collateral during the period of use.  *See In re Swedeland Dev. Group, Inc.*,

28    16 F.3d at 564 ("[T]he whole purpose of adequate protection for a creditor is to insure that the

1   creditor receives the value for which he bargained pre-bankruptcy.") (internal quotation omitted); *In*

2   *re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 636 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*,

3   58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986).

4           2.      The Secured Creditors Are Protected By An Equity Cushion

5           While protection against diminution of an "equity cushion" is not a required element of

6   adequate protection, the existence of an "equity cushion" or a "value cushion" – the value of the

7   collateral in excess of the amount of the secured claim – "is the classic form of protection for a

8   secured debt," and "the existence of an equity cushion, standing alone, can provide adequate

9   protection."  *In re Mellor*, 734 F.2d 1396 (9th Cir. 1984) ("*Mellor*"); *In re McCombs Properties*, 88

10  B.R., 261 (Bankr. C.D. Cal. 1988); *See also In Re Colonial Ctr., Inc.*, 156 B.R. 452, 459 (Bankr.

11  E.D. Pa. 1993).

12          In *Mellor*, the Ninth Circuit reversed the Bankruptcy Appellate Panel's decision affirming a

13  Bankruptcy Court's decision that a creditor was not adequately protected by a 20% equity cushion.

14  *Id.* at 1401.  The Ninth Circuit held that the 20% cushion constituted adequate protection and

15  reversed the lower court's finding to the contrary as "clearly erroneous."  *Id.* at 1400.

16          The Ninth Circuit in *Mellor* also made clear that a cushion of less than 20% could constitute

17  adequate protection and cited with approval authorities which had held that equity cushions of 10%

18  and between 15% and 20% constituted adequate protection.  *Id.*; *see also In re Carson*, 34 B.R. 502

19  (D. Kan. 1983) (11% equity cushion is adequate); *Jay Vending, Inc. v. McGowan (In re McGowan)*,

20  6 B.R.  241, 243 (Bankr. E.D. Pa. 1980) (holding that a 10% cushion is sufficient to provide

21  adequate protection); *Heritage Sav. & Loan Ass'n v. Rogers Dev. Corp. (In re Rogers Dev. Corp.)*, 2

22  B.R. 679, 685 (Bankr. E.D. Va. 1980) (equity cushion of approximately 15% to 20% was sufficient

23  adequate protection, even though the Debtor had no equity in the property); *Maude v. Hawaiian Pac.*

24  *Indus. (In re Hawaiian Pac. Indus.)*, 17 B.R. 670 (Bankr. D. Haw. 1982) (15% cushion constituted

25  adequate protection); *In re Pitts*, 2 B.R. 476 (Bankr. C.D. Ca. 1979) (15% equity cushion provides

26  adequate protection).

27          In determining the existence and extent of an equity cushion, most Courts value the collateral

28  on a going concern or fair market value, unless the debtor is, in fact, liquidating or a reorganization

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

is not in prospect. *See, e.g., Mellor*, 734 F.2d at 1401; *In re Automatic Voting Machines Corp.*, 26

B.R. 970 (Bankr. W.D.N.Y. 1983); *In re OPL Components, Inc.*, 20 B.R. 342 (Bankr. E.D.N.Y.

1982); *In re Shockley Forest Indus., Inc.*, 5 B.R. 160 (Bankr. N.D. Ga. 1980); *In re Rogers Dev.*

*Corp.*, 2 B.R. 679 (Bankr. E.D. Va. 1980).

In this Case, the Debtor will continue its operations and, to maximize the estate's value,

conduct the sale of the Hospital as a going concern. The total secured debt held by OSHPD is

approximately $5 million ($500,000 owed on the Bonds and $4.5 million owed on the Bank debt).

PHM is owed approximately $6.1 million. Corwin Medical Group is owed approximately $700,000.

Thus, the total secured debt is less than $11.9 million. As reflected in the Matthews Declaration, the

value of the Hospital is in excess of $25 million, providing the Secured Creditors an equity cushion

of at least twice their debt and potentially more. The equity in the Hospital provides the Secured

Creditors with far more than the requisite adequate protection.

3.    The Debtor Will Provide Adequate Protection to The Secured Creditors Through the
Granting of Replacement Liens and Monthly Payments

Because the Secured Creditors assert a lien on the Cash Collateral, as adequate protection for

the use of such Cash Collateral, the Debtor proposes to (a) continue to make the regularly scheduled

monthly payments required to the Secured Creditors, and (b) grant each of the Secured Creditors

effective immediately and without the necessity of the execution by the Debtor of any financing

statements or other documentation, in accordance with section 361(2) of the Bankruptcy Code, a

valid, perfected, enforceable and non-avoidable replacement lien on its existing collateral and the

proceeds thereof, including cash flow generated from operations ("Postpetition Collateral"), but only

if and to the extent that (i) the Secured Creditors' prepetition security interests are valid, enforceable,

properly perfected, and unavoidable, and (ii) the Debtor's use of Cash Collateral results in a

diminution of value of the Secured Creditors' collateral. Any replacement lien would exclude

causes of action arising under section 105, 506(c), 542, 543, 544, 545, 547, 548, 549, 550, 551, 552,

and 553 of the Bankruptcy Code. While the Debtor's use of Cash Collateral will reduce the

prepetition Cash Collateral, the operation of the business will continue to generate cash to replenish

the consumed Cash Collateral. Granting the Secured Creditors a replacement lien in the Postpetition

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Collateral to the extent of any diminution in value of each Secured Creditor's Existing Collateral

adequately protects each Secured Creditor's position by giving it an ongoing interest in postpetition

cash generated from its Existing Collateral.

4.    The Preservation and Enhancement of the Collateral Resulting From the Debtor's
Ongoing Operations Affords Further Adequate Protection to the Secured Creditors

Allowing the Debtor to use Cash Collateral to finance its ongoing operations will preserve

and enhance the Secured Creditors' Existing Collateral.  The value of the Debtor's assets is

enhanced by the value of the revenue generated by operation of the Hospital as well as the goodwill

associated with the Debtor's business.  The Debtor's ability to maximize the value of this asset is

inextricably tied to maintaining the going concern value of the business, which in turn is dependent

on having cash available to pay for operating expenses.  The Debtor is in the healthcare business and

without the continuity of operations and an uninterrupted ability to conduct business, the Debtor

could face significant patient and employee loss, which would have an immediate and devastating

effect upon the Debtor's future revenues and opportunity for maximizing value through a sale.  If the

Debtor does not have access to cash to pay its operating expenses, even for a short amount of time, it

would in all likelihood be forced to shut down and would be liquidated for far less than fair value.

The use of Cash Collateral (including all cash existing on the Petition Date plus all postpetition

revenue generated) to conduct the Debtor's business will not only preserve and protect the value of

the Secured Creditors' collateral generally – thus providing the Secured Creditors with adequate

protection of their interests – it will enhance and maximize the potential recovery for all creditors of

the estates.

It is well established that a bankruptcy court, where possible, should resolve issues presented

to it in favor of maximizing the going value of the debtor's estate and reorganization rather than

force a piecemeal liquidation because the business cannot use cash or other property.  *See In re*

*Bonner Mall Partnership,* 2 F.3d 899, 915 (9th Cir. 1993) ("Chapter 11 has two major objectives: 1)

to permit successful rehabilitation of Debtor and 2) to maximize the value of the estate.") (*citing*

*Toibb v. Radloff,* 501 U.S. 157 (1991); *NLRB v. Bildisco and Bildisco,* 465 U.S. 513, 527 (1984)); *In*

*re Dynaco Corp.,* 162 B.R. 389 (Bankr. D. N.H. 1993); *In re Hoffman*, 51 B.R. 42, 47 (Bankr. W.D.

Ark., 1985); *In re A&B Heating and Air Conditioning, Inc.*, 48 B.R. 401, 403-04 (Bankr. N.D. Fla.

1    1985); *In re Heatron, Inc.*, 6 B.R. 493, 496 (Bankr. W.D. Mo. 1980). As the *Heatron* court stated in

2    granting a debtor's motion to use cash collateral: "At the beginning of the reorganization process, the

3    Court must work with less evidence than might be desirable and should resolve issues in favor of the

4    reorganization where evidence is conflicting." *Id.* at 496.

5        In *MBank Dallas, N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1397-98 (10th Cir.

6    1987), the court summarized the foregoing principle as follows:

7            Because the ultimate benefit to be achieved by a successful
             reorganization inures to all the creditors of the estate, a fair
8            opportunity must be given to the Debtor to achieve that end. Thus,
             while interests of the secured creditor… are of concern to the court,
9            the interests of other creditors also have a bearing on whether the use
             of cash collateral should be permitted during the early stages of the
10           administration. The first effort of the court must be to insure the value
             of the collateral will be preserved. Yet, prior to confirmation of a plan
11           of reorganization, the test of that protection is not by the same
             measurements applied to the treatment of a secured creditor in a
12           proposed plan. In order to encourage the Debtor's efforts in the
             formative period prior to the proposal of reorganization, the court must
13           be flexible in applying the adequate protection standard.

14

15    *Id.* At 1397-98. This principle applies equally to efforts to realize the highest value through going

16    concern value.

17        Applying the foregoing, courts have frequently allowed a debtor to use cash collateral in

18    circumstances where such use would enhance or preserve the value of the collateral. Thus, for

19    example, in *In re Stein,* 19 B.R. 458 (Bankr. E.D. Penn. 1982), the court allowed a debtor to use cash

20    collateral even where the secured party was undersecured and had no cushion for protection. The

21    court in *Stein* found that the use of cash collateral, as here, was necessary to the continued operations

22    of the debtor and the "creditor's secured position can only be enhanced by the continued operation of

23    the [debtor's business]." *Id.* At 460. *See also In re Pine Lake Village Apt. Co.,* 16 B.R. 750 (Bankr.

24    S.D.N.Y. 1982) (debtor permitted to use cash collateral generated from rental income to enhance

25    value of real property and secured creditor's claim).

26        The foregoing holdings arise from the more general principle discussed above that a secured

27    creditor is only entitled to adequate protection of the value of the collateral securing the creditor's

28    secured claim. *See Timbers, supra,* at 629-30. Where, as here, the continuation of the debtor's

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

business preserves the value of the creditor's collateral, the debtor's continued operations constitute adequate protection of the secured creditor's interests in the collateral. Coupled with the equity cushion, the proposed replacement liens and the monthly payments to the Secured Creditors, there is no question that the Secured Creditors are adequately protected.

**C.    Emergency Relief and Interim Approval of Debtor's Use of Cash Collateral Should Be Granted.**

The authorization to use cash collateral pending a final hearing will preserve the value of the Debtor's business only if authorization is granted immediately. Section 363(c)(3) of the Bankruptcy Code and Bankruptcy Rule 4001(b)(2) require the Court to schedule a cash collateral hearing in accordance with the needs of the debtor and conduct a preliminary hearing for the purpose of authorizing the use of cash collateral to avoid irreparable harm.

The Motion and proposed Order thereon seek none of the provisions identified in Local Bankruptcy Rule 4001-2(b).

In the present case, emergency use of Cash Collateral by the Debtor, pending a final hearing, is necessary to prevent irreparable harm to the Debtor. If there is any interruption in the Debtor's operations, the value of the Hospital will be significantly impaired to the serious detriment of the Debtor, its creditors, employees and patients.

On the other hand, the Secured Creditors will suffer little, if any, harm if interim relief is granted. To the extent that a Secured Creditor has an interest in property of this estate which is entitled to adequate protection, that interest is adequately protected by the equity cushion, the preservation of the value of its collateral through the Debtor's continued business operations, the proposed replacement liens and the monthly payments.

**D.    Notice Of This Motion Complies With This Court's Notice Requirements And Is Appropriate.**

As required by the Local Bankruptcy Rules, Debtor has provided Notice of the Motion and the Motion itself on the following parties or counsel for parties in interest on September 13, 2010: the United States Trustee, the twenty largest unsecured creditors and any secured creditor whose collateral includes cash collateral or whose lien(s) might be affected by the relief sought; as required

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    by Local Bankruptcy Rule 9075-1(a)(4) service was made by facsimile, personal service or other

2    electronic means (by consent) provided, however, that Express or Overnight Mail was used where

3    the Debtor was unable to notify by facsimile, personal service or other electronic means.

4          Based upon the foregoing, and based on the existing exigent circumstances, the Debtor

5    respectfully requests that the Court find that no further notice is required for this Emergency Cash

6    Collateral Motion.

7                                          **V.**

8                                     **CONCLUSION**

9          WHEREFORE, for all the foregoing reasons, and such additional reasons as may be

10   addressed at the hearing on this Motion, the Debtor respectfully requests that this Court enter an

11   order, substantially in the form of the attached **Exhibit "B"**: (a) granting interim approval of the use

12   of Cash Collateral on an emergency basis, pending a final hearing, in accordance with the Budget;

13   (b) granting adequate protection to the Secured Creditors on an interim basis in the form of

14   replacement liens to the extent necessary to protect the Secured Creditors from a diminution in value

15   of their collateral; (c) scheduling and establishing deadlines regarding a final hearing on the Debtor's

16   use of Cash Collateral, and (d) granting such other and further relief as is just and proper under the

17   circumstances.

18

19   Dated:    September 13, 2010              PACHULSKI STANG ZIEHL & JONES LLP

20                                            By    _/s/ Samuel R. Maizel_
                                                   Samuel R. Maizel
21                                                 [Proposed] Attorneys for Victor Valley
                                                   Community Hospital, Debtor and Debtor in
                                                   Possession

22

23

24

25

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# EXHIBIT A

**VICTOR VALLEY COMMUNITY HOSPITAL**
**13 WEEK CASH FLOW PROJECTION**

| | 9/13/2010 Week 1 | 9/20/2010 Week 2 | 9/27/2010 Week 3 | 10/4/2010 Week 4 | 10/11/2010 Week 5 | 10/18/2010 Week 6 | 10/25/2010 Week 7 | 11/1/2010 Week 8 | 11/8/2010 Week 9 | 11/15/2010 Week 10 | 11/22/2010 Week 11 | 11/29/2010 Week 12 | 12/6/2010 Week 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **CASH RECEIPTS** | | | | | | | | | | | | | |
| Medicare | 178,942 | 162,000 | 175,000 | 125,000 | 40,000 | 175,000 | 155,000 | 145,000 | 40,000 | 175,000 | 155,000 | 135,000 | 145,000 |
| Medi-Cal | 103,164 | 73,000 | 155,000 | 41,944 | 173,891 | 203,000 | 150,000 | 41,944 | 173,891 | 203,000 | 150,000 | 125,000 | 41,944 |
| IEHP | 137,000 | 225,000 | 155,000 | 165,000 | 175,000 | 175,000 | 155,000 | 165,000 | 175,000 | 175,000 | 155,000 | 165,000 | 165,000 |
| Insurances | 515,843 | 243,000 | 487,000 | 450,000 | 410,000 | 467,000 | 510,000 | 498,000 | 410,000 | 467,000 | 510,000 | 510,000 | 498,000 |
| Miscellaneous | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 |
| Loan Proceeds | | | | | | | | | | | | | |
| **TOTAL CASH RECEIPTS** | 938,449 | 706,500 | 975,500 | 785,444 | 802,391 | 1,023,500 | 973,500 | 853,444 | 802,391 | 1,023,500 | 973,500 | 928,500 | 853,444 |
| | | | | | | | | | | | | | |
| SALARIES AND WAGES | 535,423 | 535,423 | 520,424 | 520,424 | 510,424 | 510,424 | 511,523 | 511,523 | 508,504 | 508,504 | 510,321 | 510,321 | 506,103 |
| EMPLOYEE BENEFITS | 80,641 | 75,985 | 76,821 | 250,731 | 87,546 | 89,756 | 64,520 | 220,000 | 76,543 | 102,250 | 104,289 | 215,000 | 87,564 |
| PROFESSIONAL FEES - MEDICAL | 19,414 | 18,324 | 17,589 | 18,162 | 17,852 | 20,981 | 19,489 | 18,543 | 16,543 | 15,325 | 15,698 | 18,963 | 17,643 |
| PROFESSIONAL FEES - NON-MEDICAL | 20,645 | 23,524 | 25,643 | 21,825 | 20,957 | 25,687 | 23,662 | 24,625 | 18,699 | 20,365 | 21,687 | 24,893 | 23,985 |
| REGISTRY | 12,600 | 11,680 | 9,850 | 11,989 | 12,586 | 10,654 | 9,897 | 10,635 | 12,986 | 11,543 | 10,653 | 12,587 | 8,997 |
| MEDICAL SUPPLIES | 212,563 | 215,625 | 213,542 | 189,859 | 214,723 | 203,921 | 194,874 | 183,974 | 212,924 | 183,985 | 179,698 | 193,952 | 203,952 |
| LAUNDRY & LINEN | 11,250 | 10,986 | 12,658 | 9,867 | 10,525 | 11,365 | 12,589 | 10,223 | 9,879 | 9,687 | 10,358 | 13,658 | 11,365 |
| OFFICE SUPPLIES | 6,258 | 7,065 | 8,054 | 8,556 | 6,589 | 7,446 | 6,478 | 5,698 | 7,452 | 6,529 | 4,569 | 6,581 | 7,869 |
| MINOR EQUIPMENT | 2,500 | 1,250 | 560 | 800 | 2,125 | 986 | 854 | 1,899 | 2,489 | 3,689 | 1,564 | 549 | 663 |
| NON MEDICAL SUPPLIES | 28,658 | 23,548 | 25,684 | 21,998 | 27,889 | 28,996 | 24,789 | 21,559 | 20,554 | 24,550 | 23,223 | 21,445 | 26,114 |
| PURCHASED SERVICES (MEDICAL) | 18,543 | 17,985 | 18,643 | 15,989 | 18,955 | 14,556 | 17,559 | 18,669 | 18,799 | 15,544 | 16,335 | 16,447 | 15,778 |
| PURCHASED SERVICES (NON MEDICAL) | 37,895 | 35,897 | 33,697 | 39,654 | 36,899 | 34,878 | 35,664 | 33,447 | 34,527 | 38,990 | 35,488 | 36,221 | 37,995 |
| LEGAL FEES | 1,085 | 800 | 6,097 | 2,589 | 1,006 | 1,895 | 5,654 | 3,324 | 5,000 | 2,354 | 6,482 | 2,264 | 1,327 |
| REPAIRS & MAINTENANCE | 42,008 | 39,882 | 36,897 | 42,665 | 46,554 | 35,882 | 28,996 | 29,887 | 41,555 | 35,662 | 26,551 | 26,843 | 34,664 |
| RENTS & LEASES | 15,814 | 14,625 | 15,425 | 16,826 | 14,553 | 15,336 | 14,996 | 15,095 | 13,998 | 15,861 | 14,659 | 15,897 | 16,332 |
| UTILITIES & TELEPHONE | 26,589 | 24,852 | 22,562 | 27,465 | 27,155 | 23,956 | 24,875 | 25,445 | 25,003 | 22,888 | 24,886 | 23,992 | 25,112 |
| INSURANCE | 29,889 | 31,000 | 28,528 | 29,556 | 21,559 | 37,995 | 21,598 | 32,112 | 28,995 | 26,897 | 24,555 | 28,489 | 21,459 |
| LICENSES & TAXES | 2,471 | 1,050 | 2,875 | 1,235 | 2,589 | 989 | 1,003 | 459 | 1,165 | 1,132 | 1,125 | 886 | 987 |
| INTEREST EXPENSE | 10,564 | 14,253 | 19,843 | 15,842 | 10,598 | 15,848 | 9,865 | 19,665 | 15,532 | 9,654 | 10,642 | 20,553 | 10,845 |
| DUES & SUBSCRIPTIONS | 1,245 | 2,543 | 1,243 | 2,145 | 1,546 | 2,214 | 2,658 | 2,648 | 1,145 | 1,168 | 2,986 | 2,156 | 1,589 |
| TRAVEL & TRAINING | 200 | 324 | 150 | 125 | 105 | 162 | 132 | 206 | 362 | 325 | 109 | 224 | 295 |
| SETTLEMENTS | - | 20,000 | | - | 20,000 | - | | - | 20,000 | | - | | |
| OTHER OPERATING EXPENSES | 20,546 | 26,542 | 25,464 | 24,358 | 23,654 | 24,565 | 26,849 | 24,658 | 21,003 | 21,785 | 23,685 | 24,855 | 22,113 |
| **TOTAL OUTFLOWS** | 1,136,801 | 1,153,163 | 1,122,247 | 1,272,459 | 1,136,389 | 1,118,492 | 1,068,504 | 1,215,194 | 1,093,657 | 1,098,687 | 1,069,563 | 1,214,776 | 1,082,751 |
| | | | | | | | | | | | | | |
| **CASH FLOW CHANGE** | (198,352) | (446,663) | (146,747) | (487,015) | (333,998) | (94,992) | (85,004) | (361,750) | (291,266) | (75,187) | (96,063) | (286,276) | (229,307) |
| | | | | | | | | | | | | | |
| **CUMULATIVE CASH FLOW CHANGE** | (198,352) | (645,015) | (791,762) | (1,278,777) | (1,612,775) | (1,707,767) | (1,792,771) | (2,154,521) | (2,445,787) | (2,520,974) | (2,617,037) | (2,903,313) | (3,132,620) |

# EXHIBIT B

Samuel R. Maizel (CA Bar No. 189301)
Scotta E. McFarland (CA Bar No. 165391)
Mary D. Lane (CA Bar No. 071592)
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 11th Floor
Los Angeles, California  90067-4100
Telephone: 310/277-6910
Facsimile:  310/201-0760
E-mail:      smaizel@pszjlaw.com
             smcfarland@pszjlaw.com
             mlane@pszjlaw.com

[Proposed] Attorneys for Debtor and Debtor in Possession,
Victor Valley Community Hospital

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**RIVERSIDE VALLEY DIVISION**

| | |
|---|---|
| In re:<br><br>VICTOR VALLEY COMMUNITY HOSPITAL,[1]<br><br>    Debtor. | Case No.  6:10-39537 CB<br><br>Chapter 11<br><br>**INTERIM ORDER (A) AUTHORIZING INTERIM USE OF CASH COLLATERAL, (B) GRANTING ADEQUATE PROTECTION FOR USE OF PREPETITION COLLATERAL, AND (C) GRANTING RELATED RELIEF**<br><br>Hearing:<br>Date:  TBD<br>Time:  TBD<br>Place:  U.S. Bankruptcy Court<br>       3420 Twelfth St.<br>       Riverside, California<br>Judge:  Honorable Catherine E. Bauer |

Upon consideration of the *Emergency Motion By the Debtor For Order (A) Authorizing Interim Use of Cash Collateral, (B) Granting Adequate Protection for Use of Prepetition Collateral, And (C) Granting Related Relief* (the "Cash Collateral Motion"),[2] pursuant to section 363(c) of title

---

[1]  The Debtor is a California nonprofit public benefit corporation, Fed. Tax I.D. No. 95-2475762.  The Debtor's address is 15248 Eleventh Street Victorville, CA  92395

[2]  Capitalized terms used but otherwise not defined herein shall have the meanings ascribed to them in the Cash Collateral Motion.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

11 of the United States Code (the "Bankruptcy Code") and Rule 4001(b) of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"); and it appearing that the Court has jurisdiction

over the matter pursuant to 28 U.S.C. §§ 1334 and 157; and venue being proper before this Court

pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Cash Collateral Motion

having been provided to the United States Trustee, the twenty largest unsecured creditors and any

secured creditor whose collateral includes cash collateral or whose lien(s) might be affected by the

relief sought, pursuant to the Bankruptcy Rules for the United States Bankruptcy Court for the

Central District of California ("Local Bankruptcy Rules"); and the Court having found and

determined that the requested relief sought in the Cash Collateral Motion is in the best interests of

the Debtor, its estate, creditors, and all parties in interest and that the legal and factual bases set forth

in the Cash Collateral Motion and in the concurrently filed *Declaration of Edward T. Matthews*

*Filed In Support Of Emergency Motions* (the "Matthews Declaration") establish just cause for the

relief granted herein; the Court having heard the statements of counsel, having considered all

relevant matters related thereto, and being otherwise fully advised in the premises; and after due

deliberation and sufficient cause appearing thereof, the Court makes the following findings of fact

and conclusions of law:

Adequate and sufficient notice of the Cash Collateral Motion and interim hearing has been

provided to all persons entitled thereto under Rule 2002 and 4001 of the Bankruptcy Rules and no

further notice of the Motion is necessary.

This matter constitutes a "core proceeding" within the meaning of 28 U.S.C. § 157.

This Court has jurisdiction over the parties and the subject matter of this proceeding pursuant

to 28 U.S.C. §§ 1334 and 157.

It is in the best interests of the Debtor's estate that, in exchange for providing adequate

protection to Office of Statewide Health Planning and Development of the State of California

("OSHPD"), Physicians Hospital Management, LLC ("PHM"), and Corwin Medical Group, Inc.,

IPA ("Corwin," and collectively with OSHPD and PHM, the "Secured Creditors") as set forth

below, the Debtor be allowed to utilize Cash Collateral (as defined below) under the terms and

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

conditions set forth herein to permit the Debtor to operate its business and attempt to propose a plan of reorganization.

The Secured Creditors assert that certain prepetition obligations were, as of the Petition Date, secured by valid, enforceable and properly perfected liens on and security interests Debtor' real and personal property and other assets (collectively, the "Existing Collateral"), including, without limitation, cash on hand of the Debtor and cash and receipts generated by the operation of the Debtor' business, which funds constitute "cash collateral" within the meaning of section 363 (a) of the Bankruptcy Code (the "Cash Collateral").

The Debtor has requested that the Court authorize the Debtor's use of Cash Collateral for the purposes set forth in the Budget that is attached as Exhibit A to the Cash Collateral Motion, which may be supplemented or extended (the "Budget").

Subject to compliance with the conditions of this Interim Order, the Debtor is permitted to use Cash Collateral during the period, and in the amounts, set forth in the Budget and only for the purposes set forth therein.

This Interim Order is entered pursuant to, and shall be construed and be consistent with sections 361 and 363 of the Bankruptcy Code and Bankruptcy Rule 4001(b)(2).

IT IS ORDERED THAT:

The Debtor shall be, and hereby is authorized to use Cash Collateral on the terms and conditions set forth in this Interim Order.  The Debtor is authorized to use Cash Collateral in accordance with the Budget; provided, however, that the Debtor (i) may use in any period amounts set forth for that period plus unused amount for any prior period, and (ii) may exceed on a monthly basis the aggregate amount of the Budget by fifteen percent (15%) measured on a four-week rolling basis, as described in the Cash Collateral Motion.

All objections to the Motion or the relief requested therein that have not been made, or that have been withdrawn, waived, or settled, and all reservations of rights included therein, hereby are overruled on the merits.

Because the Debtor's use of Cash Collateral may result in the diminution of the value of the Cash Collateral and a Secured Creditors' interests therein, the Court hereby grants a claim against

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

the Debtor's estate in favor of each Secured Creditor as adequate protection in the amount of any postpetition diminution in the value of the Secured Creditor's interest in the Cash Collateral (the "Adequate Protection Claims").

In order to secure the Adequate Protection Claims, each Secured Creditor is hereby granted a replacement security interest in and lien upon (collectively, the "Adequate Protection Liens") the Existing Collateral and all postpetition proceeds thereof (excluding, however, all claims, causes of action and proceeds thereof arising under sections 510, 544, 545, 546, 547, 548 and 549 of the Bankruptcy Code (collectively, "Avoidance Actions")) (the "Collateral").  The Adequate Protection Liens of the Secured Creditors shall be subject only to valid, perfected, enforceable and unavoidable liens and security interest granted by the Debtor to any person or entity which were superior in priority to prepetition security interests and liens held by the Secured Creditors and only to the extent such prepetition senior liens are not otherwise subject to avoidance or subordination.

Notwithstanding Bankruptcy Rule 7062, the terms and conditions of this Interim Order shall: (a) be immediately enforceable pursuant to Bankruptcy Rule 8005; and (b) not be stayed absent: (i) an application by a party in interest for such stay in conformance with such Bankruptcy Rule 8005; and (ii) a hearing upon notice to the Debtor.

The Debtor shall forthwith serve by first-class United States Mail a copy of this Interim Order upon the United States Trustee, the Secured Creditors or their respective counsel, the Debtor' twenty (20) largest creditors as determined in accordance with Bankruptcy Rule 1007(d), and any party having filed a request to receive service in these Cases.

The Debtor is authorized to use cash collateral through September _____, 2010.  The hearing to consider the entry of a Final Order authorizing and approving use of Cash Collateral and providing adequate protection is hereby scheduled for September ____, 2010 at _____ ___.m.  All objections to the entry of such Final Order authorizing the use of Cash Collateral shall be filed and received no later than September ____, 2010, by counsel to the Debtor, the twenty largest unsecured creditors, any statutorily-appointed committee and the Office of the United States Trustee.

This Court shall retain jurisdiction to hear and determine all matters arising from or related to this Order.

#######

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA