1  Samuel R. Maizel (CA Bar No. 189301)
   Mary D. Lane (CA Bar No. 71592)
2  Scotta McFarland (CA Bar No. 165391)
   PACHULSKI STANG ZIEHL & JONES LLP
3  10100 Santa Monica Blvd., 11th Floor
   Los Angeles, California  90067-4100
4  Telephone: 310/277-6910
   Facsimile:  310/201-0760
5  E-mail:    smaizel@pszjlaw.com
              mlane@pszjlaw.com
6              smcfarland@pszjlaw.com

7  [Proposed] Attorneys for Victor Valley Community
   Hospital, Debtor and Debtor in Possession
8

9              UNITED STATES BANKRUPTCY COURT

10             CENTRAL DISTRICT OF CALIFORNIA

11                   RIVERSIDE DIVISION

12

13 In re:                               Case No.:  6:10-bk-39537-CB

14 VICTOR VALLEY COMMUNITY HOSPITAL,[1]  Chapter 11

15                                       **DECLARATION OF EDWARD
                Debtor.                  MATTHEWS SUPPORT OF**
16                                       **EMERGENCY MOTIONS**

17                                       Hearing:
                                         Date:  TBD
18                                       Time:  TBD
                                         Place:  United States Bankruptcy Court
19                                              3420 Twelfth St.
                                                Courtroom 303
20                                              Riverside, CA  92501-3819
                                         Judge: Honorable Catherine E. Bauer
21

22 **TO THE HONORABLE CATHERINE BAUER, UNITED STATES BANKRUPTCY JUDGE,**
23
   **ANY ALLEGED SECURED CREDITORS, CREDITORS HOLDING THE TWENTY**
24
   **LARGEST UNSECURED CLAIMS, PARTIES REQUESTING SPECIAL NOTICE, AND**
25
26 **THE OFFICE OF THE UNITED STATES TRUSTEE:**

27

28 [1] The Debtor is a California nonprofit public benefit corporation, Fed. Tax I.D. No. 95-2475762.  The Debtor's address is
   15248 Eleventh Street Victorville, CA  92395.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

I, Edward Matthews, declare as follows:

1.     I am the Chief Financial Officer of Victor Valley Community Hospital, the above-captioned debtor and debtor in possession (the "Debtor").  I am primarily responsible for the financial management of the Debtor, and in this capacity, I am generally familiar with the day-to-day operations, business and financial affairs of the Debtor.

2.     Except as otherwise stated, all facts contained within this Declaration are based upon personal knowledge (albeit my own or that gathered from others within the Debtor's organization), my review of relevant documents, or my opinion based upon my experience concerning the operations of the Debtor.  If called upon to testify, I would testify to the facts set forth in this Declaration.

3.     I submit this Declaration in support of the "first-day" relief that the Debtor has requested in the emergency motions (the "Emergency Motions") listed and discussed below, and to assist the Court and other interested parties to understand the circumstances that compelled the commencement of this Case.  The relief sought in the Emergency Motions is intended to enable the Debtor to continue to operate effectively, thereby avoiding or minimizing certain adverse operational and financial consequences that might otherwise result from the commencement of this Case.  I have reviewed the Emergency Motions and believe that the relief sought in them is essential to ensuring the uninterrupted operation of the Debtor's business, and the success of the Case.

4.     After the filing of their Petition, the Debtor filed (concurrently with this Declaration), the following Emergency Motions:

    a.     *Emergency Motion of Debtor for Order Limiting Scope of Notice*;

    b.     *Emergency Motion for Order Pursuant to 11 U.S.C. §§ 363, 1107 and 1108 Authorizing (1) Maintenance of Existing Bank Accounts, (2) Continued Use of Existing Cash Management System, and (3) Continued Use of Business Forms;*

    c.     *Emergency Motion of the Debtor for Entry of an Order: (i) Authorizing the Debtor to (a) Pay Prepetition Wages, Salaries, Employee Benefits, and other Compensation, (b) Remit Withholding Obligations*; *(c) Maintain Worker's Compensation and Benefits Programs, (d) Pay Related Administrative Obligations; and (d) Pay Reimbursable Employee Expenses; and (ii)*

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

*Authorizing and Directing the Applicable Bank to Pay All Checks and Electronic Payment Requests Made by the Debtor Relating to the Foregoing;*

d. *Emergency Motion for Order (a) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service, and (b) Determining Adequate Assurance of Payment for Future Utility Services;*

e. *Emergency Motion of Debtor for Entry of Interim and Final Orders (a) Authorizing Use of Cash Collateral, (b) Granting Adequate Protection for Use of Prepetition Collateral, and (c) Granting Related Relief;*

f. *Emergency Motion of Debtor for an Order Extending Time to Complete Schedule of Assets and Liabilities and Statement of Financial Affairs;*

g. *Emergency Motion of Debtor for Orders (a) Authorizing Debtor to Obtain Postpetition Financing and Granting Liens and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. § 364; and (b) Scheduling A Final Hearing And Establishing Related Notice Requirements; and*

h. *Emergency Motion of the Debtor for Entry of an Order (a) Authorizing the Debtor to Pay Prepetition Claims of Emergency Room Doctors, Medical Director Doctors, and Nursing Registries Who Are Critical Service Providers and (b) Directing the Applicable Bank to Pay All Checks and Electronic Payment Requests Made by the Debtor Relating to the Foregoing.*

5.    This Declaration is divided into three parts:  Part I of this Declaration provides an overview of the Debtor's business, organizational and liability structure; Part II provides a discussion of the Debtor's financial history and the events that compelled the commencement of this Case, and the Debtor's goals for its bankruptcy case; and Part III sets forth the relevant facts in support of the Emergency Motions.  A capitalized term that is not otherwise defined herein shall have the meaning given it in the applicable Emergency Motion.

## II.

## BACKGROUND

On September 13, 2010, (the "Petition Date"), the debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtor

1    continues to operate its business and manage its affairs as a debtor in possession pursuant to sections

2    1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or committee has been appointed

3    in this Case.

4    **A.    General Description of the Debtor**

5            The Debtor, a California nonprofit public benefit corporation, operates the Victor Valley

6    Community Hospital (the "Debtor" or the "Hospital").  The Debtor was founded in 1967 and is the

7    only non-profit community hospital in the California High Desert, a service area that includes the

8    communities of Adelanto, Apple Valley, Hesperia and Victorville, serving a population of over

9    300,000 people.  The High Desert communities served by the Debtor are culturally and ethnically

10   diverse.  They also are economically depressed, and suffer under unemployment rates that are higher

11   than 20%.  The Debtor, therefore, serves a high volume of medically under served and indigent

12   patients and has been designated as a Disproportionate Share Hospital.  As a result of this high

13   volume of indigent patients, millions of dollars worth of the Debtor's services were expended on

14   charity care in 2009, and, with a worsening economy and growing unemployment, the amount in

15   uncompensated, charity care will increase significantly in 2010.

16   **B.    The Debtor's Physical Plant**

17           The Hospital is located at 15248 Eleventh Street, Victorville, California 92392.  The facility

18   was designed and constructed as an acute care hospital, and over the years it has been renovated and

19   expanded to accommodate the needs of its patients and the communities it serves.  Originally the

20   facility was operated as a 115 bed facility, but the capacity was reduced in the mid-2000s to

21   approximately 106 beds, and subsequently further reduced to its current 101 bed capacity.  The

22   Debtor owns the main, two-story, hospital building and its adjacent modular office complex which

23   houses its administrative offices.  The Debtor also leases two other facilities: (a) the Women's

24   Center and Outpatient Imaging facility, along with the Debtor's human resources department, at

25   15203 Eleventh Street in Victorville, and (b) the Education Center, at 15366 Eleventh Street, Suite

26   R, in Victorville.

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**C.    The Debtor's Staff**

The Hospital is currently staffed to operate approximately 65 beds on a normal day, although it has access to visiting nurse registries, which allow it to quickly increase its staff to meet patient needs.  Approximately 257 doctors from the local community have privileges at the Hospital.  As of the Petition Date, the Debtor employed approximately 572 people.  Of this, approximately 160 are nurses.  The rest include, but are not limited to, office staff, technicians, maintenance staff, IT staff, human resources staff, and Quality Assurance staff.

**D.    The Debtor's Services**

As an acute care facility, the Debtor provides a full range of inpatient and outpatient specialty services, including, but not limited to, basic 24-hour emergency room services, surgical services, pediatric services, operating room services, physical therapy, respiratory therapy, outpatient ambulatory services, catheterization laboratory, diagnostic services, women's health center and outpatient imaging services, laboratory and pathology services, social and Medi-Cal eligibility services, physician referral service, and community wellness and education programs.  The Debtor treats approximately 2,900 patients per month in the Emergency Room, of which approximately 250 are eventually admitted to the Hospital.  Annually, the Debtor has approximately 6,600 patients admitted to the Hospital, not including newborns.  Doctors working in the Hospital perform approximately 2,500 out-patient surgeries and approximately 2,000 in-patient surgeries and deliver approximately 1,400 babies annually.

**E.    The Debtor's Management**

The Debtor is governed by a Board of Directors (the "Board") that is comprised of six members who are leaders in the High Desert community: Kathy Davis, Chair (retired political consultant); Dennis G. Killion, Vice-Chair (educator);Thomas Brown (retired bank president); Michael Fermin (Deputy District Attorney); Tim Jasper (local business owner); and Herbert Williamson, III (Public Defender).

The Debtor's Chief Executive Officer is Cathy Pelley, who has served in this position since July 2009.  Prior to that, she was a consultant for the Hospital for the previous four months; CEO at Glendale Memorial Hospital in Glendale, California; and CEO at St . Mary's Regional Medical

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Center in Apple Valley, California.  She is a veteran, having served as an Army nurse during the Vietnam War.  She has a Nursing Degree from Philadelphia General Hospital, a Bachelor of Science degree in Business Administration and a Master of Science degree in Organization Development, both from the University of San Francisco, and has worked in the hospital industry since approximately 1970, including more than 40 years as a CEO or equivalent position.

I am the Debtor's Chief Financial Officer ("CFO") and Chief Information Officer and have served in this position since December 2008.  Prior to that, I served as founder and principal manager for Neved Investments; CFO for St. Johns Regional Medical Center in Oxnard, California; as a principal with Healthcare Marketing Group, a healthcare industry investment banking group; and as CFO of Doctors' Hospital of Montclair, in Montclair, California.  I served in the United States Army during the Vietnam War, including service in Vietnam, and was awarded the Bronze Star Medal.  I have a degree in Business Administration, with a concentration in Accounting, and a Masters of Business Administration, both from the University of Texas at Arlington.  I have worked in the hospital industry since 1975.

Additionally, the Debtor contracts, pursuant to a management agreement, with Physicians Hospital Management, LLC, a California limited liability company, (the "Manager") as contract administrator to provide a qualified professional senior management team for the Debtor that assists the Board in implementing measures necessary to improve the Debtor's fiscal and operational management.  The management fee currently in effect pursuant to the management agreement is $30,000.00 per month.  The Debtor intends to reject this agreement.

## III.

## FINANCIAL HISTORY AND EVENTS

## LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASE

**A.    Financial History**

      1.    The Debtor's Secured Debt[2]

            a.    The 2000 Bonds

---

[2]    The Debtor has not undertaken an exhaustive review to ascertain whether there is any defect in the security interest granted or the perfection of that security interest.  For the purposes herein, the Debtor will assume that the security interests were in fact duly perfected, reserving all rights with regard to this issue.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

In 2000, the Debtor applied to the California Health Facilities Financing Authority ("HFFA") for financial assistance in refinancing its existing Insured Hospital Revenue Bonds (Victor Valley Community Hospital) 1984 Series A, and this application was approved. In May 2000 the HFFA and the Treasurer of the State of California issued the California Health Facilities Financing Authority Insured Hospital Refunding Revenue Bonds (Victor Valley Community Hospital) Series 2000A (the "Bonds") in the amount of $8,470,000. HFFA entered into an Indenture with Bank of New York West Trust Company as Trustee,[3] and the proceeds of the sale of the Bonds were loaned to the Debtor (the "HFFA Loan") pursuant to a Loan Agreement between HFFA and the Debtor dated May 1, 2000. The Debtor gave HFFA a security interest in the Debtor's facilities, including real and personal property, to secure its repayment obligations under the Loan Agreement, and a Deed of Trust was duly entered into and subsequently filed. The Office of Statewide Health Planning and Development of the State of California ("OSHPD") issued a Contract of Insurance to insure the repayment of the loan obligations and the Debtor entered into a Regulatory Agreement with HFFA and OSHPD under which OSHPD was given the rights to the security given by the Loan Agreement.

As of July 31, 2010, the Debtor owed a total of approximately $2.6 million on the Bonds; with approximately $2.1 million currently held at a Bank of New York Mellon Bank as a reserve account. On or about September 2, 2010 Debtor made a payment into the reserve account of $81,225.00.

b.    The Desert Community Bank Obligations

In 2007 the Debtor desired to establish a revolving line of credit with Desert Community Bank, now a division of East West Bank (the "Bank") in the maximum amount of $4.9 million (the "Bank Loan"), which line of credit was authorized pursuant to a Note dated August 27, 2007 and a Loan Agreement, also dated August 27, 2007, between the Debtor and the Bank. The Bank and the Debtor asked OSHPD to insure the Debtor's obligations to the Bank, and on or about August 30, 2007, the Debtor entered into an Amendment to Regulatory Agreement with OSHPD and HFFA ("the Amendment") under which Debtor obtained permission to enter into the line of credit with the

---

[3]    The indenture trustee's current name is Bank of New York Mellon Trust Company, N.A.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Bank to finance working capital and pay expenses related to the execution and issuance of the line of credit and related documents.

On or about August 27, 2007, the Debtor executed for the benefit of OSHPD a Deed of Trust with Fixture Filing and Security Agreement ("Trust Deed") which was duly recorded on August 30, 2007. The Trust Deed conveyed a security interest to secure both the HFFA Loan and the Bank Loan, in, among other things, all of Debtor's land, improvements, fixtures, equipment, leases, rentals, accounts, accounts receivable, and inventory, and replaced the earlier Deed of Trust which related only to the HFFA Loan.

As of July 31, 2010, the Debtor owed the Bank approximately $4.5 million on account of this obligation. This obligation is paid through an automatic withdrawal from the Hospital's general account of about $30,000 monthly; the last payment was made in August 2010.

c.     The PHM Obligations

As of February 2, 2005, Debtor entered into a Loan Agreement with Physicians Hospital Management, LLC ("PHM") that provided for a loan of $6 million, some funds of which had been previously provided and previously evidenced by other notes. Interest accrues and was to be paid monthly; the principal is due to be paid in 2012 in a balloon payment. The Debtor has not made a payment on this obligation in approximately 3 months and currently owes $91,822 of accrued interest on this obligation.

The Loan Agreement is secured by a trust deed on Debtor's real estate subordinate to the OSHPD Deed of Trust.

d.     The Corwin Medical Group Obligations

On or about September 1, 2010, Debtor borrowed $700,000.00 from Corwin Medical Group, Inc., IPA (the "Corwin Loan") in order to pay its September 3, 2010 payroll. The promissory note evidencing the Corwin Loan provides that (a) the principal amount of the note will be due and payable on December 1, 2010, with interest at 5.00% annually; (b) that it is secured by the DSH adjustment receivable and by Medicare Settlement receivables; and (c) that the proceeds of either or both of these receivables shall be used to repay this note prior to satisfying other obligations of the Hospital.

e.      Capitalized Leases

The Debtor has a lease with Radiometer America, Inc. for a radiometer, which is secured by an security interest in the radiometer.  As of August 31, 2010, the Debtor owed approximately $ 58,579 on this lease.  The monthly payment is $2,765.00.

2.      The Debtor's Unsecured Debt

The Debtor has approximately $16.5 million in total unsecured debt, comprised of obligations to vendors of goods and services, employees, and a significant obligation to Medi-Cal, which is being paid off over 40 years pursuant to an agreement with Medi-Cal.

a.      Trade Debts

The Debtor owes approximately $1,308,000 in accrued but unpaid management fees to PHM. Additionally, the Debtor owes approximately $7 million to providers of goods and services to the Debtor, including Cerner, Medtronic, Stryker, J&J and others, as well as to the State of California for genetic testing for newborns.

b.      Employee Obligations

The Debtor owes approximately $2 million to its current and former employees for wages and Paid Time Off ("PTO") including vacation and sick time.

c.      Obligations to Medi-Cal

The Debtor currently owes approximately $6,008,000.00 for prior overpayments on Medi-Cal cost reports.  At the end of a fiscal year, the Debtor must submit a "cost report" to the Centers for Medicare and Medi-caid services, which cost report shows a recap of all rights to payment owned by the entity submitting the report compared to the amounts already paid by the federal or state governments.  The government audits these cost reports and decides whether the provider was overpaid or underpaid.  If underpaid, the government pays the funds owed.  If overpaid, the provider must reimburse the government.  In this case, prior cost reports of the Debtor going back as far as 1994 have been audited and the audits revealed that the Debtor was overpaid.

On or about May 5, 2004, the Debtor entered into an extended repayment plan (the "First Repayment Plan") with the State of California Department of Health Care Services for overpayments for cost report years 1993-1997.  The amount of the obligation covered by the First

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Extended Repayment Plan was $6,027,255 and the balance under the First Extended Repayment Plan as of September 5, 2010 was $5,583,774.  The monthly payments are $27,577 with the last payment being due on May 4, 2044.

The Debtor, on or about April 1, 2009, entered into another extended repayment plan (the "Second Extended Payment Plan") to cover the overpayments in the amount of $2,426,246.00 received in the cost report years of 2005-2007.  The amount due under the Second Extended Payment Plan is being amortized over a period ending January 1, 2011 with monthly payments of $111,203.  The monthly payments under the First Extended Payment Plan and the Second Extended Payment Plan, $138,780, are being offset by Medi-Cal from current remittance advices.

3.    The Debtor's Revenues

The primary source of the Debtor's revenues are payments for services provided to its patients from either health plans or from governmental programs such as Medicare and Medi-Cal (the California state version of the Medi-caid Program).  The following are the approximate percentages of the Debtor's sources for payments for providing patient services: Medi-Cal and Medi-Cal Managed Care: 42.7%; Medicare and Medicare Managed Care: 29.1%; Managed Care Health Maintenance Organizations/Preferred Provider Organization ("HMO/PPO"), including Aetna, Blue Cross/Blue Shield, Cigna and United: 10.1%; Commercial Workers' Compensation Insurance: 8%; and County Indigent Programs: 4.6%; and Self-Pay: 5%.  Thus, more than 75% of the Debtor's revenues come from governmental payors.  Further, historically, the Hospital has collected only approximately 8% of the amount due from self-pay patients.

The Debtor, as a Disproportionate Share Hospital, also receives payments from the California state government to help cover the extraordinary costs of serving a particularly high number of indigent patients, whether Medi-Cal and Medicare eligible or not.  For fiscal year 2009-2010 the Debtor received approximately $3.8 million in DSH payments, and is still owed two payments. However, what amount of DSH monies will be forthcoming and when it will be paid is unknown, because one payment, estimated at being over $750,000, is being withheld by the State pending resolution of a lawsuit brought against it by the Federal government; the last payment is not expected until October 2011 and will be a relatively small amount.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Additionally, the Debtor qualifies for a new program called the Hospital Quality Assurance Revenue Fund. Although this program still awaits approval by the federal Center For Medicare and Medicaid Services ("CMS"), a recent memo of the California Hospital Association ("CHA") lists the Debtor as being likely to receive several million dollars over the expected twenty-one month life of the program.

4.    Events Leading to Chapter 11

The current fiscal crisis for the Debtor is the result of the confluence of several factors. First, the Debtor provides millions of dollars per year in care to indigents, for which it is not compensated at all or is inadequately compensated. The percentage of the Debtor's resources expended on indigent care is increasing because the Debtor serves a depressed community and the economic condition of this community has worsened in the past few years. As the unemployment rate has risen, so has the number of uninsured patients. Over the last year, the volume of patients has not increased substantially, however, the number of Medi-Cal and self-pay patients increased by 7%.

Second, the Hospital's plant is approximately 45 years old and the maintenance costs for this plant are substantial and increasing every year. In addition to the maintenance costs, the costs of bringing and keeping the hospital plant in compliance with the various governmental regulatory requirements is also substantial.

Third, Medi-Cal arbitrarily reduced its payment rate by 10% in January 2010, and Medicare payment rates will be reduced by 2.9% in October 2010. These changes have caused a decline in the Debtor's revenues without a corresponding reduction in the Debtor's obligations to provide patient care.

Fourth, California's financial crisis and the inability of its legislature to pass a budget has caused uncertainty in the timing and the amounts of the DSH Payments and a delay in the hoped for Quality Assurance Fee payments.

Fifth, being a stand alone, small rural hospital in California is simply not an advantageous financial situation. Such hospitals, including the Hospital, suffer from a lack of economies of scale, poor payor mix, high overhead costs, less high-margin specialty service lines, and an overall lower

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

revenue base.  Thus, the Hospital, like many rural small hospitals, struggles to meet even the

relatively small (1 - 3 %) profit margins that is the norm for most of the

not-for-profit hospital industry.

During the relatively short period of time that Ms. Pelley and I have managed the Hospital

they have made extensive efforts to deal with the financial crisis, including, but not limited to, laying

off staff, changing to outsourcing for medical transcriptions, negotiating an increase in payor rates

from Inland Empire Health Plan, a public entity, and attempting to re-negotiate commercial

contracts, however, they lacked leverage and were not able to increase those contract rates.  In any

event, because 75% of the Debtor's payments come from governmental payors, even an increase in

payment rates from HMOs/PPOs would not make a significant difference in the Hospital's cash

flow.

The Debtor needs to generate approximately $150,000 to $200,000 per day in revenue to

cover its operating costs.  No appreciable cost savings are recognized by the Debtor when the patient

census drops below 65 beds a day, as the fixed costs remain fairly constant.  The Hospital has been

generating only approximately $100,000 per day in revenue.  Thus, the Debtor loses money every

month it operates, and could not have paid its employees their last pay period absent an emergency

loan from the Corwin Medical Group.  In light of this ongoing cash flow shortage, the Debtor was

forced to file this chapter 11 case.

Because the Debtor's CEO, Board and I have concluded that the Debtor cannot survive at its

current cash flow levels and would have to close absent drastic measures, representatives of the

Board approached Prime Healthcare Services Foundation, Inc. ("Prime"), which had previously

expressed an interest in purchasing the Hospital, and negotiated the Asset Sale Agreement which is

being presented as part of the initial bankruptcy filings.  The proposed sale to Prime, a Delaware

non-stock corporation organized exclusively for charitable purposes under Section 501(c)(3) of the

Internal Revenue Code, or its permitted assignee, will allow the Debtor to pay all its secured

creditors, and provide a significant distribution to unsecured creditors.  The chapter 11 case will give

the Debtor the breathing room necessary to sell its assets either to Prime or an over-bidder at a

bankruptcy auction, allowing the Hospital to continue to provide its essential healthcare services to

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    the High Desert Communities and provide a recovery that will benefit all of its creditors.  The

2    proposed sale provides for Prime to acquire substantially all the Debtor's assets in exchange for $25

3    million in cash or assumption of debt, as well as up to an additional $3.2 million in Debtor in

4    Possession Financing to be provided postpetition and prior to the closing of the proposed sale to

5    allow the Hospital to continue to operate.

6                                              **IV.**

7                                    **EMERGENCY MOTIONS**

8           As I stated above, I believe that the Emergency Motions will facilitate the Debtor's transition

9    into the Case and ability to maximize the return to creditors.  The Emergency Motions are discussed

10   below.

11   **A.    Emergency Motion of Debtor for Order Limiting Scope of Notice**

12          The Debtor's creditor matrix in this Case exceeds 6,000 parties.  The Debtor anticipates that

13   numerous creditors will assert claims against the estate.  Requiring notice to and service upon all of

14   these parties would substantially increase the cost of administering this estate without conferring any

15   meaningful benefit on the estate.  The Debtor submits that the limited scope of notice proposed

16   herein is necessary to avoid the administrative burdens and costs that serving notice of all pleadings

17   on these parties would impose upon the Debtor while assuring that the interested parties in this Case

18   receive proper and sufficient notice of all matters.

19          I am informed and believe that, by this motion (the "Limited Notice Motion"), the Debtor

20   seeks, pursuant to Bankruptcy Rules 2002(i), 2002(m), 4001, 6004, 6006, 6007, 9006, 9007, 9013,

21   9014, and 9019 an order authorizing the Debtor to limit notice of the Limited Notice Matters (as

22   defined below) in this Case to the following parties: (1) the Office of the United States Trustee, (2)

23   the creditors appearing on the list filed by the Debtor in accordance with Fed. R. Bankr. P. 1007(d)

24   unless and until an official committee of unsecured creditors (the "Committee") is appointed, then in

25   that event, to counsel of the Committee, (3) any party asserting secured claims, (4) parties that file

26   with the Court and serve upon the Debtor requests for notice of all matters in accordance with

27   Bankruptcy Rule 2002(i), and (5) any party with a pecuniary interest in the subject matter of the

28   particular Limited Notice Matter or its counsel.  If the relief requested in the Limited Notice Motion

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

is granted, the burden, complication, delay and cost to the Debtor's estate that is associated with administering this case and providing notice of the proceedings in this case to many thousands of parties would be dramatically reduced.

Except as stated below, the Debtor requests that the Court limit the scope of service of all notices, motions, or applications (the Limited Notice Matters"), including, but not limited to, the following:

- any proposed use, sale, or lease of property of the estate pursuant to section 363 of the Bankruptcy Code and Rules 2002(a)(2), 4001(b), and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules");

- any proposed debtor in possession financing or use of cash collateral;

- any proposed extension of the Debtor's exclusive time to file a plan of reorganization and solicit acceptance thereof (including, without limitation, the time to file a disclosure statement) pursuant to section 1121 of the Bankruptcy Code and Bankruptcy Rule 3016;

- any proposed approval of a compromise or settlement of a controversy pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rules 2002(a)(3) and 9019;

- any proposed abandonment or disposition of property of the estate pursuant to section 554 of the Bankruptcy Code and Bankruptcy Rules 6007(a) or (c);

- any proposed assumption or rejection of contracts or leases under section 365 of the Bankruptcy Code and Bankruptcy Rule 6006;

- any proposed application for compensation or reimbursement of expenses of professionals, pursuant to sections 328, 329, 330, or 331 of the Bankruptcy Code and Bankruptcy Rules 2002(a)(6), 2016, 2017, and 6005; and

- a hearing on any other contested matter in this Case that requires notice to all creditors or equity holders pursuant to the Bankruptcy Code, Bankruptcy Rule 9014, or the Local Bankruptcy Rules.

Notwithstanding the foregoing, the relief requested in the Limited Notice Motion does not affect the rights of all creditors and parties in interest in this Case to receive notice of the following matters or

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

proceedings: (i) a hearing on the dismissal or conversion of this Case; (ii) the time fixed for filing objections to any disclosure statement and any hearing to consider approval of any disclosure statement; (iii) the time fixed for accepting, rejecting, or objecting to confirmation of a plan or any modification thereof and the hearing thereon; (iv) the entry of an order confirming a plan; and (v) the date fixed for filing proofs of claim.

If the relief requested by the Limited Notice Motion is granted, the burden, complication, delay and cost to the Debtor's estate that are associated with administering this Case and providing notice of the proceedings in this Case to many parties will be dramatically reduced.  Further, because the Debtor is concurrently with this Motion filing other motions seeking relief in connection with other matters and will in all likelihood file various other motions during the first days of this Case, the Debtor requests that this Motion be heard on an emergency basis.  Granting the relief requested in this Motion on an emergency basis immediately will benefit the Estate as set forth above.

**B.**     **Emergency Motion for Order Pursuant to 11 U.S.C. §§ 363, 1107 and 1108 Authorizing (1) Maintenance of Existing Bank Accounts, (2) Continued Use of Existing Cash Management System and (3) Continued Use of Business Forms**

By the *Emergency Motion for Order Pursuant to 11 U.S.C. §§ 363, 1107 and 1108 Authorizing (1) Maintenance of Existing Bank Accounts, (2) Continued Use of Existing Cash Management System, and (3) Continued Use of Business Forms* (the "Cash Management Motion"), the Debtor is seeking an order of this Court: (a) authorizing the Debtor to maintain and to continue using 9 of its 18 existing bank accounts, (b) authorizing the Debtor to continue using its electronically generated business forms without "Debtor in Possession" appearing on them for a period of 30 days until the Debtor can alter its software to include that designation and the Case number on the forms, to utilize its preprinted forms without the "Debtor in Possession" stamp until the supply is depleted, and to approve the use of a "debtor in possession" stamp on all checks issued until the current stock of checks is depleted and checks are reordered, (c) authorizing and directing the Banks to honor postpetition checks drawn on and transfers made from the Accounts in the ordinary course of business, (d) requiring that in the event that if any Bank refuses to honor checks drawn on the Accounts (provided there are sufficient good funds in the account to honor the checks

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

and the checks are otherwise properly payable) the Bank must immediately turn over the deposits held in the applicable Account upon the Debtor's request, (e) granting the Banks limited relief from the automatic stay to continue to offset standard monthly or periodic bank fees against the Accounts in the same manner as such fees were offset prepetition, and (f) granting such other and further relief as is just and proper under the circumstances.

The Debtor requests that the relief sought in the Cash Management Motion be granted on an emergency basis because the uninterrupted use of its nine Accounts and cash management system and the continued use of its current business forms and checks as described in the Cash Management Motion and in this Declaration are essential to the Debtor's ability to maximize its postpetition operations and to adjust smoothly to being a operating debtor in possession.

The Debtor historically has maintained eighteen (18) bank accounts with four (4) financial institutions. A list of the bank accounts and the financial institutions is attached to the Cash Management Motion as Exhibit A. At Desert Community Bank, a Division of East West Bank (the "DCB"), the Debtor maintains nine (9) different accounts. These accounts include: (1) the General Checking Account (Account No. 0110416001), (2) the Payroll Account (Account No. 0108882301), (3) the Credit Card Account (Account No. 0109735001), (4) the Foundation Checking Account (Account No. 0109043701) and six other accounts know as the Repurchase Account (Account No. 0108885881), the Gold Account (0192587312), the Escrow Account (Account No. 0109555201), the Cost Settlement Account (Account No. 0158737412), the Equipment Reserve Account (Account No 0158963611), and the Old General Checking Account (Account No. 0108885801). The Debtor, as of the Petition Date, no longer utilizes the last six listed accounts. All funds in these accounts either have been or will be transferred into the General Checking Account as soon as possible[4] and these six accounts will be closed.

The Debtor has three (3) accounts at ASB: (1) a Money Market Account for Self- Insurance Premiums (Account No. 9600131), (2) a Checking Account for payment of Self-Insured Claims (Account No. 9300286) and (3) the Foundation Credit Card Account (Account No. 1318070) The

---

[4] The Escrow Account and the Old General Checking Account are frozen accounts. The Debtor is working with DCB to resolve any issues related to the accounts and to get the accounts closed.

Debtor no longer utilizes the first two of these accounts because the Debtor is no longer self-insured regarding its employees' health claims and the administrator of the self-insurance program has advised the Debtor that no further claims are outstanding.  The Debtor has transferred the funds that remained in these two accounts in the amount of approximately $8,500 into its General Checking Account and will immediately close these two accounts.  The Debtor is requesting authority to keep the Foundation Credit Card Account open.  This Account was recently opened for the deposit by the credit card companies of funds donated to the Hospital by credit card.  Closing the Account would definitely disrupt the deposit of the donations while the credit card companies changed their records and instructions as to the new account and opening a new account would serve no useful purpose.

The Debtor maintains four (4) accounts at UBC: (1) the Foundation Savings Account (Account No. 0480043480), the Capitated Funds Savings Account (Account No. 3261662435), the Capitated Claims Checking Account (Account No. 3260496319) and the Capitated Funds Money Market Account (Account No. 3260496122).  The Debtor is seeking to maintain all of these accounts.

The Debtor has one account at the AFCU (Account No. 2210581).  It is an old dormant account that was once utilized to manage the Debtors capitation funds (discussed below) but has been replaced by the accounts at UCB.  There is a balance of approximately $27,217 in the Account, most of which is invested in a money market account.  Although the funds in this account are the Debtor's funds, the only signatories on the account are with Desert Physicians Management, LLC ("DPM"), the company that manages the Debtor's capitated managed care agreement obligations. The Debtor wants to close this account and transfer the funds to its General Checking Account, and will take the actions reasonably necessary to attempt to bring about this result immediately.

The Debtor is requesting that it be authorized to leave nine of its accounts open and to utilized them as set forth below:

1.    The General Business Accounts

The Debtor has three Accounts, all with DCB, that it utilizes in its day to day business operations.  The Debtor requests that it be authorized to maintain these three accounts and to utilize postpetition in the same manner that it utilized them preptition.  The Debtor receives payment for its

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

services from five primary sources: (1) direct payments from patients ("Patient Payments"), (2) payments from its patients made by credit card ("Credit Card Payments"); (3) payments from private insurance companies on behalf of patients ("Commercial Insurance Payments"), (3) payment from the State of California under the Medi-Cal program ("Medi-Cal Payments") and (4) payments from the Federal Government under the Medicare or Medical programs (together with the Medi-Cal Payments, the "Government Payments"). These payments are deposited into two accounts, one is the General Checking Account into which the Patient Payments, the Commercial Insurance Payments and the Government Payments are deposited and the other is the Credit Card Account into which the Credit Card Payments are deposited. The Debtor transfers the funds out of the Credit Card Account into the General Checking Account on an as needed basis. The Debtor's disbursements to third-parties are made out of the General Checking Account.

The daily balance of funds in the General Checking Account is generally between $400,000 and $500,000 and in the Credit Card Account, $75,000. Neither of these accounts is an interest bearing.

The Debtor also transfers funds daily out of the General Checking Account into the Payroll Account so that every other Thursday the Payroll Account will have a balance of approximately $1,100,000 for the Debtor's payroll. Every other Thursday at approximately 10:00 a.m., funds from the Payroll Account are transferred to ADP and ADP pays the payroll taxes and the payroll. In addition, on occasion a special circumstance will arise that requires that the Debtor make a direct payroll payment. In those events, the Debtor will draft a check on the Payroll Account to meet that obligation.

DCB is approved as a depository for funds of debtors in possession by the Office of the United States Trustee for Region 16 so the funds in these Accounts are protected as required by section 345 of the Bankruptcy Code.

2.    The Foundation Accounts

The Debtor maintains three Accounts related to its fund raising activities that it refers to as "Foundation" Accounts. Although the Debtor maintains three accounts that it refers to as "Foundation" accounts, no separate legal "foundation" entity exists. These accounts are simply

Pachulski Stang Ziehl & Jones LLP
Attorneys at Law
Los Angeles, California

accounts established by the Debtor so that it can segregate the donations made to the Hospital by third parties Cash donations made to the Hospital are deposited into the Foundation Checking Account at DCB, a non-interest bearing account, and disbursements for hospital programs funded by the donated funds are made from this Account. The Debtor periodically transfers funds from the Foundation Checking Account into the Foundation Savings Account, an interest bearing account, at UBC where they are held until needed and transferred back to the Foundation Checking Account. The current balance in the Foundation Checking Account is $179,743.84 and in the Foundation Savings Account is $203,147.08. The Debtor recently opened the Foundation Credit Card Account at ASB. Credit card donations made to the Hospital are deposited into this Account by the credit card companies. This Account has a current balance of $33,9025.63. The Debtor requests that it be authorized to keep open the Foundation Checking Account, the Foundation Savings Account and the Foundation Credit Card Account and continue postpetition its prepetition cash management practices with respect to the funds donated to the Hospital by third parties. UBC, DCB and ASB are approved as depositories for funds of debtors in possession by the Office of the United States Trustee for Region 16 so the funds in the these Accounts are protected as required by section 345 of the Bankruptcy Code.

3.    Capitated Managed Care Accounts

Historically the Debtor was a party to certain capitated managed care agreements, which it cancelled as of March 31, 2010. Capitated managed care agreements are contracts pursuant to which certain health plans pay hospitals a set amount of money each month for a designated universe of persons. Such payments were to be used to pay for all covered health care services provided to the persons covered by the agreements. During the time it was a party to such agreements, it entered into an contract with DPM to supervise and administer the operation of the Hospital's business as related to capitated managed care agreement obligations. In order to manage the funds paid by the health plans pursuant to the capitated managed care agreements and the claims made by the providers of medical services to the persons covered by the agreements, the Debtor opened three accounts at UBC: (1) the Capitated Funds Saving Account, the Capitated Funds Checking Account and the Capitated Funds Money Market Account. Capitation funds, as they were received by the Hospital,

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

were deposited into either the Capitated Funds Savings Account or the Capitated Funds Money Market Account.  They were transferred out of these accounts as needed into the Capitated Funds Checking Account to pay the capitated claims or into the General Checking Accounts to be used for operations.  Currently, there is a balance of $14,010.17 in the Capitated Funds Savings Account, $384,905.44 in the Capitated Funds Checking Account and $45,804.84 in the Captiated Funds Money Market Account.  The Debtor is unaware of the amount, if any, of unpaid capitated claims but believes that any unfiled claims are too late.  The Debtor, as soon as possible, will obtain information from DPM on any outstanding capitated claims and will take the steps necessary to close these accounts and transfer the balance of the funds to the General Checking Account, however, until the Debtor is able to accomplish the resolution of all capitated funds issues, it requests authority to keep these accounts open and to utilize them as necessary and, to the extent necessary, as otherwise approved by this Court to complete its capitated fund obligations.  UBC is approved as a depository for funds of debtors in possession by the Office of the United States Trustee for Region 16 so the funds in these Accounts are protected as required by section 345 of the Bankruptcy Code.

Requiring the Debtor to close the DCB Accounts and to open new ones will disrupt the Debtor's business and cash flow.  Further, closing the Accounts and opening new ones will also increase the work required of the Debtor's accounting personnel who are already dealing with the many and varied issues related to this case and would needlessly cost the Debtor time and money with no discernible benefit to its chapter 11 estate (the "Estate") at a time when it is trying to conserve both.

The Debtor is also requesting authority to continue using its business forms without the designation "Debtor in Possession" on them for a limited time.  Many of the Debtor's business forms are electronically printed.  The Debtor seeks the authority of this Court to utilize its electronically generated forms without the "Debtor in Possession" designation for thirty days, until the Debtor can make the necessary adjustments to its software so that these forms will contain the phrase "Debtor in Possession" and the case number. To the extent it utilizes preprinted forms, the Debtor seeks authority to utilize these forms until its supplies of them are depleted.  When the Debtor reorders any

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  preprinted forms, if it is still a debtor in possession, it will have "Debtor in Possession" and the case

2  number printed on them.  Finally, the Debtor's checks are printed by an outside service.  The Debtor

3  seeks permission to continue using it's existing checks for thirty days until the Debtor receives its

4  new checks which will be pre-printed with "Debtor in Possession" and the case number. In the

5  meantime, the Debtor will hand stamp its checks with "Debtor in Possession."

6  **C.**    **Emergency Motion of the Debtor for Entry of an Order: (i) Authorizing the Debtor to**

7  **(a) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation, (b)**

8  **Remit Withholding Obligations; (c) Maintain Worker's Compensation and Benefits**

9  **Programs, (d) Pay Related Administrative Obligations; and (e) Pay Reimbursable**

10  **Employee Expenses; and (ii) Authorizing and Directing the Applicable Bank to Pay All**

11  **Checks and Electronic Payment Requests Made by the Debtor Relating to the**

12  **Foregoing**

13  By the *Emergency Motion of the Debtor for Entry of an Order: (i) Authorizing the Debtor to*

14  *(a) Pay Prepetition Wages, Salaries, Employee Benefits, and other Compensation, (b) Remit*

15  *Withholding Obligations*; *(c) Maintain Worker's Compensation and Benefits Programs, (d) Pay*

16  *Related Administrative Obligations; and (d) Pay Reimbursable Employee Expenses; and (ii)*

17  *Authorizing and Directing the Applicable Bank to Pay All Checks and Electronic Payment Requests*

18  *Made by the Debtor Relating to the Foregoing*  (the "Employee Motion"), the Debtor requests entry

19  of an order pursuant to sections 105(a), 363(b), 507(a), 1107(a) and 1108 of the Bankruptcy Code (i)

20  authorizing, but not directing, the Debtor to pay or honor in its discretion certain employee related

21  obligations (as described below) and (ii) authorizing and directing the applicable bank to pay all

22  checks and electronic payment requests made by the Debtor relating to the foregoing.

23  The Debtor's goals in this Case are to pursue a timely sale of its assets as a going concern,

24  facilitate an orderly administration of this Case and its Estate, and maximize the value of its assets

25  for the benefit of all stakeholders.  Accordingly, it is imperative to the accomplishment of the

26  Debtor's goals in this Case that the Debtor minimize any adverse impact of the chapter 11 filing on

27  the Debtor's workforce and on the orderly administration of this Case.  Any disruption in the

28  payment its payroll or the continued implementation of employee programs in the ordinary course of

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  the Debtor's business would adversely affect the Debtor's goals in this Case because it would

2  adversely impact employee morale at a particularly sensitive time.  If the Debtor is not permitted to

3  meet all payroll-related obligations in the ordinary course of business, the Debtor could suffer, at the

4  worst possible time, unmanageable employee reactions possibly resulting in the loss of valuable

5  employees who are familiar with the Debtor and its business.  Patient safety and health could suffer.

6  Failure to honor payroll and employee benefits obligations could, therefore, have severe detrimental

7  effects on the Debtor's ability to maintain its going concern value and administer the Estate.

8  Accordingly, the Debtor respectfully requests that the Court grant the Employee Motion.

9  Because the Debtor's Employees are vital to the Debtor's ability to continue to operate the

10  hospital and the uninterrupted payment of wages and the honoring of Employee benefits is vital to

11  maintaining its Employees, the Debtor requests that this Motion be heard on an emergency basis.

12  The Debtor's employees covered by this Motion are still employed by the Debtor.

13  The obligations to or on behalf of employees must be paid to avoid employees terminating

14  their employment with the Debtor, employees being distracted from their vital duties of caring for

15  the patients and of otherwise operating the hospital and hurting employee morale at a particularly

16  sensitive time for all employees.  The Debtor's employees are essential to the effective

17  reorganization of the Debtor's business and if many terminate their employment or suffer from

18  serious distractions and moral problems, the Debtor's business may be interrupted and irreparably

19  harmed.

20  Paying and/or honoring the obligations to or on behalf of employees will accrue to the

21  benefit of the Debtor because it will improve employee morale and greatly increase the chances that

22  the Debtor will be able to retain its workforce.  Retaining a motivated, experienced workforce will

23  ultimately benefit the creditors of these estates by enhancing the going concern value of the Debtor's

24  business and accordingly, its possibilities for reorganization.

25  The Debtor intends to sell its assets as an operating hospital in order to enhance the

26  recoveries of its creditors and its ability to reorganize its debts.  The Debtor will file a motion for

27  approval of sale procedures and for approval of the sale to a stalking horse bidder on or about the

28  date it files its voluntary chapter 11 petition.

1    Four of the total of 572 employees that will be paid prepetition wages pursuant to this

2  Motion, if it is granted, are insiders.  They are the officers of the Debtor and are essential to its

3  operations and its ability to sell its assets for the greatest amount possible.

4    The Debtors seek to honor claims that are within the limits established by 11 U.S.C. § 507.

5    The Debtor is seeking approval of, and intends to have, postpetition financing in place that

6  will provide it adequate cash to pay the obligations covered by this Motion, as well as all

7  administrative expenses as such obligations come due.

8    As of the Petition Date, the Debtor employed approximately 572 employees (the

9  "Employees") of which 405 are full-time, 45 are part-time and 122 are per diem employees.  Part-

10  time employees are regularly scheduled to work every pay period whereas per diem employees are

11  used on an as needed basis and are not regularly scheduled.  The Debtor's Employees are classified

12  into four categories:  (a) Management  (4 Employees); (b) Clinical (205 Employees); (c) Non

13  Clinical (155 Employees); and (d) Nurses (208 Employees).  Clinical Employees are licensed and

14  non-licensed employees who provide direct patient care but are not licensed nurses.

15    To minimize the hardship that the Employees will suffer if prepetition obligations are not

16  paid when due and to avoid potential harm to the patients in the Debtor's hospital, disruption and

17  possible irreparable harm to the Debtor's workforce and operations as the Debtor sells its business

18  and administers this Case, the Debtor seeks authority to pay and/or honor certain prepetition

19  obligations for, among other items, wages, salaries, and other compensation including federal and

20  state withholding taxes, payroll taxes, contributions to employee benefit plans,  vacation or other

21  paid time off and all other employment related benefits that the Debtor pays or provides in the

22  ordinary course of its business and the administrative obligations related thereto (collectively, the

23  "Employee Obligations").  In addition, the Debtor requests authority to pay to the appropriate third

24  parties the prepetition Withholding Obligations (as defined below) that are in most instances not

25  property of the Debtor's Estate, and to reimburse to employees the prepetition Reimbursement

26  Obligations (as defined below).

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1.      Prepetition Wages, Salaries and Associated Benefits

The Employees are paid their wages and salaries (the "Wages") bi-weekly, in arrears, every other Friday for the two-week period ending the previous Saturday through direct deposit or by check.  The Debtor's average bi-weekly gross payroll is approximately $1,100,000, which includes Wages, withholding taxes paid by Employees and withholdings for various Employee benefits (described more fully below).  The date on which the Employees were last paid was September 3, 2010, for the two week period ending August 28, 2010.

The Debtor's next routine payroll is scheduled for September 17, 2010 (the "September 17th Payroll"). The September 17th Payroll covers prepetition Wages earned from August 29, 2010 through September 11, 2010.  The total amount of the September 17th Payroll is expected to be approximately $1,100,000.

The payroll scheduled for October 1, 2010 (the "October 1st Payroll"), which covers Wages earned from September 12, 2010 through September 25, 2010 is the next routine payroll.  The October 1st Payroll will include amounts for the prepetition period of September 12, 2010 through September 13, 2010.  The total amount of the October 1st Payroll is expected to be approximately $1,100,000, with approximately $141,000 of that amount relating to the prepetition period.  This figure is only an estimate. Because the payroll varies from pay period to pay period, it is impossible to determine the exact amount of the October 1st Payroll at this time.

In the ordinary course of its business, the Debtor routinely withholds from the Wages certain amounts that the Debtor is required to transmit to third parties for purposes such as Social Security and Medicare, federal and state or local income taxes, contributions to the Debtor's benefit plans, 401(k) contributions, garnishment, child support or similar obligations pursuant to court order or law (collectively, the "Withholding Obligations").[5]  The prepetition amount of Withholding Obligations that has accrued but remains unpaid as of the Petition Date is approximately $483,000 and is encompassed within the total figure for prepetition Wages described above.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

---

[5] Many of the Withholding Obligations are discussed in more detail below.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Further, the Debtor estimates that, as of the Petition Date, approximately $125,000 of the Debtor's contributions to certain tax obligations (the "Employer Tax Obligations"), such as Social Security, had accrued but remain unpaid in connection with as yet unpaid prepetition Wages.

The Debtor seeks authority to continue with its payroll schedule in the ordinary course of its business and to pay all prepetition Wages, which includes the Withholding Obligations, and the Employer Tax Obligations, as planned on the dates indicated above.  No Employee will be paid, on account of prepetition accrued Wages, more than $11,725.  The Debtor, therefore, will not make a payroll distribution to any Employee in an amount that exceeds the allowable $11,725 priority amount of such prepetition Wages under section 507(a)(4) of the Bankruptcy Code.  In addition, the Debtor requests authority to forward the prepetition Withholding Obligations including, but not limited to, all payroll taxes associated with the prepetition Wages to the appropriate parties and to pay the prepetition Employer Tax Obligations as they come due.

In my opinion, the costs associated with paying priority employee Wage claims, which includes the Withholding Obligations, and Employer Tax Obligations are relatively minimal compared with the damage that would result to the Debtor's estate and its ability to sell its assets and reorganize its debt if the Debtor fails to meet its payroll obligations.

The Debtor's payroll is disbursed by ADP, a supplier of human resources and document services that provides the Debtor with payroll management and administrative services.  The Debtor funds its payroll to ADP by 10:00 a.m. on the Thursday before a Friday payroll date.  Employees receive their direct deposits or checks, as the case may be, through ADP on the applicable Friday payroll date.  Insofar as any un-cashed prepetition checks with respect to wages, salaries and certain other payroll related payments would have been issued by ADP based on funds already provided to ADP, the Debtor believes that such checks will be unaffected by the bankruptcy filing and honored in the ordinary course.

As of the Petition Date, the Debtor did not owe ADP any unpaid fees with respect to its processing of the Debtor's payroll and related payroll administration matters (the "ADP Administration Fees").  The bi-weekly ADP Administration Fee is approximately $8,400.

2.      Business Expense Reimbursements

The Debtor customarily reimburses Employees who incur business expenses in the ordinary course of performing their duties on behalf of the Debtor.  Such expenses typically include, but are not limited to, mileage, department expenses, travel expenses, safety incentive programs, and phone expenses (the "Reimbursement Obligations").  Expense reports detailing the expenses are submitted for reimbursement by the Employees and generally must be supported by copies of receipts.

It is difficult for the Debtor to determine the exact amount of Reimbursement Obligations that is due and owing for any particular time period since the expenses incurred by Employees on behalf of the Debtor throughout the year vary on a monthly basis and because there may be some delay between when an Employee incurs an expense and submits the corresponding expense report for processing.  Based on historical experience, the Debtor anticipates that, as of the Petition Date, the Debtor owed an estimated $4,500 in Reimbursement Obligations for certain of its Employees.  The Debtor seeks authority to pay any prepetition Reimbursement Obligations up to a total amount of $4,500, and to continue to pay Reimbursement Obligations incurred postpetition in the ordinary course of the Debtor's business.

3.      Paid Time Off

The Debtor provides its full and part-time Employees with paid time off (the "PTO").  Per Diem or Employees are not eligible for PTO.  An eligible full-time employee is one who is regularly scheduled to work 72 or more hours per pay period.  An eligible part-time employee is one who is regularly scheduled to work 40 to 71 hours per pay period.  PTO is time off due to vacation, holiday or personal time, which includes sick time.  Upon the completion of a 90-day waiting period (approximately one month ago, the Debtor changed the policy to allow accrual of PTO to start after a 30-day waiting period, however, the policy change has not yet been put into effect), eligible Employees (except for managers, department or operations directors or executives, which begin to accrue PTO on the first day of work) begin to accrue PTO.  Eligible full-time employees can accrue up to 168 hours annually for years 1 through 5, 216 hours annually for years 6 through 10 and 256 hours annually thereafter.  Eligible part-time employees can accrue up to a maximum of 84 hours

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

annually for years 1 through 5, 108 hours annually for years 6 though 10 and 128 hours annually thereafter.  PTO accrues only on hours worked.

Employees can accrue up to 240 hours of PTO.  When this cap is reached , no further PTO will accrue until the Employee uses some of the accrued PTO or some of the accrued time is cashed out by the Employee.  As of the Petition Date, the Debtor is carrying approximately $863,425 on its books for accrued and unused PTO.

The Debtor seeks authority to honor its existing PTO policies to extent it would permit continuing Employees to use their prepetition accrued leave in the ordinary course of business and, going forward, to honor the change in the policy to allow accrual to begin after a 30-day waiting period rather than the 90-day period.  The Debtor is not, by this Motion, seeking permission to cash out any accrued and unused PTO of continuing Employees but does seek the authority, in the Debtor's discretion, to pay the Employees for unused vacation time that accrued within the 180 days prior to the Petition Date when their services with the Debtor are terminated so long as the total of the payments already made for prepetition Employee Obligations and the PTO does not exceed $11,725.  The Debtor believes that there will be minimal liability associated with cashing out accrued and used PTO upon the employees termination because it anticipates that the purchaser will hire most of the Employees and will assume the PTO liability for those Employees.

4.    Employee Benefits

To keep the morale of the Employees positive for the benefit of the Debtor's business, the Debtor has established a variety of benefit plans and programs (the "Employee Benefits") designed to assist its Employees and the Employees' eligible dependents in meeting certain financial burdens, including those that can arise from illness, injury or death.

a.    Medical, Vision and Dental Insurance

The Debtor offers all full-time Employees medical and prescription insurance (the "Medical Benefits") through a policy with Anthem Blue Cross, a third party. The Debtor pays $187,500 in monthly premiums for the Medical Benefits and the Employees pay $62,500 per month.  As of the Petition Date, the Debtor owed Anthem Blue Cross approximately $248,128.08 for accrued and unpaid prepetition premiums.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

The Debtor also offers Employees dental and vision insurance (collectively, the "Vision and Dental Benefits"). The vision benefits are fully insured by Medical Eye Services and the dental benefits are insured by DeltaCare USA/Delta Dental. The Debtor pays $8,836.15 in monthly premiums for Vision and Dental Benefits and the Employees pay $5,890.15 per month. As of the Petition Date, the Debtor portion of the accrued and unpaid premiums owed for the Vision and Dental Benefits was approximately $8,836.15 and the Employees share of the premiums was approximately $5,890.76.

The Debtor seeks authority to pay the Debtor's portion of the premiums that accrued and remain unpaid as of the Petition Date for the Medical Benefits and the Vision and Dental Benefits and to turn over to Anthem Blue Cross, Medical Eye Services and DeltaCareUSA/Delta Dental amounts sufficient to satisfy the portion of the accrued and unpaid prepetition premiums to be paid by the Employees in connection with the payment of the Wages and Withholding Obligations. The Debtor also seeks authority to continue to pay, in the Debtor's discretion and in the ordinary course of the Debtor's business, the premiums for the Medical Benefits and the Vision and Dental Benefits incurred postpetition.

Furthermore, and for similar reasons, the Debtor seeks to continue to perform any obligations under Section 4980B of the Internal Revenue Code to administer Continuation Health Coverage ("COBRA") (*see* 26 U.S.C. § 4980B in respect to former employees. The Debtor believes that any prepetition costs related to COBRA coverage benefits are *de minimus*, but nonetheless, to maintain employee morale and ensure the orderly administration of the Estate, the Debtor requests authority to pay in its discretion any such prepetition costs.

b.    Employee Life, Disability and Workers' Compensation

The Debtor also offers Employees premium-based group life insurance and accidental death and disability insurance through Mutual of Omaha (the "Life Insurance"). The premiums and other related charges for this insurance coverage are paid 100% by the Debtor and total approximately $364.09 semi-monthly. The Debtor also provides workers' compensation insurance through the

Alpha Fund, a self insured program (the "Workers Compensation Insurance").[6]  The amount of the annual payment is approximately $685,644.00, which is paid monthly in the amount of $57,137. The fee payable to Alpha Fund for the administration of the Workers Compensation Insurance program is included in the amount of the annual payment.  The Debtor believes that it is current on all the above mentioned insurance policies. To the extent it is not, however, the Debtor seeks authority, in its discretion, to pay any accrued and unpaid prepetition premiums and related charges for the Life Insurance and the Workers' Compensation Insurance and to continue the above benefits postpetition and to deliver the Employees portion of any accrued and unpaid prepetition premiums to Mutual of Omaha in connection with the payment of the Wages and Withholding Obligations.

c.    401(k) Plan

The Debtor also offers eligible Employees the opportunity to participate in a 401(k) Savings and Retirement Plan ("401(k) Plan") that is administered by Transamerica.  Employees participating in this program may contribute up to the federal statutory cap per year.  The Debtor deducts the 401(k) Plan contributions from Employee paychecks.  The Debtor has the discretion to contribute 1% of the Employees contributions.  The last discretionary contribution made by the Debtor was July 3, 2010.  As of the Petition Date, the Debtor has unremitted 401(k) Plan contributions (and payments for employee 401(K) loans) totaling approximately $131,476.16.  Failure to timely forward the Employees' 401(k) Plan deductions may be a violation of the Employee Retirement Income Security Act of 1974, as amended, resulting in potential personal liability for the Debtor's officers for such deducted amounts.  The Debtor believes that maintaining the 401(k) Plan is critical to maintaining employee morale.  The Debtor seeks authority to delivery to Transamerica the Employee contributions in connection with the payment of Wages and Withholding Obligations described above.  Transamerica's administration fee is paid from the 401(k) Plan assets.

---

[6] The Debtor has purchased a fully insured workers' compensation program within a self-insured pool.  There is no refund of unused amounts of the premium or retrospective adjustment in the amount of the premium.  However, each year that the Alpha Fund maintains a surplus position, its board of directors may declare a dividend be paid that would result in a return of a surplus amount to all participants that were participants in the Alpha Fund for the operational year at issue.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

d.    Miscellaneous Employee Benefit Plans

The Debtor also offers its eligible Employees the opportunity to participate in an IRS Section 125 Cafeteria Plan, a Flexible Spending Account/Dependent Care Account, voluntary health, life, and disability insurance, pre-paid legal services program, and a US Savings Bond program. Additionally, Employees may purchase meal cards and gift shop cards. All of these programs are 100% funded by the Employees and are paid for through payroll deductions. The Debtor requests authority to continue to honor these programs, in its discretion, and to continue distributing to third-parties the payments for these programs in connection with the payment of Wages and Withholding Obligations as described above, including the distribution of payments that are for prepetition amounts due.

5.    Insider Compensation

The Debtor is a non profit 501(c)(3) corporation so there are no shareholders to whom compensation is owed. The Debtor does have 4 officers who receive compensation and who will be filing the appropriate insider compensation forms with the Court. Although the Debtor is seeking authority through this Motion to pay the prepetition amounts due these officers up to the priority claim cap of $11,725, it will not pay the officers any Wages until it is allowed to do so under Local Bankruptcy Rule 2014-1 regarding insider compensation.

6.    Temporary Staffing

In addition to their full-time Employees, the Debtor also currently utilizes ICR Staffing, Inc. ("ICR") to provide additional support in the Debtor's human resources and quality assurance departments. The Debtor is currently utilizing two (2) temporary Employees from ICR These Employees are highly skilled Employees and have become familiar with the Debtor's business. The Employee who works in the human resources department has worked with the Debtor since February, 2010. She is responsible for screening health care worker applicants, administering the workers' compensation program and the student worker program in coordination with local county officials as well as the administration of the department itself. She would not be easily replaced as it takes at least six months working in the Debtor's human resources department to become proficient at these tasks. The Employee who works in the quality assurance department has worked with the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Debtor since December, 2009.  She is a data entry specialist who is responsible for all quality assurance hot line inquiries and reports.  This position requires above average typing skills and health care technical knowledge.  She would not be easily replace due to the knowledge she has gained over the past approximately ten months and her highly technical knowledge and above average typing skills.  The Debtor's business would be harmed if the Debtor is not allowed to pay ICR the amount that is owned it for the prepetition work of these two Employees and ICR, as a result, removes these temporary Employees.  The Debtor estimates that it owes ICR approximately $15,000 for the prepetition services rendered by the temporary Employees.

While the Debtor does not directly compensate the temporary Employees employed through ICR, the Debtor's failure to pay for their prepetition services could severely hamper the Debtor's ability to conduct the necessary services provided by the two temporary Employees.  The Debtor requests authority to pay, in its discretion, any pre-petition amounts owed to ICR up to a maximum of $15,000.

Many Employees live from paycheck to paycheck and rely exclusively on receiving their full compensation or reimbursement of their expenses in order to continue to pay their daily living expenses.  These Employees may be exposed to significant financial and healthcare related problems if the Debtor is not permitted to pay and/or honor the Wages, PTO policy and Employee Benefits, and the expenses associated therewith in the ordinary course of the Debtor's business.  It is critical, therefore, that the Debtor be permitted to pay outstanding, non-discretionary prepetition Wages that would otherwise constitute priority claims against the Debtor's estate, to honor its prepetition PTO policy regarding the use of accrued PTO and the payment for it upon termination, and to continue to fund its Employee Benefits.  To fail to do so would be devastating to the Employees' morale and could lead to the loss of key Employees at this critical time.

Furthermore, the Debtor requests that its bank be authorized and directed to receive, process, honor and pay all checks presented for payment and to honor all transfer requests made by the Debtor related to Employee Obligations, whether such checks were presented or funds transfer requests were submitted prior to or after the Petition Date (including checks that have been presented and dishonored), to the extent that the accounts contain sufficient funds.  The Debtor will identify to

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    the banks the checks that are to be honored pursuant to an order approving this Motion.

2    Accordingly, checks other than those for Employee Obligations should not be honored inadvertently.

3    Moreover, pursuant to a budget that the Debtor filed with the Court, the Debtor expects to have

4    sufficient funds to pay all Employee Obligations, to the extent described herein, on an ongoing basis

5    and in the ordinary course of business.

6    **D.    Emergency Motion for Order (A) Prohibiting Utilities from Altering, Refusing, or**

7    **Discontinuing Service, and (B) Determining Adequate Assurance of Payment for**

8    **Future Utility Services**

9        This *Emergency Motion for Order (a) Prohibiting Utilities from Altering, Refusing, or*

10    *Discontinuing Service, and (b) Determining Adequate Assurance of Payment for Future Utility*

11    *Services* (the "Utilities Motion") requests the approval of procedures for providing utilities with

12    adequate protection.  The Debtor receives essential utility services from several utility companies.  A

13    list of the utility companies (each, a "Utility Company," and, collectively, the "Utility Companies")

14    and the Debtor's utility accounts is attached to the Utilities Motion as Exhibit A.  The Debtor's

15    facilities receive one or more of the essential water, gas, electric, telephone, and garbage services

16    from the Utility Companies.

17        The Debtor requests that the relief sought in the Utilities Motion be granted on an emergency

18    basis because uninterrupted utilities are essential to the survival of the Debtor's business and it's

19    patients. In addition, certainty as to the amount of the deposits will provide the Debtor's business

20    with much needed stability at this critical time.  Furthermore, I am advised by counsel that the

21    Bankruptcy Code sets forth a short time frame for resolving disputes with utility companies.

22        The Debtor operates a hospital.  On any given business day, an average of 12 patients are

23    undergoing surgical procedures and other patients are receiving medical treatments for which

24    sophisticated, life-sustaining, utility-powered equipment is absolutely essential.  While any

25    interruption in utility services would certainly be detrimental to the Debtor's business, the more

26    important consideration in this case is that any utility interruption, no matter how brief, could be

27    extremely harmful to patients.  The Debtor's ability to operate the hospital depends on maintaining

28    the confidence of the doctors who perform procedures there and the patients who are treated there.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Both constituencies must be absolutely assured that there will be no interruption of service or they will understandably choose another hospital.

At this critical time and given the nature of the Debtor's business, uninterrupted electricity, gas, water, garbage service, local and long distance telephone services, and internet services are essential to the ongoing operations of the Debtor's business and to the preservation of the value thereof. Any interruption, however brief, in utility services to the Debtor will irreparably disrupt the Debtor's operations.

The Debtor routinely pays its regular monthly utility obligations when due. In addition, the Debtor's chapter 11 filing occurred during the middle of the billing cycles for many, if not all, of the Utility Companies. As a result, there are likely outstanding prepetition amounts owed to the Utility Companies.

The Debtor has and will have adequate cash to meet all of its necessary postpetition operating expenses on a current basis, including payments to the Utility Companies. The Debtor has specifically included in its budget amounts for payments to Utility Companies, including the payment of the Utility Deposits (as defined below).

The Debtor proposes to give each of the Utility Companies adequate assurance of payment for its future services in the form of cash deposits (the "Utility Deposits" and each, a "Utility Deposit") in amounts that are equal to the average monthly invoice for one month of prepetition services provided to the Debtor by each Utility Company. As so calculated, the average monthly invoice amount, is listed on Exhibit A to the Utilities Motion (as shown next to each Utility Company's name). The Debtor proposes to pay the Utility Deposits within forty-five days after the Court's entry of an order granting this Motion.

In addition, the Debtor seeks to establish reasonable procedures (the "Procedures") by which a Utility Company may request further adequate assurance of future payment, in the event that such Utility Company believes that its Utility Deposit does not provide it with satisfactory adequate assurance. Such Procedures would provide that:

(a)    If a Utility Company is not satisfied with the Utility Deposit provided by the Debtor, such Utility Company must serve a written request (the "Request") upon the Debtor setting forth the

location(s) for which Utility Services are provided, the account number(s) for such location(s), the outstanding balance for each account, a summary of the Debtor's payment history on each account and an explanation of why the Utility Deposit is inadequate assurance of payment;

(b)     The Request must be actually received by the Debtor's counsel, Samuel R. Maizel, Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Boulevard, 11th Floor, Los Angeles, California  90067, within forty-five days after the entry date of the order (the "Order") granting this Motion (the "Request Deadline");

(c)     Without further order of this Court, the Debtor may enter into agreements granting additional adequate assurance to a Utility Company serving a timely Request, if the Debtor, in its discretion, determines that the Request is reasonable;

(d)     If the Debtor believes that a Request is unreasonable, then it shall, within thirty days after the Request Deadline, file a motion (a "Determination Motion") pursuant to section 366(c)(3) of the Bankruptcy Code, seeking an order that the Utility Deposit, plus any additional consideration offered by the Debtor, constitutes adequate assurance of payment.  Pending notice and a hearing on this Motion, the Utility Company that is the subject of the unresolved Request may not alter, refuse, or discontinue services to the Debtor or recover or setoff against a prepetition deposit, if any; and

(e)     The Utility Deposit shall be deemed adequate assurance of payment for any Utility Company that fails to make a timely Request.

The Debtor reserves the right, without further order of the Court, to supplement the list of Utility Companies attached as Exhibit A to the Utilities Motion if any Utility Company has been omitted.  If the Debtor adds a Utility Company to the list after the Court enters the proposed Order, the Debtor will serve a copy of this Motion and the signed Order on any Utility Company that is added to the list (the "Supplemental Service").  Concurrently with the Supplemental Service, the Debtor will file with the Court a supplement to Exhibit A to the Utilities Motion showing the name of the Utility Company that is being added to the list.  In addition, the Debtor will provide a Utility Deposit for the added Utility Company within forty-five days of entry of the Order or concurrently with the Supplemental Service, whichever is later.  If the Debtor has not received utility services from the added Utility Company for the twelve (12) months prior to the Petition Date, then the utility

deposit will be equal to one month of the Debtor's expected monthly invoice amounts for utility consumption from the added Utility Company. If the added Utility Company does not believe that the deposit received from the Debtor is adequate, the added Utility Company shall deliver a Request by the Request Deadline or within thirty (30) days after the service of the Supplemental Service, whichever is later. If such Request is made, the procedures outlined above shall apply to its consideration and resolution

Additionally, the Debtor proposes that if the Debtor defaults on an obligation to pay a Utility Company for postpetition services and such default is not cured within twenty (20) days of such Debtor's receipt of written notice of default, then the applicable Utility Company may file a motion requesting that the Debtor furnish further adequate assurance of future payment, and such motion shall be heard on an expedited basis..

Finally, the Debtor requests that the Order provide that Utility Companies must immediately refund any Utility Deposit (without offset for prepetition claims) in the event that the Debtor terminates the services of any Utility Company and after all postpetition invoices owed by the Debtor to that Utility Company have been paid. The Debtor believes that the immediate refund of a Utility Deposit by a Utility Company whose services have been terminated and whose postpetition bills have been paid is fair and appropriate under the circumstances because the Utility Company would no longer require adequate assurances of the Debtor's future performance.

Under the circumstances of this case in which the Debtor has no significant outstanding prepetition utility obligations and has already arranged to maintain current payment for postpetition services, the Debtor believes that the proposed Utility Deposits constitute adequate assurance of payment under section 366(c) of the Bankruptcy Code. The Debtor also proposes to further protect the Utility Companies by agreeing to expedited access to this Court by a Utility Company should the Debtor default postpetition and by establishing the Procedures provided for herein, pursuant to which any Utility Company can request additional adequate assurance by demonstrating facts and circumstances with respect to its postpetition services to the Debtor that merit greater protection.

**E.    Emergency Motion of the Debtor for Entry of an Order (a) Authorizing the Debtor to Pay Prepetition Claims of Emergency Room Doctors, Medical Director Doctors, and Nursing Registries Who Are Critical Service Providers and (b) Directing the Applicable Bank to Pay All Checks and Electronic Payment Requests Made by the Debtor Relating to the Foregoing**

The *Emergency Motion of the Debtor for Entry of an Order (a) Authorizing the Debtor to Pay Prepetition Claims of Emergency Room Doctors, Medical Director Doctors, and Nursing Registries Who Are Critical Service Providers and (b) Directing the Applicable Bank to Pay All Checks and Electronic Payment Requests Made by the Debtor Relating to the Foregoing* requests the right to pay the pre-petition wages of (a) on call specialist emergency room doctors whose wages are payable on September 15, 2010, for the period through August 31, 2010, and due and payable on October 15, 2010, for the period through September 30, 2010; (b) medical directors whose wages are due and payable on the same schedule; and (c) nurse registries whose compensation is payable 15 days after the nurse in question has been provided to the Hospital.

The Debtor's on-call emergency room specialist doctors, whose fees for August are approximately $67,000 (the "Doctors"), are vital to the operation of the Debtor's business, the hospital, and to the health and safety of the patients in the hospital.  In addition to the regular doctors who work in the emergency room, who are not at issue here, the Debtor has contractual relationships with an "Emergency Room Specialty Back-Up Panel" that has specialists on call to come in to the emergency room if they are needed.  Schedule "B" attached to the Motion shows each date and who is on call for a particular specialty on that date.  These Doctors expect to be paid on the 15th of a month for services performed the previous month.  These Doctors have the ability to choose to work in other hospitals rather than in the emergency room of Debtor's hospital and cannot be compelled to respond to the Hospital's calls  Debtor believes that if these doctors are not paid on September 15, 2010 for services provided through August 31, and on October 15, 2010 for services provided through September 30, 2010 (a mixture of prepetition and postpetition services), these doctors will not choose to perform services at the Debtor's emergency room.  Based on Exhibit "A" (after subtracting about $13,000 for the seven medical director doctors), Debtor seeks the right to pay the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Doctors on account of prepetition claims (1) up to $70,000 on or about September 15, 2010, and (2) up to $55,000 on or about October 15, 2010  Attached to the Motion as Exhibit "B" is a list of which Doctors are expected to have already worked in September 2010 before the Petition Date, although they may have procured a substitute who would be paid under this Motion.

The Hospital's seven medical directors, whose fees for August totaled less than $13,000, are equally critical in that they review the clinical work in their department, help insure quality standards are met, and intervene with other physicians as necessary.  Attached to the Emergency Motion as Exhibit "A" is a list of August, 2010 On-Call and Department Directorships, which list the Doctors and the medical directors, with the compensation of the medical directors highlighted.  The Debtor needs to have a director of utilization review, a medical director for the cath lab, a director of anesthesia, a director of clinical pathology, a director of the ICU, and a director of psychiatry.  These persons fulfill important functions in the Hospital and their services are necessary for quality control and payor reimbursement.  Debtor seeks authority to pay these persons up to $13,000 for August services on or about September 15, 2010 and up to $7,500 for prepetition September services on or about October 15, 2010

The Debtor will experience irreparable harm if the nursing registries are not paid currently.  To meet state mandatory patient to registered nurse ratios, the Hospital is required to have at least a minimum certain staffing unless the severity of a patient's illness dictates increased staffing.  For example, for patients in intensive care or post anesthesia care, there must be a nurse for every two patients and in pediatrics there must be a nurse for every four patients in accordance with applicable state law.  The Hospital schedules its employees in an effort to comply with these standards using scheduled employees only.  However, if a nurse calls in sick, a patient's condition worsens, or several emergency room patients are admitted to the Hospital, the Hospital first requests its own staff to cover additional hours.  Sometimes the Hospital needs a person who can show up for work in two hours if its own staff is unable to cover the need.  Then, the Hospital must call for temporary personnel from one of the contracted registry agencies and seek to obtain temporary staffing from those which have the best rates or the most available supply of competent and qualified nurses.  If one registry cannot supply the needed nurses, the Hospital must obtain them from another registry.

1  This is mandatory. The other circumstance in which the Hospital uses registries is for "traveler"

2  services when there are prolonged vacancies in hard to fill positions.  For example, the registry

3  agency, RN India, supplied a competent and qualified Registered Nurse who was able to work in the

4  critical care and medical/surgical telemetry areas where current hard to fill vacancies exist.  This RN

5  is contracted to work for the Hospital for one year.  In addition, the registry agency, Reliable

6  Nursing Solutions, supplied a dietician for two weeks when the Hospital's one dietician took the

7  vacation to which she was entitled.  Desert Cities Dialysis provides agency nurses who are able to

8  provide the inpatient acute care dialysis for critical patients who are in end-stage renal failure.  This

9  is a service upon which the Hospital must rely as the competent specialty nurses are hard to find and

10  employ based on the infrequent but highly critical patient need.  As Exhibit "C" reflects, the Hospital

11  owes these registries approximately $100,000 for the period through September 6, 2010, and

12  anticipates owing up to $10,000 more for the prepetition period from September 7, through

13  September 13.  Through this motion the Debtor seeks authority to pay these registries up to $110,000

14  on account of these pre-petition services, such payment to come in the form of compensation on or

15  after September 15, 2010 for the services through September 6, and subsequent payment on or about

16  September 20 for services through September 13, 2010 or as soon thereafter as the correct payable

17  information is on hand..

18         The emergency exists as to these critical vendors because on Wednesday September 15, 2010

19  the Debtor is required to pay Doctors and medical directors for services performed through August

20  31, 2010.  The Debtor believes that without the relief requested, the Doctors and departmental

21  directors, who do not have contracts, will be faced with financial hardship and will no longer take

22  call in Debtor's emergency room or perform duties as directors.  Payment of, and otherwise

23  honoring, the Hospital's obligations to these Doctors and directors is necessary to prevent them from

24  terminating their relationship with the Debtor and to maintain their  morale pending approval of the

25  sale of Debtor's hospital and through the administration of the Debtor's case.  The Debtor's

26  emergency room doctors are vital to its ability to operate and its directors perform a function without

27  which quality control cannot be assured.  They provide essential services required for the health and

28  safety of the hospital patients and without which the Debtor's ability to preserve its assets for the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    benefit of all creditors will be seriously impaired.  The same reason exists for paying the nurse

2    registries because if they are unpaid, they will not supply nurses and if there are not an adequate

3    number of nurses, and specialty nurses as needed, the hospital must turn away patients and will lose

4    its value as a going concern.  The nurse registries are small local companies that rely upon current

5    payments and if they are not paid by the Hospital, they have a serious predicament because they are

6    nevertheless obligated to pay the nurses that they sent out to the Hospital.  The Debtor proposes to

7    pay the nurse registries up to $100,000 on or after September 15 to bring them current through

8    September 6, 2010 and up to $10,000 on or after September 20 to bring them current through

9    September 13, 2010.

10    **F.    Emergency Motion Of Debtor For Entry Of Interim And Final Orders (A) Authorizing**

11    **Use Of Cash Collateral, (B) Granting Adequate Protection For Use Of Prepetition**

12    **Collateral, And (C) Granting Related Relief**

13    The Debtor filed this Cash Collateral Motion because the Debtor has an immediate and

14    ongoing need for use of cash collateral in which its secured creditors (the "Secured Creditors") assert

15    an interest ("Cash Collateral") in order to maintain its business operations.  The Debtor must have

16    access to Cash Collateral to make payments to vendors for postpetition goods, employees, sales

17    taxes and other pertinent, ordinary expenses of its business.  Should the Debtor suffer an inability to

18    use Cash Collateral immediately, such inability would cause a massive interruption to the operations

19    of the Debtor.  As a result,  the value of the Debtors' business will be significantly impaired, to the

20    serious harm and detriment of the Debtor and its creditors, employees and customers.

21    Pursuant to the Cash Collateral Motion, the Debtor seeks authorization to use what may be

22    the Cash Collateral of the Secured Creditors in accordance with the Budget (defined below).  The

23    use of Cash Collateral will provide the Debtor with the necessary capital with which to operate its

24    business, pay its employees, maximize value, including the value of the Secured Creditors' existing

25    collateral (the "Existing Collateral"), and pursue timely sales of its assets.

26    In anticipation of this Case, the Debtor has developed cashflow projections reflecting

27    anticipated revenue and expenditures through the first 13 weeks of the case, contained in the

28    proposed Operations Budget (the "Budget") attached Exhibit A to the Motion, provided that Debtor

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1   seeks authority to exceed 15% of the aggregate of the weekly expenditures reflected on the Budget

2   (the "Allowed Variance"), measured on a four-week rolling basis.  The Budget, which was reviewed

3   and approved by Edward Matthews, sets forth the amount of cash necessary for the Debtor to

4   operate its business postpetition.  The Budget takes into account the effect this bankruptcy filing may

5   have on the Debtor's business and the expenses of the administration of this Case.

6          Because the Secured Creditors assert a lien on the Cash Collateral, as adequate protection for

7   the use of such Cash Collateral, the Debtor proposes to (a) continue to make the regularly scheduled

8   monthly payments required to the Secured Creditors, and (b) grant each of the Secured Creditors

9   effective immediately and without the necessity of the execution by the Debtor of any financing

10  statements or other documentation, in accordance with section 361(2) of the Bankruptcy Code, a

11  valid, perfected, enforceable and non-avoidable replacement lien on its existing collateral and the

12  proceeds thereof, including cash flow generated from operations ("Postpetition Collateral"), but only

13  if and to the extent that (i) the Secured Creditors' prepetition security interests are valid, enforceable,

14  properly perfected, and unavoidable, and (ii) the Debtor's use of Cash Collateral results in a

15  diminution of value of the Secured Creditors' collateral.  Any replacement lien would exclude

16  causes of action arising under section 105, 506(c), 542, 543, 544, 545, 547, 548, 549, 550, 551, 552,

17  and 553 of the Bankruptcy Code.  While the Debtor's use of Cash Collateral will reduce the

18  prepetition Cash Collateral, the operation of the business will continue to generate cash to replenish

19  the consumed Cash Collateral.  Granting the Secured Creditors a replacement lien in the Postpetition

20  Collateral to the extent of any diminution in value of each Secured Creditor's Existing Collateral

21  adequately protects each Secured Creditor's position by giving it an ongoing interest in postpetition

22  cash generated from its Existing Collateral.

23         The Debtor requests that the Court conduct an interim hearing, pursuant to Bankruptcy Rule

24  4001(b), to consider the entry of the interim order in substantially the form of Exhibit B attached to

25  the Motion: (1) approving the use of Cash Collateral on an emergency interim basis, pending a final

26  hearing, in accordance with the Budget, to enable the Debtor  to operate its business and avoid

27  immediate and irreparable harm to the estates, (2) granting adequate protection to the Secured

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Creditors on an interim basis, and (3) scheduling and establishing deadlines regarding a final hearing on the Debtor's use of Cash Collateral.

**G.    Emergency Motion of Debtor for an Order Extending Time to Complete Schedule of Assets and Liabilities and Statement of Financial Affairs:**

The Debtor's fifteen (14) day period to file its Schedules expires on September 27, 2010.

Due to the demands on the Debtor created by (i) filing this Case and the reasons giving rise thereto, (ii) the need to maintain continuity in the Debtor's business, (iii) the need to prepare and file the "First Day Motions", and (iv) the immediate need to comply with the filing requirements as set forth in the "Guidelines for Fulfilling the Requirements of the United States Trustee", the Debtor will not be able to complete the Schedules within the fourteen (14) day statutory period. . Consequently, the Debtors request that this Court extend the time within which they must file their Schedules up to and including October 11, 2010.

Because the requested extension of time will allow the Debtor to file more accurate Schedules and will not prejudice creditors by the extension of time, I believe that cause has been shown for the requested fourteen day extension from the current September 13, 2010 deadline to October 11, 2010.  I believe that it will take several weeks for the Debtor to analyze and compile the information needed to complete their Schedules.  Under the circumstances of these cases, I believe that the Debtors' requested fourteen day extension is appropriate and reasonable.

**H.    Motion Of Debtor For Orders (A) Authorizing Debtor To (I) Obtain Post-Petition Financing And Granting Security Interests And Superpriority Administrative Expense Status Pursuant To 11 U.S.C. § 364; (Ii) Use Cash Collateral Pursuant To 11 U.S.C. § 363; (Iii) To Provide Adequate Protection Pursuant To 11 U.S.C. §§ 361; And (B) Scheduling A Final Hearing And Establishing Related Notice Requirements**

By this Motion, the Debtor requests entry of an interim order substantially in the form attached at Exhibit A to the Motion (the "Interim Order") and thereafter a final order (the "Final Order" and, together, the "DIP Financing Orders"), to avoid immediate and irreparable harm to the Debtor and its creditors which would result from the Debtor's failure to obtain postpetition financing.  This Motion seeks authority for the Debtor to incur up to $3.2 million in postpetition

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

indebtedness over the first 13 weeks of the case in exchange for (A) a continuing first priority security interest in and lien, subject and subordinate to the Carve-Out, upon all of the Debtor's right, title and interest in any claims arising under Bankruptcy Code sections 502(d), 544, 545, 547, 548, 549, 550 or 553, other than such claims against the DIP Lender ("Avoidance Claims"), (B) a continuing security interest in and lien, subject and subordinate to all existing security, interests and liens and to the Carve-Out, upon all of the Debtor's right, title and interest in and to all of its other personal property and assets except for real property assets, whether now owned or hereafter acquired, and (C) subject to the Carve-Out, superpriority administrative expense claim status pursuant to sections 364(b), 503(b) and 507 as more fully described below and in the Interim Order a postpetition superpriority administrative expense claim to the proposed DIP Lender.  If the proposed DIP Lender is the successful bidder at the proposed auction of the Debtor's assets (sought by separate motion filed concurrently herewith) the DIP financing will be forgiven; if the proposed DIP Lender is not the successful bidder, the DIP financing obligation will be repaid as part of the purchase consideration from the successful over-bidder.  No other party will lend the Debtor, whose assets are otherwise fully encumbered, sufficient amounts without security, to allow the Debtor to stay in operation long enough to conduct an auction of its assets on a going concern basis and thereby maximize its return to creditors.

The terms of the DIP Facility are as follows:

| DIP Facility: | A superpriority expense claim credit facility in an aggregate amount of up to $3,200,000.00. |
|---|---|
| DIP Lender: | Prime Healthcare Services Foundation, Inc. or its designee |
| Purpose: | The DIP Facility will be used to finance Debtor's working capital and general corporate purposes through consummation of the sale of Debtor's asset to Prime or an over bidder. |
| Borrowing Conditions: | Amounts to be loaned are determined by Debtor's needs pursuant to a thirteen week budget |
| Interest: | Eight percent (8%) per annum ("Base Rate") with default rate interest at the Base Rate plus two percent (2%). |
| Liens/Superpriority Administrative Claim | (i)      A continuing first priority security interest in and lien, subject and subordinate to the Carve-Out, upon all of the Debtor's right, title and interest in any claims arising under Bankruptcy Code sections 502(d), 544, 545, 547, 548, 549, 550 or 553, other than such claims |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| | |
|---|---|
| | against the DIP Lender ("Avoidance Claims"). |
| | (ii)      A continuing security interest in and lien, subject and subordinate to all existing security, interests and liens and to the Carve-Out, upon all of the Debtor's right, title and interest in and to all of its other personal property and assets except for real property assets, whether now owned or hereafter acquired. |
| | Subject to the Carve-Out, all DIP Obligations shall be an allowed superpriority administrative expense claim (the "DIP Super-Priority Claim" and, with the security interests and liens described above, the "DIP Protections") with priority (except as otherwise provided in the Interim Order) in Debtor's case under sections 364(b), 503(b), and 507(b) and otherwise over all administrative expense claims and unsecured claims against Debtor and its estate, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, except as otherwise provided in the Interim Order, administrative expenses of the kinds specified in, arising, or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 726(b), 1113, and 1114, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment. |
| Carve-Out: | The DIP Protections are subject and subordinate to the following (the "Carve-Out"): (a) allowed administrative expenses pursuant to 28 U.S.C §1930(a)(6) (the "U.S. Trustee Fees"); and (b) allowed fees and expenses of attorneys and financial advisors employed by Debtor and the Creditors' Committee pursuant to sections 327 and 1103 (the "Case Professionals"). For purposes of clauses (b), (i) if at the time of reference, written notice of termination of the commitment to fund the DIP Facility (a "DIP Commitment Termination Notice") has not been provided by the DIP Lender in accordance with the DIP Financing Agreement and the Interim Order, the amount of the Carve-Out shall not be limited, except that no payment may be made to any Case Professional except as provided in the Budget and as authorized by order of the Bankruptcy Court allowing such payment (including pursuant to any fee procedures order entered by the Bankruptcy Court); and (ii) if, at the time of reference, a DIP Commitment Termination Notice has been given in accordance with the DIP Financing Agreement and this Interim Order , the amount of the Carve Out (the "Carve Out Amount") shall be limited to $50,000.00 plus, as of the Termination Date (as defined in the Interim Order), any fees and expenses of Case Professionals that are listed in the Budget and which have been as of that date actually incurred but have not yet been paid; provided in such case such fees and expenses are ultimately approved by the Bankruptcy Court, or such lesser amount as so approved. So long as the Termination Date has not occurred, Debtor shall, to the extent provided in the Budget, be permitted to pay fees, compensation, and reimbursement of expenses allowed and payable (including any such fees and expenses that are accrued but unpaid and ultimately allowed) under section 330, 331 or 503, as the same may be due and payable. |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| Term: | All obligations under the DIP Facility, accrued or otherwise, will be due and payable in full on the earliest to occur of (i) October 15, 2010, unless a Final Order has been entered by such date and if so entered, December 13, 2010; (ii) the occurrence and continuance of an Event of Default (as defined in the Interim Order) and delivery of a DIP Commitment Termination Notice; or (iii) the sale of all or substantially all of Debtor's assets. |
|---|---|
| Fees: | None, except the DIP Lender's out-of-pocket costs and expenses. |
| Events of Default | None |

The Debtor does not currently generate sufficient funds from its operations to pay its costs of operations and other obligations necessary to continue to operate as a going concern. Accordingly, the Debtor seeks approval of the DIP Facility.

The DIP Facility pursuant to the DIP Financing Agreement is reasonable and fair under the circumstances and, therefore, the financing provided under the DIP Facility serves the best interests of the Debtor, its creditors and its estate.

It is essential to the continued operation of the Debtor's business that it be authorized to obtain emergency financing under the DIP Facility on an interim basis pending the Final Hearing. Funds are urgently needed to meet Debtor's immediate and considerable working capital and other liquidity needs, and to complete the proposed sale. In the absence of emergency access to interim financing, Debtor's sale efforts would be immediately and irreparably jeopardized, resulting in significant harm to the Debtor's estate and creditors. The Debtor further requests that the Court schedule a hearing to consider entry of a Final Order. and, therefore, to prevent immediate and irreparable harm to the Debtor's estate.

The Debtor submits that the interim and final relief sought by this Motion is vital in order to maintain and finance its ongoing operations, preserve the going concern value of the Debtor's assets pending the conclusion of the proposed sale process.

1    I declare under penalty of perjury that the foregoing is true and correct to the best of my

2    knowledge.

3    Executed this 14th day of Sep 2010 in Victorville, CA.

4

5

6

7    Edward Matthews

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA