1   Samuel R. Maizel (CA Bar No. 189301)
    Scotta E. McFarland (CA Bar No. 165391)
2   Mary D. Lane (CA Bar No. 071592)
    PACHULSKI STANG ZIEHL & JONES LLP
3   10100 Santa Monica Blvd., 11th Floor
    Los Angeles, California  90067-4100
4   Telephone: 310/277-6910
    Facsimile:  310/201-0760
5   E-mail:      smaizel@pszjlaw.com
6                smcfarland@pszjlaw.com
                 mlane@pszjlaw.com
7   [Proposed] Attorneys for Victor Valley Community
    Hospital, Debtor and Debtor in Possession
8

9                **UNITED STATES BANKRUPTCY COURT**

10               **CENTRAL DISTRICT OF CALIFORNIA**

11               **RIVERSIDE DIVISION**

12  In re:                                    Case No.: 6:10-39537 CB

13  VICTOR VALLEY COMMUNITY                   Chapter 11
    HOSPITAL,[1]
14                                            **NOTICE OF MOTION AND MOTION FOR
                                              THE ENTRY OF AN ORDER**
15              Debtor.                       **(A) APPROVING SALE PROCEDURES IN
                                              CONNECTION WITH SALE OF VICTOR
16                                            VALLEY COMMUNITY HOSPITAL;
                                              (B) SCHEDULING AN AUCTION FOR THE
17                                            SALE AND A HEARING TO APPROVE THE
                                              SALE; (C) AUTHORIZING THE SALE
18                                            FREE AND CLEAR OF LIENS, CLAIMS,
                                              ENCUMBRANCES AND INTERESTS; AND
19                                            (D) GRANTING RELATED RELIEF;
                                              MEMORANDUM OF POINTS AND
20                                            AUTHORITIES IN SUPPORT THEREOF**

21                                            [Declaration of Edward T. Matthews In Support
                                              of Sale Procedures Motion Filed Concurrently
22                                            Herewith]

23                                            Hearing Date re Sale Procedures
                                              Date:  TBD
24                                            Time:  TBD
                                              Place: United States Bankruptcy Court
25                                                    3420 Twelfth Street
                                                      Courtroom 303
26                                                    Riverside, CA 92501-3819
                                              Judge: Honorable Catherine E. Bauer
27

28  _____
    [1] The Debtor is a California non-profit public benefit corporation, Fed. Tax I.D. No. 95-2475762.  The Debtor's address
    is 15248 Eleventh Street Victorville, CA  92395

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**TO THE HONORABLE CATHERINE E. BAUER, UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, ANY ALLEGED SECURED CREDITORS, CREDITORS HOLDING THE TWENTY LARGEST UNSECURED CLAIMS, PARTIES ON THE LIMITED SERVICE LIST, ALL ENTITIES THAT HAVE EXPRESSED TO THE DEBTOR AN INTEREST IN PURCHASING THE ASSETS, ALL ENTITIES KNOWN TO HAVE ASSERTED ANY INTERESTS IN OR UPON THE ASSETS, AND OTHER INTERESTED PARTIES:**

**PLEASE TAKE NOTICE THAT** Victor Valley Community Hospital, debtor and debtor in possession herein (the "Debtor"), files this motion (the "Motion") pursuant to sections 105, 363 and 365 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1530, as amended (the "Bankruptcy Code"), Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (each a "Bankruptcy Rule," and collectively, the "Bankruptcy Rules"), and Local Bankruptcy Rule 6004-1, for approval of certain procedures to conduct a sale of the acute care hospital known as Victor Valley Community Hospital (the "Acute Care Hospital"), and outpatient, ancillary and other healthcare businesses incident to the operation of the Acute Care Hospital (the "Other Businesses") (the Acute Care Hospital and the Other Businesses are referred to collectively as the "Hospital") and for approval, at a subsequent hearing, of the sale of the Hospital to the highest bidder that complies with the applicable procedures.  Specifically, the Debtor seeks an order:

(a)    approving the proposed sale procedures, including the overbid provisions (the "Sale Procedures"), set forth below in connection with the proposed sale at auction (the "Auction") of the Hospital, pursuant to the terms of the Asset Sale Agreement ("ASA"), a copy of which is attached hereto as **Exhibit "A,"** free and clear of all liens, claims, interests and encumbrances, to Prime Healthcare Services Foundation, Inc. ("Prime"), or such other party making a higher and better bid at the Auction, pursuant to sections 105 and 363(b)(f)(h) and (m) of the Bankruptcy Code;

(b)    approving Prime's status as the stalking horse purchaser of the Hospital;

(c)    approving the ASA;

1

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

(d)    approving the break-up fee of $650,000 (the "Break-Up Fee"), the initial overbid

increment of $1,150,000 (including the Break-Up Fee), and subsequent overbids of $250,000 (the

"Overbid Increment");

(e)    scheduling (1) the place, date and time of the Auction and (2) the date and time of the

hearing (the Sale Hearing, as defined below) to consider the approval of the sale of the Hospital (the

"Sale");

(f)    approving the proposed form of the notice of the Auction and the Sale Hearing (the

"Notice of Auction and Sale Hearing") substantially in the form attached hereto as **Exhibit "B"**, and

the manner of service of same; and

(g)    granting such other relief as is fair and equitable.

**PLEASE TAKE FURTHER NOTICE** that the Sale Procedures being proposed are

summarized as follows:

(a)    On or before **September 23, 2010**, the Debtor will file and serve the ASA,

substantially in the form attached hereto as **Exhibit "A"** and the Notice of Auction and Sale Hearing

substantially in the form attached hereto as **"Exhibit "B"** on the Sale Notice Parties.

(b)    Potential Purchasers seeking to overbid Prime shall have until **October 5, 2010** to

complete their due diligence.  Prior to being permitted to conduct any due diligence, a Potential

Purchaser must execute a confidentiality agreement in form and substance satisfactory to the Debtor.

(c)    Potential Purchasers must submit any Offers to the Debtor by delivering the Offer

(including Bidder Purchase Agreement and Good Faith Deposit) to Samuel R. Maizel at the offices

of Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Blvd., 11th Floor, Los Angeles,

California 90067, or a designee subsequently identified by the Debtor, by no later than **October 8,**

**2010 at 5:00 pm (Pacific time)**.  Each Offer must be in writing and satisfy the following conditions:

(1)    Terms of Offer

An Offer must be on terms that are better than the terms of the ASA.  An Offer must include

clean and blacklined versions of the ASA reflecting any proposed changes thereto (including any

changes to the Purchase Price) (the "Bidder Purchase Agreement").  The clean version of the Bidder

Purchase Agreement must be signed by a duly authorized officer of the Potential Purchaser.  An

90231-001\DOCS_LA:224102.8

Offer must be for at least $29,350,000.00, consisting of the aggregate amount of the $25 million

Purchase Price, the $3.2 million of Debtor-in-Possession Financing being provided to the Debtor by

Prime that Prime is prepared to forgive, and the initial Overbid Increment of $1,150,000 (which is

inclusive of the $650,000 Break-Up Fee amount).

(2)     Offers Irrevocable

Except with respect to an Offer submitted by the Successful Bidder or the Back-Up Bidder,

which must remain open, binding and irrevocable on such Successful Bidder or Back-Up Bidder

until the closing of the sale of the Property, an Offer must remain open, binding and irrevocable on

the Potential Purchaser until the Court's order approving the sale of the Property (the "Sale Order")

is entered.

(3)     Good Faith Deposit

An Offer shall also be accompanied by a deposit paid to the Debtor in an amount equal to

$5,750,000 (the "Good Faith Deposit"). Each Good Faith Deposit is payable in U.S. dollars to the

Debtor. The Good Faith Deposit shall be irrevocable. Each Good Faith Deposit shall be provided to

and held by counsel to the Debtor in an interest-bearing account until the third day after the Sale

Order is entered, after which time the Good Faith Deposits of the bidders that were not selected as

the Successful Bidder or the Back-Up Bidder shall be returned.

(4)     Contingencies

An Offer may not be conditioned on obtaining financing or any internal approval or be

subject to contingencies other than those in the ASA.

(5)     Financing Sources

In addition, an Offer must contain information, acceptable to the Debtor, which demonstrates

to the Debtor in its sole and absolute discretion that the Potential Purchaser has sufficient cash on

hand or a binding financial commitment from an established and financially sound financial

institution to ensure such Potential Purchaser's ability to meet its commitments and otherwise fully

perform pursuant to its Offer and to close the transaction within the time frame established.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1       (6)     Identity of Bidder and Legal Power

2       An Offer must disclose the identity of the Potential Purchaser, including confirmation that its

3  bid is made as principal for the Potential Purchaser's account and, if not, the basis upon which the

4  Potential Purchaser is acting and the identities of all other participants (if any).  It must also disclose

5  any agreements or understandings between the Potential Purchaser and any third party with respect

6  to the Property.  The Offer must also be accompanied by sufficient indicia that the person submitting

7  the Offer is legally empowered, by power of attorney or otherwise, to (i) bid on behalf of the

8  Potential Purchaser, and (ii) complete and sign, on behalf of the Potential Purchaser, a binding and

9  enforceable Bidder Purchase Agreement.

10       (7)     No Fees

11       An Offer may not request or entitle the Potential Purchaser to any fee, including, but not

12  limited to, a break-up fee, termination fee, expense reimbursement or similar type of payment.

13  Moreover, by submitting an Offer, a Potential Purchaser shall be deemed to waive the right to pursue

14  a substantial contribution claim under section 503 of the Bankruptcy Code related in any way to this

15  sale of the Hospital.

16       (8)     Due Diligence Acknowledgment; Release

17       The Offer must contain an acknowledgement and representation that the Potential Purchaser

18  (i) had an opportunity to conduct any and all due diligence regarding the Property prior to making

19  the Offer, (ii) has relied solely upon its own independent review, investigation and/or inspection of

20  any documents and/or the Property in making its Offer, (iii) did not rely upon any written or oral

21  statements, representations, promises, warranties or guaranties whatsoever, whether express,

22  implied, by operation of law or otherwise, or the completeness of any information provided in

23  connection therewith or the Auction, except as expressly stated in the Bidder Purchase Agreement;

24  and (iv) agrees, as part of the documents to be executed at Closing, to release, indemnify and hold

25  harmless the Debtor, and agents and professionals of the Debtor in connection with all matters

26  arising in connection with the sale of the Hospital.

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

90231-001\DOCS_LA:224102.8

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

(9)    Compliance with Sale Procedures and other Orders of the Court

Each Offer must include a written statement that (i) the Potential Purchaser agrees to comply with the Sale Procedures and such other terms and procedures as may be imposed by the Bankruptcy Court or the Debtor, in his sole and absolute discretion, at or prior to the Auction; (ii) the Potential Purchaser believes in good faith that its Offer satisfies the requirement for a Qualified Bid set forth in this Motion, (iii) the Potential Purchaser's Good Faith Deposit will be treated in accordance with the provisions set forth herein or otherwise approved by order of the Court; and (iv) the Potential Purchaser consents to the core jurisdiction of the Bankruptcy Court and waives any right to a jury trial in connection with any disputes relating to (r) any order approving the Motion, (s) the purchase of the Hospital, (t) Auction, (u) Sale Procedures, (v) Sale, (w) Break-Up Fee, (x) Overbid Increment, (y) Sale Hearing, or (z) the construction and enforcement of the any agreement or any other matter relating to any of the foregoing.

(d)    Any opposition to the proposed sale procedures must be in writing and filed and served so that it is received by proposed counsel for the Debtor not later than **5 P.M. Pacific time on the day preceding the hearing.**.  Your failure to timely object may be deemed by the Court to constitute consent to the relief requested herein.

(e)    Any reply to papers filed with regards to the proposed sale procedures must be filed and served no later than the time of the hearing on the proposed sale procedures.

(f)    No later than **October 12, 2010**, the Debtor will notify Potential Purchasers submitting Offers if they are Qualified Bidders and entitled to participate in the Auction to overbid Prime.

(g)    The Auction will be conducted on **October 15, 2010, beginning at 10:00 a.m. (Pacific time)** in the offices of Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Blvd., 11th Floor, Los Angeles, California 90067, or at such other location as may be disclosed by the Debtor to the Qualified Bidders.

(h)    Any opposition to the proposed sale shall be filed and served by no later than **5 p.m. Pacific time on October 18, 2010.**  Your failure to timely object may be deemed by the Court to constitute consent to the relief requested herein.

(i)    Any reply papers filed with regards to the proposed sale must be filed and served no later than the time of the hearing to confirm the proposed sale.

(j)    The hearing to confirm the proposed sale shall be conducted on **October 20, 2010**, at a time convenient to the Court's calendar, or on such later date as ordered by the Court.

**PLEASE TAKE NOTICE** that the above summary of the Sale Procedures is qualified in its entirety by the description of the Sale Procedures contained in the Memorandum of Points and Authorities.  To the extent that there is any inconsistency between the above summary and the Memorandum of Points and Authorities, the description in the Memorandum of Points and Authorities shall control.

**PLEASE TAKE FURTHER NOTICE** that this Motion is brought immediately after the filing of the Debtor's petition because of Debtor's serious cash flow problem.  Just before the petition was filed, Debtor was forced to borrow $700,000 to fund its September 3, 2010 payroll. Concurrently, the Debtor has filed a motion for approval of DIP financing under which the stalking horse bidder, Prime, will loan it up to approximately $3.2 million for operating expenses, including funds to meet the September 17, 2010 payroll and subsequent payrolls.  If Prime is the successful bidder, it will forgive this loan.  Without a prompt sale of the Hospital, the Debtor cannot continue to provide patient care.

**PLEASE TAKE FURTHER NOTICE** that the Motion is based on this Motion, the accompanying Memorandum of Points and Authorities, the earlier Declaration of Edward T. Matthews filed in connection with the emergency first-day motions, and the Declaration of Edward T. Matthews (the "Matthews Declaration") being filed concurrently herewith, the statements, arguments and representations of counsel who appear at the Sale Procedures Hearing and the Sale Hearing, the record in this case, any other evidence properly before the court prior to or at the applicable hearing, and all matters of which this court may properly take judicial notice.

**PLEASE TAKE FURTHER NOTICE** that in order to ensure that the best possible price for the Assets is obtained, the Debtor proposes providing notice of the Auction and Sale Procedures substantially in the form attached as **Exhibit "B"** hereto (the "Notice"), by (a) publishing the Notice in the Los Angeles Times, and (b) serving the Notice upon (i) the Office of the United States

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  Trustee; (ii) counsel to the creditors claiming a lien upon the Debtor's assets, (iii) counsel to the

2  twenty largest unsecured creditors; (iv) all entities who have expressed to the Debtor an interest in

3  purchasing the Assets; (v) all entities known to have asserted any interests in or upon the Assets;

4  (vi) all federal, state, and local regulatory or taxing authorities or recording offices which have a

5  reasonably known interest in the relief requested by the Motion; and (vii) all entities on the Limited

6  Service List as of such date (collectively "the Sale Notice Parties").  In this manner, the Debtor

7  intends to provide all parties who could potentially be interested in purchasing the Assets with notice

8  of the auction and the opportunity to present higher and better bids pursuant to the sale procedures.

9  To the extent necessary, the Debtor requests that the Court waive compliance with Local Bankruptcy

10  Rule 9075-1(a)(5) and approve service (in addition to the means of service set forth in such Local

11  Bankruptcy Rule) by overnight delivery.  In the event that the Court grants the relief requested by

12  the Motion, the Debtor shall provide notice of the entry of the order granting such relief upon each

13  of the Sale Notice Parties and any other parties in interest as the Court directs.  The Debtor submits

14  that such notice is sufficient and that no other or further notice be given.

15  Dated:    September 14, 2010              PACHULSKI STANG ZIEHL & JONES LLP

16                                           By    /s/ *Samuel R. Maizel*
                                                   Samuel R. Maizel
17                                                 [Proposed] Attorneys for Victor Valley
                                                   Community Hospital, Debtor and Debtor in
18                                                 Possession

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

90231-001\DOCS_LA:224102.8

# TABLE OF CONTENTS

I. BACKGROUND ................................................................................................................. 1

  A. GENERAL DESCRIPTION OF THE DEBTOR ........................................................... 1
  B. THE DEBTOR'S PHYSICAL PLANT ....................................................................... 1
  C. THE DEBTOR'S STAFF ........................................................................................ 2
  D. THE DEBTOR'S SERVICES ................................................................................... 2
  E. THE DEBTOR'S MANAGEMENT ........................................................................... 2
  F. THE DEBTOR'S SECURED DEBT .......................................................................... 3
    *1. The 2000 Bonds* ..................................................................................... 3
    *2. The Desert Community Bank Obligations* ............................................. 4
    *3. The PHM Obligations* ........................................................................... 5
    *4. The Corwin Medical Group Obligations* ............................................... 5
    *5. Capitalized Leases* ................................................................................ 5
  G. THE DEBTOR'S UNSECURED DEBT ..................................................................... 6
    *1. Trade Debts* ........................................................................................... 6
    *2. Employee Obligations* ........................................................................... 6
    *3. Obligations to Medi-Cal* ....................................................................... 6
  H. THE DEBTOR'S REVENUES ................................................................................. 7
  I. THE CHAPTER 11 FILING .................................................................................... 8
  K. JURISDICTION AND VENUE ............................................................................... 10

II. FACTS CONCERNING THE PROPOSED SALE ................................................ 10

  A. PURCHASE PRICE ............................................................................................. 11
  B. ASSETS BEING TRANSFERRED .......................................................................... 11
  C. GOOD FAITH DEPOSIT ...................................................................................... 12
  D. CLOSING .......................................................................................................... 12
  E. BREAK-UP FEE ................................................................................................. 12
  F. BUYER'S CONDITIONS ...................................................................................... 12
    *1. Opportunity for Due Diligence* ............................................................ 12
    *2. Submission of Offer* .............................................................................. 13
    *3. Terms of Offer* ...................................................................................... 13
    *4. Offers Irrevocable* ................................................................................ 13
    *5. Good Faith Deposit* .............................................................................. 14
    *6. Contingencies* ....................................................................................... 14
    *7. Financing Sources* ................................................................................ 14
    *8. Identity of Bidder and Legal Power* ..................................................... 14
    *9. No Fees* ................................................................................................. 14
    *10. Due Diligence Acknowledgment; Release* ............................................ 15
    *11. Compliance with Sale Procedures and other Orders of the Court* ....... 15
    *12. Successive Overbids* ............................................................................. 15
    *13. The Auction and Selection of the Successful Bid* .................................. 16
    *14. Objections* ............................................................................................. 17
    *15. Court Approval at Sale Hearing* ........................................................... 17
    *16. Return of Earnest Money Deposit* ......................................................... 17
    *17. The Break-Up Fee* ................................................................................. 18

III. ARGUMENT ............................................................................................................... 18

  A. THE SALE PROCEDURES ARE AN APPROPRIATE MEANS OF MAXIMIZING VALUE ............... 18
  B. THE PROPOSED SALE IS A PROPER EXERCISE OF THE DEBTOR'S REASONABLE BUSINESS
    JUDGMENT ........................................................................................................ 20
  C. THE PURCHASE PRICE IS ADEQUATE AND THE AUCTION WILL ENSURE THAT THE HIGHEST
    PRICE POSSIBLE IS OBTAINED FOR THE ASSETS ................................................ 22
  D. THE SALE WILL LIKELY INCREASE THE RECOVERY TO UNSECURED CREDITORS ............... 22
  E. THE SALE DOES NOT RELY ON THE CREDITWORTHINESS OF THE BUYER ........................ 22

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

i

F.   THE VALUE OF THE ASSETS WILL DECLINE OVER TIME ........................................ 22
G.   THE COURT SHOULD AUTHORIZE THE SALE FREE AND CLEAR OF LIENS, CLAIMS,
     INTERESTS AND ENCUMBRANCES ................................................................. 23
H.   PARTIES ASSERTING INTERESTS COULD BE COMPELLED TO ACCEPT A MONEY
     SATISFACTION (11 U.S.C. §363(F)(5)) ............................................ 23
I.   THE PROPOSED TRANSACTION IS IN GOOD FAITH .......................................... 25
J.   NOTICE OF THE SALE IS REASONABLE UNDER THE CIRCUMSTANCES ................. 26

IV. CONCLUSION .................................................................................. 27

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

ii

# TABLE OF AUTHORITIES

## Cases

*Cello Bag Co. v. Champion Int'l Corn (In re Atlanta Packaging Prods., Inc.)*
    99 B.R. 124 (Bankr. N.D. Ga. 1988) ...................................................................... 19
*Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*
    94 B.R. 343 (E.D. Pa. 1988) ................................................................................. 23
*Doehring v. Crown Corp. (In re Crown Corp.),*
    679 F.2d 774 (9th Cir. 1982) ............................................................................... 19
*Equity Funding Corp. of Am. v. Fin. Assocs. (In re Equity Funding Corp.)*
    492 F.2d 793 (9th Cir. 1974) ............................................................................... 21
*Ewell v. Diebert (In re Well)*
    958 F.2d 276 (9th Cir. 1992) ............................................................................... 25
*Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*
    107 F.3d 558 (8th Cir. 1997) ............................................................................... 18
*In re 995 Fifth Ave. Assocs., L.P.*
    96 B.R. 24 (Bankr. S.D.N.Y. 1989) ....................................................................... 19
*In re Abbotts Dairies*
    788 F.2d 143 (3rd Cir. 1986) ............................................................................... 25
*In re Canyon P'shi*
    55 B.R. 520 (Bankr. S.D. Cal. 1985) ..................................................................... 21
*In re Crowthers McCall Pattern, Inc.*
    114 B.R. 877 (Bankr. S.D.N.Y. 990) ..................................................................... 19
*In re Delaware & H. Ry.*
    124 B.R. 169 (Bankr. D. Del. 1991) ...................................................................... 27
*In re Edwards*
    962 F.2d 641 (7th Cir. 1992) ......................................................................... 25, 26
*In re Financial News Network, Inc.*
    931 F.2d 217 (2d Cir. 1991) ................................................................................. 19
*In re Hunt Energy Co., Inc.*
    48 B.R. 472 (Bankr. N.D. Ohio 1985) .................................................................... 24
*In re Integrated Res., Inc.*
    147 B.R. 650 (S.D.N.Y. 1992) ........................................................................ 18, 20
*In re Marrose Corp.*
    Nos. 1992 WL 33848, at *5 (Bankr. S.D.N.Y. Feb. 15, 1992) ................................. 20
*In re Moore,*
    110 B.R. 924 (Bankr. C.D. Cal. 1990) ................................................................... 21
*In re Red Oak Farms, Inc.*
    36 B.R. 856 (Bankr. W.D. Mo. 1984) .................................................................... 24
*In re Terrace Chalet Apartments, Ltd.,*
    159 B.R. 821 (N.D. Ill. 1993) ............................................................................... 24
*In re Weyland*
    63 B.R. 854 (Bankr. E.D. Wisc. 1986) ................................................................... 24
*Simantob v. Claims Prosecutor, LLC (In re Lahijani)*
    325 B.R. 282 (BAP 9th Cir. 2005) ........................................................................ 21
*Walter v. Sunwest Bank (In re Walter)*
    83 B.R. 14 (BAP 9th Cir. 1988) ............................................................................ 21

## Statutes

11 U.S.C. §§ 101-1530 ............................................................................................. 1
11 U.S.C. §363 .............................................................................................. passim
28 U.S.C. §1334 ................................................................................................... 10
28 U.S.C. §1408 ................................................................................................... 10
28 U.S.C. §1409 ................................................................................................... 10

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

28 U.S.C. §157 ........................................................................................................ 10

**Rules**

F.R.B.P. 1129 ................................................................................................... 22, 23
F.R.B.P. 2002 ..................................................................................................... 1, 25
F.R.B.P. 506 ............................................................................................................ 23
F.R.B.P. 6004 ........................................................................................................... 1
F.R.B.P. 6006 ........................................................................................................... 1
F.R.B.P. 9014 ........................................................................................................... 1
F.R.B.P. 9075-1 ........................................................................................................ 7

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

iv

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## BACKGROUND

### A.    General Description of the Debtor

The Debtor, a California nonprofit public benefit corporation, operates the Victor Valley Community Hospital (the "Debtor" or the "Hospital").  The Debtor was founded in 1967 and is the only non-profit community hospital in the California High Desert, a service area that includes the communities of Adelanto, Apple Valley, Hesperia and Victorville, serving a population of over 300,000 people.  The High Desert communities served by the Debtor are culturally and ethnically diverse.  They also are economically depressed, and suffer under unemployment rates that are higher than 20%.  The Debtor, therefore, serves a high volume of medically under served and indigent patients and has been designated as a Disproportionate Share Hospital.  As a result of this high volume of indigent patients, millions of dollars worth of the Debtor's services were expended on charity care in 2009, and, with a worsening economy and growing unemployment, the amount in uncompensated, charity care will increase significantly in 2010.

### B.    The Debtor's Physical Plant

The Hospital is located at 15248 Eleventh Street, Victorville, California 92392.  The facility was designed and constructed as an acute care hospital, and over the years it has been renovated and expanded to accommodate the needs of its patients and the communities it serves.  Originally the facility was operated as a 115 bed facility, but the capacity was reduced in the mid-2000s to approximately 106 beds, and subsequently further reduced to its current 101 bed capacity.  The Debtor owns the main, two-story, hospital building and its adjacent modular office complex which houses its administrative offices.  The Debtor also leases two other facilities: (a) the Women's Center and Outpatient Imaging facility, along with the Debtor's human resources department, at 15203 Eleventh Street in Victorville, and (b) the Education Center, at 15366 Eleventh Street, Suite R, in Victorville, California.

90231-001\DOCS_LA:224102.8

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**C.    The Debtor's Staff**

The Hospital is currently staffed to operate approximately 65 beds on a normal day, although it has access to visiting nurse registries, which allow it to quickly increase its staff to meet patient needs.  Approximately 257 doctors from the local community have privileges at the Hospital.  As of the Petition Date, the Debtor employed approximately 572 people.  Of this, approximately 160 are nurses.  The rest include, but are not limited to, office staff, technicians, maintenance staff, IT staff, human resources staff, and Quality Assurance staff.

**D.    The Debtor's Services**

As an acute care facility, the Debtor provides a full range of inpatient and outpatient specialty services, including, but not limited to, basic 24-hour emergency room services, surgical services, pediatric services, operating room services, physical therapy, respiratory therapy, outpatient ambulatory services, catheterization laboratory, diagnostic services, women's health center and outpatient imaging services, laboratory and pathology services, social and Medi-Cal eligibility services, physician referral service, and community wellness and education programs.  The Debtor treats approximately 2,900 patients per month in the Emergency Room, of which approximately 250 are eventually admitted to the Hospital.  Annually, the Debtor has approximately 6,600 patients admitted to the Hospital, not including newborns.  Doctors working in the Hospital perform approximately 2,500 out-patient surgeries and approximately 2,000 in-patient surgeries and deliver approximately 1,400 babies annually.

**E.    The Debtor's Management**

The Debtor is governed by a Board of Directors (the "Board") that is comprised of six members who are leaders in the High Desert community: Kathy Davis, Chair (retired political consultant); Dennis G. Killion, Vice-Chair (educator);Thomas Brown (retired bank president); Michael Fermin (Deputy District Attorney); Tim Jasper (local business owner); and Herbert Williamson, III (Public Defender).

The Debtor's Chief Executive Officer is Cathy Pelley, who has served in this position since July 2009.  Prior to that, she was a consultant for the Hospital for the previous four months; CEO at Glendale Memorial Hospital in Glendale, California; and CEO at St . Mary's Regional Medical

2

Center in Apple Valley, California. She is a veteran, having served as an Army nurse during the Vietnam War. She has a Nursing Degree from Philadelphia General Hospital, a Bachelor of Science degree in Business Administration and a Master of Science degree in Organization Development, both from the University of San Francisco, and has worked in the hospital industry since approximately 1970, including more than 40 years as a CEO or equivalent position.

The Debtor's Chief Financial Officer ("CFO") and Chief Information Officer is Edward Matthews, who has served in this position since December 2008. Prior to that, he served as founder and principal manager for Neved Investments; CFO for St. Johns Regional Medical Center in Oxnard, California; as a principal with Healthcare Marketing Group, a healthcare industry investment banking group; and as CFO of Doctors' Hospital of Montclair, in Montclair, California. He served in the United States Army during the Vietnam War, including service in Vietnam, and was awarded the Bronze Star Medal. He has a degree in Business Administration, with a concentration in Accounting, and a Masters of Business Administration, both from the University of Texas at Arlington. He has worked in the hospital industry since 1975.

Additionally, the Debtor contracts, pursuant to a management agreement, with Physicians Hospital Management, LLC, a California limited liability company, (the "Manager") as contract administrator to provide a qualified professional senior management team for the Debtor that assists the Board in implementing measures necessary to improve the Debtor's fiscal and operational management. The management fee currently in effect pursuant to the management agreement is $30,000.00 per month. The Debtor intends to reject this agreement.

**F.    The Debtor's Secured Debt[2]**

    **1.    The 2000 Bonds**

In 2000, the Debtor applied to the California Health Facilities Financing Authority ("HFFA") for financial assistance in refinancing its existing Insured Hospital Revenue Bonds (Victor Valley Community Hospital) 1984 Series A, and this application was approved. In May 2000 the HFFA and the Treasurer of the State of California issued the California Health Facilities Financing

---

[2]     The Debtor has not undertaken an exhaustive review to ascertain whether there is any defect in the security interest granted or the perfection of that security interest. For the purposes herein, the Debtor will assume that the security interests were in fact duly perfected, reserving all rights with regard to this issue.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

90231-001\DOCS_LA:224102.8

Authority Insured Hospital Refunding Revenue Bonds (Victor Valley Community Hospital) Series 2000A (the "Bonds") in the amount of $8,470,000.  HFFA entered into an Indenture with Bank of New York West Trust Company as Trustee,[3] and the proceeds of the sale of the Bonds were loaned to the Debtor (the "HFFA Loan") pursuant to a Loan Agreement between HFFA and the Debtor dated May 1, 2000.  The Debtor gave HFFA a security interest in the Debtor's facilities, including real and personal property, to secure its repayment obligations under the Loan Agreement, and a Deed of Trust was duly entered into and subsequently filed.  The Office of Statewide Health Planning and Development of the State of California ("OSHPD") issued a Contract of Insurance to insure the repayment of the loan obligations and the Debtor entered into a Regulatory Agreement with HFFA and OSHPD under which OSHPD was given the rights to the security given by the Loan Agreement.

As of July 31, 2010, the Debtor owed a total of approximately $2.6 million on the Bonds; with approximately $2.1 million currently held at a Bank of New York Mellon Bank as a reserve account.  On or about September 2, 2010 Debtor made a payment into the reserve account of $81,225.00.

**2.    The Desert Community Bank Obligations**

In 2007 the Debtor desired to establish a revolving line of credit with Desert Community Bank, now a division of East West Bank (the "Bank") in the maximum amount of $4.9 million (the "Bank Loan"), which line of credit was authorized pursuant to a Note dated August 27, 2007 and a Loan Agreement, also dated August 27, 2007, between the Debtor and the Bank.  The Bank and the Debtor asked OSHPD to insure the Debtor's obligations to the Bank, and on or about August 30, 2007, the Debtor entered into an Amendment to Regulatory Agreement with OSHPD and HFFA ("the Amendment") under which Debtor obtained permission to enter into the line of credit with the Bank to finance working capital and pay expenses related to the execution and issuance of the line of credit and related documents.

On or about August 27, 2007, the Debtor executed for the benefit of OSHPD a Deed of Trust with Fixture Filing and Security Agreement ("Trust Deed") which was duly recorded on August 30,

---

[3]    The indenture trustee's current name is Bank of New York Mellon Trust Company, N.A.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

2007.  The Trust Deed conveyed a security interest to secure both the HFFA Loan and the Bank

Loan, in, among other things, all of Debtor's land, improvements, fixtures, equipment, leases,

rentals, accounts, accounts receivable, and inventory, and replaced the earlier Deed of Trust which

related only to the HFFA Loan.

As of July 31, 2010, the Debtor owed the Bank approximately $4.5 million on account of this

obligation.  This obligation is paid through an automatic withdrawal from the Hospital's general

account of about $30,000 monthly; the last payment was made in August 2010.

### 3.    The PHM Obligations

As of February 2, 2005, Debtor entered into a Loan Agreement with Physicians Hospital

Management, LLC ("PHM") that provided for a loan of $6 million, some funds of which had been

previously provided and previously evidenced by other notes.  Interest accrues and was to be paid

monthly; the principal is due to be paid in 2012 in a balloon payment.  The Debtor has not made a

payment on this obligation in approximately 3 months and currently owes $91,822 of accrued

interest on this obligation.

The Loan Agreement is secured by a trust deed on Debtor's real estate subordinate to the

OSHPD Deed of Trust.

### 4.    The Corwin Medical Group Obligations

On or about September 1, 2010, Debtor borrowed $700,000.00 from Corwin Medical Group,

Inc., IPA (the "Corwin Loan") in order to pay its September 3, 2010 payroll.  The promissory note

evidencing the Corwin Loan provides that (a) the principal amount of the note will be due and

payable on December 1, 2010, with interest at 5.00% annually; (b) that it is secured by the DSH

adjustment receivable and by Medicare Settlement receivables; and (c) that the proceeds of either or

both of these receivables shall be used to repay this note prior to satisfying other obligations of the

Hospital.

### 5.    Capitalized Leases

The Debtor has a lease with Radiometer America, Inc. for a radiometer, which is secured by

an security interest in the radiometer.  As of August 31, 2010, the Debtor owed approximately

$58,579 on this lease.  The monthly payment is $2,765.00.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

### G.    The Debtor's Unsecured Debt

The Debtor has approximately $16.5 million in total unsecured debt, comprised of obligations to vendors of goods and services, employees, and a significant obligation to Medi-Cal, which is being paid off over 40 years pursuant to an agreement with Medi-Cal.

#### 1.    Trade Debts

The Debtor owes approximately $1,308,000 in accrued but unpaid management fees to PHM. Additionally, the Debtor owes approximately $7 million to providers of goods and services to the Debtor, including Cerner, Medtronic, Stryker, J&J and others, as well as to the State of California for genetic testing for newborns.

#### 2.    Employee Obligations

The Debtor owes approximately $2 million to its current and former employees for wages and Paid Time Off ("PTO") including vacation and sick time.

#### 3.    Obligations to Medi-Cal

The Debtor currently owes approximately $6,008,000.00 for prior overpayments on Medi-Cal cost reports.  At the end of a fiscal year, the Debtor must submit a "cost report" to the Centers for Medicare and Medi-caid services, which cost report shows a recap of all rights to payment owed by the entity submitting the report compared to the amounts already paid by the federal or state governments.  The government audits these cost reports and decides whether the provider was overpaid or underpaid.  If underpaid, the government pays the funds owed.  If overpaid, the provider must reimburse the government.  In this case, prior cost reports of the Debtor going back as far as 1994 have been audited and the audits revealed that the Debtor was overpaid.

On or about May 5, 2004, the Debtor entered into an extended repayment plan (the "First Repayment Plan") with the State of California Department of Health Care Services for overpayments for cost report years 1993-1997.  The amount of the obligation covered by the First Extended Repayment Plan was $6,027,255 and the balance under the First Extended Repayment Plan as of September 5, 2010 was $5,583,774.  The monthly payments are $27,577 with the last payment being due on May 4, 2044.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

6

The Debtor, on or about April 1, 2009, entered into another extended repayment plan (the "Second Extended Payment Plan") to cover the overpayments in the amount of $2,426,246.00 received in the cost report years of 2005-2007. The amount due under the Second Extended Payment Plan is being amortized over a period ending January 1, 2011 with monthly payments of $111,203. The monthly payments under the First Extended Payment Plan and the Second Extended Payment Plan, $138,780, are being offset by Medi-Cal from current remittance advices.

**H.    The Debtor's Revenues**

The primary source of the Debtor's revenues are payments for services provided to its patients from either health plans or from governmental programs such as Medicare and Medi-Cal (the California state version of the Medi-caid Program). The following are the approximate percentages of the Debtor's sources for payments for providing patient services: Medi-Cal and Medi-Cal Managed Care: 42.7%; Medicare and Medicare Managed Care: 29.1%; Managed Care Health Maintenance Organizations/Preferred Provider Organization ("HMO/PPO"), including Aetna, Blue Cross/Blue Shield, Cigna and United: 10.1%; Commercial Workers' Compensation Insurance: 8%; and County Indigent Programs: 4.6%; and Self-Pay: 5%. Thus, more than 75% of the Debtor's revenues come from governmental payors. Further, historically, the Hospital has collected only approximately 8% of the amount due from self-pay patients.

The Debtor, as a Disproportionate Share Hospital, also receives payments from the California state government to help cover the extraordinary costs of serving a particularly high number of indigent patients, whether Medi-Cal and Medicare eligible or not. For fiscal year 2009-2010 the Debtor received approximately $3.8 million in DSH payments, and is still owed two payments. However, what amount of DSH monies will be forthcoming and when it will be paid is unknown, because one payment, estimated at being over $750,000, is being withheld by the State pending resolution of a lawsuit brought against it by the Federal government; the last payment is not expected until October 2011 and will be a relatively small amount.

Additionally, the Debtor qualifies for a new program called the Hospital Quality Assurance Revenue Fund. Although this program still awaits approval by the federal Center For Medicare and Medicaid Services ("CMS"), a recent memo of the California Hospital Association ("CHA") lists

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

7

the Debtor as being likely to receive several million dollars over the expected twenty-one month life of the program.

## I.    The Chapter 11 Filing

The current fiscal crisis for the Debtor is the result of the confluence of several factors.  First, the Debtor provides millions of dollars per year in care to indigents, for which it is not compensated at all or is inadequately compensated.  The percentage of the Debtor's resources expended on indigent care is increasing because the Debtor serves a depressed community and the economic condition of this community has worsened in the past few years.  As the unemployment rate has risen, so has the number of uninsured patients.  Over the last year, the volume of patients has not increased substantially, however, the number of Medi-Cal and self-pay patients increased by 7%.

Second, the Hospital's plant is approximately 45 years old and the maintenance costs for this plant are substantial and increasing every year.  In addition to the maintenance costs, the costs of bringing and keeping the hospital plant in compliance with the various governmental regulatory requirements is also substantial.

Third, Medi-Cal arbitrarily reduced its payment rate by 10% in January 2010, and Medicare payment rates will be reduced by 2.9% in October 2010.  These changes have caused a decline in the Debtor's revenues without a corresponding reduction in the Debtor's obligations to provide patient care.

Fourth, California's financial crisis and the inability of its legislature to pass a budget has caused uncertainty in the timing and the amounts of the DSH Payments and a delay in the hoped for Quality Assurance Fee payments.

Fifth, being a stand alone, small rural hospital in California is simply not an advantageous financial situation.  Such hospitals, including the Hospital, suffer from a lack of economies of scale, poor payor mix, high overhead costs, less high-margin specialty service lines, and an overall lower revenue base.  Thus, the Hospital, like many rural small hospitals, struggles to meet even the relatively small (1 - 3 %) profit margins that is the norm for most of the not-for-profit hospital industry.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

90231-001\DOCS_LA:224102.8

During the relatively short period of time that Ms. Pelley and Mr. Matthews have managed the Hospital they have made extensive efforts to deal with the financial crisis, including, but not limited to, laying off staff, changing to outsourcing for medical transcriptions, negotiating an increase in payor rates from Inland Empire Health Plan, a public entity, and attempting to re-negotiate commercial contracts, however, they lacked leverage and were not able to increase those contract rates.  In any event, because 75% of the Debtor's payments come from governmental payors, even an increase in payment rates from HMOs/PPOs would not make a significant difference in the Hospital's cash flow.

The Debtor needs to generate approximately $150,000 to $200,000 per day in revenue to cover its operating costs.  No appreciable cost savings are recognized by the Debtor when the patient census drops below 65 beds a day, as the fixed costs remain fairly constant.  The Hospital has been generating only approximately $100,000 per day in revenue.  Thus, the Debtor loses money every month it operates, and could not have paid its employees their last pay period absent an emergency loan from the Corwin Medical Group.  In light of this ongoing cash flow shortage, the Debtor was forced to file this chapter 11 case.

Because the Debtor's CEO, CFO, and Board have concluded that the Debtor cannot survive at its current cash flow levels and would have to close absent drastic measures, representatives of the Board approached Prime Healthcare Services Foundation, Inc. ("Prime"), which had previously expressed an interest in purchasing the Hospital, and negotiated the Asset Sale Agreement which is being presented as part of the initial bankruptcy filings.  The proposed sale to Prime, a Delaware non-stock corporation organized exclusively for charitable purposes under Section 501(c)(3) of the Internal Revenue Code, or its permitted assignee, will allow the Debtor to pay all its secured creditors, and provide a significant distribution to unsecured creditors.  The chapter 11 case will give the Debtor the breathing room necessary to sell its assets either to Prime or an over-bidder at a bankruptcy auction, allowing the Hospital to continue to provide its essential healthcare services to the High Desert Communities and provide a recovery that will benefit all of its creditors.  The proposed sale provides for Prime to acquire substantially all the Debtor's assets in exchange for $25 million in cash or assumption of debt, as well as up to an additional $3.2 million in Debtor in

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  Possession Financing to be provided postpetition and prior to the closing of the proposed sale to

2  allow the Hospital to continue to operate.

3      On September 13, 2010 (the "Petition Date"), the Debtor filed a voluntary petition for relief

4  under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtor

5  continues to operate its business and manage its affairs as a debtor in possession pursuant to sections

6  1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or committee has been appointed

7  in this chapter 11 case.

8  **K.**    **Jurisdiction and Venue**

9      The court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a

10  core proceeding pursuant to 28 U.S.C. § 157(b)(2). The venue of the Case is proper pursuant to

11  28 U.S.C. §§ 1408 and 1409.

12  **II.**

13  **FACTS CONCERNING THE PROPOSED SALE**

14      The Debtor proposes to sell its entire ongoing business to Prime or a higher bidding

15  Purchaser. The Asset Sale Agreement with Prime ("ASA") sets forth types of assets that are part of

16  the operating Hospital and are to be transferred, which include all interests of the Debtor in real

17  property; all tangible personal property owned by the Debtor and used by the Debtor in the operation

18  of the Hospital; all of Debtor's interests in leases and contracts to be assumed by Purchaser; all

19  receivables and other accounts payable to Debtor; all DSH payments payable to the Debtor; and

20  other various other assets described in the ASA (collectively, "the Assets")[4].

21      Section 1.9 of the ASA lists excluded assets which consist of cash, cash equivalents and

22  short-term investments held in the name of or for the benefit of the Victor Valley Community

23  Hospital Foundation, contracts and leases which are not assumed by Purchaser, assets belonging to

24  others, and a whole list of types of assets that remain as assets of the Estate.

25      Prime has offered to purchase the Assets for $25 million less offsets for obligations that are

26  assumed but not paid now, including: (a) the balance due under the First and Second Extended

27

28  _____

[4] This description of the Assets is not exhaustive and is qualified in its entirety by the terms of the ASA which is attached
as **Exhibit "A."**. To the extent that there is any inconsistency between the above summary and the ASA, the description
in the ASA shall control. Accordingly, parties in interest are urged to review the ASA in its entirety

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

90231-001\DOCS_LA:224102.8

Repayment Plans to Medi-Cal, and (b) the amount of accrued payroll and paid time off for employees hired by Prime.  In addition, as is detailed in a separate motion, Prime proposes to loan the Debtor up to $3.2 million in debtor in possession financing pursuant to a proposed budget, and whatever is actually advanced in connection with that loan will not be an offset against the $25 million purchase price.  Rather, if Prime is the successful bidder, the DIP Financing will be forgiven; if it is not the successful bidder, it will be repaid out of the purchase price.  It is contemplated that the purchase price is sufficient to pay all secured creditors in full and that there will be a dividend for unsecured creditors.

Accordingly, and as detailed below, the Debtor believes that a sale of the Assets to Prime, or to a different successful Purchaser at an auction, on substantially the terms and conditions of the Asset Sale Agreement attached hereto as **Exhibit "A,"** is in the best interests of the Debtor's estate.  The Debtor also believes that Prime's bid, or a higher successful bid at the auction, will establish the current value of the Hospital.  Finally, the Debtor asks that the Court approve the Debtor's proposed sales procedures, including the payment of a Break-Up Fee to Prime, as fair and reasonable under the circumstances.

The details of the Proposed Sale are as follows:

**A.**    **Purchase Price**

$25 million less offsets for obligations that are assumed but not paid now, including: (a) the balance due under the First and Second Extended Repayment Plans to Medi-Cal, and (b) the amount of accrued payroll and paid time off for employees hired by Prime; plus forgiveness of whatever is advanced pursuant to the DIP bridge loan which is not to exceed $3.2 million.  In addition, pursuant to the ASA Prime has promised to make about $15 million of capital expenditures over the next five years.

**B.**    **Assets Being Transferred**

All interests of the Debtor in real property; all tangible personal property owned by the Debtor and used by the Debtor in the operation of the Hospital; all of Debtor's interests in leases and contracts to be assumed by Purchaser; all receivables and other accounts payable to Debtor; all DSH

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

90231-001\DOCS_LA:224102.8

1  payments payable to the Debtor; and other various other assets described in the ASA.  Parties should

2  review the ASA carefully for an exhaustive list of the Assets.

**C.**    **Good Faith Deposit**

4       $5 million.

**D.**    **Closing**

6       No later than 10 days after Bankruptcy Court entry of the sale confirmation order.

**E.**    **Break-Up Fee**

8       There is to be a break up fee of $650,000.00 which constitutes a superpriority administrative

9  expense of the Debtor, which Prime is allowed to credit bid in any overbid that it may elect to make

10  with respect to the Assets.

**F.**    **Buyer's Conditions**

12       The two primary conditions are California Attorney General approval and Bankruptcy Court

13  approval including a finding that Prime is a "good faith" purchaser.

14       The sale of the Assets to Purchaser shall be subject to overbidding in favor of third parties

15  willing to participate at the Auction.  The Debtor shall follow the following procedures (the "Sale

16  Procedures") as to any party who wishes to submit an overbid:

17       **1.**    **Opportunity for Due Diligence**

18       Prior to being permitted to conduct any due diligence, a party must execute a confidentiality

19  agreement in form and substance satisfactory to the Debtor.  The Debtor will provide parties

20  interested in acquiring the Assets ("Potential Purchasers") with reasonable access to the Debtor's

21  books, records, independent accountants and legal counsel for the purpose of conducting due

22  diligence.  The Debtor shall not be required to provide confidential or proprietary information to a

23  Potential Purchaser if the Debtor reasonably believes that such disclosure would be detrimental to

24  the interests of the Debtor.  Potential Purchasers seeking to overbid Prime shall have until

25  **October 5, 2010** to complete their due diligence.

26       **2.**    **Submission of Offer**

27       Potential Purchasers must submit any Offers to the Debtor by delivering the Offer (including

28  Bidder Purchase Agreement and Good Faith Deposit) to Samuel R. Maizel at the offices of

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

12

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Blvd., 11th Floor, Los Angeles, California 90067, or a designee subsequently identified by the Debtor, by no later than **October 8, 2010 at 5:00 pm (Pacific time)** (each such offer, an "Offer").[5]  Mr. Maizel or a subsequent designee shall circulate copies of all Offers promptly to the Debtor and Counsel to the Creditors' Committee, if any.  Each Offer must be in writing and satisfy the following conditions:

**3.      Terms of Offer**

An Offer must be on terms that are better than the terms of the ASA.  An Offer must include clean and blacklined versions of the ASA reflecting any proposed changes thereto (including any changes to the Purchase Price) (the "Bidder Purchase Agreement").  The clean version of the Bidder Purchase Agreement must be signed by a duly authorized officer of the Potential Purchaser.  An Offer must be for at least $29,350,000.00, consisting of the aggregate amount of the $25 million Purchase Price, the $3.2 million of Debtor-in-Possession Financing being provided to the Debtor by Prime that Prime is prepared to forgive, and the initial Overbid Increment of $1,150,000 (which is inclusive of the $650,000 Break-Up Fee amount) and must also take into consideration the commitment of Prime to provide capital of $15 million over the five-year period post-closing.  An Offer must also include provision to make offers of employment to Debtor's employees consistent with paragraph 5.3 of the ASA.

**4.      Offers Irrevocable**

Except with respect to an Offer submitted by the Successful Bidder or the Back-Up Bidder, which must remain open, binding and irrevocable on such Successful Bidder or Back-Up Bidder until the closing of the sale of the Property, an Offer must remain open, binding and irrevocable on the Potential Purchaser until the Court's order approving the sale of the Property (the "Sale Order") is entered.

**5.      Good Faith Deposit**

An Offer shall also be accompanied by a deposit paid to the Debtor in an amount equal to $5,750,000 (the "Good Faith Deposit").  Each Good Faith Deposit is payable in U.S. dollars to the

---

[5]  The Debtor reserves the right to consider, and at its sole discretion accept, any bid that may be made up through the entry of the order approving the sale of any of the Assets.

Debtor.  The Good Faith Deposit shall be irrevocable.  Each Good Faith Deposit shall be provided to and held by counsel to the Debtor  in an interest-bearing account until the third day after the Sale Order is entered, after which time the Good Faith Deposits of the bidders that were not selected as the Successful Bidder or the Back-Up Bidder shall be returned.

**6.    Contingencies**

An Offer may not be conditioned on obtaining financing or any internal approval or be subject to contingencies other than those in the ASA.

**7.    Financing Sources**

In addition, an Offer must contain information, acceptable to the Debtor, which demonstrates to the Debtor in its sole and absolute discretion that the Potential Purchaser has sufficient cash on hand or a binding financial commitment from an established and financially sound financial institution to ensure such Potential Purchaser's ability to meet its commitments and otherwise fully perform pursuant to its Offer and to close the transaction within the time frame established.

**8.    Identity of Bidder and Legal Power**

An Offer must disclose the identity of the Potential Purchaser, including confirmation that its bid is made as principal for the Potential Purchaser's account and, if not, the basis upon which the Potential Purchaser is acting and the identities of all other participants (if any).  It must also disclose any agreements or understandings between the Potential Purchaser and any third party with respect to the Property.  The Offer must also be accompanied by sufficient indicia that the person submitting the Offer is legally empowered, by power of attorney or otherwise, to (i) bid on behalf of the Potential Purchaser, and (ii) complete and sign, on behalf of the Potential Purchaser, a binding and enforceable Bidder Purchase Agreement.

**9.    No Fees**

An Offer may not request or entitle the Potential Purchaser to any fee, including, but not limited to, a break-up fee, termination fee, expense reimbursement or similar type of payment. Moreover, by submitting an Offer, a Potential Purchaser shall be deemed to waive the right to pursue a substantial contribution claim under section 503 of the Bankruptcy Code related in any way to this Motion, the Sale Motion, the submission of the Offer, or the Sale Procedures.

90231-001\DOCS_LA:224102.8

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**10.    Due Diligence Acknowledgment; Release**

The Offer must contain an acknowledgement and representation that the Potential Purchaser (i) had an opportunity to conduct any and all due diligence regarding the Property prior to making the Offer, (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Property in making its Offer, (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bidder Purchase Agreement; and (iv) agrees, as part of the documents to be executed at Closing, to release, indemnify and hold harmless the Debtor, agents and professionals of each of the foregoing in connection with all matters arising in connection with the sale of the Hospital.

**11.    Compliance with Sale Procedures and other Orders of the Court**

Each Offer must include a written statement that (i) the Potential Purchaser agrees to comply with the Sale Procedures and such other terms and procedures as may be imposed by the Bankruptcy Court or the Debtor, in his sole and absolute discretion, at or prior to the Auction; (ii) the Potential Purchaser believes in good faith that its Offer satisfies the requirement for a Qualified Bid set forth in this Motion, (iii) the Potential Purchaser's Good Faith Deposit will be treated in accordance with the provisions set forth herein or otherwise approved by order of the Court; and (iv) the Potential Purchaser consents to the core jurisdiction of the Bankruptcy Court and waives any right to a jury trial in connection with any disputes relating to (r) any order approving the Motion, (s) the purchase of the Hospital, (t) Auction, (u) Sale Procedures, (v) Sale, (w) Break-Up Fee, (x) Overbid Increment, (y) Sale Hearing, or (z) the construction and enforcement of the any agreement or any other matter relating to any of the foregoing.

**12.    Successive Overbids**

All overbids after the first overbid must be in increments of no less than $250,000.

The Debtor, in its sole discretion, shall determine whether an Offer has satisfied all the conditions set forth above.  Any Offer that satisfies such conditions shall be deemed a "Qualified Bid."

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**13.    The Auction and Selection of the Successful Bid**

The Auction will be conducted at the offices of Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Boulevard, Suite 1100, Los Angeles, California 90067, or at another location as may be timely disclosed by the Debtor to Qualified Bidders, on the Auction Date, commencing at 10:00 a.m. PDT.

Only parties that have timely submitted a Qualified Bid will be permitted to participate in and/or make any statements on the record at the Auction. All Qualified Bidders must appear in person at the Auction, or through a duly authorized representative. If multiple Qualifying Bids satisfying all Auction requirements are received, each party shall have the right to continue to improve its bid at the Auction. The Auction will be an 'open format' such that all participants are contemporaneously to be made aware of the particulars of any Qualified Bids that are submitted.

The Debtor may conduct the Auction in all respects in the manner it determines will result in the highest, best or otherwise financially superior offer(s) for the Assets provided that such manner is not inconsistent with the provisions hereof or the Bankruptcy Code. The initial minimum bid must be at least $1,150,000 (inclusive of the Break-Up Fee) higher than the Purchase Price, and subsequent minimum bids must be in increments of no less than $250,000. At the conclusion of the Auction, and subject to Court approval following the Auction, the successful bid shall be selected by the Debtor or the Debtor's designee (the "Successful Bid").

Within two business days (subject to reasonable extension) of the adjournment of the Auction, the entity that made the highest and best bid (the "Successful Bidder") shall complete and sign all agreements, contracts, instruments or other documents evidencing and containing the terms and conditions upon which such bid was made.

**14.    Objections**

The failure of any objecting person or entity to timely file its objection shall be a bar to the assertion at the Auction or any hearing with respect thereto thereafter, of any objection to this Sale

90231-001\DOCS_LA:224102.8

16

Motion, the Auction, the sale, the terms of the ASA or consummation and performance of any sale

agreement (including the transfer of the Assets free and clear of all liens and interests) and shall be

deemed a consent to such transfer, if authorized by the Court.

**15.    Court Approval at Sale Hearing**

An evidentiary hearing, among other things, to confirm the results of the Auction and

approve the sale of the Assets to the Successful Bidder (the "Approval Hearing") will be held before

the Honorable Catherine E. Bauer, United States Bankruptcy Judge, in the United States Bankruptcy

Court, 3420 Twelfth Street, Riverside, CA  92501-3819 on the date and at the time set by the

Bankruptcy Court, or at such time thereafter as counsel may be heard and is anticipated to be

approximately two business days after the Auction Date.  The sale of the Assets will be subject to,

among other things, the entry of an order of the Bankruptcy Court approving the sale.  The Approval

Hearing may be adjourned from time to time without further notice to creditors or parties in interest

other than by announcement of the adjournment in open court or on the Court's calendar on the date

scheduled for the Approval Hearing or any adjourned date.

**16.    Return of Earnest Money Deposit**

Earnest Money Deposits of all Qualified Bidders shall be held in an interest-bearing escrow

account until the third day after the Approval Order is entered, after which time the Earnest Money

Deposits of the non-Successful Bidder(s) shall be returned.  If the Successful Bidder fails to

consummate a Court-approved sale because of a material breach or failure to perform on the part of

such Successful Bidder, the Debtor shall be entitled to retain that portion of the Earnest Money

Deposit which is equal to the Debtor's actual damages caused by the material breach or failure to

perform by the Successful Bidder, including without limitation, sufficient funds to pay the Breakup

Fee.  In no event shall such Earnest Money Deposit limit the Successful Bidder's liability for any

such breach or failure to perform.

**17.    The Break-Up Fee**

In the event that, through no fault of Prime, (i) Prime is not the Successful Bidder or (ii) the

court does not approve the sale to Prime, then: Prime shall be paid, on the first business day

following the closing of the Sale of the Assets to the Successful Bidder, the Break-Up Fee in the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

17

1   amount of $650,000 in cash or other immediately available funds without the necessity for further

2   Court approval or review.  The Breakup Fee shall be paid from the proceeds of the sale, or, if the

3   sale does not close, solely from any deposit made by the Successful Bidder with the Debtor in

4   connection with the Sale of the Assets.

5       The Debtor believes that the foregoing Sale Procedures provide an appropriate framework for

6   selling the Assets and will enable the Debtor to review, analyze and compare all bids received to

7   determine which bid is in the best interests of the estates and creditors.  Moreover, for the reasons

8   discussed below, the Debtor believes the Sale Procedures, including the Break-Up Fee, are fair and

9   reasonable under the circumstances.  Therefore, the Debtor respectfully requests that this court

10  approve the Sale Procedures in full.

11                                         **III.**

12                                    **ARGUMENT**

13  **A.**      **The Sale Procedures Are an Appropriate Means of Maximizing Value**

14      After notice and a hearing, a debtor may sell its assets outside the ordinary course of its

15  business.  11 U.S.C. § 363.  In order to obtain approval of a proposed sale of assets, a debtor usually

16  must show that the proposed purchase price is the highest and best offer available under the

17  circumstances of the case.  *See, e.g., Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn*

18  *Stores, Inc.),* 107 F.3d 558, 564-65 (8th Cir. 1997) (holding that in bankruptcy sales, "a primary

19  object of the code [is] to enhance the value of the estate at hand"); *In re Integrated Res., Inc.,*

20  147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the . . .

21  Debtors' duty with respect to such sales is to obtain the highest price or greatest overall benefit

22  possible for the estate.") (quoting *Cello Bag Co. v. Champion Int'l Corn (In re Atlanta Packaging*

23  *Prods., Inc.*), 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988)).

24      In connection with sales of assets outside of the ordinary course of business, bankruptcy

25  courts frequently approve competitive bidding procedures as a means of ensuring that such sales will

26  generate the highest and best returns to the debtor.  *See, e.g., Doehring v. Crown Corp. (In re Crown*

27  *Corp.),* 679 F.2d 774, 775 (9th Cir. 1982) (district court required specific minimum overbid

28  amounts, deposits, and comparable deal terms to be used by all overbidders); *In re Crowthers*

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

*McCall Pattern, Inc.*, 114 B.R. 877, 879 (Bankr. S.D.N.Y. 990) (court entered order requiring that overbids be made in specified minimum increments with deposits); *In re Financial News Network, Inc.*, 931 F.2d 217 (2d Cir. 1991) (requiring that overbids exceed the initial offer by 9.5 percent).

Historically, bankruptcy courts have also approved break-up fees similar to the Break-Up Fee proposed here under the "business judgment rule," which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment. *See, e.g., In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may "be legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking"); *In re Marrose Corp.*, Nos. 1992 WL 33848, at *5 (Bankr. S.D.N.Y. Feb. 15, 1992) (approving of "agreements to provide breakup fees or reimbursement of fees and expenses meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers."); *Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.)*, 147 B.R. 650, 657-58 (S.D.N.Y. 1992) (establishing three basic factors for determining whether to permit breakup fees in bankruptcy: whether "the relationship of the parties who negotiated the break-up fee [is] tainted by self-dealing or manipulation," whether the "fee hamper[s], rather than encourage[s], bidding," and whether "the amount of the fee [is] unreasonable relative to purchase price"), appeal dismissed, 3 F.3d 49 (2d Cir. 1993).

The Debtor submits that sufficient cause exists to approve the proposed Sale Procedures and Break-Up Fee. Prime was understandably unwilling to commit to hold open its offer to purchase the Assets without the Break-Up Fee. Prime will have expended, and likely will continue to expend, considerable time, money and energy pursuing the purchase, and will have engaged in extended and lengthy, good faith negotiations. Further, Prime's efforts have increased the chances that the Debtor will receive the highest and best offer for the Assets by establishing a bid standard or minimum for other bidders to the Auction and by serving as a catalyst for other potential or actual bidders, to the benefit of the estate, creditors, and all other parties in interest.

The Break-Up Fee is 2.3 percent of the Purchase Price, ignoring the commitment by Prime to supply capital of $15 million over five years. According to Kelly K. Frazier, *A Comparison*

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

19

*Shopping Guide for 363 Sales*, break-up and topping fees range from 1.5 to 5 percent "with the average being approximately 2.7 percent" *Id.* at 139.

The Debtor thus requests that the court approve the bid protections included in the Sale Procedures and payment of the Break-Up Fee.

**B.     The Proposed Sale Is a Proper Exercise of the Debtor's Reasonable Business Judgment**

Section 363(b)(1) of the Bankruptcy Code provides that "the [debtor in possession], after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate. 11 U.S.C. § 363(b)(1). Courts interpret section 363 to require only that such sale or use of property be within the sound judgment of the debtor to which the court gives great deference. *See, e.g., In re Moore,* 110 B.R. 924 (Bankr. C.D. Cal. 1990); *In re Canyon P'ship,* 55 B.R. 520 (Bankr. S.D. Cal. 1985); *see also Simantob v. Claims Prosecutor, LLC (In re Lahijani),* 325 B.R. 282, 289 (BAP 9th Cir. 2005) (trustee's position is afforded deference, "particularly where business judgment is entailed in the analysis"); *Walter v. Sunwest Bank (In re Walter),* 83 B.R. 14, 19-20 (BAP 9th Cir. 1988) ("[T]here must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business . . .Whether the proffered business justification is sufficient depends on the facts of the case.")

As stated by the Bankruptcy Appellate Panel for the Ninth Circuit in *In re Walter*, the bankruptcy judge should consider all salient factors pertaining to the proposed transaction and accordingly, act to further the diverse interests of the debtor, creditors, and equity holders alike. *Id.,* 83 B.R. at 20. Among other factors, courts should consider the consideration to be paid, the financial condition and needs of the debtor, the qualifications of the buyer, and whether a risk exists that the assets proposed to be sold would decline in value if left in the debtor's possession. *See Equity Funding Corp. of Am. v. Fin. Assocs. (In re Equity Funding Corp.)*, 492 F.2d 793, 794 (9th Cir. 1974) (affirming trial court's finding that the proposed sale of the debtor's assets would be in the best interest of the estate in light of impending deterioration of market value of debtor's assets).

As evidenced in the Matthews Declaration, the Debtor has considered each of the relevant factors with respect to the Proposed Sale. Based on these factors, the Debtor submits that the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

following justifications demonstrate that the Proposed Sale is an appropriate exercise of business

judgment, and is in the best interests of the Debtor's estate.

**C.      The Purchase Price Is Adequate And The Auction Will Ensure That The Highest Price**

**Possible Is Obtained For The Assets**

As set forth in the Matthews Declaration, the Debtor believes that the Purchase Price or a

higher bid at the Sale Hearing will establish the fair value of the Assets.  The Debtor also believes

Prime's bid to be an adequate purchase price when all of the circumstances are taken into account.

**D.      The Sale Will Likely Increase the Recovery To Unsecured Creditors**

The Hospital is out of cash and its operations lose money.  To the extent that the Assets can

be sold quickly, but prudently, such a sale will maximize the return to creditors.

**E.      The Sale Does Not Rely On The Creditworthiness Of The Buyer**

An offer may not be conditioned on obtaining financing and must contain information that

demonstrates to the Debtor that the Potential Purchaser has sufficient cash on hand or a binding

financial commitment from an established and financially sound financial institution to ensure the

Potential Purchaser's ability to meet its commitments and otherwise fully perform pursuant to its

Offer.  It requires a good faith deposit of $5,000,000 from Prime and a deposit of $5,750,000 from

prospective overbidders.  These deposits are not refundable except in certain circumstances.

**F.      The Value Of The Assets Will Decline Over Time**

A Hospital whose operations lose money will, by definition, decline in value over time.  The

decline will be much steeper, however, if the Debtor becomes unable to meet its payroll and is

forced to cease operating.  Then, any sale would not be as a going concern and would be at a lower

price consistent with the need to start up once again.

**G.      The Court Should Authorize the Sale Free and Clear of Liens, Claims, Interests and**

**Encumbrances**

The Debtor requests that the court approve the sale of the Assets free and clear of all

interests, with any such interests to attach to the sale proceeds with the same validity and priority as

existed prior to the sales, or to be paid in full.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

21

1    Section 363(f) of the Bankruptcy Code expressly authorizes a debtor to sell property outside

2  the ordinary course of business "free and clear of any interest in such property of an entity" if any

3  one of the five following conditions is met:

4    (a)    applicable non-bankruptcy law permits sale of such property free and clear of such

5  interest;

6    (b)    such entity consents;

7    (c)    such interest is a lien and the price at which such property is to be sold is greater than

8  the aggregate value of all liens on such property;

9    (d)    such interest is in bona fide dispute; or

10    (e)    such entity could be compelled, in a legal or equitable proceeding, to accept a money

11  satisfaction of such interest.

12    Because section 363(f) of the Bankruptcy Code is written in the disjunctive, any one of these

13  five conditions provides authority to sell the Assets free and clear of liens. *See Citicorp*

14  *Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988).

15  **H.**    **Parties Asserting Interests Could Be Compelled To Accept a Money Satisfaction**

16  **(11 U.S.C. §363(f)(5))**

17    The Bankruptcy Code further provides that assets may be sold free and clear of liens, claims,

18  interests and encumbrances if the holders thereof "could be compelled, in a legal or equitable

19  proceeding, to accept a money satisfaction of [their] interest[s]." 11 U.S.C. § 363(f)(5). Here, the

20  the ASA contemplates that secured creditors with valid claims will be paid in full out of the sale

21  proceeds.

22    Section 1129(b)(2) of the Bankruptcy Code permits a debtor or trustee to retain property and

23  cram down objecting creditors upon payment of the actual value of the collateral. *See, e.g., In re*

24  *Terrace Chalet Apartments, Ltd.*, 159 B.R. 821, 829 (N.D. Ill. 1993) (holding that a creditor who

25  could be crammed down under section 1129(b) could be compelled to accept a money satisfaction of

26  his interest under section 363(f)(5)); *In re Hunt Energy Co., Inc.*, 48 B.R. 472, 485 (Bankr. N.D.

27  Ohio 1985) (same); *In re Weyland*, 63 B.R. 854, 860-61 (Bankr. E.D. Wisc. 1986) (same); *In re Red*

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

22

1    *Oak Farms, Inc.*, 36 B.R. 856, 858 (Bankr. W.D. Mo. 1984).  In addition, section 1129(b)(2)(A)(ii)

2    of the Bankruptcy Code permits the sale free and clear of liens with liens to attach to proceeds.

3        The Assets to be sold here consist of all interests of the Debtor in real property; all tangible

4    personal property owned by the Debtor and used by the Debtor in the operation of the Hospital; all

5    of Debtor's interests in leases and contracts to be assumed by Purchaser; all receivables and other

6    accounts payable to Debtor; all DSH payments payable to the Debtor; and other assets described in

7    the ASA, and, under section 1129 (b)(2) of the Bankruptcy Code, any lienholder could be compelled

8    to accept a monetary satisfaction of its claims.  Under section 506(a) of the Bankruptcy Code, the

9    amount of a secured claim is limited to the value of the collateral securing such claim.  As a result, a

10   fair price for the collateral itself establishes the maximum amount of a creditor's secured claim.  In

11   addition, under section 1129(b)(2)(A)(ii) of the Bankruptcy Code, a secured creditor's collateral may

12   be sold free and clear of liens, with liens to attach to proceeds.  Thus, under sections 1129(b)(2) and

13   506(a) of the Bankruptcy Code, holders of liens, claims, interests or encumbrances could be

14   compelled to accept money satisfaction of their interests, and the Assets therefore may be sold free

15   and clear of any such liens, claims, interests or encumbrances pursuant to section 363(f)(5) of the

16   Bankruptcy Code.

17       Accordingly, the Debtor submits that approval of the sale of the Assets free and clear of

18   liens, claims, interests or encumbrances is appropriate under, among other things, section 363(f) (5)

19   of the Bankruptcy Code and should be approved.

20   **I.    The Proposed Transaction Is In Good Faith**

21       "[W]hen a bankruptcy court authorizes a sale of assets pursuant to section 363(b)(1) of the

22   Bankruptcy Code, it is required to make a finding with respect to the 'good faith' of the purchaser."

23   *In re Abbotts Dairies*, 788 F.2d 143, 149-50 (3rd Cir. 1986).  The purpose of such a finding is to

24   facilitate the operation of section 363(m) of the Bankruptcy Code, which provides a safe harbor for a

25   purchaser of a debtor's property when the purchase is made in "good faith."  Specifically, section

26   363(m) provides:

27        The reversal or modification on appeal of an authorization under
         subsection (b) or(c) of this section of a sale or lease of property does
28       not affect the validity of the sale or lease under such authorization to

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal unless such authorization and such sale of lease were stayed pending appeal.

11 U.S.C. § 363(m); *see Ewell v. Diebert (In re Well),* 958 F.2d 276, 280 (9th Cir. 1992). This provision serves the important purposes both of encouraging good faith transactions and of preserving the finality of the bankruptcy court's orders unless stayed pending appeal. *Abbotts Dairies,* 788 F.2d at 147. As the Seventh Circuit recognized in *In re Edwards,* 962 F.2d 641 (7th Cir. 1992), "[i]f purchasers at judicially approved sales of property of a bankruptcy estate, and their lenders, cannot rely on the deed that they receive at the sale, it will be difficult to liquidate bankruptcy estates at positive prices." *Id.* at 643. The court also noted that although the law balances the competing interests between lien holders and purchasers of assets of the estate, it weighs such interests "heavily in favor of the bona fide purchaser, particularly where, as here, there are substantial business justifications for the proposed transaction." *Id.*

In this case, Prime or a higher bidder is entitled to the safe harbor provided by section 363(m) of the Bankruptcy Code. Indeed, the Matthews Declaration demonstrates that the negotiations between Prime and the Debtor at all times have been conducted at arms' length and in good faith. In connection with the Proposed Sale, the Debtor has evaluated the alternatives and acted with the intent of obtaining the best possible deal for the estate in terms of maximizing value. The terms of the Proposed Sale accomplish this appropriate objective. Moreover, Prime is not an insider of the Debtor. Any Successful Bidder at the Sale Hearing will also be a good faith, arm's length purchaser. For these reasons, the Debtor requests that the court make a factual determination that Prime, or a Successful Bidder at the Sale Hearing, has purchased the Assets in good faith as defined in section 363(m) of the bankruptcy Code.

**J.      Notice of the Sale is Reasonable Under the Circumstances**

Within one or two business days of this Court's approval of the Sale Procedures, the Debtor will serve the Notice of Auction, substantially in the form attached hereto as **Exhibit "B,"** upon (i) the Office of the United States Trustee; (ii) counsel to the creditors claiming a lien upon the Debtor's assets, (iii) the twenty largest unsecured creditors; (iv) all entities who have expressed to the Debtor an interest in purchasing the Assets; (v) all entities known to have asserted any interests

24

1  in or upon the Assets; (vi) all federal, state, and local regulatory or taxing authorities or recording

2  offices which have a reasonably known interest in the relief requested by the Motion; and (vii) all

3  entities on the Limited Service List as of such date (collectively, the "Notice Parties").

4       Under Bankruptcy Rule 2002(a) and (c), the Debtor is required to notify its creditors of the

5  Proposed Sale, disclosure of the time and place of the Auction, the terms and conditions of the sale,

6  and the deadline for filing any objections thereto.  The Notice of Auction, a copy of which is

7  attached hereto as **Exhibit "B,"** contains the type of information required under Bankruptcy Rule

8  2002, and also includes information on the Sale Procedures.  This information will enable interested

9  parties to participate in the Auction and the Sale Hearing if they so choose.  Thus, the Debtor

10  submits that adequate notice of this Motion and the Sale Hearing has been and will be provided.  *See*

11  *In re Delaware & H. Ry.*, 124 B.R. 169, 180 (Bankr. D. Del. 1991) (the disclosures necessary in

12  such a sale notice need only include the terms of the sale and the reasons why such a sale is in the

13  best interests of the estate and do not need to include the functional equivalent of a disclosure

14  statement).

15  **IV.**

16  **<u>CONCLUSION</u>**

17       For all the foregoing reasons, the Debtor respectfully requests that the court enter an order

18  authorizing the Debtor to sell the Assets free and clear of liens, claims, interest and encumbrances

19  pursuant to the ASA and in accordance with the Sale Procedures, and that the court grant such other

20  and further relief as is just and proper.  A proposed order confirming the sale will be lodged and

21  served after the Auction.

22  Dated:    September 14, 2010         PACHULSKI STANG ZIEHL & JONES LLP

23

24  By    /s/ *Samuel R. Maizel*
            Samuel R. Maizel

25              [Proposed] Attorneys for Victor Valley
            Community Hospital, Debtor and Debtor in

26              Possession

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

90231-001\DOCS_LA:224102.8