# EXHIBIT A

# TO

# ORDER

000013

# POSTPETITION REVOLVING CREDIT AND SECURITY AGREEMENT

**between**

## VICTOR VALLEY COMMUNITY HOSPITAL, a California nonprofit public benefit corporation
### as
### BORROWER

**and**

### Prime Healthcare Services Foundation, Inc.
### as LENDER

**Dated as of**
**September 16, 2010**

# POSTPETITION REVOLVING CREDIT AND SECURITY AGREEMENT

## TABLE OF CONTENTS

I. DEFINITIONS ........................................................................................................... 1

II. ADVANCES, PAYMENT AND INTEREST ....................................................... 2

2.1    The Revolving Facility ............................................................................ 2

2.2    Maturity ................................................................................................... 2

2.3    Interest on the Advances .......................................................................... 3

2.4    Revolving Facility Disbursements; Requirement to Deliver  Borrowing Certificate ..... 3

2.5    [INTENTIONALLY DELETED] ............................................................. 3

2.6    Promise to Pay; Manner of Payment ....................................................... 3

2.7    Repayment of Excess Advances .............................................................. 4

2.8    Payments by Lender ................................................................................. 4

2.9    [INTENTIONALLY DELETED] ............................................................. 4

2.10   Grant of Security Interest; Collateral; Superpriority Claim .................... 4

2.11   Collateral Administration ........................................................................ 6

2.12   [INTENTIONALLY DELETED] ............................................................. 7

2.13   Evidence of Loans .................................................................................... 7

III. FEES AND OTHER CHARGES ......................................................................... 8

3.1    [INTENTIONALLY DELETED] ............................................................. 8

3.2    [INTENTIONALLY DELETED] ............................................................. 8

3.3    [INTENTIONALLY DELETED] ............................................................. 8

3.4    [INTENTIONALLY DELETED] ............................................................. 8

3.5    [INTENTIONALLY DELETED] ............................................................. 8

3.6    Default Rate of Interest ........................................................................... 8

IV. CONDITIONS PRECEDENT ............................................................................. 8

4.1    Conditions Precedent to Initial Advance and Closing ............................ 8

4.2    Post-Closing Conditions .......................................................................... 9

4.3    Conditions Precedent to Each Advance ................................................... 10

V. REPRESENTATIONS AND WARRANTIES ...................................................... 11

5.1    Organization and Authority ..................................................................... 11

5.2    DIP Loan Documents ............................................................................... 11

5.3    Subsidiaries, Capitalization and Ownership Interests .............................. 12

90231-002\DOCS_LA:225469.2

000015

5.4    Properties ........................................................................................................ 12

5.5    Other Agreements ........................................................................................... 12

5.6    Litigation ........................................................................................................ 12

5.7    Hazardous Materials ...................................................................................... 13

5.8    Potential Tax Liability; Tax Returns; Governmental Reports ...................... 13

5.9    Medicare Cost Reports ................................................................................... 13

5.10   Compliance with Law ..................................................................................... 13

5.11   Intellectual Property ....................................................................................... 14

5.12   Licenses and Permits; Labor .......................................................................... 15

5.13   No Default ...................................................................................................... 15

5.14   No Withholding of Reimbursements ............................................................. 15

5.15   [INTENTIONALLY DELETED] ................................................................... 15

5.16   Healthcare Matters ......................................................................................... 15

5.17   Hospital Operations/Litigation ...................................................................... 16

5.18   Insurance ........................................................................................................ 16

5.19   Names; Location of Offices, Records and Collateral .................................... 16

5.20   [INTENTIONALLY DELETED] ................................................................... 16

5.21   [INTENTIONALLY DELETED] ................................................................... 16

5.22   [INTENTIONALLY DELETED] ................................................................... 16

5.23   Survival .......................................................................................................... 16

VI. AFFIRMATIVE COVENANTS ............................................................................... 17

6.1    Financial Statements, Borrowing Certificate, Financial Reports and
Other Information ...................................................................................................... 17

6.2    Payment of Obligations .................................................................................. 18

6.3    Conduct of Business and Maintenance of Existence and Assets ................... 18

6.4    Compliance with Legal and Other Obligations ............................................. 18

6.5    Insurance ........................................................................................................ 19

6.6    [INTENTIONALLY DELETED] ................................................................... 19

6.7    Inspection; Periodic Audits ............................................................................ 19

6.8    Further Assurances; Post Closing .................................................................. 19

6.9    Payment of Indebtedness ................................................................................ 20

6.10   Lien Searches ................................................................................................. 20

6.11   Use of Proceeds .............................................................................................. 20

6.12    Collateral Documents; Security Interest in Collateral ................................................... 20

6.13    [INTENTIONALLY DELETED]................................................................................. 21

6.14    Taxes and Other Charges......................................................................................... 21

6.15    [INTENTIONALLY DELETED]................................................................................. 21

6.16    Payroll Taxes ......................................................................................................... 21

6.17    [INTENTIONALLY DELETED]................................................................................. 21

6.18    [INTENTIONALLY DELETED]................................................................................. 21

VII. NEGATIVE COVENANTS.................................................................................................. 21

7.1    Financial Covenants ............................................................................................... 21

7.2    Permitted Indebtedness ........................................................................................... 21

7.3    Permitted Liens ...................................................................................................... 22

7.4    Investments; New Facilities or Collateral; Subsidiaries ............................................. 22

7.5    Dividends; Redemptions; Restricted Payments ......................................................... 23

7.6    [INTENTIONALLY DELETED]................................................................................. 23

7.7    Charter Documents; Fiscal Year; Name; Jurisdiction of Organization;
Dissolution; Use of Proceeds ........................................................................................... 23

7.8    Truth of Statements ................................................................................................ 23

7.9    IRS Form 8821 ....................................................................................................... 23

7.10    Transfer of Assets ................................................................................................ 24

7.11    Modification of Agreements ................................................................................... 24

7.12    [INTENTIONALLY DELETED]............................................................................... 24

7.13    Chapter 11 Claims................................................................................................ 24

7.14    Filing of Motions and Applications ......................................................................... 24

7.15    [INTENTIONALLY DELETED]............................................................................... 25

VIII. EVENTS OF DEFAULT ................................................................................................... 25

8.1    The occurrence of anyone or more of the following shall constitute
an "Event of Default": ..................................................................................................... 25

IX. RIGHTS AND REMEDIES AFTER DEFAULT ................................................................... 27

9.1    Rights and Remedies............................................................................................... 27

9.2    Application of Proceeds .......................................................................................... 29

9.3    Rights and Remedies not Exclusive.......................................................................... 29

X. WAIVERS AND JUDICIAL PROCEEDINGS ....................................................................... 30

10.1    [INTENTIONALLY DELETED]............................................................................... 30

10.2    Delay; No Waiver of Defaults ................................................................. 30

10.3    Jury Trial Waiver ................................................................................... 30

XI. EFFECTIVE DATE AND TERMINATION ............................................. 30

11.1    Termination and Effective Date Thereof ................................................ 30

11.2    Survival ................................................................................................. 31

XII. MISCELLANEOUS ............................................................................... 31

12.1    Governing law; Jurisdiction; Service of Process; Venue......................... 31

12.2    Successors and Assigns; Participations; New Lenders ............................. 32

12.3    Application of Payments ......................................................................... 32

12.4    Indemnity .............................................................................................. 33

12.5    Notice .................................................................................................... 33

12.6    Severability; Captions; Counterparts; Facsimile Signatures..................... 33

12.7    Expenses ............................................................................................... 34

12.8    Entire Agreement ................................................................................... 34

12.9    [INTENTIONALLY DELETED].............................................................. 35

12.10  Confidentiality and Publicity .................................................................. 35

12.11  [INTENTIONALLY DELETED].............................................................. 35

12.12  Acknowledgements ................................................................................ 35

12.13  Bankruptcy Court Orders Paramount....................................................... 35

XIII. FORGIVENESS UPON ACQUISITION ............................................... 36

90231-002\DOCS_LA:225469.2

000018

## POSTPETITION REVOLVING CREDIT AND SECURITY AGREEMENT

THIS POSTPETITION REVOLVING CREDIT AND SECURITY AGREEMENT (the "Agreement) dated as of September 16, 2010 is entered into by and between VICTOR VALLEY COMMUNITY HOSPITAL, a California nonprofit public benefit corporation as debtor and debtor-in-possession (the "Borrower"), and Prime Healthcare Services Foundation, Inc. (the "Lender").

**WHEREAS**, on the Petition Date Borrower commenced a case (the "**Bankruptcy Case**") under Chapter 11 of Title 11, United States Code (as amended, the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Central District of California (together with any other court having Jurisdiction over the Bankruptcy Case or any proceedings therein from time to time, the "**Bankruptcy Court**") and Borrower is continuing to operate its business and manage its properties as a debtor and debtor-in-possession under sections 1107 and 1108 of the Bankruptcy Code;

**WHEREAS**, Borrower has requested that Lender make available to Borrower a revolving credit facility (the "**Revolving Facility**") in a maximum principal amount at any time outstanding of up to Four Million Five Hundred Thousand Dollars ($4,500,000) (the "**Facility Cap**"), the proceeds of which shall be used by Borrower, and Borrower alone, exclusively for the following purposes and only to the extent that Borrower's receipts are insufficient to pay operating expenses of the Borrower, for the generation of receivables, and for other lawful· purposes as permitted under this Agreement and in accordance with the Budget (set forth as Exhibit C hereof); and (b) to pay any of the Obligations; and

**WHEREAS**, Lender is willing to make the Revolving Facility available to Borrower upon the terms and· subject to the conditions set forth in this Agreement, and subject to the terms and conditions· set forth in the Financing Order.

**NOW, THEREFORE**, in consideration of the foregoing and for other good and valuable consideration, .the receipt and adequacy of which hereby are acknowledged, Borrower and Lender hereby agree as follows:

**I.**
**DEFINITIONS**

For purposes of this Agreement, in addition to the definitions above and elsewhere in this Agreement, the terms listed in Appendix B hereto shall have the meanings given such terms in Appendix B, which is incorporated herein and made a part hereof. All capitalized terms used herein that are not specifically defined herein (including, without limitation, Goods, Fixtures, General Intangibles, Chattel Paper, Investment Property, Documents, Commercial Tort Claims, Instruments, Deposit Accounts, Letter-of-Credit Rights and Supporting Obligations) shall have the meanings therefore provided in Article 9 of the UCC in effect on the date hereof (or as amended and in effect from time to time as approved by Lender) to the extent the same are used or defined therein. Unless otherwise specified herein or in Appendix B, any agreement or contract referred to herein or in Appendix B shall mean such agreement as it may be, or have been modified, amended or supplemented from time to time in accordance with its terms. Unless

otherwise specified, as used in the DIP Loan Documents or in any certificate, report, instrument or other document made or delivered pursuant to any of the DIP Loan Documents, all accounting terms not defined in Appendix B or elsewhere in this Agreement shall have the meanings given to such terms in and shall be interpreted in accordance with GAAP.

## II.
## ADVANCES, PAYMENT AND INTEREST

### 2.1    The Revolving Facility

Subject to the provisions of this Agreement and the Financing Orders, Lender shall make Advances to Borrower under the Revolving Facility from time to time during the Term, provided that, notwithstanding any other provision of this Agreement and the Financing Orders, the aggregate amount of all Advances at anyone time outstanding under the Revolving Facility shall not exceed the lesser of (a) the Facility Cap, or (b) the amount set forth for such period, in the Budget; however Borrower's cash payments for any measurement period covered by the Budget may vary as described in Appendix A and amounts not spent in any prior measurement period may be spent in any subsequent measurement period. The Revolving Facility is a revolving credit facility, which may be drawn, repaid and redrawn, from time to time as permitted under this Agreement and the Financing Orders.  This Revolving Facility is for the purpose of meeting the shortfall between Borrowers receipts and the Borrower's expenses as set forth on the Budget. Borrower's right to draw hereby and Lender's obligation to make Advances hereunder is subject to the application by Borrower of all receipts to the payment of items as set forth in the Budget. Advances under the Revolving Facility automatically shall be made for the payment of interest, reasonable fees of Lender as set forth herein, and other amounts owing with respect to the Obligations on the date when due to the extent available and as provided for herein.

### 2.2    Maturity

All Advances and all other outstanding Obligations under the Revolving Facility shall be immediately due and payable in full in cash, if not earlier in accordance with the terms of this Agreement and the Financing Orders, without further application to or order of the Bankruptcy Court, on the earlier of (i)  the effective date of a plan reorganization for the Borrower approved by the Lender; (ii) acceleration of maturity of the Obligations upon the occurrence of an Event of Default; (iii) the sale or liquidation of all or substantially all of the assets of the Borrower; (iv) twenty (20) days after the Bankruptcy Court enters an order (a) confirming a plan of reorganization for the Borrower that has not been approved in writing by Lender; or (b) granting a motion to sell substantially all of Borrower's assets pursuant to a transaction not approved in writing by Lender; (v) the date on which a plan or sale referred to in the prior subsection (iv) becomes effective or is consummated; or (v) December 31, 2010 (the date upon which the first of the foregoing occurs is referred to herein as the "**Maturity Date**").  Borrower expressly acknowledges and agrees that under no circumstances shall Lender have any obligation to extend, and Lender has made no commitment to extend, the Maturity Date beyond the deadlines set forth herein.

**2.3      Interest on the Advances**

Subject to Section 3.5. interest on outstanding Advances under the Revolving Facility shall accrue monthly in arrears on the first day of each calendar month at an annual rate equal to one percent (1%) calculated on the basis of a 360-day year and for the actual number of calendar days elapsed in each interest calculation period. Interest accrued on each Advance under the Revolving Facility shall be due and payable in accordance with the procedures provided for in Section 2.2 and Section 2.6, commencing the first Business Day of the first calendar month following the Closing Date, and continuing until the later of the expiration of the Term and the full performance and irrevocable payment in full in cash of the Obligations and termination of this Agreement.

**2.4      Revolving Facility Disbursements; Requirement to Deliver Borrowing Certificate**

So long as no Default or Event of Default shall have occurred and be continuing, Borrower may give Lender irrevocable written notice requesting an Advance under the Revolving Facility by delivering to Lender not later than 11:00 a.m. (California time) at least one Business Day prior to the proposed Business Day on which such requested Advance is to be made (the "**Borrowing Date**"), a completed Borrowing Certificate (Exhibit A attached hereto and incorporated by reference) and relevant supporting documentation satisfactory to Lender, which shall (i) specify the proposed Borrowing Date of such Advance which shall be a Business Day, (ii) specify the principal amount of such requested Advance. The amount of each Advance shall not exceed the amount set forth in the Budget (Exhibit C attached hereto and incorporated by reference) for the applicable time period, and no Advance or portion thereof may be used for any purpose not expressly set forth in the Budget for the applicable time period and shall reflect the application of all amounts received to items set forth in the Budget for the applicable period. On each Borrowing Date, Borrower irrevocably authorizes Lender to disburse the proceeds of the requested Advance to the Borrower's account(s) as set forth on Schedule 2.4

**2.5      [INTENTIONALLY DELETED]**

**2.6      Promise to Pay; Manner of Payment**

Borrower absolutely and unconditionally promises to pay principal, interest and all other amounts and Obligations payable hereunder, or under any other DIP Loan Document, without any right of rescission and without any deduction whatsoever, including any deduction for any setoff, counterclaim or recoupment, and notwithstanding any damage to, defects in or destruction of the Collateral or any other event, including obsolescence of any property or improvements. All payments made by Borrower (other than payments automatically paid through Advances under the Revolving Facility as provided herein), shall be made only by wire transfer on the date when due, without offset or counterclaim, in U.S. Dollars, in immediately available funds to such Account as may be indicated in writing by Lender to Borrower from time to time. Any such payment received after 2:00 p.m. (California time) on the date when due shall be deemed received on the following Business Day. Whenever any payment hereunder shall be stated to be due or shall become due and payable on a day other than a Business Day, the due date thereof shall be extended to, and such payment shall be made on, the next succeeding Business Day, and

000021

such extension of time in such case shall be included in the computation of payment of any interest (at the interest rate then in effect during such extension) and/or fees, as the case may be.

### 2.7    Repayment of Excess Advances

Any balance of Advances under the Revolving Facility outstanding at any time in excess of the Facility Cap then in effect, shall' be immediately due and payable by Borrower without the necessity of any demand, at the Payment Office, whether or not a Default or Event of Default has occurred or is continuing and shall be paid in the manner specified in Section 2.6.

### 2.8    Payments by Lender

Should any amount required to be paid under any DIP Loan Document be unpaid when due, such amount may be paid by Lender, which payment shall be deemed a request for an Advance under the Revolving Facility as of the date such payment is due, and Borrower irrevocably authorizes disbursement of any such funds to Lender by way of direct payment of the relevant amount, interest or Obligations without necessity of any demand. No payment or prepayment of any amount by Lender or any other Person shall entitle any Person to be subrogated to the rights of Lender under any DIP Loan Document unless and until the Obligations have been fully performed and paid irrevocably in cash and this Agreement has been terminated. Any sums expended by Lender as a result of any Borrower's or any Guarantor's failure to pay, perform or comply with any DIP Loan Document or any of the Obligations may be charged to Borrower's account as an Advance under the Revolving Facility and added to the Obligations.

### 2.9    [INTENTIONALLY DELETED]

### 2.10    Grant of Security Interest; Collateral; Superpriority Claim

(a)    To secure the payment and performance of the Obligations, the Borrower, upon entry of the Final Financing Order, as applicable, by the Bankruptcy Court, hereby grants to Lender:

(i)    [Intentionally Deleted]

(ii)    a continuing subordinate security interest in and Lien upon, and pledges to Lender, all of its right, title and interest in and to all of its personal and real property and assets whether now owned or hereafter acquired, including, without limitation, the following which Liens and security interests shall have the priorities set forth in the Financing Orders:

(A)    all of Borrower's tangible personal property, including, without limitation, all present and future Goods, Inventory, Equipment (including items of Equipment which are or become Fixtures), Real Property and Computer Hardware and Software, now owned or hereafter acquired;

(B)    all of Borrower's intangible personal property, including, without limitation all present and future Accounts, securities, contract rights, Permits, General Intangibles, Intellectual Property, Chattel Paper, Documents, Instruments, Deposit Accounts

(including the Lockbox Account), Investment Property, Letter-of-Credit Rights and Supporting Obligations, rights to the payment of money or other forms of consideration of any kind, tax refunds and insurance proceeds (including, without limitation, the proceeds of any life insurance policy), now owned or hereafter acquired, and all intangible and tangible personal property relating to or arising out of any of the foregoing;

(C)    all of Borrower's present and future Government Contracts and rights thereunder and the related Government Accounts and proceeds thereof, now or hereafter owned or acquired by Borrower; provided, however, that Lender shall not have a security interest in any rights under any Government Contract of Borrower or in the related Government Account where the taking of such security interest is a violation of an express prohibition contained in the Government Contract (for purposes of this limitation, the fact that a Government Contract is subject to, or otherwise refers to, Title 31, § 3727 or Title 41, § 15 of the United States Code shall not be deemed an express prohibition against assignment thereof) or is prohibited by applicable law, unless in any case consent is otherwise validly obtained;

(D)    all other rights and interests in property of the "estate" (within the meaning of the Bankruptcy Code) except as otherwise set forth in the Financing Orders; provided, however, that until the Final Financing Order has been entered, the liens and security interests conveyed pursuant to the DIP Loan Documents shall not attach to Avoidance Claims or Avoidance Claim Proceeds;

(E)    all other rights and interests in Distressed Hospital Funds;

(F)    all other rights and interests in Quality Assurance Fee funds; and

(G)    any and all additions and accessions to any of the foregoing, and any and all replacements, products and proceeds (including insurance proceeds) of any of the foregoing.

The foregoing collectively referred to as the "**Collateral.**"

(b)    Notwithstanding the foregoing provisions of this Section 2.10, such grant of a security interest shall not extend to, and the term "Collateral" shall not include the Carve-Out as set forth in the Financing Orders.

(c)    As to all Collateral, including without limitation, all cash, cash equivalents and Commercial Tort Claims the title to which is held by Borrower, or the possession of which is held by Borrower in the form of a leasehold interest, Borrower hereby assigns and conveys as security, grants a security interest in, hypothecates, mortgages, pledges and sets over unto Lender all of the right, title and interest of Borrower in all of such Collateral, including without limitation, all cash, cash equivalents and Commercial Tort Claims and in all such leasehold interests; together in each case with all of the right, title and interest of Borrower in and to all, any lease or sublease thereof, all general intangibles relating thereto and all proceeds thereof, Borrower acknowledges that, pursuant to the Financing Orders, the Liens granted in favor of Lender in all of the Collateral shall be perfected without the recordation of any UCC financing statements, notices of Lien or other instruments of mortgage or assignment. Borrower further agrees that Lender is authorized to file or record financing statements with respect to the

Collateral without the signature of Borrower in such Form and in such offices as Lender reasonably determines appropriate to further evidence the perfection of the security interests of Lender under this Agreement and to use the collateral description "all assets of the Debtor" in any such financing statements.

Borrower shall promptly notify Lender of any Commercial Tort Claims arising after the Closing Date in which it has an interest and shall provide all necessary information concerning each such Commercial Tort Claim, or upon any and all Commercial Tort Claims upon request by Lender, and make all necessary filings with respect thereto to perfect Lender's security interest therein.

The Liens, lien priority, administrative priorities and other rights and remedies granted to Lender in the Financing Orders and the other DIP Loan Documents (specifically including, but not limited to, the existence, perfection and priority of the Liens and security interests provided therein, and the administrative priority provided therein) shall not be modified, altered or impaired in any manner by another financing or extension of credit or incurrence of debt by Borrower (pursuant to section 364 of the Bankruptcy Code or otherwise), or by any other act or omission whatsoever until the full performance and irrevocable payment in full in cash of the Obligations and termination of this Agreement.

(d)      Upon the entry of the Interim Financing Order and the Final Financing Order by the Bankruptcy Court, the Obligations of the Borrower will constitute allowed administrative expenses in the Bankruptcy Case, having priority in payment over all other administrative expenses and unsecured claims against the Borrower now existing or hereafter arising, of any kind or nature whatsoever, including without limitation, all administrative expenses of the kind specified in, or arising or ordered under, sections 105, 326, 328, 503(b), 506(c),507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code, subject, as to priority, only to the Carve-Out having priority of payment over the Obligations to the extent set forth in the Financing Orders; provided, that no administrative claim of Lender shall extend to the proceeds of Avoidance Claims.

**2.11    Collateral Administration**

(a)      All tangible Collateral granted by Borrower to Lender will at all times be kept by Borrower at 15248 Eleventh St., Victorville, CA 92395 and shall not, without thirty (30) calendar days prior written notice to Lender, be moved therefrom, and in any case shall not be moved outside the State of California.

(b)      Borrower shall keep accurate and complete records of its Accounts and all payments and collections thereon and shall submit such records to Lender on such periodic bases as Lender may request.

(c)      Whether or not an Event of Default has occurred, any of Lender's officers, employees, representatives or agents shall have the right, at any time during normal business hours, and upon reasonable notice, in the name of Lender, any designee of Lender or Borrower, to verify the validity, amount or any other matter relating to any Accounts of Borrower.

Borrower shall cooperate fully with Lender in an effort to facilitate and. promptly conclude- such verification process.

(d)      As and when determined by Lender in its reasonable discretion, Lender will perform the searches described in clauses (i) and (ii) below against each Borrower (the results of which are to be consistent with Borrower's representations and warranties under this Agreement), all at Borrowers' expense: (i) UCC searches with the Secretary of State of the Jurisdiction of organization of Borrower and each Guarantor, the Secretary of State and local filing offices of each jurisdiction where Borrowers maintain their respective executive offices, a place of business or assets; and (ii) judgment, federal tax lien and state tax lien searches, in each jurisdiction searched under clause (i) above.

(e)      Borrower, upon Lender's request, shall: (1) take all actions that may be lawfully required by Lender to create and perfect Lender's Lien on any Collateral and effectuate the intentions of the DIP Loan Documents; and (ii) immediately deliver to Lender all items for which Lender must receive possession to obtain a perfected security interest and all notes, certificates, and documents of title, Chattel Paper, warehouse receipts, Instruments, and any other similar instruments constituting Collateral.

## 2.12    [INTENTIONALLY DELETED]

## 2.13    Evidence of Loans

(a)      Lender shall maintain, in accordance with its usual practice, electronic or written records evidencing the indebtedness and obligations to such Lender resulting from each Loan made by such Lender from time to time, including without limitation, the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.

(b)      The entries made in the electronic or written records maintained pursuant to subsection (a) of this Section 2.13 (the "**Register**") shall be prima facie evidence of the existence and amounts of the obligations and indebtedness therein recorded; provided, however, that the failure of the Lender to maintain such records or any error therein shall not in any manner affect the obligations of the Borrower to repay the Loans or Obligations in accordance with their terms.

(c)      Lender will account to Borrower monthly with a statement of Advances under the Revolving Facility, and any charges and payments made pursuant to this Agreement.

(d)      Borrower agrees that:

(i)      upon written notice by Lender to the Borrower that a promissory note or other evidence of indebtedness is requested by Lender to evidence the Loans and other Obligations owing or payable to, or to be made by, such Lender, the Borrower shall promptly (and in any event within three (3) Business Days of any such request) execute and deliver to Lender an appropriate promissory note or notes in form and substance reasonably acceptable to the Lender and Borrower, payable to the order of Lender or in a principal amount equal to the amount of the Loans owing or payable to Lender;

(ii)    all references to "Notes" in the DIP Loan Documents shall mean Notes, if any, to the extent issued (and not returned to the Borrower for cancellation) hereunder, as the same may be amended, modified, divided, supplemented and/or restated from time to time; and

(iii)    upon Lender's written request, and in any event within three (3) Business Days of any such request, Borrower shall execute and deliver to Lender new Notes and/or divide the Notes in exchange for the existing Notes in such smaller amounts or denominations as Lender shall specify in its sole and absolute discretion (including, without limitation, new Notes as a result of the mutilation, destruction, loss or theft of any Notes); provided, that the aggregate principal amount of such new Notes shall not exceed the aggregate principal amount of the Notes outstanding at the time such request is made; and provided, further, that such notes that are to be replaced shall then be deemed no longer outstanding hereunder and replaced by such new notes and returned to the Borrower within a reasonable period of time after Lender's receipt of the replacement notes.

## III.
## FEES AND OTHER CHARGES

**3.1    [INTENTIONALLY DELETED]**

**3.2    [INTENTIONALLY DELETED]**

**3.3    [INTENTIONALLY DELETED]**

**3.4    [INTENTIONALLY DELETED]**

**3.5    [INTENTIONALLY DELETED]**

**3.6    Default Rate of Interest**

Upon the occurrence and during the continuation of an Event of Default, the Applicable Rate of interest in effect at such time with respect to the Obligations shall be increased by one percent (1%) per annum (the "**Default Rate**") or to the maximum legal rate whichever is the lesser.

## IV.
## CONDITIONS PRECEDENT

**4.1    Conditions Precedent to Initial Advance and Closing**

The obligations of Lender to make any advances are subject, in each case, to the reasonable satisfaction of Lender, of the following:

(a)    Borrower shall have delivered to Lender: (i) the DIP Loan Documents to which it is a party, including all Schedules thereto (except to the extent permitted otherwise pursuant to Section 4.2(f) hereof), each duly executed by an authorized officer of Borrower and the other parties thereto, and (ii) a Borrowing Certificate for the each Advance under the Revolving Facility executed by an authorized officer of Borrower;

(b)     Lender shall have received all in form and substance satisfactory to Lender in its sole discretion; (i) each document (including, without limitation, any Uniform Commercial Code financing statement) required by any DIP Loan Document or under law or requested by Lender to be filed, registered or recorded to create in favor of Lender, a perfected security interest upon the Collateral and (ii) evidence of each such filing, registration or recordation and of the payment by Borrower of any necessary fee, tax or expense relating, thereto;

(c)     The Bankruptcy Court shall have entered the Interim Financing Order, and such order shall be in full force and effect and shall not have been vacated, reversed, modified or stayed in any respect and, if such order is the subject of a pending appeal, motion for reconsideration, motion for rehearing, etc., then no further performance of any obligation of any party to the order shall have been stayed pending the disposition of such appeal or motion;

(d)     Lender shall have received evidence of the provision for payment out of the proceeds of the Advance, of all fees, charges and expenses payable to Lender on or prior to the Closing Date, pursuant to the DIP Loan Documents and the Interim Financing Order;

(e)     No current principal or key management personnel of any such Person shall have been indicted or be under active investigation by any Governmental Authority for a felony crime;

(f)     Other than the filing of the Bankruptcy Case, there shall not have occurred any Material Adverse Change or Material Adverse Effect from that which was reflected on the Borrower's financial statements that were delivered to Lender, or any liabilities or obligations of any nature with respect to Borrower or any Guarantor which could reasonably be likely to have a Material Adverse Effect;

(g)     Borrower shall have executed and filed IRS Form 8821 in favor of Lender with the appropriate office of the Internal Revenue Service;

(h)     Lender shall have received a certificate of the corporate secretary or assistant secretary of Borrower (as applicable) dated as of the Closing Date, as to the incumbency and signature of the Persons executing the DIP Loan Documents, in form and substance acceptable to Lender;

(i)     Lender shall have received such other DIP Loan Documents, certificates, or information as Lender may reasonably request, all in form and substance reasonably satisfactory to Lender;

(j)     Borrower shall be in compliance with Section 6.5 hereof, and Lender shall have received copies of Borrower's insurance declarations or other such evidence to establish to Lender's reasonable satisfaction that all required insurance policies are in place in sufficient amounts, and that Lender has been named as loss payee or additional insured, as appropriate.

**4.2**    **Post-Closing Conditions**

On or before the date that is fifteen (15) days after the Closing Date (except with respect to the conditions set forth in <u>Section 4.2(f),</u> which must be satisfied earlier), the following conditions subsequent shall be satisfied, in the sole judgment of Lender:

(a)    Lender shall have received (i) the Charter and Good Standing Documents, all in form and substance acceptable to Lender, and (ii) a certificate of the corporate secretary or assistant secretary of Borrower (as applicable) dated as of the date of the Charter and Good Standing Documents, as to the incumbency of and signature of the Persons executing the Charter and Good Standing Documents, all in form and substance acceptable to Lender;

(b)    Borrower shall be in compliance with <u>Section 6.5</u>, and Lender shall have received original certificates of all insurance policies of Borrower confirming that they are in effect and that the premiums due and owing with respect thereto have been paid in full and naming Lender a-s loss payee or additional insured, as appropriate;

(c)    Lender shall have received copies of all Permits required for Borrower to conduct the business in which it is currently engaged or is contemplated pursuant to the DIP Loan Documents, the absence of which could reasonably be expected to be, have or result in a Material Adverse Effect;

(d)    On or before the tenth (10th) day after the Closing Date, Borrower shall have delivered to Lender Schedules 5.4 and 5.11 to this Agreement, which shall be subject to Lender's review and approval, in its Permitted Discretion.

**4.3    Conditions Precedent to Each Advance**

The obligations of Lender to make any Advance (including, without limitation the Initial Advance) are, in each case, subject to the satisfaction, in the sale judgment of Lender, of the following additional conditions precedent:

(a)    In the case of an Advance, Borrower shall have delivered to Lender a Borrowing Certificate for the Advance executed by an authorized officer of Borrower, which shall constitute a representation and warranty by Borrower as of the Borrowing Date of such Advance that the conditions contained in this <u>Section 4.3</u> have been satisfied;

(b)    Each of the representations and warranties made by Borrower in or pursuant to this Agreement shall be accurate, before and after giving effect to such Advance and no Default or Event of Default shall have occurred or be continuing or would exist after giving effect to the Advance under the Revolving Facility on such date;

(c)    Immediately after giving effect to the requested Advance, the sum of the aggregate outstanding principal amount of Advances under the Revolving Facility shall not exceed the lesser of (i) Facility Cap then in effect, minus the portion of the Carve Out not yet paid to professionals, or (ii) the amount set forth as the "Combined Pre & Post Loan Balances" for such period in the Budget;

(d)    Lender shall have received all fees, charges and expenses payable to Lender on or prior to such date pursuant to the DIP Loan Documents, including without limitation, all unpaid audit fees and expenses, and attorneys' fees and expenses; and

(e)    There shall not have occurred or exist any Material Adverse Change or Material Adverse Effect.

# V.
## REPRESENTATIONS AND WARRANTIES

Borrower represents and warrants as of the date hereof, the Closing Date, and each Borrowing Date as follows:

### 5.1    Organization and Authority

Borrower is a corporation duly organized, validly existing and in good standing under the laws of its state of formation. Borrower (i) has all requisite corporate or entity power and authority to own its properties and assets and to carry on its business as now being conducted and as contemplated in the DIP Loan Documents, (ii) is duly qualified to do business in every jurisdiction in which failure so to qualify would reasonably be likely to have a Material Adverse Effect, and (iii) subject to the entry of the Financing Orders, has all requisite power and authority (A) to execute, deliver and perform the DIP· Loan Documents to which it is a party, (B) to borrow hereunder, (C) to consummate the transactions contemplated under the DIP Loan Documents, and (D) to grant the Liens with regard to the Collateral pursuant to the DIP Loan Documents and the Financing Orders. Borrower is not an "investment company" registered or required to be registered under the Investment Company Act of 1940, as amended, or is controlled by such an "investment company."

### 5.2    DIP Loan Documents

Upon entry of the Interim Financing Order, the execution, delivery and performance by Borrower of the DIP Loan Documents to which it is a party, and the consummation of the transactions contemplated thereby, (i) have been duly authorized by all requisite action of Borrower and have been duly executed and delivered by or on behalf of Borrower; (ii) do not violate any provisions of (A) applicable law, statute, rule, regulation, ordinance or tariff, (B) any order of any Governmental Authority binding on Borrower or its properties, or (C) the certificate of incorporation or bylaws (or any other equivalent governing agreement or document) of Borrower; (iii) are not in conflict with, and do not result in a breach or default of or constitute an event of default, or an event, fact, condition or circumstance which, with notice or passage of time, or both, would constitute or result in a conflict, breach, default or event of default under, any indenture, agreement or other instrument to which Borrower is a party, or by which the properties or assets of Borrower are bound the effect of which could reasonably be expected to be, have or reflect in a Material Adverse Effect (other than conflicts, breaches, and defaults the enforcement of which is stayed by virtue of the filing of the Bankruptcy Case, or the Financing Orders); (iv) except as set forth herein and in the Financing Orders, will not result in the creation or imposition of any Lien of any nature upon any of the properties or assets of any such Borrower and (v) do not require the consent, approval or authorization of, or filing, registration or qualification with, any Governmental Authority or any other Person, except for the entry of the Interim Financing Order. When executed and delivered, and upon entry of the Interim Financing Order, each of the DIP Loan Documents to which Borrower is a party will constitute the legal, valid and binding obligation of Borrower, enforceable against Borrower in accordance with its terms.

### 5.3 Subsidiaries, Capitalization and Ownership Interests

Borrower has no Subsidiaries.

### 5.4 Properties

Borrower (i) is the sole owner and has good, valid and marketable title to, or a valid leasehold interest in, all of its properties and assets, including the Collateral, subject to no transfer restrictions or Liens of any kind except for Permitted Liens; and (ii) except as set forth on <u>Schedule 5.4</u>, is in compliance in all material respects with each lease to which it is a party or otherwise bound (other than breaches and defaults the enforcement of which is stayed by virtue of the filing of the Bankruptcy Case or leases for locations which will be rejected in the Bankruptcy Case). <u>Schedule 5.4</u> lists all real properties (and their locations) owned or leased by or to, and all other assets or property that are leased or licensed by, Borrower and all leases (including leases of leased real property) covering or with respect to such properties and assets. Borrower enjoys peaceful and undisturbed possession under all such leases and such leases are all the leases necessary for the operation of such properties and assets, are valid and subsisting and are in full force and effect.

### 5.5 Other Agreements

Borrower is not (i) a party to any judgment, order or decree or any agreement, document or instrument, or subject to any restriction, which would affect its ability to execute and deliver, or perform under, any DIP Loan Document or to pay the Obligations (other than restrictions the enforcement of which is stayed by virtue of the filing of the Bankruptcy Case or the Financing Orders), (ii) in default in the performance, observance or fulfillment of any obligation, covenant or condition contained in any agreement, document or instrument to which it is a party or to which any of its properties or assets are subject, the enforcement of which default is not stayed by virtue of the filing of the Bankruptcy Case, and, if not remedied within any applicable grace or cure period would reasonably be likely to have a Material Adverse Effect, nor is there any event, fact, condition or circumstance which, with notice or passage of time or both, would constitute or result in a conflict, breach, default or event of default (other than conflicts, breaches, defaults or events of default, the enforcement of which is stayed by virtue of the filing of the Bankruptcy Case) under, any of the foregoing which, if not remedied within any applicable grace or cure period would reasonably be likely to have a Material Adverse Effect; or (iii) a party or subject to any agreement, document or instrument with respect to, or obligation to pay any, management or service fee with respect to, the ownership, operation, leasing or performance of its business, except as set forth in <u>Schedule 5.5(iii)</u>.

### 5.6 Litigation

Excluding pre-Petition Date litigation which is stayed by the provisions of Section 362 of the Bankruptcy Code and other than the CLIA/CMS investigation currently on appeal to the US Court of Appeals for the Ninth Circuit, there is no action, suit, proceeding or investigation pending against Borrower that (i) will prevent the validity of any of the DIP Loan Documents or the right of Borrower to enter into any DIP Loan Document or to consummate the transactions contemplated thereby, (ii) would reasonably be likely to be or have, either individually or in the

aggregate, any Material Adverse Change or Material Adverse Effect, or (iii) would reasonably be likely to result in any Change of Control or other change in the current ownership, control or management of Borrower.  Borrower is not aware that there is any basis for the foregoing. Other than in connection with the Bankruptcy Case, Borrower is not a party or subject to any order, writ, injunction, Judgment or decree of any Governmental Authority.

### 5.7    Hazardous Materials

Borrower is in compliance in all material respects with an applicable Environmental Laws. Borrower has not been notified of any action, suit, proceeding or investigation (i) relating in any way to compliance by or liability of Borrower under any Environmental Laws, (ii) which otherwise deals with any Hazardous Substance or any Environmental Law, or (iii) which seeks to suspend, revoke or terminate any license, permit or approval necessary for the generation, handling, storage, treatment or disposal of any Hazardous Substance.

### 5.8    Potential Tax Liability; Tax Returns; Governmental Reports

(a)    Except as set forth in Schedule 5.8, Borrower has not (i) has received any oral or written communication from the Internal Revenue Service with respect to any investigation or assessment relating to Borrower directly, or relating to any consolidated tax return which was filed on behalf of such Person, (ii) is not aware of any year which remains open pending tax examination or audit by the IRS (other than as automatically set forth under applicable regulations), and (iii) is not aware of any information that could give rise to an IRS tax liability or assessment.

(b)    Borrower (i) has filed all federal, state, foreign (if applicable) and local tax returns and other reports which are required by law to be filed by Borrower, (ii) has paid all taxes, assessments, fees and other governmental charges, including, without limitation, payroll and other employment related taxes, in each case that are due and payable, except only for items that Borrower is currently contesting in good faith with adequate reserves under GAAP, which contested items are described on Schedule 5.8, and (iii) are not aware of any information that could give rise to a tax assessment or Lien in favor of any Governmental Authority for delinquent taxes, assessments, fees or other governmental charges.

### 5.9    Medicare Cost Reports

Borrower has timely filed all Cost Reports required by third party payors, including, but not limited to Medicare, Medi-Cal, and such other commercial payors, as applicable.

### 5.10    Compliance with Law

Borrower has been and is currently in compliance, and is presently taking and will continue to take all actions necessary to assure that it shall, on or before each applicable compliance date and continuously thereafter, comply with Public Law 104191 of August 21, 1996, known as the Health Insurance Portability and Accountability Act of 1996 ("**HIPAA**") and its implementing regulations, including without limitation, the Standards for Electronic Transaction and Code Set (45 CFR Parts 160 and 162), the Standards for Privacy of Individually Identifiable Health Information (45 CFR Parts 160 and 164), and the Security Standards for the

Protection of Electronic Protected Health Information (45 CFR Parts 160 and 164) and such other regulations that may, from time to time, be promulgated thereunder (collectively, the "**Standards**"), except for any noncompliance or violation that could not reasonably be expected to subject Borrower to penalties, monetary or otherwise, or other sanctions under or pursuant to HIPAA, the Standards or other applicable law. As of the Closing Date, Borrower has not received any notice from any Governmental Authority that such Governmental Authority has imposed or intends to impose any enforcement actions, fines or penalties for any failure or alleged failure to comply with HIPAA or its implementing regulations. Borrower (i) is in compliance with all laws, statutes, rules, regulations, ordinances and tariffs of any Governmental Authority applicable to Borrower and/or Borrower's business, assets or operations, including, without limitation, the Worker Adjustment and Retraining Act (or similar law), ERISA and Healthcare Laws and any applicable requirements promulgated under any such law, and (ii) is not in violation of any order of any Governmental Authority or other board or tribunal, except in the case of clauses (i) and (ii), above, where noncompliance or violation could not reasonably be expected to have a Material Adverse Effect. There is no event, fact, condition or circumstance which, with notice or passage of time, or both, would constitute or result in any noncompliance with, or any violation of, any of the foregoing, in each case except where noncompliance or violation could not reasonably be expected to have a Material Adverse Effect. Borrower has not received any notice that Borrower is not in compliance in any respect with any of the requirements of any of the foregoing. Borrower has (a) not engaged in any Prohibited Transactions as defined in Section 406 of ERISA and Section 4975 of the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder, (b) not failed to meet any applicable minimum funding requirements under Section 302 of ERISA in respect of its plans and no funding requirements have been postponed or delayed, (c) no knowledge of any amounts due but unpaid to the Pension Benefit Guaranty Corporation, or of any event or occurrence which would cause the Pension Benefit Guaranty Corporation to institute proceedings under Title IV of ERISA to terminate any of the employee benefit plans, (d) fiduciary responsibility under ERISA for investments with respect to any plan existing for the benefit of Persons other than its employees or former employees, or (e) withdrawn, completely or partially, from any multi-employer pension plans so as to incur liability under the Multiemployer Pension Plan Amendments of 1980. With respect to Borrower, there exists no event described in Section 4043 of ERISA, excluding Subsections 4043(b)(2) and 4043(b)(3) thereof, for which the thirty (30) day notice period contained in 12 C.F.R. § 2615.3 have not been waived. Borrower has maintained in all material respects all records required to -be maintained by the Joint Commission on Accreditation of Healthcare Organizations ("**JCAHO**"), the Food and Drug Administration, Drug Enforcement Agency and State Boards of Pharmacy, all applicable federal and state licensing authorities and the Medicare, Medi-Cal and CHAMPUS/TRICARE programs as required by the Healthcare Laws, and there are no presently existing circumstances which likely would result in material violations of the Healthcare Laws. There is no Liability Event.

### 5.11    Intellectual Property

Except as set forth on <u>Schedule 5.11</u>, Borrower does not own, licenses or utilizes, and is not a party to, any patents, patent applications, trademarks, trademark applications, service marks, registered copyrights, copyright applications, copyrights, trade names, trade secrets, software, licenses or other Intellectual Property.

### 5.12    Licenses and Permits; Labor

Borrower is in compliance with and has all Permits and Intellectual Property necessary or required by applicable law or Governmental Authority for the operation of Borrower's business. All of the foregoing are in full force and effect and not in known conflict with the rights of others. Borrower is NOT: (i) in breach of or default under the provisions of any of the foregoing, nor is there any event, fact, condition or circumstance which with notice or passage of time or both, would constitute or result in a conflict, breach, default or event of default under, any of the foregoing which, if not remedied within any applicable grace or cure period would reasonably be likely to have a Material Adverse Effect, other than breaches, defaults or events of default the enforcement of which is stayed by virtue of the filing of the Bankruptcy Code, (ii) a party to or subject to any agreement, instrument or restriction that is so unusual or burdensome that it might have a Material Adverse Effect, and/or (iii) and has not been, involved in any labor dispute, strike, walkout or union organization which would reasonably be likely to have a Material Adverse Effect.

### 5.13    No Default

No Default or Event of Default exists.

### 5.14    No Withholding of Reimbursements

No third-party payor, including any Governmental Authority, or any financial intermediary for any Governmental Authority, including, but not limited to, CMS, Medicare, Medicaid and Medi-Cal, is, or has in any way indicated in writing that it may begin, withholding, setting-off, recouping, or attempting to withhold, set-off, or recoup, any amounts alleged to be owed to such payor by the Borrower, against any amounts alleged to be due to the Borrower.

### 5.15    [INTENTIONALLY DELETED]

### 5.16    Healthcare Matters

(a)    Borrower has obtained from the (i) Medicare program, the provider numbers which will permit Borrower to bill the Medicare program with respect to the provision of general acute care and skilled nursing services to patients insured under the Medicare program, and (ii) Medi-Cal program, the provider numbers and in-patient service contracts which will permit Borrower to bill the Medi-Cal program with respect to the provision of general acute care and skilled nursing services to patients insured under the Medi-Cal program. Borrower is in material compliance with the conditions of participation in the Medicare and Medi-Cal programs.

(b)    Other than the CLIA/CMS investigation currently on appeal to the US Court of Appeals for the Ninth Circuit, there is no pending, there is no pending or threatened, proceeding or investigation of Borrower relative to the Emergency Medical Treatment or Active Labor Act ("**EMTALA**") nor are there any investigations or proceedings pending, or threatened by any Governmental Authority with respect to the Medicare, Medi-Cal or CHAMPUS/TRICARE programs.

### 5.17    Hospital Operations/Litigation

Neither Borrower nor any of its respective directors, officers or management employees (in their respective capacities as directors, officers or management employees of Borrower) has been, (i) a party to a Corporate Integrity Agreement with the Office of Inspector General of the Department of Health and Human Services; (ii) subject to reporting obligations pursuant to any settlement agreement entered into with any Governmental Authority; (iii) the subject of any government payor program investigation conducted by any federal or state enforcement agency; (iv) a defendant in any qui tam/False Claims Act litigation; (v) the subject of any search warrant in any qui tam/False Claims Act litigation; (vi) the subject of any search warrant, subpoena, civil investigative demand, contact letter, or telephone or personal contact by or from any federal or state enforcement agency relating to an investigation; or (vii) to the Borrower's Knowledge, since the Petition Date, subject of any writing received by Borrower from any independent contractor, employee, vendor, physician, or any other person alleging that Borrower has violated any law or regulation in a material manner.

### 5.18    Insurance

Borrower has in full force and effect such insurance policies as are customary in its industry and as may be required pursuant to Section 6.5 hereof.  All such insurance policies are listed and described on Schedule 5.18.

### 5.19    Names; Location of Offices, Records and Collateral

During the preceding five years, Borrower has NOT conducted business under or used any name (whether corporate, partnership or assumed) other than as shown on Schedule 5.19A. Borrower is the sole owner of all of its names listed on Schedule 5.19A, and any and all business done and invoices issued in such names are such Person's sales, business and invoices. Each trade name of Borrower or, represents a division or trading style of Borrower. Borrower maintains its places of business and chief executive offices only at the locations set forth on Schedule 5.19B, and all Accounts of Borrower arise, originate and are located, and all of the Collateral granted by Borrower and all books and records in connection therewith or in any way relating thereto or evidencing such Collateral are located and shall only be located, in and at such locations of Borrower. All of the Collateral is located only in the continental United States.

### 5.20    [INTENTIONALLY DELETED]

### 5.21    [INTENTIONALLY DELETED]

### 5.22    [INTENTIONALLY DELETED]

### 5.23    Survival

Borrower makes the representations and warranties contained herein with the knowledge and intention that Lender is relying and will rely thereon. All such representations and warranties will survive the execution and delivery of this Agreement, the making of the Advances under the Revolving Facility.

# VI.
## AFFIRMATIVE COVENANTS

Borrower covenants and agrees that, until full performance and satisfaction, and indefeasible payment in full in cash, of all the Obligations and termination of this Agreement:

### 6.1    Financial Statements, Borrowing Certificate, Financial Reports and Other Information

(a)    <u>Financial Reports</u>. In addition to providing the Borrowing Certificate in accordance with <u>Section 2.4</u>, Borrower shall furnish to Lender as soon as available and in any event within thirty (30) calendar days after the end of each calendar month, unaudited consolidated financial statements of Borrower, consisting of a balance sheet and statements of income, retained earnings, cash flows and owners' equity as of the end of the immediately preceding calendar month. With each such financial statement, Borrower shall also deliver a certificate of its chief financial officer stating that (A) such person has reviewed the relevant terms of the DIP Loan Documents and the condition of Borrower, (B) no Default or Event of Default has occurred or is continuing, or, if any of the foregoing has occurred or is continuing, specifying the nature and status and period of existence thereof and the steps taken or proposed to be taken with respect thereto, and (C) Borrower is in compliance with all financial covenants attached as Annex I hereto. Such certificate shall be accompanied by the calculations necessary to show compliance with the financial covenants in a form satisfactory to Lender.

(b)    <u>Other Materials</u>. Borrower shall furnish to Lender as soon as available, and in any event within ten (10) calendar days after the preparation or issuance thereof or at such other time as set forth below: (i) copies of such financial statements (other than those required to be delivered pursuant to <u>Section 6.1(a)</u> prepared by, for or on behalf of Borrower and any other notes, reports and other materials related thereto, including, without limitation, any pro forma financial statements) as may be reasonably requested by Lender, (ii) any reports, returns, information, notices and other materials that Borrower shall send to its stockholders, members, partners or other equity owners at any time, (iii) copies of licenses and permits required by any applicable federal, state, foreign or focal law, statute ordinance or regulation or Governmental Authority for the operation of its business, (iv) within fifteen (15) calendar days after the end of each calendar month for such month, a sales and collection report and accounts receivable and accounts payable aging schedule, including a report of sales, credits issued and collections received, and a schedule of Inventory, itemizing and describing the kind, type, quality and quantity of Inventory, all such reports showing a reconciliation to the amounts reported in the monthly financial statements, (v) promptly upon receipt thereof, copies of any reports submitted to Borrower by its independent accountants in connection with any interim audit of the books of Borrower and copies of each management control letter provided by such independent accountants, and (vi) copies of all reports and/or financial information provided to the Bankruptcy Court, the United States Trustee and any statutorily appointed or ad hoc committee in the Bankruptcy Case, and (vii) such additional information, documents, statements, reports and other materials as Lender may reasonably request from a credit or security perspective or otherwise from time to time.

(c)    Consents. Borrower shall use commercially reasonable efforts to obtain and deliver from time to time all required consents, approvals and agreements from such third parties as required, with respect to effectuating the DIP Loan Documents and the transactions contemplated thereby.

## 6.2    Payment of Obligations

Borrower shall make full and timely indefeasible payment in cash of the principal of and interest on the Loans, Advances and all other Obligations.

## 6.3    Conduct of Business and Maintenance of Existence and Assets

Except with respect to rejections of leases or executory contracts, Borrower shall (i) conduct its business in accordance with good business practices customary to the industry, (ii) engage principally in the same or similar lines of business substantially as heretofore conducted, (iii) collect its Accounts in the ordinary course of business, (iv) maintain all of its material properties, assets and equipment used or useful in its business in good repair, working order and condition (normal wear and tear excepted and except as may be disposed of in the ordinary course of business and in accordance with the terms of the DIP loan Documents and otherwise as determined by Borrower using commercially reasonable business judgment), (v) from time to time to make all necessary or desirable repairs, renewals and replacements thereof, as determined by Borrower using commercially reasonable business judgment, (vi) maintain and keep in full force and effect its existence and all material Permits and qualifications to do business and good standing in each jurisdiction in which the ownership or lease of property or the nature of its business makes such Permits or qualification necessary and in which failure to maintain such Permits or qualification could reasonably be likely to have a Material Adverse Effect; and (vii) remain in good standing and maintain operations in all jurisdictions in which currently located.

## 6.4    Compliance with Legal and Other Obligations

Borrower shall (a) comply with all laws, statutes, rules, regulations, ordinances and tariffs of all Governmental Authorities applicable to it or its business, assets or operations, including applicable requirements of the Healthcare Laws, the Standards for Privacy of Individually Identifiable Health information which were promulgated pursuant to HIPAA,(b) maintain and comply with all Permits necessary to conduct its business and comply with any new or additional requirements that may be imposed on it or its business, and (c) properly file all Medicare, Medi-Cal and, as applicable, CHAMPUS/TRICARE cost reports. Without limiting the foregoing, the Borrower is, and while this Agreement shall remain in effect shall remain, qualified for participation in the Medicare and Medi-Cal programs; Borrower has, and while this Agreement shall remain in effect shall maintain, a current and valid provider contract with such programs; Borrower is, and while this Agreement shall remain in effect shall remain, in compliance with the conditions of participation in such programs; Borrower has, and while this Agreement shall remain in effect shall maintain, all approvals or qualification necessary for capital reimbursement for the Hospital; and Borrower has obtained, and while this Agreement shall remain in effect shall maintain, accreditation of the Hospital by JCAHO applicable to all of its patient care facilities/services. While this Agreement shall remain in effect, all billing practices of the Borrower with respect to the Hospital and all third party payors, including the Medicare, Medi-

Cal and CHAMPUS/TRICARE programs and private insurance companies, shall remain in compliance with all applicable laws, regulations and policies of such third party payors and the Medicare, Medi-Cal and CHAMPUS/TRICARE programs.

### 6.5    Insurance

Borrower shall (i) keep all of its insurable properties and assets including without limitation Inventory that is in transit (whether by vessel, air or land) adequately insured in all material respects as at present against losses, damages and hazards as are customarily insured against by businesses engaging in similar activities or owning similar assets or properties and at least the minimum amount required by applicable law (and with respect to Inventory that is in transit, maintain insurance covering the same for its full replacement cost under all risk marine insurance policies endorsed to cover all risks and with such amounts of coverage and deductibles as at present, issued by such insurance carriers at present or as are reasonably acceptable to Lender), including, without limitation, professional liability insurance, as applicable; (ii) maintain general public liability insurance at all times against liability on account of damage to persons and property having such limits, deductibles, exclusions and co-insurance and other provisions as are customary for a business engaged in activities similar to those of Borrower; and (iii) maintain insurance under all applicable workers' compensation laws; all of the foregoing insurance policies to (A) name Lender as loss payee and additional insured thereunder, and (B) expressly provide that they cannot be altered, amended, modified or canceled without thirty (10) Business Days prior written notice to Lender and that they inure to the benefit of Lender notwithstanding any action or omission or negligence of or by Borrower thereunder.

### 6.6    [INTENTIONALLY DELETED]

### 6.7    Inspection; Periodic Audits

Borrower shall permit the representatives of Lender, from time to time during normal business hours upon reasonable notice, to (i) visit and inspect any of its offices or properties or any other place where Collateral is located to inspect the Collateral and/or to examine or audit all of its books of account, records, reports and other papers, (ii) make copies and extracts therefrom, and (iii) discuss its business, operations, prospects, properties, assets, liabilities, condition and/or Accounts with its officers and independent public accountants (and by this provision such officers and accountants are authorized to discuss the foregoing).

### 6.8    Further Assurances; Post Closing

At Borrower's sole cost and expense, Borrower shall (i) take such further actions, obtain such consents and approvals and duly execute and deliver such further agreements, assignments, instructions or documents as Lender may reasonably request with respect to the purposes, terms and conditions of the DIP Loan Documents and the consummation of the transactions contemplated thereby, and (ii) without limiting and notwithstanding any other provision of any DIP Loan Document, execute and deliver, or cause to be executed and delivered, such agreements and documents, and take or cause to be taken such actions, and otherwise perform, observe and comply with such obligations, in each case, that to the extent such costs are not already included in the Budget, Lender shall advance the costs and expenses for any such action

requested by Lender, and the expenditure of such funds shall not be considered an expense for Budget purposes, although the Facility Cap shall be reduced by the amount of any such advance.

### 6.9    Payment of Indebtedness

Except as otherwise prescribed in the DIP Loan Documents, or to the extent excused pursuant to the Bankruptcy Code, and, with respect to Subordinated Debt, subject to any applicable Subordination Agreement or subordination provisions, Borrower shall pay, discharge or otherwise satisfy at or before maturity (subject to applicable grace periods and, in the case of trade payables, to ordinary course payment practices) all of its material obligations and liabilities, except when the amount or validity thereof is being contested in good faith by appropriate proceedings and such reserves as Lender may deem proper and necessary in its sole discretion shall have been made.

### 6.10    Lien Searches

If Liens other than Permitted Liens exist, Borrower immediately shall take, execute and deliver all actions, documents and instruments necessary to release and terminate or subordinate such Liens.

### 6.11    Use of Proceeds

Borrower shall use the proceeds from the Revolving Facility only for the purposes, and at the times set forth in the Budget and as provided in the Financing Orders.

### 6.12    Collateral Documents; Security Interest in Collateral

Borrower shall (i) execute, obtain, deliver, file, register and/or record any and all financing statements, continuation statements, stock powers, instruments and other documents, or cause the execution, filing, registration, recording or delivery of any and all of the foregoing, that are necessary or required under law or otherwise or reasonably requested by Lender to be executed, filed, registered, obtained, delivered or recorded to create, maintain, perfect, preserve, validate or otherwise protect the pledge of the Collateral to Lender and Lender's perfected Lien on the Collateral, and Borrower irrevocably grants Lender the right, at Lender's option, to file any or all of the foregoing, (ii) immediately upon learning thereof, report to Lender any reclamation, return or repossession of goods in excess of $10,000 (individually or in the aggregate), and (iii) defend the Collateral and Lenders perfected Lien thereon against all claims and demands of all Persons at any time claiming the same or any interest therein adverse to Lender, and pay all reasonable costs and expenses (including, without limitation, in-house documentation and diligence fees and legal expenses and reasonable attorneys' fees and expenses) in connection with such defense, which may at Lender's reasonable discretion be added to the Obligations; provided, in each case, that to the extent such costs are not already included in the Budget, Lender shall advance the costs and expenses for any such action requested by Lender, and the expenditure of such funds shall not be considered an expense for Budget purposes, although the Facility Cap shall be reduced by the amount of any such advance.

**6.13    [INTENTIONALLY DELETED]**

**6.14    Taxes and Other Charges**

Borrower shall promptly, and in any event within five (5) Business Days after Borrower or any authorized officer of Borrower obtains knowledge thereof, notify Lender in writing of any oral or written communication from the Internal Revenue Service or otherwise with respect to any (i) tax investigations, relating to the Borrower directly, or relating to any consolidated tax return which was filed on behalf of Borrower, (ii) notices of tax assessment or possible tax assessment, (iii) years that are designated open pending tax examination or audit, and (iv) information that could give rise to an IRS tax liability or assessment.

**6.15    [INTENTIONALLY DELETED]**

**6.16    Payroll Taxes**

Without limiting or being limited by any other provision of any DIP Loan Document, Borrower at all times shall process, manage and pay its Postpetition Date payroll taxes and shall cause to be delivered to Lender within ten (10) business days after the end of each calendar month a report of its Postpetition Date payroll taxes for the immediately preceding calendar month and evidence of payment thereof.

**6.17    [INTENTIONALLY DELETED]**

**6.18    [INTENTIONALLY DELETED]**

**VII.**
**NEGATIVE COVENANTS**

Borrower covenants and agrees that, until full performance and satisfaction, and indefeasible payment in full in cash, of all of the Obligations and termination of this Agreement:

**7.1    Financial Covenants**

Borrower shall not violate the financial covenants set forth on Appendix A to this Agreement, which is incorporated herein and made a part hereof. Borrower shall demonstrate its compliance with the financial covenants by submitting to Lender a compliance certificate in the form set forth in Exhibit B hereto at such times as compliance is measured.

**7.2    Permitted Indebtedness**

Borrower shall not create, incur, assume or suffer to exist any Postpetition Date Indebtedness, except the following (collectively, "**Permitted Indebtedness**"): (i) Indebtedness under the DIP Loan Documents, (ii) any Indebtedness not otherwise described in this Section 7.2 and set forth on Schedule 7.2; (iii) accounts payable to trade creditors and current operating expenses (other than for borrowed money) incurred after the Petition Date which are not aged more than sixty (60) calendar days from the billing date or more than thirty (30) days from the due date, in each case incurred in the ordinary course of business and paid within such time

period, unless the same are being contested in good faith and by appropriate and lawful proceedings and such reserves, if any, with respect thereto as are required by GAAP and deemed adequate by Borrower's independent accountants shall have been reserved; and (iv) Permitted Subordinated Debt. Borrower shall not make prepayments on any existing or future Indebtedness to any Person other than to Lender or to the extent specifically permitted by this Agreement or any subsequent agreement between Borrower and Lender.

### 7.3    Permitted Liens

Borrower shall not create, incur, or assume any Lien upon, in or against, or pledge of, any of the Collateral or any of its properties or assets or any of its shares, securities or other equity or ownership or partnership interests, whether now owned or hereafter acquired, except the following (collectively, "**Permitted Liens**"): (i) Liens under the DIP Loan Documents or otherwise arising in favor of Lender, (ii) Liens imposed by law for taxes (other than payroll taxes), assessments or charges of any Governmental Authority for claims not yet due or which are being contested in good faith by appropriate proceedings and with respect to which adequate reserves or other appropriate provisions are being maintained by such Person in accordance with GAAP to the satisfaction of Lender in its sole discretion, (iii) (A) statutory Liens of landlords and of carriers, warehousemen, mechanics or materialmen, and (B) other Liens imposed by law or that arise by operation of law in the ordinary course of business from the date of creation thereof, in each case only for amounts not yet due or which are being contested in good faith by appropriate proceedings and with respect to which adequate reserves or other appropriate provisions are being maintained by such Person in accordance with GAAP to the satisfaction of Lender in its sole discretion, (iv) Liens (A) incurred or deposits made in the ordinary course of business (including, without limitation, surety bonds and appeal bonds) in connection with workers' compensation, unemployment insurance and other types of social security benefits or to secure the performance of tenders, bids, leases, contracts (other than for the repayment of Indebtedness), statutory obligations and other similar obligations, or (B) arising as a result of progress payments under government contracts, and (v) other Liens in existence as of the Petition Date not otherwise described above and disclosed on <u>Schedule 7.3</u> .

### 7.4    Investments; New Facilities or Collateral; Subsidiaries

Borrower, directly or indirectly, shall not (i) merge with, purchase, own, hold, invest in or otherwise acquire obligations or stock or securities of, or any other interest in, or all or substantially all of the assets of, any Person or any joint venture or (ii) make or permit to exist any Postpetition Date loans, advances or guarantees to or for the benefit of any Person or assume, guarantee, endorse, contingently agree to purchase or otherwise become liable for or upon or incur any Postpetition Date obligation of any Person (other than those created by the DIP Loan Documents and Permitted Indebtedness and other than (A) trade credit extended in the ordinary course of business, (B) advances for business travel and similar temporary advances made in the ordinary course of business to officers, directors and employees, (C) the endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business), and (D) indebtedness and other obligations in the ordinary course of Borrower's business. Borrower, directly or indirectly, shall not purchase, own, operate, hold, invest in or otherwise acquire any facility, property or assets or any Collateral that is not located

at the locations set forth on Schedule 5.18B unless Borrower shall provide to Lender at least thirty (30) Business Days prior written notice. Borrower shall have no Subsidiaries.

### 7.5    Dividends; Redemptions; Restricted Payments

Borrower shall not (i) declare, pay or make any dividend or Distribution on any shares of capital stock or other securities or interests, (ii) apply any of its funds, property or assets to the acquisition, redemption or other retirement of any capital stock or other securities or interests or of any options to purchase or acquire any of the foregoing, (iii) otherwise make any payments or Distributions to any stockholder, member, partner or other equity owner in such Person's capacity as such, or (iv) except as provided by the Budget, make any payment of any management, service, consulting or related or similar fee.

### 7.6    [INTENTIONALLY DELETED]

### 7.7    Charter Documents; Fiscal Year; Name; Jurisdiction of Organization; Dissolution; Use of Proceeds

Borrower shall not (i) amend, modify, restate or change its certificate of incorporation or formation or bylaws or similar charter documents in a manner that would be adverse to Lender, (ii) change its fiscal year unless Borrower demonstrates to Lender's satisfaction compliance with the covenants contained herein for both the fiscal year in effect prior to any change and the new fiscal year period by delivery to Lender of appropriate interim and annual pro forma, historical and current compliance certificates for such periods and such other information as Lender may reasonably request, (iii) change its name or change its jurisdiction of organization; (iv) amend, alter or suspend or terminate or make provisional in any material way, any Permit without the prior written consent of Lender, which consent shall not be unreasonably withheld, (v) other than the filing of the Bankruptcy Case or commence or suffer any proceedings seeking or that would result in any of the foregoing, or (vi) use any proceeds of any Advance for "purchasing" or "carrying" "margin stock" as defined in Regulations U, T or X of the Board of Governors of the Federal Reserve System.

### 7.8    Truth of Statements

Borrower shall not after the date hereof, furnish to Lender any certificate or other document that contains any untrue statement of a material fact or that omits to state a material fact necessary to make it not misleading in light of the circumstances under which it was furnished.

### 7.9    IRS Form 8821

Borrower shall not alter, amend, restate, or otherwise modify, or withdraw, terminate or re-file the IRS Form 8821 required to be filed pursuant to the Conditions Precedent in Section 4.1 hereof.

### 7.10    Transfer of Assets

Borrower shall not sell, lease, transfer, assign or otherwise dispose of any interest in any properties or assets (other than (x) sales of Inventory in the ordinary course of business), (y) sales of excess, obsolete, unused or redundant assets in the aggregate amount not to exceed $25,000, regardless of the number of such sale transactions without Lender's express written consent, and (z) rejections of leases and executory contracts), or agree to do any of the foregoing at any future time, except that:

(a)    Borrower may lease (as lessee) real or personal property or surrender all or a portion of a lease of the same, in each case in the ordinary course of business (so long as such lease does not create or result in and is not otherwise a Capitalized Lease Obligation prohibited under this Agreement), <u>provided that</u> a Landlord Waiver and Consent and such other consents as are reasonably required by Lender are signed and delivered to Lender with respect to any lease of real or other property, as applicable; and

(b)    Borrower may license or sublicense Intellectual Property or customer lists from third parties in the ordinary course of business, <u>provided</u>, that such licenses or sublicenses shall not interfere with the business or other operations of such Person and such Person's rights, title and/or interest in or to such Intellectual Property and customer lists and interests therein are pledged to Lender as further security for the Obligations and included as part of the Collateral.

### 7.11    Modification of Agreements

Except with respect to rejected leases and executory contracts, Borrower shall not make, or agree to make, any modification, amendment or waiver of any of the terms or provisions of, and will not fail to enforce or diligently pursue its remedies under any and all agreements, documents, instruments and/or certificates executed in connection with any Permitted Subordinated Debt.

### 7.12    [INTENTIONALLY DELETED]

### 7.13    Chapter 11 Claims

Borrower shall not incur, create, assume, suffer to exist or permit any administrative expense or any Claim (now existing or hereafter arising, of any kind or nature whatsoever) which is superior to or pari passu with those granted to Lender by this Agreement or the Financing Orders other than the Carve-Out.

### 7.14    Filing of Motions and Applications

Borrower shall not apply to the Bankruptcy Court for authority to (a) take any action that is prohibited by the terms of any of the DIP Loan Documents, (b) refrain from taking any action that is required to be taken by the terms of any of the DIP Loan Documents or the Financing Orders, or (c) seek or consent to any amendment, supplement, or any other modification of any terms of the Financing Orders.

7.15    **[INTENTIONALLY DELETED]**

## VIII.
## EVENTS OF DEFAULT

**8.1    The occurrence of anyone or more of the following shall constitute an "Event of Default":**

(a)    Borrower shall fail to pay when due any amount on the Obligations or provided for in any DIP Loan Document (whether on any payment date, at maturity, by reason of acceleration, by required prepayment or otherwise);

(b)    any representation, statement or warranty made or deemed made by Borrower or any other Person (other than Lender) in any DIP Loan Document or in any other certificate, document, report or opinion delivered in conjunction with any DIP Loan Document to which it is a party, shall not be true and correct in all material respects or shall have been false or misleading in any material respect on the date when made or deemed to have been made (except to the extent already qualified by materiality, dollar thresholds or Material Adverse Effect qualifiers, in which case it shall be true and correct in all respects and shall not be false or misleading in any respect);

(c)    Borrower or any other party thereto other than Lender, shall be in violation, breach or default of, or shall fail to perform, observe or comply with any covenant, obligation or agreement set forth in any DIP Loan Document or the Financing Orders, and such violation, breach, default or failure shall not be cured within the applicable period set forth in any DIP Loan Document or the Financing Orders, if any, provided that, with respect to the affirmative covenants set forth in Article VI (other than Sections 6.1, 6.2, 6.5, , 6.8, 6.9, 6.11 and 6.16 for which there shall be no cure period), there shall be a five (5) Business Day cure period commencing from the earlier of (i) Receipt by such Person of written notice of such breach, default, violation or failure, and (ii) the time at which such Person or any authorized officer thereof knew or became aware, or should have known or been aware, of such failure, violation, breach or default, but no Advances will be made during the cure period;

(d)    any of the DIP Loan Documents ceases to be in full force and effect, or (ii) any Lien created thereunder ceases to constitute a valid perfected Lien on the Collateral having the priority set forth in the Financing Orders in accordance with the terms thereof, or Lender ceases to have a valid perfected security interest in any of the Collateral or any securities pledged to Lender pursuant to the Security Documents, or the Financing Orders having the priority set forth in the Financing Orders;

(e)    one or more tax assessments, judgments or decrees for post-Petition Date obligations is rendered against Borrower in an amount in excess of $10,000 individually or $10,000 in the aggregate, which is/are not satisfied, vacated or discharged of record within thirty (30) calendar days of being rendered and due and payable;

(f)    an order is entered by the Bankruptcy Court in the Bankruptcy Case appointing, or the Borrower files a motion or application for an order seeking the appointment of, in either case, without express prior written consent of the Lender (i) a trustee under Section 1104 of the

Bankruptcy Code, or (ii) an examiner with enlarged powers relating to the operation of the business (i.e., powers beyond those set forth in <u>Section 1106(a)(3) and (4)</u> of the Bankruptcy Code) under <u>Section 1106(b)</u> of the Bankruptcy Code;

(g)     without the prior written consent of the Lender, an order shall be entered by the Bankruptcy Court converting the Bankruptcy Case to a Chapter 7 case;

(h)     an order is entered by the Bankruptcy Court approving a disclosure statement or confirming a plan of reorganization in the Bankruptcy Case that does not (i) contain a provision for termination of the Agreement and payment in full in cash of all Obligations of the Borrower hereunder and under the other DIP Loan Documents on or before the effective date of such plan, or (ii) provide for the continuation of the Liens and security interests granted to Lender and priorities until the effective date of such plan unless the Obligations have been paid in full and the Agreement has been terminated;

(i)     an order is entered by the Bankruptcy Court dismissing the Bankruptcy Case, which order does not contain a provision for termination of the Agreement, and payment in full in cash of all Obligations of the Borrower hereunder and under the other DIP Loan Documents prior to entry thereof;

(j)     an order is entered by the Bankruptcy Court in the Bankruptcy Case, without the prior written consent of the Lender (i) to revoke, reverse, stay modify, supplement or amend the Financing Orders, (ii) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to the Borrower equal or superior to the priority of the Lender in respect to the Obligations, except for the Carve Out, or (iii) to grant or permit the grant of a Lien on the Collateral other than a Permitted Lien;

(k)     an order is entered by the Bankruptcy Court that is not stayed pending appeal· granting relief from the automatic stay allowing secured creditor of Borrower to enforce its remedies to liquidate or obtain possession of the Collateral;

(l)     any action is commenced by Borrower that contests the validity, perfection, priority or enforceability of any of the Liens and security interests of the Lender or Prepetition Lender;

(m)     without the prior written consent of the Lender, the determination of Borrower, whether by vote of such Person's Board of Directors or otherwise, to suspend the operation of such Person's business in the ordinary course sell substantially all of either Borrower's assets, unless the proceeds of such sale will pay the Obligations in full, or the filing of a motion or other application in the Bankruptcy Case, seeking authority to do any of the foregoing;

(n)     (i) any Material Adverse Effect or Material Adverse Change occurs, or (ii) Borrower ceases its business operations as currently conducted;

(o)     an Event of Default occurs under any other DIP Loan Document;

(p)    Borrower is determined to have engaged in fraud in connection with the operation of Borrower's business, including, but not limited to, any matters relating to any of Borrower's Government Accounts, Government Contracts, or any Governmental Authority.

(q)    Borrower enters into or becomes a party to any agreement or commitment to do, or cause to be done, any of the things described in this Article VIII or otherwise prohibited by any DIP Loan Document (subject to any cure periods set forth therein);

(r)    (i) the subordination provisions of any Subordination Agreement and/or the subordination provisions contained in or otherwise pertaining to any other agreement or instrument governing any Subordinated Debt shall for any reason be revoked or invalidated, or otherwise cease to be in full force and effect, or (ii) the Obligations for any reason shall not have the priority contemplated by this Agreement;

(s)    reserved;

(t)    the healthcare facility operated by Borrower, or any material portion thereof, (i) become the subject of any proceedings by any Governmental. Authority for condemnation, seizure, appropriation, or similar action; or (ii) ceases operations, including the admission of patients, for a continuous period of more than five (5) days or, more than ten (10) days in the aggregate following the Closing Date.

Then, and in any such event, notwithstanding any other provision of any Loan Document, Lender, on five (5) business days' notice to Borrower, in which period Borrower may contest the existence of any such Event of Default, may do any of the following: (i) terminate its obligations to make Advances hereunder, whereupon the same shall immediately terminate and (ii) declare all or any of the Notes, all interest thereon and all other Obligations to be due and payable immediately

## IX.
## RIGHTS AND REMEDIES AFTER DEFAULT

### 9.1    Rights and Remedies

(a)    In addition to the acceleration provisions set forth in Article VIII above, upon the occurrence and continuation of an Event of Default, subject to the Financing Orders, Lender shall have the right to exercise any and all rights, options and remedies provided for in the DIP Loan Documents, under the UCC, the Bankruptcy Code, the Financing Orders or at law or in equity, including, without limitation, the right to in accordance with the procedures set forth in the Financing Orders (i) apply any property of Borrower held by Lender to reduce the Obligations, (ii) foreclose the Liens created under the Security Documents, (iii) realize upon, take possession of and/or sell any Collateral or securities pledged with or without Judicial process, (iv) exercise all rights and powers with respect to the Collateral as Borrower might exercise, (v) collect and send notices regarding the Collateral, with or without judicial process, (vi) by its own means or with Judicial assistance, enter any premises at which Collateral and/or pledged securities are located, or render any of the foregoing unusable or dispose of the Collateral and/or pledged securities on such premises without any liability for rent, storage, utilities, or other sums, and Borrower shall not resist or interfere with such action, (vii) require

that all or any of the Collateral be assembled and made available to Lender at any place designated by Lender, (viii) reduce or otherwise change the Facility Cap, and/or (ix) relinquish or abandon any Collateral or securities pledged or any Lien thereon. Notwithstanding any provision of any DIP Loan Document, upon the occurrence and continuation of an Event of Default, subject to the Financing Orders, Lender, in its sole discretion, shall have the right, at anytime that Borrower fails to do so, and from time to time, without prior notice, to: (i) obtain insurance covering any of the Collateral to the extent required hereunder; (ii) pay for the performance of any of Obligations; (iii) to the extent not stayed by the filing of the Bankruptcy Case, discharge taxes or Liens on any of the Collateral that are in violation of any DIP Loan Document unless Borrower is in good faith with due diligence by appropriate proceedings contesting those items; and (iv) pay for the maintenance and preservation of the Collateral. Such expenses and advances shall be added to the Obligations until reimbursed to Lender and shall be secured by the Collateral, and such payments by Lender shall not be construed as a waiver by Lender of any Event of Default or any other rights or remedies of Lender.

(b)     Borrower agrees that notice received by it at least ten (10) calendar days before the time of any intended public sale, or the time after which any private sale or other disposition of Collateral is to be made, shall be deemed to be reasonable notice of such sale or other disposition. If permitted by applicable law, any perishable Collateral which threatens to speedily decline in value or which is sold on a recognized market may be sold immediately by Lender without prior notice to Borrower. At any sale or disposition of Collateral or securities pledged, Lender may (to the extent permitted by applicable law) purchase all or any part thereof free from any right of redemption by any Borrower which right is hereby waived and released. Borrower covenants and agrees not to, and not to permit or cause any of its Subsidiaries to, interfere with or impose any obstacle to Lender's exercise of its rights and remedies with respect to the Collateral. 'Lender, in dealing with or disposing of the Collateral or any part thereof, shall not be required to give priority or preference to any item of Collateral or otherwise to marshal assets or to take possession or sell any' Collateral with judicial process.

(c)     Borrower hereby grants to Lender, after the occurrence and during the continuance of an Event of Default, an irrevocable, nonexclusive license (exercisable without payment of royally or other compensation to Borrower) to use, assign, license or sublicense any Intellectual Property now owned or hereafter acquired by Borrower, and wherever the same may be located, including in such license reasonable access as to all media in which any of the licensed items may be recorded or stored and to all computer programs and used for the compilation or printout thereof, in each case in connection with the exercise of Lender's remedies hereunder and under the other Loan Documents. All proceeds received by Lender in connection with such license will be used by Lender to satisfy the Obligations.

(d)     In addition to the acceleration provisions set forth in Article VIII above, upon the occurrence and continuation of an Event of Default, Borrower shall take any action that Lender may request in order to enable Lender to obtain and enjoy the full rights and benefits granted to Lender hereunder. Without limiting the generality of the foregoing, upon the occurrence and continuation of an Event of Default, at the request of Lender and at Borrower's sale cost and expense, Borrower shall execute all documents and take in other actions requested by Lender to enable Lender, its designee, any receiver, trustee or similar official or any purchaser of all or any

part of the Collateral to obtain from any Person any required authority necessary to operate the business of Borrower.

**9.2    Application of Proceeds**

In addition to any other rights, options and remedies Lender has under the DIP Loan Documents, the Bankruptcy Code, the UCC, the Financing Orders, at law or in equity, all dividends, interest, rents, issues, profits, fees, revenues, income and other proceeds collected or received from collecting, holding, managing, renting, selling, or otherwise disposing of all or any part of the Collateral or any proceeds thereof upon exercise of its remedies hereunder shall be applied in the following order of priority: (i) first, to the payment of all costs and expenses of such collection, storage, lease, holding, operation, management, sale, disposition or delivery and of conducting Borrower's business and of maintenance, repairs, replacements, alterations, additions and improvements of or to the Collateral, and to the payment of all sums which Lender may be required or may elect to pay, if any, for taxes, assessments, insurance and other charges upon the Collateral or any part thereof, and all other payments that Lender may be required or authorized to make under any provision of this Agreement (including, without limitation, in each such case, in-house documentation and diligence fees and legal expenses, search, audit, recording, professional and filing fees and expenses and reasonable attorneys' fees and all expenses, liabilities and advances made or incurred in connection therewith); (ii) second, to the payment of all Obligations as provided herein; (iii) third, to the satisfaction of the Prepetition Debt; (iv) fourth, to the satisfaction of Indebtedness secured by any subordinate security interest of record in the Collateral if written notification of demand therefor is received before distribution of the proceeds is completed, provided, that, if requested by Lender, the holder of a subordinate. security interest shall furnish reasonable proof of its interest, and unless it does so, Lender need not address its claims; and (iv) fifth, to the payment of any surplus then, remaining to Borrower, unless otherwise provided by law or directed by a court of competent jurisdiction, provided that Borrower shall be liable for any deficiency if such proceeds are insufficient to satisfy the Obligations or any of the other items referred to in this section.

**9.3    Rights and Remedies not Exclusive**

Lender shall have the right in its sole discretion to determine which rights, Liens and/or remedies Lender may at any time pursue, relinquish, subordinate or modify arid such determination will not in any way modify or affect any of Lenders rights, Liens or remedies under any DIP Loan Document, the Financing Orders, the Bankruptcy Code, applicable law or equity. The enumeration of any rights and remedies in any DIP Loan Document or the Financing Orders is not intended to be exhaustive, and all rights and remedies of Lender described in any DIP Loan Document or Financing Orders are cumulative and are not alternative to or exclusive of any other rights or remedies which Lender otherwise may have. The partial or complete exercise of any right or remedy shall not preclude any other further exercise of such or any other right or remedy.

## X.
## WAIVERS AND JUDICIAL PROCEEDINGS

**10.1    [INTENTIONALLY DELETED]**

**10.2    Delay; No Waiver of Defaults**

No course of action or dealing, renewal, release or extension of any provision of any DIP Loan Document or the Financing Orders, or single or partial exercise of any such provision, or delay, failure or omission on Lender's part in enforcing any such provision shall affect the liability of Borrower or any Guarantor or operate as a waiver of such provision or affect the liability of Borrower or any Guarantor or preclude any other or further exercise of such provision. No waiver by any party to any DIP Loan Document of anyone or more defaults by any other party in the performance of any of the provisions of any DIP Loan Document shall operate or be construed as a waiver of any future default, whether of a like or different nature, and each such waiver shall be limited solely to the express terms and provisions of such waiver. Notwithstanding any other provision of any DIP Loan Document, by completing the Closing under this Agreement and/or by making Advances, Lender does not waive any breach of any representation or warranty under any DIP Loan Document, and all of Lender's claims and rights resulting from any such breach or misrepresentation are specifically reserved.

**10.3    Jury Trial Waiver**

EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION ARISING UNDER THE DIP LOAN DOCUMENTS OR IN ANY WAY CONNECTED WITH OR INCIDENTAL TO THE DEALINGS OF THE PARTIES WITH RESPECT TO THE DIP LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENTS OF THE PARTIES TO THE WAIVER OF THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY.

## XI.
## EFFECTIVE DATE AND TERMINATION

**11.1    Termination and Effective Date Thereof**

Subject to Lender's right to terminate and cease making Advances upon or after any Event of Default, this Agreement shall continue in full force and effect until the full performance and indefeasible payment in cash of all Obligations, unless terminated sooner as provided in this Section 11.1. Borrower may terminate this Agreement at any time upon not less than fourteen calendar days' prior written notice to Lender and upon full performance and indefeasible payment in full in cash of all Obligations on or prior to such fourteenth calendar day after Receipt by Lender of such written notice. All of the Obligations shall be immediately due and

payable upon any such termination on the termination date stated in any notice of termination (the "Termination Date"); provided that, notwithstanding any other provision of any DIP Loan Document, the Termination Date shall be effective no earlier than the first Business Day of the month following the expiration of the fourteen (14) calendar days' prior written notice period. Notwithstanding any other provision of any DIP Loan Document, no termination of this Agreement shall affect Lender's rights or any of the Obligations existing as of the effective date of such termination, and the provisions of the DIP Loan Documents shall continue to be fully operative until the Obligations have been fully performed and indefeasibly paid in cash in full. The Liens granted to Lender hereunder, under the Financing Orders, under the other Security Documents and the financing statements filed pursuant thereto and the rights and powers of Lender shall continue in full force and effect notwithstanding the fact that Borrower's borrowings hereunder may from time to time be in a zero credit position until all of the Obligations have been fully performed and indefeasibly paid in full in cash and all commitments to lend hereunder have terminated.

## 11.2    Survival

All obligations, covenants, agreements, representations, warranties, waivers and indemnities made by Borrower in any DIP Loan Document and Finance Orders shall survive the execution and delivery of the DIP Loan Documents, the Closing, the making of the Advances and any termination of this Agreement until all Obligations are fully performed and indefeasibly paid in full in cash. The obligations and provisions of Sections 3, 10.3, 11.1, 11.2. 12.4, 12.5, 12.7, 12.10 and 12.11 shall survive termination of the DIP Loan Documents and any payment, in full or in part, of the Obligations.

**XII.**
**MISCELLANEOUS**

## 12.1    Governing law; Jurisdiction; Service of Process; Venue

The DIP Loan Documents shall be governed by and construed in accordance with the internal laws of the State of California without giving effect to its choice of law provisions and, to the extent applicable, the Bankruptcy Code. Any judicial proceeding against Borrower with respect to the Obligations, any DIP Loan Document or any related agreement must be brought in the Bankruptcy Court or, if the Bankruptcy Court does not have jurisdiction, any federal or state court of competent jurisdiction located in the State of California. By execution and delivery of each DIP Loan Document to which it is a party, Borrower (i) accepts the non-exclusive jurisdiction of the aforesaid courts and irrevocably agrees to be bound by any judgment rendered thereby, (ii) waives personal service of process, (iii) agrees that service of process upon it may be made by certified or registered mail, return receipt requested, pursuant to Section 12.5 hereof, (iv) waives any objection to jurisdiction and venue of any action instituted hereunder and agrees not to assert any defense based on lack of jurisdiction, venue or convenience, and (v) agrees that this loan was made in California, that Lender has accepted in California DIP Loan Documents executed by Borrower and has disbursed Advances under the DIP Loan Documents in California. Nothing shall affect the right of Lender to serve process in any manner permitted by law or shall limit the right of Lender to bring proceedings against Borrower in the courts of any other jurisdiction having jurisdiction. Any judicial proceedings against Lender involving, directly or

indirectly, the Obligations, any DIP Loan Document or any related agreement shall be brought only in the Bankruptcy Court, if the Bankruptcy Court has jurisdiction, or in a federal or state court located in the State of California. All parties acknowledge that they participated in the negotiation and drafting of this Agreement and that, accordingly, no party shall move or petition a court construing this Agreement to construe it more stringently against one party than against any other.

**12.2    Successors and Assigns; Participations; New Lenders**

The DIP Loan Documents shall inure to the benefit of Lender, Transferees and all future holders of the Loan, any Note, the obligations and/or any of the Collateral, and each of their respective successors and assigns. Each DIP Loan Document shall be binding upon the Persons other than Lender that are parties thereto and their respective successors and assigns, and no such Person may assign, delegate or transfer any DIP Loan Document or any of its rights or obligations thereunder without the prior written consent of Lender. No rights are intended to be created under any DIP Loan Document for the benefit of any third party donee, creditor or incidental beneficiary of any Borrower or Guarantor, including, but not limited to, any trustee or examiner succeeding to the rights of Borrower pursuant to Chapter 11 of the Bankruptcy Code or pursuant to any conversion to a case under Chapter 7 of the Bankruptcy Code. Nothing contained in any DIP Loan Document shall be construed as a delegation to Lender of any other Person's duty of performance. BORROWER ACKNOWLEDGES AND AGREES THAT LENDER AT ANY TIME AND FROM TIME TO TIME MAY (I) DIVIDE AND RESTATE ANY NOTE, AND/OR (II) SELL, ASSIGN OR GRANT PARTICIPATING INTERESTS IN OR TRANSFER ALL OR ANY PART OF ITS RIGHTS OR OBLIGATIONS UNDER ANY DIP LOAN DOCUMENT, LOANS, ANY NOTE, THE OBLIGATIONS AND/OR THE COLLATERAL TO OTHER PERSONS (EACH SUCH TRANSFEREE, ASSIGNEE OR PURCHASER, A "TRANSFEREE"). Each Transferee shall have all of the rights and benefits with respect to the Financing Orders, Loans, Obligations, any Notes, Collateral and/or DIP Loan Documents held by it as fully as if  the original holder thereof, and either Lender or any Transferee may be designated as the sale agent to manage the transactions and obligations contemplated therein; <u>provided that</u>, notwithstanding anything to the contrary in any DIP Loan Document, Borrower shall not be obligated to pay under this Agreement to any Transferee any sum in excess of the sum which Borrower would have been obligated to pay to Lender had such participation not been effected. Notwithstanding any other provision of any DIP Loan Document, Lender may disclose to any Transferee all information, reports, financial statements, certificates and documents obtained under any provision of any DIP Loan Document.

**12.3    Application of Payments**

To the extent that any payment made or received with respect to the Obligations is subsequently invalidated, determined to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor in possession, receiver, custodian, Committee or any other Person under any Debtor Relief Law, common law or equitable cause or any other law, then the Obligations intended to be satisfied by such payment shall be revived and shall continue as if such payment had not been received by Lender. Any payments with respect to the Obligations received shall be credited and applied in such manner and order as Lender shall decide in its sole discretion.

### 12.4    Indemnity

Borrower shall indemnify Lender, its Affiliates and its and their respective managers, members, officers, employees, Affiliates, agents, representatives, successors, assigns, accountants and attorneys (collectively, the "Indemnified Persons") from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, reasonable fees and disbursements of counsel and in-house documentation and diligence fees and legal expenses) which may be imposed on, incurred by or asserted against any Indemnified Person with respect to or arising out of, or in any litigation, proceeding or investigation instituted or conducted by any Person with respect to any aspect of, or any transaction contemplated by or referred to in, or any matter related to, any DIP Loan Document or any agreement, document or transaction contemplated thereby, whether or not such Indemnified Person is a party thereto, except to the extent that any of the foregoing arises out of the negligence or willful misconduct of such Indemnified Person. Lender agrees to give Borrower reasonable notice of any event of which Lender becomes aware for which indemnification may be required under this <u>Section 12.4</u>, and Lender may elect (but is not obligated) to direct the defense thereof, <u>provided that</u> the selection of counsel shall be subject to Borrower's consent, which consent shall not be unreasonably withheld or delayed. Any Indemnified Person may, in its reasonable discretion, take such actions as it deems necessary and appropriate to investigate, defend or settle any event or take other remedial or corrective actions with respect thereto as may be necessary for the protection of such Indemnified Person or the Collateral. Notwithstanding the foregoing, if any insurer agrees to undertake the defense of an event (an "Insured Event"), Lender agrees not to exercise its right to select counsel to defend the event if that would cause Borrower's insurer to deny coverage; <u>provided, however</u>, that Lender reserves the right to retain counsel to represent any Indemnified Person with respect to an Insured Event at its sole cost and expense. To the extent that Lender obtains recovery from a third party other than an Indemnified Person of any of the amounts that Borrower has paid to Lender pursuant to the indemnity set forth in this <u>Section 12.4</u>, then Lender shall promptly pay to Borrower the amount of such recovery.

### 12.5    Notice

Any notice or request under any DIP Loan Document shall be given to any party to this Agreement at such party's address set forth beneath its signature on the signature page to this Agreement, or at such other address as such party may hereafter specify in a notice given in the manner required under this <u>Section 12.5</u>. Nothing in this Agreement or in any other DIP Loan Document shall be construed to limit or affect the obligation of the Borrower or any other Person to serve upon the Lender in the manner prescribed by the Bankruptcy Code any pleading or notice required to be given to Lender pursuant to the Bankruptcy Code.

### 12.6    Severability; Captions; Counterparts; Facsimile Signatures

If any provision of any DIP Loan Document is adjudicated to be invalid under applicable laws or regulations, such provision shall be inapplicable to the extent of such invalidity without affecting the validity or enforceability of the remainder of the DIP Loan Documents which shall be given effect so far as possible. The captions in the DIP Loan Documents are intended for convenience and reference only and shall not affect the meaning or interpretation of the DIP

000051

Loan Documents. The DIP Loan Documents may be executed in one or more counterparts (which taken together, as applicable, shall constitute one and the same instrument) and by facsimile transmission or email transmission via .pdf format, which facsimile or .pdf signatures shall be considered original executed counterparts. Each party to this Agreement agrees that it will be bound by its own facsimile or .pdf signature and that it accepts the facsimile signature of each other party.

### 12.7    Expenses

Borrower shall pay whether or not the Closing occurs, all reasonable and actual costs and expenses incurred by Lender and/or its Affiliates, including, without limitation, documentation and diligence fees and expenses, all search, audit, appraisal, recording, professional and filing fees and expenses and all other out-of-pocket charges and expenses (including, without limitation, UCC and judgment and tax lien searches and UCC filings and fees for post-Closing UCC and judgment and tax lien searches and wire transfer fees and audit expenses), and reasonable and actual attorneys' fees and expenses, (i) in any effort to enforce, protect or collect payment of any Obligation or to enforce any DIP Loan Document or any related agreement, document or instrument in which Lender prevails, (ii) in connection with entering into, negotiating, preparing, reviewing and executing the DIP Loan Documents and/or any related agreements, documents or instruments, (iii) arising in any way out of administration of the Obligations, (iv) in connection with instituting, maintaining, preserving, enforcing and/or foreclosing on Lender's Liens in any of the Collateral or securities pledged under the DIP Loan Documents, whether through judicial proceedings or otherwise, in which Lender prevails, (v) in defending or prosecuting any actions, claims or proceedings arising out of or relating to Lender's transactions with Borrower, in which Lender prevails, (vi) in seeking, obtaining or receiving any advice with respect to its rights and obligations under any DIP Loan Document and any related agreement, document or instrument, and/or (vii) in connection with any modification, restatement, supplement, amendment, waiver or extension of any DIP Loan Document and/or any related agreement, document or instrument. All of the foregoing shall be charged to Borrower's account and shall be part of the Obligations. If Lender or any of its Affiliates uses in-house counsel for any purpose under any DIP Loan Document for which Borrower is responsible to payor indemnify, Borrower expressly agrees that its Obligations include the allocable reasonable costs of in-house counsel for the work performed. Without limiting the foregoing, Borrower shall pay all taxes (other than taxes based upon or measured by Lender's income or revenues or any personal property tax), if any, in connection with the issuance of any Note and the filing and/or recording of any documents and/or financing statements.

### 12.8    Entire Agreement

This Agreement, the Financing Orders and the other DIP Loan Documents to which Borrower is a party constitute the entire agreement between Borrower and Lender with respect to the subject matter hereof and thereof, and supersede all prior agreements and understandings, if any, relating to the subject matter hereof or thereof. Any promises, representations, warranties or guarantees not herein contained and hereinafter made shall have no force and effect unless in writing signed by Borrower and Lender. No provision of this Agreement may be changed, modified, amended, restated, waived, supplemented, discharged, canceled or terminated orally or by any course of dealing or in any other manner other than by an agreement in writing signed by

Lender and Borrower. Each party hereto acknowledges that it has been advised by counsel in connection with the negotiation and execution of this Agreement and is not relying upon oral representations or statements inconsistent with the terms and provisions hereof.

### 12.9    [INTENTIONALLY DELETED]

### 12.10    Confidentiality and Publicity

Borrower hereby agrees that Lender or any Affiliate of Lender may (i) disclose a genera1 description of transactions arising under the DIP Loan Documents for advertising, marketing or other similar purposes and (ii) use Borrower's name, logo or other indicia germane to such party in connection with such advertising, marketing or other similar purposes.

### 12.11    [INTENTIONALLY DELETED]

### 12.12    Acknowledgements

Borrower hereby acknowledges that:

(a)    it has been advised by counsel in the negotiation, execution and delivery of this Agreement, the other DIP Loan Documents, and the Financing Orders;

(b)    Lender has no fiduciary relationship to the Borrower, and the relationship between Borrower, and Lender is solely that of debtor and creditor; and

(c)    no joint venture exists between the Borrower and Lender.

### 12.13    Bankruptcy Court Orders Paramount

In the event of any direct conflict between the terms and conditions of this Agreement (and/or any DIP Loan Document) and the specific terms and conditions of the Financing Order, the terms and conditions of the Financing Orders shall prevail. Nothing set forth in this Agreement shall require the Borrower or any Guarantor to act or fail to act in a manner that would violate the Bankruptcy Code or any order of the Bankruptcy Court, without prejudice to Lender's ability to declare the occurrence of an Event of Default based upon such action or failure to act in the event of any inconsistency between this Agreement and any of the other DIP Loan Documents, the terms of this Agreement shall control.

## XIII.
## FORGIVENESS UPON ACQUISITION

In the event that during the term of this Loan the Lender, or an affiliate, successor or assignee of Lender acquires Borrower, or all or substantially all of the assets of Borrower, the Obligations hereunder shall be forgiven by Lender. However; in the event of such acquisition by a party other than Lender or an affiliate or an affiliate, successor or assignee of Lender, the Obligations hereunder are required to be paid in full at the time of and as part of such acquisition.

**IN WITNESS WHEREOF,** each of the parties has duly executed this Postpetition Revolving Credit and Security Agreement as of the date first written above.

**VICTOR VALLEY COMMUNITY HOSPITAL**

By:
Name:  Catherine M. Pelley
Its: Chief Executive Officer

Address for Notices:
Victor Valley Community Hospital
15248 Eleventh Street
Victorville, CA 92395
Attention: Catherine M. Pelley
Telephone: (760) 843-6201
Fax: (760) 843-6020

Prime Healthcare Services Foundation, Inc.

By:
Name:
Its:

Address for Notices:
Prime Healthcare Services Foundation, Inc.
3300 E. Guasti Road, Suite 300
Ontario, CA 91761
Attention: Michael J. Sarrao, Esq.
Telephone:  (909) 235-4307
Fax:  (909) 464-8887

## APPENDIX A

## FINANCIAL COVENANTS

### 1)    Compliance with Budget

(a)    Borrower shall not expend any funds or monies for any purpose other than those line items as set forth in the Budget, with respect to the amount, timing and recipient of such payments. Borrower's actual Cash Payments (as verified by bank account records) for any measurement period covered by the Budget for each line item and Total Expenses may not exceed the budgeted amount for that same line item or Total Expenses for such measurement period, provided, however, that (a) Borrower shall be permitted a variance of ten percent (10%), on a rolling three-week, non-cumulative basis, with respect to each expense line item and a variance of five percent (5%) Total Expenses, and (b) amounts not spent in any prior measurement period may be spent in any subsequent measurement periods.

### 2)    Financial Covenants

(a)    Use of Receipts.   All of Borrowers payment receipts shall be applied to those expenses set forth in the Budget.

(b)    No Overdrafts   Borrower at no time shall be in a book overdraft or bank overdraft position on any of its bank accounts unless it is diligently and promptly curing such position.

## APPENDIX B

## DEFINITIONS

"Advance" shall mean a borrowing under the Revolving Facility. Any amounts paid by Lender on behalf of Borrower under any DIP Loan Document shall be an Advance for purposes of the Agreement.

"Affiliate" shall mean, as to any Person, any other Person (a) that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person, (b) who is a director or officer (i) of such Person, (ii) of any Subsidiary of such Person. For purposes of this definition, the term "control" (and the correlative terms, "controlled by" and "under common control with") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies, whether through ownership of securities or other interests, by contract or otherwise.

"Applicable Rate" shall mean, with respect to any Obligation, the rate of interest applicable from time to time to such Obligation under this Agreement.

"Avoidance Claims" shall mean any claims or causes of action arising Bankruptcy Code sections 502(d), 544, 545, 547-549, 550, or 553 in the Bankruptcy Case.

"Avoidance Claims Proceeds" any monies recovered in connection with the successful prosecution or settlement of any Avoidance Claims.

"Bankruptcy Case" shall have the meaning given such term in the recitals hereof.

"Bankruptcy Code" shall have the meaning given such term in the recitals hereof.

"Bankruptcy Court" shall have the meaning given such term in the recitals hereof.

"Bankruptcy Rule" shall mean the Federal Rules of Bankruptcy Procedure.

"Borrower's Knowledge" shall mean matters known, or to be known after reasonable inquiry, of the Borrower's CEO, CFO, COO, or Chief Nursing Officer, whether such officer is serving in a permanent or interim capacity.

"Borrowing Certificate" shall mean a Borrowing Certificate substantially in the form of Exhibit A.

"Borrowing Date" shall have the meaning given such term in Section 2.4.

"Budget" shall mean the Budget attached hereto as Exhibit C to this Agreement, updated and amended from time to time subject to approval by Lender and compliance with the covenants set forth in Appendix A to this Agreement, and subject to the variances permitted with respect thereto in accordance with Appendix A.

"Business Day" shall mean any day other than a Saturday, Sunday or other day on which the Federal Reserve or Lender is closed.

"Capital Expenditures" shall mean, for any applicable period of measurement, the sum (without duplication) of all expenditures (whether paid in cash or accrued as liabilities) during such period of measurement that are or should be treated as capital expenditures under GAAP.

"Capital Lease" shall mean, as to any Person, a lease of any interest in any kind of property or asset by that Person as lessee that is, should be or should have been recorded as a "capital lease" in accordance with GAAP.

"Capitalized Lease Obligations" shall mean all obligations of any Person under Capital Leases, in each case, taken at the amount thereof accounted for as a liability in accordance with GAAP.

"Carve-Out Event" shall have the meaning ascribed to such term in the Financing Orders.

"Cash Payments" shall mean, for any Budget period, Borrower's aggregate cash disbursements for such period.

"Charter and Good Standing Documents" shall mean, for the Borrower (i) a copy of the certificate of incorporation or formation (or other charter document) certified as of a date satisfactory to Lender before the Closing Date by the applicable Governmental Authority of the jurisdiction of incorporation or organization of Borrower, (ii) a copy of the bylaws or similar organizational documents certified as of a date satisfactory to Lender before the Closing Date by the corporate secretary or assistant secretary of Borrower, (iii) an original certificate of good standing as of a date acceptable to Lender issued by the applicable Governmental Authority of the jurisdiction of incorporation or organization of Borrower and of every other jurisdiction in which Borrower has an office or conducts business or is otherwise required to be in good standing, and (iv) copies of the resolutions of the Board of Directors or managers (or other applicable governing body) and, if required, stockholders, members or other equity owners authorizing the execution, delivery and performance of the DIP Loan Documents to which Borrower is a party, certified by an authorized officer of such Person as of the Closing Date.

"Claim" shall have the meaning given such term in Section 101(5) of the Bankruptcy Code.

"Closing" shall mean the satisfaction, or written waiver by Lender, of all of the conditions precedent set forth in the Agreement required to be satisfied prior to the consummation of the transactions contemplated hereby.

"Closing Date" shall mean the date of this Agreement.

"CMS" shall mean the Centers for Medicare and Medicaid Services.

"Collateral" shall mean, collectively and each individually, all collateral and/or security granted and/or securities pledged to Lender by Borrower and any other Person pursuant to the

DIP Loan Documents including, without limitation, the items set forth or otherwise described in Section 2.10 of this Agreement.

"Compliance Certificate" shall mean a compliance certificate substantially in the form of Exhibit B.

"Computer Hardware and Software" shall mean, with respect to any Person, all of such Person's rights (including rights as licensee and lessee) with respect to (a) computer and other electronic data processing hardware, including all integrated computer systems, central processing units, memory units, display terminals, printers, computer elements~ card readers, tape drives, hard and soft disk drives, cables, electrical supply hardware, generators, power equalizers, accessories, peripheral devices and other related computer hardware; (b) all software and all software programs designed for use on the computers and electronic data processing hardware described in clause (a) above, including all operating system software, utilities and application programs in any form (source code and object code in magnetic tape, disk or hard copy format or any other listings whatsoever) and any other software; (c) any firmware associated with any of the foregoing; (d) any other software; and (e) any documentation for or related to hardware, software and firmware described in clauses (a), (b), (c) and (d) above, including flow charts, logic diagrams, manuals, specifications, training materials, charts and pseudo codes.

"Copyrights" shall mean, with respect to any Person, all of such Person's now existing or hereafter acquired right, title, and interest in and to: (i) copyrights, rights and interests in copyrights, works protectable by copyright, all applications, registrations and recordings relating to the foregoing as may at any time be filed in the United States Copyright Office or in any similar office or agency of the United States, any State thereof, any political subdivision thereof or in any other country, and all research and development relating to the foregoing; and (ii) all renewals of any of the foregoing.

"Cost Report" shall mean the annual financial report required by federal law (SSA 1886 et. seq.) of hospitals participating in the Medicare Program.

"Debtor Relief Law" shall mean, collectively, the Bankruptcy Code and all other applicable liquidation, conservatorship, bankruptcy, moratorium, rearrangement, receivership, insolvency; reorganization or similar debtor relief laws from time to time in effect affecting the rights of creditors generally, as amended from time to time.

"Default" shall mean any event, fact, circumstance or condition that, with the giving of a-applicable notice or passage of rime or both, would constitute or be or result in an Event of Default.

"Default Rate" shall have the meaning given such term in Section 3.5.

"DIP Loan Documents" shall mean, collectively and each individually, the Agreement, the Notes, the Security Documents, the Uniform Commercial Code Financing Statements, the Borrowing Certificates, the Financing Orders, and all other agreements, documents, instruments and certificates heretofore or hereafter executed or delivered to Lender in connection with any of

the foregoing or the Loans, as the same may be a-mended, modified or supplemented from time to time.

"<u>Distribution</u>" shall mean any fee, payment, bonus or other remuneration of any kind, and any repayment of or debt service on loans or other indebtedness.

"<u>Environmental Laws</u>" shall mean, collectively and each individually, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, the Superfund Amendment and Reauthorization Act of 1986, the Resource Conservation and Recovery Act, the Toxic Substances Control Act, the Clean Air Act, the Clean Water Act, any other "Superfund" or "Superlien" law and all other federal, state and local and foreign environmental, land use, zoning, health, chemical use, safely and sanitation laws, statutes, ordinances and codes relating to the protection of the environment and/or governing the use, storage, treatment, generation, transportation, processing, handling, production or disposal of Hazardous Substances, in each case, as amended, and the rules, regulations, policies, guidelines, interpretations, decisions, orders and directives of Governmental Authorities with respect thereto.

"<u>Equipment</u>"  shall mean all "equipment" (as defined in the UCC) of Borrower (or, if referring to another Person, of such other Person), now owned or hereafter acquired, and all documents of title or other documents representing any of the foregoing, and all collateral security and guaranties of any kind, now or hereafter in existence, given by any Person with respect to any of the foregoing.

"<u>ERISA</u>" shall mean the Employee Retirement Income Security Act of 1974, as amended, and the regulations thereunder.

"<u>Event of Default</u>"    shall mean the occurrence of any event set forth in <u>Article VIII</u>.

"<u>Excess Escrow Funds</u>"    shall have the meaning ascribed to such term in the Financing Orders.

"<u>Facility Cap</u>"    shall have the meaning given such term in the recitals hereof.

"<u>Fair Valuation</u>"    shall mean the determination of the value of the consolidated assets of a Person on the basis of the amount which may be realized by a willing seller within a reasonable time through collection or sale of such assets at market value on a going concern basis to an interested buyer who is willing to purchase under ordinary selling conditions in an arm's length transaction.

"<u>Final Financing Order</u>" shall mean an order that is entered by the Bankruptcy Court, inform and substance satisfactory to Lender, that (a) authorizes and directs Borrower to enter into and perform under the DIP Loan Documents, including the authorization to incur post-petition secured indebtedness, to grant to Lender the liens, security interests, priorities and other protections provided for under the DIP Loan Documents, and (b) affords to Lender adequate protection of the Liens in favor of Prepetition Lender.

"<u>Financing Orders</u>" shall mean collectively, the Interim Financing Order and the Final Financing Order.

"<u>GAAP</u>" shall mean generally accepted accounting principles in the United States of America in effect from time to time as applied by nationally recognized accounting firms.

"<u>Government Account</u>" shall be defined to mean all Accounts arising out of or with respect to any Government Contract.

"<u>Government Contract</u>" shall be defined to mean all contracts with a Governmental Authority, and all amendments thereto.

"<u>Governmental Authority</u>" shall mean any federal, state, municipal, national, local or other governmental department, court, commission, board, bureau, agency or instrumentality or political subdivision thereof, or any entity or officer exercising executive, legislative or judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case, whether of the united States or a state, territory or possession thereof, a foreign sovereign entity or country or Jurisdiction or the District of Columbia, specifically including fiscal intermediaries of the Medicare Program.

"<u>Hazardous Substances</u>" shall mean, without limitation, any flammable explosives, radon, radioactive materials, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, petroleum and petroleum products, methane, hazardous materials, hazardous wastes, hazardous or toxic substances or related materials as defined in or subject to any applicable Environmental Law.

"<u>Healthcare Laws</u>" shall mean all applicable statutes, laws, ordinances, rules and regulations of any Governmental Authority, federal and state, with respect to regulatory matters primarily relating to patient healthcare, healthcare providers and healthcare services (including without limitation Section 1128B(b) of the Social Security Act, as amended, 42 U.S.C. Section 1320a-7(b) (Criminal Penalties Involving Medicare or State Health Care Programs), commonly referred to as the "Federal Anti-Kickback Statute," and the Social Security Act, as amended, Section 1877, 42 U.S.C. Section 1395nn (Prohibition Against Certain Referrals), commonly referred to as the "Stark Statute," California Business and Professions Code Sections 650 et seq., 31 U.S.C. Section et seq. (the "False Claims Act") and HIPAA.

"<u>Indebtedness</u>" shall mean, without duplication, (a) all items which, in accordance with GAAP would be included in determining total liabilities as shown on the liability side of the balance sheet of Borrower as of the date as of which Indebtedness is to be determined, including any lease which, in accordance with GAAP would constitute Indebtedness, (b) all indebtedness secured by any mortgage, pledge, security, Lien or conditional sale or other title retention agreement to which any property or asset owned or held by Borrower is subject, whether or not the indebtedness secured thereby shall have been assumed, (c) all indebtedness of others which such Person has directly or indirectly guaranteed, endorsed (otherwise than for collection or deposit in the ordinary course of business), discounted or sold with recourse or agreed (contingently or otherwise) to purchase or repurchase or otherwise acquire, or in respect of which such Borrower has agreed to supply or advance funds (whether by way of loan, stock,

equity or other ownership interest purchase, capital contribution or otherwise) or otherwise to become directly or indirectly liable.

"<u>Indemnified Person</u>" shall have the meaning given such term in <u>Section 12.4</u>.

"<u>Initial Advance</u>" shall have the meaning given such term in <u>Section 4.1</u>.

"<u>Insured Event</u>" shall have the meaning given such term in <u>Section 12.4</u>.

"<u>Intellectual Property</u>" shall mean all present and future: trade secrets, know-how and other proprietary information; Trademarks, internet domain names, service marks, trade dress, trade names, business names, designs, logos, slogans (and all translations, adaptations, derivations and combinations of the foregoing) indicia and other source and/or business identifiers, and the goodwill of the business relating thereto' an "registrations or applications for registrations which have heretofore been or may hereafter be issued thereon throughout the world; Copyrights (including Copyrights for computer programs) and all tangible and intangible property embodying the Copyrights, unpatented inventions (whether or not patentable); Patents; industrial design applications and registered industrial designs; license agreements related to any of the foregoing and income therefrom; books, records, writings, computer tapes or disks, flow diagrams, specification sheets, computer software, source codes, object codes, executable code, data, databases and other physical manifestations, embodiments or incorporations of any of the foregoing; the right to sue for all past, present and future infringements of any of the foregoing; all other intellectual property; and all common law and other rights throughout the world in and to all of the foregoing.

"<u>Inventory</u>" shall mean all "inventory" (as defined in the UCC) of Borrower (or, if referring to another Person, of such other Person), now owned or hereafter acquired, and all documents of title or other documents representing any of the foregoing, and all collateral security and guaranties of any kind, now or hereafter in existence, given by any Person with respect to any of the foregoing.

"<u>Landlord Waiver and Consent</u>" shall mean a waiver/consent in form and substance satisfactory to Lender from the owner/lessor of any premises not owned by Borrower at which any of the Collateral is now or hereafter located for the purpose of providing Lender access to such Collateral, in each case as such may be modified, amended or supplemented from time to time.

"<u>Liability Event</u>" shall mean any event, fact, condition or circumstance or series thereof (a) in or for which Borrower becomes liable or otherwise responsible for any amount owed or" owing to any Medicare, Medi-Cal or CHAMPUS/TRICARE program by a provider under common ownership with such Borrower or any provider owned by Borrower pursuant to any applicable law, ordinance, rule, decree, order or regulation of any Governmental Authority after the failure of any such provider to pay any such amount when owed or owing, (b) in which Medicare, Medi-Cal or CHAMPUS/TRICARE payments to any Borrower are lawfully set-off against payments to Borrower to satisfy any liability of or for any amounts owed or owing to any Medicare, Medi-Cal or CHAMPUS/TRICARE program by a provider under common ownership with Borrower pursuant to any applicable law, ordinance, rule, decree, order or regulation of any

Governmental Authority, or (c) any of the foregoing under clauses (a) or (b) in each case pursuant to statutory or regulatory provisions that are similar to any applicable law, ordinance, rule, decree, order or regulation of any Governmental Authority referenced in clauses (a) and (b) above or successor provisions thereto.

"Lien" shall mean any mortgage, pledge, security interest, encumbrance, restriction, lien or charge of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement or any lease in the nature thereof), or any other arrangement pursuant to which title to the property is retained by or vested in some other Person for security purposes.

"Loan" or "Loans" shall mean, individually and collectively, all Advances under the Revolving Facility.

"Material Adverse Effect" or "Material Adverse Change" shall mean any event, condition or circumstance, or set of events, conditions or circumstances or any change(s) that (i) has had any material adverse effect upon or change in the validity or enforceability of any DIP Loan Document, (ii) has been material and adverse to the value of any of the Collateral, to the priority of the Lender's security interest in the Collateral, or to the business, operations, prospects, properties, assets, liabilities or condition of Borrower, or (iii) has materially impaired the ability of the Borrower to pay any portion of the Obligations or to otherwise perform the Obligations or to consummate the transactions under the DIP Loan Documents executed by such Person.

"Maturity Date" shall have the meaning set forth in Section 2.2.

"Note" or "Notes" hall mean all promissory notes issued pursuant to Section 2.13.

"Obligations" shall mean all present and future obligations, Indebtedness and liabilities of Borrower to Lender at any time and from time to time of every kind, nature and description, direct or indirect, secured or unsecured, joint and several, absolute or contingent, due or to become due, matured or unmatured, now existing or hereafter arising, contractual or tortuous, liquidated or unliquidated, whether under any of the DIP Loan Documents or otherwise relating to the Notes, Loans and/or any other obligations of Borrower, to Lender first arising after the Petition Date, including, without limitation, all obligations, liabilities and Indebtedness owing to Lender in respect of all applicable fees, charges and expenses and/or all amounts paid or advanced by Lender on behalf of or for the benefit of any Borrower for any reason at any time after the Petition Date, including in each case obligations of performance as well as obligations of payment and interest that accrue after the commencement of any proceeding under any Debtor Relief Law by or against any such Person (other than the Bankruptcy Case).

"Patents" shall mean, with respect to any Person, all of such Person's now existing or hereafter acquired right, title and interest in and to: (i) all patents, patent applications, inventions, invention disclosures and improvements, and all applications, registrations and recordings relating to the foregoing as may at any time be filed in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof, any political subdivision thereof or in any other country, and all research and development relating to the

foregoing; and (ii) the reissues, divisions, continuances, renewals, extensions and continuances-·in-part of any of the foregoing.

"<u>Payment Office</u>" shall mean initially the address set forth beneath Lender's name on the signature page of the Agreement, and thereafter, such other office of Lender, if any, which it may designate by notice to Borrower to be the Payment Office.

"<u>Permit</u>" shall mean collectively all licenses, leases, powers, permits, franchises, certificates, authorizations, approvals, certificates of need, provider numbers and other rights.

"<u>Permitted Discretion</u>" shall mean a determination or judgment made by Lender in good faith in the exercise of reasonable (from the perspective of a secured lender) business judgment.

"<u>Permitted Indebtedness</u>" shall have the meaning given such term in <u>Section 7.2</u>.

"<u>Permitted Liens</u>" shall have the meaning given such term in <u>Section 7.3</u>.

"<u>Permitted Subordinated Debt</u>" shall mean any Indebtedness subordinated to the Obligations, in form and substance satisfactory to Lender.

"<u>Person</u>" shall mean an individual, a partnership, a corporation, a limited liability company, a business trust, a Joint stock company, a trust, an unincorporated association, a joint venture, a Governmental Authority or any other entity of whatever nature.

"<u>Petition Date</u>" shall mean September 13, 2010, the date of the Borrower's filing of its voluntary petition for relief under chapter 11 of the Bankruptcy Code.

"<u>Professional Expense Escrow</u>" shall have the meaning ascribed to such term in the Financing Orders.

"<u>Professional Persons</u>" shall mean a Person who is an attorney, accountant, appraiser, auctioneer, or other professional person and who is retained, with Bankruptcy Court approval, by (i) Borrower, pursuant to Sections 327 and 328 of the Bankruptcy Code or (ii) the Committee pursuant to Section 1103 of the Bankruptcy Code.

"<u>Real Property</u>" shall mean all of Borrower's right, title and interest in and to its owned and leased premises and all buildings, fixtures and improvements situated thereon or related thereto.

"<u>Receipt</u>" shall have the meaning given such term in <u>Section 12.5</u>.

"<u>Register</u>" shall have the meaning given such term <u>Section 2.13</u>.

"<u>Related Documents</u>" shall mean all agreements, documents and instruments pertaining to Permitted Subordinated Debt.

"<u>Revolving Facility</u>" shall have the meaning given such term in the recitals hereof.

"Security Documents" shall mean the Notes, this Agreement, all Guaranties, Uniform Commercial Code Financing Statements and any other agreements, documents or instruments necessary to create or perfect the Liens in the Collateral or pursuant to which any Person grants to Lender collateral in any form as security for the Obligations, as such may be modified, amended or supplemented from time to time.

"Subordinated Debt" shall mean any Indebtedness, contingent equity, earn out or other obligations of Borrower that is unsecured and subordinated, by written contract in form and substance satisfactory to Lender, in right of repayment, Liens, security and remedies to all of the Obligations and to all of Lenders' rights, Liens and remedies.

"Subordination Agreement" shall mean, collectively and each individually, any subordination agreements to which Lender and other service providers or creditors of any Borrower are a party.

"Subsidiary" shall mean, (i) as to Borrower, any Person in which more than 50% of all equity, membership, partnership or other ownership interests is owned directly or indirectly by Borrower or one or more of its Subsidiaries, and (ii) as to any other Person, any Person in which more than 50% of all equity, membership, partnership or other ownership interests is owned directly or indirectly by such Person or by one or more of such Person's Subsidiaries.

"Superpriority Claim"        shall mean a claim against Borrower in the Bankruptcy Case which is an administrative expense claim having priority over any and all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code, including a claim pursuant to Section 364(c)(1) of the Bankruptcy Code.

"Termination Date"    shall have the meaning given such term in Section 11.1.

"Trademarks" shall mean, with respect to any Person, all of such Person's now existing or hereafter acquired right, title, and interest in and to: (i) trademarks, trade names, corporate names, company names, business names, fictitious business names, trade styles, service marks, logos, other business identifiers, prints and labels on which any of the foregoing have appeared or appear, ·all applications, registrations and recordings relating to the foregoing as may at any time be filed in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof, any political subdivision thereof or in any other country, and all research and development relating to the foregoing; (ii) all renewals thereof; and (iii) all designs and general intangibles of a like nature.

"Transaction" shall have the meaning given such term in Section 6.13.

"Transferee"    shall have the meaning given such term in Section 12.2.

"UCC" shall mean the Uniform Commercial Code as in effect in the State of California from time to time.

"US Dollars" and $ __ shall mean lawful money of the United States of America.

# APPENDIX C

## PERIODIC REPORTS

(i)     Copies of all bank statements, together with bank statement reconciliation reports, to be provided monthly.

(ii)    Weekly reports specifying: (a) actual cash receipts and Cash Payments with respect to the prior week's Budget, stating all variances from the prior week's Budget and providing a narrative discussion and analysis by management with respect to any and all negative variances, (b) cumulative Budget v. actual variances, from the Petition Date through end of the prior week, and (c) verification for all cash receipts, all to be provided by 5:00 p.m. (Pacific Time) on Wednesday of each week.

(iii)   Weekly, regardless of whether an Advance is being requested, by 5:00 p.m. (Pacific Time) on Wednesday of each week, a Borrowing Certificate, accompanied schedules and other supporting documents requested by Lender.

(iv)    Weekly accounts receivable aging reports, including sorts by payor, to be provided by 5:00 p.m. (Pacific Time) on Wednesday of each week.

(v)     Weekly patient statistics report, showing patient days, patient discharges, daily admissions, daily discharges, average length of stay (ALOS) –and patient census, broken out by category (acute, sub-acute and total), to be provided by 5:00 p.m. (Pacific Time) on Wednesday of each week.

(vi)    Such other reports, together with appropriate verification thereof as Lender may from time to time reasonably require.

# APPENDIX D

## SCHEDULES

**Schedule 2.4 – List of Bank Accounts Where Funds Will Be Deposited**

**Schedule 5.4 – List of all real properties (and their locations) owned or leased by or to, and all other assets or property that are leased or licensed by, Borrower and all leases (including leases of leased real property) covering or with respect to such properties and assets.  Schedule must include a list of all defaults under leases.**

**Schedule 5.5(iii) – List of all agreements, documents or instruments with respect to, or obligation to pay any, management or service fee with respect to, the ownership, operation, leasing or performance of its business.**

**Schedule 5.8 – List of any and all (i) oral or written communication from the Internal Revenue Service with respect to any investigation or assessment relating to Borrower directly, or relating to any consolidated tax return which was filed on behalf of such Person, (ii) year which remains open pending tax examination or audit by the IRS (other than as automatically set forth under applicable regulations), (iii) any information that could give rise to an IRS tax liability or assessment, and (iv) any matters currently contested with the IRS in good faith with adequate reserves under GAAP.**

**Schedule 5.11 – List of any and all patents, patent applications, trademarks, trademark applications, service marks, registered copyrights, copyright applications, copyrights, trade names, trade secrets, software, licenses or other Intellectual Property which the Borrower owns, licenses or utilizes.**

**Schedule 5.18 – List of all insurance policies.**

**Schedule 5.19 – List of any name (whether corporate, partnership or assumed) which the Borrower has used in the past five years.**

**Schedule 7.2 – List of all Postpetition liabilities**

**Schedule 7.3 – List of Prepetition liabilities**

# EXHIBIT A

000067

## Exhibit A

## BORROWING CERTIFICATE
Dated as of _____

VICTOR VALLEY COMMUNITY HOSPITAL, a California non profit public benefit corporation, the debtor in possession in bankruptcy case no. 6:10-39537-CB (the "**Borrower**"), by the undersigned duly Authorized Officer, hereby certifies to Lender in accordance with the Postpetition Revolving Credit and Security Agreement dated as of September 16, 2010 between Borrower and Lender (as amended, supplemented or modified from time to time, the "**DIP Loan Agreement;**" all capitalized terms not defined herein have the meanings given them in the Loan Agreement) and other DIP Loan Documents that:

A.    Borrowing Base and Compliance

(1)    Attached hereto is Schedule 1 an update showing actual receipts and expenditures and comparison to the amounts set forth in the Budget, together with a report showing all cash receipts of Borrower. All are true and accurate and determined in accordance with GAAP.

(2)    Borrower certifies to Lender that, as of the date hereof and the Borrowing Date (a) the DIP Loan Documents, other documents required pursuant thereto and security interests and Liens created thereby are in full force and effect, (b) each representation and warranty in the DIP Loan Documents is true and correct in all material respects as if made on and as of such date (except where such representation or warranty is otherwise expressly made as of a particular date, in which case it is or was true and correct on and as of such other date), (c) Borrower is in material compliance with all, and not in violation, breach or default of any, covenants, agreements and/or other provisions of or under any of the DIP Loan Documents which it is a party, and (d) no Default or Event of Default under any DIP Loan Document has occurred or is continuing or exists or, if applicable, will exist on such date or after giving effect to the Requested Advance (defined below).

B.    Borrowing Notice *(to be completed and effective only if Borrower is requesting an Advance)*

(1)    In accordance with Sections 2.4 and 4.3 of the DIP Loan Agreement, Borrower hereby irrevocably requests from Lender an Advance under the Revolving Facility pursuant to the DIP Loan Agreement in the aggregate principal amount of $_____ ("**Requested Advance**") to be made on _____ (the "**Borrowing Date**"), which day is a Business Day.

(2)    Immediately after giving effect to the Requested Advance, the aggregate outstanding principal amount of Advances will not exceed the lesser of (i) the Facility Cap, and (ii) the amount set forth for such period in the Budget.

(3)    Attached hereto are all consents, approvals and agreements from third parties necessary with respect to the requested Advance.

C.    <u>General Certifications</u>

Borrower further certifies to Lender that:  (a) the certifications, representations, calculations and statements herein will be true and correct as of the date hereof and on the Borrowing Date (if applicable); (b) all conditions and provisions of <u>Section 4.3</u> of the DIP Loan Agreement are as of the date hereof, and will be as of the Borrowing Date (if applicable), fully satisfied.

IN WITNESS WHEREOF, the undersigned has caused this certificate to be executed as of the day first written above.

                                        VICTOR VALLEY COMMUNITY HOSPITAL, a
                                        California non profit public benefit corporation
Prepared by:                            Approved by:

_____        _____
Name:                                   Name:
Title:                                  Title:

2

000069

# Exhibit B

000070

EXHIBIT B

COMPLIANCE CERTIFICATE

VICTOR VALLEY COMMUNITY HOSPITAL,

DATED: _____

VICTOR VALLEY COMMUNITY HOSPITAL, a California non profit public benefit corporation, the debtor in possession in bankruptcy case no. 6:10-39537-CB (the "**Borrower**"), by the undersigned duly Authorized Officer, hereby certifies to Lender in accordance with the Postpetition Revolving Credit and Security Agreement dated as of September 16, 2010 between Borrower and Lender (as amended, supplemented or modified from time to time, the **"DIP Loan Agreement;"** all capitalized terms not defined herein have the meanings given them in the Loan Agreement) and other DIP Loan Documents that Borrower is in full compliance with all terms, covenants, conditions and agreements contained therein and that all representations and warranties made in the DIP Loan Agreement remain true and accurate.

In connection with the foregoing and not in limitation thereof the undersigned hereby certifies that as of the date hereof:

1    Borrower is in compliance with the Financial Covenants set forth in the DIP Loan Agreement as Appendix A.

2    Except as set forth herein, Borrower's representations and warranties set forth in Article V of the DIP Loan Agreement are true and correct as of the date hereof.

3    Except as set forth herein, Borrower is in compliance with all of the affirmative covenants contained in Article VI of the DIP Loan Agreement.

4    Except as set forth herein, Borrower is in compliance with all of the negative covenants contained in Article VII of the DIP Loan Agreement.

5    Except as set forth herein, No Event of Default or event that with the passage of time or notice or both would constitute an Event of Default under the DIP Loan Agreement exists.

IN WITNESS WHEREOF, the undersigned has caused this certificate to be executed as of the day first written above.

VICTOR VALLEY COMMUNITY HOSPITAL, a California non profit public benefit corporation

Prepared by:                                          Approved by:

_____          _____
Name:                                                Name:
Title:                          Title:

000071

# EXHIBIT C

000072

# VICTOR VALLEY COMMUNITY HOSPITAL
## 16 WEEK CASH FLOW PROJECTION

| | Week 1 9/13/2010 | Week 2 9/20/2010 | Week 3 9/27/2010 | Week 4 10/4/2010 | Week 5 10/11/2010 | Week 6 10/18/2010 | Week 7 10/25/2010 | Week 8 11/1/2010 | Week 9 11/8/2010 | Week 10 11/15/2010 | Week 11 11/22/2010 | Week 12 11/29/2010 | Week 13 12/6/2010 | Week 14 12/13/2010 | Week 15 12/20/2010 | Wk 16 12/27/2010 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **CASH RECEIPTS** | | | | | | | | | | | | | | | | |
| Medicare | 178,942 | 162,000 | 175,000 | 125,000 | 105,000 | 175,000 | 145,000 | 146,000 | 107,000 | 175,000 | 155,000 | 135,000 | 145,000 | 175,000 | 170,000 | 180,000 |
| Medi-Cal | 162,000 | 189,000 | 155,000 | 165,000 | 175,000 | 150,000 | 164,874 | 173,891 | 202,000 | 175,000 | 155,000 | 173,891 | 163,952 | 164,874 | 173,891 | 173,891 |
| HP | 189,000 | 225,000 | 155,000 | 165,000 | 178,000 | 175,000 | 155,000 | 165,000 | 175,000 | 155,000 | 155,000 | 155,000 | 165,000 | 165,000 | 165,000 | 178,000 |
| Insurances | 225,000 | 243,000 | 467,000 | 450,000 | 487,000 | 510,000 | 498,000 | 410,000 | 410,000 | 487,000 | 510,000 | 510,000 | 498,000 | 510,000 | 498,000 | 495,000 |
| Miscellaneous | 128,154 | | | | | | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 |
| Other Proceeds | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 |
| **TOTAL CASH RECEIPTS** | 770,797 | 822,500 | 973,500 | 785,444 | 867,391 | 1,023,500 | 973,500 | 853,444 | 869,391 | 1,023,500 | 973,500 | 928,500 | 853,444 | 1,013,500 | 923,444 | 1,027,391 |
| SALARIES AND WAGES | 1,012,737 | — | 1,040,848 | — | 1,040,848 | — | 1,023,046 | — | 1,050,008 | — | 1,020,642 | — | 1,023,642 | — | 1,023,444 | — |
| EMPLOYEE BENEFITS | 31,500 | 8,500 | 374,500 | 8,900 | 31,500 | 8,900 | 387,080 | 8,900 | 35,000 | 8,900 | 32,150 | 340,500 | 32,640 | 8,900 | 35,000 | 8,900 |
| PROFESSIONAL FEES - MEDICAL | 89,414 | 69,000 | 374,500 | 125,000 | 89,714 | | 387,080 | 35,000 | 74,300 | 82,000 | 32,150 | 340,500 | 32,640 | 79,815 | 35,000 | 370,000 |
| PROFESSIONAL FEES - NON-MEDICAL | | 6,500 | 6,000 | 6,500 | 31,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 |
| PROFESSIONAL FEES (non-BK fees) | 17,600 | 16,680 | 14,850 | 16,899 | 17,586 | 15,654 | 14,897 | 15,635 | 17,986 | 15,655 | 17,587 | 13,997 | 13,952 | 14,887 | 15,635 | 17,986 |
| PROFESSIONAL FEES (BK fees) | 152,563 | 155,625 | 153,542 | 159,659 | 154,723 | 143,921 | 164,874 | 152,924 | 153,985 | 149,696 | 133,952 | 163,952 | 163,952 | 164,874 | 153,974 | 167,924 |
| PURCHASED SERVICES (NON MEDICAL) | 11,250 | 10,986 | 12,658 | 10,525 | 10,525 | 12,589 | 12,589 | 10,996 | 10,223 | 10,358 | 13,638 | 13,638 | 11,365 | 12,589 | 10,223 | 9,879 |
| PURCHASED SERVICES (MEDICAL) | 6,238 | 7,065 | 8,054 | 8,556 | 6,589 | 7,446 | 6,478 | 9,879 | 5,698 | 6,529 | 4,559 | 6,581 | 7,869 | 6,478 | 5,698 | 7,452 |
| MEDICAL SUPPLIES | 2,500 | 1,280 | 560 | 800 | 986 | 986 | 854 | 3,689 | 1,899 | 3,689 | 1,864 | 549 | 663 | 854 | 1,899 | 2,489 |
| SURGERY & LINEN | 28,658 | 23,548 | 25,684 | 21,998 | 27,889 | 28,096 | 24,789 | 21,599 | 21,599 | 24,550 | 23,223 | 21,445 | 28,114 | 24,789 | 21,599 | 20,554 |
| OTHER SUPPLIES | 10,543 | 9,995 | 36,978 | 10,643 | 7,989 | 9,889 | 34,625 | 10,996 | 20,554 | 8,554 | 35,446 | 35,446 | 8,447 | 854 | 20,554 | 38,925 |
| MINOR EQUIPMENT | 37,895 | 35,897 | 33,697 | 39,654 | 36,899 | 34,878 | 35,664 | 33,447 | 24,527 | 38,990 | 35,488 | 36,221 | 37,995 | 35,664 | 33,447 | 34,527 |
| INVENTORY | | 800 | 6,097 | 2,589 | 1,006 | 1,895 | 5,654 | 3,324 | 5,000 | 2,354 | 69,000 | 69,000 | 1,327 | 5,654 | 5,000 | 69,000 |
| REPAIRS & MAINTENANCE | 27,009 | 34,892 | 31,897 | 32,665 | 36,554 | 30,882 | 28,996 | 28,887 | 31,555 | 30,662 | 24,451 | 29,664 | 29,664 | 28,996 | 29,887 | 28,198 |
| EQUIPMENT LEASES | 92,286 | 52,000 | 20,425 | | 82,600 | 7,500 | | 25,195 | | | | | 23,332 | | | |
| UTILITIES & TELEPHONE | 2,000 | | 37,000 | | | | | 387,080 | 74,300 | 14,300 | | 387,054 | 65,800 | 14,500 | | 387,054 |
| INTEREST | 2,471 | 1,050 | 2,875 | 1,235 | 1,560 | 989 | 1,003 | 387,080 | 1,430 | 1,132 | 1,125 | 896 | 987 | 1,600 | 459 | 1,165 |
| LICENSES & TAXES | 10,584 | 14,253 | 19,943 | 15,542 | 10,598 | 15,848 | 9,965 | 19,665 | 15,532 | 9,654 | 10,642 | 20,553 | 10,645 | 9,865 | 19,665 | 15,532 |
| RENT/LEASE EXPENSE | 1,245 | 2,343 | 1,243 | 2,145 | 1,546 | 2,214 | 2,658 | 2,648 | 1,168 | 1,168 | 2,986 | 2,156 | 1,589 | 2,668 | 2,648 | 1,145 |
| DUES & SUBSCRIPTIONS | 200 | 324 | 150 | 125 | 162 | 162 | 132 | 206 | 362 | 325 | 109 | 224 | 295 | 132 | 206 | 362 |
| MISC | | | | | | | | | | | | | | | | |
| TRAVEL & TRAINING | | | | | | | | | | | | | | | | |
| SETTLEMENTS | | | | | | | | | | | | | | | | |
| OTHER OPERATING EXPENSES | 20,546 | 28,542 | 25,464 | 24,359 | 23,654 | 24,565 | 24,849 | 24,656 | 21,003 | 21,785 | 23,685 | 24,855 | 22,113 | 26,849 | 24,659 | 21,003 |
| **TOTAL CASH OUTFLOWS** | 1,618,303 | 488,830 | 2,303,920 | 422,525 | 1,675,599 | 421,590 | 1,841,973 | 865,953 | 1,528,170 | 525,437 | 1,452,469 | 1,155,174 | 1,558,136 | 916,895 | 1,552,951 | 1,261,150 |
| **NET CASH FLOW CHANGE** | (847,506) | 333,670 | (1,330,420) | 362,919 | (808,208) | 601,910 | (868,473) | (12,509) | (658,779) | 498,063 | (478,969) | (226,674) | (704,692) | 96,605 | (629,507) | (233,759) |
| **CUMULATIVE CASH FLOW CHANGE** | (847,506) | (513,836) | (1,844,256) | (1,481,337) | (2,289,545) | (1,687,635) | (2,556,108) | (2,568,617) | (3,227,396) | (2,729,333) | (3,208,302) | (3,434,976) | (4,139,668) | (4,043,063) | (4,672,570) | (4,906,329) |

000073