1  Samuel R. Maizel (CA Bar No. 189301)
   Scotta E. McFarland (CA Bar No. 165391)
2  Mary D. Lane (CA Bar No. 071592)
   PACHULSKI STANG ZIEHL & JONES LLP
3  10100 Santa Monica Blvd., 11th Floor
   Los Angeles, California  90067-4100
4  Telephone: 310/277-6910
   Facsimile:  310/201-0760
5  E-mail:      smaizel@pszjlaw.com
6               smcfarland@pszjlaw.com
                mlane@pszjlaw.com
7  [Proposed] Attorneys for Victor Valley Community
   Hospital, Debtor and Debtor in Possession
8

9               **UNITED STATES BANKRUPTCY COURT**

10              **CENTRAL DISTRICT OF CALIFORNIA**

11                   **RIVERSIDE DIVISION**

12  In re:                          Case No.: 6:10-39537 CB

13  VICTOR VALLEY COMMUNITY         Chapter 11
    HOSPITAL,
14                                  **NOTICE OF AUCTION AND SALE HEARING**
                        Debtor.     **IN CONNECTION WITH SALE OF VICTOR**
15                                  **VALLEY COMMUNITY HOSPITAL**

16                                  <u>**Offer Deadline**</u>**: October 29, 2010 at 5:00 p.m**.
17                                           Samuel R. Maizel, Esq.
                                             Pachulski Stang Ziehl & Jones
18                                           LLP at (310)
                                             (310) 277-6910
19                                           Email: smaizel@pszjlaw.com

20                                  <u>**Auction:**</u>       **November 5, 2010 at 10:00 a.m.**
                                             Hilton Garden Inn
21                                           12603 Mariposa Road
                                             Victorville, Ca  92395

22                                  <u>**Sale Approval Hearing:**</u>
                                    Date:        November 9, 2010
23                                  Time:        2:00 p.m.
                                    Place:       United States Bankruptcy Court
24                                               3420 Twelfth Street
                                                 Riverside, CA 92501-3819
25                                  Judge:       Honorable Catherine E. Bauer

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**PLEASE TAKE NOTICE** that on September 14, 2010, Debtor and Debtor in Possession Victor Valley Community Hospital (the "Debtor") filed its *Notice of Motion and Motion for the Entry of an Order (a) Approving Sale Procedures in Connection with Sale of Victor Valley Community Hospital; (b) Scheduling an Auction for the Sale and a Hearing to Approve the Sale; (c) Authorizing the Sale Free and Clear of Liens, Claims, Encumbrances and Interests; and (d) Granting Related Relief* ("the Motion").

**PLEASE TAKE FURTHER NOTICE** that on October 7, 2010, the United States Bankruptcy Court for the Central District of California, Riverside Division (the "Bankruptcy Court") entered its order (the "Sale Procedures Order"), which approved the sale procedures and scheduled an auction for November 5, 2010 and a sale approval hearing for November 9, 2010. A true and correct copy of the Sale Procedures Order is attached hereto as Exhibit "1" and a true and correct copy of the Asset Sales Agreement as of September 2010 is attached hereto as Exhibit "2." All capitalized terms not defined herein shall have the meaning ascribed to them in the Sale Procedures Order or the Motion, as applicable.

**PLEASE TAKE FURTHER NOTICE** that, as set forth in the Sale Procedures Order, the offer of Prime Healthcare Services Foundation, Inc. ("Prime") has been approved as the Stalking Horse Bid for the purchase of the Hospital commonly known as Victor Valley Community Hospital. In order to solicit the highest and best offer for the Hospital, the Debtor will conduct an Auction pursuant to the Sale Procedures Order. In order to participate in the Auction, a Prospective Purchaser must timely submit a Qualified Bid, as set forth in the Sale Procedures approved by the Sale Procedures Order.

**PLEASE TAKE FURTHER NOTICE that if you want to consider submitting a bid or learn more about the assets being sold or the procedures for bidding on those assets, you may contact Charles Slyngstad at Burke, Williams & Sorenson at (213) 236 2709 or by email at cslyngstad@bwslaw.com or Samuel R. Maizel at Pachulski Stang Ziehl & Jones LLP, Samuel R. Maizel, at (310) 277-6910 or by email at smaizel@pszjlaw.com.**

**PLEASE TAKE FURTHER NOTICE** that, if a Qualified Bid other than the Stalking Horse Bid is timely received by the Debtor on or before 5:00 p.m. (Pacific Time) on October 29, 2010, the Debtor or its designee will conduct an Auction of the Hospital at 10:00 a.m. (Pacific Time) on November 5, 2010, at the Hilton Garden Inn, 12603 Mariposa Road, Victorville, CA 92395. Only parties that have timely submitted Qualified Bids (as defined in the Sale Procedures Order) will be permitted to participate in the Auction.

**PLEASE TAKE FURTHER NOTICE** that a hearing will be held to confirm the results of the Auction and approve the sale of the Hospital to the Proposed Purchaser or other Successful Bidder at the Auction (the "Sale Hearing") before the Honorable Catherine E. Bauer, United States Bankruptcy Judge, on November 9, 2010 at 2:00 p.m. (Pacific Time), at the Unites States Bankruptcy Court, 3420 Twelfth Street, Riverside, CA 92501-3819, or at such time thereafter as counsel may be heard. The sale of the Hospital is subject to, among other things, the entry of an order of the Bankruptcy Court approving same. The Sale Hearing may be adjourned from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open court or on the Court's calendar on the date scheduled for the Sale Hearing or any adjourned date.

**PLEASE TAKE FURTHER NOTICE** that objections to the relief requested by the Motion must (i) be set forth in writing, (ii) specify with particularity the grounds for such objections or other statements of position, (iii) be filed with the Court on or before November 8, 2010, and (iv) be served so as to be received by 5:00 PM on November 8, 2010 by (1) counsel to the Debtor, Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Blvd., 11th Floor, Los Angeles, California 90067, Attn: Samuel R. Maizel; and (2) the Office of the United States Trustee.

1

**PLEASE TAKE FURTHER NOTICE** that the failure of any person or entity to timely file an objection to the Motion may be deemed a consent to the sale of the Hospital to the Proposed Purchaser or other Successful Bidder at the Auction, and be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Motion, the Auction, the Sale and the consummation and performance thereof, if authorized by the Court.

**PLEASE TAKE FURTHER NOTICE** that this Notice is subject to the full terms and conditions of the Motion, the Sale Procedures Order and the Sale Procedures which shall control in the event of any conflict, and the Debtor strongly encourages parties in interest to review such documents in their entirety, which are available upon written request to undersigned counsel.

PACHULSKI STANG ZIEHL & JONES LLP

Dated:    October 11, 2010

By    /s/ *Samuel R. Maizel*

Samuel R. Maizel (CA Bar No. 189301)
[Proposed ] Attorneys for Victor Valley
Community Hospital, Debtor and Debtor in
Possession

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# Exhibit 1

90231-001\DOCS_LA:224973.4

Samuel R. Maizel (CA Bar No. 189301)
Scotta E. McFarland (CA Bar No. 165391)
Mary D. Lane (CA Bar No. 071592)
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 11th Floor
Los Angeles, California 90067-4100
Telephone: 310/277-6910
Facsimile: 310/201-0760
E-mail: smaizel@pszjlaw.com
        smcfarland@pszjlaw.com
        mlane@pszjlaw.com

[Proposed] Attorneys for Victor Valley Community
Hospital, Debtor and Debtor in Possession

FILED & ENTERED

OCT 07 2010

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY harris      DEPUTY CLERK

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**RIVERSIDE DIVISION**

| | |
|---|---|
| In re:<br><br>VICTOR VALLEY COMMUNITY HOSPITAL,<br><br><br>Debtor. | Case No. 6:10-39537 CB<br>Chapter 11<br><br>**ORDER (A) APPROVING SALE PROCEDURES IN CONNECTION WITH SALE OF VICTOR VALLEY COMMUNITY HOSPITAL;**<br>**(B) SCHEDULING AN AUCTION FOR THE SALE AND A HEARING TO APPROVE THE SALE;**<br>**(C) AUTHORIZING THE SALE FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; AND (D) GRANTING RELATED RELIEF**<br><br>**[Relates to Docket No. 22]**<br><br>Hearing<br>Date:   September 22, 2010<br>Time:  11:00 a.m.<br>Place:  Courtroom 303<br>         3420 Twelfth Street<br>         Riverside CA, 92501<br>Judge: Honorable Catherine E. Bauer |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**THIS MATTER CAME BEFORE THE COURT** at the above-captioned date and time before the Honorable Catherine E. Bauer, United States Bankruptcy Judge, to consider the approval of the Debtor's *Motion for the Entry of an Order (A) Approving Sale Procedures in Connection with Sale of Victor Valley Community Hospital; (B) Scheduling an Auction for the Sale and a Hearing to Approve the Sale; (C) Authorizing the Sale Free and Clear of Liens, Claims, Encumbrances and Interests; and (D) Granting Related Relief* ("the Sale Motion") [Docket No. 22].  Appearances were made as noted on the record.  All Capitalized Terms not otherwise defined herein or otherwise modified herein shall have the same meaning as those ascribed in the Sale Motion.

The Court having considered the Sale Motion and the Declaration of Edward T. Matthews in support thereof, and finding that notice of the Sale Motion was appropriate and sufficient and that no other notice need be given, and after due deliberation and sufficient cause appearing therefor

**THE COURT HEREBY FINDS AS FOLLOWS:**

A.	This Court has jurisdiction to hear and determine the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334.

B.	Proper, timely, adequate and sufficient notice of the Sale Motion has been provided to all parties entitled thereto in accordance with section 363(b) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 9007, and 9014, the local rules of this Court, and the procedural due process requirements of the United States Constitution with respect to the relief granted herein.  No other or further notice of the relief granted herein is or was necessary.

C.	A notice in substantially the form of the *Notice of Auction and Sale Hearing in Connection with the Sale of Victor Valley Community Hospital* attached to the Sale Motion as Exhibit B (the "Notice"), conformed to be consistent with this Order, served by the Debtor within two business days after entry of this Order, provides due, adequate and timely notice of the sale of the Hospital to the recipients thereof in accordance with Bankruptcy Rule 2002 and the applicable provisions of the Bankruptcy Code.

D.	A reasonable opportunity to object or to be heard regarding the relief granted herein has been afforded to all interested persons and entities.

E.	The proposed Sale Procedures described in the Sale Motion carefully balance the

PACHULSKI  STANG  ZIEHL  & JONES  LLP
ATTORNEYS   AT LAW
LOS ANGELES , CALIFORNIA

Debtor's interests in (i) inducing a buyer to commit to purchase the Hospital, (ii) preserving the opportunity to attract higher and better offers, and (iii) expediting the sale process.

F.     Based on the record presented to the Court at the above-captioned hearing, including the Declaration of Edward T. Matthews, the Sale Procedures (including the Minimum Bid Requirement, the Break-Up Fee and the Overbid Provisions) are fair and reasonable (as set forth in this Order), reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and are intended to maximize the value to the Debtor's estate.

G.     This Court concludes that entry of this Order is in the best interests of the Debtor's estate and its creditors as it will, among other things, retain for the benefit of its estate the prospect of a successful sale while enabling the Debtor to solicit alternate offers in accordance herewith.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED AS FOLLOWS**

1.     The Sale Procedures set forth herein are approved and the Debtor may proceed to conduct an Auction under the following procedures; provided that all objections to the proposed sale are preserved:

a.     Only parties that have timely submitted a Qualified Bid will be permitted to participate in and/or make any statements on the record at the Auction.  All Qualified Bidders must appear in person at the Auction, or through a duly authorized representative.  If multiple Qualifying Bids satisfying all Auction requirements are received, each party shall have the right to continue to improve its bid at the Auction.  The Auction will be an 'open format' such that all participants are contemporaneously to be made aware of the particulars of any Qualified Bids that are submitted.

b.     The Debtor may conduct the Auction in all respects in the manner it determines will result in the highest, best or otherwise financially superior offer(s) for the Assets provided that such manner is not inconsistent with the provisions hereof or the Bankruptcy Code.  At the conclusion of the Auction, and subject to Court approval following the Auction, the successful bid shall be selected by the Debtor (the "Successful Bid").

c.     The Debtor may enter into an Asset Sale Agreement with a back-up prospective buyer (a "Back-up Buyer") at the conclusion of the Auction, which would take effect if

PACHULSKI  STANG  ZIEHL  & JONES  LLP
ATTORNEYS  AT LAW
LOS ANGELES , CALIFORNIA

the transaction with the Successful Bidder is not consummated, but the obligation of the Back-up Buyer to purchase the Assets shall remain only (i) until entry of the Court's order confirming the Sale and (ii) not to exceed 21 days from the date of the Auction (a "Back-up Transaction").  The Auction terms will require the bidder making the second highest Qualified Bid to sign an Asset Sale Agreement and serve as a Back-up Buyer.

          d.      Within two business days (subject to reasonable extension) of the adjournment of the Auction, the entity that made the highest and best bid (the "Successful Bidder") shall complete and sign all agreements, contracts, instruments or other documents evidencing and containing the terms and conditions upon which such bid was made.

2.      Prime Healthcare Services Foundation, Inc. ("Prime") is hereby approved as the stalking horse bidder.

3.      The Break Up Fee in the amount of $650,000 is hereby approved.  It shall be paid only if (a) a final order is entered approving a sale to a bidder other than Prime or (b) the Debtor decides not to sell the Hospital.

4.      The initial overbid of $30,650,000 (including the Break Up Fee) and the subsequent minimum overbid increment of $250,000 (which shall be applicable to Prime and all other bidders) are hereby approved.

5.      The form of notice of the Auction and the Sale Hearing substantially in the form attached to the Sale Motion as Exhibit B, as conformed to the terms of this Order, is hereby approved.

6.      The Debtor shall file and serve the ASA and the Notice within one business day after this Order is entered..  The Debtor shall file the complete ASA executed by Prime (including all Schedules and Exhibits thereto) no later than October 15, 2010 and serve the same on the United States Trustee, any committee appointed in this case, and all Potential Purchasers that have expressed, by way of an email to Debtor's counsel identified in paragraph 8 below, an interest in bidding on the Assets.

7.      All Potential Purchasers shall execute a Confidentiality Agreement in form and substance satisfactory to the Debtor and each such Potential Purchaser prior to receiving confidential

PACHULSKI  STANG  ZIEHL  &  JONES  LLP
ATTORNEYS  AT  LAW
LOS  ANGELES ,  CALIFORNIA

due diligence materials from the Debtor.  The Debtor will provide Potential Purchasers with reasonable access to the Debtor's books, records, independent accountants and legal counsel for the purpose of conducting due diligence.  Potential Purchasers seeking to overbid Prime's bid shall have until October 26, 2010 to complete their due diligence.

8.    Potential Purchasers shall submit Offers to the Debtor by delivering the Offer to Samuel R. Maizel at the law offices of Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Blvd, 11th Floor, Los Angeles no later than 5 PM on October 29, 2010.  Each offer must be in writing and satisfy the following conditions:

(a)    Terms of Offer

An Offer must include clean and blacklined versions of the ASA reflecting any proposed changes thereto (including any changes to the Purchase Price) (the "Bidder Purchase Agreement").  The clean version of the Bidder Purchase Agreement must be signed by a duly authorized officer of the Potential Purchaser.  An Offer must be for at least $30,650,000.00, consisting of the aggregate amount of the $25 million Purchase Price, the $4.5 million of Debtor-in-Possession Financing being provided to the Debtor by Prime that Prime is prepared to forgive, the initial Overbid of $500,000 and the $650,000 Break-Up Fee.

(b)    Offers Irrevocable

Except with respect to an Offer submitted by the Successful Bidder  which must remain open, binding and irrevocable on such Successful Bidder until the closing of the sale of the Property, or by a Back-up Buyer, which must remain open, binding and irrevocable on such Back-up Buyer in accordance with the terms of paragraph 1.c hereof, an Offer must remain open, binding and irrevocable on the Potential Purchaser until the Court's order approving the sale of the Property (the "Sale Order") is entered.

(c)    Good Faith Deposit

An Offer shall also be accompanied by a deposit paid to the Debtor in an amount equal to $5,000,000 (the "Good Faith Deposit) payable in U.S. dollars to the Debtor.  The Good Faith Deposit shall be irrevocable.  Each Good Faith Deposit shall be provided to and held by counsel to the Debtor  in an interest-bearing account until the third day after the Sale Order is entered, after

which time the Good Faith Deposits of the bidders that were not selected as the Successful Bidder or the back-up bidder, if any, shall be returned.

(d)    Contingencies

An Offer may not be conditioned on obtaining financing or any internal approval or be subject to contingencies other than those in the ASA.

(e)    Financing Sources

In addition, an Offer must contain information, acceptable to the Debtor, which demonstrates to the Debtor in its sole and absolute discretion that the Potential Purchaser has sufficient cash on hand or a binding financial commitment from an established and financially sound financial institution to ensure such Potential Purchaser's ability to meet its commitments and otherwise fully perform pursuant to its Offer and to close the transaction within the time frame established.

(f)    Identity of Bidder and Legal Power

An Offer must disclose the identity of the Potential Purchaser, including confirmation that its bid is made as principal for the Potential Purchaser's account and, if not, the basis upon which the Potential Purchaser is acting and the identities of all other participants (if any).  It must also disclose any agreements or understandings between the Potential Purchaser and any third party with respect to the Property.  The Offer must also be accompanied by sufficient indicia that the person submitting the Offer is legally empowered, by power of attorney or otherwise, to (i) bid on behalf of the Potential Purchaser, and (ii) complete and sign, on behalf of the Potential Purchaser, a binding and enforceable Bidder Purchase Agreement.

(g)    No Fees

An Offer may not request or entitle the Potential Purchaser to any fee, including, but not limited to, a break-up fee, termination fee, expense reimbursement or similar type of payment.  Moreover, by submitting an Offer, a Potential Purchaser shall be deemed to waive the right to pursue a substantial contribution claim under section 503 of the Bankruptcy Code related in any way to this sale of the Hospital.

(h)    Due Diligence Acknowledgment; Release

The Offer must contain an acknowledgement and representation that the Potential Purchaser

PACHULSKI  STANG  ZIEHL  & JONES  LLP
ATTORNEYS  AT  LAW
LOS  ANGELES  , CALIFORNIA

(i) had an opportunity to conduct any and all due diligence regarding the Property prior to making the Offer, (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Property in making its Offer, (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bidder Purchase Agreement; and (iv) agrees, as part of the documents to be executed at Closing, to release, indemnify and hold harmless the Debtor, and agents and professionals of the Debtor in connection with all matters arising in connection with the sale of the Hospital.

(i)     Compliance with Sale Procedures and other Orders of the Court

Each Offer must include a written statement that (i) the Potential Purchaser agrees to comply with the Sale Procedures and such other terms and procedures as may be imposed by the Bankruptcy Court or the Debtor, in its sole and absolute discretion, at or prior to the Auction; (ii) the Potential Purchaser believes in good faith that its Offer satisfies the requirement for a Qualified Bid set forth in the Motion (as modified by this Order), (iii) the Potential Purchaser's Good Faith Deposit will be treated in accordance with the provisions set forth herein or otherwise approved by order of the Court; and (iv) the Potential Purchaser consents to the core jurisdiction of the Bankruptcy Court and waives any right to a jury trial in connection with any disputes relating to (r) any order approving the Motion, (s) the purchase of the Hospital, (t) Auction, (u) Sale Procedures, (v) Sale, (w) Break-Up Fee, (x) Overbid Increment, (y) Sale Hearing, or (z) the construction and enforcement of the any agreement or any other matter relating to any of the foregoing.

9.     The Debtor shall notify each of the Potential Purchasers that has submitted an Offer if it is a Qualified Bidder by no later than November 2, 2010.

10.     An Auction for the sale of the Hospital shall be held on November 5, 2010 at 10:00 AM at a place to be subsequently designated.  Members of the public may attend the Auction, it being understood that such members cannot impede the progress of the Auction.  A court reporter will transcribe the Auction and a copy of the transcript will be filed with the Court as soon as is reasonably possible.

11.     The hearing to consider the approval of the sale of the Hospital shall be held on November 9, 2010 at 2 PM in Courtroom 303, 3420 Twelfth Street, Riverside CA. 92501.

12.     In regards to the hearing to consider the approval of the sale:

a.     The Debtor shall file and serve its report on the results of the Auction by no later than noon on November 8, 2010.

b.     Objections, if any, to the Sale shall be filed and served no later than 5 PM on November 8, 2010.

c.     Replies to objections shall be filed no later than noon on November 9, 2010.

13.     The Sale of the Hospital shall be subject to the entry of the Sale Order by the Bankruptcy Court approving the transaction and contingent upon approval of the Attorney General.

14.     The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

###

DATED: October 7, 2010

_____
United States Bankruptcy Judge

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

10. An Auction for the sale of the Hospital shall be held on November 5, 2010 at 10:00 AM at the Marriott Hotel, 3400 Market Street, Riverside, California 92501 or some other suitable facility in Riverside, California. A reasonable number of members of the public may attend the Auction, it being understood that such members cannot impede the progress of the Auction. A court reporter will transcribe the Auction and a copy of the transcript will be filed with the Court as soon as is reasonably possible.

11. The hearing to consider the approval of the sale of the Hospital shall be held on November 9, 2010 at 2 PM in Courtroom 303, 3420 Twelfth Street, Riverside CA. 92501.

12. In regards to the hearing to consider the approval of the sale:

a. The Debtor shall file and serve its report on the results of the Auction by no later than noon on November 8, 2010.

b. Objections, if any, to the Sale shall be filed and served no later than 5 PM on November 8, 2010.

c. Replies to objections shall be filed no later than noon on November 9, 2010.

13. The Sale of the Hospital shall be subject to the entry of the Sale Order by the Bankruptcy Court approving the transaction and contingent upon approval of the Attorney General.

14. The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Approved as to form:

_____
Mark Bradshaw
Shulman Hodges & Bastian
Attorneys for Prime Healthcare Services Foundation, Inc.

_____
Thomas E. Patterson
Martin R. Barash
Klee, Tuchin, Bogdanoff & Stern LLP

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

12.    In regards to the hearing to consider the approval of the sale:

a.    The Debtor shall file and serve its report on the results of the Auction by no later than noon on November 8, 2010.

b.    Objections, if any, to the Sale shall be filed and served no later than 5 PM on November 8, 2010.

c.    Replies to objections shall be filed no later than noon on November 9, 2010.

13.    The Sale of the Hospital shall be subject to the entry of the Sale Order by the Bankruptcy Court approving the transaction and contingent upon approval of the Attorney General.

14.    The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.


Approved as to form:


_____
Mark Bradshaw
Shulman Hodges & Bastian
Attorneys for Prime Healthcare Services Foundation, Inc.

_____
Thomas E. Patterson
Martin R. Barash
Klee, Tuchin, Bogdanoff & Stern LLP
Attorneys for The Senior Associates Group, Inc

*Misty Perry Isaacson, Esq.*
United States Department of Justice
Office of the United State Trustee
3685 Main Street, Suite 300
Riverside, CA 92501
Telephone: (951) 276-6990
Facsimile: (951) 276-6973
misty.isaacson@usdoj.gov


_____
Wendi A. Horwitz
Deputy Attorney General
California Department of Justice
Office of the Attorney General


######

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

        b.      Objections, if any, to the Sale shall be filed and served no later than 5 PM on November 8, 2010.

        c.      Replies to objections shall be filed no later than noon on November 9, 2010.

13.     The Sale of the Hospital shall be subject to the entry of the Sale Order by the Bankruptcy Court approving the transaction and contingent upon approval of the Attorney General.

14.     The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Approved as to form:

_____
Mark Bradshaw
Shulman Hodges & Bastian
Attorneys for Prime Healthcare Services Foundation, Inc.

_____
Thomas E. Patterson
Martin R. Barash
Klee, Tuchin, Bogdanoff & Stern LLP
Attorneys for The Senior Associates Group, Inc

*Misty Perry Isaacson, Esq.*
United States Department of Justice
Office of the United State Trustee
3685 Main Street, Suite 300
Riverside, CA 92501
Telephone: (951) 276-6990
Facsimile: (951) 276-6973
misty.isaacson@usdoj.gov

*Wendi A. Horwitz*
Wendi A. Horwitz
Deputy Attorney General
California Department of Justice
Office of the Attorney General

######

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# EXHIBIT 2

## ASSET SALE AGREEMENT

This Asset Sale Agreement (the "Agreement") is made and entered into as of the ___ day of September, 2010 (the "Effective Date") by and among Victor Valley Community Hospital, a California nonprofit public benefit corporation ("Seller") on the one hand, and Prime Healthcare Services Foundation, Inc., a Delaware non-stock corporation organized exclusively for charitable purposes under § 501(c)(3) of the Internal Revenue Code or its permitted assignee ("Purchaser"), on the other hand.

## R E C I T A L S:

A.      Seller (I) engages in the business of delivering acute care services to the public through the operation of the acute care hospital known as Victor Valley Community Hospital located at 15248 11th Street, Victorville, California 92392 (the "Acute Care Hospital"), and (II) owns and operates the outpatient, ancillary and other healthcare businesses incident to the operation of the Acute Care Hospital as specifically identified on **Schedule A-1** (the "Other Businesses") (the Acute Care Hospital and the Other Businesses are referred to in this Agreement collectively as the "Hospital").

B.      Purchaser desires to purchase from Seller, and Seller desires to sell to Purchaser, substantially all of the assets owned by Seller and used with respect to the operation of the Hospital, for the consideration and upon the terms and conditions contained in this Agreement.

C.      Seller contemplates filing a voluntary petition for relief (the "Petition") commencing a case under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Central District of California, Riverside Division (the "Bankruptcy Court").

D.      The Parties intend to effectuate the transactions contemplated by this Agreement through a sale of the Assets by the Bankruptcy Court pursuant to § 363 of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual promises and covenants contained in this Agreement, and for their mutual reliance and incorporating into this Agreement the above recitals, the parties hereto agree as follows:

## ARTICLE 1

## DEFINITIONS; SALE AND TRANSFER OF ASSETS; CONSIDERATION; CLOSING

1.1      <u>Definitions</u>.  The terms listed below are defined elsewhere in this Agreement and, for ease of reference, the section containing the definition of each such term is set forth opposite such term.

| Term | Section |
|------|---------|
| Accounts Receivable | §1.8(i) |
| Acute Care Hospital | Recitals |

| Term | Section |
|------|---------|
| Affiliate | §4.6(b) |
| Aggregate Amount | §11.2.2(a)(x) |
| Aggregate Damage | §1.14(a) |
| Agreement | Preamble |
| Assets | §1.8 |
| Assumed Contracts | §1.8(f) |
| Assumed Leases | §1.8(e) |
| Assumed Obligations | §1.10 |
| Audit Periods | §2.7(d) |
| Bill of Sale | §1.5.1 |
| Break-Up Fee | §6.4(a) |
| Cash Purchase Price | §1.2 |
| Casualty Termination Notice | §1.14(a) |
| Casualty Termination Notice Period | §1.14(a) |
| CEO | §2.9 |
| CFO | §2.9 |
| Claim Notice | §11.4(a) |
| Closing | §1.4 |
| Closing Date | §1.4 |
| Closing of Financials | §10.4 |
| CNO | §2.9 |
| COBRA Coverage | §5.3(g) |
| Code | §2.11(b) |
| Consequential Damages | §11.2.2(a)(ix) |
| Damages | §11.2.1 |
| Designation Deadline | §1.12(a) |
| DSH Payments | §1.8(l) |
| Effective Date | Preamble |
| Effective Time | §1.4 |
| Environmental Laws | §2.5(c) |
| Environmental Permits | §2.5(b) |
| ERISA | §2.9 |
| Excluded Assets | §1.9 |
| Excluded Contracts | §1.9(d) |
| Excluded Leases | §1.9(e) |
| Excluded Liabilities | §1.11 |
| Financial Statements | §2.19 |
| Good Faith Deposit | §1.3 |
| Hazardous Substances | §2.5(c) |
| HFAP | §2.7(b) |
| Hired Employees | §5.3(a) |
| Hospital | Recitals |
| Hospital Employees | §5.3(a) |
| Indemnified Party | §11.4 |

2

| Term | Section |
|------|---------|
| Indemnifying Party | §11.4(a) |
| Indemnity Notice | §11.4(b) |
| Interim Financials | §2.9 |
| Inventory | §1.8(h) |
| Leased Real Property | §1.8(b) |
| Leasehold Title Policy | §4.8 |
| Licenses | §1.8(d) |
| Loss Consultant | §1.14(a) |
| Medi-Cal Liability | §1.10(a) |
| Notice Period | §11.4(a) |
| Original Closing Date | §1.14(a) |
| Operational Closing Date | §1.2 |
| Other Businesses | Recitals |
| Owned Real Property | §1.8(a) |
| Owner's Title Policy | §4.8 |
| Permitted Exceptions | §8.6 |
| Person | §4.6(b) |
| Personal Property | §1.8(c) |
| Power of Attorney | §1.5.9 |
| Pre-Closing E&O Matters | §11.2.1 |
| Prepaids | §1.8(g) |
| Purchase Price | §1.2 |
| Purchaser | Preamble |
| Purchaser Indemnified Parties | §11.2.1 |
| Real Estate Assignment(s) | §1.5.2 |
| Real Property | §1.8(b) |
| Receivable Records | §1.8(j) |
| Relevant Claim | §11.2.2(a)(xi) |
| Sale Motion | §6.1(b) |
| Sale Order | §6.1(b) |
| Seller | Preamble |
| Seller Aggregate Amount | §11.3.2(a)(vi) |
| Seller Cost Reports | §12.2(a) |
| Seller Plans | §2.11(a) |
| Seller Relevant Claim | §11.3.2(a)(vi) |
| Seller Tax Claims | §11.2.1(e) |
| Seller's Affidavit | §4.8 |
| Stabilization Funds | §1.8(n) |
| Termination Date | §9.1(h) |
| Third Party Claim | §11.4(a) |
| Title Commitment | §4.8 |
| Title Company | §1.3 |
| Title Instruments | §4.8 |
| Title Policy | §4.8 |

3

1.2     <u>Purchase Price</u>.   Subject to the terms and conditions of this Agreement, the aggregate purchase price to be paid by Purchaser to Seller for the purchase of the Assets shall be (a) Twenty-Five  Million Dollars ($25,000,000.00) minus (b) the balance due under the Medi-Cal Liability as of the calendar day immediately preceding the Effective Time (the "Operational Closing Date") assumed by Seller minus (c) the Accrued Payroll and Accrued Paid Time Off assumed by Seller as of the Operational Closing Date (the sum of (a), (b), and (c) being referred to for the purposes of this Agreement as the "Cash Purchase Price").  The payment of the Cash Purchase Price at Closing shall be governed by <u>Section 1.6.1</u>.

1.3     <u>Good Faith Deposit</u>.   By no later than 5:00 p.m. Pacific Standard Time on the Effective Date, Purchaser shall deliver to First American Title Insurance Company – NCS Ontario (the "Title Company"), by wire transfer of immediately available funds, for earnest money, Five Million Dollars ($5,000,000) (the "Good Faith Deposit").  The Title Company shall hold the Good Faith Deposit pursuant to the terms of the Good Faith Deposit Agreement attached as **Exhibit 1.3** which Seller, Purchaser and the Title Company shall execute concurrent with the execution of this Agreement.  The Good Faith Deposit is non-refundable regardless of the termination of this Agreement pursuant to <u>Section 9.1</u>, except that Purchaser shall be entitled to the return of the Good Faith Deposit in the event that Purchaser terminates this Agreement pursuant to the terms set forth in <u>Sections 9.1(c)</u>, <u>9.1(d)</u>, 9.1(f), <u>9.1(g)</u>, or <u>9.1(h)</u> or Seller and Purchaser terminate this Agreement pursuant to Section 9.1(a).  In the event the Closing occurs, the Good Faith Deposit shall be applied as a credit against the Cash Purchase Price, payable at Closing pursuant to <u>Section 1.6.1</u>.

1.4     <u>Closing Date</u>.   The consummation of the transactions contemplated by this Agreement (the "Closing") shall take place at 9:00 a.m. local time on October 29, 2010, at the offices of Purchaser, 3300 E. Guasti Road, 2nd Floor, Ontario, California  91761, or such other date, time and place as the parties shall mutually agree ("Closing Date"); provided, however, that all conditions precedent and other matters required to be completed as of the Closing Date have been or will be completed on such date.  The Closing with respect to the Hospital shall be deemed to have occurred and to be effective as between the parties as of 12:00:01 a.m. Pacific time on (a) November 1, 2010 (if the Closing Date is October 29, 2010) or (b) the next day after the Closing Date (if the Closing Date is any day other than October 29, 2010) (the "Effective Time"), meaning that the Seller will own, manage and operate the Hospital until immediately prior to the Effective Time, and Purchaser will take possession of, own and operate the Hospital beginning on the Effective Time.

1.5     <u>Items to be Delivered by Seller at Closing</u>.  At or before the Closing, Seller shall deliver to Purchaser the following, duly executed by Purchaser:

1.5.1   General Assignment, Bill of Sale and Assumption of Liabilities in the form of **Exhibit 1.5.1** attached hereto (the "Bill of Sale");

1.5.2   Assignment and Assumption of Real Estate Leases in the form of **Exhibit 1.5.2** attached hereto with respect to each Leased Real Property (the "Real Estate Assignment(s)");

1.5.3   Grant Deed(s) in the form of **Exhibit 1.5.3** attached hereto;

4

1.5.4    favorable original certificates of good standing, or comparable status, of Seller, issued by the respective states of incorporation and organization of Seller, dated no earlier than a date which is seven (7) calendar days prior to the Closing Date;

1.5.5    a certificate of an executive officer of Seller certifying to Purchaser (a) compliance with Seller's covenants set forth in this Agreement and (b) that all of the conditions contained in ARTICLE 7 have been satisfied except those, if any, waived in writing by Seller;

1.5.6    a certificate of the corporate Secretary of Seller certifying to Purchaser (i) the incumbency of the officers of Seller on the Effective Date and on the Closing Date and bearing the authentic signatures of all such officers who shall execute this Agreement and any additional documents contemplated by this Agreement and (ii) the due adoption and text of the resolutions of (A) the Board of Directors of Seller authorizing (I) the transfer of the Assets and Assumed Obligations by Seller, as applicable, to Purchaser and (II) the due execution, delivery and performance of this Agreement and all ancillary documents and instruments by Seller, as applicable, and that such resolutions have not been amended or rescinded and remain in full force and effect on the Closing Date;

1.5.7    Intentionally Deleted;

1.5.8    Uniform Commercial Code termination statements for any and all financing statements (which do not correspond to an Assumed Obligation) filed with respect to the Assets, as and if applicable;

1.5.9    Limited Power of Attorney for use of DEA and Other Registration Numbers, and DEA Order Forms, in the form of **Exhibit 1.5.9** attached hereto (the "Power of Attorney");

1.5.10  The Interim Management and Lease Agreement, which shall be substantially in the form of **Exhibit 1.5.10** attached hereto (the "Interim Management and Lease Agreement");

1.5.11  A certified copy of the Sale Order; and

1.5.12  such other instruments, certificates, consents or other documents which are reasonably necessary to carry out the transactions contemplated by this Agreement and to comply with the terms hereof.

1.6    <u>Items to be Delivered by Purchaser at Closing</u>.    At or before the Closing, Purchaser shall execute and deliver or cause to be delivered to Seller the following, duly executed by Purchaser where appropriate:

1.6.1    payment of the Cash Purchase Price;

1.6.2    a certificate of the President or any Vice President of Purchaser certifying to Seller (a) compliance with Purchaser's covenants set forth in this Agreement, (b) that Purchaser has obtained all material licenses, permits and authorizations from governmental

5

agencies or governmental bodies that are necessary or required for completion of the transactions contemplated by this Agreement and (c) that all of the conditions contained in <u>ARTICLE 8</u> have been satisfied except those, if any, waived in writing by Purchaser;

1.6.3   a certificate of the Secretary of Purchaser certifying to Seller (a) the incumbency of the officers of Purchaser on the Effective Date and on the Closing Date and bearing the authentic signatures of all such officers who shall execute this Agreement and any additional documents contemplated by this Agreement and (b) the due adoption and text of the resolutions of the Board of Directors of Purchaser authorizing the execution, delivery and performance of this Agreement and all ancillary documents and instruments by Purchaser, and that such resolutions have not been amended or rescinded and remain in full force and effect on the Closing Date;

1.6.4   favorable original certificate of good standing, or comparable status, of Purchaser, issued by each of the California and Delaware Secretary of State dated no earlier than a date which is seven (7) calendar days prior to the Closing Date;

1.6.5   the Bill of Sale;

1.6.6   the Real Estate Assignment(s);

1.6.7   Intentionally Deleted;

1.6.8   the Power of Attorney;

1.6.9   the Interim Management and Lease Agreement; and

1.6.10  such other instruments, certificates, consents or other documents which are reasonably necessary to carry out the transactions contemplated by this Agreement and to comply with the terms hereof.

1.7    <u>Prorations and Utilities</u>.   To the extent not otherwise prorated pursuant to this Agreement, Purchaser and Seller shall prorate (as of the Effective Time), if applicable, real estate and personal property lease payments, real estate and personal property taxes, assessments and other similar charges against real estate, plus power and utility charges.  As to power and utility charges, "final readings" as of the Operational Closing Date shall be ordered from the utilities; the cost of obtaining such "final readings," if any, to be paid for by Purchaser.  At the Closing, all items of income and expense listed below with respect to the Assets shall be prorated in accordance with the foregoing principles and the rules for the specific items set forth hereafter:

1.7.1   All sales, use, stamp, similar state and local taxes arising from the sale of the Assets hereunder shall be the responsibility of and allocated to Purchaser.  Real estate taxes and personal property taxes on the Assets shall be prorated based upon the payment period (*i.e.*, calendar or other tax fiscal year) to which the same are attributable.  Seller shall pay at or prior to the Closing (or Purchaser shall receive credit for) any unpaid taxes attributable to periods or portions thereof occurring prior to the Effective Time.   Seller shall receive credit for any previously paid or prepaid taxes attributable to periods or portions thereof occurring from and

after the Effective Time.  In the event that as of the Closing Date the actual tax bills for the tax year or years in question are not available and the amount of taxes to be prorated as aforesaid cannot be ascertained, then rates, millages and assessed valuation of the previous year, with known changes, shall be used.  The parties agree that if the real estate and personal property taxes prorations are made based upon the taxes for the preceding tax period, the prorations shall be re-prorated after the Closing.

1.7.2    Liens and assessments levied by any governmental authority as of the Closing Date shall be paid by the Seller.  Pending liens and assessments as of the Closing Date for matters arising after the Effective Date shall be assumed by the Purchaser.

1.7.3    Seller shall be entitled to all rents and other payments under tenant leases made prior to the Closing.  Purchaser shall be entitled to all rents and other payments under tenant leases accruing for or made during the period after the Closing.  Collected rents and other sums under the tenant leases shall be prorated as of the Effective Time.  All other rents and other payments under the tenant leases accrued but unpaid as of the Effective Time (including, without limitation, rents and other payments accrued prior to the Closing but payable in arrears after the Closing) shall belong to Purchaser , and Seller shall, upon receipt of said rents and other payments, receive the same in trust for Purchaser and shall promptly remit them to Purchaser within ten (10) business days after Seller's receipt of same.

1.7.4    All prepaid rentals, other prepaid payments, and security deposits deposited with Seller by tenants under any tenant leases assigned to Purchaser shall all belong to Purchaser and all shall be assigned and delivered to Purchaser at the Closing.

1.7.5    All prorations and payments to be made under the foregoing provisions shall be made on the basis of a written statement or statements delivered to Purchaser by Seller and approved by Purchaser.  In the event any proration, apportionment or computation shall prove to be incorrect for any reason, then either Seller or Purchaser shall be entitled to an adjustment to correct the same, provided that said party makes written demand on the party from whom it is entitled to such adjustment within thirty (30) calendar days after the erroneous payment or computation was made, or such later time as may be required, in the exercise of due diligence, to obtain the necessary information for proration.  The provisions of this Section 1.7 shall survive after the Closing.

1.7.6    After the Closing Date, Purchaser agrees to use its best efforts to diligently assist Seller (i)  for the purpose of adjudicating claims in bankruptcy, and (ii) for the preparation of termination cost reports.  Purchaser agrees to allow the Hospital's business office staff to assist Seller to finalize a listing of accounts payable, to calculate and process Seller's final payroll and other amounts payable to any employees by Seller under the terms of this Agreement, and to otherwise reasonably assist Seller in the closing of its business affairs at no charge to Seller.  Seller and Purchaser shall each have reasonable access to the other's accounting records pertaining to the Hospital to confirm the proper accounting of all matters prior to the Closing.  In addition, Purchaser agrees to make available to Seller any and all patient records lawfully required by Seller.

     1.8    <u>Transfer of Seller Assets</u>.  On the Closing Date and subject to the terms and conditions of this Agreement, Seller shall sell, assign, transfer, convey and deliver to Purchaser, free and clear of all liens and encumbrances other than the Permitted Exceptions, and Purchaser shall acquire, all of Seller's right, title and interest in and to only the following assets and properties, as such assets shall exist on the Closing Date with respect to the operation of the Hospital, to the extent not included among the Excluded Assets, as existing on the Closing Date, such transfer being deemed to be effective at the Effective Time (collectively, the "Assets"):

     (a)    all of the real property that is owned by Seller and used with respect to the operation of the Hospital, including, without limitation, the real property that is described in **Schedule 1.8(a)** (such description to include a legal description and address), together with all buildings, improvements and fixtures located thereupon, including, without limitation, all buildings and other improvements then under construction (collectively, the "Owned Real Property");

     (b)    all of Seller's interest, to the extent assignable or transferable in real property that is leased by Seller and used by Seller in the operation of the Hospital including, without limitation, the leased real property described in **Schedule 1.8(b)** which Purchaser has designated as a lease to be assumed by Purchaser pursuant to Section 1.12 herein (the "Leased Real Property") (the Owned Real Property and the Leased Real Property are collectively referred to in this Agreement as the "Real Property");

     (c)    all of the tangible personal property owned by Seller and used by Seller in the operation of the Hospital, including equipment, furniture, fixtures, machinery, vehicles, office furnishings, and leasehold improvements (the "Personal Property"), including, without limitation, the Personal Property described in **Schedule 1.8(c)**;

     (d)    all of Seller's rights, to the extent assignable or transferable, to all licenses, provider numbers, permits, approvals, certificates of exemption, franchises, accreditations and registrations and other governmental licenses, permits or approvals issued to Seller for use in the operation of the Hospital (the "Licenses"), including, without limitation, the Licenses and Medicare Provider Numbers described in **Schedule 1.8(d)**;

     (e)    all of Seller's interest, to the extent assignable or transferable, in and to all real property and personal property leases with respect to the operation of the Hospital that have been designated by Purchaser as a lease to be assumed by Purchaser pursuant to Section 1.12 herein (the "Assumed Leases");

     (f)    all of Seller's interest, to the extent assignable or transferable, in and to all contracts and agreements (including, but not limited to, purchase orders) with respect to the operation of the Hospital that have been designated by Purchaser as a contract to be assumed pursuant to Section 1.12 (the "Assumed Contracts");

     (g)    all of those advance payments, prepayments, prepaid expenses, deposits and the like which exist as of the Operational Closing Date, subject to the prorations provided in <u>Section 1.7</u> of this Agreement, which were made with respect to the operation of the Hospital (the "Prepaids"), the current categories and amounts of which are set forth on **Schedule 1.8(g)**;

8

(h)    except as excluded by Sections 1.9(f) and 1.9(g), all inventories of supplies, drugs, food, janitorial and office supplies and other disposables and consumables (i) located at  the Hospital or (ii) used with respect to the operation of the Hospital (the "Inventory");

(i)    all accounts, notes, interest and other receivables of Seller, including accounts, notes or other amounts receivable from physicians, and all claims, rights, interests and proceeds related thereto, including all accounts and other receivables, disproportionate share payments and cost report settlements related thereto, in each case arising from the rendering of services or provision of goods, products or supplies to inpatients and outpatients at the Hospital, billed and unbilled, recorded and unrecorded, for services, goods, products and supplies provided by Seller prior to the Effective Time whether payable by Medicare, Medi-Cal, TRICARE, medically indigent assistance programs, Blue Cross, Blue Shield or any other payor (including an insurance company), or any health care provider or network (such as a health maintenance organization, preferred provider organization or any other managed care program) or any fiscal intermediary of the foregoing, private pay patients, private insurance or by any other source ("Accounts Receivable");

(j)    all documents, records, correspondence, work papers and other documents other than patient records, relating to the Accounts Receivable (the "Receivable Records");

(k)    all rights to settlements and retroactive adjustments, if any, whether arising under a cost report of Seller or otherwise, for any reporting periods ending on or prior to the Effective Time, whether open or closed, arising from or against the United States government under the terms of the Medicare program or TRICARE (formerly the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS"));

(l)    all Medi-Cal disproportionate share replacement payments (Welfare & Institutions Code § 14166.11) (the "DSH Payments") received on and after the Effective Time regardless of the State fiscal year for which the DSH Payments are made in reference to and regardless of the State fiscal year for which the data was derived to calculate eligibility for such payments.  The parties acknowledge and agree that DSH Payments are determined by Medi-Cal for a particular fiscal year based on data reported for a previous State fiscal year(s). Notwithstanding the foregoing, the parties hereby confirm that it is the express intent of the parties that Purchaser shall receive the benefit of all DSH Payments received on and after the Effective Time regardless of whether the payments are made in reference to a State fiscal year prior to the Effective Time and regardless of whether the DSH Payments were calculated based on data reported for a State fiscal year prior to the Effective Time.

(m)    all Medi-Cal supplemental payments (Welfare & Institutions Code § 14666.12), and payments from the State of California known as distressed hospital funds (together with Medi-Cal supplemental payments, the "Supplemental Payments") received on and after the Effective Time regardless of the State fiscal year for which the Supplemental Payments are made in reference to and regardless of the State fiscal year for which the data was derived to calculate eligibility for such payments.  The parties acknowledge that Supplemental Payments are made to an eligible hospital for a state fiscal year, and that payments for a particular state fiscal year may be made during or after such state fiscal year.  Notwithstanding the foregoing,

9

the parties hereby confirm that it is the express intent of the parties that Purchaser shall receive the benefit of all Supplemental Payments received on and after the Effective Time regardless of whether the payments are made in reference to a State fiscal year prior to the Effective Time.

(n)    all payments made pursuant to the MediCal Hospital Provider Rate Stabilization Act (Chapter 627, Statutes of 2009, Assembly Bill 1383; October 1, 2009) (Welfare & Institutions Code Sections 14167.1 – 14167.17) (the "Stabilization Payments") regardless of the fiscal year or period for which the Stabilization Payments are made in reference to and regardless of the fiscal year or period for which the data was derived to calculate the elgibility for or amount of the Stabilization Payments.

(o)    all documents, records that are not proprietary to Seller and/or Seller's affiliates, operating manuals, files and computer software with respect to the operation of the Hospital, including, without limitation, all patient records, medical records, employee records, financial records with respect to the operation of the Hospital, equipment records, construction plans and specifications, and medical and administrative libraries *provided, however*, that any patient records and medical records which are not required by law to be maintained by Seller as of the Effective Time shall be an Excluded Asset;

(p)    to the extent assignable, all rights in all warranties of any manufacturer or vendor in connection with the Personal Property;

(q)    all goodwill of the Hospital evidenced by the Assets;

(r)    the Hospital's website(s) together with certain content therein;

(s)    the telephone and facsimile numbers used with respect to the operation of the Hospital;

(t)    the names and symbols of the Hospital set forth on **Schedule 1.8(s)**;

(u)    except as excluded by Section 1.9(s) or included in Schedule 1.9(t), all rights, claims and choses in action of Seller and its affiliates including, without limitation, all rights, claims and choses of action of Seller and its affiliates related to and/or arising out of the Accounts Receivable, and/or related to and/or arising out of the relationship and agreements between Seller and Physicians Hospital Management, LLC, Corwin Medical Group, Inc., IPA, and their affiliates, owners, members, partners, managers, directors, officers and employees (the "PHM Parties");

(v)    all claims, rights, interests and proceeds (whether received in cash or by credit to amounts otherwise due to a third party) with respect to amounts overpaid by Seller to any third party with respect to periods prior to the Effective Time (e.g. such overpaid amounts may be determined by billing audits undertaken by Purchaser or Purchaser's consultants);

(w)    all surpluses arising out of any risk pools to which Seller is a party;

10

(x)    any claims arising under Bankruptcy Code sections 502(d), 544, 545, 547, 548, 549, 550 or 553; and

(y)    any other assets of Seller with respect to the operation of the Hospital (which are not otherwise specifically described above in Sections 1.7 or 1.8) which are related to the operation of the Hospital and are not otherwise identified as an Excluded Asset in Section 1.9.

1.9    Excluded Assets.  Notwithstanding anything to the contrary in Section 1.8, Seller shall retain all assets owned directly or indirectly by it (or any of Seller's affiliates) which are not among the Assets, including, without limitation, the following assets of Seller (collectively, the "Excluded Assets"):

(a)    cash, cash equivalents and short-term investments held in the name of or for the benefit of the Victor Valley Community Hospital Foundation;;

(b)    all intercompany receivables of Seller with any of Seller's affiliates;

(c)    any asset which would revert to the employer upon the termination of any Seller Plan, including assets representing a surplus or overfunding of any Seller Plan;

(d)    all contracts which are not Assumed Contracts (the "Excluded Contracts");

(e)    all leases which are not Assumed Leases (the "Excluded Leases");

(f)    the portions of Inventory, Prepaids and other Assets disposed of, expended or canceled, as the case may be, by Seller after the Effective Date and prior to the Effective Time in the ordinary course of business;

(g)    assets owned and provided by vendors of services or goods to the Hospital;

(h)    all claims, rights, interests and proceeds with respect to state or local tax refunds (including but not limited to property tax) resulting from periods prior to the Effective Time, and the right to pursue appeals of same;

(i)    all of Seller's organizational or corporate record books, minute books and tax records;

(j)    any Owned Real Property not purchased by, or any Leased Real Property not assigned to, Purchaser pursuant to Sections 1.14(a) or 1.14(c)(ii);

(k)    all insurance proceeds arising in connection with the operation of the Assets or the Hospital prior to the Operational Closing Date not assigned to Purchaser pursuant to Sections 1.14(a) or 1.14(b);

11

(l)    all unclaimed property of any third party as of the Effective Time, including, without limitation, property which is subject to applicable escheat laws;

(m)    all bank accounts of Seller, and all cash held in bank accounts or trust or escrow accounts for the benefit of Seller, including, without limitation, accounts held in Seller's capacity as debtor-in-possession;

(n)    all rights, claims and choses in action of Seller and its affiliates (other than those subject to Section 1.8(u) with respect to periods prior to the Effective Time, and any payments, awards or other proceeds resulting therefrom;

(o)    all writings and other items that are protected from discovery by the attorney-client privilege, the attorney work product doctrine or any other cognizable privilege or protection, which are further described by way of example, rather than limitation, on **Schedule 1.9(o)**;

(p)    all documents, records, operating manuals and film pertaining to the Hospital (i) which are proprietary to Seller, or (ii) which the parties agree that Seller is required by law to retain;

(q)    all patient records and medical records which are not required by law to be maintained by Seller as of the Effective Time;

(r)    the rights of Seller and its affiliates under this Agreement including the proceeds of the transactions contemplated by this Agreement;

(s)    all rights, claims and choses in action of Seller and its affiliates related to or arising from professional services provided to or for the benefit of Seller or its affiliates, including, without limitation, legal, accounting, actuarial, retirement, insurance, auction, appraisal, and quality and risk management services; and

(t)    any assets identified in **Schedule 1.9(t)**.

1.10    <u>Assumed Obligations</u>.  On the Closing Date, Seller shall assign, and Purchaser shall assume and agrees to discharge, perform and satisfy fully, on and after the Effective Time, the following liabilities and obligations of Seller and only the following liabilities and obligations (collectively, the "Assumed Obligations"):

(a)    all liabilities and obligations of Seller of no more than Six Million One Hundred Thousand Dollars ($6,100,000) owed to the State of California relating to Medi-Cal overpayments to Seller(the "Medi-Cal Liability");

(b)    the Assumed Contracts and all liabilities of Seller under the Assumed Contracts, but only to the extent of the obligations arising thereunder with respect to events or periods on and after the Effective Time, *provided, however*, that Purchaser shall advance to Seller any money necessary for Seller to cure any defaults in the Assumed Contracts, or cure

12

such defaults itself, obtaining a credit against the Purchase Price, payable at Closing pursuant to Section 1.6.1, for the money advanced or paid;

(c)    the Assumed Leases and all liabilities of Seller under the Assumed Leases, but only to the extent of the obligations arising thereunder with respect to events or periods on and after the Effective Time, *provided, however*, that Purchaser shall advance to Seller any money necessary for Seller to cure any defaults in the Assumed Leases, or cure such defaults itself, obtaining a credit against the Purchase Price, payable at Closing pursuant to Section 1.6.1, for the money advanced or paid;

(d)    all liabilities of Seller relating to the Seller Cost Reports with respect to periods ending prior to the Effective Time;

(e)    all liabilities arising out of or relating to any act, omission, event or occurrence connected with the use, ownership or operation by Purchaser of the Hospital or any of the Assets on or after the Effective Time;

(f)    the accrued payroll and accrued paid time off pay, with respect to the Hired Employees as of the Operational Closing Date;

(g)    all unpaid real and personal property taxes, if any, that are attributable to the Assets after the Effective Time, subject to the prorations provided in Section 1.7;

(h)    all utilities being furnished to the Assets, subject to the prorations provided in Section 1.7;

(i)    any documentary, sales and transfer tax liabilities of Seller incurred as a result of the consummation of the transaction contemplated by this Agreement; and

(j)    any other obligations and liabilities identified in **Schedule 1.10(j)**.

1.11    Excluded Liabilities.  Notwithstanding anything to the contrary in Section 1.10, Purchaser shall not assume or become responsible for any of Seller's duties, obligations or liabilities that are not assumed by Purchaser pursuant to the terms of this Agreement, the Bills of Sale or the Real Estate Assignment(s) (the "Excluded Liabilities"), and Seller shall remain fully and solely responsible for all of Seller's debts, liabilities, contract obligations, expenses, obligations and claims of any nature whatsoever related to the Assets or the Hospital unless assumed by Purchaser under this Agreement, in the Bill of Sale or in the Real Estate Assignment(s).  The Excluded Liabilities shall include, without limitation:

(a)    any liabilities of Seller with respect to the operation of the Hospital prior to the Effective Time that are not otherwise specifically included in the Assumed Obligations;

(b)    all liabilities of Seller arising out of or relating to any act, omission, event or occurrence connected with the use, ownership or operation by Seller of the Hospital or any of the Assets prior to the Effective Time, other than as specifically included in the Assumed Obligations;

(c)    all liabilities of Seller in connection with claims of professional malpractice to the extent arising out of or relating to acts, omissions, events or occurrences prior to the Effective Time;

(d)    all liabilities of Seller for its share of matching contributions for eligible beneficiaries' 401(k) plans, Section 125 plans and other Seller Plans and all administrative costs associated with such welfare benefit plans arising prior to the Effective Time;

(e)    all liabilities of Seller for violations of any law, regulation or rule to the extent arising from acts or omissions of Seller prior to the Effective Time, including, without limitation, those pertaining to Medicare and Medi-Cal fraud or abuse;

(f)    all liabilities of Seller under the Excluded Contracts and under any contract that is among the Excluded Assets;

(g)    all liabilities of Seller under the Excluded Leases and under any contract that is among the Excluded Assets

(h)    all liabilities of Seller for commissions or fees owed to any finder or broker in connection with the transactions contemplated hereunder;

(i)    all liabilities of Seller or any of Seller's affiliates for any stay-bonus payments to the Hospital Employees (or to any member of the Leadership Team) accrued during periods prior to the Effective Time to provide an incentive to the Hospital Employees (or to any member of the Leadership Team) to remain employed at the Hospital through the Effective Time;

(j)    all liabilities of Seller or any of Seller's affiliates for any severance payments owed to any Hospital Employees (or to any member of the Leadership Team) if the event which gives rise to the obligation to pay severance occurs prior to the Effective Time;

(k)    all liabilities of Seller to maintain patient records and medical records which are not required by law to be maintained by Seller as of the Effective Time;

(l)    all liabilities of Seller related to any risk pools to which Seller is a party;

(m)    all liabilities of Seller, if any, for any non-accrued employee benefits; and

(n)    all liabilities of Seller or any of Seller's affiliates to any of the Excluded Employees.

1.12    Designation of Assumed Contracts and Assumed Leases.

No later than fifteen (15) days prior to the Closing (the "Designation Deadline"), Purchaser shall designate by written notice to Seller (such notice to be signed and dated by Buyer) each of the contracts and leases to which Seller is a party that Purchaser elects to have assigned to it as an Assumed Contract or an Assumed Lease as of the Effective Time (each, an "Assignment Election"). Purchaser and Seller shall cause each of the contracts and leases for

14

which Purchaser delivers an Assignment Election prior to the Designation Deadline to be assumed and assigned to Purchaser.  Except for those contracts and leases identified in an Assignment Election, Purchaser shall not assume any leases or contracts.

     1.13   <u>Disclaimer of Warranties; Release</u>.

     (a)   Except as expressly set forth in <u>ARTICLE 2</u> hereof, the Assets transferred to Purchaser will be sold by Seller and purchased by Purchaser in their physical condition at the Effective Time, "AS IS, WHERE IS AND WITH ALL FAULTS AND NONCOMPLIANCE WITH LAWS" WITH NO WARRANTY OF HABITABILITY OR FITNESS FOR HABITATION, with respect to the Real Property, including, without limitation, the land, the buildings and the improvements, and fixtures, and WITH NO WARRANTIES, INCLUDING, WITHOUT LIMITATION, THE WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, with respect to the physical condition of the Real Property, the Personal Property and Inventory, any and all of which warranties (both express and implied) Seller hereby disclaims.  All of the foregoing real and personal property shall be further subject to normal wear and tear on the land, buildings, improvements and equipment and normal and customary use of the Inventory and supplies in the ordinary course of business up to the Effective Time.

     (b)   Purchaser acknowledges that Purchaser has examined, reviewed and inspected all matters which in Purchaser's judgment bear upon the Assets and their value and suitability for Purchaser's purposes and, except as affirmatively represented and warranted by Seller, is relying solely on its own examination, review and inspection of the Assets and Assumed Obligations.  Except to the extent of any representation made by Seller herein and except with respect to the express indemnification obligations specifically set forth in Section 11.2, Purchaser releases Seller and their affiliates from all responsibility and liability regarding the condition, valuation, salability or utility of the Assets, or their suitability for any purpose whatsoever.

     1.14   <u>Risk of Loss</u>.  The risk of loss or damage to any of the Assets, Personal Property, Owned Real Property, the Hospital and all other property, transfer of which is contemplated by this Agreement, shall remain with Seller until the Effective Time and Seller shall maintain such insurance policies of Seller as are in effect at the Effective Date, or comparable policies of insurance or self-insurance covering the Assets, the Hospital and all other property through the Effective Time.

     (a)   With respect to the Real Property, if prior to the Closing, all or any part of the Real Property is destroyed or damaged by fire or the elements or by any other cause where such damage or destruction is in the aggregate (the "Aggregate Damage") less than or equal to fifteen percent (15%)  of the Purchase Price, the parties' duties and obligations under this Agreement shall not be affected and the Closing shall proceed as scheduled; *provided, however,* Seller shall retain any and all insurance proceeds and other or similar third party recompense on accounts of such damage or destruction and the Aggregate Damages (up to fifteen percent (15%) of the Purchase Price) shall be deducted from the Purchase Price.  If prior to the Closing, all or any part of the Real Property is destroyed or damaged by fire or the elements or by any other cause where the Aggregate Damage exceeds fifteen percent (15%)  of the Purchase Price, then

15

either of Seller or Purchaser, in the exercise of its sole discretion, may elect to terminate this Agreement by written notice to the other (the "Casualty Termination Notice") delivered after the date which is fifteen (15) calendar days after the occurrence of such damage or destruction but no later than the date which is thirty (30) calendar days after the occurrence of such damage or destruction (the "Casualty Termination Notice Period"); *provided, however,* that in no event shall the Casualty Termination Notice be provided if Seller and Purchaser are unable to agree prior to the inception of the Casualty Termination Notice Period that the amount of the Aggregate Damage exceeds fifteen percent (15%) of the Purchase Price. If Purchaser and Seller are unable to agree upon the amount of the Aggregate Damage by the earlier to occur of (I) the originally scheduled Closing Date (the "Original Closing Date") or (II) the inception of the Casualty Termination Notice Period, the amount of the Aggregate Damage shall be determined by Centex Rodgers, Inc. (the "Loss Consultant") pursuant to <u>Section 1.14(d)</u>.  If this Agreement is not terminated by Casualty Termination Notice pursuant to this Section, then the Aggregate Damage either as agreed by the parties or as established pursuant to <u>Section 1.14(d)</u> shall be deducted from the Purchase Price and Seller shall retain any and all insurance proceeds and other similar third party recompense; *provided, however,* that in no case shall the deduction from the Purchase Price exceed fifteen percent (15%) of the Purchase Price.  If Purchaser and Seller are unable to agree on the amount of the Aggregate Damage by the earlier to occur of (i) the Original Closing Date or (ii) the inception of the Casualty Termination Notice, the amount of the Aggregate Damage shall be determined by the Loss Consultant pursuant to <u>Section 1.14(d)</u>.

(b)    With respect to any Assets other than Real Property which are destroyed or damaged by fire or the elements or by any other cause prior to the Closing, Seller will deduct from the Purchase Price the cost to repair, restore and/or replace the Assets other than the Real Property (using the lesser of cost of repair, restore or replace as applicable), and Seller will be entitled to any and all insurance proceeds and other or similar third party recompense for such destruction or damage.  Notwithstanding anything in this Agreement to the contrary, if the damage to the Assets other than the Real Property is greater than fifteen percent (15%) of the Purchase Price, then either of Seller or Purchaser, in the exercise of its sole discretion, may elect to terminate this Agreement by written notice to the other.

(c)    If prior to the Closing, all or any part of a parcel of the Real Property is made subject to an eminent domain proceeding which would in Purchaser's reasonable judgment materially adversely impair access to the Real Property or be materially adverse to the operation of the Hospital, Purchaser may elect to (i) purchase such affected Owned Real Property, or take assignment of such Leased Real Property, and the Closing shall proceed as scheduled (*provided, however,* at the Closing Seller shall assign, transfer and set over to Purchaser all of Seller's right, title and interest in and to any award in such eminent domain proceeding) or (ii) elect to terminate this Agreement by written notice to Seller.  If Purchaser and Seller are unable to agree upon the amount of the adjustment described in subsection (i) of the preceding sentence by the Original Closing Date, the adjustment shall be resolved by the Loss Consultant pursuant to <u>Section 1.14(d)</u>.

(d)    If pursuant to either <u>Section 1.14(a)</u> or <u>1.14(c)</u>, the amount of the Aggregate Damage (and any applicable Purchase Price adjustment) is to be determined by the Loss Consultant, within five (5) calendar days after the earlier to occur of the Original Closing

16

Date or the inception of the Casualty Termination Notice Period (the "Submittal Date"), each party shall submit to the other party and to the Loss Consultant its proposed Aggregate Damage (and any applicable Purchase Price adjustment) as a result of the event(s) contemplated by either Section 1.14(a) or 1.14(c), along with a detailed description of the basis for such amount and any applicable adjustment.  Within ten (10) calendar days after the Submittal Date (the "Decision Date"), the Loss Consultant, acting as an expert and not as an arbitrator, shall select either the Aggregate Damage (and any applicable Purchase Price adjustment) proposal of Seller or the Aggregate Damage (and any applicable Purchase Price adjustment) proposal of Purchaser as the definitive amount of the Aggregate Damage (and any applicable adjustment to the Purchase Price) and Purchaser or Seller shall thereafter have the right to provide a Casualty Termination Notice provided that the Aggregate Damage exceeds fifteen percent (15%)  of the Purchase Price. If either Purchaser or Seller fails to timely provide their proposed Aggregate Damage (and any applicable Purchase Price adjustment) to the Loss Consultant, the Aggregate Damage (and any applicable Purchase Price adjustment) shall be the amount proposed by the submitting party, and Purchaser or Seller shall thereafter have the right to provide a Casualty Termination Notice provided that the Aggregate Damage exceeds fifteen percent (15%)  of the Purchase Price.  If neither party submits its proposed Aggregate Damage (and any applicable Purchase Price adjustment) to the Loss Consultant, no adjustment to the Purchase Price shall be made and neither Purchaser nor Seller shall have the right to provide a Casualty Termination Notice.  The decision of the Loss Consultant shall be conclusive and binding as between Purchaser and Seller, and the costs of such review shall be borne by the party whose proposed Aggregate Damage (and any applicable Purchase Price adjustment) is not selected by the Loss Consultant.  Upon any such determination of the adjustment to the Purchase Price in accordance with this Section 1.14, the parties shall, subject to the terms and conditions of this Agreement, consummate the transactions contemplated by this Agreement at a mutually agreeable time and place, in accordance with the provisions of this Agreement. If pursuant to either Section 1.14(a) or 1.14(c), the amount of the Aggregate Damage (and any applicable Purchase Price adjustment) is to be determined by the Loss Consultant and either the Submittal Date or the Decision Date falls on a day which is on or after the Termination Date, then the Termination Date shall be extended to the date which is ten (10) calendar days after the Decision Date.

1.15.  Debtor-in-Possession Financing.  Subject to the entry of an appropriate order from the Bankruptcy Court approving such financing and the execution of mutually acceptable agreements with respect to such financing, Purchaser shall provide Seller with debtor-in-possession financing of up to Three Million Two Hundred Thousand Dollars ($3,200,000.00) which shall be deemed paid in full if Purchaser successfully acquires the Assets pursuant to the terms of this Agreement.

# ARTICLE 2

## REPRESENTATIONS AND WARRANTIES OF SELLER

As an inducement to Purchaser to enter into this Agreement and to consummate the transactions contemplated by this Agreement, Seller hereby represents, warrants and covenants to Purchaser as to the following matters, except as disclosed in the disclosure schedule as of the Effective Date, as may be amended pursuant to the terms of this Agreement (the "Disclosure Schedule") (**Schedule** 2) hereby delivered by Seller to Purchaser:

2.1     <u>Authorization</u>.  Seller has all necessary power and authority to enter into this Agreement and to carry out the transactions contemplated hereby, subject to the parties' satisfying the terms and conditions of the required prior, written approval of the California Attorney General and the Sale Order of the Bankruptcy Court.

2.2     <u>Binding Agreement</u>.  All actions required to be taken by Seller to authorize the execution, delivery and performance of this Agreement, all documents executed by Seller which are necessary to give effect to this Agreement, and all transactions contemplated hereby, have been duly and properly taken or obtained by Seller.  No other corporate or other action on the part of Seller is necessary to authorize the execution, delivery and performance of this Agreement, all documents necessary to give effect to this Agreement and all transactions contemplated hereby.  This Agreement has been duly and validly executed and delivered by Seller and, assuming due and valid execution by Purchaser, this Agreement constitutes a valid and binding obligation of Seller enforceable in accordance with its terms subject to (a) applicable bankruptcy, reorganization, insolvency, moratorium and other laws affecting creditors' rights generally from time to time in effect and (b) limitations on the enforcement of equitable remedies.

2.3     <u>Organization and Good Standing; No Violation</u>.

(a)     Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of California.  Seller has all necessary power and authority to own, operate and lease its properties and to carry on its businesses as now conducted.

(b)     Neither the execution and delivery by Seller of this Agreement nor the consummation of the transactions contemplated hereby by Seller nor compliance with any of the material provisions hereof by Seller, will violate, conflict with or result in a breach of any material provision of Seller's articles of incorporation or bylaws or any other organizational documents of Seller.

2.4     <u>Required Consents</u>.  Except as set forth on **Schedule 2.4**, Seller is not a party to or bound by, nor are any of the Assets subject to, any mortgage, or any material lien, deed of trust, lease, or contract or any material order, judgment or decree which (a) requires the consent of another to the execution of this Agreement or (b) requires the consent of another to consummate the transactions contemplated by this Agreement.

18

2.5    <u>Compliance With Laws and Contracts</u>.

(a)    Except as set forth in **<u>Schedule 2.5(a)</u>**, to Seller's knowledge, Seller, with respect to the operation of the Hospital, is in compliance with all applicable laws, statutes, ordinances, orders, rules, regulations, policies, guidelines, licenses, certificates, judgments or decrees of all judicial or governmental authorities (federal, state, local, foreign or otherwise), except where the failure to be in such compliance would not have a material adverse effect on the Assets or the business of the Hospital.  Except as set forth in **<u>Schedule 2.5(a)</u>** and except as would not have a material adverse effect on the Hospital or the business of the Hospital, Seller, with respect to the operation of the Hospital, has not been charged in writing with or been given written notice of, and to the best knowledge of Seller, Seller, with respect to the operation of the Hospital, is not under investigation with respect to, any violation of, or any obligation to take remedial action under, any applicable (i) law, statute, ordinance, rule, regulation, policy or guideline promulgated, (ii) license or certificate issued, or (iii) order, judgment or decree entered, by any federal, state, local or foreign court or governmental authority relating to the Hospital or the business of the Hospital.  Notwithstanding the foregoing, no provision of this <u>Section 2.5(a)</u> shall be deemed a representation or warranty by Seller as to compliance with any Environmental Laws (as defined in <u>Section 2.5(c)</u> below).

(b)    To Seller's knowledge, Seller's ownership and operation of the Hospital and the Assets are and have been in compliance with all Environmental Laws, except where the failure to be in such compliance would not have a material adverse effect on the Assets or the business of the Hospital.  To Seller's knowledge, Seller has obtained all material licenses, permits and approvals necessary or required under all applicable Environmental Laws (the "Environmental Permits") for the ownership and operation of the Hospital and the Assets.  All such Environmental Permits are in effect and, to Seller's knowledge, no action to revoke or modify any of such Environmental Permits is pending. There is not now pending or, to Seller's knowledge, threatened, any claim, investigation or enforcement action by any governmental authority (whether judicial, executive or administrative) concerning Seller's potential liability under Environmental Laws in connection with the ownership or operation of the Hospital or the Assets.  To Seller's knowledge, there has not been a release or threatened release of any Hazardous Substance at, upon, in, under or from the Hospital or the Assets at any time.  To Seller's knowledge, no portion of the Real Property has been used as a dump or landfill or a storage, recycling or disposal facility for any Hazardous Substance, other than for the storage and disposal of medical waste in connection with the ordinary course operation of the Hospital.

(c)    For the purposes of this Agreement, the term "Environmental Laws" shall mean all state, federal or local laws, ordinances, codes or regulations relating to Hazardous Substances or to the protection of the environment, including, without limitation, laws and regulations relating to the storage, treatment and disposal of medical and biological waste.  For purposes of this Agreement, the term "Hazardous Substances" shall mean (i) any hazardous or toxic waste, substance, or material defined as such in (or for the purposes of) any Environmental Laws, (ii) asbestos-containing material, (iii) medical and biological waste, (iv) polychlorinated biphenyls, (v) petroleum products, including gasoline, fuel oil, crude oil and other various constituents of such products, and (vi) any other chemicals, materials or substances, exposure to which is prohibited, limited or regulated by any Environmental Laws.

19

(d)    Except as set forth in **Schedule 2.5(d)**, to Seller's knowledge, Seller has performed all material obligations relating to the Assets and the business of the Hospital, and is not in breach or default, nor do any circumstances exist which with or without notice or lapse of time, or both, would result in breach or default, nor is there any claim of such breach or default with respect to any obligation to be performed, under any material contract, material lease, guaranty, indenture or loan agreement relating to the Assets or the business of the Hospital, which breach or default or its consequences would materially adversely affect the Assets or the business of the Hospital.  No provision of this Section 2.5(d) shall apply to any failure to obtain consents to the assignment of the Assumed Contracts and Assumed Leases from the third parties to the Assumed Contracts and Assumed Leases in which consent is required to assign the Assumed Contracts and Assumed Leases to Purchaser (the "Contract and Lease Consents").

2.6    Title; All Assets.

(a)    Seller has good and marketable fee simple or leasehold title, as the case may be, to the Real Property, subject to the matters set forth in Section 2.6(b).  Seller has good and valid title to the Personal Property, which individually or in the aggregate is material to the condition (financial or otherwise), operations or the business of the Hospital.

(b)    The Real Property and the Personal Property is held by Seller free and clear of all liens, pledges, claims, charges, security interests or other encumbrances, and is not, in the case of the Real Property, subject to any rights-of-way, building or use restrictions, exceptions, variances, reservations or limitations of any nature whatsoever except (i) the Leases, (ii) liens for current real property taxes and assessments, (iii) mechanics', carriers', workmen's, repairmen's and other statutory liens, if any, which do not materially impair the ordinary business operations of the Hospital or for which, in respect of matters affecting title in the Real Property, title insurance coverage has been obtained, (iv) rights of way, building or use restrictions, zoning regulations, exceptions, easements, covenants, variances, reservations, encroachments and other limitations of any kind, if any, which do not materially impair the ordinary business operations of the Hospital or for which, in respect of matters affecting title to the Real Property, title insurance coverage has been obtained, (v) those standard printed exceptions customarily set forth in title reports or title policies (other than exceptions for matters identified in the Surveys with respect to the Real Property), and (vi) other such encumbrances as are set forth in **Schedule 2.6(b)**.  None of the Real Property is subject to a pending, or to Seller's knowledge threatened, condemnation or similar proceeding.

(c)    The Inventory with respect to the Hospital is, and at the Closing Date will be, maintained in such quantities as is consistent with the Hospital's historical practices, subject to the Hospital's need to draw down Inventory as a result of financial difficulties that have led to its need to commence bankruptcy proceedings and the likely continuing impact on the Hospital's ability to purchase Inventory from vendors during the bankruptcy proceedings.

(d)    The Assets and the Excluded Assets comprise substantially all of the property and assets used in the conduct of the operations of the Hospital.  Except as set forth on **Schedule 2.6(d)**, the Owned Real Property and the Leased Real Property comprise all of the real property used in the conduct of the operations of the Hospital.

2.7    <u>Certain Representations With Respect to the Hospital</u>.

(a)    All material licenses and certifications which are necessary to operate the business of the Hospital by Seller are valid and in good standing.  Seller has previously delivered to Purchaser or will promptly deliver after the Effective Date all written correspondence received by Seller from any governmental agency since, or related to uncorrected material deficiencies in, the most recent state licensure or certification survey related to the Hospital.

(b)    The Acute Care Hospital is duly accredited by the Healthcare Facilities Accreditation Program of the American Osteopathic Association ("HFAP") for the period set forth in **Schedule 2.7(b)**.  Seller has previously delivered to Purchaser or will promptly deliver after the Effective Date all written correspondence received by Seller from HFAP since, or related to uncorrected material deficiencies in, the most recent HFAP survey related to the Hospital.

(c)    The Acute Care Hospital is certified for participation in the Medicare and TRICARE programs, and has current and valid provider contracts with each of such programs, except where the failure to have such contracts would not have a material adverse effect on the business of the Acute Care Hospital.  Except as set forth in **Schedule 2.7(c)**, Seller has not received written notices from the regulatory authorities which enforce the statutory or regulatory provisions in respect of any of the Medicare, Medi-Cal or TRICARE programs of any pending or threatened investigations with respect to the operation of the Acute Care Hospital.

(d)    Notices of Program Reimbursement have been issued by the applicable fiscal intermediary with respect to the cost reports of the Hospital for Medicare, Medi-Cal (if required) and Blue Cross (if required) through the periods set forth in **Schedule 2.7(d)** (the "Audit Periods").  Each of such reports was timely filed.  To the knowledge of Seller, (i) Seller has not received notice of any material dispute between the Acute Care Hospital and the applicable governmental agency or private entity, or their intermediaries or representatives, regarding such cost reports for periods subsequent to the periods specified in **Schedule 2.7(d)** and (ii) there are no pending or threatened material claims by any of such programs against the Acute Care Hospital with respect to the Audit Periods or any period thereafter.

(e)    With respect to the operation of the Acute Care Hospital, Seller does not have any outstanding loan, grant or loan guarantee pursuant to the Hill-Burton Act (42 USC Section 291a, *et seq.*).

(f)    Seller, with respect to the operation of the Hospital, has not been excluded from the Medicare or any federal or state health care program, and there is no pending or, to Seller's knowledge, threatened exclusion action against Seller with respect to the operation of the Hospital.

2.8    <u>Brokers and Finders</u>.  With the exception of costs to be incurred in bankruptcy proceedings and an auction, neither Seller nor any affiliate thereof, nor any officer or director thereof, have engaged or incurred any liability to any finder, broker or agent in connection with the transactions contemplated hereunder.

2.9    <u>Financial Statements</u>.    The following have been or will be prepared from the books and records of Seller (a) the audited financial statements of Seller with respect to the operation of the Hospital as of September 30, 2007 and September 30, 2008, and for the years then ended (the "2007 & 2008 & 2009  Financials") and (b) the unaudited financial statements of Seller with respect to the operation of Hospital for months after September 30, 2009 through July 2010 and as otherwise made available to Purchaser pursuant to <u>Section 4.5</u> (the "Interim Financials") (the 2007 & 2008 & 2009 Financials, and the Interim Financials are collectively referred to herein as the "Financial Statements").  The Financial Statements fairly present, or will fairly present when prepared, the financial position and results of operations, as applicable, of Seller with respect to the operation of the Hospital as of and for the periods then ended, in each case in conformity with generally accepted accounting principles consistently applied during such periods, except that the Financial Statements (i) do not reflect all cost report adjustments, allocations or adjustments of overhead, intercompany interest or income taxes, and other year-end adjustments, (ii) do not contain footnotes, (iii) were prepared without physical inventories, (iv) do not contain an unaudited statement of cash flow, (v) omit substantially all the disclosures required by generally accepted accounting principles, (vi) are not restated for subsequent events, (vii) may not reflect any adjustments for impairment of long-lived assets or goodwill, or restructuring charges or the reclassification of assets held for sale on the applicable balance sheet, and (viii) may not fully reflect the following liabilities: (A) vacation, holiday and similar accruals and accruals in respect of Seller's or any affiliate of Seller's self-insured employee health benefits, (B) liabilities payable in connection with workers' compensation claims, (C) liabilities payable pursuant to any employee welfare benefit plan (within the meaning of Section 3(1) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA")), maintained by Seller or any affiliate of Seller on account of any of the Hospital's employees, the chief executive officer of the Hospital ("CEO"), the chief financial officer of the Hospital ("CFO"), the chief operating officer of the Hospital ("COO") and the chief nursing officer of the Hospital ("CNO"), (D) federal, state and local income or franchise taxes and (E) payroll and bonuses payable and vacation, holiday and similar accruals with respect to the CEO, CFO, COO and CNO.

2.10    <u>Legal Proceedings</u>.    Except as set forth on **<u>Schedule 2.10</u>**, there are no claims, proceedings or investigations pending or, to the best knowledge of Seller, threatened relating to or affecting Seller with respect to the operation of the Hospital or any of the Assets before any court or governmental body (whether judicial, executive or administrative) in which an adverse determination would have a material adverse effect on the Assets or the business condition of the Hospital.  Seller, with respect to the operation of the Hospital, is not subject to any judgment, order, decree or other governmental restriction specifically (as distinct from generically) applicable to it or its assets, including the Assets, which would have a material adverse effect on the Assets or the business condition (financial or otherwise) of the Hospital.  Seller, with respect to the operation of the Hospital, is not in default with respect to any final order, writ, injunction or decree served upon Seller from any court or any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, which default would have a material adverse effect on the Assets or the business condition (financial or otherwise) of the Hospital other than as set forth on **<u>Schedule 2.10</u>**.

2.11    Employee Benefits.

(a)    **Schedule 2.11(a)** contains a list of (i) each pension, profit sharing, bonus, deferred compensation, or other retirement plan or arrangement of Seller with respect to the operation of the Hospital, whether oral or written, which constitutes an "employee pension benefit plan" as defined in Section 3(2) of ERISA, (ii) each medical, health, disability, insurance or other plan or arrangement of Seller with respect to the operation of the Hospital, whether oral or written, which constitutes an "employee welfare benefit plan" as defined in Section 3(1) of ERISA, and (iii) each other employee benefit or perquisite provided by Seller with respect to the operation of the Hospital, in which any employee of Seller participates in his capacity as such (collectively, the "Seller Plans").

(b)    With respect to each Seller Plan, to Seller's knowledge, Seller does not have any direct or indirect, actual or contingent liability, other than to make payments for contributions, premiums or benefits when due in the ordinary course, all of which payments that are due having been made.  Neither the Hospital nor any of the Assets are subject to any lien under ERISA or the Internal Revenue Code of 1986, as amended (the "Code").

(c)    All of the Seller Plans have been administered in material compliance with ERISA and the applicable provisions of the Code.  There are no "accumulated funding deficiencies" within the meaning of ERISA or the Code or any federal excise tax or other liability on account of any deficient fundings in respect of the Seller Plans.

2.12    Personnel.

(a)    **Schedule 2.12(a)** sets forth a complete list (as of the date set forth therein) of names, positions and current annual salaries or wage rates, bonus and other compensation and/or benefit arrangements, and the paid time off pay of all full-time and part-time employees of Seller with respect to the operation of the Hospital and indicating whether such employee is a part-time or full-time employee.

(b)    There are no labor unions representing or collective bargaining agreements in effect covering the employees of Seller with respect to the operation of the Hospital.  There is no unfair labor practice complaint against Seller pending, or to the best knowledge of Seller threatened, before the National Labor Relations Board with respect to the operation of the Hospital.  To the best knowledge of Seller there is no labor strike, arbitration, dispute, slowdown or stoppage, and no union organizing campaign, pending or threatened, by or involving the employees of Seller that would materially affect the operation of the Hospital.

(c)    **Schedule 2.12(c)** sets forth a complete list of the names and positions of all full-time employees of Seller with respect to the operation of the Hospital that have been terminated without cause during the ninety (90) days immediately preceding the Effective Date. Seller shall update Schedule 2.13(c) at Closing to reflect such terminations occurring during the ninety (90) days immediately preceding the Closing Date.

23

(d)      Except as set forth on **Schedule 2.12(d)**, neither Seller nor any affiliate of Seller is a party to an employment agreement with any Hospital Employee, including any member of the Leadership Team.

2.13    <u>Insurance</u>.  Seller maintains, and has maintained, without interruption, at all times during Seller's ownership of the Hospital, self-insurance or policies or binders of insurance covering such risks and events, including personal injury, property damage, malpractice and general liability, to provide adequate and sufficient insurance coverage for all the assets and operations of the Hospital.  **Schedule 2.13** contains a list of all such insurance maintained by Seller with respect to the operation of the Hospital as of the Effective Date.

2.14    <u>Seller Knowledge</u>.  References in this Agreement to "Seller's knowledge", "knowledge of Seller" or the "best knowledge of Seller" or words of substantially similar import, mean the actual then current knowledge of the Chief Executive Officer of Seller as of the Closing, without any research, investigation or inquiry.  No constructive or imputed knowledge shall be attributed to any such individual by virtue of any position held, relationship to any other Person or for any other reason.

## ARTICLE 3

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

As an inducement to Seller to enter into this Agreement and to consummate the transactions contemplated by this Agreement, Purchaser hereby represents, warrants and covenants to Seller as to the following matters as of the Effective Date and, except as otherwise provided herein, shall be deemed to remake all of the following representations, warranties and covenants as of the Closing Date:

3.1    <u>Authorization</u>.  Purchaser has full power and authority to enter into this Agreement and has full power and authority to perform its obligations hereunder and to carry out the transactions contemplated hereby.

3.2    <u>Binding Agreement</u>.  All legal and other actions required to be taken by Purchaser to authorize the execution, delivery and performance of this Agreement, all documents executed by Purchaser which are necessary to give effect to this Agreement, and all transactions contemplated hereby, have been duly and properly taken or obtained by Purchaser; provided, however, that as of the Effective Date, Purchaser does not have a license or any of the necessary state or federal certificates, approvals or agreements to own and operate the Hospital or participate in any state or federal healthcare programs.  Except as otherwise provided above, no other legal or other action on the part of Purchaser is necessary to authorize the execution, delivery and performance of this Agreement, all documents necessary to give effect to this Agreement and all transactions contemplated hereby.  This Agreement has been duly and validly executed and delivered by Purchaser and, assuming due and valid execution by Seller, this Agreement constitutes a valid and binding obligation of Purchaser enforceable in accordance with its terms subject to (a) applicable bankruptcy, reorganization, insolvency, moratorium and other laws affecting creditors' rights generally from time to time in effect and (b) limitations on the enforcement of equitable remedies.

3.3     <u>Organization and Good Standing</u>.   Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, is duly authorized to transact business in the State of California, and has full power and authority to own, operate and lease its properties and to carry on its business as now conducted.

3.4     <u>No Violation</u>.   Except as set forth in **Schedule 3.4**, neither the execution and delivery by Purchaser of this Agreement nor the consummation of the transactions contemplated hereby nor compliance with any of the material provisions hereof by Purchaser will (a) violate, conflict with or result in a breach of any material provision of the Articles of Incorporation, Bylaws or other organizational documents of Purchaser or any contract, lease or other instrument by which Purchaser is bound; (b) require any approval or consent of, or filing with, any governmental agency or authority, (c) violate any law, rule, regulation, or ordinance to which Purchaser is or may be subject, (d) violate any judgment, order or decree of any court or other governmental agency or authority to which Purchaser is subject.

3.5     <u>Brokers and Finders</u>.   Neither Purchaser nor any affiliate thereof nor any officer or director thereof has engaged any finder or broker in connection with the transactions contemplated hereunder.

3.6     <u>Representations of Seller</u>.   Purchaser acknowledges that it is purchasing the Assets on an "AS IS, WHERE IS" basis (as more particularly described in <u>Section 1.13</u>), and that Purchaser is not relying on any representation or warranty (expressed or implied, oral or otherwise) made on behalf of Seller other than as expressly set forth in this Agreement. Purchaser further acknowledges that Seller is not making any representations or warranties herein relating to the operation of the Hospital on and after the Effective Time.

3.7     <u>Legal Proceedings</u>.   Except as described on **Schedule 3.7**, there are no claims, proceedings or investigations pending or, to the best knowledge of Purchaser, threatened relating to or affecting Purchaser or any affiliate of Purchaser before any court or governmental body (whether judicial, executive or administrative) in which an adverse determination would materially adversely affect the properties, business condition (financial or otherwise) of Purchaser or any affiliate of Purchaser or which would adversely affect Purchaser's ability to consummate the transactions contemplated hereby.   Neither Purchaser nor any affiliate of Purchaser is subject to any judgment, order, decree or other governmental restriction specifically (as distinct from generically) applicable to Purchaser or any affiliate of Purchaser which materially adversely affects the condition (financial or otherwise), operations or business of Purchaser or any affiliate of Purchaser or which would adversely affect Purchaser's ability to consummate the transactions contemplated hereby.

3.8     <u>No Knowledge of Seller's Breach</u>.   Neither Purchaser nor any of its affiliates has knowledge of any breach of any representation or warranty by Seller or of any other condition or circumstance that would excuse Purchaser from its timely performance of its obligations hereunder.   If information comes to Purchaser's attention on or before the Closing Date (whether through Seller or otherwise and whether before or after the Effective Date) which indicates that Seller has breached any of its representations and warranties under this Agreement, then for the purposes of Seller's liability under such representations and warranties on and after the Effective Time the effect shall be as if the representations and warranties had been modified in this

25

Agreement in accordance with the actual state of facts existing prior to the Effective Time such that there will be no breach under Seller's representations and warranties in relation to such information; *provided, however,* that Purchaser must immediately notify Seller if any such breach comes to its attention on or before the Closing Date, and Purchaser's failure to so notify Seller shall constitute a waiver by Purchaser of Seller's breach, if any, of any representation or warranty. If information comes to Purchaser's attention on or before the Closing Date (whether through Seller or otherwise, including through updated schedules, and whether before or after the Effective Date) which would excuse Purchaser from its timely performance of its obligations hereunder, Purchaser must immediately notify Seller if any such information comes to its attention on or before the Closing Date, and Purchaser's failure to so notify Seller shall constitute a waiver of such condition or circumstances insofar as it would excuse Purchaser from its timely performance of its obligations hereunder.

3.9    <u>Ability to Perform</u>.  Purchaser has the ability to obtain funds in cash in amounts equal to the Purchase Price by means of credit facilities or otherwise and will at the Closing have immediately available funds in cash, which are sufficient to pay the Purchase Price and to pay any other amounts payable pursuant to this Agreement and to consummate the transactions contemplated by this Agreement.

3.10    <u>Solvency</u>.  Purchaser is solvent and will not be rendered insolvent as a result of any of the transactions contemplated by this Agreement.  For purposes hereof, the term "solvency" means that:  (a) the fair salable value of Purchaser's tangible assets is in excess of the total amount of its liabilities (including for purposes of this definition all liabilities, whether or not reflected on a balance sheet prepared in accordance with generally accepted accounting principles, and whether direct or indirect, fixed or contingent, secured or unsecured, and disputed or undisputed); (b) Purchaser is able to pay its debts or obligations in the ordinary course as they mature; and (c) Purchaser has capital sufficient to carry on its businesses and all businesses which it is about to engage.

3.11    <u>Purchaser Knowledge</u>.  References in this Agreement to "Purchaser's knowledge" or "the best knowledge of Purchaser" or words of substantially similar import means the actual then current knowledge of the Chief Executive Officer, Chief Financial Officer or Chief Operating Officer of Purchaser, without any research, investigation or inquiry. No constructive or imputed knowledge shall be attributed to any such individual by virtue of any position held, relationship to any other Person or for any other reason.

## ARTICLE 4

## COVENANTS OF SELLER

4.1    <u>Access and Information; Inspections</u>.  From the Effective Date through the Effective Time, (a) Seller shall afford to the officers and agents of Purchaser (which shall include accountants, attorneys, bankers and other consultants and authorized agents of Purchaser) reasonably full and complete access during normal business hours to and the right to inspect the plants, properties, books, accounts, records and all other relevant documents and information with respect to the assets, liabilities and business of the Hospital and (b) Seller shall furnish Purchaser with such additional financial and operating data and other information in Seller's

26

possession as to businesses and properties of the Hospital as Purchaser or its representatives may from time to time reasonably request, without regard to where such information may be located; *provided, however,* that all disclosures of information shall be consistent with the confidentiality, agreements and any other non-disclosure agreements entered into (or to be entered into) among Purchaser, its representatives and Seller.  Purchaser's right of access and inspection shall be exercised on twenty-four (24) hours notice and in such a manner as not to interfere unreasonably with the operations of the Hospital.  Such access may include consultations with the personnel of Seller; *provided, however,* that Purchaser shall not consult with or contact in any manner any employee at the Hospital without Seller's prior written consent (which consent may only be given by Catherine Pelley or a designee).  Further, Purchaser may (except as otherwise provided in Section 13.12) undertake environmental, mechanical and structural surveys of the Hospital. Notwithstanding the foregoing, all access and inspection activities contemplated by this Section 4.1 shall be subject to twenty-four (24) hours notice and the prior reasonable approval of Seller (which approval may only be granted by Catherine Pelley or a designee) and all disclosures of information shall be consistent with the confidentiality agreements and any other non-disclosure agreements entered into (or to be entered into) among Purchaser, its representatives and Seller (including affiliates of Seller).

4.2    Conduct of Business.  On and after the Effective Date and prior to the Effective Time, and except as otherwise consented to or approved by an authorized officer of Purchaser, required by this Agreement, or required or necessary in connection with Seller's bankruptcy proceedings, Seller shall, with respect to the operation of the Hospital:

(a)    carry on its businesses with respect to the operation of the Hospital in substantially the same manner as presently conducted and not make any material adverse change in operations, finance, accounting policies (unless Seller is required to adopt such changes under generally accepted accounting principles), or real or personal property;

(b)    maintain the Hospital and all parts thereof and all other Assets in operating condition in a manner consistent with past practices, ordinary wear and tear excepted, inclusive of substitutions and retirements in the ordinary course of business;

(c)    perform all of its material obligations under the Assumed Contracts and Assumed Leases, *provided, however* that Seller may be as of the Effective Date in material breach under such contracts or other material contracts and Seller has no obligation to cure such breaches or defaults unless in the context of assuming and assigning contracts under the terms of this Agreement or in the Bankruptcy Court;

(d)    keep in full force and effect present insurance policies or other comparable self-insurance; and

(e)    use its reasonable efforts to maintain and preserve its respective business organizations intact, and maintain its respective relationships with physicians, suppliers, customers and others having business relationships with the Hospital subject to the impact of financial difficulties that have led to the Hospital's need to commence bankruptcy proceedings and the likely continuing impact of financial difficulties and the bankruptcy proceedings.

27

4.3     Negative Covenants.  From the Effective Date until the Effective Time, with respect to the operation of the Hospital, Seller shall not, without the prior written consent of Purchaser or except as may be required by law or required or necessary in connection with Seller's bankruptcy proceedings:

(a)     except as provided in **Schedule 4.3(a)**, increase compensation payable or to become payable or make any bonus payment to or otherwise enter into one or more bonus agreements with any employee, except in the ordinary course of business in accordance with Seller's customary personnel policies;

(b)     create, assume or permit to exist any new debt, mortgage, deed of trust, pledge or other material lien or encumbrance upon any of the Assets;

(c)     acquire (whether by purchase or lease) or sell, assign, lease, or otherwise transfer or dispose of any property, plant or equipment, except in the ordinary course of business consistent with historical practices;

(d)     except with respect to previously budgeted expenditures, purchase capital assets or incur costs in respect of material construction in progress;

(e)     take any action outside the ordinary course of business that would have a material adverse effect on the Assets or the Hospital, except at Seller's discretion in connection with the rejection of executory contracts in proceedings before the Bankruptcy Court; or

(f)     materially reduce Inventory except in the ordinary course of business.

For purposes of this Section 4.3, Seller shall be deemed to have obtained Purchaser's prior written consent to undertake the actions otherwise prohibited by this Section 4.3 if Seller gives Purchaser written notice of a proposed action and Seller does not receive from Purchaser a written notice of objection to such action within five (5) business days after Purchaser receives Seller's written notice. Notwithstanding any provision to the contrary contained in this Agreement, neither Section 4.2 nor this Section 4.3 shall be construed to prohibit Seller from engaging in any act which Seller reasonably believes is necessary to preserve and protect the condition or continued operations of the Hospital or to comply with contractual obligations or the requirements of governmental or regulatory authorities.  Seller shall give Purchaser prompt written notice subsequent to taking any act described in the immediately preceding sentence.

4.4     Cooperation.  Seller shall reasonably cooperate with Purchaser and its authorized representatives and attorneys:  (a) in Purchaser's efforts to obtain all consents, approvals, authorizations, clearances and licenses required to carry out the transactions contemplated by this Agreement (including, without limitation, those of governmental and regulatory authorities) or which Purchaser reasonably deems necessary or appropriate, (b) in the preparation of any document or other material which may be required by any governmental agency as a predicate to or result of the transactions contemplated in this Agreement, and (c) in Purchaser's efforts to effectuate the assignment of Assumed Contracts to Purchaser as of the Closing Date; *provided, however*, that it shall be Purchaser's responsibility to obtain all consents, approvals, assignments, authorizations, clearances and licenses required to carry out the transactions contemplated by this

28

Agreement.  To the extent Purchaser needs certain information and data which is in the possession of Seller in order for Purchaser to complete Purchaser's license and permit approval applications, Purchaser shall receive, upon request, reasonable assistance from Seller in connection with the provision of such information.  Notwithstanding any provision to the contrary contained in this Agreement, Seller shall not be obligated to obtain the approval or consent from any party to any of the Assumed Contracts or Assumed Leases to the assignment of such Assumed Contracts or Assumed Leases to Purchaser, even if any such contract or lease states that it is not assignable without such party's consent.

      4.5   <u>Additional Financial Information</u>.  Within thirty (30) calendar days following the end of each calendar month prior to Closing, Seller shall deliver to Purchaser complete copies of the unaudited balance sheet and related unaudited statements of income relating to Seller with respect to the operation of the Hospital for each month then ended, together with corresponding year-to-date amounts, which presentation shall be consistent with the provisions of <u>Section 2.9</u> which are applicable to the Financial Statements.

      4.6   <u>No-Shop</u>.

      (a)   Other than through the contemplated bankruptcy auction process, from and after the Effective Date until the earlier of the Closing Date or the termination of this Agreement, Seller shall not, without the prior written consent of Purchaser:  (i) offer for sale or lease the assets of the Hospital or the Assets (or any material portion thereof); (ii) solicit offers to buy all or any material portion of any of the Hospital or the Assets; (iii) hold or continue to hold discussions with any party (other than Purchaser) looking toward such an offer or solicitation; or (iv) enter into any agreement with any party (other than Purchaser) with respect to the sale or other disposition of any of the Hospital or the Assets.

      (b)   Any reference in this Agreement to an "affiliate" shall mean any Person directly or indirectly controlling, controlled by or under common control with a second Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.  A "Person" shall mean any natural person, partnership, corporation, limited liability company, association, trust or other legal entity.

      4.7   <u>Seller's Efforts to Close</u>.  Seller shall use its reasonable commercial efforts to satisfy all of the conditions precedent set forth in <u>ARTICLE 7</u> and <u>ARTICLE 8</u> to its or Purchaser's obligations under this Agreement to the extent that Seller's action or inaction can control or influence the satisfaction of such conditions.

      4.8   <u>Title Matters</u>.  Prior to the Closing Date, Seller shall cause to be delivered to Purchaser (a) a preliminary binder or title commitment(s) (the "Title Commitment") sufficient for the issuance of an ALTA Extended Coverage Owner's Title Insurance Policy with respect to the Owned Real Property (the "Owner's Title Policy") and, if applicable, an ALTA Extended Coverage Leasehold Title Policy in a form approved for issuance in California with respect to any Leased Real Property specified on **<u>Schedule 4.8</u>** (the "Leasehold Title Policy") (the Owner's Title Policy and the Leasehold Title Policy are collectively referred to in this Agreement as the

29

"Title Policy"), issued by the Title Company, together with true, correct and legible (or, if not legible, the best available) copies of all instruments referred to therein as conditions or exceptions to title (the "Title Instruments") and (b) an ALTA survey or surveys of the Owned Real Property complying with the Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys for the Owned Real Property in a form reasonably acceptable to Purchaser (the "Surveys"). Section 13.11 shall govern which party or parties hereto shall bear the costs and expenses of the Title Commitment, the Title Policy and the Surveys. At the Closing, Seller shall deliver to the Title Company an owner's affidavit in substantially the form of **Exhibit 4.8** attached hereto (the "Seller's Affidavit"). SELLER MAKES NO REPRESENTATION OR WARRANTY AS TO THE TRUTH, ACCURACY OR COMPLETENESS OF THE TITLE COMMITMENT, THE TITLE INSTRUMENTS, THE TITLE POLICY, THE SURVEYS OR THE ENVIRONMENTAL SURVEY (HEREINAFTER DEFINED). PURCHASER ACKNOWLEDGES AND AGREES THAT ALL MATERIALS, DATA AND INFORMATION DELIVERED BY SELLER TO PURCHASER IN CONNECTION WITH THE TITLE COMMITMENT, THE TITLE INSTRUMENTS, THE TITLE POLICY, THE SURVEYS OR THE ENVIRONMENTAL SURVEY ARE PROVIDED TO PURCHASER AS A CONVENIENCE ONLY AND THAT ANY RELIANCE ON OR USE OF SUCH MATERIALS, DATA OR INFORMATION BY PURCHASER SHALL BE AT THE SOLE RISK OF PURCHASER.

4.9    Termination of Hospital Employees.  Seller shall provide all of its employees with layoff or plant closure notices as required under the WARN Act (defined in Section 5.3(c) below) within fifteen (15) days of the filing of the Petition.  Upon the Effective Time, the Hospital Employees shall cease to be employees of Seller, and shall be removed from such entities' respective payrolls.  Seller shall terminate effective as of the Effective Time the active participation of all of the Hospital Employees in all of the Seller Plans.  After the Effective Time, subject to the administration of Seller's bankruptcy proceedings, Seller shall timely make or cause to be made by Seller's affiliates appropriate distributions to, or for the benefit of, all of the Hospital Employees in respect of the Seller Plans which are in force and effect with respect to the Hospital Employees at the Hospital immediately prior to the Effective Time in accordance with ERISA, the Code, and the terms and conditions of the Seller Plans; *provided, however,* no such distribution shall be required to the extent it is among the Assumed Obligations.

4.10    Termination Cost Reports.  Seller shall file all Medicare, Medi-Cal, TRICARE, Blue Cross and any other termination cost reports required to be filed as a result of the consummation of (a) the transfer of the Assets to Purchaser and (b) the transactions contemplated by this Agreement.  Purchaser shall permit Seller access to all Hospital books and records to prepare such reports and shall assist Seller in the process of preparing, filing, and reviewing the termination cost reports.  All such termination cost reports shall be filed by Seller in a manner that is consistent with current laws, rules and regulations.  Seller shall be responsible for filing governmental cost reports for the period January 1, 2010 through the Operational Closing Date.  Purchaser shall be responsible for its own cost report filings relating to the Hospital beginning on the day immediately following the Operational Closing Date.

c:\documents and settings\mk\local settings\temporary internet files\olkf\apa 9-13-2010 (prime)(clean 003).doc

4.11    Required Governmental Approvals.    Except as otherwise set forth in this Agreement, Seller (a) will use its reasonable efforts to secure such consents, approvals (or exemptions therefrom) and authorizations from governmental and regulatory authorities as are necessary to enable Seller lawfully to sell the Assets to Purchaser, (b) will reasonably cooperate with Purchaser in Purchaser's efforts to obtain such consents, approvals (or exemptions therefrom) and authorizations from governmental and regulatory authorities as are necessary to enable Purchaser to operate the Hospital after the Effective Time, and (c) will provide such information and communications to governmental and regulatory authorities as Purchaser or such authorities may reasonably request.

## ARTICLE 5

## COVENANTS OF PURCHASER

5.1    Purchaser's Efforts to Close.    Purchaser shall use its reasonable commercial efforts to satisfy all of the conditions precedent set forth in ARTICLE 7 and ARTICLE 8 to its or Seller's obligations under this Agreement to the extent that Purchaser's action or inaction can control or influence the satisfaction of such conditions.

5.2    Required Governmental Approvals.    Purchaser (a) shall use its best efforts to secure, as promptly as practicable before the Closing Date, all consents, approvals (or exemptions therefrom), authorizations, clearances and licenses required to be obtained from governmental and regulatory authorities in order to carry out the transactions contemplated by this Agreement and to cause all of its covenants and agreements to be performed, satisfied and fulfilled, and (b) will provide such other information and communications to governmental and regulatory authorities as Seller or such authorities may reasonably request.    Purchaser is responsible for all filings with and requests to governmental authorities necessary to enable Purchaser to operate the Hospital at and after the Effective Time.    Purchaser shall, no later than fifteen (15) business days after the Effective Date, file all applications, licensing packages and other similar documents with all applicable governmental and regulatory authorities which are a prerequisite to obtaining the material licenses, permits, authorizations and provider numbers described in Section 8.1. Purchaser shall be entitled, but not obligated, to obtain the Contract and Lease Consents.    Purchaser shall be entitled, but not obligated, to solicit and obtain estoppel certificates from any third party to any Lease of Real Property.    Purchaser's failure to obtain any or all of the Contract and Lease Consents or estoppel certificates as of the Closing Date shall not be a condition precedent to either party's obligation to close the transactions contemplated by this Agreement.

5.3    Certain Employee Matters.

(a)    Purchaser covenants and agrees that it shall make offers of employment in substantially equivalent positions and for the same consideration then in effect to substantially all of the persons who, immediately prior to the Effective Time, are employees of (i) Seller with respect to the operation of the Hospital or (ii) any affiliate of Seller which employs individuals at the Hospital (whether such employees are full time employees, part-time employees, on short-term or long-term disability or on leave of absence pursuant to Seller's policies, the Family and Medical Leave Act of 1993 or other similar local law) (the "Hospital Employees").    Any of the

31

Hospital Employees who accept an offer of employment with Purchaser as of or after the Effective Time shall be referred to in this Agreement as the "Hired Employees". Purchaser shall provide employee benefits (including, without limitation, health, dental, disability, life insurance and retirement plans) to each of the Hired Employees that are not less favorable than those provided to other similarly situated employees of Purchaser and its affiliates.

(b)    Purchaser shall continue to employ the Hired Employees and shall avoid creating any obligation under the WARN Act (defined in Section 5.3(c) below) on the part of Seller, and such employees' employment shall be on terms that require said employees to perform comparable services in a comparable position at the same rates of pay and benefits at which such employees were employed at the Hospital prior to the Closing Date.

(c)    Purchaser and Seller acknowledge and agree that the provisions of Section 5.3 are designed, in part, to ensure that Seller is not required to give notice to employees of the Hospital of the "closure" thereof under the Worker Adjustment and Retraining Notification Act (the "WARN Act") or any other comparable state law. Accordingly, Purchaser agrees to indemnify, defend and hold harmless Seller from any liability which it may incur under the WARN Act or any comparable state law in the event of the violation by Purchaser of its obligations under Section 5.3, including a violation which results from allegations that Purchaser constructively terminated the employees of the Hospital as a result of the terms and conditions of employment provided or offered by Purchaser; *provided, however,* that nothing herein shall be construed as imposing any obligation on Purchaser to indemnify, defend or hold harmless Seller from any liability which it may incur under the WARN Act (i) as a result of the acts or omissions of Seller prior to the Closing Date, including any liability which may result from the aggregations of acts of Seller prior to the Closing Date and the acts of Purchaser after the Closing Date, it being understood and agreed that Purchaser shall only be liable for its own acts and omissions after the Closing Date, or (ii) as a result of the filing of a frivolous suit or claim by an employee terminated by Purchaser following the effective time for cause, including criminal convictions, and within the guidelines of the WARN Act. Nothing in this Section 5.3 shall create any rights in favor of any person not a party hereto, including employees of the Hospital, or constitute an employment agreement or condition of employment for any employee of Seller.

(d)    To the extent consistent with the Seller's existing policies and procedures, Purchaser shall give all Hired Employees full credit for all paid time off pay to such employees as of the Operational Closing Date, either by (i) crediting such employees the time off reflected in the employment records of Seller and/or any of its affiliates immediately prior to the Effective Time or (ii) by making full payments to such employees of the amounts which such employees would have received had they taken such paid time off.

(e)    On and after the Effective Time, Hired Employees shall be eligible for a medical and hospital plan sponsored by Purchaser. Hired Employees shall be given credit for periods of employment with Seller and Seller's affiliates, as applicable, prior to the Effective Time for purposes of determining eligibility to participate and amount of benefits (including without limitation vesting of benefits), and preexisting condition limitations will be waived with respect to Hired Employees and their covered dependents unless such preexisting condition limitations were applicable prior to the Effective Time. In addition, if prior to the Effective Time

32

a Hired Employee or his or her covered dependents paid any amounts towards a deductible or out-of-pocket maximum in Seller's or its affiliate's medical and health plan's current fiscal year, such amounts shall be applied toward satisfaction of the deductible or out-of-pocket maximum in the current fiscal year of Purchaser's medical and health plan that covers Hired Employees on and after the Effective Time.

(f)    Seller shall be responsible to provide continuation coverage pursuant to the requirements of Code section 4980B and Part 6 of Title I of ERISA ("COBRA Coverage") with respect to the Hospital Employees (and their dependents) whose qualifying event occurred prior to the date on which the Hospital Employees become Hired Employees. Purchaser shall be responsible to provide COBRA Coverage with respect to each of the Hired Employees (and their dependents) whose qualifying event occurs on or after the date on which the Hospital Employees become Hired Employees. From and after the Closing Date, Seller shall not be liable and responsible for, and Purchaser shall incur liability or responsibility with respect to, any "Continuation Coverage" (as that term is defined by COBRA Section 4980B of the Internal Revenue Code of 1986, as amended (the "Code") and Section 601, et seq. of ERISA) for any Hired Employee terminated on or after the Closing Date. Purchaser shall take no action, which, in any manner, might encourage Hired Employees to assert any COBRA rights against Seller. Purchaser acknowledges and agrees that it is the intent of this provision that Purchaser shall be required to provide continued health coverage under ERISA or Section 4980B of the Code to any of such Hired Employees or to any qualified beneficiary (as defined for purposes of Section 4980B of the Code) with respect to any such Hired Employees.

(g)    After the Operational Closing Date, Purchaser's human resources department will give reasonable assistance to Seller's and its affiliate's human resources departments and Seller's agents with respect to Seller's and Seller's affiliates' post-Closing administration of Seller's and Seller's affiliates' pre-Closing wage and benefit obligations, and employee pension benefit plans and employee health or welfare benefit plans for the Hospital Employees (other than the Retained Management Employees). Within five (5) days after the Operational Closing Date, Purchaser shall provide to Seller a list of all the Hospital Employees who were offered employment by Purchaser but refused such employment.

5.4    <u>Excluded Assets</u>.  As soon as practicable after the Closing Date, Purchaser shall deliver to Seller or Seller's designee any Excluded Assets found at the Hospital on and after the Effective Time, without imposing any charge on Seller for Purchaser's storage or holding of same on and after the Effective Time.

5.5    <u>Waiver of Bulk Sales Law Compliance</u>.  Purchaser hereby waives compliance by Seller with the requirements, if any, of Article 6 of the Uniform Commercial Code as in force in any state in which the Assets are located and all other similar laws applicable to bulk sales and transfers.

5.6    <u>Indigent and Low Income Care</u>.  Purchaser acknowledges that the Hospital has historically provided significant levels of care for indigent and low-income patients and has operated and provided care (to indigent and low-income patients and others) through a variety of community-based health programs. Subject to changes in applicable law or governmental guidelines or policies (such as implementation of universal healthcare coverage), for a period of

no less than five (5) years following the Operational Closing Date, Purchaser shall (a) adhere to applicable statutes and regulations pertaining to charity care as in effect immediately prior to the Operational Closing Date or such more liberal or generous policies and practices on charity care as Purchaser may have in effect or implement from time to time, (b) continue to provide care to indigent and low-income patients at levels similar to or more generous than those historically provided by the Hospital and (c) assure access to high-quality healthcare services to all persons seeking medical care, regardless of their ability to pay.

5.7    <u>Medical Staff</u>.  To ensure continuity of care in the community, Purchaser agrees that the Hospital's medical staff members in good standing as of the Effective Time shall maintain medical staff privileges at the Hospital as of the Effective Time.  On and after the Effective Time, the medical staff will be subject to the Hospital's Medical Staff Bylaws then in effect.

5.8    <u>Local Governing Board</u>.

(a)    Immediately after the Effective Time, Purchaser shall form a local governing board at the Hospital in accordance with the terms of this <u>Section 5.8</u>.  Such local governing board shall be an advisory committee to the board of directors of Purchaser comprised of medical staff members, community leaders and the Hospital's Chief Executive Officer.  The local governing board shall be subject to the authority of Purchaser's board of directors and the terms of Purchaser's Articles of Incorporation, Bylaws and other organizational documents.  The individuals on the local governing board should (i) represent the Hospital in the community and represent the views of the community to the local governing board in its deliberations, (ii) participate in Purchaser's community outreach programs and (iii) supervise the Hospital's charity care policies and practices.

(b)    The local governing board of the Hospital shall have responsibilities that are consistent with similar local governing boards at other hospitals, or in other markets, respectively, which are owned directly or indirectly by affiliates of Purchaser.  Purchaser shall consult with Seller or a successor established by Seller as to the appointment of community members to serve as members of the local governing board.

5.9    <u>Capital Expenditures</u>.  During the period commencing on the Operational Closing Date and ending on the five (5) year anniversary date of the Closing, Purchaser agrees that it will invest no less than Fifteen Million Dollars ($15,000,000.00) for capital improvements, equipment, information technology, infrastructure improvements, and/or working capital at the Hospital.

5.10    <u>Maintenance of Services</u>.  Purchaser agrees that following the Closing, Purchaser will operate the Hospital as a licensed acute care hospital with an open and accessible emergency department and further agrees that the emergency department.

5.11    <u>Attorney General Conditions</u>.  Purchaser understands that the California Attorney General is likely to impose certain conditions on Purchaser's acquisition and operation of the Hospital.  Purchaser agrees to accept such conditions provided that they are reasonably related to ensuring that Purchaser continue to preserve current Hospital services and continue to provide current charitable medical services and community benefit programs.  Purchaser shall have the primary obligation, with assistance as necessary from Seller, to obtain (i) the California Attorney General's written waiver under Corporations Code section 5920(c) of the Attorney General's written consent requirement under Corporations Code section 5922 or (ii) the Attorney General's written consent under Corporations Code section 5922, of this Agreement and the transactions contemplated by this Agreement.  Purchaser shall advance or reimburse Seller for, at Seller's election, any costs associated with the Attorney General waiver or consent requirements, including, without limitation, the cost of the written submissions, meetings pursuant to California Corporations Code section 5922, contracts with consultants or experts, appraisal costs, and costs incurred in connection with compliance with Title 11 of the California Code of Regulations, including section 999.5.

## ARTICLE 6

## SELLER'S BANKRUPTCY AND BANKRUPTCY COURT APPROVAL

6.1    <u>Bankruptcy Court Approval</u>.

(a)    Seller and Purchaser acknowledge that this Agreement and the sale of the Assets and the assumption and assignment of the Assumed Contracts and Assumed Leases are subject to Bankruptcy Court approval.

(b)    Seller shall promptly file a motion pursuant to Bankruptcy Code Section 363 seeking approval of this Agreement ("Sale Motion") and shall exercise good faith and use reasonable efforts to obtain a "Sale Order".  For purposes of this Agreement, the term "Sale Order" shall mean an order of the Bankruptcy Court authorizing the sale of the Assets (including the assumption and assignment of the Assumed Contracts and Assumed Leases) to Purchaser consistent with this Agreement and in a form satisfactory to Purchaser.

(c)    Seller agrees to proceed in good faith to obtain Bankruptcy Court approval of the sale contemplated herein with a determination that Purchaser is in good faith pursuant to Bankruptcy Code section 363(m) and to file such declarations and other evidence as may be required to support a finding of good faith.

(d)    From and after the Effective Date and prior to the Closing or the termination of this Agreement, Seller shall not take any action which is intended to (or is reasonably likely to), or fail to take any action the intent (or the reasonably likely result) of which failure to act is to, result in the reversal, voiding, modification or staying of this Agreement.

6.2    Bankruptcy Filings

(a)    From and after the Effective Date and until the Closing Date, Seller shall deliver to Purchaser copies of all pleadings, motions, notices, statements, schedules, applications, reports and other papers that are filed in the Bankruptcy Case at the time of their filing, but with respect to any such papers that Seller may file that relate, in whole or in part, to this Agreement, or to Purchaser or its agents or representatives, Seller shall use reasonable efforts to provide such prior notice as may be reasonable under the circumstances before the filing of such papers. Notwithstanding the foregoing, Seller shall not file any pleadings, motions, notices, statements, schedules, applications, reports and other papers in the Bankruptcy Case that would, or would reasonably be expected to, alter, modify, limit or restrict Purchaser's rights or remedies pursuant to this Agreement, without the prior written consent of Purchaser (which may be granted or withheld in Purchaser's sole discretion).

6.3    Bidding Procedures.

(a)    Seller reserves the right to obtain a higher bid for the Assets pursuant to bidding procedures to be utilized by the Seller in its discretion and in the exercise of its business judgment.  Seller has represented to Purchaser that any overbids must: (a) be accompanied by a deposit in the form of cash or a cashier's check in the amount of $5,750,000; (b) provide evidence satisfactory to the Seller of having sufficient specifically committed funds to complete the transaction or a non-contingent lending commitment for the full bid amount and such other documentation relevant to the bidder's ability to qualify as the purchaser of the Assets and ability to close the sale and immediately and unconditionally pay the purchase price at closing; (c) provide admissible evidence of its ability to provide adequate assurance of future performance under the Assigned Leases and Assigned Contracts; (d) seek to acquire the Assets on terms and conditions not less favorable to the Seller than the terms and conditions to which the Purchaser has agreed, including but not limited to completing any due diligence by the same deadline as imposed on the Purchaser and closing on the sale in the same time parameters as the Purchaser.

6.4    Break-Up Fee.

(a)    In the event that an overbidder (and not the Purchaser) is the successful bidder for the purchase of the Assets or Seller voluntarily elects not to proceed with a sale of its Assets, the Seller shall request authorization of the Bankruptcy Court to pay the Purchaser's fees and expense associated with the sale of the Assets in an amount of the Purchaser's fees and expenses, agreed by the parties to be $650,000 ("Break-Up Fee").  The Break-Up Fee will be subject to Bankruptcy Court approval and shall constitute a super-priority administrative expense of Seller under Section 364(c)(1) of the Bankruptcy Code with priority over any and all administrative expenses of any kind, including those specified in Sections 503(b) or 507(b) of

36

the Bankruptcy Code. Purchaser shall be allowed to credit bid the Break-Up Fee in any overbids that Purchaser may elect to make with respect the Assets.

6.5     Appeal of Sale Order.

(a)     In the event an appeal is taken or a stay pending appeal is requested from the Sale Order, Seller shall immediately notify Purchaser of such appeal or stay request and shall provide to Purchaser promptly a copy of the related notice of appeal or order of stay. Seller shall also provide Purchaser with written notice of any motion or application filed in connection with any appeal from either of such orders. In the event of an appeal of the Sale Order, Seller shall be primarily responsible for drafting pleadings and attending hearings as necessary to defend against the appeal.

## ARTICLE 7

## CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER

Seller's obligation to sell the Assets and to close the transactions as contemplated by this Agreement shall be subject to the satisfaction of each of the following conditions on or prior to the Closing Date unless specifically waived in writing by Seller in whole or in part at or prior to the Closing:

7.1     Signing and Delivery of Instruments.  Purchaser shall have executed and delivered all documents, instruments and certificates required to be executed and delivered pursuant to the provisions of this Agreement. Purchaser acknowledges that Purchaser shall not satisfy the condition precedent set forth in this Section 7.1 (as it relates to the delivery of the amount set forth in Section 1.6.1) unless Purchaser initiates the wire transfer of the amount set forth in Section 1.6.1 to the Title Company, and provides to Seller a Federal Reserve wire reference number with respect thereto, on or before 12:00 noon (Pacific time) on the Closing Date.

7.2     No Restraints.  No temporary restraining order, preliminary or permanent injunction or other order preventing the consummation of the transactions contemplated in this Agreement shall have been issued by any court of competent jurisdiction or any other governmental body and shall remain in effect on the Closing Date, and further, no governmental entity shall have commenced any action or suit before any court of competent jurisdiction or other governmental authority that seeks to restrain or prohibit the consummation of the transactions contemplated hereby.

7.3     Performance of Covenants.  Purchaser shall have in all respects performed or complied with each and all of the obligations, covenants, agreements and conditions required to be performed or complied with by it on or prior to the Closing Date.

7.4     Governmental Authorizations.  Purchaser shall have obtained all material licenses, permits and authorizations from governmental agencies or governmental bodies that are necessary or required for completion of the transactions contemplated by this Agreement, including reasonable assurances that any material licenses, permits and authorizations not

37

actually issued as of the Closing will be issued following Closing (which may include oral assurances from appropriate governmental agencies or bodies) and all necessary approvals required to redeem the California Health Facility Financing Authority Insured Hospital Refunding Revenue Bonds (Victor Valley Community Hospital Series 2000A).

7.5    Board Approval.  Seller's Board of Directors shall have approved the transactions contemplated by this Agreement.

7.6    Attorney General Approval.    The California Attorney General shall have approved the transactions contemplated by this Agreement.

7.7    Bankruptcy Court Approval.  The Bankruptcy Court shall have entered the Sale Order.

## ARTICLE 8

## CONDITIONS PRECEDENT TO OBLIGATIONS OF PURCHASER

Purchaser's obligation to purchase the Assets and to close the transactions contemplated by this Agreement shall be subject to the satisfaction of each of the following conditions on or prior to the Closing Date unless specifically waived in writing by Purchaser in whole or in part at or prior to the Closing.

8.1    Governmental Authorizations.    Purchaser shall have obtained licenses, permits and authorizations from governmental agencies or governmental bodies that are required for operation of the Acute Care Hospital, except in such case where failure to obtain such license, permit or authorizations from a governmental agency or governmental body does not have a material adverse effect.

8.2    Bankruptcy Court Approval.  The Bankruptcy Court shall have entered the Sale Order and made a finding that Purchaser is a "good faith" purchaser under § 363 of the Bankruptcy Code.

8.3    Signing and Delivery of Instruments.  Seller shall have executed and delivered all documents, instruments and certificates required to be executed and delivered pursuant to all of the provisions of this Agreement.

8.4    Performance of Covenants.  Seller shall have in all material respects performed or complied with each and all of the obligations, covenants, agreements and conditions required to be performed or complied with by Seller on or prior to the Closing Date; *provided, however,* this condition will be deemed to be satisfied unless (a) Seller was given written notice of such failure to perform or comply and did not or could not cure such failure to perform or comply within fifteen (15) business days after receipt of such notice and (b) the respects in which such obligations, covenants, agreements and conditions have not been performed have had or would more likely than not result in a material adverse effect on the Assets or the business of the Hospital.

8.5    <u>No Restraints</u>.    No temporary restraining order, preliminary or permanent injunction or other order preventing the consummation of the transactions contemplated in this Agreement shall have been issued by any court of competent jurisdiction or any governmental body and shall remain in effect on the Closing Date, and further, no governmental entity shall have commenced any action or suit before any court of competent jurisdiction or other governmental authority that seeks to restrain or prohibit the consummation of the transactions contemplated hereby.

8.6    <u>Title Insurance Policy</u>.    The Title Company has irrevocably committed to issue the Title Policy to Purchaser covering the Owned Real Property and any ground lease specified on **Schedule 4.8** in the amount of the full insurable value of the Owned Real Property and any such ground lease, respectively (which amount shall be set forth in **Schedule 11.2(b)**).    Such Title Policy shall show fee simple title to the Owned Real Property vested in Purchaser, and valid leasehold title to the Leased Real Property which is subject to any ground lease specified on **Schedule 4.8**, subject only to: (a) current real estate taxes not yet due and payable; and (b) the permitted title exceptions listed in **Schedule 8.6** hereto (the "Permitted Exceptions").    The failure to obtain the Title Policy in a form required by Purchaser shall not be a breach of any obligation of Seller under this Agreement.

8.7    <u>Attorney General Approval</u>.    <u>The California Attorney General shall have approved the transactions contemplated by this Agreement.</u>

## ARTICLE 9

## <u>TERMINATION</u>

9.1    <u>Termination</u>.    This Agreement may be terminated at any time prior to Closing:

(a)    by the mutual written consent of the parties;

(b)    by Seller if a material breach of this Agreement has been committed by Purchaser and such breach has not been (i) waived in writing by Seller or (ii) cured by Purchaser to the reasonable satisfaction of Seller within fifteen (15) business days after service by Seller upon Purchaser of a written notice which describes the nature of such breach; *provided, however,* Seller shall not be permitted to terminate this Agreement pursuant to this <u>Section 9.1(b)</u> if such material breach was caused by Seller or if Seller is also in material breach of this Agreement;

(c)    by Purchaser if a material breach of this Agreement has been committed by Seller and such breach has not been (i) waived in writing by Purchaser or (ii) cured by Seller to the reasonable satisfaction of Purchaser within fifteen (15) business days after service by Purchaser upon Seller of a written notice which describes the nature of such breach; *provided, however,* Purchaser shall not be permitted to terminate this Agreement pursuant to this <u>Section 9.1(c)</u> if such material breach was caused by Purchaser or if Purchaser is also in material breach of this Agreement;

(d)    by Purchaser if any of the conditions in <u>ARTICLE 8</u> have not been satisfied as of the Closing Date or if satisfaction of any condition in <u>ARTICLE 8</u> is or becomes

impossible and Purchaser has not waived such condition in writing on or before the Closing Date (provided that the failure to satisfy the applicable condition or conditions has occurred by reason other than (i) through the failure of Purchaser to comply with its obligations under this Agreement or (ii) Seller's failure to provide its closing deliveries on the Closing Date as a result of Purchaser not being ready, willing and able to close the transaction on the Closing Date);

(e)      by Seller if any of the conditions in ARTICLE 7 have not been satisfied as of the Closing Date or if satisfaction of any such condition in ARTICLE 7 is or becomes impossible and Seller has not waived such condition in writing on or before the Closing Date (provided that the failure to satisfy the applicable condition or conditions has occurred by reason other than (i) through the failure of Seller to comply with their obligations under this Agreement or (ii) Purchaser's failure to provide its closing deliveries on the Closing Date as a result of Seller not being ready, willing and able to close the transaction on the Closing Date);

(f)      by either Purchaser or Seller if the Bankruptcy Court enters an order dismissing the Bankruptcy Case or fails to approve the sale of the Assets to Purchaser;

(g)      by Purchaser or Seller, upon the delivery of a Casualty Termination Notice in accordance with Section 1.14; or

(h)      by either Purchaser or Seller if the Closing has not occurred (other than through the failure of any party seeking to terminate this Agreement to comply fully with its obligations under this Agreement) on or before December 31, 2010, unless the failure to close by that date is due to pending review of the transaction by the California Attorney General under the California Corporations Code (the "Termination Date").

9.2     Termination Consequences.

(a)      If this Agreement is terminated pursuant to Sections 9.1(a), (b), (e), or (g), (a) all further obligations of the parties under this Agreement shall terminate, except that the obligations in Sections 5.6, 13.3, 13.8, and 13.12 shall survive, and (b) each party shall pay the costs and expenses incurred by it in connection with this Agreement, except as provided in Section 13.12.

(b)      If this Agreement is terminated by Purchaser pursuant to Sections 9.1(c), (d), (f), or (h), (a) the obligations in Sections 5.6, 13.3, 13.8, and 13.12 shall survive, (b) Seller shall pay to Purchaser the sum of Six Hundred Fifty Thousand Dollars ($650,000.00) (the "Break-Up Fee") within fifteen (15) business days of the termination of this Agreement.  Each Party acknowledges that the agreements contained in this Section 9.2(b) are an integral part of the transactions contemplated by this Agreement, that without these agreements such Party would not have entered into this Agreement, and that any amounts payable pursuant to this Section 9.2(b) do not constitute a penalty, and constitute liquidated damages and the receipt of the payment of the Break-Up Fee shall constitute the sole remedy for Purchaser arising out of such termination, including the matters, circumstances or reasons giving rise to the right of Buyer to terminate.

# ARTICLE 10

## POST-CLOSING MATTERS

10.1     <u>Excluded Assets and Excluded Liabilities</u>.  Subject to <u>Section 11.2</u> hereof, any asset or any liability, all other remittances and all mail and other communications that is an Excluded Asset or an Excluded Liability (a) pursuant to the terms of this Agreement, (b) as otherwise determined by the parties' mutual written agreement or (c) absent such agreement, as determined by adjudication by a court or similar tribunal, and which comes into the possession, custody or control of Purchaser (or its respective successors-in-interest, assigns or affiliates) shall within five (5) business days following receipt be transferred, assigned or conveyed by Purchaser (and its respective successors-in-interest, assigns and affiliates) to Seller at Seller's cost.  Until such transfer, assignment and conveyance, Purchaser (and its respective successors-in-interest, assigns and affiliates) shall not have any right, title or interest in or obligation or responsibility with respect to such asset or liability except that Purchaser shall hold such asset in trust for the benefit of Seller.  Purchaser (and its respective successors-in-interest, assigns and affiliates) shall have neither the right to offset amounts payable to Seller under this <u>Section 9.1</u> against, nor the right to contest its obligation to transfer, assign and convey to Seller because of, outstanding claims, liabilities or obligations asserted by Purchaser against Seller and the indemnification provisions of <u>Section 11.2</u>.  If Purchaser does not remit any monies included in the Excluded Assets to Seller in accordance with the first sentence of this <u>Section 10.1</u>, such withheld funds shall bear interest at the Prime Rate in effect on the calendar day upon which such payment was required to be made to Seller (the "Excluded Asset Due Date") plus five percent (5%) (or the maximum rate allowed by law, whichever is less), such interest accruing on each calendar day after the Excluded Asset Due Date until payment of the Excluded Assets and all interest thereon is made to Seller.  The terms of this <u>ARTICLE 10</u> shall not be subject to the time limitations contained in <u>Section 11.1</u> of this Agreement.

10.2     <u>Preservation and Access to Records After the Closing</u>.

     (a)     From the Operational Closing Date until seven (7) years after the Operational Closing Date or such longer period as required by law (the "Document Retention Period"), Purchaser shall keep and preserve all medical records, patient records, medical staff records and other books and records which are among the Assets as of the Effective Time, but excluding any records which are among the Excluded Assets.  Purchaser will afford to the representatives of Seller, including its counsel and accountants, full and complete access to, and copies (including, without limitation, color laser copies) of, such records with respect to time periods prior to the Effective Time (including, without limitation, access to records of patients treated at the Hospital prior to the Effective Time) during normal business hours after the Effective Time, to the extent reasonably needed by Seller or Seller's affiliates for business purposes.  Purchaser acknowledges that, as a result of entering into this Agreement and operating the Hospital, it will gain access to patient records and other information which are subject to rules and regulations concerning confidentiality.  Purchaser shall abide by any such rules and regulations relating to the confidential information it acquires, and shall maintain privacy practices which are equal to or better than the privacy practices of Seller.  Purchaser shall maintain the patient and medical staff records at the Hospital in accordance with applicable law

41

and the requirements of relevant insurance carriers.  After the expiration of the Document Retention Period, if Purchaser intends to destroy or otherwise dispose of any of the documents described in this Section 10.2(a), Purchaser shall provide written notice to Seller of Purchaser's intention no later than forty-five (45) calendar days prior to the date of such intended destruction or disposal.  Seller shall have the right, at its sole cost, to take possession of such documents during such forty-five (45) calendar day period.  If Seller does not take possession of such documents during such forty-five (45) calendar day period, Purchaser shall be free to destroy or otherwise dispose of such documentation upon the expiration of such forty-five (45) calendar day period.

(b)    Purchaser shall give full cooperation to Seller, Seller's affiliates and their insurance carriers in respect of the defense of claims by third parties against Seller or any affiliate of Seller, in respect of events occurring prior to the Effective Time with respect to the operation of the Hospital.  Such cooperation shall include, without limitation, making the Hired Employees available for interviews, depositions, hearings and trials.  Such cooperation shall also include making all of its employees available to assist in the securing and giving of evidence and in obtaining the presence and cooperation of witnesses (all of which shall be done without payment of any fees or expenses to Purchaser or to such employees).  In addition, Seller and Seller's affiliates shall be entitled to remove from the Hospital originals of any such records, but only for purposes of pending litigation involving the persons to whom such records refer, as certified in writing prior to removal by counsel retained by Seller or any of Seller's affiliates in connection with such litigation.  Any records so removed from the Hospital shall be promptly returned to Purchaser following Seller's or its applicable affiliate's use of such records.

(c)    In connection with (i) the transition of the Hospital pursuant to the transaction contemplated by this Agreement, (ii) Seller's rights to the Excluded Assets, and (iii) Seller's obligations under the Excluded Liabilities, Purchaser shall after the Effective Time give Seller access during normal business hours to Purchaser's books, accounts and records and all other relevant documents and information with respect to the assets, liabilities and business of the Hospital as representatives of Seller and Seller's affiliates may from time to time reasonably request, all in such manner as not to unreasonably interfere with the operations of the Hospital.  Seller acknowledges that it shall coordinate its activities contemplated by this Section 10.2(c) through Michael Sarrao, or his designee.

(d)    Purchaser and its representatives shall be given access by Seller during normal business hours to the extent reasonably needed by Purchaser for business purposes to all documents, records, correspondence, work papers and other documents retained by Seller pertaining to any of the Assets or with respect to the operation of the Hospital prior to the Effective Time, all in such manner as to not interfere unreasonably with Seller's business.  Such documents and other materials shall be, at Seller's option, either (i) copied by Seller for Purchaser at Purchaser's expense, or (ii) removed by Purchaser from the premises, copied by Purchaser and promptly returned to Seller.

(e)    Purchaser shall comply with, and be solely responsible for, all obligations under the Standards for Privacy of Individually Identifiable Health Information (45 CFR Parts

c:\documents and settings\mk\local settings\temporary internet files\olkf\apa 9-13-2010 (prime)(clean 003).doc

160 and 164) promulgated pursuant to the Health Insurance Portability and Accountability Act of 1996 with respect to the operation of the Hospital on and after the Effective Time.

(f)    Purchaser shall cooperate with Seller, on a timely basis and as reasonably requested by Seller, in connection with the provision of all data of the Hospital and other information required by Seller for reporting to HFAP for the remainder of the quarterly period in which the Closing has occurred.

(g)    To the maximum extent permitted by law, if any Person requests or demands, by subpoena or otherwise, any documents relating to the Excluded Liabilities or Excluded Assets, including without limitation, documents relating to the operations of any of the Hospital or any of the Hospital's committees prior to the Effective Time, prior to any disclosure of such documents, Purchaser shall notify Seller and shall provide Seller with the opportunity to object to, and otherwise coordinate with respect to, such request or demand.

## ARTICLE 11

## SURVIVAL AND INDEMNIFICATION

11.1    <u>Survival</u>.  Except as expressly set forth in this Agreement to the contrary, all representations, warranties, covenants, agreements and indemnifications of Purchaser and Seller, respectively, contained in this Agreement or in any document delivered pursuant hereto shall continue to be fully effective and enforceable following the Operational Closing Date for one year and shall thereafter be of no further force and effect.  Notwithstanding the foregoing, the indemnifications contained in Section 11.2.1(f) shall continue to be fully effective and enforceable following the Operational Closing Date for the applicable statute of limitations period, plus thirty (30) days, and the indemnifications contained in <u>Sections 11.2.1(c)</u>, <u>11.2.1(d)</u>, <u>11.2.1(e)</u>, <u>11.2.1(h)</u>, and <u>11.3.1(d)</u> shall continue to be fully effective and enforceable following the Operational Closing Date without any time limitation; *provided, however,* that if there is an outstanding notice of a claim at the end of any such applicable period in compliance with the terms of <u>Section 11.4</u>, such applicable period shall not end in respect of such claim until such claim is resolved.

11.2    <u>Indemnification of Purchaser by Seller</u>.

11.2.1    <u>Indemnification</u>.  Seller shall keep and save Purchaser, and its directors, officers, employees, agents and other representatives (the "Purchaser Indemnified Parties"), forever harmless from and shall indemnify and defend the Purchaser Indemnified Parties from and against any and all obligations, judgments, liabilities, penalties, violations, fees, fines, claims, losses, costs, demands, damages, liens, encumbrances and expenses including reasonable attorneys' fees (collectively, "Damages"), to the extent connected with or arising or resulting from (a) any breach of any representation or warranty of Seller under this Agreement, (b) any breach or default by Seller of any covenant or agreement of Seller under this Agreement, (c) the Excluded Liabilities, (d) the Excluded Assets, (e) all federal, state and local income taxes relating to Seller ("Seller Tax Claims"), (f) any professional liability claim arising out of the business operations of the Acute Care Hospital prior to the Effective Time ("Pre-Closing E&O Matters"), (g) any act, conduct or omission of Seller that has accrued, arisen, occurred or come

into existence at any time prior to the Effective Time, and (h) any of those certain pending governmental investigations which are described on **Schedule 11.2.1**.  Seller's obligations under this Section 11.2.1 shall remain subject to, and shall be limited by, the provisions contained in Section 1.13.  No provision in this Agreement shall prevent Seller from pursuing any of its legal rights or remedies that may be granted to Seller by law against any person or legal entity other than Purchaser.  Nothing in this Article 11 shall prevent Seller as debtor from reorganizing, liquidating, or dissolving, and distributing its assets under federal or state law, including federal bankruptcy law.

11.2.2   Indemnification Limitations.

(a)     Notwithstanding any provision to the contrary contained in this Agreement, Seller shall be under no liability to indemnify Purchaser under Section 11.2.1 and no claim under Section 11.2.1 of this Agreement shall:

(i)     be made unless notice thereof shall have been given by or on behalf of Purchaser to Seller in the manner provided in Section 11.4, unless failure to provide such notice in a timely manner does not materially impair Seller's ability to defend its rights, mitigate damages, seek indemnification from a third party or otherwise protect its interests;

(ii)    be made to the extent that any loss may be recovered under a policy of insurance in force on the date of loss; *provided, however,* that this Section 11.2.2(a)(ii) shall not apply to the extent that (A) coverage under the applicable policy of insurance is denied by the applicable insurance carrier (provided, further, that nothing hereunder shall require that Purchaser institute any formal legal proceeding against the applicable insurer prior to seeking indemnification from Seller) or (B) any such loss is not fully covered by the applicable policy of insurance;

(iii)   be made to the extent that such claim relates to a liability arising out of or relating to any act, omission, event or occurrence connected with:

(A)     the use, ownership or operation of the Hospital, or

(B)     the use, ownership or operation of any of the Assets,

on and after the Effective Time (without regard to whether such use, ownership or operation is consistent with Seller's policies, procedures and/or practices prior to the Effective Time); other than as specifically included in the Excluded Liabilities, Seller Tax Claims or Pre-Closing E&O Matters;

(iv)    be made to the extent that such claim (or the basis therefor) is set forth in the Disclosure Schedule, any Exhibit or Schedule to this Agreement; provided, that this Section 11.2.2(a)(iv) shall not apply to the Excluded Liabilities, Seller Tax Claims or Pre-Closing E&O Matters;

44

(v)    be made to the extent that Purchaser had knowledge of (A) any breach of a representation and warranty by Seller (as contemplated by <u>Section 3.8</u>) or (B) other indemnifiable event, prior to the Effective Time;

(vi)    be made to the extent such claim relates to an obligation or liability for which Purchaser has agreed to indemnify Seller pursuant to <u>Section 10.3</u>;

(vii)    be made to the extent that such claim would not have arisen but for a voluntary act, omission or transaction carried out by Purchaser or its affiliates after the Effective Date;

(viii)    be made to the extent such claim relates to Seller's failure to comply with or the Assets' failure to be in compliance with (A) the Americans with Disabilities Act or (B) the Alfred E. Alquist Hospital Facilities Seismic Safety Act of 1983, as amended by the California Hospital Facilities Seismic Safety Act (codified at California Health and Safety Code §129675 through §130070); *provided, however,* this <u>Section 11.2.2(a)(viii)</u> shall not apply to the extent that such claim arises as a result of a claim brought by a non-governmental third party who has suffered personal injury prior to the Effective Time;

(ix)    be made to the extent such claim seeks Damages which are consequential in nature (as opposed to direct), including, without limitation, loss of future revenue or income or loss of business reputation or opportunity (collectively, "Consequential Damages"); *provided, however,* the limitation contained in this <u>Section 11.2.2(a)(ix)</u> shall not apply to the extent (A) of any payments which Purchaser is required to make to a third party (other than any third party which is an affiliate of, investor of or lender to Purchaser) which are in the nature of Consequential Damages and (B) such third party's claim is unrelated to the failure to obtain any or all of the Contract and Lease Consents; and

(x)    accrue to Purchaser unless and only to the extent that (A) the actual liability of Seller in respect of any single claim under <u>Section 11.2.1(a)</u> exceeds Ten Thousand Dollars ($10,000) (a "Relevant Claim") and (B) the total actual liability of Seller in respect of all Relevant Claims arising under <u>Section 11.2.1(a)</u> in the aggregate exceeds Five Hundred Thousand Dollars ($500,000) (the "Aggregate Amount"), in which event Purchaser shall be entitled to seek indemnification under <u>Section 11.2.1(a)</u> for all Relevant Claims only in an amount of Damages which exceed the Aggregate Amount.

(b)    Notwithstanding any provision to the contrary contained in this Agreement, the maximum aggregate liability of Seller to Purchaser under this Agreement shall not exceed the amount equal to the Purchase Price in the aggregate.

(c)    If Purchaser is entitled to recover any sum (whether by payment, discount, credit or otherwise) from any third party in respect of any matter for which a claim of indemnity could be made against Seller hereunder, Purchaser shall use its reasonable efforts to recover the full amount of such sum from such third party prior to making a claim hereunder and any sum recovered will reduce the amount of the claim.  If Seller pays to Purchaser an amount in respect

45

of a claim, and Purchaser subsequently recovers from a third party a sum which is referable to that claim, Purchaser shall forthwith repay to Seller so much of the amount paid by it as does not exceed the sum recovered from the third party less all reasonable costs, charges and expenses incurred by Purchaser in obtaining payment in respect of that claim and in recovering that sum from the third party.

 11.3 <u>Indemnification of Seller by Purchaser</u>.

  11.3.1 <u>Indemnification</u>. Purchaser shall keep and save Seller, and Seller's affiliates and respective directors, officers, employees, agents and other representatives, forever harmless from and shall indemnify and defend Seller and Seller's affiliates and respective directors, officers, employees, agents and other representatives against any and all matters and Damages, to the extent connected with or arising or resulting from (a) any breach of any representation or warranty of Purchaser under this Agreement, (b) any breach or default by Purchaser under any covenant or agreement of Purchaser under this Agreement, (c) any claims, demands or causes of action by the PHM Parties , or any of the foregoing entities' owners, members, partners, managers, directors, officers, and employees arising out of matters related to the negotiation of this Agreement, this Agreement, post-petition activities, and the actions of Purchaser and its permitted assignee; *provided, however*, that Purchaser shall have no obligation to defend or indemnify against any matter related to any loans or advances, whether secured or unsecured, made by the PHM Parties to Seller or its affiliates, any management fees due to the PHM Parties as a result of services provided by the PHM Parties, and/or any management fees allegedly due as a result of the rejection of any agreements between Seller and the PHM Parties, , (d) cost reports (and all claims with respect thereto) relating to Purchaser with respect to Medicare, Medi-Cal, TRICARE or Blue Cross programs or any other third-party payor for all periods beginning on and after the Effective Time, (e) the Assumed Obligations, (f) any professional liability claim arising out of the business operations of the Hospital on and after the Effective Time, (g) any other obligation or liability specifically assumed by Purchaser in this Agreement, (h) liabilities to the Hired Employees arising out of actions of Purchaser based wholly or in part upon the contents of the personnel records of such employees, (i) any act, conduct or omission of Purchaser that has accrued, arisen, occurred or come into existence at any time, (j) any securities litigation involving (i) Purchaser and/or (ii) any financing obtained by Purchaser which is utilized to fund, in whole or in part, the Cash Purchase Price, other than to the extent arising out of any willful misconduct of Seller or its employees, or intentionally false or intentionally misleading statements of Seller or its employees, (k) any non-compliance with any "bulk transfer laws", and (l) any and all loss, liability, cost, damage or expense (including, without limitation, attorneys' fees, accountants' fees, consultants' fees, court costs and interest) related to Purchaser's inspections and assessments of the Assets prior to the Effective Time.  No provision in this Agreement shall prevent Purchaser from pursuing any of its legal rights or remedies that may be granted to Purchaser by law against any person or legal entity other than Seller or any affiliate of Seller.

11.3.2  Indemnification Limitations.

(a)  Notwithstanding any provision to the contrary contained in this Agreement, Purchaser shall be under no liability to indemnify Seller under Section 11.3.1 and no claim under Section 11.3.1 of this Agreement shall:

(i)  be made unless notice thereof shall have been given by or on behalf of Seller to Purchaser in the manner provided in Section 11.4, unless failure to provide such notice in a timely manner does not materially impair Purchaser's ability to defend its rights, mitigate damages, seek indemnification from a third party or otherwise protect its interests;

(ii)  be made to the extent that any loss may be recovered under a policy of insurance in force on the date of loss; *provided, however,* that this Section 11.3.2(a)(ii) shall not apply to the extent that (A) coverage under the applicable policy of insurance is denied by the applicable insurance carrier (provided, further, that nothing hereunder shall require that Seller institute any formal legal proceeding against the applicable insurer prior to seeking indemnification from Purchaser) or (B) any such loss is not fully covered by the applicable policy of insurance;

(iii)  be made to the extent that such claim relates to a liability of Seller arising out of or relating to any act, omission, event or occurrence connected with:

(A)  the use, ownership or operation of the Hospital, or

(B)  the use, operation or ownership of any of the Assets,

prior to the Effective Time, other than as specifically stated in Section 11.3.1 or included in the Assumed Obligations;

(iv)  be made to the extent such claim relates to an obligation or liability for which Seller has agreed to indemnify Purchaser pursuant to Section 11.2;

(v)  be made to the extent such claim seeks Consequential Damages; *provided, however,* the limitation contained in this Section 11.3.2(a)(v) shall not apply to the extent of any payments which Seller or any affiliate of Seller is required to make to a third party which are in the nature of Consequential Damages; and

(vi)  accrue to Seller unless and only to the extent that (A) the actual liability of Purchaser in respect of any single claim under Section 11.3.1(a) exceeds Ten Thousand Dollars ($10,000) (a "Seller Relevant Claim") and (B) the total actual liability of Purchaser in respect of all Seller Relevant Claims arising under Section 11.3.1(a) in the aggregate exceeds Five Hundred Thousand Dollars ($500,000) (the "Seller Aggregate Amount"), in which event Seller shall be entitled to seek indemnification under Section 11.3.1(a) for all Seller Relevant Claims only in an amount of Damages which exceed the Seller Aggregate Amount.

(b)    If Seller is entitled to recover any sum (whether by payment, discount, credit or otherwise) from any third party in respect of any matter for which a claim of indemnity could be made against Purchaser hereunder, Seller shall use their reasonable endeavors to recover such sum from such third party and any sum recovered will reduce the amount of the claim.  If Purchaser pays to Seller an amount in respect of a claim, and Seller subsequently recovers from a third party a sum which is referable to that claim, Seller shall forthwith repay to Purchaser so much of the amount paid by it as does not exceed the sum recovered from the third party less all reasonable costs, charges and expenses incurred by Seller in obtaining payment in respect of that claim and in recovering that sum from the third party.

11.4    <u>Method of Asserting Claims</u>.    All claims for indemnification by any person entitled to indemnification (the "Indemnified Party") under this <u>ARTICLE 11</u> will be asserted and resolved as follows:

(a)    In the event any claim or demand, for which a party hereto (an "Indemnifying Party") would be liable for the Damages to an Indemnified Party, is asserted against or sought to be collected from such Indemnified Party by a person other than Seller, Purchaser or their affiliates (a "Third Party Claim"), the Indemnified Party shall deliver a notice of its claim (a "Claim Notice") to the Indemnifying Party within thirty (30) calendar days after the Indemnified Party receives written notice of such Third Party Claim; *provided, however,* that notice shall be provided to the Indemnifying Party within fifteen (15) calendar days after receipt of a complaint, petition or institution of other formal legal action by the Indemnified Party.  If the Indemnified Party fails to provide the Claim Notice within such applicable time period after the Indemnified Party receives written notice of such Third Party Claim and thereby materially impairs the Indemnifying Party's ability to protect its interests, the Indemnifying Party will not be obligated to indemnify the Indemnified Party with respect to such Third Party Claim.  The Indemnifying Party will notify the Indemnified Party within thirty (30) calendar days after receipt of the Claim Notice (the "Notice Period") whether the Indemnifying Party desires, at the sole cost and expense of the Indemnifying Party, to defend the Indemnified Party against such Third Party Claim.

(i)    If the Indemnifying Party notifies the Indemnified Party within the Notice Period that the Indemnifying Party desires to defend the Indemnified Party with respect to the Third Party Claim pursuant to this <u>Section 11.4(a)</u>, then the Indemnifying Party will have the right to defend, at its sole cost and expense, such Third Party Claim by all appropriate proceedings, which proceedings will be prosecuted by the Indemnifying Party to a final conclusion or will be settled at the discretion of the Indemnifying Party.  The Indemnifying Party will have full control of such defense and proceedings, including any compromise or settlement thereof.  Notwithstanding the foregoing, the Indemnified Party may, at its sole cost and expense, file during the Notice Period any motion, answer or other pleadings that the Indemnified Party may deem necessary or appropriate to protect its interests or those of the Indemnifying Party and which is not prejudicial, in the reasonable judgment of the Indemnifying Party, to the Indemnifying Party.  Except as provided in <u>Section 11.4(a)(ii)</u> hereof, if an Indemnified Party takes any such action that is prejudicial and causes a final adjudication that is adverse to the Indemnifying Party, the Indemnifying Party will be relieved of its

48

obligations hereunder with respect to the portion of such Third Party Claim prejudiced by the Indemnified Party's action.  If requested by the Indemnifying Party, the Indemnified Party agrees, at the sole cost and expense of the Indemnifying Party, to cooperate with the Indemnifying Party and its counsel in contesting any Third Party Claim that the Indemnifying Party elects to contest, or, if appropriate and related to the Third Party Claim in question, in making any counterclaim against the person asserting the Third Party Claim, or any cross-complaint against any person (other than the Indemnified Party or any of its affiliates).  The Indemnified Party may participate in, but not control, any defense or settlement of any Third Party Claim controlled by the Indemnifying Party pursuant to this Section 11.4(a)(i), and except as specifically provided in this Section 11.4(a)(i), the Indemnified Party will bear its own costs and expenses with respect to such participation.

(ii)    If the Indemnifying Party fails to notify the Indemnified Party within the Notice Period that the Indemnifying Party desires to defend the Indemnified Party pursuant to this Section 11.4(a), or if the Indemnifying Party gives such notice but fails to prosecute diligently or settle the Third Party Claim, or if the Indemnifying Party fails to give any notice whatsoever within the Notice Period, then the Indemnified Party will have the right to defend, at the sole cost and expense of the Indemnifying Party, the Third Party Claim by all appropriate proceedings, which proceedings will be promptly and reasonably prosecuted by the Indemnified Party to a final conclusion or will be settled at the discretion of the Indemnified Party.  The Indemnified Party will have full control of such defense and proceedings, including any compromise or settlement thereof; *provided, however,* that if requested by the Indemnified Party, the Indemnifying Party agrees, at the sole cost and expense of the Indemnifying Party, to cooperate with the Indemnified Party and its counsel in contesting any Third Party Claim which the Indemnified Party is contesting, or, if appropriate and related to the Third Party Claim in question, in making any counterclaim against the person asserting the Third Party Claim, or any cross-complaint against any person (other than the Indemnifying Party or any of its affiliates).  Notwithstanding the foregoing provisions of this Section 11.4(a)(ii), if the Indemnifying Party has notified the Indemnified Party with reasonable promptness that the Indemnifying Party disputes its liability to the Indemnified Party with respect to such Third Party Claim and if such dispute is resolved in favor of the Indemnifying Party, the Indemnifying Party will not be required to bear the costs and expenses of the Indemnified Party's defense pursuant to this Section 11.4(a)(ii) or of the Indemnifying Party's participation therein at the Indemnified Party's request, and the Indemnified Party will reimburse the Indemnifying Party in full for all reasonable costs and expenses incurred by the Indemnifying Party in connection with such litigation.  Subject to the above terms of this Section 11.4(a)(ii), the Indemnifying Party may participate in, but not control, any defense or settlement controlled by the Indemnified Party pursuant to this Section 11.4(a)(ii), and the Indemnifying Party will bear its own costs and expenses with respect to such participation.  The Indemnified Party shall give sufficient prior notice to the Indemnifying Party of the initiation of any discussions relating to the settlement of a Third Party Claim to allow the Indemnifying Party to participate therein.

49

(b)     In the event any Indemnified Party should have a claim against any Indemnifying Party hereunder that either (i) does not involve a Third Party Claim being asserted against or sought to be collected from the Indemnified Party or (ii) is a Seller Tax Claim, the Indemnified Party shall deliver an Indemnity Notice (as hereinafter defined) to the Indemnifying Party.  The term "Indemnity Notice" shall mean written notification of a claim for indemnity under ARTICLE 11 hereof (which claim does not involve a Third Party Claim or is a Seller Tax Claim) by an Indemnified Party to an Indemnifying Party pursuant to this Section 11.4, specifying the nature of and specific basis for such claim and the amount or the estimated amount of such claim.)  The failure by any Indemnified Party to give the Indemnity Notice shall not impair such party's rights hereunder except to the extent that an Indemnifying Party demonstrates that it has been prejudiced thereby.

(c)     If the Indemnifying Party does not notify the Indemnified Party within thirty (30) calendar days following its receipt of a Claim Notice or an Indemnity Notice that the Indemnifying Party disputes its liability to the Indemnified Party hereunder, such claim specified by the Indemnified Party will be conclusively deemed a liability of the Indemnifying Party hereunder and the Indemnifying Party shall pay the amount of such liability to the Indemnified Party on demand, or on such later date (i) in the case of a Third Party Claim, as the Indemnified Party suffers the Damages in respect of such Third Party Claim, (ii) in the case of an Indemnity Notice in which the amount of the claim is estimated, when the amount of such claim becomes finally determined or (iii) in the case of a Seller Tax Claim, upon the earlier of when a lien attaches, or within fifteen (15) calendar days following final determination of the item giving rise to the claim for indemnity.  If the Indemnifying Party has timely disputed its liability with respect to such claim, as provided above, the Indemnifying Party and the Indemnified Party agree to proceed in good faith to negotiate a resolution of such dispute, and if not resolved through negotiations, such dispute will be resolved by adjudication by a court or similar tribunal.

(d)     The Indemnified Party agrees to give the Indemnifying Party reasonable access to the books and records and employees of the Indemnified Party in connection with the matters for which indemnification is sought hereunder, to the extent the Indemnifying Party reasonably deems necessary in connection with its rights and obligations hereunder.

(e)     The Indemnified Party shall assist and cooperate with the Indemnifying Party in the conduct of litigation, the making of settlements and the enforcement of any right of contribution to which the Indemnified Party may be entitled from any person or entity in connection with the subject matter of any litigation subject to indemnification hereunder.  In addition, the Indemnified Party shall, upon request by the Indemnifying Party or counsel selected by the Indemnifying Party (without payment of any fees or expenses to the Indemnified Party or an employee thereof), attend hearings and trials, assist in the securing and giving of evidence, assist in obtaining the presence or cooperation of witnesses, and make available its own personnel; and shall do whatever else is necessary and appropriate in connection with such litigation.  The Indemnified Party shall not make any demand upon the Indemnifying Party or counsel for the Indemnifying Party in connection with any litigation subject to indemnification hereunder, except a general demand for indemnification as provided hereunder.  If the Indemnified Party shall fail to perform such obligations as Indemnified Party hereunder or to cooperate fully with the Indemnifying Party in Indemnifying Party's defense of any suit or

50

proceeding, such cooperation to include, without limitation, attendance at all depositions and the provision of all documents relevant to the defense of any claim, then, except where such failure does not have an adverse effect on the Indemnifying Party's defense of such claims, the Indemnifying Party shall be released from all of its obligations under this Agreement with respect to that suit or proceeding and any other claims which had been raised in such suit or proceeding.

(f)    Following indemnification as provided for hereunder, the Indemnifying Party shall be subrogated to all rights of the Indemnified Party with respect to all persons or entities relating to the matter for which indemnification has been made; *provided, however,* that the Indemnifying Party shall have no subrogation rights to seek reimbursement through or from the Indemnified Party's insurance policies, programs, coverage, carriers or beneficiaries.

11.5    <u>Exclusive</u>.  Other than claims for fraud or equitable relief (which equitable relief claims are nevertheless subject to <u>Section 11.1</u>), any claim arising under this Agreement or in connection with or as a result of the transactions contemplated by this Agreement or any Damages or injury alleged to be suffered by any party as a result of the actions or failure to act by any other party shall, unless otherwise specifically stated in this Agreement, be governed solely and exclusively by the provisions of this <u>ARTICLE 11</u>.  If Seller and Purchaser cannot resolve such claim by mutual agreement, such claim shall be determined by adjudication by a court or similar tribunal subject to the provisions of this <u>ARTICLE 11</u>.

# ARTICLE 12

## TAX AND COST REPORT MATTERS

12.1    <u>Tax Matters; Allocation of Purchase Price</u>.

(a)    After the Closing Date, the parties shall cooperate fully with each other and shall make available to each other, as reasonably requested, all information, records or documents relating to tax liabilities or potential tax liabilities attributable to Seller with respect to the operation of the Hospital for all periods prior to the Effective Time and shall preserve all such information, records and documents at least until the expiration of any applicable statute of limitations or extensions thereof.  The parties shall also make available to each other to the extent reasonably required, and at the reasonable cost of the requesting party (for out-of-pocket costs and expenses only), personnel responsible for preparing or maintaining information, records and documents in connection with tax matters and as Seller reasonably may request in connection with the completion of its post-Closing audits of the Hospital.

(b)    The Purchase Price shall be allocated among each category of the Assets of the Hospital and among the Seller in accordance with **Schedule 12.1(b)**.  Seller and Purchaser hereby agree to allocate the Purchase Price in accordance with **Schedule 12.1(b)**, to be bound by such allocations, to account for and report the purchase and sale of the Assets contemplated hereby for federal and state tax purposes in accordance with such allocations, and not to take any position (whether in tax returns, tax audits, or other tax proceedings), which is inconsistent with such allocations without the prior written consent of the other parties.

51

12.2    Cost Report Matters.

(a)    Consistent with Section 4.10, Seller shall prepare and timely file all cost reports relating to the periods ending prior to the Effective Time or required as a result of the consummation of the transactions described in this Agreement, including, without limitation, those relating to Medicare, Medi-Cal, Blue Cross and other third party payors which settle on a cost report basis (the "Seller Cost Reports").

(b)    Upon reasonable notice and during normal business office hours, Purchaser will cooperate reasonably with Seller in regard to Seller's preparation, filing, handling, and appeals of the Seller Cost Reports.   Upon reasonable notice and during normal business office hours, Purchaser will cooperate with Seller in connection with any cost report disputes and/or other claim adjudication matters relative to governmental program reimbursement.   Such cooperation shall include, at no cost to Seller, obtaining access to files at the Hospital and Purchaser's provision to Seller of data and statistics, and the coordination with Seller pursuant to reasonable notice of Medicare and Medi-Cal exit conferences or meetings.

## ARTICLE 13

## MISCELLANEOUS PROVISIONS

13.1    Further Assurances and Cooperation.    Seller shall execute, acknowledge and deliver to Purchaser any and all other assignments, consents, approvals, conveyances, assurances, documents and instruments reasonably requested by Purchaser at any time and shall take any and all other actions reasonably requested by Purchaser at any time for the purpose of more effectively assigning, transferring, granting, conveying and confirming to Purchaser, the Assets.   After consummation of the transaction contemplated in this Agreement, the parties agree to cooperate with each other and take such further actions as may be necessary or appropriate to effectuate, carry out and comply with all of the terms of this Agreement, the documents referred to in this Agreement and the transactions contemplated hereby.

13.2    Successors and Assigns.    All of the terms and provisions of this Agreement shall be binding upon and shall inure to the benefit of and be enforceable by the respective successors and assigns of the parties hereto; *provided, however,* that no party hereto may assign any of its rights or delegate any of its duties under this Agreement without the prior written consent of the other parties, except that Purchaser may assign any of its rights or delegate any of its duties under this Agreement to any wholly-owned subsidiary of Purchaser.

13.3    Governing Law; Venue.    This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of California as applied to contracts made and performed within the State of California.   The parties hereby waive their right to claim in any proceeding involving this Agreement that the law of any jurisdiction other than the State of California shall apply to such dispute; and the parties hereby covenant that they shall assert no such claim in any dispute arising under this Agreement.   Any proceeding which arises out of or relates in any way to the subject matter of this Agreement shall be brought in the United States Bankruptcy Court for the Central District of California.   The parties hereby consent to the

jurisdiction of such court and waive their right to challenge any proceeding involving or relating to this Agreement on the basis of lack of jurisdiction over the Person or forum non conveniens.

13.4    Amendments.   This Agreement may not be amended other than by written instrument signed by the parties hereto.

13.5    Exhibits, Schedules and Disclosure Schedule.   The Disclosure Schedule and all exhibits and schedules referred to in this Agreement shall be attached hereto and are incorporated by reference herein.  From the Effective Date until the Closing, the parties agree that Seller may update the Disclosure Schedule as necessary upon written notice to Purchaser, which update shall be acceptable to Purchaser in its reasonable discretion.   Notwithstanding the foregoing, should any exhibit or schedule not be completed and attached hereto as of the Effective Date, Seller and Purchaser shall promptly negotiate in good faith any such exhibit or schedule, which exhibit or schedule must be acceptable to each of Seller and Purchaser in their reasonable discretion prior to being attached hereto.   Any matter disclosed in this Agreement or in the Disclosure Schedule with reference to any Section of this Agreement shall be deemed a disclosure in respect of all sections to which such disclosure may apply.

13.6    Publicity.   Prior to the Closing Date, Seller and Purchaser shall consult with each other as to the form and substance of any press release or other public disclosure materially related to this Agreement or the transactions contemplated hereby and each shall have the right to review and comment on the other's press releases prior to issuance; provided, however, that nothing in this Section 13.6 shall be deemed to prohibit either Seller or Purchaser from making any disclosure it deems necessary to comply with its legal obligations, its obligations under this Agreement, its ability to satisfy the closing conditions, and/or Seller's obligations under the Bankruptcy Code.

13.7    Notices.   Any notice, demand or communication required, permitted, or desired to be given hereunder shall be deemed effectively given when personally delivered, when received by telegraphic or other electronic means (including facsimile) or overnight courier, or five (5) calendar days after being deposited in the United States mail, with postage prepaid thereon, certified or registered mail, return receipt requested, addressed as follows:

| | |
|---|---|
| If to Seller: | Victor Valley Community Hospital |
| | 15428 11th Street |
| | Victorville, California 92392 |
| | Attention: Chief Executive Officer |
| | Facsimile No. (760) 843 - 6020 |
| | |
| With a copies to: | Burke Williams & Sorensen, LLP |
| (which copies shall | 444 S. Flower Street, Suite 2400 |
| not constitute notice) | Los Angeles, California 90071 |
| | Attention: Charles E. Slyngstad, Esq. |
| | Facsimile No. (213) 236-2700 |

Pachulski Stang Ziehl & Jones
10100 Santa Monica Boulevard, 11th Floor
Los Angeles, California 90067
Attention: Samuel R. Maizel, Esq.
Facsimile No. (310) 201-0760

If to Purchaser:        Prime Healthcare Services Foundation, Inc.
3300 R. Guasti Road, 2nd Floor
Ontario, California 91761
Attention: Michael Sarrao
Facsimile No.: (909) 235-4419

With a copy to:         Shulman Hodges & Bastian LLP
(which copies shall     26632 Towne Centre Drive, Suite 300
not constitute notice)  Foothill Ranch, California 92610
Attention: Mark Bradshaw, Esq.
Facsimile No.: (949) 340-3000

or at such other address as one party may designate by notice hereunder to the other parties.

13.8    Headings.  The section and other headings contained in this Agreement and in the Disclosure Schedule, exhibits and schedules to this Agreement are included for the purpose of convenient reference only and shall not restrict, amplify, modify or otherwise affect in any way the meaning or interpretation of this Agreement or the Disclosure Schedule, exhibits and schedules hereto.

13.9    Fair Meaning.  This Agreement shall be construed according to its fair meaning and as if prepared by all parties hereto.

13.10    Gender and Number; Construction.  All references to the neuter gender shall include the feminine or masculine gender and vice versa, where applicable, and all references to the singular shall include the plural and vice versa, where applicable.  Unless otherwise expressly provided, the word "including" followed by a listing does not limit the preceding words or terms and shall mean "including, without limitation."

13.11    Third Party Beneficiary.  None of the provisions contained in this Agreement are intended by the parties, nor shall they be deemed, to confer any benefit on any person not a party to this Agreement.

13.12    Expenses and Attorneys' Fees.  Except as otherwise provided in this Agreement, each party shall bear and pay its own costs and expenses relating to the preparation of this Agreement and to the transactions contemplated by, or the performance of or compliance with any condition or covenant set forth in, this Agreement, including without limitation, the disbursements and fees of their respective attorneys, accountants, advisors, agents and other representatives, incidental to the preparation and carrying out of this Agreement, whether or not the transactions contemplated hereby are consummated.  The parties expressly agree that (a) all sales, transfer, documentary transfer and similar taxes, fees, surcharges and the like in

54

connection with the sale of the Assets shall be borne by Purchaser;  (b) the following shall be borne one-half by Purchaser and one-half by Seller: (i) all costs of the Title Commitment and the Title Policy (including the cost of any endorsements thereto); and (ii) all recording fees or similar charges in connection with the sale of the Assets; and (c) all costs of the Environmental Survey and all costs of the Surveys shall be borne by Purchaser.  If any action is brought by any party to enforce any provision of this Agreement, the prevailing party shall be entitled to recover its court costs and reasonable attorneys' fees.

13.13    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same Agreement, binding on all of the parties hereto.  The parties agree that facsimile copies of signatures shall be deemed originals for all purposes hereof and that a party may produce such copies, without the need to produce original signatures, to prove the existence of this Agreement in any proceeding brought hereunder.

13.14    <u>Entire Agreement</u>.  This Agreement, the Disclosure Schedule, the exhibits and schedules, and the documents referred to in this Agreement contain the entire understanding between the parties with respect to the transactions contemplated hereby and supersede all prior or contemporaneous agreements, understandings, representations and statements, oral or written, between the parties on the subject matter hereof (the "Superseded Agreements"), which Superseded Agreements shall be of no further force or effect.

13.15    <u>No Waiver</u>.  Any term, covenant or condition of this Agreement may be waived at any time by the party which is entitled to the benefit thereof but only by a written notice signed by the party expressly waiving such term or condition.   The subsequent acceptance of performance hereunder by a party shall not be deemed to be a waiver of any preceding breach by any other party of any term, covenant or condition of this Agreement, other than the failure of such other party to perform the particular duties so accepted, regardless of the accepting party's knowledge of such preceding breach at the time of acceptance of such performance.  The waiver of any term, covenant or condition shall not be construed as a waiver of any other term, covenant or condition of this Agreement.

13.16    <u>Severability</u>.  If any term, provision, condition or covenant of this Agreement or the application thereof to any party or circumstance shall be held to be invalid or unenforceable to any extent in any jurisdiction, then the remainder of this Agreement and the application of such term, provision, condition or covenant in any other jurisdiction or to persons or circumstances other than those as to whom or which it is held to be invalid or unenforceable, shall not be affected thereby, and each term, provision, condition and covenant of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

13.17    <u>Time is of the Essence</u>.  Time is of the essence for all dates and time periods set forth in this Agreement and each performance called for in this Agreement.

*[REMAINDER OF PAGE IS BLANK]*

55

IN WITNESS WHEREOF, this Agreement has been entered into as of the day and year first above written.

**PURCHASER:**

Prime Healthcare Services Foundation, Inc., a Delaware corporation

By:_____
Name: _____
Title: _____

**SELLER:**

Victor Valley Community Hospital, a California corporation

By:_____
Name:_____
Its:_____

56

ASSET SALE AGREEMENT

among

Victor Valley Community Hospital,

a California corporation,


and

Prime Healthcare Services Foundation, Inc.,

a Delaware corporation


DATED:  September __, 2010

## LIST OF SCHEDULES

| SCHEDULE | DESCRIPTION |
|---|---|
| Those schedules provided in the Disclosure Schedule; and | |
| A-1 | Other Businesses |
| 1.8(a) | Owned Real Property |
| 1.8(b) | Leased Real Property |
| 1.8(c) | Personal Property |
| 1.8(d) | Licenses |
| 1.8(g) | Prepaids |
| 1.8(t) | Names of Hospital |
| 1.9(o) | Privileged and Protected Items |
| 1.9(f) | Other Excluded Assets |
| 1.10(j) | Other Obligations & Liabilities |

| SCHEDULE | DESCRIPTION |
|---|---|
| 2.4 | Consents |
| 2.5(a) | Compliance with Law |
| 2.5(d) | Material Obligations |
| 2.6(b) | Real Property Encumbrances |
| 2.6(d) | Real Property Used in Operations |
| 2.7(b) | HFAP Periods |
| 2.7(c) | Threatened Medicare or Medi-Cal Investigations |
| 2.7(d) | Audit Periods |
| 2.9 | Financial Statements |
| 2.10 | Legal Proceedings |
| 2.11(a) | Seller Plans |
| 2.12(a) | Personnel List |
| 2.12(c) | Employee Terminations |
| 2.12(d) | Employment Agreements |
| 2.13 | Insurance |
| 3.4 | No Violation – Purchaser |
| 3.7 | Legal Proceedings – Purchaser |
| 4.3(a) | Increased Compensation |
| 4.8 | Ground Leases |

| **SCHEDULE** | **DESCRIPTION** |
|---|---|
| 8.6 | Permitted Exceptions |
| 11.2.1 | Certain Governmental Investigations |
| 12.1(b) | Allocation of Purchase Price |

# LIST OF EXHIBITS

| EXHIBIT | DESCRIPTION |
| --- | --- |
| 1.3 | Good Faith Deposit Agreement |
| 1.5.1 | Bills of Sale |
| 1.5.2 | Real Estate Assignment(s) |
| 1.5.3 | Grant Deeds |
| 1.5.9 | Power of Attorney |
| 1.5.10 | Interim Management & Lease Agreement |
| 4.8 | Seller's Affidavit |