1  Samuel R. Maizel (CA Bar No. 189301)
   Scotta E. McFarland (CA Bar No. 165391)
2  Mary D. Lane (CA Bar No. 071592)
   PACHULSKI STANG ZIEHL & JONES LLP
3  10100 Santa Monica Blvd., 11th Floor
   Los Angeles, California  90067-4100
4  Telephone: 310/277-6910
   Facsimile:  310/201-0760
5  E-mail:      smaizel@pszjlaw.com
6               smcfarland@pszjlaw.com
                mlane@pszjlaw.com
7  Attorneys for Victor Valley Community Hospital, Debtor
   and Debtor in Possession

8

9                    UNITED STATES BANKRUPTCY COURT

10                   CENTRAL DISTRICT OF CALIFORNIA

11                        RIVERSIDE DIVISION

12  In re:                              Case No.: 6:10-39537 CB

13  VICTOR VALLEY COMMUNITY             Chapter 11
    HOSPITAL,[1]
14                                      NOTICE OF MOTION AND DEBTOR'S
                                        MOTION FOR THE ENTRY OF AN
15                   Debtor.            ORDER AUTHORIZING THE SALE OF
                                        SUBSTANTIALLY ALL OF THE
16                                      DEBTOR'S ASSETS FREE AND CLEAR OF
                                        LIENS, CLAIMS, ENCUMBRANCES AND
17                                      INTERESTS AND GRANTING RELATED
                                        RELIEF; MEMORANDUM OF POINTS
18                                      AND AUTHORITIES IN SUPPORT
                                        THEREOF; DECLARATION OF
19                                      CATHERINE M. PELLEY IN SUPPORT
                                        THEREOF
20
                                        Hearing Date
21                                      Date:   July 12, 2011
                                        Time:   2:00 p.m.
22                                      Place:  United States Bankruptcy Court
                                                3420 Twelfth Street
23                                              Courtroom 303
                                                Riverside, CA 92501-3819
24                                      Judge: Honorable Catherine E. Bauer

25                                      Objection Deadline: July 11, 2011, 5:00 p.m.
                                        Pacific
26

27

28  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
    [1] The Debtor is a California non-profit public benefit corporation, Fed. Tax I.D. No. 95-2475762.  The Debtor's address
    is 15248 Eleventh Street Victorville, CA  92395

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  **TO THE HONORABLE CATHERINE E. BAUER, UNITED STATES BANKRUPTCY**

2  **JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, ANY ALLEGED SECURED**

3  **CREDITORS, COUNSEL TO THE OFFICIAL COMMITTEE OF UNSECURED**

4  **CREDITORS, PARTIES ON THE LIMITED SERVICE LIST, ALL ENTITIES KNOWN TO**

5  **HAVE ASSERTED ANY INTERESTS IN OR UPON THE ASSETS, AND OTHER**

6  **INTERESTED PARTIES:**

7  **PLEASE TAKE NOTICE** that Victor Valley Community Hospital, debtor and debtor in

8  possession herein (the "Debtor"), files this motion (the "Motion") pursuant to sections 105 and 363

9  of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1530, as amended (the "Bankruptcy

10  Code"), Rules 2002, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (each a

11  "Bankruptcy Rule," and collectively, the "Bankruptcy Rules"), and Local Bankruptcy Rule 6004-1,

12  for approval of the sale of the Debtor's assets, as set forth in Section 1.8 of the Asset Sale

13  Agreement (the "ASA") attached hereto as **Exhibit "A"**, (the "Assets") that make up the Debtor's

14  acute care hospital known as Victor Valley Community Hospital (the "Acute Care Hospital"), and

15  outpatient, ancillary and other healthcare businesses incident to the operation of the Acute Care

16  Hospital (the "Other Businesses") (the Acute Care Hospital and the Other Businesses are referred to

17  collectively as the "Hospital") to Prime Healthcare Services Foundation, Inc. ("Prime" or

18  "Purchaser"),[2] which entity was the stalking horse bidder for the November 5, 2010 auction of the

19  substantially all of the assets of the Debtor and the Back-up Buyer, as determined pursuant to the

20  sale procedures (the "Sale Procedures") approved by this Court in the *Order (a) Approving Sale*

21  *Procedures in Connection with Sale of Victor Valley Community Hospital; (b) Scheduling an*

22  *Auction for the Sale and a Hearing to Approve the Sale; (c) Authorizing the Sale Free and Clear of*

23  *Liens, Claims, Encumbrances and Interests; and (d) Granting Related Relief.* (the "Sale Procedures

24  Order") [Docket No. 103].  By the Motion, the Debtor is seeking an order of the Bankruptcy Court

25  that grants, among other things, the following relief:

26  (1)  approval the Asset Sale Agreement ("ASA") between the Debtor and Prime, a copy

27

28  [2] Prime is a Delaware non-stock corporation organized exclusively for charitable purposes under § 501(c)(3) of the
Internal Revenue Code located at 3300 E. Guasti Road, 2nd Floor, Ontario, California.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

2

1  of which is attached hereto as **Exhibit "A"**, which is substantially the same as the

2  Asset Sale Agreement previously approved by the *Order (1) Authorizing the Sale of*

3  *Substantially All of the Debtor's Assets Free and Clear of Liens, Claims,*

4  *Encumbrances and Interests, (2) Authorizing the Assignment of Certain Obligation of*

5  *the Debtor to Purchasers, (3) Finding that the Purchasers Are Good Faith*

6  *Purchasers, and (4) Granting Related Relief* ( the "VVHA Sale Order") [Docket No.

7  360] approving the sale of the Debtor's assets to Victor Valley Hospital Acquisition,

8  Inc. and Victor Valley Hospital Real Estates, LLC (collectively, "VVHA");[3]

9  (2)  authorization and approval of the sale of the Assets to Prime pursuant to the terms of

10  the ASA;

11  (3)  ordering that the sale of the Assets be free and clear of all liens, claims, interests and

12  encumbrances, except the Permitted Encumbrances as that term is defined in the

13  ASA, (collectively, the "Liens") pursuant to section 363(f) of the Bankruptcy Code

14  with all such Liens to attach to the proceeds of the sale with the same priority,

15  validity, force and effect (or lack thereof) they enjoy against any of the assets being

16  sold;

17  (4)  finding that Prime is a good faith purchaser of the Assets and granting Prime the

18  protection given good faith purchasers pursuant to section 363(m) of the Bankruptcy

19  Code.

20  **PLEASE TAKE FURTHER NOTICE** that the assets being purchased by Prime do not

21  include the Debtor's cash and various other miscellaneous assets as set forth section 1.9 of the ASA.

22  **PLEASE TAKE FURTHER NOTICE** that the purchase price set forth in Section 1.2 of the

23  ASA for the Assets is $35,000,000, which amount includes certain of the Debtor's obligations that

24  Prime is assuming and certain credits that Prime will receive pursuant to sections 1.8(l), 1.8(m), and

25  1.8(n) of the attached APA.

26  **PLEASE TAKE FURTHER NOTICE** that closing of the sale of the Assets is conditioned

27

28  [3] The originally approved sale of the substantially all of the Debtor's assets to VVHA is discussed in more detail in the attached Memorandum of Points and Authorities.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:240723.2 90231-002

on, among other things, the following:

(1)    Purchaser shall have obtained, or in certain instances applied for, licenses, permits and authorizations that are required for operation of the Acute Care Hospital, unless the failure to obtain such license, permit or authorizations does not have a material adverse effect;

(2)    The Bankruptcy Court shall have entered an order approving the sale and finding that the Purchaser is a "good faith" purchaser under section 363 of the Bankruptcy Code;

(3)    Seller shall have in all material respects performed or complied with each and all of it obligations, covenants, agreements and conditions under the ASA;

(4)    No temporary restraining order, preliminary or permanent injunction or other order preventing the consummation of the transactions contemplated in this Agreement be in effect on the Closing Date and no governmental entity shall have commenced any action or suit before any court of competent jurisdiction or other governmental authority that seeks to restrain or prohibit the consummation of the sale;

(5)    The Title Company has irrevocably committed to issue the Title Policy to Purchaser covering real property owned by the Debtor that is being purchased by the Purchaser and any ground lease being assumed and assigned to the Purchaser in the amount of the full insurable value of such real property and ground lease, respectively; and

(6)    The California Attorney General shall have approved the transactions contemplated by the ASA.

**PLEASE TAKE FURTHER NOTICE** that the above summary of certain terms of the ASA is not intended to be a complete summary of the terms of the ASA and is qualified in its entirety by ASA.  To the extent that there is any inconsistency between the above summary and the ASA, the ASA controls.  The Debtor suggests that parties review the ASA attached hereto as **Exhibit "A"** in its entirety.

**PLEASE TAKE FURTHER NOTICE** that the sale is intended to be free and clear of all Liens, including, without limitation, the liens, claims, interests, rights and encumbrances described on **Exhibit "2"** attached hereto.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**PLEASE TAKE FURTHER NOTICE** that the sale to Prime described herein, in the attached Memorandum of Points and Authorities and in the ASA is not subject to any further higher and better bids because, as a result of the auction of the Assets conducted on November 5, 2010 by the Debtor (the "Auction")and VVHA declining to close the sale, Prime's bid, as the back-up bid, is now the highest and best bid. The Auction was conducted after the Debtor marketed the Hospital, served notice of the auction on interested parties, including, but not limited to, all parties that had shown an interest in purchasing the Hospital, and published the notice of the Auction in the Los Angeles times. The Auction was conducted pursuant to the sale procedures approved by this Court in the Sale Procedures Order. There were only two qualified bidders: Prime and VVHA. Prime, having bid $35 million, was the Back-up Buyer. The successful bidders at the Auction, VVHA, have now declined to close the sale. The Debtor, therefore, has determined that, in light of the fact that VVHA declined to close the sale, Prime's back-up bid is the highest and best offer for the Assets and that it is in the best interest of the creditors of its estate to proceed to closing with Prime on the basis of its back-up bid.

**PLEASE TAKE FURTHER NOTICE** that it is estimated that, after all credits and other adjustments and payment of closing costs, approximately $20.9 million in net proceeds from the sale will be available to the estate.

**PLEASE TAKE FURTHER NOTICE** that the tax consequences of the sale to the estate of are discussed below in the attached Memorandum of Points and Authorities.

**PLEASE TAKE FURTHER NOTICE** that the Motion is based on this Motion, the accompanying Memorandum of Points and Authorities, the Declaration of Catherine M. Pelley filed in support hereof, (the "Pelley Declaration") being filed concurrently herewith, the statements, arguments and representations of counsel who appear at the hearing on this Motion, the record in this case, any other evidence properly before the Court prior to or at the applicable hearing, and all matters of which this Court may properly take judicial notice.

**PLEASE TAKE FURTHER NOTICE** that the Court has agreed to hear this Motion on shortened notice. The hearing on this Motion will be held on July 12, 2011 at 2:00 p.m. before the Honorable Catherine E. Bauer, Courtroom 303, 3420 Twelfth Street, Riverside, California. Any

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

5

1  objection or response to the Motion must be filed with the Court and served upon undersigned

2  counsel for the Debtor by 5:00 p.m. Pacific time on July 11, 2011.  The failure to timely file and

3  serve written opposition may be deemed by the Court to be consent to the granting of the relief

4  requested in the Motion and the relief sought in this Motion may be granted without further notice.

5      **WHEREFORE**, the Debtor requests that the Court enter an order granting this Motion,

6  approving the ASA, authorizing and approving the sale of the Assets, free and clear of all Liens,

7  pursuant to the terms of the ASA, finding that the Purchaser is a good faith purchaser and granting it

8  the protections of section 363(m) of the Bankruptcy Code, and granting related relief.

9  Dated:    July 5, 2011                PACHULSKI STANG ZIEHL & JONES LLP

10                          By    /s/ *Samuel R. Maizel*
                                    Samuel R. Maizel
11                                  Attorneys for Victor Valley Community
                                    Hospital, Debtor and Debtor in Possession
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*PACHULSKI STANG ZIEHL & JONES LLP*
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:240723.2 90231-002

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ......................................................................................................... 7

II.     JURISDICTION AND VENUE ................................................................................... 7

III.    THE BANKRUPTCY CASE ....................................................................................... 7

IV.     GENERAL HISTORY OF THE DEBTOR ................................................................ 8

    A.    GENERAL DESCRIPTION OF THE DEBTOR ........................................................ 8

    B.    THE DEBTOR'S PHYSICAL PLANT ...................................................................... 8

    C.    THE DEBTOR'S STAFF ......................................................................................... 9

    D.    THE DEBTOR'S SERVICES .................................................................................. 9

    E.    THE DEBTOR'S MANAGEMENT ......................................................................... 9

    F.    THE DEBTOR'S SECURED DEBT ...................................................................... 10

        1.    OSHPD Obligations ............................................................................... 10

        2.    The PHM Obligations ............................................................................ 11

        3.    The Corwin Medical Group Obligations ............................................. 11

        4.    Claim of Department of Health Services (Medi-Cal) ......................... 11

        5.    San Bernardino County Tax Claim ...................................................... 12

    G.    THE DEBTOR'S UNSECURED DEBT .................................................................. 12

    H.    CONDITIONS LEADING TO THE DECISION TO SELL THE HOSPITAL ............... 12

    I.    THE HISTORY OF THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS ....... 13

V.      SUMMARY OF THE TERMS OF THE SALE ....................................................... 16

    A.    ASSETS BEING SOLD ......................................................................................... 16

    B.    EXCLUDED ASSETS ........................................................................................... 16

    C.    PURCHASE PRICE .............................................................................................. 16

    D.    GOOD FAITH DEPOSIT ...................................................................................... 17

    E.    CLOSING DATE .................................................................................................. 17

    F.    CONDITIONS TO THE OBLIGATIONS OF PURCHASER ...................................... 17

VI.     ARGUMENT ............................................................................................................. 18

    A.    THE PROPOSED SALE IS A PROPER EXERCISE OF THE DEBTOR'S REASONABLE BUSINESS
JUDGMENT ......................................................................................................... 18

        1.    The Purchase Price Is Adequate .......................................................... 19

        2.    The Sale Will Likely Increase the Recovery to Unsecured Creditors ........... 19

        3.    The Creditworthiness of the Buyer ...................................................... 19

        4.    The Value of the Assets Will Decline Over Time ............................... 19

    B.    THE COURT SHOULD AUTHORIZE THE SALE FREE AND CLEAR OF LIENS, CLAIMS,
INTERESTS AND ENCUMBRANCES ..................................................................... 19

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

i

1.    The Purchase Price Is Greater Than the Aggregate Value of All Liens ........ 20

2.    Parties Asserting Interests Could Be Compelled to Accept a Money
Satisfaction ................................................................................................ 21

3.    Lienholders Consent to the Sale ............................................................. 22

C.    THE PROPOSED TRANSACTION IS IN GOOD FAITH ...................................... 22

D.    NOTICE OF THE SALE IS REASONABLE UNDER THE CIRCUMSTANCES ........................ 23

VII.    CONCLUSION ............................................................................................ 24

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# TABLE OF AUTHORITIES

**Page**

## Cases

*In re Abbotts Dairies*,
  788 F.2d 143 (3rd Cir. 1986) ............................................................... 22, 23
*In re Canyon P'ship*,
  55 B.R. 520 (Bankr. S.D. Cal. 1985) .......................................................... 18
*Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*,
  94 B.R. 343 (E.D. Pa. 1988) ..................................................................... 20
*Clear Channel*,
  391 B.R. at 45-46 ...................................................................................... 21
*In re Edwards*,
  962 F.2d 641 (7th Cir. 1992) ..................................................................... 23
*Equity Funding Corp. of Am. v. Fin. Assocs. (In re Equity Funding Corp.)*,
  492 F.2d 793 (9th Cir. 1974) ..................................................................... 18
*Ewell v. Diebert (In re Well)*,
  958 F.2d 276 (9th Cir. 1992) ..................................................................... 22
*In re Hunt Energy Co., Inc.*,
  48 B.R. 472 (Bankr. N.D. Ohio 1985) ........................................................ 21
*In re Moore*,
  110 B.R. 924 (Bankr. C.D. Cal. 1990) ....................................................... 18
*In re Red Oak Farms, Inc.*,
  36 B.R. 856 (Bankr. W.D. Mo. 1984) ......................................................... 21
*Simantob v. Claims Prosecutor, LLC (In re Lahijani)*,
  325 B.R. 282 (B.A.P. 9th Cir. 2005) ............................................................ 18
*In re Terrace Chalet Apartments, Ltd.*,
  159 B.R. 821 (N.D. Ill. 1993) .................................................................... 21
*Walter v. Sunwest Bank (In re Walter)*,
  83 B.R. 14 (B.A.P. 9th Cir. 1988) .............................................................. 18
*In re Weyland*,
  63 B.R. 854 (Bankr. E.D. Wisc. 1986) ....................................................... 21

## Statutes

11 U.S.C. § 363(b)(1) ....................................................................................... 18
11 U.S.C. § 363(f)(5) ........................................................................................ 21
11 U.S.C. § 363(m) ........................................................................................... 22
28 U.S.C. § 157 ................................................................................................. 7
28 U.S.C. § 157(b)(2) ........................................................................................ 7
28 U.S.C. § 1334 ............................................................................................... 7
28 U.S.C. § 1408 ............................................................................................... 7
28 U.S.C. § 1409 ............................................................................................... 7
California Civil Code § 2924k ........................................................................... 21

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.**

**INTRODUCTION**

The Debtor, pursuant to the sale procedures approved by this Court in the Sale Procedures Order, held the Auction of the Assets on November 5, 2010, at which VVHA and Prime were the bidders. The Debtor, after careful consideration of the two final bids, selected VVHA as the successful bidder and Prime as the Back-up Bidder. The Debtor then proceeded to take all necessary actions to close the sale of the Assets to VVHA. After the condition to closing the sale had been satisfied, VVHA declined to close. The Debtor continued to negotiate with VVHA in an effort to get VVHA to close the sale, but also negotiated with Prime regarding closing the sale on the basis of the back-up bid.[4] The Debtor concluded that further discussions with VVHA were fruitless and entered into the ASA, attached hereto as **Exhibit "A".** with Prime. The purchase price under the ASA is $35 million, as was the back-up bid. The Debtor believes the sale of the Assets to Prime pursuant to the terms of the ASA is in the best interest of the Debtor's estate and its creditors and requests that the Court approve the sale.

**II.**

**JURISDICTION AND VENUE**

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicate for the relief requested herein is section 1129 (a) of the Bankruptcy Code.

**III.**

**THE BANKRUPTCY CASE**

On September 13, 2010 (the "Petition Date"), the Debtor[5] filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor continues to manage its

---

[4] Pursuant to the Sale Procedures Order, the Back-up Bidder was only bound to close the sale on the basis of the back-up bid for 21 days after the Auction date.

[5] Capitalized terms not otherwise defined in this Memorandum of Points and Authorities shall have the meanings given them in the attached *Motion for the Entry of an Order Authorizing the Sale of Substantially All of  the Debtor's Assets*

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

7

1  assets and properties as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy

2  Code.  The Committee was appointed in this case on September 28, 2010.  No trustee or examiner

3  has been appointed in this case.

**IV.**

**GENERAL HISTORY OF THE DEBTOR**

A.      **General Description of the Debtor**

The Debtor, a California nonprofit public benefit corporation, operates the Victor Valley
Community Hospital.  The Debtor was founded in 1967 and is the only non-profit community
hospital in the California High Desert, a service area that includes the communities of Adelanto,
Apple Valley, Hesperia and Victorville, serving a population of over 300,000 people.  The High
Desert communities served by the Debtor are culturally and ethnically diverse.  They also are
economically depressed, and suffer under unemployment rates that are higher than 20%.  The
Debtor, therefore, serves a high volume of medically under-served and indigent patients and has
been designated as a Disproportionate Share Hospital.  As a result of this high volume of indigent
patients, millions of dollars worth of the Debtor's services were expended on charity care in 2009,
and, with a worsening economy and growing unemployment, the amount in uncompensated, charity
care will increase significantly in 2010.

B.      **The Debtor's Physical Plant**

The Hospital is located at 15248 Eleventh Street, Victorville, California 92392.  The facility
was designed and constructed as an acute care hospital, and over the years it has been renovated and
expanded to accommodate the needs of its patients and the communities it serves.  Originally the
facility was operated as a 115 bed facility, but the capacity was reduced in the mid-2000s to
approximately 106 beds, and subsequently further reduced to its current 101 bed capacity.  The
Debtor owns the main, two-story, hospital building and its adjacent modular office complex which
houses its administrative offices.  The Debtor also leases two other facilities: (a) the Women's
Center and Outpatient Imaging facility, along with the Debtor's human resources department, at

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

28  *Free and Clear of Liens, Claims, Encumbrances and Interests, and Granting Related Relief* (the "Motion") or in the
APA, as the case may be.

DOCS_LA:240723.2 90231-002

15203 Eleventh Street in Victorville, and (b) the Education Center, at 15366 Eleventh Street,

Suite R, in Victorville, California.

**C.      The Debtor's Staff**

The Hospital is currently staffed to operate approximately 60 beds on a normal day, although

it has access to visiting nurse registries, which allow it to quickly increase its staff to meet patient

needs.  Approximately 224 doctors from the local community have privileges at the Hospital.  As of

the Petition Date, the Debtor employed approximately 572 people, of which, approximately 160

were nurses.  The rest include, but are not limited to, office staff, technicians, maintenance staff, IT

staff, human resources staff, and Quality Assurance staff.  The Debtor currently employees

approximately 602 people.

**D.      The Debtor's Services**

As an acute care facility, the Debtor provides a full range of inpatient and outpatient specialty

services, including, but not limited to, basic 24-hour emergency room services, surgical services,

pediatric services, operating room services, physical therapy, respiratory therapy, outpatient

ambulatory services, catheterization laboratory, diagnostic services, women's health center and

outpatient imaging services, laboratory and pathology services, social and Medi-Cal eligibility

services, physician referral service, and community wellness and education programs.  The Debtor

treats approximately 2,900 patients per month in the Emergency Room, of which approximately 250

are eventually admitted to the Hospital.  Historically, the Debtor has had approximately 6,600

patients admitted to the Hospital annually, not including newborns and doctors working in the

Hospital perform approximately 2,500 out-patient surgeries and approximately 2,000 in-patient

surgeries and deliver approximately 1,400 babies annually.

**E.      The Debtor's Management**

The Debtor is governed by a Board of Directors (the "Board") that is comprised of six

members who are leaders in the High Desert community: Kathy Davis, Chair; Dennis G. Killion,

Vice-Chair; Thomas Brown; Michael Fermin; Tim Jasper; and Herbert Williamson, III.  The

Debtor's Chief Executive Officer is Cathy Pelley, who has served in this position since March 2009.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

9

DOCS_LA:240723.2 90231-002

1    The Debtor's Chief Financial Officer ("CFO") and Chief Information Officer is Edward Matthews,

2    who has served in this position since December 2008.

3            Additionally, prior to the Petition Date, the Debtor had a contract with PHM as contract

4    administrator to provide a qualified professional senior management team for the Debtor to assist the

5    Board in implementing measures necessary to improve the Debtor's fiscal and operational

6    management.  On October 21, 2010, the Bankruptcy Court entered the *Order Authorizing Rejection*

7    *of Agreement for Management Services with Physicians Hospital Management, LLC* [Docket

8    No. 156], the Agreement for Management Services was rejected by the Debtor and PHM ceased its

9    services thereunder.

10   **F.    The Debtor's Secured Debt**[6]

11           **1.    OSHPD Obligations**

12           In 2007 the Debtor desired to establish a revolving line of credit with Desert Community

13   Bank, now a division of East West Bank (the "Bank") in the maximum amount of $4.9 million (the

14   "Bank Loan"), which line of credit was authorized pursuant to a Note dated August 27, 2007 and a

15   Loan Agreement, also dated August 27, 2007, between the Debtor and the Bank.  The Bank and the

16   Debtor asked OSHPD to insure the Debtor's obligations to the Bank, and on or about August 30,

17   2007, the Debtor entered into an Amendment to Regulatory Agreement with OSHPD and HFFA

18   ("the Amendment") under which Debtor obtained permission to enter into the line of credit with the

19   Bank to finance working capital and pay expenses related to the execution and issuance of the line of

20   credit and related documents.

21           On or about August 27, 2007, the Debtor executed for the benefit of OSHPD a Deed of Trust

22   with Fixture Filing and Security Agreement ("Trust Deed") that was duly recorded on August 30,

23   2007.  The Trust Deed conveyed a security interest to secure both the HFFA Loan and the Bank

24   Loan, in, among other things, all of Debtor's land, improvements, fixtures, equipment, leases,

25   rentals, accounts, accounts receivable, and inventory, and replaced the earlier Deed of Trust which

26

27

28

---

[6]        The Debtor has not undertaken an exhaustive review to ascertain whether there is any defect in the security
interest granted or the perfection of that security interest.  For the purposes herein, the Debtor will assume that the
security interests were in fact duly perfected, reserving all rights with regard to this issue.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:240723.2 90231-002

related only to the HFFA Loan.  During the course of this Case, OSHPD has paid the Bank pursuant to the guaranty.

This obligation is paid through an automatic withdrawal from the Hospital's general account of about $30,000 monthly.  As of May 31, 2011, the balance due was approximately $4,423,000.

**2.      The PHM Obligations**

As of February 2, 2005, Debtor entered into a Loan Agreement with PHM that provided for a loan of $6 million (the "PHM Loan"), some funds of which had been previously provided and previously evidenced by other notes.  Interest accrues and was to be paid monthly; the principal is due to be paid in 2012 in a balloon payment.  The PHM Loan is secured by a trust deed on Debtor's real estate subordinate to the OSHPD Deed of Trust and has a current balance of approximately $6,686,000.

**3.      The Corwin Medical Group Obligations**

On or about September 1, 2010, the Debtor borrowed $700,000.00 from Corwin Medical Group, Inc., IPA (the "Corwin Loan") in order to pay its September 3, 2010 payroll.  The promissory note evidencing the Corwin Loan provides that (a) the principal amount of the note will be due and payable on December 1, 2010, with interest at 5.00% annually; (b) that it is secured by the DSH adjustment receivable and by Medicare Settlement receivables; and (c) that the proceeds of either or both of these receivables shall be used to repay this note prior to satisfying other obligations of the Hospital.  Corwin had also previously loaned the Debtor additional amount.

**4.      Claim of Department of Health Services (Medi-Cal)**

The Department of Health Services ("DHS") filed a Claim in the Case in the amount of $5,560,160.60 based upon the Repayment Agreement between the Debtor and DHS dated June 21, 2004.  DHS alleges that the amount is secured by recoupment rights from Medi-Cal payments.  Under the terms of the ASA, the Purchasers will assume the Repayment Agreement at the Closing of the Sale.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:240723.2 90231-002

**5.    San Bernardino County Tax Claim**

The County of San Bernardino has a tax claim in the amount of approximately $6,692 that is secured by the real property owned by the Debtor.  The Claim will be paid in full, in Cash, on the Closing Date of the Sale.

**G.    The Debtor's Unsecured Debt**

The Debtor, the Claims Agent and the Debtor's Professionals have been reviewing the Claims and the Debtor carefully reviewed its books and records as they relate to the Claims.  Many claims objections have been filed and several have been resolved.  Based on the careful analysis of the Unsecured Claims and the Debtor's books and records and the resolutions that have been reached with the creditors regarding certain of the claims objections , the conclusion is that the Debtor has approximately $9.7 million in cure payments (including $4.5 million to CMS) and $7.6 in general prepetition unsecured debt (including the unsecured claims of Physicians Hospital Management, LLC and Corwin Medical Group, Inc.).

**H.    Conditions Leading to the Decision to Sell the Hospital**

The Debtor's fiscal crisis was the result of the confluence of several factors.  First, the Debtor provides millions of dollars per year in care to indigents, for which it is not compensated at all or is inadequately compensated.  The percentage of the Debtor's resources expended on indigent care is increasing because the Debtor serves a depressed community and the economic condition of this community has worsened in the past few years.  As the unemployment rate has risen, so has the number of uninsured patients.  Over the last 18 months, the volume of patients has not increased substantially, however, the number of Medi-Cal and self-pay patients increased by 7%.

Second, the Hospital's plant is approximately 45 years old and the maintenance costs for this plant are substantial and increasing every year.  In addition to the maintenance costs, the costs of bringing and keeping the hospital plant in compliance with the various governmental regulatory requirements is also substantial.

Third, Medi-Cal arbitrarily reduced its payment rate by 10% in January 2010, and Medicare payment rates were be reduced in October 2010.  These changes have caused a decline in the

DOCS_LA:240723.2 90231-002

1    Debtor's revenues without a corresponding reduction in the Debtor's obligations to provide patient

2    care.

3    Fourth, being a stand alone, small rural hospital in California is simply not an advantageous

4    financial situation.  Such hospitals, including the Hospital, suffer from a lack of economies of scale,

5    poor payor mix, high overhead costs, less high-margin specialty service lines, and an overall lower

6    revenue base.  Thus, the Hospital, like many rural small hospitals, struggles to meet even the

7    relatively small (1 - 3 %) profit margins that is the norm for most of the not-for-profit hospital

8    industry.

9    During the relatively short period of time that Ms. Pelley and Mr. Matthews have managed

10    the Hospital they have made extensive efforts to deal with the financial crisis, including, but not

11    limited to, laying off staff, changing to outsourcing for medical transcriptions, negotiating an

12    increase in payor rates from Inland Empire Health Plan, a public entity, and attempting to re-

13    negotiate commercial contracts, however, they lacked leverage and were not able to increase those

14    contract rates.  In any event, because 75% of the Debtor's payments come from governmental

15    payors, even an increase in payment rates from HMOs/PPOs would not make a significant difference

16    in the Hospital's cash flow.

17    The Debtor needs to generate approximately $150,000 to $200,000 per day in revenue to

18    cover its operating costs.  No appreciable cost savings are recognized by the Debtor when the patient

19    census drops below 65 beds a day, as the fixed costs remain fairly constant.  The Hospital has been

20    generating only approximately $100,000 per day in revenue.  Thus, the Debtor loses money every

21    month it operates, and could not have paid its employees their last prepetition pay period absent an

22    emergency loan from the Corwin Medical Group.  In light of this ongoing cash flow shortage, the

23    Debtor was forced to file this chapter 11 case.

24    **I.    The History of the Sale of Substantially All of the Debtor's Assets**

25    On September 14, 2010, the day after the Petition Date, the Debtor filed a motion to approve

26    the sale of substantially all the Debtor's assets to Prime and to set bidding procedures to allow the

27    Debtor to hold an auction pursuant to section 363 of the Bankruptcy Code (the "Sale Motion")

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

13

1    [Docket No. 22].  The Court held a hearing on the bid procedures portion of the Sale Motion on

2    September 21, 2010 and approved them as set forth in the Sale Procedures Order.

3         On November 5, 2010, the Auction of substantially all the Debtor's assets was conducted

4    between the two bidders, Prime and VVHA, who had previously timely deposited their $5 million

5    good faith deposits and had been determined to be Qualified Bidders by Alvarez & Marsal

6    Healthcare Industry Group ("A&M").  VVHA presented the highest monetary bid, at $37 million.

7    Prime's monetary bid was $35 million.  The Board of Directors considered the monetary aspects of

8    the bids and the non-monetary considerations, which had been presented to the Board by the two

9    bidders in person at a meeting the previous evening, and decided to accept the bid of VVHA.  Prime

10   was the Back-up Buyer, pursuant to the Sale Procedures Order.

11        On November 8, 2010, the Debtor filed its *Report on the Results of the Auction; Declaration*

12   *of George D. Pillari in Support Thereof* [Docket No. 227] that set forth the above, described various

13   enhancements to the VVHA bid that had come about during the Auction, and asked that the sale be

14   approved.  Various parties filed objections, comments, or expressions of support to the Sale Motion

15   as it related to the sale of the Hospital to VVHA.  Debtor filed a reply and lodged the transcript of

16   the Auction.

17        On November 9, 2010, a hearing was held on the sale portion of the Sale Motion.  After

18   hearing argument, the Court approved the sale to VVHA.  The Court entered the Sale Order,

19   approving the sale of the Hospital to VVHA, on December 3, 2010 [Docket No. 351].

20        On or about November 19, 2010, the Debtor presented a substantial package of materials

21   related to the sale to VVHA to the California Attorney General for its consideration in determining

22   whether to approve the proposed sale.  Subsequently, on December 29, 2010, the Attorney General

23   issued its conditional approval of the sale (the "Conditions to Approval of Sale").

24        The Conditions to Approval of Sale required VVHA to post two $3 million escrows, one in a

25   segregated account for working capital needs that is to be maintained until the Hospital achieves

26   "operating self-sustainability" as defined in the Conditions to Approval of Sale, and the other in a

27   blocked account which would be forfeited to the Community Foundation in the event VVHA closes,

28   sells, transfers, leases, exchanges, options, conveys, or otherwise disposes of the Hospital or if

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1   VVHA files bankruptcy before April 30, 2016.  Additionally, the Conditions to Approval of Sale

2   required VVHA to take an assignment of the Debtor's contract with the Inland Empire Health Plan

3   for at least five years.  The Conditions to Approval of Sale also directed that any surplus funds of the

4   Debtor after payment of all Allowed Claims in full would be paid over the Community Foundation

5   Serving Riverside and San Bernardino Counties.

6           The Debtor, VVHA and Inland Empire Health Plan entered into negotiations over the

7   satisfaction of those conditions and reached an agreement on how the conditions would be satisfied.

8   The Debtor then requested that the Attorney General approve certain changes to the asset sale

9   agreement intended to enable the parties to fulfill the Conditions to Approval of Sale.[7]  The Attorney

10  General, on May 12, 2011, issued its letter of conditional approval of the amendments to the VVHA

11  asset sale agreement (the "Second Conditions to Approval of Sale").  The Debtor was advised that

12  VVHA had agreed to all of the conditions set forth in the Second Conditions to Approval of Sale.

13  One of the conditions to its approval of the revised asset sale agreement was that the sale close by

14  June 1, 2011.

15          On May 25, 2011, VVHA, through its counsel, sent the Debtor's CEO a letter alleging that

16  various conditions to its obligation to close had not been satisfied.  The Debtor, through its corporate

17  counsel, immediately responded by letter dated May 27, 2011, stating that all conditions to VVHA's

18  obligation to close had in fact been satisfied and urging VVHA to close the transaction before the

19  June 1, 2011 deadline.  VVHA declined to close the transaction and also declined to seek an

20  extension of the Attorney General's deadline for closing the transaction.  The Debtor asked the

21  Attorney General to extend its deadline but the Attorney General declined to do so.

22          The Debtor continued to negotiate with VVHA in an effort to get it to close the sale, but also

23  approached Prime regarding its continued interest in purchasing the Hospital.  After arms-length,

24  good faith negotiations between the Debtor and Prime, Prime agreed to enter into the ASA, which is

25  in substantially in the form of the asset purchase agreement filed by the Debtors on October 15, 2011

26  [Docket No. 136], with one particular difference worthy of note: Prime's bid at the Auction included

27  the purchase of the Debtor's case whereas the ASA excludes cash from the assets being purchased.

28

---

[7] The terms of the request for the amendment of the Conditions to Approval of Sale are discussed more fully below.

DOCS_LA:240723.2 90231-002

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

The purchase price under the APA of $35 million[8] is the amount of Prime's back-up bid at the Auction. The Debtor's board of directors has now approved the sale of the Assets to Prime under the terms of the ASA, subject to, among other conditions, this Court's and the California Attorney General's approval of the sale.

## V.

## SUMMARY OF THE TERMS OF THE SALE[9]

**A.** **Assets Being Sold**

The Debtor proposes to sell the Assets, which comprise its entire ongoing business, to Prime. The Assets set forth in Section 1.8 of the ASA are part of the operating Hospital and are to be transferred, which include all interests of the Debtor in real property (owned and leased); all tangible personal property owned by the Debtor and used by the Debtor in the operation of the Hospital; all of Debtor's interests in leases and contracts to be assumed by Purchaser; all receivables and other accounts payable to Debtor; all DSH payments payable to the Debtor; and various other assets described in the ASA.

**B.** **Excluded Assets**

Section 1.9 of the ASA lists assets that are excluded from the Assets. The excluded assets consist of cash, cash equivalents and short-term investments held in the name of or for the benefit of the Debtor, including those held in the name of or for the benefit of Victor Valley Community Hospital Foundation, contracts and leases which are not assumed and assigned to the Purchaser, assets belonging to others, and various other assets as set forth in Section 1.9 of the ASA.

**C.** **Purchase Price**

Prime has offered to purchase the Assets for $35 million less (i) the balance due under the Medi-Cal Liability as of the calendar day immediately preceding the Effective Time (the "Operational Closing Date") assumed by Purchaser, (ii) the Accrued Payroll and Accrued Paid Time

---

[8] The Purchase Price is subject to certain credits and adjustments as set forth in the APA.

[9] This summary of the APA is not exhaustive and is qualified in its entirety by the ASA, which is attached as **Exhibit "A."**. To the extent that there is any inconsistency between the above summary and the ASA, the ASA shall control. Accordingly, parties in interest are urged to review the ASA in its entirety

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Off assumed by Purchaser as of the Operational Closing Date, and (iii) any credits due Purchaser

pursuant to the terms of Sections 1.8(l), 1.8(m), and 1.8(n) of the ASA.

**D.      Good Faith Deposit**

$5 million.

**E.      Closing Date**

August 31, 2011.

**F.      Conditions to the Obligations of Purchaser**

The two primary conditions are California Attorney General approval and Bankruptcy Court

approval including a finding that Prime is a "good faith" purchaser.  Other conditions to the

Purchaser's obligations under the ASA, include, but not limited to the following:

(1)      Purchaser shall have obtained, or in certain instances applied for,

licenses, permits and authorizations that are required for operation of the Acute Care Hospital, unless

the failure to obtain such license, permit or authorizations does not have a material adverse effect;

(2)      Seller shall have in all material respects performed or complied with

each and all of it obligations, covenants, agreements and conditions under the ASA;

(3)      No temporary restraining order, preliminary or permanent injunction

or other order preventing the consummation of the transactions contemplated in this Agreement be in

effect on the Closing Date and no governmental entity shall have commenced any action or suit

before any court of competent jurisdiction or other governmental authority that seeks to restrain or

prohibit the consummation of the sale; and

(4)      The Title Company has irrevocably committed to issue the Title Policy

to Purchaser covering real property owned by the Debtor that is being purchased by the Purchaser

and any ground lease being assumed and assigned to the Purchaser in the amount of the full

insurable value of such real property and ground lease, respectively.

The Debtor believes that a sale of the Assets to Prime on substantially the terms and

conditions of the ASA, attached hereto as **Exhibit "A,"** is in the best interests of the Debtor's estate.

Based upon the history of the sale of the Hospital , the Debtor believes that Prime's bid establishes

the current value of the Assets.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

17

# VI.

# ARGUMENT

**A.**     **The Proposed Sale Is a Proper Exercise of the Debtor's Reasonable Business Judgment**

Section 363(b)(1) of the Bankruptcy Code provides that "the [debtor in possession], after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate.  11 U.S.C. § 363(b)(1).  Courts interpret section 363 to require only that such sale or use of property be within the sound judgment of the debtor to which the court gives great deference. *See, e.g., In re Moore,* 110 B.R. 924 (Bankr. C.D. Cal. 1990); *In re Canyon P'ship,* 55 B.R. 520 (Bankr. S.D. Cal. 1985)*; see also Simantob v. Claims Prosecutor, LLC (In re Lahijani),* 325 B.R. 282, 289 (B.A.P. 9th Cir. 2005) (trustee's position is afforded deference, "particularly where business judgment is entailed in the analysis"); *Walter v. Sunwest Bank (In re Walter),* 83 B.R. 14, 19-20 (B.A.P. 9th Cir. 1988) ("[T]here must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business . . .Whether the proffered business justification is sufficient depends on the facts of the case.")

As stated by the Bankruptcy Appellate Panel for the Ninth Circuit in *In re Walter*, the bankruptcy judge should consider all salient factors pertaining to the proposed transaction and accordingly, act to further the diverse interests of the debtor, creditors, and equity holders alike. *Id.,* 83 B.R. at 20.  Among other factors, courts should consider the consideration to be paid, the financial condition and needs of the debtor, the qualifications of the buyer, and whether a risk exists that the assets proposed to be sold would decline in value if left in the debtor's possession.  *See Equity Funding Corp. of Am. v. Fin. Assocs. (In re Equity Funding Corp.),* 492 F.2d 793, 794 (9th Cir. 1974) (affirming trial court's finding that the proposed sale of the debtor's assets would be in the best interest of the estate in light of impending deterioration of market value of debtor's assets).

As evidenced in the Pelley Declaration, the Debtor has considered each of the relevant factors with respect to the sale of the Assets.  Based on these factors, the Debtor submits that the following justifications demonstrate that the sale is an appropriate exercise of business judgment, and is in the best interests of the Debtor's estate.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

### 1.    The Purchase Price Is Adequate

As set forth in the Pelley Declaration, the Debtor believes that, based upon the entire history of the Debtor's marketing, auction and attempts to sell the Hospital (discussed above), the Purchase Price establishes the fair value of the Assets.  The Debtor knows of no viable alternative purchasers that are willing and able to close the sale of the Assets for an amount that will net the Debtor as much cash as the sale to Prime pursuant to the ASA.

### 2.    The Sale Will Likely Increase the Recovery to Unsecured Creditors

The Hospital's operations lose money every month.  Other factors as set forth above lead to the conclusion that the Hospital should be sold.  The sale of the Assets to Prime as set forth herein will result in a much higher recovery for the unsecured creditors than any other alternative available to the Debtor.

### 3.    The Creditworthiness of the Buyer

In the course of evaluating Primes original bid for the Assets and in identifying the Prime as the stalking horse bidder, the Debtor investigated the ability of the Prime to close the sale and believe that such ability exists.  Further, Prime has met the APA's requirement for a $5 million good faith deposit.  These deposit is not refundable except in certain circumstances.

### 4.    The Value of the Assets Will Decline Over Time

A Hospital whose operations lose money will, by definition, decline in value over time.  The Hospital's operations are suffering.  Currently, the Hospital is only performing seven surgical procedures and has a census of less than 50 patients on a daily basis.  If the Debtor becomes unable to meet its payroll and is forced to cease operating, the value will decline precipitously.  In that event, any sale would not be as a going concern but would be at a lower price consistent with the need to start up operations once again.

### B.    The Court Should Authorize the Sale Free and Clear of Liens, Claims, Interests and Encumbrances

The Debtor requests that the court approve the sale of the Assets free and clear of all interests, with any such interests to attach to the sale proceeds with the same validity and priority as existed prior to the sales, or to be paid in full.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

19

DOCS_LA:240723.2 90231-002

1    Section 363(f) of the Bankruptcy Code expressly authorizes a debtor to sell property outside

2    the ordinary course of business "free and clear of any interest in such property of an entity" if any

3    one of the five following conditions is met:

4    (a)    applicable non-bankruptcy law permits sale of such property free and clear of such

5    interest;

6    (b)    such entity consents;

7    (c)    such interest is a lien and the price at which such property is to be sold is greater than

8    the aggregate value of all liens on such property;

9    (d)    such interest is in bona fide dispute; or

10    (e)    such entity could be compelled, in a legal or equitable proceeding, to accept a money

11    satisfaction of such interest.

12    Because section 363(f) of the Bankruptcy Code is written in the disjunctive, any one of these

13    five conditions provides authority to sell the Assets free and clear of liens. *See Citicorp*

14    *Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988). The Debtor

15    submits that at least one of the conditions is met as to each of the liens asserted against the Assets.

16    Further, the interests of each of the holders of such liens is adequately protected by either being paid

17    in full at the time of closing, or by having such liens attach to the net proceeds of the sale, subject to

18    any claims and defenses the Debtor may possess with respect thereto.

19    **1.    The Purchase Price Is Greater Than the Aggregate Value of All Liens**

20    The purchase price is $35 million. Part of that purchase price is the assumption by Prime of

21    the obligations to the DHS, which filed a claim in the case in the amount of $5,560,160.60 based

22    upon the Repayment Agreement between the Debtor and DHS dated June 21, 2004. DHS alleges

23    that the amount is secured by recoupment rights from Medi-Cal payments. The rest of the lien

24    claims asserted against the Debtor's assets amount to approximately $11.9 million. After all credits

25    and adjustments (including adjustments for the debts being assumed), the Debtor's estate should

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:240723.2 90231-002

1    receive approximately $20.9 in net proceeds from the sale. The amount is more than adequate to

2    satisfy all of the lien claims.[10]

3            **2.    Parties Asserting Interests Could Be Compelled to Accept a Money Satisfaction**

4            Section 363(f)(5) of the Bankruptcy Code provides that assets may be sold free and clear of

5    liens if the holders "could be compelled, in a legal or equitable proceeding, to accept a money

6    satisfaction of [their] interest[s]." 11 U.S.C. § 363(f)(5). To the extent any alleged lien, claim or

7    encumbrance is found to be valid and enforceable against the Assets, the Debtor believes that the

8    sale proceeds are sufficient to satisfy such lien in full.

9            In general, all holders of liens, claims and encumbrances can be compelled to accept the full

10   amount to which they are entitled. Moreover, to the extent any alleged lien, claim or encumbrance

11   that is valid and enforceable against the Assets cannot be satisfied in full, provisions exist under non-

12   bankruptcy law in which a lienholder may be compelled to accept a monetary judgment less than the

13   amount of its lien. *See Clear Channel*, 391 B.R. at 45-46, *eg,* California Civil Code § 2924k (order

14   of distribution of foreclosure sale proceeds where lienholders other than foreclosing lender paid next

15   to last on account of their interests). Section 363(f)(5) requires merely that "there be the possibility

16   of, some proceeding, either at law or at equity, in which the nondebtor could be forced to accept

17   money in satisfaction of its interest." *Clear Channel*, 391 B.R. at 45.

18           In addition to state law provisions that compel a lienholder to accept less than the amount of

19   its lien, some have argued that section 1129(b)(2) of the Bankruptcy Code permits a debtor or trustee

20   to retain property and cram down objecting creditors upon payment of the actual value of the

21   collateral. *See, e.g.*, *In re Terrace Chalet Apartments, Ltd.*, 159 B.R. 821, 829 (N.D. Ill. 1993)

22   (holding that a creditor who could be crammed down under section 1129(b) could be compelled to

23   accept a money satisfaction of his interest under section 363(f)(5)); *In re Hunt Energy Co., Inc.*, 48

24   B.R. 472, 485 (Bankr. N.D. Ohio 1985) (same); *In re Weyland*, 63 B.R. 854, 860-61 (Bankr. E.D.

25   Wisc. 1986) (same); *In re Red Oak Farms, Inc.*, 36 B.R. 856, 858 (Bankr. W.D. Mo. 1984); *Cf.

26   Clear Channel*, 391 B.R. at 46. Under section 1129(b)(2) of the Bankruptcy Code, any lienholder

27

28   _____
[10] The Debtor, by including the various asserted lien claims in the above discussion, does not waive any of its objections
or defenses to the alleged claims are to the alleged liens or other security.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:240723.2 90231-002

1  could be compelled to accept a monetary satisfaction of its claims.  Under section 506(a) of the

2  Bankruptcy Code, the amount of a secured claim is limited to the value of the collateral securing

3  such claim.  As a result, a fair price for the collateral itself establishes the maximum amount of a

4  creditor's secured claim.  In addition, under section 1129(b)(2)(A)(ii) of the Bankruptcy Code, a

5  secured creditor's collateral may be sold free and clear of liens with liens to attach to proceeds.

6       Because holders of valid liens, claims and encumbrances enforceable against the Assets

7  could be compelled to accept money satisfaction of their interests, the Assets may therefore be sold

8  free and clear of any such liens pursuant to section 363(f)(5) of the Bankruptcy Code.

9      **3.**      **Lienholders Consent to the Sale**

10       If a party alleging that it holds a secured claim does not object to the sale of the Assets, it

11  should be deemed to have consented to the sale.  The Debtor believes that most, if not all, of the

12  lienholders will not object to the sale.

13       Accordingly, the Debtor submits that approval of the sale of the Assets free and clear of

14  liens, claims, interests or encumbrances is appropriate under, among other things, section 363(f) of

15  the Bankruptcy Code and should be approved.

16  **C.**     **The Proposed Transaction Is In Good Faith**

17       "[W]hen a bankruptcy court authorizes a sale of assets pursuant to section 363(b)(1) of the

18  Bankruptcy Code, it is required to make a finding with respect to the 'good faith' of the purchaser."

19  *In re Abbotts Dairies*, 788 F.2d 143, 149-50 (3rd Cir. 1986).  The purpose of such a finding is to

20  facilitate the operation of section 363(m) of the Bankruptcy Code, which provides a safe harbor for a

21  purchaser of a debtor's property when the purchase is made in "good faith."  Specifically, section

22  363(m) provides:

23          The reversal or modification on appeal of an authorization under
        subsection (b) or(c) of this section of a sale or lease of property does

24          not affect the validity of the sale or lease under such authorization to
        an entity that purchased or leased such property in good faith, whether

25          or not such entity knew of the pendency of the appeal unless such
        authorization and such sale of lease were stayed pending appeal.

26

27       11 U.S.C. § 363(m); *see Ewell v. Diebert (In re Well)*, 958 F.2d 276, 280 (9th Cir. 1992).

28  This provision serves the important purposes both of encouraging good faith transactions and of

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    preserving the finality of the bankruptcy court's orders unless stayed pending appeal. *Abbotts*

2    *Dairies,* 788 F.2d at 147.  As the Seventh Circuit recognized in *In re Edwards,* 962 F.2d 641 (7th Cir.

3    1992), "[i]f purchasers at judicially approved sales of property of a bankruptcy estate, and their

4    lenders, cannot rely on the deed that they receive at the sale, it will be difficult to liquidate

5    bankruptcy estates at positive prices." *Id.* at 643.  The court also noted that although the law

6    balances the competing interests between lien holders and purchasers of assets of the estate, it

7    weighs such interests "heavily in favor of the bona fide purchaser, particularly where, as here, there

8    are substantial business justifications for the proposed transaction." *Id.*

9         In this case, Prime is entitled to the safe harbor provided by section 363(m) of the

10   Bankruptcy Code.  Indeed, the Pelley Declaration demonstrates that the negotiations between Prime

11   and the Debtor at all times have been conducted at arms' length and in good faith.  In connection

12   with the sale of the Assets, the Debtor has evaluated the alternatives and acted with the intent of

13   obtaining the best possible deal for the estate in terms of maximizing value.  The terms of the ASA

14   accomplish this appropriate objective.  Moreover, Prime is not an insider of the Debtor.  For these

15   reasons, the Debtor requests that the court make a factual determination that Prime has purchased the

16   Assets in good faith as defined in section 363(m) of the Bankruptcy Code.

17   **D.    Notice of the Sale is Reasonable Under the Circumstances**

18        The Debtor has served the Notice of Motion, Motion, Memorandum of Points and

19   Authorities and supporting Declaration upon (i) the Office of the United States Trustee; (ii) counsel

20   to the creditors claiming a lien upon the Debtor's assets, (iii) the twenty largest unsecured creditors;

21   (vi) all federal, state, and local regulatory or taxing authorities or recording offices which have a

22   reasonably known interest in the relief requested by the Motion; and (vii) all entities on the Limited

23   Service List by email (to the extent possible) or overnight delivery.  The Debtor submits that such

24   notice is sufficient under the circumstances to give all parties in interest sufficient time to review the

25   Motion and supporting documents and file any opposition that they believe is appropriate.

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

23

# VII.

## **CONCLUSION**

For all the foregoing reasons, the Debtor respectfully requests that the court enter an order authorizing the Debtor to sell the Assets free and clear of liens, claims, interest and encumbrances pursuant to the ASA and that the court grant such other and further relief as is just and proper.

Dated:    July 5, 2011                    PACHULSKI STANG ZIEHL & JONES LLP


                                          By    /s/ *Samuel R. Maizel*
                                                Samuel R. Maizel
                                                Attorneys for Victor Valley Community
                                                Hospital, Debtor and Debtor in Possession

24

DOCS_LA:240723.2 90231-002

# EXHIBIT A

ASSET SALE AGREEMENT

among

Victor Valley Community Hospital,

a California corporation,


and

Prime Healthcare Services Foundation, Inc.,

a Delaware corporation


DATED:  July ___, 2011

## ASSET SALE AGREEMENT

This Asset Sale Agreement (the "Agreement") is made and entered into as of the ____ day of July, 2011 (the "Effective Date") by and among Victor Valley Community Hospital, a California nonprofit public benefit corporation ("Seller") on the one hand, and Prime Healthcare Services Foundation, Inc., a Delaware non-stock corporation organized exclusively for charitable purposes under § 501(c)(3) of the Internal Revenue Code or its permitted assignee ("Purchaser"), on the other hand.

## R E C I T A L S:

A.      Seller (I) engages in the business of delivering acute care services to the public through the operation of the acute care hospital known as Victor Valley Community Hospital located at 15248 11th Street, Victorville, California 92392 (the "Acute Care Hospital"), and (II) owns and operates the outpatient, ancillary and other healthcare businesses incident to the operation of the Acute Care Hospital as specifically identified on **Schedule A-1** (the "Other Businesses") (the Acute Care Hospital and the Other Businesses are referred to in this Agreement collectively as the "Hospital").

B.      Purchaser desires to purchase from Seller, and Seller desires to sell to Purchaser, substantially all of the assets owned by Seller and used with respect to the operation of the Hospital, for the consideration and upon the terms and conditions contained in this Agreement.

C.      Seller filed a voluntary petition for relief (the "Petition") commencing a case under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Central District of California, Riverside Division (the "Bankruptcy Court").

D.      The Parties intend to effectuate the transactions contemplated by this Agreement through a sale of the Assets by the Bankruptcy Court pursuant to § 363 of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual promises and covenants contained in this Agreement, and for their mutual reliance and incorporating into this Agreement the above recitals, the parties hereto agree as follows:

## ARTICLE 1

## DEFINITIONS; SALE AND TRANSFER OF ASSETS; CONSIDERATION; CLOSING

1.1      Definitions.  The terms listed below are defined elsewhere in this Agreement and, for ease of reference, the section containing the definition of each such term is set forth opposite such term.

| Term | Section |
|------|---------|
| Accounts Receivable | §1.8(i) |
| Acute Care Hospital | Recitals |

| Term | Section |
|------|---------|
| Affiliate | §4.6(b) |
| Aggregate Amount | §11.2.2(a)(x) |
| Aggregate Damage | §1.14(a) |
| Agreement | Preamble |
| Assets | §1.8 |
| Assumed Contracts | §1.8(f) |
| Assumed Leases | §1.8(e) |
| Assumed Obligations | §1.10 |
| Audit Periods | §2.7(d) |
| Bill of Sale | §1.5.1 |
| Break-Up Fee | §6.4(a) |
| Cash Purchase Price | §1.2 |
| Casualty Termination Notice | §1.14(a) |
| Casualty Termination Notice Period | §1.14(a) |
| CEO | §2.9 |
| CFO | §2.9 |
| Claim Notice | §11.4(a) |
| Closing | §1.4 |
| Closing Date | §1.4 |
| Closing of Financials | §10.4 |
| CNO | §2.9 |
| COBRA Coverage | §5.3(g) |
| Code | §2.11(b) |
| Consequential Damages | §11.2.2(a)(ix) |
| Damages | §11.2.1 |
| Designation Deadline | §1.12(a) |
| DSH Payments | §1.8(l) |
| Effective Date | Preamble |
| Effective Time | §1.4 |
| Environmental Laws | §2.5(c) |
| Environmental Permits | §2.5(b) |
| ERISA | §2.9 |
| Excluded Assets | §1.9 |
| Excluded Contracts | §1.9(d) |
| Excluded Leases | §1.9(e) |
| Excluded Liabilities | §1.11 |
| Financial Statements | §2.19 |
| Good Faith Deposit | §1.3 |
| Hazardous Substances | §2.5(c) |
| HFAP | §2.7(b) |
| Hired Employees | §5.3(a) |
| Hospital | Recitals |
| Hospital Employees | §5.3(a) |
| Indemnified Party | §11.4 |

2

| Term | Section |
|------|---------|
| Indemnifying Party | §11.4(a) |
| Indemnity Notice | §11.4(b) |
| Interim Financials | §2.9 |
| Inventory | §1.8(h) |
| Leased Real Property | §1.8(b) |
| Leasehold Title Policy | §4.8 |
| Licenses | §1.8(d) |
| Loss Consultant | §1.14(a) |
| Medi-Cal Liability | §1.10(a) |
| Notice Period | §11.4(a) |
| Original Closing Date | §1.14(a) |
| Operational Closing Date | §1.2 |
| Other Businesses | Recitals |
| Owned Real Property | §1.8(a) |
| Owner's Title Policy | §4.8 |
| Permitted Exceptions | §8.6 |
| Person | §4.6(b) |
| Personal Property | §1.8(c) |
| Power of Attorney | §1.5.9 |
| Pre-Closing E&O Matters | §11.2.1 |
| Prepaids | §1.8(g) |
| Provider Agreement | §1.6.2 |
| Purchase Price | §1.2 |
| Purchaser | Preamble |
| Purchaser Indemnified Parties | §11.2.1 |
| Real Estate Assignment(s) | §1.5.2 |
| Real Property | §1.8(b) |
| Receivable Records | §1.8(j) |
| Relevant Claim | §11.2.2(a)(xi) |
| Sale Motion | §6.1(b) |
| Sale Order | §6.1(b) |
| Seller | Preamble |
| Seller Aggregate Amount | §11.3.2(a)(vi) |
| Seller Cost Reports | §12.2(a) |
| Seller Plans | §2.11(a) |
| Seller Relevant Claim | §11.3.2(a)(vi) |
| Seller Tax Claims | §11.2.1(e) |
| Seller's Affidavit | §4.8 |
| Stabilization Funds | §1.8(n) |
| Termination Date | §9.1(h) |
| Third Party Claim | §11.4(a) |
| Title Commitment | §4.8 |
| Title Company | §1.3 |
| Title Instruments | §4.8 |

| **Term** | **Section** |
|---|---|

Title Policy ...................................................................... §4.8

    1.2    <u>Purchase Price</u>.  Subject to the terms and conditions of this Agreement, the aggregate purchase price to be paid by Purchaser to Seller for the purchase of the Assets shall be (a) Thirty-Five Million Dollars ($35,000,000.00) minus (b) the balance due under the Medi-Cal Liability as of the calendar day immediately preceding the Effective Time (the "Operational Closing Date") assumed by Purchaser minus (c) the Accrued Payroll and Accrued Paid Time Off assumed by Purchaser as of the Operational Closing Date minus (d) any credits due Purchaser pursuant to the terms of Sections 1.8(l), 1.8(m), and 1.8(n) (the result of the aforementioned calculation being referred to for the purposes of this Agreement as the "Cash Purchase Price"). The payment of the Cash Purchase Price at Closing shall be governed by <u>Section 1.6.1</u>.

    1.3    <u>Good Faith Deposit</u>.  By no later than 5:00 p.m. Pacific Standard Time on July 5, 2011, Purchaser shall deliver to First American Title Insurance Company – NCS Ontario (the "Title Company"), by wire transfer of immediately available funds, for earnest money, Five Million Dollars ($5,000,000) (the "Good Faith Deposit").  The Title Company shall hold the Good Faith Deposit pursuant to the terms of the Good Faith Deposit Agreement attached as **Exhibit 1.3** which Seller, Purchaser and the Title Company shall execute concurrent with the execution of this Agreement.  The Good Faith Deposit is non-refundable regardless of the termination of this Agreement pursuant to <u>Section 9.1</u>, except that Purchaser shall be entitled to the return of the Good Faith Deposit in the event that Purchaser terminates this Agreement pursuant to the terms set forth in <u>Sections 9.1(c)</u>, <u>9.1(d)</u>, <u>9.1(f)</u>, <u>9.1(g)</u>, or <u>9.1(h)</u> or Seller and Purchaser terminate this Agreement pursuant to Section 9.1(a).  In the event the Closing occurs, the Good Faith Deposit shall be applied as a credit against the Cash Purchase Price, payable at Closing pursuant to <u>Section 1.6.1</u>.

    1.4    <u>Closing Date</u>.  The consummation of the transactions contemplated by this Agreement (the "Closing") shall take place at 9:00 a.m. local time on August 31, 2011, at the offices of Purchaser, 3300 E. Guasti Road, 2nd Floor, Ontario, California  91761, or such other date, time and place as the parties shall mutually agree ("Closing Date"); provided, however, that all conditions precedent and other matters required to be completed as of the Closing Date have been or will be completed on such date.  The Closing with respect to the Hospital shall be deemed to have occurred and to be effective as between the parties as of 12:00:01 a.m. Pacific time on (a) September 1, 2011 (if the Closing Date is August 31, 2011) or (b) the next day after the Closing Date (if the Closing Date is any day other than August 31, 2011) (the "Effective Time").  The Seller will own, control the management of and operate the Hospital until immediately prior to the Effective Time.  From the Effective Time until Purchaser obtains its own license to operate and maintain the Hospital issued by the State of California Department of Public Health, the Seller will control the management of and operate the Hospital, and Purchaser will own and manage the Hospital pursuant to the Interim Management and Lease Agreement.

4

1.5    <u>Items to be Delivered by Seller at Closing</u>.  At or before the Closing, Seller shall execute and deliver or cause to be delivered to Purchaser directly or through the Title Company the following, duly executed by Seller where appropriate:

1.5.1    General Assignment, Bill of Sale and Assumption of Liabilities (the "Bill of Sale");

1.5.2    Assignment and Assumption of Real Estate Leases with respect to each Leased Real Property (the "Real Estate Assignment(s)");

1.5.3    Grant Deed(s);

1.5.4    favorable original certificates of good standing, or comparable status, of Seller, issued by the respective states of incorporation and organization of Seller, dated no earlier than a date which is ten (10) calendar days prior to the Closing Date;

1.5.5    a certificate of an executive officer of Seller certifying to Purchaser (a) compliance with Seller's covenants set forth in this Agreement,(b) that all of the conditions contained in <u>ARTICLE 7</u> have been satisfied except those, if any, waived in writing by Seller, and (c) that all of the representations and warranties set forth in Article 2 are true and correct in all material respects as of the Operational Closing Date;

1.5.6    a certificate of the corporate Secretary of Seller certifying to Purchaser (i) the incumbency of the officers of Seller on the Effective Date and on the Closing Date and bearing the authentic signatures of all such officers who shall execute this Agreement and any additional documents contemplated by this Agreement and (ii) the due adoption and text of the resolutions of (A) the Board of Directors of Seller authorizing (I) the transfer of the Assets and Assumed Obligations by Seller, as applicable, to Purchaser and (II) the due execution, delivery and performance of this Agreement and all ancillary documents and instruments by Seller, as applicable, and that such resolutions have not been amended or rescinded and remain in full force and effect on the Closing Date;

1.5.7    a duly executed and enforceable settlement agreement with the United States Department of Health & Human Services and the Centers for Medicare and Medicaid Services (collectively, "Medicare") which, among other things, releases all claims against Seller other than claims for fraud related to all periods prior to the Operational Closing Date other than the cost report years of 2010 and 2011, or such stub portion of the year of 2011 (the "CMS Release");

1.5.8    Uniform Commercial Code termination statements for any and all financing statements (which do not correspond to an Assumed Obligation) filed with respect to the Assets, as and if applicable to the extent that the effect of such statements has not been transferred from the Assets being sold to the proceeds of the sale;

1.5.9    Limited Power of Attorney for use of DEA and Other Registration Numbers, and DEA Order Forms, in the form of **Exhibit 1.5.9** attached hereto (the "Power of Attorney");

5

1.5.10 The Interim Management and Lease Agreement, which shall be substantially in the form of **Exhibit 1.5.10** attached hereto (the "Interim Management and Lease Agreement");

      1.5.11  A certified copy of the Sale Order; and

      1.5.12  such other instruments, certificates, consents or other documents which are reasonably necessary to carry out the transactions contemplated by this Agreement and to comply with the terms hereof.

      1.6    <u>Items to be Delivered by Purchaser at Closing</u>.  At or before the Closing, Purchaser shall execute and deliver or cause to be delivered to Seller directly or through the Title Company the following, duly executed by Purchaser where appropriate:

      1.6.1    payment of the Cash Purchase Price pursuant to wire instructions that will be provided by the Title Company to Purchaser two (2) business days prior to the Closing Date;

      1.6.2    a certificate of the President or any Vice President of Purchaser certifying to Seller (a) compliance with Purchaser's covenants set forth in this Agreement, (b) that Purchaser has obtained all material licenses, permits and authorizations from governmental agencies or governmental bodies that are necessary or required for completion of the transactions contemplated by this Agreement, including, subject to Seller's delivery of the CMS Release, the assumption and assignment of the Medicare Health Insurance Benefit Agreement identified as Provider No. 05-0517 ("Provider Agreement"), (c) that Purchaser has filed its change of ownership application with the California Department of Public Health and applied for the Department of Health and Human Services and the Centers for Medicare and Medicaid Services approval of a change of ownership by the filing of Form CMS 855, (d) that all of the conditions contained in <u>ARTICLE 8</u> have been satisfied except those, if any, waived in writing by Purchaser, and (e) that the representations and warranties set forth in Article 3 are true and correct in all material respects as of the Operational Closing Date;

      1.6.3    a certificate of the Secretary of Purchaser certifying to Seller (a) the incumbency of the officers of Purchaser on the Effective Date and on the Closing Date and bearing the authentic signatures of all such officers who shall execute this Agreement and any additional documents contemplated by this Agreement and (b) the due adoption and text of the resolutions of the Board of Directors of Purchaser authorizing the execution, delivery and performance of this Agreement and all ancillary documents and instruments by Purchaser, and that such resolutions have not been amended or rescinded and remain in full force and effect on the Closing Date;

      1.6.4    favorable original certificate of good standing, or comparable status, of Purchaser, issued by each of the California and Delaware Secretary of State dated no earlier than a date which is ten (10) calendar days prior to the Closing Date;

      1.6.5    the Bill of Sale;

      1.6.6    the Real Estate Assignment(s);

6

1.6.7    Intentionally Deleted;

1.6.8    the Power of Attorney;

1.6.9    the Interim Management and Lease Agreement;

1.6.10   a duly executed Substitution of Attorney form executed by attorneys of Purchaser's choice substituting into the Desert Vista Action as counsel of record; and

1.6.11   such other instruments, certificates, consents or other documents which are reasonably necessary to carry out the transactions contemplated by this Agreement and to comply with the terms hereof.

1.7     Prorations and Utilities.   To the extent not otherwise prorated pursuant to this Agreement, Purchaser and Seller shall prorate (as of the Effective Time), if applicable, real estate and personal property lease payments, real estate and personal property taxes, assessments and other similar charges against real estate, plus power and utility charges.   As to power and utility charges, "final readings" as of the Operational Closing Date shall be ordered from the utilities; the cost of obtaining such "final readings," if any, to be paid for by Purchaser.   At the Closing, all items of income and expense listed below with respect to the Assets shall be prorated in accordance with the foregoing principles and the rules for the specific items set forth hereafter:

1.7.1    All sales, use, stamp, similar state and local taxes arising from the sale of the Assets hereunder shall be the responsibility of and allocated to Purchaser.   Real estate taxes and personal property taxes on the Assets shall be prorated based upon the payment period (i.e., calendar or other tax fiscal year) to which the same are attributable.   Seller shall pay at or prior to the Closing (or Purchaser shall receive credit for) any unpaid taxes attributable to periods or portions thereof occurring prior to the Effective Time.   Seller shall receive credit for any previously paid or prepaid taxes attributable to periods or portions thereof occurring from and after the Effective Time.   In the event that as of the Closing Date the actual tax bills for the tax year or years in question are not available and the amount of taxes to be prorated as aforesaid cannot be ascertained, then rates, millages and assessed valuation of the previous year, with known changes, shall be used.   The parties agree that if the real estate and personal property taxes prorations are made based upon the taxes for the preceding tax period, the prorations shall be re-prorated after the Closing.

1.7.2    Liens and assessments levied by any governmental authority as of the Closing Date shall be paid by the Seller.   Pending liens and assessments as of the Closing Date for matters arising after the Effective Date shall be assumed by the Purchaser.

1.7.3    Seller shall be entitled to all rents and other payments under tenant leases made prior to the Closing.   Purchaser shall be entitled to all rents and other payments under tenant leases accruing for or made during the period after the Closing.   Collected rents and other sums under the tenant leases shall be prorated as of the Effective Time.   All other rents and other payments under the tenant leases accrued but unpaid as of the Effective Time (including, without limitation, rents and other payments accrued prior to the Closing but payable in arrears after the Closing) shall belong to Purchaser, and Seller shall, upon receipt of said rents and other

7

payments, receive the same in trust for Purchaser and shall promptly remit them to Purchaser within ten (10) business days after Seller's receipt of same.

1.7.4    All prepaid rentals, other prepaid payments, and security deposits deposited with Seller by tenants under any tenant leases assigned to Purchaser shall all belong to Purchaser and all shall be assigned and delivered to Purchaser at the Closing.

1.7.5    All prorations and payments to be made under the foregoing provisions shall be made on the basis of a written statement or statements delivered to Purchaser by Seller and approved by Purchaser.  In the event any proration, apportionment or computation shall prove to be incorrect for any reason, then either Seller or Purchaser shall be entitled to an adjustment to correct the same, provided that said party makes written demand on the party from whom it is entitled to such adjustment within thirty (30) calendar days after the erroneous payment or computation was made, or such later time as may be required, in the exercise of due diligence, to obtain the necessary information for proration.  The provisions of this Section 1.7 shall survive after the Closing.

1.7.6    After the Closing Date, Purchaser agrees to use its best efforts to diligently assist Seller (i) for the purpose of adjudicating claims in bankruptcy, (ii) for the resolution of any matters relating to the 2010 open cost report and the 2011 cost report and Seller shall cooperate with Purchaser's efforts to obtain a release from Medicare for liabilities, if any, arising out of the 2010 and 2011 cost reports, and (iii) for the preparation of termination cost reports.  Purchaser agrees to provide reasonable office space at the Hospital for two representatives of Seller and to allow the Hospital's business office staff to assist Seller for sufficient time after the Effective Time to finalize a listing of accounts payable, to calculate and process Seller's final payroll and other amounts payable to any employees by Seller under the terms of this Agreement, and to otherwise reasonably assist Seller in the closing of its business affairs at no charge to Seller. Seller and Purchaser shall each have reasonable access to the other's accounting records pertaining to the Hospital to confirm the proper accounting of all matters prior to the Closing.  In addition, Purchaser agrees to make available to Seller any and all patient records lawfully required by Seller.

1.8    Transfer of Seller Assets.  On the Closing Date and subject to the terms and conditions of this Agreement, Seller shall sell, assign, transfer, convey and deliver to Purchaser, free and clear of all liens and encumbrances other than the Permitted Exceptions, and Purchaser shall acquire, all of Seller's right, title and interest in and to only the following assets and properties, as such assets shall exist on the Closing Date with respect to the operation of the Hospital, to the extent not included among the Excluded Assets, as existing on the Closing Date, such transfer being deemed to be effective at the Effective Time (collectively, the "Assets"):

(a)    all of the real property that is owned by Seller and used with respect to the operation of the Hospital, including, without limitation, the real property that is described in **Schedule 1.8(a)** (such description to include a legal description and address), together with all buildings, improvements and fixtures located thereupon, including, without limitation, all buildings and other improvements then under construction (collectively, the "Owned Real Property");

8

(b)      all of Seller's interest, to the extent assignable or transferable in real property that is leased by Seller and used by Seller in the operation of the Hospital including, without limitation, the leased real property described in **Schedule 1.8(b)** which Purchaser has designated as a lease to be assumed by Purchaser pursuant to <u>Section 1.12</u> herein (the "Leased Real Property") (the Owned Real Property and the Leased Real Property are collectively referred to in this Agreement as the "Real Property");

(c)      all of the tangible personal property owned by Seller and used by Seller in the operation of the Hospital, including equipment, furniture, fixtures, machinery, vehicles, office furnishings, and leasehold improvements (the "Personal Property"), including, without limitation, the Personal Property described in **Schedule 1.8(c)**;

(d)      all of Seller's rights, to the extent assignable or transferable, to all licenses, provider numbers, permits, approvals, certificates of exemption, franchises, accreditations and registrations and other governmental licenses, permits or approvals issued to Seller for use in the operation of the Hospital (the "Licenses"), including, without limitation, the Licenses and Medicare Provider Number(s) described in **Schedule 1.8(d)**, subject to the government's approval of the assignment and assumption by Purchaser of Seller's current and valid Provider Agreement and Seller's delivery of the CMS Release;

(e)      all of Seller's interest, to the extent assignable or transferable, in and to all real property and personal property leases with respect to the operation of the Hospital that have been designated by Purchaser as a lease to be assumed by Purchaser pursuant to <u>Section 1.12</u> herein (the "Assumed Leases");

(f)      all of Seller's interest, to the extent assignable or transferable, in and to all contracts and agreements (including, but not limited to, purchase orders) with respect to the operation of the Hospital that have been designated by Purchaser as a contract to be assumed pursuant to <u>Section 1.12</u> (the "Assumed Contracts");

(g)      all of those advance payments, prepayments, prepaid expenses, deposits and the like which exist as of the Operational Closing Date, subject to the prorations provided in <u>Section 1.7</u> of this Agreement, which were made with respect to the operation of the Hospital (the "Prepaids"), the current categories and amounts of which are set forth on **Schedule 1.8(g)**;

(h)      except as excluded by <u>Sections 1.9(f)</u> and <u>1.9(g)</u>, all inventories of supplies, drugs, food, janitorial and office supplies and other disposables and consumables (i) located at  the Hospital or (ii) used with respect to the operation of the Hospital (the "Inventory");

(i)      all accounts owed to, notes, interest payable under the foregoing and other receivables of Seller, including accounts, notes or other amounts receivable from physicians or medical groups, and all claims, rights, interests and proceeds related thereto, including all accounts and other receivables, disproportionate share payments and cost report settlements related thereto, in each case arising from the rendering of services or provision of goods, products or supplies to inpatients and outpatients at the Hospital, billed and unbilled, recorded and unrecorded, for services, goods, products and supplies provided by Seller prior to the

9

Effective Time whether payable by Medicare, Medi-Cal, TRICARE, medically indigent assistance programs, Blue Cross, Blue Shield or any other payor (including, without limitation, any insurance company, health care service plan, self-funded health plan), or any health care provider or network (such as a health maintenance organization, preferred provider organization or any other managed care program) or any fiscal intermediary of the foregoing, private pay patients, private insurance or by any other source ("Accounts Receivable");

(j)      all documents, records, correspondence, work papers and other documents other than patient records, relating to the Accounts Receivable (the "Receivable Records");

(k)      all rights to settlements and retroactive adjustments, if any, whether arising under a cost report of Seller or otherwise, for any reporting periods ending on or prior to the Effective Time, whether open or closed, arising from or against the United States government under the terms of the Medicare program or TRICARE (formerly the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS"));

(l)      all Medi-Cal disproportionate share replacement payments (Welfare & Institutions Code § 14166.11) (the "DSH Payments") received on and after the Effective Time regardless of the State fiscal year for which the DSH Payments are made in reference to and regardless of the State fiscal year for which the data was derived to calculate eligibility for such payments.  The parties acknowledge and agree that DSH Payments are determined by Medi-Cal for a particular fiscal year based on data reported for a previous State fiscal year(s). Notwithstanding the foregoing, the parties hereby confirm that it is the express intent of the parties that Purchaser shall receive the benefit of all DSH Payments received on and after the Effective Time regardless of whether the payments are made in reference to a State fiscal year prior to the Effective Time and regardless of whether the DSH Payments were calculated based on data reported for a State fiscal year prior to the Effective Time.  The parties further confirm and agree that it is the express intent of the Parties that Purchaser shall receive a credit against the Cash Purchase Price equal to the amount of all DSH Payments actually received by Seller in its bank account(s) between the Effective Date and the Effective Time;

(m)      all Medi-Cal supplemental payments (Welfare & Institutions Code § 14666.12), and payments from the State of California known as distressed hospital funds (together with Medi-Cal supplemental payments, the "Supplemental Payments") received on and after the Effective Time regardless of the State fiscal year for which the Supplemental Payments are made in reference to and regardless of the State fiscal year for which the data was derived to calculate eligibility for such payments.  The parties acknowledge that Supplemental Payments are made to an eligible hospital for a state fiscal year, and that payments for a particular state fiscal year may be made during or after such state fiscal year.  Notwithstanding the foregoing, the parties hereby confirm that it is the express intent of the parties that Purchaser shall receive the benefit of all Supplemental Payments received on and after the Effective Time regardless of whether the payments are made in reference to a State fiscal year prior to the Effective Time. The parties further confirm and agree that it is the express intent of the Parties that Purchaser shall receive a credit against the Cash Purchase Price equal to the amount of all Supplemental Payments actually received by Seller in its bank account(s) between the Effective Date and the Effective Time;

LA #4811-6314-8297 v2

(n)      all payments made pursuant to the MediCal Hospital Rate Stabilization Act of 2011, as a result of Senate Bill 90, or pursuant to follow-on quality assurance fee legislation, and from the Hospital Quality Assurance Revenue Fund (the "Stabilization Payments") regardless of the fiscal year or period for which the Stabilization Payments are made in reference to and regardless of the fiscal year or period for which the data was derived to calculate the eligibility for or amount of the Stabilization Payments.  The parties hereby confirm that it is the express intent of the Parties that Purchaser shall receive a credit against its payment of the Cash Purchase Price equal to the amount of all Stabilization Payments actually received by the Seller in its bank account(s) between the Effective Date and the Effective Time, *provided, however*, that the credit against the Cash Purchase Price received by Seller for DSH Payments, Supplemental Payments, and Stabilization Payments under Sections 1.8(l), 1.8(m), and 1.8(n) shall be no less than Three Million Dollars ($3,000,000.00).  The parties further confirm that it is the express intent of the parties that Purchaser shall receive the benefit of all Stabilization Payments received on and after the Effective Time regardless of when the payments are made;

(o)      all documents, records that are not proprietary to Seller and/or Seller's affiliates, operating manuals, files and computer software with respect to the operation of the Hospital, including, without limitation, all patient records, medical records, employee records, financial records with respect to the operation of the Hospital, equipment records, construction plans and specifications, and medical and administrative libraries, *provided, however*, that any patient records and medical records which are not required by law to be maintained by Seller as of the Effective Time shall be an Excluded Asset;

(p)      to the extent assignable, all rights in all warranties of any manufacturer or vendor in connection with the Personal Property;

(q)      all goodwill of the Hospital evidenced by the Assets;

(r)      the Hospital's website(s) together with certain content therein;

(s)      the telephone and facsimile numbers used with respect to the operation of the Hospital;

(t)      the names and symbols of the Hospital set forth on **Schedule 1.8(t)**;

(u)      except as excluded by Section 1.9(s) or included in Schedule 1.9(t), all rights, claims and choses in action of Seller and its affiliates including, without limitation, all rights, claims and choses of action of Seller and its affiliates related to and/or arising out of the Accounts Receivable, *Victor Valley Community Hospital v. Desert Vista Anesthesiology Medical Group, Inc., etc., et al,* San Bernardino Superior Court Case No. CIVVS 1003249 (filed May 20, 2010) (the "Desert Vista Action"), and/or related to and/or arising out of the relationship and agreements prior to September 13, 2010 between Seller and Physicians Hospital Management, LLC, Corwin Medical Group, Inc., IPA, and their affiliates, owners, members, partners, managers, directors, officers and employees (the "PHM Parties");;

(v)      all claims, rights, interests and proceeds (whether received in cash or by credit to amounts otherwise due to a third party) with respect to amounts overpaid by Seller to

11

any third party with respect to periods prior to the Effective Time (e.g. such overpaid amounts may be determined by billing audits undertaken by Purchaser or Purchaser's consultants);

(w)    all surpluses arising out of any risk pools to which Seller is a party;

(x)    any claims arising under Bankruptcy Code sections 502(d), 544, 545, 547, 548, 549, or 550; and

(y)    any other assets of Seller with respect to the operation of the Hospital (which are not otherwise specifically described above in <u>Sections 1.7 or 1.8</u>) which are related to the operation of the Hospital and are not otherwise identified as an Excluded Asset in <u>Section 1.9</u>.

1.9    <u>Excluded Assets</u>.  Notwithstanding anything to the contrary in <u>Section 1.8</u>, Seller shall retain all assets owned directly or indirectly by it (or any of Seller's affiliates) which are not among the Assets, including, without limitation, the following assets of Seller (collectively, the "Excluded Assets"):

(a)    cash, cash equivalents and short-term investments held in any account in the name of or for the benefit of Seller, which includes, without limitation, those held in the name of or for the benefit of the Victor Valley Community Hospital Foundation;

(b)    all intercompany receivables of Seller with any of Seller's affiliates;

(c)    any asset which would revert to the employer upon the termination of any Seller Plan, including assets representing a surplus or overfunding of any Seller Plan;

(d)    all contracts which are not Assumed Contracts (the "Excluded Contracts");

(e)    all leases which are not Assumed Leases (the "Excluded Leases");

(f)    the portions of Inventory, Prepaids and other Assets disposed of, expended or canceled, as the case may be, by Seller after the Effective Date and prior to the Effective Time in the ordinary course of business;

(g)    assets owned and provided by vendors of services or goods to the Hospital;

(h)    all claims, rights, interests and proceeds with respect to state or local tax refunds (including but not limited to property tax) resulting from periods prior to the Effective Time, and the right to pursue appeals of same;

(i)    all of Seller's organizational or corporate record books, minute books and tax records;

(j)    any Owned Real Property not purchased by, or any Leased Real Property not assigned to, Purchaser pursuant to <u>Sections 1.14(a) or 1.14(c)(ii)</u>;

(k)      all insurance proceeds arising in connection with the operation of the Assets or the Hospital prior to the Operational Closing Date not assigned to Purchaser pursuant to Sections 1.14(a) or 1.14(b);

(l)      all unclaimed property of any third party as of the Effective Time, including, without limitation, property which is subject to applicable escheat laws;

(m)      all bank accounts of Seller, and all cash held in bank accounts or trust or escrow accounts for the benefit of Seller, including, without limitation, accounts held in Seller's capacity as debtor-in-possession;

(n)      all rights, claims and choses in action of Seller and its affiliates (other than those subject to Section 1.8) with respect to periods prior to the Effective Time, and any payments, awards or other proceeds resulting therefrom;

(o)      all writings and other items that are protected from discovery by the attorney-client privilege, the attorney work product doctrine or any other cognizable privilege or protection, which are further described by way of example, rather than limitation, on **Schedule 1.9(o)**;

(p)      all documents, records, operating manuals and film pertaining to the Hospital (i) which are proprietary to Seller, or (ii) which the parties agree that Seller is required by law to retain;

(q)      all patient records and medical records which are not required by law to be maintained by Seller as of the Effective Time;

(r)      the rights of Seller and its affiliates under this Agreement including the proceeds of the transactions contemplated by this Agreement;

(s)      all rights, claims and choses in action of Seller and its affiliates (i) related to or arising from professional services provided to or for the benefit of Seller or its affiliates, including, without limitation, legal, accounting, actuarial, retirement, insurance, auction, appraisal, and quality and risk management services, (ii) related to or arising from any conduct from and after September 13, 2010 affecting the Seller, including, without limitation, those against organizations owned, controlled or affiliated with Kali Chaudhuri, M.D., their owners, agents, partners, members, investors, joint venturers, affiliates, employees and confederates, whether previously identified or subject to discovery hereafter, to the extent any of them took any action involving the Seller and Seller's proposed sale transaction with buyers known as Victor Valley Hospital Acquisition, Inc. and Victor Valley Hospital Real Estate, LLC (the "Chaudhuri Parties"). The parties acknowledge and agree that all rights, claims, and choses of action against the PHM Parties described in Section 1.8(u) do not fall within the provisions of this Section 1.9(s);

(t)      any assets identified in **Schedule 1.9(t)**.

13

1.10    <u>Assumed Obligations</u>.  On the Closing Date, Seller shall assign, and Purchaser shall assume and agrees to discharge, perform and satisfy fully, on and after the Effective Time, the following liabilities and obligations of Seller and only the following liabilities and obligations (collectively, the "Assumed Obligations"):

(a)    all liabilities and obligations of Seller of no more than Five Million Six Hundred Thousand Dollars ($5,600,000) owed to the State of California relating to Medi-Cal overpayments to Seller (the "Medi-Cal Liability");

(b)    the Assumed Contracts and all liabilities of Seller under the Assumed Contracts, but only to the extent of the obligations arising thereunder with respect to events or periods on and after the Effective Time, *provided, however*, that Purchaser shall advance to Seller any money necessary for Seller to cure any defaults in the Assumed Contracts, or cure such defaults itself, obtaining a credit against the Purchase Price, payable at Closing pursuant to <u>Section 1.6.1</u>, for the money advanced or paid;

(c)    all current and valid provider contracts of Seller with Medicare, Medi-Cal and TRICARE programs, including, without limitation, the Provider Agreement, including successor liability, subject to the government's approval and Seller's delivery of the CMS Release and Seller's indemnification obligations under Section 11.2;

(d)    the Assumed Leases and all liabilities of Seller under the Assumed Leases, but only to the extent of the obligations arising thereunder with respect to events or periods on and after the Effective Time, *provided, however*, that Purchaser shall advance to Seller any money necessary for Seller to cure any defaults in the Assumed Leases, or cure such defaults itself, obtaining a credit against the Purchase Price, payable at Closing pursuant to <u>Section 1.6.1</u>, for the money advanced or paid;

(e)    all liabilities of Seller relating to the Seller Cost Reports except (a) for those matters which are the subject of the CMS Release and (b) liabilities which are related to the number of beds at the Acute Care Hospital for cost report purposes for the period of October 1, 2009 to the Operational Closing Date;

(f)    all liabilities arising out of or relating to any act, omission, event or occurrence connected with the use, ownership or operation by Purchaser of the Hospital or any of the Assets on or after the Effective Time;

(g)    the Accrued Payroll and Accrued Paid Time Off of Seller's employees as of the Operational Closing Date;

(h)    all unpaid real and personal property taxes, if any, that are attributable to the Assets after the Effective Time, subject to the prorations provided in <u>Section 1.7</u>;

(i)    all utilities being furnished to the Assets, subject to the prorations provided in <u>Section 1.7</u>;

14

---

(j)        any documentary, sales and transfer tax liabilities of Seller incurred as a result of the consummation of the transaction contemplated by this Agreement; and

(k)        any other obligations and liabilities identified in **Schedule 1.10(k)**.

1.11    Excluded Liabilities.    Notwithstanding anything to the contrary in Section 1.10, Purchaser shall not assume or become responsible for any of Seller's duties, obligations or liabilities that are not expressly assumed by Purchaser pursuant to the terms of this Agreement, the Bills of Sale or the Real Estate Assignment(s) (the "Excluded Liabilities"), and Seller shall remain fully and solely responsible for all of Seller's debts, liabilities, contract obligations, expenses, obligations and claims of any nature whatsoever related to the Assets or the Hospital unless assumed by Purchaser under this Agreement, in the Bill of Sale or in the Real Estate Assignment(s).  The Excluded Liabilities shall include, without limitation:

(a)        any liabilities of Seller with respect to the operation of the Hospital prior to the Effective Time that are not otherwise specifically included in the Assumed Obligations;

(b)        all liabilities of Seller arising out of or relating to any act, omission, event or occurrence connected with the use, ownership or operation by Seller of the Hospital or any of the Assets prior to the Effective Time, other than as specifically included in the Assumed Obligations;

(c)        all liabilities of Seller in connection with claims of professional malpractice to the extent arising out of or relating to acts, omissions, events or occurrences prior to the Effective Time;

(d)        all liabilities of Seller for its share of matching contributions for eligible beneficiaries' 401(k) plans, Section 125 plans and other Seller Plans and all administrative costs associated with such welfare benefit plans arising prior to the Effective Time;

(e)        all liabilities of Seller for violations of any law, regulation or rule to the extent arising from acts or omissions of Seller prior to the Effective Time, including, without limitation, those pertaining to Medicare and Medi-Cal fraud or abuse; *provided, however*, that Purchaser as a condition to the government's approval of the assumption and assignment of the Provider Agreement may be required to accept liability as to the government for such violations that are not released by virtue of the CMS Release;

(f)        all liabilities of Seller under the Excluded Contracts and under any contract that is among the Excluded Assets;

(g)        all liabilities of Seller under the Excluded Leases and under any contract that is among the Excluded Assets;

(h)        all liabilities of Seller for commissions or fees owed to any finder or broker in connection with the transactions contemplated hereunder;

15

LA #4811-6314-8297 v2

(i)      all liabilities of Seller or any of Seller's affiliates for any stay-bonus payments to the Hospital Employees (or to any member of the Leadership Team) accrued during periods prior to the Effective Time to provide an incentive to the Hospital Employees (or to any member of the Leadership Team) to remain employed at the Hospital through the Effective Time;

(j)      all liabilities of Seller or any of Seller's affiliates for any severance payments owed to any Hospital Employees (or to any member of the Leadership Team) if the event which gives rise to the obligation to pay severance occurs prior to the Effective Time;

(k)      all liabilities of Seller to maintain patient records and medical records which are not required by law to be maintained by Seller as of the Effective Time;

(l)      all liabilities of Seller related to any risk pools to which Seller is a party;

(m)      all liabilities of Seller, if any, for any non-accrued employee benefits; and

(n)      all liabilities of Seller under the CMS Release;

(o)      all liabilities of Seller for cost report liabilities not covered by the CMS Release which are related to the number of licensed beds at the Acute Care Hospital during the period of October 1, 2009 to the Operational Closing Date *provided*, *however*, that such liabilities shall not exceed Five Hundred Thousand Dollars ($500,000.00) and that Seller shall be relieved of any such liabilities as between Seller and Purchaser as of June 30, 2012; and

(p)      all liabilities of Seller or any of Seller's affiliates to any of the Excluded Employees.

1.12    Designation of Assumed Contracts and Assumed Leases.

No later than twenty-five (25) days prior to the Closing (the "Designation Deadline"), Purchaser shall designate by written notice to Seller (such notice to be signed and dated by Buyer) each of the contracts and leases to which Seller is a party that Purchaser elects to have assigned to it as an Assumed Contract or an Assumed Lease as of the Effective Time (each, an "Assignment Election").  Purchaser and Seller shall cause each of the contracts and leases for which Purchaser delivers an Assignment Election prior to the Designation Deadline to be assumed and assigned to Purchaser.  Except for those contracts and leases identified in an Assignment Election, Purchaser shall not assume any leases or contracts.

1.13    Disclaimer of Warranties; Release.

(a)      Except as expressly set forth in <u>ARTICLE 2</u> hereof, the Assets transferred to Purchaser will be sold by Seller and purchased by Purchaser in their physical condition at the Effective Time, "AS IS, WHERE IS AND WITH ALL FAULTS AND NONCOMPLIANCE WITH LAWS" WITH NO WARRANTY OF HABITABILITY OR FITNESS FOR HABITATION, with respect to the Real Property, including, without limitation, the land, the buildings and the improvements, and fixtures, and WITH NO WARRANTIES, INCLUDING,

16

WITHOUT LIMITATION, THE WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, with respect to the physical condition of the Real Property, the Personal Property and Inventory, any and all of which warranties (both express and implied) Seller hereby disclaims. All of the foregoing real and personal property shall be further subject to normal wear and tear on the land, buildings, improvements and equipment and normal and customary use of the Inventory and supplies in the ordinary course of business up to the Effective Time.

(b)    Purchaser acknowledges that Purchaser has examined, reviewed and inspected all matters which in Purchaser's judgment bear upon the Assets and their value and suitability for Purchaser's purposes and, except as affirmatively represented and warranted by Seller, is relying solely on its own examination, review and inspection of the Assets and Assumed Obligations. Except to the extent of any representation made by Seller herein and except with respect to the express indemnification obligations specifically set forth in Section 11.2, Purchaser releases Seller and their affiliates from all responsibility and liability regarding the condition, valuation, salability or utility of the Assets, or their suitability for any purpose whatsoever.

1.14    Risk of Loss.   The risk of loss or damage to any of the Assets, Personal Property, Owned Real Property, the Hospital and all other property, transfer of which is contemplated by this Agreement, shall remain with Seller until the Effective Time and Seller shall maintain such insurance policies of Seller as are in effect at the Effective Date, or comparable policies of insurance or self-insurance covering the Assets, the Hospital and all other property through the Effective Time.

(a)    With respect to the Real Property, if prior to the Closing, all or any part of the Real Property is destroyed or damaged by fire or the elements or by any other cause where such damage or destruction is in the aggregate (the "Aggregate Damage") less than or equal to fifteen percent (15%) of the Purchase Price, the parties' duties and obligations under this Agreement shall not be affected and the Closing shall proceed as scheduled; *provided, however,* Seller shall retain any and all insurance proceeds and other or similar third party recompense on accounts of such damage or destruction and the Aggregate Damages (up to fifteen percent (15%) of the Purchase Price) shall be deducted from the Purchase Price. If prior to the Closing, all or any part of the Real Property is destroyed or damaged by fire or the elements or by any other cause where the Aggregate Damage exceeds fifteen percent (15%) of the Purchase Price, then either of Seller or Purchaser, in the exercise of its sole discretion, may elect to terminate this Agreement by written notice to the other (the "Casualty Termination Notice") delivered after the date which is fifteen (15) calendar days after the occurrence of such damage or destruction but no later than the date which is thirty (30) calendar days after the occurrence of such damage or destruction (the "Casualty Termination Notice Period"); *provided, however,* that in no event shall the Casualty Termination Notice be provided if Seller and Purchaser are unable to agree prior to the inception of the Casualty Termination Notice Period that the amount of the Aggregate Damage exceeds fifteen percent (15%) of the Purchase Price. If Purchaser and Seller are unable to agree upon the amount of the Aggregate Damage by the earlier to occur of (I) the originally scheduled Closing Date (the "Original Closing Date") or (II) the inception of the Casualty Termination Notice Period, the amount of the Aggregate Damage shall be determined by Centex

17

Rodgers, Inc. (the "Loss Consultant") pursuant to Section 1.14(d).  If this Agreement is not terminated by Casualty Termination Notice pursuant to this Section, then the Aggregate Damage either as agreed by the parties or as established pursuant to Section 1.14(d) shall be deducted from the Purchase Price and Seller shall retain any and all insurance proceeds and other similar third party recompense; *provided, however,* that in no case shall the deduction from the Purchase Price exceed fifteen percent (15%) of the Purchase Price.  If Purchaser and Seller are unable to agree on the amount of the Aggregate Damage by the earlier to occur of (i) the Original Closing Date or (ii) the inception of the Casualty Termination Notice, the amount of the Aggregate Damage shall be determined by the Loss Consultant pursuant to Section 1.14(d).

(b)     With respect to any Assets other than Real Property which are destroyed or damaged by fire or the elements or by any other cause prior to the Closing, Seller will deduct from the Purchase Price the cost to repair, restore and/or replace the Assets other than the Real Property (using the lesser of cost of repair, restore or replace as applicable), and Seller will be entitled to any and all insurance proceeds and other or similar third party recompense for such destruction or damage.  Notwithstanding anything in this Agreement to the contrary, if the damage to the Assets other than the Real Property is greater than fifteen percent (15%) of the Purchase Price, then either of Seller or Purchaser, in the exercise of its sole discretion, may elect to terminate this Agreement by written notice to the other.

(c)     If prior to the Closing, all or any part of a parcel of the Real Property is made subject to an eminent domain proceeding which would in Purchaser's reasonable judgment materially adversely impair access to the Real Property or be materially adverse to the operation of the Hospital, Purchaser may elect to (i) purchase such affected Owned Real Property, or take assignment of such Leased Real Property, and the Closing shall proceed as scheduled (*provided, however,* at the Closing Seller shall assign, transfer and set over to Purchaser all of Seller's right, title and interest in and to any award in such eminent domain proceeding) or (ii) elect to terminate this Agreement by written notice to Seller.  If Purchaser and Seller are unable to agree upon the amount of the adjustment described in subsection (i) of the preceding sentence by the Original Closing Date, the adjustment shall be resolved by the Loss Consultant pursuant to Section 1.14(d).

(d)     If pursuant to either Section 1.14(a) or 1.14(c), the amount of the Aggregate Damage (and any applicable Purchase Price adjustment) is to be determined by the Loss Consultant, within five (5) calendar days after the earlier to occur of the Original Closing Date or the inception of the Casualty Termination Notice Period (the "Submittal Date"), each party shall submit to the other party and to the Loss Consultant its proposed Aggregate Damage (and any applicable Purchase Price adjustment) as a result of the event(s) contemplated by either Section 1.14(a) or 1.14(c), along with a detailed description of the basis for such amount and any applicable adjustment.  Within ten (10) calendar days after the Submittal Date (the "Decision Date"), the Loss Consultant, acting as an expert and not as an arbitrator, shall select either the Aggregate Damage (and any applicable Purchase Price adjustment) proposal of Seller or the Aggregate Damage (and any applicable Purchase Price adjustment) proposal of Purchaser as the definitive amount of the Aggregate Damage (and any applicable adjustment to the Purchase Price) and Purchaser or Seller shall thereafter have the right to provide a Casualty Termination Notice provided that the Aggregate Damage exceeds fifteen percent (15%) of the Purchase

18

Price. If either Purchaser or Seller fails to timely provide their proposed Aggregate Damage (and any applicable Purchase Price adjustment) to the Loss Consultant, the Aggregate Damage (and any applicable Purchase Price adjustment) shall be the amount proposed by the submitting party, and Purchaser or Seller shall thereafter have the right to provide a Casualty Termination Notice provided that the Aggregate Damage exceeds fifteen percent (15%) of the Purchase Price. If neither party submits its proposed Aggregate Damage (and any applicable Purchase Price adjustment) to the Loss Consultant, no adjustment to the Purchase Price shall be made and neither Purchaser nor Seller shall have the right to provide a Casualty Termination Notice. The decision of the Loss Consultant shall be conclusive and binding as between Purchaser and Seller, and the costs of such review shall be borne by the party whose proposed Aggregate Damage (and any applicable Purchase Price adjustment) is not selected by the Loss Consultant. Upon any such determination of the adjustment to the Purchase Price in accordance with this Section 1.14, the parties shall, subject to the terms and conditions of this Agreement, consummate the transactions contemplated by this Agreement at a mutually agreeable time and place, in accordance with the provisions of this Agreement. If pursuant to either Section 1.14(a) or 1.14(c), the amount of the Aggregate Damage (and any applicable Purchase Price adjustment) is to be determined by the Loss Consultant and either the Submittal Date or the Decision Date falls on a day which is on or after the Termination Date, then the Termination Date shall be extended to the date which is ten (10) calendar days after the Decision Date.

## ARTICLE 2

## REPRESENTATIONS AND WARRANTIES OF SELLER

As an inducement to Purchaser to enter into this Agreement and to consummate the transactions contemplated by this Agreement, Seller hereby represents, warrants and covenants to Purchaser as to the following matters, except as disclosed in the disclosure schedule as of the Effective Date, as may be amended pursuant to the terms of this Agreement (the "Disclosure Schedule") (**Schedule 2**) hereby delivered by Seller to Purchaser:

2.1    Authorization.    Seller has all necessary power and authority to enter into this Agreement and to carry out the transactions contemplated hereby, subject to the parties' satisfying the terms and conditions of the required prior, written approval of the California Attorney General and the Sale Order of the Bankruptcy Court.

2.2    Binding Agreement.    All actions required to be taken by Seller to authorize the execution, delivery and performance of this Agreement, all documents executed by Seller which are necessary to give effect to this Agreement, and all transactions contemplated hereby, have been duly and properly taken or obtained or authorized by Seller. No other corporate or other action on the part of Seller is necessary to authorize the execution, delivery and performance of this Agreement, all documents necessary to give effect to this Agreement and all transactions contemplated hereby. This Agreement has been duly and validly executed and delivered by Seller and, assuming due and valid execution by Purchaser, this Agreement constitutes a valid and binding obligation of Seller enforceable in accordance with its terms subject to (a) applicable bankruptcy, reorganization, insolvency, moratorium and other laws affecting creditors' rights or

19

charities generally from time to time in effect and (b) limitations on the enforcement of equitable remedies.

      2.3    <u>Organization and Good Standing; No Violation</u>.

      (a)    Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of California.  Seller has all necessary power and authority to own, operate and lease its properties and to carry on its businesses as now conducted.

      (b)    Neither the execution and delivery by Seller of this Agreement nor the consummation of the transactions contemplated hereby by Seller nor compliance with any of the material provisions hereof by Seller, will violate, conflict with or result in a breach of any material provision of Seller's articles of incorporation or bylaws or any other organizational documents of Seller.

      2.4    <u>Required Consents</u>.  Except as set forth on **Schedule 2.4**, Seller is not a party to or bound by, nor are any of the Assets subject to, any mortgage, or any material lien, deed of trust, lease, or contract or any material order, judgment or decree which (a) requires the consent of another to the execution of this Agreement or (b) requires the consent of another to consummate the transactions contemplated by this Agreement.

      2.5    <u>Compliance With Laws and Contracts</u>.

      (a)    Except as set forth in **Schedule 2.5(a)** or as disclosed by the CMS Release or expressed in governmental proofs of claims filed with the Bankruptcy Court, to Seller's knowledge, Seller, with respect to the operation of the Hospital, is in compliance with all applicable laws, statutes, ordinances, orders, rules, regulations, policies, guidelines, licenses, certificates, judgments or decrees of all judicial or governmental authorities (federal, state, local, foreign or otherwise), except where the failure to be in such compliance would not have a material adverse effect on the Assets or the business of the Hospital.  Except as set forth in **Schedule 2.5(a)** or as disclosed by the CMS Release or expressed in governmental proofs of claims filed with the Bankruptcy Court, and except as would not have a material adverse effect on the Hospital or the business of the Hospital, Seller, with respect to the operation of the Hospital, has not been charged in writing with or been given written notice of, and to the best knowledge of Seller, Seller, with respect to the operation of the Hospital, is not under investigation with respect to, any violation of, or any obligation to take remedial action under, any applicable (i) law, statute, ordinance, rule, regulation, policy or guideline promulgated, (ii) license or certificate issued, or (iii) order, judgment or decree entered, by any federal, state, local or foreign court or governmental authority relating to the Hospital or the business of the Hospital.  Notwithstanding the foregoing, no provision of this <u>Section 2.5(a)</u> shall be deemed a representation or warranty by Seller as to compliance with any Environmental Laws (as defined in <u>Section 2.5(c)</u> below).

      (b)    To Seller's knowledge, Seller's ownership and operation of the Hospital and the Assets are and have been in compliance with all Environmental Laws, except where the failure to be in such compliance would not have a material adverse effect on the Assets or the business of the Hospital.  To Seller's knowledge, Seller has obtained all material licenses,

permits and approvals necessary or required under all applicable Environmental Laws (the "Environmental Permits") for the ownership and operation of the Hospital and the Assets. All such Environmental Permits are in effect and, to Seller's knowledge, no action to revoke or modify any of such Environmental Permits is pending. There is not now pending or, to Seller's knowledge, threatened, any claim, investigation or enforcement action by any governmental authority (whether judicial, executive or administrative) concerning Seller's potential liability under Environmental Laws in connection with the ownership or operation of the Hospital or the Assets. To Seller's knowledge, there has not been a release or threatened release of any Hazardous Substance at, upon, in, under or from the Hospital or the Assets at any time. To Seller's knowledge, no portion of the Real Property has been used as a dump or landfill or a storage, recycling or disposal facility for any Hazardous Substance, other than for the storage and disposal of medical waste in connection with the ordinary course operation of the Hospital.

(c)     For the purposes of this Agreement, the term "Environmental Laws" shall mean all state, federal or local laws, ordinances, codes or regulations relating to Hazardous Substances or to the protection of the environment, including, without limitation, laws and regulations relating to the storage, treatment and disposal of medical and biological waste. For purposes of this Agreement, the term "Hazardous Substances" shall mean (i) any hazardous or toxic waste, substance, or material defined as such in (or for the purposes of) any Environmental Laws, (ii) asbestos-containing material, (iii) medical and biological waste, (iv) polychlorinated biphenyls, (v) petroleum products, including gasoline, fuel oil, crude oil and other various constituents of such products, and (vi) any other chemicals, materials or substances, exposure to which is prohibited, limited or regulated by any Environmental Laws.

(d)     Except as set forth in **Schedule 2.5(d)** or as disclosed by the CMS Release or expressed in governmental proofs of claims filed with the Bankruptcy Court, to Seller's knowledge, Seller has performed all material obligations relating to the Assets and the business of the Hospital, and is not in breach or default, nor do any circumstances exist which with or without notice or lapse of time, or both, would result in breach or default, nor is there any claim of such breach or default with respect to any obligation to be performed, under any material contract, material lease, guaranty, indenture or loan agreement relating to the Assets or the business of the Hospital, which breach or default or its consequences would materially adversely affect the Assets or the business of the Hospital. No provision of this <u>Section 2.5(d)</u> shall apply to any failure to obtain consents to the assignment of any provider contracts, or consents to the assignment of the Assumed Contracts and Assumed Leases from the third parties to the Assumed Contracts and Assumed Leases in which consent is required to assign the Assumed Contracts and Assumed Leases to Purchaser (the "Contract and Lease Consents").

2.6     <u>Title; All Assets</u>.

(a)     Seller has good and marketable fee simple or leasehold title, as the case may be, to the Real Property, subject to the matters set forth in <u>Section 2.6(b)</u>. Seller has good and valid title to the Personal Property, which individually or in the aggregate is material to the condition (financial or otherwise), operations or the business of the Hospital.

(b)     The Real Property and the Personal Property is held by Seller free and clear of all liens, pledges, claims, charges, security interests or other encumbrances, and is not, in

21

the case of the Real Property, subject to any rights-of-way, building or use restrictions, exceptions, variances, reservations or limitations of any nature whatsoever except (i) the Leases, (ii) liens for current real property taxes and assessments, (iii) mechanics', carriers', workmen's, repairmen's and other statutory liens, if any, which do not materially impair the ordinary business operations of the Hospital or for which, in respect of matters affecting title in the Real Property, title insurance coverage has been obtained, (iv) rights of way, building or use restrictions, zoning regulations, exceptions, easements, covenants, variances, reservations, encroachments and other limitations of any kind, if any, which do not materially impair the ordinary business operations of the Hospital or for which, in respect of matters affecting title to the Real Property, title insurance coverage has been obtained, (v) those standard printed exceptions customarily set forth in title reports or title policies (other than exceptions for matters identified in the Surveys with respect to the Real Property), and (vi) other such encumbrances as are set forth in **Schedule 2.6(b)**.  None of the Real Property is subject to a pending, or to Seller's knowledge threatened, condemnation or similar proceeding.

(c)    The Inventory with respect to the Hospital is, and at the Closing Date will be, maintained in such quantities as is consistent with the Hospital's historical practices, subject to the Hospital's need to draw down Inventory as a result of financial difficulties that have led to its need to commence bankruptcy proceedings and the likely continuing impact on the Hospital's ability to purchase Inventory from vendors during the bankruptcy proceedings.

(d)    The Assets and the Excluded Assets comprise substantially all of the property and assets used in the conduct of the operations of the Hospital.  Except as set forth on **Schedule 2.6(d)**, the Owned Real Property and the Leased Real Property comprise all of the real property used in the conduct of the operations of the Hospital.

2.7    Certain Representations With Respect to the Hospital.

(a)    Except with regard to the Hospital's laboratory licenses and related certificates, all material licenses and certifications which are necessary to operate the business of the Hospital by Seller are valid and in good standing.  Seller has previously delivered to Purchaser or will promptly deliver after the Effective Date all written correspondence received by Seller from any governmental entity since, or related to uncorrected material deficiencies in, the most recent state licensure or certification survey related to the Hospital.

(b)    The Acute Care Hospital is duly accredited by the Healthcare Facilities Accreditation Program of the American Osteopathic Association ("HFAP") for the period set forth in **Schedule 2.7(b)**.  Seller has previously delivered to Purchaser or will promptly deliver after the Effective Date all written correspondence received by Seller from HFAP since, or related to uncorrected material deficiencies in, the most recent HFAP survey related to the Hospital.

(c)    The Acute Care Hospital is certified for participation in the Medicare and TRICARE programs, and has current and valid provider contracts with each of such programs, except where the failure to have such contracts would not have a material adverse effect on the business of the Acute Care Hospital.  Except as set forth in **Schedule 2.7(c)**, and except for matters relating to disclosures in filings with the United States Bankruptcy Court in connection

22

with Seller's Motion for Order Authorizing Assumption and Assignment of Medicare Provider Agreement with United States Centers for Medicare and Medicaid Services [Docket No. 466] and a related proposed Stipulation Re: Assumption and Assignment of Provider Agreement (the "CMS Matters") or as disclosed by the CMS Release or expressed in governmental proofs of claims filed with the Bankruptcy Court, Seller has not received written notices from the regulatory authorities which enforce the statutory or regulatory provisions in respect of any of the Medicare, Medi-Cal or TRICARE programs of any pending or threatened investigations with respect to the operation of the Acute Care Hospital.  During the cost report periods commencing on and after October 1, 2009, the Acute Care Hospital has maintained 101 licensed beds for Medicare cost report periods.

(d)     Notices of Program Reimbursement have been issued by the applicable fiscal intermediary with respect to the cost reports of the Hospital for Medicare, Medi-Cal (if required) and Blue Cross (if required) through the periods set forth in **Schedule 2.7(d)** (the "Audit Periods").  Each of such reports was timely filed.  To the knowledge of Seller, (i) Seller has not received notice of any material dispute between the Acute Care Hospital and the applicable governmental agency or private entity, or their intermediaries or representatives, regarding such cost reports for periods subsequent to the periods specified in **Schedule 2.7(d)** except as disclosed by the CMS Matters, the CMS Release or expressed in governmental proofs of claims filed with the Bankruptcy Court and (ii) there are no pending or threatened material claims by any of such programs against the Acute Care Hospital with respect to the Audit Periods or any period thereafter.

(e)     With respect to the operation of the Acute Care Hospital, Seller does not have any outstanding loan, grant or loan guarantee pursuant to the Hill-Burton Act (42 USC Section 291a, *et seq.*).

(f)     Seller, with respect to the operation of the Hospital, has not been excluded from the Medicare or any federal or state health care program, and, except with regard to the Hospital's laboratory, there is no pending or, to Seller's knowledge, threatened exclusion action against Seller with respect to the operation of the Hospital.

2.8     <u>Brokers and Finders</u>.  With the exception of costs to be incurred in bankruptcy proceedings or any future auction, neither Seller nor any affiliate thereof, nor any officer or director thereof, have engaged or incurred any liability to any finder, broker or agent in connection with the transactions contemplated hereunder.

2.9     <u>Financial Statements</u>.  The following have been or will be prepared from the books and records of Seller: (a) the audited financial statements of Seller with respect to the operation of the Hospital as of September 30, 2008, September 30, 2009, and September 30, 2010 and for the years then ended (the "2008 & 2009 & 2010 Financials") and (b) the unaudited financial statements of Seller with respect to the operation of Hospital for months after September 30, 2010 through April 2010 and as otherwise made available to Purchaser pursuant to <u>Section 4.5</u> (the "Interim Financials") (the 2008 & 2009 & 2010 Financials, and the Interim Financials are collectively referred to herein as the "Financial Statements").  The Financial Statements fairly present, or will fairly present when prepared, the financial position and results of operations, as applicable, of Seller with respect to the operation of the Hospital as of and for

23

the periods then ended, in each case in conformity with generally accepted accounting principles consistently applied during such periods, except that the Financial Statements (i) do not reflect all cost report adjustments, allocations or adjustments of overhead, intercompany interest or income taxes, and other year-end adjustments, (ii) do not contain footnotes, (iii) were prepared without physical inventories, (iv) do not contain an unaudited statement of cash flow, (v) omit substantially all the disclosures required by generally accepted accounting principles, (vi) are not restated for subsequent events, including, without limitation, the CMS Matters, (vii) may not reflect any adjustments for impairment of long-lived assets or goodwill, or restructuring charges or the reclassification of assets held for sale on the applicable balance sheet, and (viii) may not fully reflect the following liabilities: (A) vacation, holiday and similar accruals and accruals in respect of Seller's or any affiliate of Seller's self-insured employee health benefits, (B) liabilities payable in connection with workers' compensation claims, (C) liabilities payable pursuant to any employee welfare benefit plan (within the meaning of Section 3(1) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA")), maintained by Seller or any affiliate of Seller on account of any of the Hospital's employees, the chief executive officer of the Hospital ("CEO"), the chief financial officer of the Hospital ("CFO"), the chief operating officer of the Hospital ("COO") and the chief nursing officer of the Hospital ("CNO"), (D) federal, state and local income or franchise taxes and (E) payroll and bonuses payable and vacation, holiday and similar accruals with respect to the CEO, CFO, COO and CNO.

2.10    <u>Legal Proceedings</u>.  Except with regard to the Hospital's laboratory licenses and related certificates, and except as set forth on **<u>Schedule 2.10</u>** or as disclosed by the CMS Release or expressed in governmental proofs of claims filed with the Bankruptcy Court, there are no claims, proceedings or investigations pending or, to the best knowledge of Seller, threatened relating to or affecting Seller with respect to the operation of the Hospital or any of the Assets before any court or governmental body (whether judicial, executive or administrative) in which an adverse determination would have a material adverse effect on the Assets or the business condition of the Hospital.  Seller, with respect to the operation of the Hospital, is not subject to and is not reasonably likely to become subject to any judgment, order, decree or other governmental restriction specifically (as distinct from generically) applicable to it or its assets, including the Assets, which would have a material adverse effect on the Assets or the business condition (financial or otherwise) of the Hospital.  Except with regard to the Hospital's laboratory licenses and related certificates, Seller, with respect to the operation of the Hospital, is not in default with respect to any final order, writ, injunction or decree served upon Seller from any court or any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, which default would have a material adverse effect on the Assets or the business condition (financial or otherwise) of the Hospital other than as set forth on **<u>Schedule 2.10</u>**.

2.11    <u>Employee Benefits</u>.

(a)    **<u>Schedule 2.11(a)</u>** contains a list of (i) each pension, profit sharing, bonus, deferred compensation, or other retirement plan or arrangement of Seller with respect to the operation of the Hospital, whether oral or written, which constitutes an "employee pension benefit plan" as defined in Section 3(2) of ERISA, (ii) each medical, health, disability, insurance or other plan or arrangement of Seller with respect to the operation of the Hospital, whether oral

24

or written, which constitutes an "employee welfare benefit plan" as defined in Section 3(1) of ERISA, and (iii) each other employee benefit or perquisite provided by Seller with respect to the operation of the Hospital, in which any employee of Seller participates in his capacity as such (collectively, the "Seller Plans").

(b)     With respect to each Seller Plan, to Seller's knowledge, Seller does not have any direct or indirect, actual or contingent liability, other than to make payments for contributions, premiums or benefits when due in the ordinary course, all of which payments that are due having been made.  Neither the Hospital nor any of the Assets are subject to any lien under ERISA or the Internal Revenue Code of 1986, as amended (the "Code").

(c)     All of the Seller Plans have been administered in material compliance with ERISA and the applicable provisions of the Code.  There are no "accumulated funding deficiencies" within the meaning of ERISA or the Code or any federal excise tax or other liability on account of any deficient fundings in respect of the Seller Plans.

2.12    Personnel.

(a)     **Schedule 2.12(a)** sets forth a complete list (as of the date set forth therein) of names, positions and current annual salaries or wage rates, bonus and other compensation and/or benefit arrangements, and the paid time off pay of all full-time and part-time employees of Seller with respect to the operation of the Hospital and indicating whether such employee is a part-time or full-time employee.

(b)     There are no labor unions representing or collective bargaining agreements in effect covering the employees of Seller with respect to the operation of the Hospital.  There is no unfair labor practice complaint against Seller pending, or to the best knowledge of Seller threatened, before the National Labor Relations Board with respect to the operation of the Hospital.  To the best knowledge of Seller there is no labor strike, arbitration, dispute, slowdown or stoppage, and no union organizing campaign, pending or threatened, by or involving the employees of Seller that would materially affect the operation of the Hospital.

(c)     **Schedule 2.12(c)** sets forth a complete list of the names and positions of all full-time employees of Seller with respect to the operation of the Hospital that have been terminated without cause during the ninety (90) days immediately preceding the Effective Date. Seller shall update Schedule 2.13(c) at Closing to reflect such terminations occurring during the ninety (90) days immediately preceding the Closing Date.

(d)     Except as set forth on **Schedule 2.12(d)**, neither Seller nor any affiliate of Seller is a party to an employment agreement with any Hospital Employee, including any member of the Leadership Team.

2.13    Insurance.  Seller maintains, and has maintained, without interruption, at all times during Seller's ownership of the Hospital, self-insurance or policies or binders of insurance covering such risks and events, including personal injury, property damage, malpractice and general liability, to provide adequate and sufficient insurance coverage for all the assets and

operations of the Hospital.  **Schedule 2.13** contains a list of all such insurance maintained by Seller with respect to the operation of the Hospital as of the Effective Date.

2.14    Seller Knowledge.    References in this Agreement to "Seller's knowledge", "knowledge of Seller" or the "best knowledge of Seller" or words of substantially similar import, mean the actual then current knowledge of the Chief Executive Officer and Chief Financial Officer of Seller as of the Closing, without any research, investigation or inquiry.   No constructive or imputed knowledge shall be attributed to any such individual by virtue of any position held, relationship to any other Person or for any other reason.

## ARTICLE 3

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

As an inducement to Seller to enter into this Agreement and to consummate the transactions contemplated by this Agreement, Purchaser hereby represents, warrants and covenants to Seller as to the following matters as of the Effective Date and, except as otherwise provided herein, shall be deemed to remake all of the following representations, warranties and covenants as of the Closing Date:

3.1    Authorization.    Purchaser has full power and authority to enter into this Agreement and has full power and authority to perform its obligations hereunder and to carry out the transactions contemplated hereby.

3.2    Binding Agreement.    All legal and other actions required to be taken by Purchaser to authorize the execution, delivery and performance of this Agreement, all documents executed by Purchaser which are necessary to give effect to this Agreement, and all transactions contemplated hereby, have been duly and properly taken or obtained by Purchaser; provided, however, that as of the Effective Date, Purchaser does not have a license or any of the necessary state or federal certificates, approvals or agreements to own and operate the Hospital or participate in any state or federal healthcare programs.  Except as otherwise provided above, no other legal or other action on the part of Purchaser is necessary to authorize the execution, delivery and performance of this Agreement, all documents necessary to give effect to this Agreement and all transactions contemplated hereby.  This Agreement has been duly and validly executed and delivered by Purchaser and, assuming due and valid execution by Seller, this Agreement constitutes a valid and binding obligation of Purchaser enforceable in accordance with its terms subject to (a) applicable bankruptcy, reorganization, insolvency, moratorium and other laws affecting creditors' rights generally from time to time in effect and (b) limitations on the enforcement of equitable remedies.

3.3    Organization and Good Standing.    Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, is duly authorized to transact business in the State of California, and has full power and authority to own, operate and lease its properties and to carry on its business as now conducted.

3.4     No Violation.  Except as set forth in **Schedule 3.4**, neither the execution and delivery by Purchaser of this Agreement nor the consummation of the transactions contemplated hereby nor compliance with any of the material provisions hereof by Purchaser will (a) violate, conflict with or result in a breach of any material provision of the Articles of Incorporation, Bylaws or other organizational documents of Purchaser or any contract, lease or other instrument by which Purchaser is bound; (b) require any approval or consent of, or filing with, any governmental agency or authority, (c) violate any law, rule, regulation, or ordinance to which Purchaser is or may be subject, (d) violate any judgment, order or decree of any court or other governmental agency or authority to which Purchaser is subject.

3.5     Brokers and Finders.  Neither Purchaser nor any affiliate thereof nor any officer or director thereof has engaged any finder or broker in connection with the transactions contemplated hereunder.

3.6     Representations of Seller.  Purchaser acknowledges that it is purchasing the Assets on an "AS IS, WHERE IS" basis (as more particularly described in Section 1.13), and that Purchaser is not relying on any representation or warranty (expressed or implied, oral or otherwise) made on behalf of Seller other than as expressly set forth in this Agreement. Purchaser further acknowledges that Seller is not making any representations or warranties herein relating to the operation of the Hospital on and after the Effective Time.

3.7     Legal Proceedings.  Except as described on **Schedule 3.7**, there are no claims, proceedings or investigations pending or, to the best knowledge of Purchaser, threatened relating to or affecting Purchaser or any affiliate of Purchaser before any court or governmental body (whether judicial, executive or administrative) in which an adverse determination would materially adversely affect the properties, business condition (financial or otherwise) of Purchaser or any affiliate of Purchaser or which would adversely affect or has adversely affected Purchaser's ability to consummate the transactions contemplated hereby.  Neither Purchaser nor any affiliate of Purchaser is subject to and is not reasonably likely to become subject to any judgment, order, decree or other governmental restriction specifically (as distinct from generically) applicable to Purchaser or any affiliate of Purchaser which materially adversely affects the condition (financial or otherwise), operations or business of Purchaser or any affiliate of Purchaser or which would adversely affect Purchaser's ability to consummate the transactions contemplated hereby.

3.8     No Knowledge of Seller's Breach.  Neither Purchaser nor any of its affiliates has knowledge of any breach of any representation or warranty by Seller or of any other condition or circumstance that would excuse Purchaser from its timely performance of its obligations hereunder.  If information comes to Purchaser's attention on or before the Closing Date (whether through Seller or otherwise and whether before or after the Effective Date) which indicates that Seller has breached any of its representations and warranties under this Agreement, then for the purposes of Seller's liability under such representations and warranties on and after the Effective Time the effect shall be as if the representations and warranties had been modified in this Agreement in accordance with the actual state of facts existing prior to the Effective Time such that there will be no breach under Seller's representations and warranties in relation to such information; *provided, however,* that Purchaser must immediately notify Seller if any such

27

breach comes to its attention on or before the Closing Date, and Purchaser's failure to so notify Seller shall constitute a waiver by Purchaser of Seller's breach, if any, of any representation or warranty. If information comes to Purchaser's attention on or before the Closing Date (whether through Seller or otherwise, including through updated schedules, and whether before or after the Effective Date) which would excuse Purchaser from its timely performance of its obligations hereunder, Purchaser must immediately notify Seller if any such information comes to its attention on or before the Closing Date, and Purchaser's failure to so notify Seller shall constitute a waiver of such condition or circumstances insofar as it would excuse Purchaser from its timely performance of its obligations hereunder.

3.9     <u>Ability to Perform</u>.  Purchaser has the ability to obtain funds in cash in amounts equal to the Purchase Price by means of credit facilities or otherwise and will at the Closing have immediately available funds in cash, which are sufficient to pay the Purchase Price and to pay any other amounts payable pursuant to this Agreement and to consummate the transactions contemplated by this Agreement.

3.10     <u>Solvency</u>.  Purchaser is solvent and will not be rendered insolvent as a result of any of the transactions contemplated by this Agreement.  For purposes hereof, the term "solvency" means that:  (a) the fair salable value of Purchaser's tangible assets is in excess of the total amount of its liabilities (including for purposes of this definition all liabilities, whether or not reflected on a balance sheet prepared in accordance with generally accepted accounting principles, and whether direct or indirect, fixed or contingent, secured or unsecured, and disputed or undisputed); (b) Purchaser is able to pay its debts or obligations in the ordinary course as they mature; and (c) Purchaser has capital sufficient to carry on its businesses and all businesses which it is about to engage.

3.11     <u>Purchaser Knowledge</u>.  References in this Agreement to "Purchaser's knowledge" or "the best knowledge of Purchaser" or words of substantially similar import means the actual then current knowledge of the Chief Executive Officer, Chief Financial Officer or Chief Operating Officer of Purchaser, without any research, investigation or inquiry. No constructive or imputed knowledge shall be attributed to any such individual by virtue of any position held, relationship to any other Person or for any other reason.

## ARTICLE 4

## COVENANTS OF SELLER

4.1     <u>Access and Information; Inspections</u>.  From the Effective Date through the date that is fifteen (15) days before the Closing Date, (a) Seller shall afford to the officers and agents of Purchaser (which shall include accountants, attorneys, bankers and other consultants and authorized agents of Purchaser) reasonably full and complete access during normal business hours to and the right to inspect the plants, properties, books, accounts, records and all other relevant documents and information with respect to the assets, liabilities and business of the Hospital and (b) Seller shall furnish Purchaser with such additional financial and operating data and other information in Seller's possession as to businesses and properties of the Hospital as Purchaser or its representatives may from time to time reasonably request, without regard to where such information may be located; *provided, however,* that all disclosures of information

28

shall be consistent with the confidentiality, agreements and any other non-disclosure agreements entered into (or to be entered into) among Purchaser, its representatives and Seller. Purchaser's right of access and inspection shall be exercised on forty-eight (48) hours notice Monday through Friday and in such a manner as not to interfere unreasonably with the operations of the Hospital. Such access may include consultations with the personnel of Seller; *provided, however,* that Purchaser shall not consult with or contact in any manner any employee at the Hospital without Seller's prior written consent (which consent may only be given by Catherine Pelley or another designee). Further, Purchaser may (except as otherwise provided in <u>Section 13.12</u>) undertake environmental, mechanical and structural surveys of the Hospital. Notwithstanding the foregoing, all access and inspection activities contemplated by this <u>Section 4.1</u> shall be subject to forty-eight (48) hours notice Monday through Friday and the prior reasonable approval of Seller (which approval may only be granted by Catherine Pelley or another designee) and all disclosures of information shall be consistent with the confidentiality agreements and any other non-disclosure agreements entered into (or to be entered into) among Purchaser, its representatives and Seller (including affiliates of Seller).

4.2    <u>Conduct of Business</u>. On and after the Effective Date and prior to the Effective Time, and except as otherwise consented to or approved by an authorized officer of Purchaser, required by this Agreement, or required or necessary in connection with Seller's bankruptcy proceedings, Seller shall, with respect to the operation of the Hospital:

(a)    carry on its businesses with respect to the operation of the Hospital in substantially the same manner as presently conducted and not make any material adverse change in operations, finance, accounting policies (unless Seller is required to adopt such changes under generally accepted accounting principles), or real or personal property;

(b)    maintain the Hospital and all parts thereof and all other Assets in operating condition in a manner consistent with past practices, ordinary wear and tear excepted, inclusive of substitutions and retirements in the ordinary course of business;

(c)    perform all of its material obligations under the Assumed Contracts and Assumed Leases, *provided, however* that Seller may be as of the Effective Date in material breach under such contracts or other material contracts and Seller may have already rejected or may after the Effective Time reject certain contracts, and Seller has no obligation to cure such breaches or defaults unless in the context of assuming and assigning contracts under the terms of this Agreement or in the Bankruptcy Court;

(d)    keep in full force and effect present insurance policies or other comparable self-insurance; and

(e)    use its reasonable efforts to maintain and preserve its respective business organizations intact, and maintain its respective relationships with physicians, suppliers, customers and others having business relationships with the Hospital, subject to the impact of financial difficulties that led to the Hospital's need to commence bankruptcy proceedings, the likely continuing impact of financial difficulties and the bankruptcy proceedings, and the effect of any disputes regarding matters referred to or with persons identified in <u>Section 1.9(s) and 1.9(t)</u>.

29

4.3     <u>Negative Covenants</u>.  From the Effective Date until the Effective Time, with respect to the operation of the Hospital, Seller shall not, without the prior written consent of Purchaser or except as may be required by law or required or necessary in connection with Seller's bankruptcy proceedings:

(a)     except as provided in **<u>Schedule 4.3(a)</u>**, increase compensation payable or to become payable or make any bonus payment to or otherwise enter into one or more bonus agreements with any employee, except in the ordinary course of business in accordance with Seller's customary personnel policies;

(b)     create, assume or permit to exist any new debt, mortgage, deed of trust, pledge or other material lien or encumbrance upon any of the Assets other than as may be related to an existing debtor-in-possession financing agreement or arrangement;

(c)     acquire (whether by purchase or lease) or sell, assign, lease, or otherwise transfer or dispose of any property, plant or equipment, except in the ordinary course of business consistent with historical practices;

(d)     except with respect to previously budgeted expenditures, purchase capital assets or incur costs in respect of material construction in progress;

(e)     take any action outside the ordinary course of business that would have a material adverse effect on the Assets or the Hospital, except at Seller's discretion in connection with the rejection of executory contracts or with actions involving the Chaudhuri Parties in proceedings before the Bankruptcy Court; or

(f)     materially reduce Inventory except in the ordinary course of business.

For purposes of this <u>Section 4.3</u>, Seller shall be deemed to have obtained Purchaser's prior written consent to undertake the actions otherwise prohibited by this <u>Section 4.3</u> if Seller gives Purchaser written notice of a proposed action and Seller does not receive from Purchaser a written notice of objection to such action within five (5) business days after Purchaser receives Seller's written notice. Notwithstanding any provision to the contrary contained in this Agreement, neither <u>Section 4.2</u> nor this <u>Section 4.3</u> shall be construed to prohibit Seller from engaging in any act which Seller reasonably believes is necessary to preserve and protect the condition or continued operations of the Hospital, its contractual obligations or the requirements of governmental or regulatory authorities.  Seller shall give Purchaser prompt written notice subsequent to taking any act described in the immediately preceding sentence.

4.4     <u>Cooperation</u>.  Seller shall reasonably cooperate with Purchaser and its authorized representatives and attorneys:  (a) in Purchaser's efforts to obtain all consents, approvals, authorizations, clearances and licenses required to carry out the transactions contemplated by this Agreement (including, without limitation, those of governmental and regulatory authorities) or which Purchaser reasonably deems necessary or appropriate, (b) in the preparation of any document or other material which may be required by any governmental agency as a predicate to or result of the transactions contemplated in this Agreement, and (c) in Purchaser's efforts to effectuate the assignment of Assumed Contracts to Purchaser as of the Closing Date; *provided,*

30

*however*, that it shall be Purchaser's responsibility to obtain all consents, approvals, assignments, authorizations, clearances and licenses required to carry out the transactions contemplated by this Agreement.    To the extent Purchaser needs certain information and data which is in the possession of Seller in order for Purchaser to complete Purchaser's license and permit approval applications, Purchaser shall receive, upon request, reasonable assistance from Seller in connection with the provision of such information.    Notwithstanding any provision to the contrary contained in this Agreement, Seller shall not be obligated to obtain the approval or consent from any party to any of the Assumed Contracts or Assumed Leases to the assignment of such Assumed Contracts or Assumed Leases to Purchaser, even if any such contract or lease states that it is not assignable without such party's consent, but Seller shall be obligated to obtain the approval or consent for the assignment of the Medicare Provider Agreement to Purchaser without Purchaser being required to assume any liability for claims (other than fraud claims) arising out of periods which are covered under the CMS Release (except to the extent that such approval or consent is withheld by Medicare solely because Purchaser is the assignee) and Seller shall be obligated to pay any cure amounts which are required for the assumption of the Assumed Contracts and/or the Assumed Leases.    The parties acknowledge and agree that this Section 4.4 is not intended to limit Seller's obligation to seek Bankruptcy Court approval, pursuant to Bankruptcy Code § 365 or otherwise, of any Assumed Contracts or Assumed Leases and shall not alter the provisions of Sections 1.10(b) and 1.10(d).

4.5    Additional Financial Information.  Within thirty (30) calendar days following the end of each calendar month prior to Closing, Seller shall deliver to Purchaser complete copies of the unaudited balance sheet and related unaudited statements of income relating to Seller with respect to the operation of the Hospital for each month then ended, together with corresponding year-to-date amounts, which presentation shall be consistent with the provisions of Section 2.9 which are applicable to the Financial Statements.

4.6    No-Shop.

(a)    From and after the Effective Date until the earlier of August 31, 2011 or the termination of this Agreement, Seller shall not, without the prior written consent of Purchaser: (i) offer for sale or lease the assets of the Hospital or the Assets (or any material portion thereof); (ii) solicit offers to buy all or any material portion of any of the Hospital or the Assets; (iii) hold or continue to hold discussions with any party (other than Purchaser) looking toward such an offer or solicitation; or (iv) enter into any agreement with any party (other than Purchaser) with respect to the sale or other disposition of any of the Hospital or the Assets.

(b)    Any reference in this Agreement to an "affiliate" shall mean any Person directly or indirectly controlling, controlled by or under common control with a second Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.  A "Person" shall mean any natural person, partnership, corporation, limited liability company, association, trust or other legal entity.

31

4.7    Seller's Efforts to Close.  Seller shall use its reasonable commercial efforts to satisfy all of the conditions precedent set forth in ARTICLE 7 and ARTICLE 8 to its or Purchaser's obligations under this Agreement to the extent that Seller's action or inaction can control or influence the satisfaction of such conditions.

4.8    Title Matters.  No later than ten (10) days prior to the Closing Date, Seller shall cause to be delivered to Purchaser (a) a preliminary binder or title commitment(s) (the "Title Commitment") sufficient for the issuance of an ALTA Extended Coverage Owner's Title Insurance Policy with respect to the Owned Real Property (the "Owner's Title Policy") and, if applicable, an ALTA Extended Coverage Leasehold Title Policy in a form approved for issuance in California with respect to any Leased Real Property specified on **Schedule 4.8** (the "Leasehold Title Policy") (the Owner's Title Policy and the Leasehold Title Policy are collectively referred to in this Agreement as the "Title Policy"), issued by the Title Company, together with true, correct and legible (or, if not legible, the best available) copies of all instruments referred to therein as conditions or exceptions to title (the "Title Instruments") and (b) an ALTA survey or surveys of the Owned Real Property complying with the Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys for the Owned Real Property in a form reasonably acceptable to Purchaser (the "Surveys").  Section 13.12 shall govern which party or parties hereto shall bear the costs and expenses of the Title Commitment, the Title Policy and the Surveys.  At the Closing, Seller shall deliver to the Title Company an owner's affidavit (the "Seller's Affidavit").  SELLER MAKES NO REPRESENTATION OR WARRANTY AS TO THE TRUTH, ACCURACY OR COMPLETENESS OF THE TITLE COMMITMENT, THE TITLE INSTRUMENTS, THE TITLE POLICY, THE SURVEYS OR THE ENVIRONMENTAL SURVEY (HEREINAFTER DEFINED).  PURCHASER ACKNOWLEDGES AND AGREES THAT ALL MATERIALS, DATA AND INFORMATION DELIVERED BY SELLER TO PURCHASER IN CONNECTION WITH THE TITLE COMMITMENT, THE TITLE INSTRUMENTS, THE TITLE POLICY, THE SURVEYS OR THE ENVIRONMENTAL SURVEY ARE PROVIDED TO PURCHASER AS A CONVENIENCE ONLY AND THAT ANY RELIANCE ON OR USE OF SUCH MATERIALS, DATA OR INFORMATION BY PURCHASER SHALL BE AT THE SOLE RISK OF PURCHASER.

4.9    Termination of Hospital Employees.  Seller shall provide all of its employees with layoff or plant closure notices as required under the WARN Act (defined in Section 5.3(c) below) no later than July 1, 2011.  Upon the Effective Time, the Hospital Employees shall cease to be employees of Seller, and shall be removed from such entities' respective payrolls.  Seller shall terminate effective as of the Effective Time the active participation of all of the Hospital Employees in all of the Seller Plans.  After the Effective Time, subject to the administration of Seller's bankruptcy proceedings, Seller shall timely make or cause to be made by Seller's affiliates appropriate distributions to, or for the benefit of, all of the Hospital Employees in respect of the Seller Plans which are in force and effect with respect to the Hospital Employees at the Hospital immediately prior to the Effective Time in accordance with ERISA, the Code, and the terms and conditions of the Seller Plans; *provided, however,* no such distribution shall be required to the extent it is among the Assumed Obligations.

32

4.10    Termination Cost Reports.  Seller shall file all Medicare, Medi-Cal, TRICARE, Blue Cross and any other termination cost reports required to be filed as a result of the consummation of (a) the transfer of the Assets to Purchaser and (b) the transactions contemplated by this Agreement.  Purchaser shall permit Seller access to all Hospital books and records to prepare such reports and shall assist Seller in the process of preparing, filing, and reviewing the termination cost reports.  All such termination cost reports shall be filed by Seller in a manner that is consistent with current laws, rules and regulations.  Seller shall be responsible for filing governmental cost reports for the period October 1, 2009 through the Operational Closing Date. Purchaser shall be responsible for its own cost report filings relating to the Hospital beginning on the day immediately following the Operational Closing Date.

4.11    Required Governmental Approvals.  Except as otherwise set forth in this Agreement, Seller (a) will use its reasonable efforts to secure such consents, approvals (or exemptions therefrom) and authorizations from governmental and regulatory authorities as are necessary to enable Seller lawfully to sell the Assets to Purchaser, (b) will reasonably cooperate with Purchaser in Purchaser's efforts to obtain such consents, approvals (or exemptions therefrom) and authorizations from governmental and regulatory authorities as are necessary to enable Purchaser to operate the Hospital after the Effective Time, and (c) will provide such information and communications to governmental and regulatory authorities as Purchaser or such authorities may reasonably request.

4.12    Deposit Account.  On the Operational Closing Date, Seller shall deposit Five Hundred Thousand Dollars ($500,000.00) into a separate deposit account at a FDIC insured bank (the "Deposit Account") and shall maintain a balance of Five Hundred Thousand Dollars ($500,000.00) until July 15, 2012.  The funds maintained in the Deposit Account shall be used solely for the purpose of paying liabilities of Seller for cost report liabilities not covered by the CMS Release which are related to the number of licensed beds at the Acute Care Hospital during the period of October 1, 2009 to the Operational Closing Date.  Any funds remaining in the Deposit Account as of July 15, 2012 shall be released to Seller.

4.13    Distribution of Net Proceeds & Restricted Funds.  So long as Purchaser is a non-profit entity, Seller shall distribute any net proceeds and any restricted funds to Purchaser to fund charitable activities as designated by Seller's Board of Directors, unless Seller is otherwise instructed by the California Attorney General.

## ARTICLE 5

## COVENANTS OF PURCHASER

5.1    Purchaser's Efforts to Close.  Purchaser shall use its reasonable commercial efforts to satisfy all of the conditions precedent set forth in ARTICLE 7 and ARTICLE 8 to its or Seller's obligations under this Agreement to the extent that Purchaser's action or inaction can control or influence the satisfaction of such conditions.

5.2    Required Governmental Approvals.  Purchaser (a) shall use its best efforts to apply for and secure, as promptly as practicable before the Closing Date and within ninety (90) days thereafter, all consents, approvals (or exemptions therefrom), authorizations, clearances and

33

licenses required to be obtained from governmental and regulatory authorities in order to carry out the transactions contemplated by this Agreement and to cause all of its covenants and agreements to be performed, satisfied and fulfilled, and (b) will provide such other information and communications to governmental and regulatory authorities as Seller or such authorities may reasonably request. Purchaser is responsible for all filings with and requests to governmental authorities necessary to enable Purchaser to operate the Hospital at and after the Effective Time. Purchaser shall, no later than thirty (30) business days prior to the Closing Date, file all applications, licensing packages and other similar documents with all applicable governmental and regulatory authorities which are a prerequisite to obtaining the material licenses, permits, authorizations and provider numbers described in Section 8.1. Purchaser shall be entitled, but not obligated, to obtain the Contract and Lease Consents. Purchaser shall be entitled, but not obligated, to solicit and obtain estoppel certificates from any third party to any Lease of Real Property. Except as otherwise provided in this Agreement, Purchaser's failure to obtain any or all of the Contract and Lease Consents or estoppel certificates as of the Closing Date shall not be a condition precedent to either party's obligation to close the transactions contemplated by this Agreement.

5.3    Certain Employee Matters.

(a)    Purchaser covenants and agrees that as of the Effective Time it shall make or be deemed to have made offers of employment in substantially equivalent positions and for the same consideration then in effect to substantially all of the persons who, immediately prior to the Effective Time, are employees of (i) Seller with respect to the operation of the Hospital or (ii) any affiliate of Seller which employs individuals at the Hospital (whether such employees are full time employees, part-time employees, on short-term or long-term disability or on leave of absence pursuant to Seller's policies, the Family and Medical Leave Act of 1993 or other similar local law) (the "Hospital Employees"). Any of the Hospital Employees who accept an offer of employment with Purchaser as of or after the Effective Time shall be referred to in this Agreement as the "Hired Employees". Purchaser shall provide employee benefits (including, without limitation, health, dental, disability, life insurance and retirement plans) to each of the Hired Employees that are not less favorable than those provided to other similarly situated employees of Purchaser and its affiliates.

(b)    Purchaser shall continue to employ the Hired Employees and shall avoid creating any obligation under the WARN Act (defined in Section 5.3(c) below) on the part of Seller, and such employees' employment shall be on terms that require said employees to perform comparable services in a comparable position at the same rates of pay and benefits at which such employees were employed at the Hospital prior to the Closing Date.

(c)    Purchaser and Seller acknowledge and agree that the provisions of Section 5.3 are designed, in part, to ensure that Seller is not required to give notice to employees of the Hospital of the "closure" thereof under the Worker Adjustment and Retraining Notification Act (the "WARN Act") or any other comparable state law. Accordingly, Purchaser agrees to indemnify, defend and hold harmless Seller from any liability which it may incur under the WARN Act or any comparable state law in the event of the violation by Purchaser of its obligations under Section 5.3, including a violation which results from allegations that Purchaser

34

constructively terminated the employees of the Hospital as a result of the terms and conditions of employment provided or offered by Purchaser; *provided, however,* that nothing herein shall be construed as imposing any obligation on Purchaser to indemnify, defend or hold harmless Seller from any liability which it may incur under the WARN Act (i) as a result of the acts or omissions of Seller prior to the Closing Date, including any liability which may result from the aggregations of acts of Seller prior to the Closing Date and the acts of Purchaser after the Closing Date, it being understood and agreed that Purchaser shall only be liable for its own acts and omissions after the Closing Date, or (ii) as a result of the filing of a frivolous suit or claim by an employee terminated by Purchaser following the effective time for cause, including criminal convictions, and within the guidelines of the WARN Act.  Nothing in this Section 5.3 shall create any rights in favor of any person not a party hereto, including employees of the Hospital, or constitute an employment agreement or condition of employment for any employee of Seller.

(d)     To the extent consistent with the Seller's existing policies and procedures, Purchaser shall give all Hired Employees full credit for all paid time off pay to such employees as of the Operational Closing Date, either by (i) crediting such employees the time off reflected in the employment records of Seller and/or any of its affiliates immediately prior to the Effective Time or (ii) by making full payments to such employees of the amounts which such employees would have received had they taken such paid time off.

(e)     On and after the Effective Time, Hired Employees shall be eligible for a medical and hospital plan sponsored by Purchaser.  Hired Employees shall be given credit for periods of employment with Seller and Seller's affiliates, as applicable, prior to the Effective Time for purposes of determining eligibility to participate and amount of benefits (including without limitation vesting of benefits), and preexisting condition limitations will be waived with respect to Hired Employees and their covered dependents unless such preexisting condition limitations were applicable prior to the Effective Time.  In addition, if prior to the Effective Time a Hired Employee or his or her covered dependents paid any amounts towards a deductible or out-of-pocket maximum in Seller's or its affiliate's medical and health plan's current fiscal year, such amounts shall be applied toward satisfaction of the deductible or out-of-pocket maximum in the current fiscal year of Purchaser's medical and health plan that covers Hired Employees on and after the Effective Time.

(f)     Seller shall be responsible to provide continuation coverage pursuant to the requirements of Code section 4980B and Part 6 of Title I of ERISA ("COBRA Coverage") with respect to the Hospital Employees (and their dependents) whose qualifying event occurred prior to the date on which the Hospital Employees become Hired Employees.  Purchaser shall be responsible to provide COBRA Coverage with respect to each of the Hired Employees (and their dependents) whose qualifying event occurs on or after the date on which the Hospital Employees become Hired Employees.  From and after the Closing Date, Seller shall not be liable and responsible for, and Purchaser shall incur liability or responsibility with respect to, any "Continuation Coverage" (as that term is defined by COBRA Section 4980B of the Internal Revenue Code of 1986, as amended (the "Code") and Section 601, et seq. of ERISA) for any Hired Employee terminated on or after the Closing Date.  Purchaser shall take no action, which, in any manner, might encourage Hired Employees to assert any COBRA rights against Seller.  Purchaser acknowledges and agrees that it is the intent of this provision that Purchaser shall be

35

required to provide continued health coverage under ERISA or Section 4980B of the Code to any of such Hired Employees or to any qualified beneficiary (as defined for purposes of Section 4980B of the Code) with respect to any such Hired Employees.

(g)    After the Operational Closing Date, Purchaser's human resources department will give reasonable assistance to Seller's and its affiliate's human resources departments and Seller's agents with respect to Seller's and Seller's affiliates' post-Closing administration of Seller's and Seller's affiliates' pre-Closing wage and benefit obligations, and employee pension benefit plans and employee health or welfare benefit plans for the Hospital Employees (other than the Retained Management Employees). Within five (5) days after the Operational Closing Date, Purchaser shall provide to Seller a list of all the Hospital Employees who were offered employment by Purchaser but refused such employment.

5.4    Excluded Assets.  As soon as practicable after the Closing Date, Purchaser shall deliver to Seller or Seller's designee any Excluded Assets found at the Hospital on and after the Effective Time, without imposing any charge on Seller for Purchaser's storage or holding of same on and after the Effective Time.

5.5    Waiver of Bulk Sales Law Compliance.  Purchaser hereby waives compliance by Seller with the requirements, if any, of Article 6 of the Uniform Commercial Code as in force in any state in which the Assets are located and all other similar laws applicable to bulk sales and transfers.

5.6    Indigent and Low Income Care.  Purchaser acknowledges that the Hospital has historically provided significant levels of care for indigent and low-income patients and has operated and provided care (to indigent and low-income patients and others) through a variety of community-based health programs.  Subject to changes in applicable law or governmental guidelines or policies (such as implementation of universal healthcare coverage), for a period of no less than five (5) years following the Operational Closing Date, Purchaser shall (a) adhere to applicable statutes and regulations pertaining to charity care as in effect immediately prior to the Operational Closing Date or such more liberal or generous policies and practices on charity care as Purchaser may have in effect or implement from time to time, (b) continue to provide care to indigent and low-income patients at levels similar to or more generous than those historically provided by the Hospital and (c) assure access to high-quality healthcare services to all persons seeking medical care, regardless of their ability to pay.

5.7    Medical Staff.  To ensure continuity of care in the community, Purchaser agrees that the Hospital's medical staff members in good standing as of the Effective Time shall maintain medical staff privileges at the Hospital as of the Effective Time.  On and after the Effective Time, the medical staff will be subject to the Hospital's Medical Staff Bylaws then in effect.

5.8    Local Governing Board.

(a)    Immediately after the Effective Time, Purchaser shall form a local governing board at the Hospital in accordance with the terms of this Section 5.8. Such local governing board shall be an advisory committee to the board of directors of Purchaser comprised

36

of medical staff members, community leaders and the Hospital's Chief Executive Officer. The local governing board shall be subject to the authority of Purchaser's board of directors and the terms of Purchaser's Articles of Incorporation, Bylaws and other organizational documents. The individuals on the local governing board should (i) represent the Hospital in the community and represent the views of the community to the local governing board in its deliberations, (ii) participate in Purchaser's community outreach programs and (iii) supervise the Hospital's charity care policies and practices.

(b)      The local governing board of the Hospital shall have responsibilities that are consistent with similar local governing boards at other hospitals, or in other markets, respectively, which are owned directly or indirectly by affiliates of Purchaser. Purchaser shall consult with Seller or a successor established by Seller as to the appointment of community members to serve as members of the local governing board.

5.9      Capital Expenditures. During the period commencing on the Operational Closing Date and ending on the five (5) year anniversary date of the Closing, Purchaser agrees that it will invest no less than Twenty-Five Million Dollars ($25,000,000.00) for capital improvements, equipment, information technology, infrastructure improvements, and/or working capital at the Hospital with no less than Fifteen Million Dollars ($15,000,000.00) of said amount being spent on capital improvements, equipment, information technology, and infrastructure improvements.

5.10      Maintenance of Services. Purchaser agrees that following the Closing, Purchaser will operate the Hospital as a licensed acute care hospital with essential services including labor and delivery and an open and accessible emergency department.

5.11      Attorney General Conditions. Purchaser understands that the California Attorney General is likely to impose certain conditions on Purchaser's acquisition and operation of the Hospital. Purchaser agrees to accept such conditions provided that they are reasonably related to ensuring that Purchaser continues to preserve current Hospital services and continues to provide current charitable medical services and community benefit programs. Seller shall have the primary obligation, with assistance as necessary from Purchaser, to obtain (i) the California Attorney General's written waiver under Corporations Code section 5920(c) of the Attorney General's written consent requirement under Corporations Code section 5922 or (ii) the Attorney General's written consent under Corporations Code section 5922, of this Agreement and the transactions contemplated by this Agreement.

# ARTICLE 6

# SELLER'S BANKRUPTCY AND BANKRUPTCY COURT APPROVAL

6.1      Bankruptcy Court Approval.

(a)      Seller and Purchaser acknowledge that this Agreement and the sale of the Assets and the assumption and assignment of the Assumed Contracts and Assumed Leases are subject to Bankruptcy Court approval.

(b)    Seller shall promptly file a motion pursuant to Bankruptcy Code Section 363 seeking approval of this Agreement ("Sale Motion") and shall exercise good faith and use reasonable efforts to obtain a "Sale Order". For purposes of this Agreement, the term "Sale Order" shall mean an order of the Bankruptcy Court authorizing the sale of the Assets (including the assumption and assignment of the Assumed Contracts and Assumed Leases) to Purchaser consistent with this Agreement and in a form satisfactory to Purchaser.

(c)    Seller agrees to proceed in good faith to obtain Bankruptcy Court approval of the sale contemplated herein with a determination that Purchaser is in good faith pursuant to Bankruptcy Code section 363(m) and to file such declarations and other evidence as may be required to support a finding of good faith.

(d)    From and after the Effective Date and prior to the Closing or the termination of this Agreement, Seller shall not take any action which is intended to (or is reasonably likely to), or fail to take any action the intent (or the reasonably likely result) of which failure to act is to, result in the reversal, voiding, modification or staying of this Agreement.

6.2    Bankruptcy Filings

(a)    From and after the Effective Date and until the Closing Date, Seller shall deliver to Purchaser copies of all pleadings, motions, notices, statements, schedules, applications, reports and other papers that are filed in the Bankruptcy Case at the time of their filing, but with respect to any such papers that Seller may file that relate, in whole or in part, to this Agreement, or to Purchaser or its agents or representatives, Seller shall use reasonable efforts to provide such prior notice as may be reasonable under the circumstances before the filing of such papers. Notwithstanding the foregoing, Seller shall not file any pleadings, motions, notices, statements, schedules, applications, reports and other papers in the Bankruptcy Case that would, or would reasonably be expected to, alter, modify, limit or restrict Purchaser's rights or remedies pursuant to this Agreement, without the prior written consent of Purchaser (which may be granted or withheld in Purchaser's sole discretion).

6.3    Intentionally Deleted.

6.4    Intentionally Deleted.

6.5    Appeal of Sale Order.

(a)    In the event an appeal is taken or a stay pending appeal is requested from the Sale Order, Seller shall immediately notify Purchaser of such appeal or stay request and shall provide to Purchaser promptly a copy of the related notice of appeal or order of stay. Seller shall also provide Purchaser with written notice of any motion or application filed in connection with any appeal from either of such orders. In the event of an appeal of the Sale Order, Seller shall be primarily responsible for drafting pleadings and attending hearings as necessary to defend against the appeal.

LA #4811-6314-8297 v2

# ARTICLE 7

## CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER

Seller's obligation to sell the Assets and to close the transactions as contemplated by this Agreement shall be subject to the satisfaction of each of the following conditions on or prior to the Closing Date unless specifically waived in writing by Seller in whole or in part at or prior to the Closing:

7.1    <u>Signing and Delivery of Instruments</u>.    Purchaser shall have executed and delivered all documents, instruments and certificates required to be executed and delivered pursuant to the provisions of this Agreement.  Purchaser acknowledges that Purchaser shall not satisfy the condition precedent set forth in this <u>Section 7.1</u> (as it relates to the delivery of the amount set forth in <u>Section 1.6.1</u>) unless Purchaser initiates the wire transfer of the Cash Purchase Price (<u>Section 1.6.1</u>) to the account identified by the Title Company in its wire instructions to Purchaser, and provides to Seller a Federal Reserve wire reference number with respect thereto, on or before 12:00 noon (Pacific time) on the Closing Date.

7.2    <u>No Restraints</u>.    No temporary restraining order, preliminary or permanent injunction or other order preventing the consummation of the transactions contemplated in this Agreement shall have been issued by any court of competent jurisdiction or any other governmental body and shall remain in effect on the Closing Date, and further, no governmental entity shall have commenced any action or suit before any court of competent jurisdiction or other governmental authority that seeks to restrain or prohibit the consummation of the transactions contemplated hereby.

7.3    <u>Performance of Covenants</u>.  Purchaser shall have in all respects performed or complied with each and all of the obligations, covenants, agreements and conditions required to be performed or complied with by it on or prior to the Closing Date.

7.4    <u>Governmental Authorizations</u>.    Purchaser shall have obtained all material licenses, permits and authorizations from governmental agencies or governmental bodies that are necessary or required for completion of the transactions contemplated by this Agreement, including reasonable assurances that any material licenses, permits and authorizations requested or applied for but not actually issued as of the Closing will be issued following Closing (which may include oral assurances from appropriate governmental agencies or bodies).

7.5    <u>Board Approval.</u>  Seller's Board of Directors shall have approved the transactions contemplated by this Agreement.

7.6    <u>Attorney General Approval</u>.    The California Attorney General shall have approved the transactions contemplated by this Agreement.

7.7    <u>Bankruptcy Court Approval</u>.  The Bankruptcy Court shall have entered the Sale Order.

7.8    <u>CMS Release</u>.  The CMS Release shall have been duly executed by Seller and

39

Medicare and shall be valid and enforceable under all applicable laws including, without limitation, all applicable bankruptcy laws.

## ARTICLE 8

## CONDITIONS PRECEDENT TO OBLIGATIONS OF PURCHASER

Purchaser's obligation to purchase the Assets and to close the transactions contemplated by this Agreement shall be subject to the satisfaction of each of the following conditions on or prior to the Closing Date unless specifically waived in writing by Purchaser in whole or in part at or prior to the Closing.

8.1    <u>Governmental Authorizations</u>.  Purchaser shall have obtained licenses, permits and authorizations from governmental agencies or governmental bodies that are required for operation of the Acute Care Hospital or shall have received reasonable assurances from governmental agencies or governmental bodies that the licenses, permits and authorizations required for operation of the Acute Care Hospital will be issued after the Effective Time, except in such case where failure to obtain such license, permit or authorizations from a governmental agency or governmental body does not have a material adverse effect.

8.2    <u>Bankruptcy Court Approval</u>.  The Bankruptcy Court shall have entered the Sale Order and made a finding that Purchaser is a "good faith" purchaser under § 363 of the Bankruptcy Code.

8.3    <u>Signing and Delivery of Instruments</u>.  Seller shall have executed and delivered all documents, instruments and certificates required to be executed and delivered pursuant to all of the provisions of this Agreement.

8.4    <u>Performance of Covenants</u>.  Seller shall have in all material respects performed or complied with each and all of the obligations, covenants, agreements and conditions required to be performed or complied with by Seller on or prior to the Closing Date; *provided, however,* this condition will be deemed to be satisfied unless (a) Seller was given written notice of such failure to perform or comply and did not or could not cure such failure to perform or comply within fifteen (15) business days after receipt of such notice and (b) the respects in which such obligations, covenants, agreements and conditions have not been performed have had or would more likely than not result in a material adverse effect on the Assets or the business of the Hospital.

8.5    <u>No Restraints</u>.  No temporary restraining order, preliminary or permanent injunction or other order preventing the consummation of the transactions contemplated in this Agreement shall have been issued by any court of competent jurisdiction or any governmental body and shall remain in effect on the Closing Date, and further, no governmental entity shall have commenced any action or suit before any court of competent jurisdiction or other governmental authority that seeks to restrain or prohibit the consummation of the transactions contemplated hereby.

LA #4811-6314-8297 v2

8.6     Title Insurance Policy.  The Title Company has irrevocably committed to issue the Title Policy to Purchaser covering the Owned Real Property and any ground lease specified on **Schedule 4.8** in the amount of the full insurable value of the Owned Real Property and any such ground lease, respectively (which amount shall be set forth in **Schedule 11.2(b)**).  Such Title Policy shall show fee simple title to the Owned Real Property vested in Purchaser, and valid leasehold title to the Leased Real Property which is subject to any ground lease specified on **Schedule 4.8**, subject only to: (a) current real estate taxes not yet due and payable; and (b) the permitted title exceptions listed in **Schedule 8.6** hereto (the "Permitted Exceptions").  The failure to obtain the Title Policy in a form required by Purchaser shall not be a breach of any obligation of Seller under this Agreement.

8.7     Attorney General Approval.  The California Attorney General shall have approved the transactions contemplated by this Agreement.

8.8     CMS Release.  The CMS Release shall have been duly executed by Seller and Medicare and shall be valid and enforceable under all applicable laws including, without limitation, all applicable bankruptcy laws.

## ARTICLE 9

## **TERMINATION**

9.1     Termination.  This Agreement may be terminated at any time prior to Closing:

(a)     by the mutual written consent of the parties;

(b)     by Seller if a material breach of this Agreement has been committed by Purchaser and such breach has not been (i) waived in writing by Seller or (ii) cured by Purchaser to the reasonable satisfaction of Seller within fifteen (15) business days after service by Seller upon Purchaser of a written notice which describes the nature of such breach; *provided, however,* Seller shall not be permitted to terminate this Agreement pursuant to this Section 9.1(b) if such material breach was caused by Seller or if Seller is also in material breach of this Agreement;

(c)     by Purchaser if a material breach of this Agreement has been committed by Seller and such breach has not been (i) waived in writing by Purchaser or (ii) cured by Seller to the reasonable satisfaction of Purchaser within fifteen (15) business days after service by Purchaser upon Seller of a written notice which describes the nature of such breach; *provided, however,* Purchaser shall not be permitted to terminate this Agreement pursuant to this Section 9.1(c) if such material breach was caused by Purchaser or if Purchaser is also in material breach of this Agreement;

(d)     by Purchaser if any of the conditions in **ARTICLE 8** have not been satisfied as of the Closing Date or if satisfaction of any condition in **ARTICLE 8** is or becomes impossible and Purchaser has not waived such condition in writing on or before the Closing Date (provided that the failure to satisfy the applicable condition or conditions has occurred by reason other than (i) through the failure of Purchaser to comply with its obligations under this

41

Agreement or (ii) Seller's failure to provide its closing deliveries on the Closing Date as a result of Purchaser not being ready, willing and able to close the transaction on the Closing Date);

(e)    by Seller if any of the conditions in <u>ARTICLE 7</u> have not been satisfied as of the Closing Date or if satisfaction of any such condition in <u>ARTICLE 7</u> is or becomes impossible and Seller has not waived such condition in writing on or before the Closing Date (provided that the failure to satisfy the applicable condition or conditions has occurred by reason other than (i)  through the failure of Seller to comply with their obligations under this Agreement or (ii) Purchaser's failure to provide its closing deliveries on the Closing Date as a result of Seller not being ready, willing and able to close the transaction on the Closing Date);

(f)    by either Purchaser or Seller if the Bankruptcy Court enters an order dismissing the Bankruptcy Case or fails to approve the sale of the Assets to Purchaser;

(g)    by Purchaser or Seller, upon the delivery of a Casualty Termination Notice in accordance with <u>Section 1.14</u>; or

(h)    by either Purchaser or Seller if the Closing has not occurred (other than through the failure of any party seeking to terminate this Agreement to comply fully with its obligations under this Agreement) on or before August 31, 2011, unless the failure to close by that date is due to pending review of the transaction by the California Attorney General under the California Corporations Code (the "Termination Date").

9.2    <u>Termination Consequences</u>.

(a)    If this Agreement is terminated pursuant to <u>Sections 9.1(a), (b), (e), or (g)</u>, (a) all further obligations of the parties under this Agreement shall terminate, except that the obligations in <u>Sections 5.6</u>, <u>13.3</u>, <u>13.8</u>, and <u>13.12</u> shall survive, and (b) each party shall pay the costs and expenses incurred by it in connection with this Agreement, except as provided in <u>Section 13.12</u>.

## ARTICLE 10

## POST-CLOSING MATTERS

10.1    <u>Excluded Assets and Excluded Liabilities</u>.  Subject to <u>Section 11.2</u> hereof, any asset or any liability, all other remittances and all mail and other communications that is an Excluded Asset or an Excluded Liability (a) pursuant to the terms of this Agreement, (b) as otherwise determined by the parties' mutual written agreement or (c) absent such agreement, as determined by adjudication by a court or similar tribunal, and which comes into the possession, custody or control of Purchaser (or its respective successors-in-interest, assigns or affiliates) shall within five (5) business days following receipt be transferred, assigned or conveyed by Purchaser (and its respective successors-in-interest, assigns and affiliates) to Seller at Seller's cost.  Until such transfer, assignment and conveyance, Purchaser (and its respective successors-in-interest, assigns and affiliates) shall not have any right, title or interest in or obligation or responsibility with respect to such asset or liability except that Purchaser shall hold such asset in trust for the benefit of Seller.  Purchaser (and its respective successors-in-interest, assigns and

affiliates) shall have neither the right to offset amounts payable to Seller under this <u>Section 9.1</u> against, nor the right to contest its obligation to transfer, assign and convey to Seller because of, outstanding claims, liabilities or obligations asserted by Purchaser against Seller and the indemnification provisions of <u>Section 11.2</u>.  If Purchaser does not remit any monies included in the Excluded Assets to Seller in accordance with the first sentence of this <u>Section 10.1</u>, such withheld funds shall bear interest at the Prime Rate in effect on the calendar day upon which such payment was required to be made to Seller (the "Excluded Asset Due Date") plus five percent (5%) (or the maximum rate allowed by law, whichever is less), such interest accruing on each calendar day after the Excluded Asset Due Date until payment of the Excluded Assets and all interest thereon is made to Seller.  The terms of this <u>ARTICLE 10</u> shall not be subject to the time limitations contained in <u>Section 11.1</u> of this Agreement.

      10.2    <u>Preservation and Access to Records After the Closing</u>.

      (a)    From the Operational Closing Date until seven (7) years after the Operational Closing Date or such longer period as required by law (the "Document Retention Period"), Purchaser shall keep and preserve all medical records, patient records, medical staff records and other books and records which are among the Assets as of the Effective Time, but excluding any records which are among the Excluded Assets.  Purchaser will afford to the representatives of Seller, including its counsel and accountants, full and complete access to, and copies (including, without limitation, color laser copies) of, such records with respect to time periods prior to the Effective Time (including, without limitation, access to records of patients treated at the Hospital prior to the Effective Time) during normal business hours after the Effective Time, to the extent reasonably needed by Seller or Seller's affiliates for business purposes.  Purchaser acknowledges that, as a result of entering into this Agreement and operating the Hospital, it will gain access to patient records and other information which are subject to rules and regulations concerning confidentiality.  Purchaser shall abide by any such rules and regulations relating to the confidential information it acquires, and shall maintain privacy practices which are equal to or better than the privacy practices of Seller.  Purchaser shall maintain the patient and medical staff records at the Hospital in accordance with applicable law and the requirements of relevant insurance carriers.  After the expiration of the Document Retention Period, if Purchaser intends to destroy or otherwise dispose of any of the documents described in this <u>Section 10.2(a)</u>, Purchaser shall provide written notice to Seller of Purchaser's intention no later than forty-five (45) calendar days prior to the date of such intended destruction or disposal.  Seller shall have the right, at its sole cost, to take possession of such documents during such forty-five (45) calendar day period.  If Seller does not take possession of such documents during such forty-five (45) calendar day period, Purchaser shall be free to destroy or otherwise dispose of such documentation upon the expiration of such forty-five (45) calendar day period.

      (b)    Purchaser shall give full cooperation to Seller, Seller's affiliates and their insurance carriers in respect of the defense of claims by third parties against Seller or any affiliate of Seller..  Such cooperation shall include, without limitation, making the Hired Employees available for interviews, depositions, hearings and trials.  Such cooperation shall also include making all of its employees available to assist in the securing and giving of evidence and in obtaining the presence and cooperation of witnesses (all of which shall be done without

43

payment of any fees or expenses to Purchaser or to such employees).  In addition, Seller and Seller's affiliates shall be entitled to remove from the Hospital originals of any such records, but only for purposes of pending litigation involving the persons to whom such records refer, as certified in writing prior to removal by counsel retained by Seller or any of Seller's affiliates in connection with such litigation.  Any records so removed from the Hospital shall be promptly returned to Purchaser following Seller's or its applicable affiliate's use of such records.

(c)     In connection with (i) the transition of the Hospital pursuant to the transaction contemplated by this Agreement, (ii) Seller's rights to the Excluded Assets, and (iii) Seller's obligations under the Excluded Liabilities, Purchaser shall after the Effective Time give Seller access during normal business hours to Purchaser's books, accounts and records and all other relevant documents and information with respect to the assets, liabilities and business of the Hospital as representatives of Seller and Seller's affiliates may from time to time reasonably request, all in such manner as not to unreasonably interfere with the operations of the Hospital. Seller acknowledges that it shall coordinate its activities contemplated by this <u>Section 10.2(c)</u> through Michael Sarrao, or his designee.

(d)     Purchaser and its representatives shall be given access by Seller during normal business hours to the extent reasonably needed by Purchaser for business purposes to all documents, records, correspondence, work papers and other documents retained by Seller pertaining to any of the Assets or with respect to the operation of the Hospital prior to the Effective Time, all in such manner as to not interfere unreasonably with Seller's business.  Such documents and other materials shall be, at Seller's option, either (i) copied by Seller for Purchaser at Purchaser's expense, or (ii) removed by Purchaser from the premises, copied by Purchaser and promptly returned to Seller.

(e)     Purchaser shall comply with, and be solely responsible for, all obligations under the Standards for Privacy of Individually Identifiable Health Information (45 CFR Parts 160 and 164) promulgated pursuant to the Health Insurance Portability and Accountability Act of 1996 with respect to the operation of the Hospital on and after the Effective Time.

(f)     Purchaser shall cooperate with Seller, on a timely basis and as reasonably requested by Seller, in connection with the provision of all data of the Hospital and other information required by Seller for reporting to HFAP for the remainder of the quarterly period in which the Closing has occurred.

(g)     To the maximum extent permitted by law, if any Person requests or demands, by subpoena or otherwise, any documents relating to the Excluded Liabilities or Excluded Assets, including without limitation, documents relating to the operations of any of the Hospital or any of the Hospital's committees prior to the Effective Time, prior to any disclosure of such documents, Purchaser shall notify Seller and shall provide Seller with the opportunity to object to, and otherwise coordinate with respect to, such request or demand.

# ARTICLE 11

## SURVIVAL AND INDEMNIFICATION

11.1    <u>Survival</u>.  Except as expressly set forth in this Agreement to the contrary, all representations, warranties, covenants, agreements and indemnifications of Purchaser and Seller, respectively, contained in this Agreement or in any document delivered pursuant hereto shall continue to be fully effective and enforceable following the Operational Closing Date for one year and shall thereafter be of no further force and effect.  Notwithstanding the foregoing, the indemnifications contained in Section 11.2.1(f) shall continue to be fully effective and enforceable following the Operational Closing Date for the applicable statute of limitations period, plus thirty (30) days, and the indemnifications contained in <u>Sections 11.2.1(c)</u>, <u>11.2.1(d)</u>, <u>11.2.1(e)</u>, <u>11.2.1(h)</u>, and <u>11.3.1(d)</u> shall continue to be fully effective and enforceable following the Operational Closing Date without any time limitation; *provided, however,* that if there is an outstanding notice of a claim at the end of any such applicable period in compliance with the terms of <u>Section 11.4</u>, such applicable period shall not end in respect of such claim until such claim is resolved.

11.2    <u>Indemnification of Purchaser by Seller</u>.

11.2.1    <u>Indemnification</u>.  Seller shall keep and save Purchaser, and its directors, officers, employees, agents and other representatives (the "Purchaser Indemnified Parties"), forever harmless from and shall indemnify and defend the Purchaser Indemnified Parties from and against any and all obligations, judgments, liabilities, penalties, violations, fees, fines, claims, losses, costs, demands, damages, liens, encumbrances and expenses including reasonable attorneys' fees (collectively, "Damages"), to the extent connected with or arising or resulting from (a) any breach of any representation or warranty of Seller under this Agreement, (b) any breach or default by Seller of any covenant or agreement of Seller under this Agreement, (c) the Excluded Liabilities, (d) the Excluded Assets, (e) all federal, state and local income taxes relating to Seller ("Seller Tax Claims"), (f) any professional liability claim arising out of the business operations of the Acute Care Hospital prior to the Effective Time ("Pre-Closing E&O Matters"), (g) any act, conduct or omission of Seller that has accrued, arisen, occurred or come into existence at any time prior to the Effective Time, and (h) any of those certain pending governmental investigations which are described on **Schedule 11.2.1**.  Seller's obligations under this <u>Section 11.2.1</u> shall remain subject to, and shall be limited by, the provisions contained in <u>Section 1.13</u>.  No provision in this Agreement shall prevent Seller from pursuing any of its legal rights or remedies that may be granted to Seller by law against any person or legal entity other than Purchaser.  Nothing in this Article 11 shall prevent Seller as debtor from reorganizing, liquidating, or dissolving, and distributing its assets under federal or state law, including federal bankruptcy law.

11.2.2    <u>Indemnification Limitations</u>.

(a)    Notwithstanding any provision to the contrary contained in this Agreement, Seller shall be under no liability to indemnify Purchaser under <u>Section 11.2.1</u> and no claim under <u>Section 11.2.1</u> of this Agreement shall:

(i)    be made unless notice thereof shall have been given by or on behalf of Purchaser to Seller in the manner provided in <u>Section 11.4</u>, unless failure to provide such notice in a timely manner does not materially impair Seller's ability to defend its rights, mitigate damages, seek indemnification from a third party or otherwise protect its interests;

(ii)    be made to the extent that any loss may be recovered under a policy of insurance in force on the date of loss; *provided, however,* that this <u>Section 11.2.2(a)(ii)</u> shall not apply to the extent that (A) coverage under the applicable policy of insurance is denied by the applicable insurance carrier (provided, further, that nothing hereunder shall require that Purchaser institute any formal legal proceeding against the applicable insurer prior to seeking indemnification from Seller) or (B) any such loss is not fully covered by the applicable policy of insurance;

(iii)    be made to the extent that such claim relates to a liability arising out of or relating to any act, omission, event or occurrence connected with:

(A)    the use, ownership or operation of the Hospital, or

(B)    the use, ownership or operation of any of the Assets,

on and after the Effective Time (without regard to whether such use, ownership or operation is consistent with Seller's policies, procedures and/or practices prior to the Effective Time); other than as specifically included in the Excluded Liabilities, Seller Tax Claims or Pre-Closing E&O Matters;

(iv)    be made to the extent that such claim (or the basis therefor) is set forth in the Disclosure Schedule, any Exhibit or Schedule to this Agreement; provided, that this <u>Section 11.2.2(a)(iv)</u> shall not apply to the Excluded Liabilities, Seller Tax Claims or Pre-Closing E&O Matters;

(v)    be made to the extent that Purchaser had knowledge of (A) any breach of a representation and warranty by Seller (as contemplated by <u>Section 3.8</u>) or (B) other indemnifiable event, prior to the Effective Time;

(vi)    be made to the extent such claim relates to an obligation or liability for which Purchaser has agreed to indemnify Seller pursuant to <u>Section 10.3</u>;

(vii)    be made to the extent that such claim would not have arisen but for a voluntary act, omission or transaction carried out by Purchaser or its affiliates after the Effective Date;

(viii)    be made to the extent such claim relates to Seller's failure to comply with or the Assets' failure to be in compliance with (A) the Americans with Disabilities Act or (B) the Alfred E. Alquist Hospital Facilities Seismic Safety Act of 1983, as amended by the California Hospital Facilities Seismic Safety Act (codified at California Health and Safety Code §129675 through §130070); *provided, however,* this

46

Section 11.2.2(a)(viii) shall not apply to the extent that such claim arises as a result of a claim brought by a non-governmental third party who has suffered personal injury prior to the Effective Time;

(ix)    be made to the extent such claim seeks Damages which are consequential in nature (as opposed to direct), including, without limitation, loss of future revenue or income or loss of business reputation or opportunity (collectively, "Consequential Damages"); *provided, however,* the limitation contained in this Section 11.2.2(a)(ix) shall not apply to the extent (A) of any payments which Purchaser is required to make to a third party (other than any third party which is an affiliate of, investor of or lender to Purchaser) which are in the nature of Consequential Damages and (B) such third party's claim is unrelated to the failure to obtain any or all of the Contract and Lease Consents; and

(x)    accrue to Purchaser unless and only to the extent that (A) the actual liability of Seller in respect of any single claim under Section 11.2.1(a) exceeds Ten Thousand Dollars ($10,000) (a "Relevant Claim") and (B) the total actual liability of Seller in respect of all Relevant Claims arising under Section 11.2.1(a) in the aggregate exceeds Five Hundred Thousand Dollars ($500,000) (the "Aggregate Amount"), in which event Purchaser shall be entitled to seek indemnification under Section 11.2.1(a) for all Relevant Claims only in an amount of Damages which exceed the Aggregate Amount.

(b)    Notwithstanding any provision to the contrary contained in this Agreement, the maximum aggregate liability of Seller to Purchaser under this Agreement shall not exceed the amount equal to the Purchase Price in the aggregate.

(c)    If Purchaser is entitled to recover any sum (whether by payment, discount, credit or otherwise) from any third party in respect of any matter for which a claim of indemnity could be made against Seller hereunder, Purchaser shall use its reasonable efforts to recover the full amount of such sum from such third party prior to making a claim hereunder and any sum recovered will reduce the amount of the claim.  If Seller pays to Purchaser an amount in respect of a claim, and Purchaser subsequently recovers from a third party a sum which is referable to that claim, Purchaser shall forthwith repay to Seller so much of the amount paid by it as does not exceed the sum recovered from the third party less all reasonable costs, charges and expenses incurred by Purchaser in obtaining payment in respect of that claim and in recovering that sum from the third party.

11.3    Indemnification of Seller by Purchaser.

11.3.1    Indemnification.    Purchaser shall keep and save Seller, and Seller's affiliates and respective directors, officers, employees, agents and other representatives, forever harmless from and shall indemnify and defend Seller and Seller's affiliates and respective directors, officers, employees, agents and other representatives against any and all matters and Damages, to the extent connected with or arising or resulting from (a) any breach of any representation or warranty of Purchaser under this Agreement, (b) any breach or default by Purchaser under any covenant or agreement of Purchaser under this Agreement, (c) any claims, demands or causes of action by the PHM Parties, or any of the foregoing entities' owners,

47

members, partners, managers, directors, officers, and employees arising out of matters related to the negotiation of this Agreement, this Agreement, post-petition activities, and the actions of Purchaser and its permitted assignee, *provided, however*, that Purchaser shall have no obligation to defend or indemnify against any matter related to any loans or advances, whether secured or unsecured, made by the PHM Parties to Seller or its affiliates, any management fees due to the PHM Parties as a result of services provided by the PHM Parties, any management fees allegedly due as a result of the rejection of any agreements between Seller and the PHM Parties, and/or any proofs of claim, whether secured or unsecured, asserted by the PHM Parties in the Bankruptcy Court (d) any claims, demands or causes of action related to the Desert Vista Action including attorneys' fees and costs incurred after the Effective Date; (e) cost reports (and all claims with respect thereto) relating to Purchaser with respect to Medicare, Medi-Cal, TRICARE or Blue Cross programs or any other third-party payor for all periods beginning on and after the Effective Time, (f) the Assumed Obligations, (g) any professional liability claim arising out of the business operations of the Hospital on and after the Effective Time, (h) any other obligation or liability specifically assumed by Purchaser in this Agreement, (i) liabilities to the Hired Employees arising out of actions of Purchaser based wholly or in part upon the contents of the personnel records of such employees, (j) any act, conduct or omission of Purchaser that has accrued, arisen, occurred or come into existence at any time, (k) any securities litigation involving (i) Purchaser and/or (ii) any financing obtained by Purchaser which is utilized to fund, in whole or in part, the Cash Purchase Price, other than to the extent arising out of any willful misconduct of Seller or its employees, or intentionally false or intentionally misleading statements of Seller or its employees, (l) any non-compliance with any "bulk transfer laws", and (m) any and all loss, liability, cost, damage or expense (including, without limitation, attorneys' fees, accountants' fees, consultants' fees, court costs and interest) related to Purchaser's inspections and assessments of the Assets prior to the Effective Time.  No provision in this Agreement shall prevent Purchaser from pursuing any of its legal rights or remedies that may be granted to Purchaser by law against any person or legal entity other than Seller or any affiliate of Seller.

    11.3.2  Indemnification Limitations.

        (a)    Notwithstanding any provision to the contrary contained in this Agreement, Purchaser shall be under no liability to indemnify Seller under Section 11.3.1 and no claim under Section 11.3.1 of this Agreement shall:

            (i)    be made unless notice thereof shall have been given by or on behalf of Seller to Purchaser in the manner provided in Section 11.4, unless failure to provide such notice in a timely manner does not materially impair Purchaser's ability to defend its rights, mitigate damages, seek indemnification from a third party or otherwise protect its interests;

            (ii)    be made to the extent that any loss may be recovered under a policy of insurance in force on the date of loss; *provided, however,* that this Section 11.3.2(a)(ii) shall not apply to the extent that (A) coverage under the applicable policy of insurance is denied by the applicable insurance carrier (provided, further, that nothing hereunder shall require that Seller institute any formal legal proceeding against the

48

applicable insurer prior to seeking indemnification from Purchaser) or (B) any such loss is not fully covered by the applicable policy of insurance;

   (iii) be made to the extent that such claim relates to a liability of Seller arising out of or relating to any act, omission, event or occurrence connected with:

     (A) the use, ownership or operation of the Hospital, or

     (B) the use, operation or ownership of any of the Assets,

prior to the Effective Time, other than as specifically stated in Section 11.3.1 or included in the Assumed Obligations;

   (iv) be made to the extent such claim relates to an obligation or liability for which Seller has agreed to indemnify Purchaser pursuant to Section 11.2;

   (v) be made to the extent such claim seeks Consequential Damages; *provided, however,* the limitation contained in this Section 11.3.2(a)(v) shall not apply to the extent of any payments which Seller or any affiliate of Seller is required to make to a third party which are in the nature of Consequential Damages; and

   (vi) accrue to Seller unless and only to the extent that (A) the actual liability of Purchaser in respect of any single claim under Section 11.3.1(a) exceeds Ten Thousand Dollars ($10,000) (a "Seller Relevant Claim") and (B) the total actual liability of Purchaser in respect of all Seller Relevant Claims arising under Section 11.3.1(a) in the aggregate exceeds Five Hundred Thousand Dollars ($500,000) (the "Seller Aggregate Amount"), in which event Seller shall be entitled to seek indemnification under Section 11.3.1(a) for all Seller Relevant Claims only in an amount of Damages which exceed the Seller Aggregate Amount.

  (b) If Seller is entitled to recover any sum (whether by payment, discount, credit or otherwise) from any third party in respect of any matter for which a claim of indemnity could be made against Purchaser hereunder, Seller shall use their reasonable endeavors to recover such sum from such third party and any sum recovered will reduce the amount of the claim.  If Purchaser pays to Seller an amount in respect of a claim, and Seller subsequently recovers from a third party a sum which is referable to that claim, Seller shall forthwith repay to Purchaser so much of the amount paid by it as does not exceed the sum recovered from the third party less all reasonable costs, charges and expenses incurred by Seller in obtaining payment in respect of that claim and in recovering that sum from the third party.

  11.4 Method of Asserting Claims.  All claims for indemnification by any person entitled to indemnification (the "Indemnified Party") under this ARTICLE 11 will be asserted and resolved as follows:

  (a) In the event any claim or demand, for which a party hereto (an "Indemnifying Party") would be liable for the Damages to an Indemnified Party, is asserted against or sought to be collected from such Indemnified Party by a person other than Seller,

49

Purchaser or their affiliates (a "Third Party Claim"), the Indemnified Party shall deliver a notice of its claim (a "Claim Notice") to the Indemnifying Party within thirty (30) calendar days after the Indemnified Party receives written notice of such Third Party Claim; *provided, however,* that notice shall be provided to the Indemnifying Party within fifteen (15) calendar days after receipt of a complaint, petition or institution of other formal legal action by the Indemnified Party.  If the Indemnified Party fails to provide the Claim Notice within such applicable time period after the Indemnified Party receives written notice of such Third Party Claim and thereby materially impairs the Indemnifying Party's ability to protect its interests, the Indemnifying Party will not be obligated to indemnify the Indemnified Party with respect to such Third Party Claim.  The Indemnifying Party will notify the Indemnified Party within thirty (30) calendar days after receipt of the Claim Notice (the "Notice Period") whether the Indemnifying Party desires, at the sole cost and expense of the Indemnifying Party, to defend the Indemnified Party against such Third Party Claim.

(i)    If the Indemnifying Party notifies the Indemnified Party within the Notice Period that the Indemnifying Party desires to defend the Indemnified Party with respect to the Third Party Claim pursuant to this Section 11.4(a), then the Indemnifying Party will have the right to defend, at its sole cost and expense, such Third Party Claim by all appropriate proceedings, which proceedings will be prosecuted by the Indemnifying Party to a final conclusion or will be settled at the discretion of the Indemnifying Party.  The Indemnifying Party will have full control of such defense and proceedings, including any compromise or settlement thereof.  Notwithstanding the foregoing, the Indemnified Party may, at its sole cost and expense, file during the Notice Period any motion, answer or other pleadings that the Indemnified Party may deem necessary or appropriate to protect its interests or those of the Indemnifying Party and which is not prejudicial, in the reasonable judgment of the Indemnifying Party, to the Indemnifying Party.  Except as provided in Section 11.4(a)(ii) hereof, if an Indemnified Party takes any such action that is prejudicial and causes a final adjudication that is adverse to the Indemnifying Party, the Indemnifying Party will be relieved of its obligations hereunder with respect to the portion of such Third Party Claim prejudiced by the Indemnified Party's action.  If requested by the Indemnifying Party, the Indemnified Party agrees, at the sole cost and expense of the Indemnifying Party, to cooperate with the Indemnifying Party and its counsel in contesting any Third Party Claim that the Indemnifying Party elects to contest, or, if appropriate and related to the Third Party Claim in question, in making any counterclaim against the person asserting the Third Party Claim, or any cross-complaint against any person (other than the Indemnified Party or any of its affiliates).  The Indemnified Party may participate in, but not control, any defense or settlement of any Third Party Claim controlled by the Indemnifying Party pursuant to this Section 11.4(a)(i), and except as specifically provided in this Section 11.4(a)(i), the Indemnified Party will bear its own costs and expenses with respect to such participation.

(ii)    If the Indemnifying Party fails to notify the Indemnified Party within the Notice Period that the Indemnifying Party desires to defend the Indemnified Party pursuant to this Section 11.4(a), or if the Indemnifying Party gives such notice but fails to prosecute diligently or settle the Third Party Claim, or if the Indemnifying Party

50

fails to give any notice whatsoever within the Notice Period, then the Indemnified Party will have the right to defend, at the sole cost and expense of the Indemnifying Party, the Third Party Claim by all appropriate proceedings, which proceedings will be promptly and reasonably prosecuted by the Indemnified Party to a final conclusion or will be settled at the discretion of the Indemnified Party.  The Indemnified Party will have full control of such defense and proceedings, including any compromise or settlement thereof; *provided, however,* that if requested by the Indemnified Party, the Indemnifying Party agrees, at the sole cost and expense of the Indemnifying Party, to cooperate with the Indemnified Party and its counsel in contesting any Third Party Claim which the Indemnified Party is contesting, or, if appropriate and related to the Third Party Claim in question, in making any counterclaim against the person asserting the Third Party Claim, or any cross-complaint against any person (other than the Indemnifying Party or any of its affiliates).  Notwithstanding the foregoing provisions of this <u>Section 11.4(a)(ii)</u>, if the Indemnifying Party has notified the Indemnified Party with reasonable promptness that the Indemnifying Party disputes its liability to the Indemnified Party with respect to such Third Party Claim and if such dispute is resolved in favor of the Indemnifying Party, the Indemnifying Party will not be required to bear the costs and expenses of the Indemnified Party's defense pursuant to this <u>Section 11.4(a)(ii)</u> or of the Indemnifying Party's participation therein at the Indemnified Party's request, and the Indemnified Party will reimburse the Indemnifying Party in full for all reasonable costs and expenses incurred by the Indemnifying Party in connection with such litigation.  Subject to the above terms of this <u>Section 11.4(a)(ii)</u>, the Indemnifying Party may participate in, but not control, any defense or settlement controlled by the Indemnified Party pursuant to this <u>Section 11.4(a)(ii)</u>, and the Indemnifying Party will bear its own costs and expenses with respect to such participation.  The Indemnified Party shall give sufficient prior notice to the Indemnifying Party of the initiation of any discussions relating to the settlement of a Third Party Claim to allow the Indemnifying Party to participate therein.

(b)     In the event any Indemnified Party should have a claim against any Indemnifying Party hereunder that either (i) does not involve a Third Party Claim being asserted against or sought to be collected from the Indemnified Party or (ii) is a Seller Tax Claim, the Indemnified Party shall deliver an Indemnity Notice (as hereinafter defined) to the Indemnifying Party.  The term "Indemnity Notice" shall mean written notification of a claim for indemnity under <u>ARTICLE 11</u> hereof (which claim does not involve a Third Party Claim or is a Seller Tax Claim) by an Indemnified Party to an Indemnifying Party pursuant to this <u>Section 11.4</u>, specifying the nature of and specific basis for such claim and the amount or the estimated amount of such claim.)  The failure by any Indemnified Party to give the Indemnity Notice shall not impair such party's rights hereunder except to the extent that an Indemnifying Party demonstrates that it has been prejudiced thereby.

(c)     If the Indemnifying Party does not notify the Indemnified Party within thirty (30) calendar days following its receipt of a Claim Notice or an Indemnity Notice that the Indemnifying Party disputes its liability to the Indemnified Party hereunder, such claim specified by the Indemnified Party will be conclusively deemed a liability of the Indemnifying Party hereunder and the Indemnifying Party shall pay the amount of such liability to the Indemnified Party on demand, or on such later date (i) in the case of a Third Party Claim, as the Indemnified

51

Party suffers the Damages in respect of such Third Party Claim, (ii) in the case of an Indemnity Notice in which the amount of the claim is estimated, when the amount of such claim becomes finally determined or (iii) in the case of a Seller Tax Claim, upon the earlier of when a lien attaches, or within fifteen (15) calendar days following final determination of the item giving rise to the claim for indemnity.  If the Indemnifying Party has timely disputed its liability with respect to such claim, as provided above, the Indemnifying Party and the Indemnified Party agree to proceed in good faith to negotiate a resolution of such dispute, and if not resolved through negotiations, such dispute will be resolved by adjudication by a court or similar tribunal.

(d)     The Indemnified Party agrees to give the Indemnifying Party reasonable access to the books and records and employees of the Indemnified Party in connection with the matters for which indemnification is sought hereunder, to the extent the Indemnifying Party reasonably deems necessary in connection with its rights and obligations hereunder.

(e)     The Indemnified Party shall assist and cooperate with the Indemnifying Party in the conduct of litigation, the making of settlements and the enforcement of any right of contribution to which the Indemnified Party may be entitled from any person or entity in connection with the subject matter of any litigation subject to indemnification hereunder.  In addition, the Indemnified Party shall, upon request by the Indemnifying Party or counsel selected by the Indemnifying Party (without payment of any fees or expenses to the Indemnified Party or an employee thereof), attend hearings and trials, assist in the securing and giving of evidence, assist in obtaining the presence or cooperation of witnesses, and make available its own personnel; and shall do whatever else is necessary and appropriate in connection with such litigation.  The Indemnified Party shall not make any demand upon the Indemnifying Party or counsel for the Indemnifying Party in connection with any litigation subject to indemnification hereunder, except a general demand for indemnification as provided hereunder.  If the Indemnified Party shall fail to perform such obligations as Indemnified Party hereunder or to cooperate fully with the Indemnifying Party in Indemnifying Party's defense of any suit or proceeding, such cooperation to include, without limitation, attendance at all depositions and the provision of all documents relevant to the defense of any claim, then, except where such failure does not have an adverse effect on the Indemnifying Party's defense of such claims, the Indemnifying Party shall be released from all of its obligations under this Agreement with respect to that suit or proceeding and any other claims which had been raised in such suit or proceeding.

(f)     Following indemnification as provided for hereunder, the Indemnifying Party shall be subrogated to all rights of the Indemnified Party with respect to all persons or entities relating to the matter for which indemnification has been made; *provided, however,* that the Indemnifying Party shall have no subrogation rights to seek reimbursement through or from the Indemnified Party's insurance policies, programs, coverage, carriers or beneficiaries.

11.5     <u>Exclusive</u>.  Other than claims for fraud or equitable relief (which equitable relief claims are nevertheless subject to <u>Section 11.1</u>), any claim arising under this Agreement or in connection with or as a result of the transactions contemplated by this Agreement or any Damages or injury alleged to be suffered by any party as a result of the actions or failure to act by any other party shall, unless otherwise specifically stated in this Agreement, be governed

solely and exclusively by the provisions of this ARTICLE 11. If Seller and Purchaser cannot resolve such claim by mutual agreement, such claim shall be determined by adjudication by a court or similar tribunal subject to the provisions of this ARTICLE 11.

# ARTICLE 12

# TAX AND COST REPORT MATTERS

12.1    Tax Matters; Allocation of Purchase Price.

      (a)    After the Closing Date, the parties shall cooperate fully with each other and shall make available to each other, as reasonably requested, all information, records or documents relating to tax liabilities or potential tax liabilities attributable to Seller with respect to the operation of the Hospital for all periods prior to the Effective Time and shall preserve all such information, records and documents at least until the expiration of any applicable statute of limitations or extensions thereof. The parties shall also make available to each other to the extent reasonably required, and at the reasonable cost of the requesting party (for out-of-pocket costs and expenses only), personnel responsible for preparing or maintaining information, records and documents in connection with tax matters and as Seller reasonably may request in connection with the completion of its post-Closing audits of the Hospital.

      (b)    The Purchase Price shall be allocated among each category of the Assets of the Hospital and among the Seller in accordance with **Schedule 12.1(b)**. Seller and Purchaser hereby agree to allocate the Purchase Price in accordance with **Schedule 12.1(b)**, to be bound by such allocations, to account for and report the purchase and sale of the Assets contemplated hereby for federal and state tax purposes in accordance with such allocations, and not to take any position (whether in tax returns, tax audits, or other tax proceedings), which is inconsistent with such allocations without the prior written consent of the other parties.

12.2    Cost Report Matters.

      (a)    Consistent with Section 4.10, Seller shall prepare and timely file all cost reports relating to the periods ending prior to the Effective Time or required as a result of the consummation of the transactions described in this Agreement, including, without limitation, those relating to Medicare, Medi-Cal, Blue Cross and other third party payors which settle on a cost report basis (the "Seller Cost Reports").

      (b)    Upon reasonable notice and during normal business office hours, Purchaser will cooperate reasonably with Seller in regard to Seller's preparation, filing, handling, and appeals of the Seller Cost Reports. Upon reasonable notice and during normal business office hours, Purchaser will cooperate with Seller in connection with any cost report disputes and/or other claim adjudication matters relative to governmental program reimbursement. Such cooperation shall include, at no cost to Seller, obtaining access to files at the Hospital and Purchaser's provision to Seller of data and statistics, and the coordination with Seller pursuant to reasonable notice of Medicare and Medi-Cal exit conferences or meetings.

# ARTICLE 13

## MISCELLANEOUS PROVISIONS

13.1    <u>Further Assurances and Cooperation</u>.    Seller shall execute, acknowledge and deliver to Purchaser any and all other assignments, consents, approvals, conveyances, assurances, documents and instruments reasonably requested by Purchaser at any time and shall take any and all other actions reasonably requested by Purchaser at any time for the purpose of more effectively assigning, transferring, granting, conveying and confirming to Purchaser, the Assets.  After consummation of the transaction contemplated in this Agreement, the parties agree to cooperate with each other and take such further actions as may be necessary or appropriate to effectuate, carry out and comply with all of the terms of this Agreement, the documents referred to in this Agreement and the transactions contemplated hereby.

13.2    <u>Successors and Assigns</u>.    All of the terms and provisions of this Agreement shall be binding upon and shall inure to the benefit of and be enforceable by the respective successors and assigns of the parties hereto; *provided, however,* that no party hereto may assign any of its rights or delegate any of its duties under this Agreement without the prior written consent of the other parties, except that Purchaser may assign any of its rights or delegate any of its duties under this Agreement to any wholly-owned subsidiary of Purchaser.

13.3    <u>Governing Law; Venue</u>.    This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of California as applied to contracts made and performed within the State of California.  The parties hereby waive their right to claim in any proceeding involving this Agreement that the law of any jurisdiction other than the State of California shall apply to such dispute; and the parties hereby covenant that they shall assert no such claim in any dispute arising under this Agreement.  Any proceeding which arises out of or relates in any way to the subject matter of this Agreement shall be brought in the United States Bankruptcy Court for the Central District of California.  The parties hereby consent to the jurisdiction of such court and waive their right to challenge any proceeding involving or relating to this Agreement on the basis of lack of jurisdiction over the person or forum non conveniens.

13.4    <u>Amendments</u>.    This Agreement may not be amended other than by written instrument signed by the parties hereto.

13.5    <u>Exhibits, Schedules and Disclosure Schedule</u>.    The Disclosure Schedule and all exhibits and schedules referred to in this Agreement shall be attached hereto and are incorporated by reference herein.  From the Effective Date until the Closing, the parties agree that Seller may update the Disclosure Schedule as necessary upon written notice to Purchaser, which update shall be acceptable to Purchaser in its reasonable discretion.  Notwithstanding the foregoing, should any exhibit or schedule not be completed and attached hereto as of the Effective Date, Seller and Purchaser shall promptly negotiate in good faith any such exhibit or schedule, which exhibit or schedule must be acceptable to each of Seller and Purchaser in their reasonable discretion prior to being attached hereto.  Any matter disclosed in this Agreement or in the Disclosure Schedule with reference to any Section of this Agreement shall be deemed a disclosure in respect of all sections to which such disclosure may apply.

13.6    Publicity.  Prior to the Closing Date, Seller and Purchaser shall consult with each other as to the form and substance of any press release or other public disclosure materially related to this Agreement or the transactions contemplated hereby and each shall have the right to review and comment on the other's press releases prior to issuance; provided, however, that nothing in this Section 13.6 shall be deemed to prohibit either Seller or Purchaser from making any disclosure it deems necessary to comply with its legal obligations, its obligations under this Agreement, its ability to satisfy the closing conditions, and/or Seller's obligations under the Bankruptcy Code.

13.7    Notices.  Any notice, demand or communication required, permitted, or desired to be given hereunder shall be deemed effectively given when personally delivered, when received by telegraphic or other electronic means (including facsimile) or overnight courier, or five (5) calendar days after being deposited in the United States mail, with postage prepaid thereon, certified or registered mail, return receipt requested, addressed as follows:

| | |
|---|---|
| If to Seller: | Victor Valley Community Hospital<br>15428 11th Street<br>Victorville, California 92392<br>Attention: Chief Executive Officer<br>Facsimile No. (760) 843-6020 |
| With copies to:<br>(which copies shall<br>not constitute notice) | Burke Williams & Sorensen, LLP<br>444 S. Flower Street, Suite 2400<br>Los Angeles, California 90071<br>Attention: Charles E. Slyngstad, Esq.<br>Facsimile No. (213) 236-2700 |
| | Pachulski Stang Ziehl & Jones<br>10100 Santa Monica Boulevard, 11th Floor<br>Los Angeles, California 90067<br>Attention: Samuel R. Maizel, Esq.<br>Facsimile No. (310) 201-0760 |
| If to Purchaser: | Prime Healthcare Services Foundation, Inc.<br>3300 E. Guasti Road, 2nd Floor<br>Ontario, California 91761<br>Attention: Michael Sarrao, Esq.<br>Facsimile No.: (909) 235-4419 |
| With a copy to:<br>(which copy shall<br>not constitute notice) | Shulman Hodges & Bastian LLP<br>8105 Irvine Center Drive, Suite 600<br>Irvine, California 92618<br>Attention: Mark Bradshaw, Esq.<br>Facsimile No.: (949) 340-3000 |

or at such other address as one party may designate by notice hereunder to the other parties.

LA #4811-6314-8297 v2

13.8    Headings.  The section and other headings contained in this Agreement and in the Disclosure Schedule, exhibits and schedules to this Agreement are included for the purpose of convenient reference only and shall not restrict, amplify, modify or otherwise affect in any way the meaning or interpretation of this Agreement or the Disclosure Schedule, exhibits and schedules hereto.

13.9    Fair Meaning.  This Agreement shall be construed according to its fair meaning and as if prepared by all parties hereto.

13.10    Gender and Number; Construction.    All references to the neuter gender shall include the feminine or masculine gender and vice versa, where applicable, and all references to the singular shall include the plural and vice versa, where applicable.  Unless otherwise expressly provided, the word "including" followed by a listing does not limit the preceding words or terms and shall mean "including, without limitation."

13.11    Third Party Beneficiary.  None of the provisions contained in this Agreement are intended by the parties, nor shall they be deemed, to confer any benefit on any person not a party to this Agreement.

13.12    Expenses and Attorneys' Fees.  Except as otherwise provided in this Agreement, each party shall bear and pay its own costs and expenses relating to the preparation of this Agreement and to the transactions contemplated by, or the performance of or compliance with any condition or covenant set forth in, this Agreement, including without limitation, the disbursements and fees of their respective attorneys, accountants, advisors, agents and other representatives, incidental to the preparation and carrying out of this Agreement, whether or not the transactions contemplated hereby are consummated.  The parties expressly agree that (a) all sales, transfer, documentary transfer and similar taxes, fees, surcharges and the like in connection with the sale of the Assets shall be borne by Purchaser;  (b) the following shall be borne one-half by Purchaser and one-half by Seller: (i) all costs of the Title Commitment and the Title Policy (including the cost of any endorsements thereto); and (ii) all recording fees or similar charges in connection with the sale of the Assets; and (c) all costs of the Environmental Survey and all costs of the Surveys shall be borne by Purchaser.  If any action is brought by any party to enforce any provision of this Agreement, the prevailing party shall be entitled to recover its court costs and reasonable attorneys' fees.

13.13    Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same Agreement, binding on all of the parties hereto.  The parties agree that facsimile copies of signatures shall be deemed originals for all purposes hereof and that a party may produce such copies, without the need to produce original signatures, to prove the existence of this Agreement in any proceeding brought hereunder.

13.14    Entire Agreement.  This Agreement, the Disclosure Schedule, the exhibits and schedules, and the documents referred to in this Agreement contain the entire understanding between the parties with respect to the transactions contemplated hereby and supersede all prior or contemporaneous agreements, understandings, representations and statements, oral or written,

56

between the parties on the subject matter hereof (the "Superseded Agreements"), which Superseded Agreements shall be of no further force or effect.

13.15   No Waiver.  Any term, covenant or condition of this Agreement may be waived at any time by the party which is entitled to the benefit thereof but only by a written notice signed by the party expressly waiving such term or condition.   The subsequent acceptance of performance hereunder by a party shall not be deemed to be a waiver of any preceding breach by any other party of any term, covenant or condition of this Agreement, other than the failure of such other party to perform the particular duties so accepted, regardless of the accepting party's knowledge of such preceding breach at the time of acceptance of such performance.  The waiver of any term, covenant or condition shall not be construed as a waiver of any other term, covenant or condition of this Agreement.

13.16   Severability.  If any term, provision, condition or covenant of this Agreement or the application thereof to any party or circumstance shall be held to be invalid or unenforceable to any extent in any jurisdiction, then the remainder of this Agreement and the application of such term, provision, condition or covenant in any other jurisdiction or to persons or circumstances other than those as to whom or which it is held to be invalid or unenforceable, shall not be affected thereby, and each term, provision, condition and covenant of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

13.17   Time is of the Essence.  Time is of the essence for all dates and time periods set forth in this Agreement and each performance called for in this Agreement.

*[REMAINDER OF PAGE IS BLANK]*

LA #4811-6314-8297 v2

IN WITNESS WHEREOF, this Agreement has been entered into as of the day and year first above written.

**PURCHASER:**

Prime Healthcare Services Foundation, Inc., a Delaware corporation

By: _____

Name:  Michael J. Sarrao
Title:    Secretary and Treasurer

**SELLER:**

Victor Valley Community Hospital, a California corporation

By: _____

Name:  Kathy A. Davis
Its:      Chair, Governing Board of Directors

58

IN WITNESS WHEREOF, this Agreement has been entered into as of the day and year first above written.

PURCHASER:

Prime Healthcare Services Foundation, Inc., a Delaware corporation

By: _____
Name: Michael J. Sarrao
Title:    Secretary and Treasurer

SELLER:

Victor Valley Community Hospital, a California corporation

By: _____
Name: Kathy A. Davis
Its:    Chair, Governing Board of Directors

58

LA #4811-6314-8297.v2

## LIST OF SCHEDULES

| SCHEDULE | DESCRIPTION |
|---|---|
| Those disclosures provided in the Disclosure Schedule; and | |
| A-1 | Other Businesses |
| 1.8(a) | Owned Real Property |
| 1.8(b) | Leased Real Property |
| 1.8(c) | Personal Property |
| 1.8(d) | Licenses |
| 1.8(g) | Prepaids |
| 1.8(t) | Names of Hospital |
| 1.9(o) | Privileged and Protected Items |
| 1.9(t) | Other Excluded Assets |
| 1.10(k) | Other Obligations & Liabilities |

| SCHEDULE | DESCRIPTION |
|---|---|
| 2.4 | Consents |
| 2.5(a) | Compliance with Law |
| 2.5(d) | Material Obligations |
| 2.6(b) | Real Property Encumbrances |
| 2.6(d) | Real Property Used in Operations |
| 2.7(b) | HFAP Periods |
| 2.7(c) | Threatened Medicare or Medi-Cal Investigations |
| 2.7(d) | Audit Periods |
| 2.10 | Legal Proceedings |
| 2.11(a) | Seller Plans |
| 2.12(a) | Personnel List |
| 2.12(c) | Employee Terminations |
| 2.12(d) | Employment Agreements |
| 2.13 | Insurance |
| 3.4 | No Violation – Purchaser |
| 3.7 | Legal Proceedings – Purchaser |
| 4.3(a) | Increased Compensation |
| 4.8 | Ground Leases |

| **SCHEDULE** | **DESCRIPTION** |
|---|---|
| 8.6 | Permitted Exceptions |
| 11.2.1 | Certain Governmental Investigations |
| 12.1(b) | Allocation of Purchase Price |

# LIST OF EXHIBITS

| EXHIBIT | DESCRIPTION |
|---|---|
| 1.3 | Good Faith Deposit Agreement |
| 1.5.9 | Power of Attorney |
| 1.5.10 | Interim Management & Lease Agreement |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
**10100 Santa Monica Boulevard, 11th Floor, Los Angeles, CA  90067**

A true and correct copy of the foregoing document *NOTICE OF MOTION AND DEBTOR'S MOTION FOR THE ENTRY OF AN ORDER AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS AND GRANTING RELATED RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF; DECLARATION OF CATHERINE M. PELLEY IN SUPPORT THEREOF* will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On **July 5, 2011** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒  Service information continued on attached page

**II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On **July 5, 2011** I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be</u> completed no later than 24 hours after the document is filed.

**By Overnight Mail**
Honorable Catherine Bauer
United States Bankruptcy Court
Central District of California
3420 Twelfth Street, Suite 365
Riverside, CA  92501-3819

☒  Service information continued on attached page

**III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **July 5, 2011** I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge <u>will be</u> completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| July 5, 2011 | Myra Kulick | /s/ Myra Kulick |
|---|---|---|
| Date | Type Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                 **F 9013-3.1.PROOF.SERVICE**

**I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")**

*Allison R Axenrod on behalf of Creditor Claims Recovery Group LLC*
*allison@claimsrecoveryllc.com*

*Martin R Barash on behalf of Interested Party The Senior Associates Group, Inc.*
*mbarash@ktbslaw.com*

*Kirk A Barber on behalf of Creditor Professional Hospital Supply, Inc.*
*barberlawgroup@yahoo.com*

*Manuel A Boigues on behalf of Creditor SEIU United Healthcare Workers - West*
*bankruptcycourtnotices@unioncounsel.net*

*Mark Bradshaw on behalf of Creditor Desert Valley Hospital, Inc.*
*mbradshaw@shbllp.com*

*Jeff Cohen on behalf of Interested Party Southpaw Asset Management LP*
*JC@SouthpawAsset.com*

*Sanaea Daruwalla on behalf of Attorney Burke, Williams, & Sorensen, LLP*
*sdaruwalla@bwslaw.com*

*Richard K Diamond (TR) on behalf of Creditor Committee Committee Of Creditors, Unsecured Claims*
*jlv@dgdk.com, rdiamond@ecf.epiqsystems.com*

*Abram Feuerstein on behalf of U.S. Trustee United States Trustee (RS)*
*abram.s.feuerstein@usdoj.gov*

*H Alexander Fisch on behalf of Interested Party Victor Valley Acquisition, Inc.*
*afisch@stutman.com*

*Fredric Glass on behalf of Creditor Fair Harbor Capital, LLC*
*fglass@fairharborcapital.com*

*Matthew A Gold on behalf of Creditor Argo Partners*
*courts@argopartners.net*

*Everett L Green on behalf of U.S. Trustee United States Trustee (RS)*
*everett.l.green@usdoj.gov*

*Robert A Hessling on behalf of Interested Party Courtesy NEF*
*rhessling@dgdk.com*

*Lawrence J Hilton on behalf of Creditor Cerner Corporation*
*lhilton@oneil-llp.com, ssimmons@oneil-llp.com*

*Mark D Houle on behalf of Creditor Health Net of California, Inc.*
*mark.houle@pillsburylaw.com*

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                                    **F 9013-3.1.PROOF.SERVICE**

*Raffi Khatchadourian on behalf of Creditor Sysco Food Services of Los Angeles, Inc.*
*raffi@hemar-rousso.com*

*Maya Krish on behalf of Creditor Fair Liquidity Partners, LLC*
*mkrish@cactuscollect.com*

*Mary D Lane on behalf of Debtor Victor Valley Community Hospital*
*mlane@pszjlaw.com*

*Ganna Liberchuk on behalf of Creditor Hain Capital Group, LLC*
*gliberchuk@haincapital.com*

*Craig A Loren on behalf of Creditor Debt Acquisition Group, LLC*
*aloren@debtacquisitiongroup.com,*
*bschwab@debtacquisitiongroup.com;jsarachek@debtacquisitiongroup.com*

*Michael B Lubic on behalf of Interested Party LabWest, Inc.*
*michael.lubic@klgates.com*

*Samuel R Maizel on behalf of Attorney Pachulski Stang Ziehl & Jones LLP*
*smaizel@pszjlaw.com, smaizel@pszjlaw.com*

*Elmer D Martin on behalf of Creditor Desert Community Bank, a Division of East West Bank*
*elmermartin@gmail.com*

*Scotta E McFarland on behalf of Debtor Victor Valley Community Hospital*
*smcfarland@pszjlaw.com, smcfarland@pszjlaw.com*

*Robert K Minkoff on behalf of Creditor Jefferies Leveraged Credit Products, LLC*
*rminkoff@jefferies.com*

*Jane Odonnell on behalf of Creditor California Health Facilities Financing Authority*
*jane.odonnell@doj.ca.gov*

*Courtney E Pozmantier on behalf of Interested Party The Senior Associates Group, Inc.*
*cpozmantier@ktbslaw.com*

*Martha E Romero on behalf of Creditor San Bernardino County Tax Collector*
*Romero@mromerolawfirm.com*

*Terrel Ross on behalf of Interested Party TR Capital Management, LLC*
*tross@trcmllc.com*

*Steven J Schwartz on behalf of Attorney DANNING GILL DIAMOND & KOLLITZ, LLP*
*sschwartz@dgdk.com*

*David Scott on behalf of Creditor Centillion Investments LLC*
*centillion@centillioninvest.com*

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                                           **F 9013-3.1.PROOF.SERVICE**

*Seth B Shapiro on behalf of Interested Party Centers for Medicare and Medicaid Services*
*seth.shapiro@usdoj.gov*

*Derrick Talerico on behalf of Creditor SCAN Health Plan*
*dtalerico@loeb.com, kpresson@loeb.com;ljurich@loeb.com*

*David P Tonner on behalf of Creditor Archon Bay Capital, LLC*
*operations@blueheroncapital.com*

*United States Trustee (RS)*
*ustpregion16.rs.ecf@usdoj.gov*

*Michael H Weiss on behalf of Interested Party Choice Medical Group*
*mw@weissandspees.com, lm@weissandspees.com;jb@weissandspees.com*

*Andrew F Whatnall on behalf of Creditor DACA 2010L, LP*
*awhatnall@daca4.com*

**II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL (on July 6, 2011)**

*Please see attached Service Lists*

**III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL**

*Please see attached Service Lists*

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                    **F 9013-3.1.PROOF.SERVICE**

# Victor Valley Community Hospital
## 2002 Service List
### (with emails, telephone and fax)

*Via Email*
Debtor
Victor Valley Community Hospital
Catherine M. Pelley
Chief Executive Officer
15248 Eleventh Street
Victorville, CA  92395
T: (760) 843-6201
F: (760) 843-6020
Email:  cpelley @vvch.org

*Via Email*
Board of Directors
Kathy Davis
Chair, Governing Board of Directors
17100 B Bear Valley Rd.
Box 357
Victorville, CA  92395
T: (760) 427-2607
F: (760) 951-1308
Email:  kathydavis49@hotmail.com

*Via Email*
Business Counsel to Debtor
Charlie Slyngstad
Burke Williams and Sorenson, LLP
444 S. Flower St., Ste. 2400
Los Angeles, CA  90071
T: (213) 236-0600
F: (213) 236-2700
Email:  cslyngstad@bwslaw.com

*Via Email*
Office of the United States Trustee
Everett Green
3685 Main St., Ste. 300
Riverside, CA  92501
T: (951) 276-6990
F: (951) 276-6973
Email:  everett.green@usdoj.gov

*Via Email*
Attorneys for Official Committee of Creditors
Holding Unsecured Claims
Richard K. Diamond
Steven Schwartz
Danning, Gill, Diamond & Kollitz, LLP
2029 Century Park East, Third Floor
Los Angeles, CA 90067
P: (310) 277-0077
F: (310) 277-5735
Email:  rdiamond@dgdk.com
         sschwartz@dgdk.com

**Creditors' Committee**

*Via Email*
Committee Member
Medtronic USA, Inc.
MS V215
3850 Victoria Street North
Shoreview, MN  55126-2978
Representative: Steve Carlson
T:        (763) 514-0614
          (800) 511-0934
F:        (763) 367-1403
Email:  Steve.j.carlson@medtronic.com

*Via Email*
Committee Member
PHS Professional Hospital Supply
42500 Winchester Road
Temecula, CA 92590
Representative: Kirk Barber
T: (951) 296-2600 ext. 1240
F:  (951)- 296-2625
Email:  barberlawgroup@yahoo.com

*Via Email*
Committee Member
Rodney W. Brown, J.D.
LabWest, Inc.
1821 E. Dyer Rd., Suite 100
Santa Ana, CA 92705
T: (949) 724-3900 Ext. 2730
C:  (714) 290-7748
F:  (949) 474-0940
Email:  rbrown@westclifflabs.com

*Via Email*
Attorneys for LabWest, a subsidiary of
LabCorp.
Michael Benjamin Lubic
K&L Gates
10100 Santa Monica Blvd., 7th Floor
Los Angeles, California  90067
T:  (310) 552-5030
F:  (310) 552.5001
*Email:  michael.lubic@klgates.com*

**Government Agencies**

*Via Email*
Counsel for the US DHHS/CMS
Phillip Seligman, Esq.
US Department of Justice
Commercial Litigation Branch
1100 L Street, N.W.
Room 10104
Washington, DC  20005
Mail
P.O. Box 875
Ben Franklin Station
Washington, DC  20044-0875
T:  202-307-1105
F:  202-307-0494
*Email:  Phillip.Seligman@usdoj.gov*

*Via Email*
Wendi A. Horwitz
Deputy Attorney General
California Department of Justice
Office of the Attorney General
300 South Spring St., Suite 1702
Los Angeles, CA 90013
Direct Phone: 213-897-2178
Facsimile: 213-897-7605
*Email:  Wendi.Horwitz@doj.ca.gov*

*Via FedEx*
California Health Facilities Financing
Authority
915 Capitol Mall, Suite 590
Sacramento, CA  95814
T: (916) 653-2799

*Via Facsimile*
Office of Statewide Health Planning and
Development
Cal-Mortgage Loan Insurance Division
400 "R" Street, Suite 470
Sacramento, CA  95811
T: (916) 319-8800
F: (916) 445-2837

**Secured Creditors**

*Via Email*
Corwin Medical Group
Manmohan Nayyar, MD
Raman Poola, MD / Anna Sugi
18564 Hwy 18, Suite 110
Apple Valley, CA  92307
T: (760) 242-7777
F: (760) 242-0485
*Email:  mnayyarmd@choicemg.com*
          *ramanpoola@yahoo.com*
          *asugi@choicemg.com*

*Via Email*
Manmohan Nayyar, MD
Physicians Hospital Management, LLC
18523 Corwin Rd., Suite H
Apple Valley, CA  92307
T: (760) 946-3876
F: (760) 242-1936
*Email:  mnayyarmd@choicemg.com*

*Via Email*
Attorneys for PHM
Michael H. Weiss, Esq.
Weiss & Spees
1925 Century Park East, Suite 650
Los Angeles, CA 90067-2701
(424) 245-3100 (Telephone)
(424) 245-3199 (Fax)
*Email:  mw@weissandspees.com*

*Via Email*
BNY Mellon Trust Company NA
700 South Flower Street, Suite 500
Los Angeles, CA  90017
Attention:  Aaron Masters
T: (213) 630-6400
F: (213) 630-6442
*Email:  aaron.masters@bnymellon.com*
*Via Email*

Gregg Buxton, Vice President
Desert Community Bank
a Division of East West Bank
14800 La Paz Drive
Victorville, CA  92395
T:  (760) 241-8221
F:  (760) 243-6819
*Email:  gregg.buxton@dcbk.org*

*Via Email*
Maita Prout, Attorney
East West Bank
135 N. Los Robles Ave., Suite 600
Pasadena, CA 91101
T:  (626) 768-6839
F:  (626) 243-1274
*Email:*  maita.prout@eastwestbank.com

*Via Email*
Counsel to the Indenture Trustee for the
HFFA Bonds
Catherine D. Meyer
Pillsbury Winthrop Shaw Pittman LLP
725 South Figueroa Street, Suite 2800
Los Angeles, CA  90017-5406
T:  213.488.7362
F:  213.226.4160
*Email:  catherine.meyer@pillsburylaw.com*

**Interested Parties**

*Via Email*
Thomas L. Driscoll, Esq.
Attorney at Law
2002 3rd St Apt 114
San Francisco, CA 94107
T: (415) 281-0900
F: (415) 281-0903
*Email:  tdriscoll@tld3.com*

*Via Email*
Biotronik
Attention:  Allen Trammell
6024 Jean Road
Lake Oswego, Oregon  97035
Tel:  503-387-2549
Fax: 503-387-2623
Email:  Allen.Trammell@biotronik.com

*Via FedEx*
Delta One Partners, Inc.
Corporate Headquarters South
48550 North View Drive
Palm Desert, CA  92260

*Via Facsimile*
Law Offices of Leslie M. Lava
207 2nd St #A
Sausalito, CA 94965
T: (415) 331-6464
F: (415) 331-6465

*Via Facsimile*
Westhoff, Cone & Holmstedt:
500 Ygnacio Valley Road, Suite 380
Walnut Creek, CA 94596
T: (925) 472-8740
F: (925) 939-5099

*Via Facsimile*
Davis Wright Tremaine LLP
64 Oak Knoll Drive
San Anselmo, CA  94960
T: (415) 276-6500
F: (415) 276-6599

*Via Email*
Daniel Settelmayer, Esq.
Latham & Watkins LLP
PO Box 894256
Los Angeles, CA  90189-4256
T: (213) 485-1234
F: (213) 891-8763
*Email:  daniel.settelmayer@lw.com*

*Via Email*
Stalking Horse Bidder
Prime Healthcare Services Foundation, Inc.
Attn: Lex Reddy
Chief Executive Officer
3300 East Guasti Road, 2nd Fl.
Ontario, CA  91761
T: (909) 235-4410
F: (909) 235-4424
*Email:  lexreddy@dvmc.com*

*Via Email*
Counsel for Prime Healthcare Services
Foundation, Inc.
Lee Shulman
Mark Bradshaw
Shulman Hodges & Bastian LLP
26632 Towne Centre Drive, Ste. 300
Foothill Ranch, CA  92610
T: (949) 340-3400
F: (949) 340-3000
*Email:  lshulman@shbllp.com*
     *mbradshaw@shbllp.com*

*Via Facsimile*
J. Raymond Elliott
President and Chief Executive Officer
Boston Scientific
re: Guidant Corporation
One Boston Scientific Place
Natick, MA 01760-1537
T: (508) 650-8000
F: (508) 650-8923

*Via Facsimile*
Johnson & Johnson Health Care Systems Inc.
425 Hoes Lane
Piscataway, NJ 08854
Attention:  John Shipley
T: (732) 562-3000
F: (732) 562-2284

*Via Facsimile*
Radiometer America, Inc.
810 Sharon Drive
Westlake, OH 44145
T: (800) 735-0600
F: (440) 871-2510

*Via Email*
Quadramed
Attention:  Penny W. Collings
QuadraMed Corporation
12110 Sunset Hills Road # 600
Reston VA 20190
Attn: P.Collings
T:  (703) 904-5614
F:  (703) 742-5399
*Email:  pcollings @quadramed.com*

*Via Facsimile*
Stephen M. O'Hara
President and CEO
Angelica Textile Services (R-Colton
1105 Lakewood Parkway #210
Alpharetta, GA  30009
T: (678) 823-4100
F: (678) 823-4165

*Via Email*
James W. Young
President and CEO
Platinum Health, Inc.
Cell:  (714) 401-5500
Email:  jameswyoung@msn.com

**Requests for Special Notice**

*Via Email*
Attorneys for Professional Hospital Supply
Kirk Barber
Kirk Barber Law Group, A.P.L.C.
42500 Winchester Road
Temecula, CA 92590
(951) 296-2600, ext. 1240(Telephone)
(951) 302-9849(Facsimile)
*Email:  barberlawgroup@yahoo.com*

*Via Email*
Attorneys for Cerner Corporation
Lawrence J. Hilton
O'Neil LLP
19900 MacArthur Boulevard; Suite 1050
Irvine, California 92612
T: (949) 798-0500
F: (949) 798-0511
*Email: lhilton @oneil-llp.com*

*Via Email*
Attorneys for Cerner Corporation
Darrell W. Clark
Stinson Morrison Hecker LLP
1150 18th Street, NW; Suite 800
Washington, DC 20036-3816
T:: (202) 728-3019
F: (202) 785-9163
*Email:  DClark @stinson.com*

*Via Email*
Counsel for The Senior Associates Group
Klee, Tuchin, Bogdanoff & Stern LLP
Attn: Thomas E. Patterson, Esq. and
Martin R. Barash, Esq.
1999 Avenue of the Stars, 39th Floor
Los Angeles, California 90067-6049
Fax: (310) 407-9090
*Email    tpatterson @ktbslaw.com*
      *mbarash @ktbslaw.com*

*Via Email*
Counsel for The Senior Associates Group
Michael C. Kelcy, Esq.
3605 Canon Blvd.
Altadena, CA 91001
Fax: (626) 345-9589
Email:  mkelcy@charter.net

*Via Email*
Attorneys for Health Net
Mark D. Houle, Esq.
Pillsbury Winthrop Shaw Pittman LLP
650 Town Center Drive, Suite 700
Costa Mesa, California 92626-7122
T: (714-436-6800
F: (714) 436-2800
*Email:  mark.houle @pillsburylaw.com*

*Via Email*
<u>Attorneys for County of San Bernardino</u>
Martha E. Romero
Romero Law Firm
BMR Professional Building
6516 Bright Avenue
Whittier, CA  90601
T:  (562)-907-6800
F:  (562) 907-6820
*Email:  Romero@mromerolawfirm.com*

*Via Email*
<u>Attorneys for Creditor OSHPD and the CA
Health Facilities and Financing Authority</u>
Jane O'Donnell
Deputy Attorney General Dept of Justice
Office of the Attorney General
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550
T:  (916) 322-0253
F:  (916) 327-2247
*Email:  Jane.Odonnell@doj.ca.gov*

*Via Email*
<u>Attorneys for the United States of America,
on behalf of the United States Department of
Health and Human Services and the
Centers for Medicare and Medicaid Services</u>
Seth B. Shapiro, Trial Attorney
U.S. Department of Justice - Civil Division
Commercial Litigation Branch
1100 L Street, NW, Room 10012
P.O. Box 875, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 514-7164
Facsimile: (202) 307-0494
*Email:  seth.shapiro@usdoj.gov*

*Via Facsimile*
Victor Valley Hospital Acquisition, Inc.
6800 Indiana Avenue, Suite 130
Riverside, CA  92506
Attention:  William E. Thomas, Esq.
Fax:  (951) 782-8850

*Via Facsimile*
Victor Valley Hospital Real Estate, LLC
6800 Indiana Avenue, Suite 130
Riverside, CA  92506
Attention:  William E. Thomas, Esq.
Fax:  (951) 782-8850

*Via Email*
<u>Attorneys for Victor Valley Hospital Real
Estate LLC and Victory Valley Hospital
Acquisition, Inc.</u>
Gary E. Klausner
H. Alexander Fisch
Jeffrey A. Resler
Stutman, Treister & Glatt PC
1901 Avenue of the Stars, 12th Floor
Los Angeles, California 90067
Telephone: (310) 228-5600
Facsimile: (310) 228-5788
*E-mails: gklausner@stutman.com
          aarnold@stutman.com
          jresler@stutman.com*

*Via FedEx*
Tin Kin Lee on behalf of Creditor Inland
Empire Health Plan
Tin Kin Lee Law Offices
55 S Lake Ave Ste 705
Pasadena, CA 91101

*Via FedEx*
Liquidity Solutions Inc
One University Plaza
Ste 312
Hackensack, NJ 07601

*Via FedEx*
Tannor Partners Credit Fund II, LP
200 Business Park Drive, Suite 200
Armonk, NY 10504

*Via Email*
<u>Attorney for Creditor, Peggy Buckley</u>
Michael Grennier
Law Offices of Steve Pell
2633 Loma Vista Road
Ventura, CA  93003-1548
Tel:  805-653-6615 / Fax:  805-653-1055
*Email:  michaelgrennier@stevepell.com*

*Via Express Mail*
State Board Of Equalization
P O Box 942879
Sacramento, CA 94279-0055

## <u>In re Victor Valley Community Hospital</u>
## Miscellaneous Parties to be Served with Sale Motion

<u>Via Email</u>
William E. ("Bill") Thomas
Strategic Global Management, Inc.
6800 Indiana Ave., Suite 130
Riverside, California  92506(909) 782-8812
***Email: bthomas@kpcgc.net***
T: (909) 782-8812
F: (909) 782-8850

<u>Via Email</u>
Charles M. Holzner, M.D., Senior Medical Director
Ken Kim, M.D., Chief Medical Officer
Caremore Health Plan
12900 Park Plaza Dr., Suite 150
Cerritos, CA  90703
***Email:  charles.holzner@caremore.com***

**Taxing Agencies**
**(By Overnight Mail)**

ANNETTE KERBER-ASST
TREASURER-TAX COLL
ASSISTANT TREASURER-TAX
COLLECTOR
172 W THIRD ST, 1ST FLR
SAN BERNARDINO, CA 92415-0360

BOARD OF EQUALIZATION
PO BOX 942879
SACRAMENTO, CA 94279-8022

County of Riverside
Auditor-Controller
PO Box 1326 Lemon Street
11th Floor
Riverside, CA 92502

DEPARTMENT OF TREASURY
INTERNAL REVENUE SERVICE
OGDEN, UT 84201-0039

Employment Development Department
Bankruptcy Group
PO Box 826880
Sacramento, CA 94280

EMPLOYMENT DEVELOPMENT DEPT.
PO BOX 826846
SACRAMENTO, CA 94246-0001

Franchise Tax Board
Attention Bankruptcy
PO Box 2952
Sacramento, CA 95812

INTERNAL REVENUE SERVICE
PO BOX 24017
FRESNO, CA 93779

Internal Revenue Service
PO Box 21126
Philadelphia, PA 19114

INTERNAL REVENUE SERVICE-ACS
P.O. BOX 145566
CINCINNATI, OH 45214

INTERNAL REVENUE SERVICES
PO BOX 660264
DALLAS, TX 75266-0264

Riveside County Treasurer
PO Box 12005
Riverside, CA 92502

# VICTOR VALLEY COMMUNITY HOSPITAL
## COUNTERPARTIES SERVICE LIST
## (By U.S. Mail)

AMICAS
LOCKBOX ACCOUNT
P. O.  BOX 100838
ATLANTA, GA 30384-0838

ANGELICA TEXTILE SERVICES-R-COLTON
ATTN: LUCY SAAL
1105 LAKEWOOD PARKWAY SUITE 210
ALPHARETTA, GA 30004

APATITE SELF STORAGE
12217 APATITE LANE
VICTORVILLE, CA 92392

APEX CCL STAFFING SERVICE
10935 FORDHAM COURT
ALTA LOMA, CA 91701

APPLE VALLEY CHRISTIAN CARE CENTER
11959 APPLE VALLEY RD
APPLE VALLEY, CA 92308

ARORA M.D., VIJAY
16167 SISKIYOU RD
APPLE VALLEY, CA 92307

ARROWHEAD REGIONAL MEDICAL CENTER
400 N PEPPER AVE
COLTON, CA 92324

ASSISTANCE LEAGUE OF VICTOR VALLEY
PO BOX 39
APPLE VALLEY, CA 92307

BAMBHANIA, RAMESH MD
16003 TUSCOLA RD
STE H
APPLE VALLEY, CA 92307

BARSTOW COMMUNITY HOSPITAL
P.O. BOX 844809
DALLAS, TX 75284-4809

BARSTOW COMMUNITY HOSPITAL
P.O. BOX 844809
DALLAS, TX 75284-4809

BARSTOW COMMUNITY HOSPITAL
P.O. BOX 844809
DALLAS, TX 75284-4809

BHAGAT M.D., BIPINCHANDRA
17290 JASMINE STREET
SUITE 101
VICTORVILLE, CA 92395

BHUTWALA M.D., ASHVIN
17450 MAIN STREET
SUITE #D
HESPERIA, CA 92345

BIOSYSTEMS
28161 NORTH KEITH DRIVE
LAKE FOREST, IL 60045

BISWAS M.D., NANDA
12677 HESPERIA ROAD
VICTORVILLE, CA 92392

BLOODBANK OF SAN BERNARDINO
384 ORANGE SHOW ROAD
SAN BERNARDINO, CA 92412

BUSINESS CONTROLS INC
5995 GREENWARD PLAZA BLVD
STE 11C
ENGLEWOOD, CO 80111

CALIFORNIA HEALTH FOUNDATION
1215 K STREET
SUITE 800
95814

CALIMLIM M.D., MARCELINO
15247 ELEVENTH ST
VICTORVILLE, CA 92394

CALLIBRA, INC., DBA DISCHARGE 1-2-3
150 N MARTINGALE ROAD
SUITE 838
SCHAUMBURG, IL 60173

CAMERON AND COMPANY, INC.
114 N TOWN CENTER DR
LAS VEGAS, NV 89144

CAPPILLA, ARTHUR
6442 COLDWATER CANYON AVE.,
SUITE 109
NORTH HOLLYWOOD, CA 91606

CARDIAC SCIENCE
DEPT 0587
P O  BOX 120587
DALLAS, TX 75312-0587

CARDINAL HEALTH
ALARIS PRODUCTS
3698 COLLECTION CENTER DRIVE
CHICAGO, IL 60693

CAREER COLLEGES OF AMERICA
184 W CLUB CENTER DRIVE
STE K
SAN BERNARDINO, CA 92408

CAREER COLLEGES OF AMERICA
184 W CLUB CENTER DRIVE
STE K
SAN BERNARDINO, CA 92408

CERNER CORPORATION
2800 ROCKCREEK PARKWAY
KANSAS CITY, MO 64117

CHAFFEY COLLEGE
5885 HAVEN AVENUE
RANCHO CUCAMONGA, CA 91737

CHANDRASHEKHAR, RAVINDRA MD
12675 HESPERIA R.
VICTORVILLE, CA 92395

CHEN, MAIHSIEN MD
16085 TUSCOLA RD
STE 1
APPLE VALLEY, CA 92307

CHOW, STEPHEN MD
15248 ELEVENTH STREET
VICTORVILLE, CA 92395

CLARIENT LABORATORY SERVICES, INC.
PO BOX 51268
LOS ANGELES, CA 90051-5568

CLEANHARBORS
PO BOX 3442
BOSTON, MA 02241

CMRE FINANCIAL SERVICES, INC.
3350 BIRCH STREET
SUITE 200
BREA, CA 92821

CONCORD CAREER INSTITUTE
201 EAST AIRPORT DR
SUITE A
SAN BERNARDINO, CA 92408

COUNTY OF SAN BERNARDINO
351 MOUNTAIN VIEW AVE
SAN BERNARDINO, CA 92415-0010

CYMETRIX
PO BOX 51302
LOS ANGELES, CA 90051

CYRACOM INTERNATIONAL
5780 N SWAN RD
TUCSON, AZ 85718

DALUVOY M.D.,RAO
16850 BEAR VALLEY RD
VICTORVILLE, CA 92392

DALUVOY M.D.,RAO
908 E. MAIN STREET
BARSTOW, CA 92311

DATA SYSTEM GROUP
2331 ALHAMBRA BLVD
SACRAMENTO, CA 95817

DEDICATED BIOPSY SERVICES, INC
1466 OLDENBURG LANE
NORCO, CA 92860

DELA CRUZ M.D.,CELESTINA
15247 ELEVENTH ST
STE 800
VICTORVILLE, CA 92395

DEPARTMENT OF HEALTH SERVICES
PO BOX 997413
SACRAMENTO, CA 95899-7413

DESERT CITIES DIALYSIS
12675 HESPERIA RD
VICTORVILLE, CA 92392

DESERT KNOLLS CONVALESCENT HOSPITAL
14973 HEPERIA RD
VICTORVILLE, CA 92395

DESERT SIERRA CANCER SURVEILLANCE
11368 MOUNTAIN VIEW AVE
SUITE C
LOMA LINDA, CA 92354

DICICOMO GEFFERS AND ASSOCIATES
20961 MORNINGSIDE DR
TRABUCO CANYON, CA 92679

DIVERSIFIED BIOPHARMA SOLUTIONS INC
25612 BARTON ROAD, SUITE 340
LOMA LINDA, CA 92354

DOCU-TRUST
145 EAST MILL STREET
SAN BERNARDINO, CA 92408

DODDS M.D.,STEVEN
17868 HIGHWAY 18
STE 416
APPLE VALLEY, CA 92307

DRUG ABUSE WARNING NETWORK
1650 RESEARCH BLVD
ROCKVILLE, MD 20850

DSG SYSTEM SOFTWARE
2322 CAPITAL AVE
SACRAMENTO, CA 95816

DUGGAN HIM SERVICES, INC
7559 NORTHLAND AVE
SAN RAMON, CA 94583

EAST WEST BANK
2090 HUNTINGTON DRIVE
2ND FLOOR
SAN MARINO, CA 91108

ECOLAB PEST ELIMINATION DEVISION
P.O. BOX 6007
GRAND FORKS, ND 58206

ECONOMIC ALTERNATIVES, INC.
1307 WEST 6TH STREET
SUITE 203
CORONA, CA 92882-3173

EDWARD MATTHEWS
15019 NANTICOKE
APPLE VALLEY,, CA 92308

EMERALD HEALTH SERVICES
DEPARTMENT 6221
LOS ANGELES, CA 90084-6221

EPIC MANAGEMENT GROUP INC
4387 CLAIR STREET
P O  BOX 2531
MONTCLAIR, CA 91763-1031

FISCHL M.D., PETER
16130 KOKANEE RD
SUITE 103
APPLE VALLEY, CA 92307

GANESH M.D.,NARESH
15982 TUSCOLA RD
STE A
APPLE VALLEY, CA 92307

GAUTAM, RAVINDRA M.D.
PO BOX 1519
BARSTOW, CA 92312

GE MEDICAL SYSTEMS
5517 COLLECTION CENTER DR
CHICAGO, IL 60693

GHAEL, DINESHCHANDRA
11919 HESPERIA RD
STE 1
HESPERIA, CA 92345

GILL M.D., VIVEK
9723 SIERRA VISTA
PHELAN, CA 92371

GOLDEN STATE ANETHESIA CONSULTANTS
PO BOX 50045
PASADENA, CA 91115

GREELY MEDICAL STAFF
200 HOODS LANE
MARBLEHEAD, MA 01945

GROVER M.D., RAKESH
16018 TUSCOLA RD
SUITE #2
APPLE VALLEY, CA 92307

GUHA M.D., AMAL
16124 LASOTA RD
STE A
APPLE VALLEY, CA 92307

HALO UNLIMITED INC
21520-G YORBA LINDA BLVD #354
YORBA LINDA, CA 92887

HEALTH CARE CONCEPTS
1575 DELUCCHI LANE
SUITE 204
RENO, NV 89502

HEALTH CARE INFUSION LLC
6710 N. SCOTTSDALE RD
SUITE 235
PARADISE VALLEY, AZ 85253

HEALTH CARE LEGAL SERVICES
39867 TREASURY CENTER
CHICAGO, IL 60691

HEALTH SERVICES ADVISORY GROUP
700 N BRAND BLVD
SUITE 410
GLENDALE, CA 91203

HEALTHCARE RESOURCE GROUP
476394 HWY 95
STE 201
PONDERAY, ID 83852

HEALTHCARE SERVICES INTERNATIONAL
P.O.BOX 12828
PHILADELPHIA, PA 19101

HEALTHLINE SYSTEMS, INC
17085 CAMINO SAN BERNARDO
SAN DIEGO, CA 92127

HEALTHLINE SYSTMES

HERITAGE
PO BOX 7014
LANCASTER, CA 93539

HFS CONSULTANTS
505 FOURTEENTH ST. FIFTH FLOOR
OAKLAND, CA 94612

HFS CONSULTANTS
505 FOURTEENTH ST. FIFTH FLOOR
OAKLAND, CA 94612

HI DESERT ALARM
BELL MOUNTAIN ENTERPRISES, INC
16637 MOJAVE DR
VICTORVILLE, CA 92395-3856

HI DESERT ALARM
BELL MOUNTAIN ENTERPRISES, INC
16637 MOJAVE DR
VICTORVILLE, CA 92395-3856

HIGH DESERT  CREDITORS SERVICE
14608 MAIN STREET
SUITE B
VICTORVILLE, CA 92392

HIGH DESERT CARDIO-PULMONARY MED
16017 TOSCOLA RD
SUITE A
APPLE VALLEY, CA 92307

HIGH DESERT ENDOSCOPY CENTER
18523 CORWIN RD
SUITE H2
APPLE VALLEY, CA 92307

HILTON GARDEN INN
12603 MARIPOSA RD
VICTORVILLE, CA 92395

HOSPITAL EMPLOYEE LABOR POOL, LLC
5400 ORANGE AVE
SUITE 101
CYPRESS, CA 90630

HVIDSTON R.N., VICKI
3780 SALISH TRAIL
STEVENSVILLE, MT 59870

I.C.R. SEARCH, INC.
143360 ST ANDREWS DRIVE
SUITE 1
VICTORVILLE, CA 92395

ICEMA
515 NORTH ARROWHEAD AVE
SAN BERNARDINO, CA 92415

IEHP
P.O. BOX 19026
SAN BERNARDINO, CA 92423

IVAR, LLC
6710 SCOTTSDALE ROAD
SUITE 235
PARADISE VALLEY, AZ 85253

KAMATH M.D., RAMADAS
18564 HIGHWAY 18
STE 103 & 104
APPLE VALLEY, CA 92307

KASLOW CONSULTING SERVICES
3458 MALAGA COURT
CALABASAS, CA 91302

KING, LU-WEI M.D
18182 OUTER HIGHWAY 18
STE 101 & 102
APPLE VALLEY, CA 92307

KNOLLS WEST
16890 GREEN TREE BLVD
VICTORVILLE, CA 92395

KONICA MINOLTA BUSINESS SOLUTION
PO BOX 7247-0322
PHILADELPHIA, PA 19170

LA QUINTA

LA QUINTA VICTORVILLE
12000 MARIPOSA ROAD
HESPERIA, CA 92345

LAI, TSU MD
18523 CORWIN ROAD
SUITE B
APPLE VALLEY, CA 92307

LIFESIGNS,INC
2222 LAVERNA AVE
LOS ANGELES, CA 90041

MARYLAND HOSPITAL ASSOCIATION
ATTN: GAIL WILSON
6820 DEERPATH ROAD
ELKRIDGE, MD 21075

MATHESON TRI*GAS
PO BOX 845502
DALLAS, TX 75284-5502

MATNEY M.D.,GLENN
12402 INDUSTRIAL BLVD
VICTORVILLE, CA 92395

MATNEY, M.D., GLENN
12402 INDUSTRIAL BLVD
SUITE B-1
VICTORVILLE, CA 92395

MED STAFF HEALTHCARE SOLUTIONS
P.O. BOX 404691
ATLANTA, GA 30384

MEDICAL DATA EXCHANGE
ONE WORLD TRADE CENTER
SUITE 2400
LONG BEACH, CA 90831

MEDICAL MARKETPLACE
PO BOX 2483
APPLE VALLEY, CA 92307

MEDICAL MARKETPLACE
PO BOX 2483
APPLE VALLEY, CA 92307

MEDQUIST, INC
P O  BOX 10832
NEWARK, NJ 07193

MEMON, M.D. RADHA
15248 ELEVENTH STREET
VICTORVILLE, CA 92395

MILLIMAN CARE GUIDELINES, LLC
719 2ND AVE
SUITE 300
SEATTLE, WA 98104

MKH TESTING & INSPECTION, INC
4195 CHINO HILLS PKWY
#619
CHINO HILLS, CA 91709

MONEKE M.D., VICTOR
15995 TUSCOLA RD
STE 208
APPLE VALLEY, CA 92307

MURTHY M.D., NIRMALA
18523 CORWIN RD
STE H
APPLE VALLEY, CA 92307

NASHED M.D.,EZZAT
16200 BEAR VALLEY ROAD #102
VICTORVILLE, CA 92395

NHUNG, TRAN MD
15998 QUANTICO RD
STE A
APPLE VALLEY, CA 92307

NIHON KOHDEN
15248 ELEVENTH STREET
VICTORVILLE, CA 92395

NUCLEAR BROKERS
207 BULLARD LANE
ALPINE, CA 91901

NWAGWU M.D.,ODOCHI
11678 RANCHO RD
ADELANTO, CA 92301

OHIAERI M.D., IKE
14344 CAJON AVE STE 102
VICTORVILLE, CA 92392

OMEGA HEALTHCARE STAFFING
PO BOX 881774
SAN FRANCISCO, CA 94188

ONE LEGACY
221 SOUTH FIGUEROA
SUITE 500
LOS ANGELES, CA 90012

ORCHARD SOFTWARE CORPORATION
701 CONGRESSIONAL BLVD
SUITE 360
CARMEL, IN 46032

OUR 365 INC.
3613 MUELLAR ROAD
SAINT CHARLES, MO 63301

PATEL M.D.,MUKESCHANDRA
P.O. BOX 1090
SUITE 220
VICTORVILLE, CA 92393

PATHI, RAMA M.D.
18145 HIGHWAY 18
STE D
APPLE VALLEY, CA 92307

PAYMENTECH
PO BOX 6600
HAGERSTOWN, MD 21741

PAZDRAL, M.D. WILLIAM
15247 ELEVENTH ST.
STE 500
VICTORVILLE, CA 92395

PELLEY, CATHERINE
13057 ASTER RD
APPLE VALLEY,, CA 92307

PHYSICIANS HOSPITAL MANAGMENT LLC
18523 CORWIN RD
SUITE H
APPLE VALLEY, CA 92307

PHYSICIANS SURGERY CENTER
12567 HESPERIA RD
VICTORVILLE, CA 92392

PICC LINE ACCESS,INC.
822 KILMARNOC WAY
RIVERSIDE, CA 92508

POMONA VALLEY MEDICAL CENTER
1798 NORTH GAREY AVE
POMONA, CA 91767

PRAXAIR
230-PRAXAIR DISTRIBUTION INC
DEPT LA 21511
PASADENA, CA 91185-1511

PRE-EMPLOY.COM, INC
P O  BOX 491570
REDDING, CA 96049

PRECISION ORTHOTICS & PROSTHETICS
2550 BEVERLY BLVD
SUITE 201
LOS ANGELES, CA 90057

PREMIER PURCHASING  PARTNERS
2100 DOUGLAS BLVD
PO BOX 619002
ROSEVILLE, CA 95661

PROFESSIONAL HOSPITAL SUPPLY INC
41980 WINCHESTER ROAD
TEMECULA, CA 92590

PROFESSIONAL RESEARCH CONSULTANTS,
11326  P ST
OMAHA, NE 68137

PRUDENTIAL OVERALL SUPPLY
P.O. BOX 11210
SANTA ANA, CA 92711

PURI M.D.,RAJIV
12830 HESPERIA ROAD SUITE A
VICTORVILLE, CA 92392

PYXIS CORPORATION
3750 TORREY VIEW COURT
SAN DIEGO, CA 92130

PYXIS CORPORATION
3750 TORREY VIEW COURT
SAN DIEGO, CA 92130

QUADRAMED CORPORATION
NJIC
700 LAKE DRIVE,
AMBLER, PA 19002

RADIOMETER AMERICA
13217 COLLECTIONS CENTER DRIVE
CHICAGO, IL 60693

RADLAUER, GERALD
18031 HIGHWAY 18 STE C
APPLE VALLEY, CA 92307

RADNET
1510 COTNER AVE
LOS ANGELES, CA 90025

RAJASEKHAR M.D.,DAMODARA
18182 OUTER HWY 18
SUITE 103
APPLE VALLEY, CA 92307

RAPA MANAGEMENT CONSULTANTS
1125 EAST BROADWAY
#33
GLENDALE, CA 91205

READYLINK
PO BOX 1047
THOUSAND PALMS, CA 92276

REDDINET
515 SOUTH FIGUEROA ST
STE 1300
LOS ANGELES, CA 90071

REHABABILITIES, INC
PO BOX 1565
RANCHO CUCAMONGA, CA 91729-1565

RELIABLE NURSING SOLUTIONS, INC.
16057 KAMANA ROAD
UNIT B
APPLE VALLEY, CA 92307

RESIDENCE INN MARRIOTT
2025 CONVENTION CENTER WAY
ONTARIO, CA 91764

RISE INTERPRETING INC
3337 W FLORIDA AVE
#131
HEMET, CA 92545

RNI STAFFING
18401 BURBANK BLVD
STE 201
TARZANA, CA 91356

ROCHE DIAGNOSTIC CORPORATION
DEPT AT 952243
ATLANTA, GA 31192-2243

SALAZAR M.D.,JUVILUSAN
12760 HESPERIA RD
STE C
VICTORVILLE, CA 92395

SAN BERNARDINO COUNTY SCHOOLS
601 NORTH E STREET
SAN BERNARDINO, CA 92410

SANTA BARBARA CITY COLLEGE
721 CLIFF DRIVE
SANTA BARBARA, CA 93109

SCHINDLER ELEVATOR CORPORATION
P. O.  BOX 93050
CHICAGO, IL 60673

SHARMA M.D.,AKHIL
17257 JASMINE ST
STE A
VICTORVILLE, CA 92395

SHARMA M.D.,APARNA
17450 MAIN ST
STE E
HESPERIA, CA 92345

SIEMANS HEALTHCARE DIAGNOSTICS INC.
PO BOX 6101
NEWARK, DE 19714

SIVERTS PUBLISHING LLC
14808 CHOCO RD
APPLE VALLEY, CA 92307

SOBRERA, MARILOU MD
15248 ELEVENTH STREET
VICTORVILLE, CA 92395

SOBRERA, MARILOU MD
15248 ELEVENTH STREET
VICTORVILLE, CA 92395

SPARKS LAW FIRM
650 TOWN CENTER DRIVE
SUITE 1200
COSTA MESA, CA 92626

ST. MARY MEDICAL CENTER
DEPT LA 21514
PASADENA, CA 91185-1514

STARPOINT HEALTH
14400 BEAR VALLEY RD
VICTORVILLE, CA 92392

STEPHENSON ACQUISO & COLMAN
303 NORTH GLENOAKS BLVD
STE 700
BURBANK, CA 91502

STERICYCLE
28161 N KEITH DRIVE
LAKE FOREST, IL 60045

SURGICAL DIRECTIONS,LLC
541 N. FAIRBANKS STE.2740
CHICAGO, IL 60611

SYSMEX
P O  BOX 94002
CHICAGO, IL 60690

SYSMEX
P O  BOX 94002
CHICAGO, IL 60690

TADROS, M.D. REDA M., INC
848 WEST HUNTINGTON DR
UNIT 7
ARCADIA, CA 91007

TADROS, M.D. REDA M., INC
848 WEST HUNTINGTON DR
UNIT 7
ARCADIA, CA 91007

TEAMHEALTH WEST
520 NORTH CENTRAL AVE, SUITE #750
GLENDALE, CA 91203

THE CAMDEN GROUP
100 N SEPULVEDA BLVD
SUITE 600
EL SEGUNDO, CA 90245

THE GOVERNANCE INSTITUTE
6333 GREENWICH DRIVE
SUITE 200
SAN DIEGO, CA 92122

TIC TWO MANAGEMENT, LLC
PO BOX 2110 12402 INDUSTRIAL BLVD
B-2
VICTORVILLE, CA 92393-2110

TMAD
320 NORTH HELSTEAD STREET
SECOND FLOOR
PASADENA, CA 91107

TOP NOTCH NETWORK SOLUTIONS
15401 ANACAPA RD. SUITE 2
VICTORVILLE, CA 92392

TOSHIBA AMERICA MEDICAL CREDIT
PO BOX 41601
PHILADELPHIA, PA 19101-1601

TRIAGE CONSULTING GROUP
211 MAIN ST
SUITE 1100
SAN FRANCISCO, CA 94105

UNITED CODING
17011 BEACH BLVD., #900
HUNTINGTON BEACH, CA 92647

UNIVERSITY OF CALIFORNIA/SAN DIEGO
UCSD EXTENSION HEALTHCARE
9500 GILMAN DRIVE 0170 EAST
LA JOLLA, CA 92093

VACHIRAKORNTONG M.D.,VIRUCH
15998 QUANTICO RD
STE A
APPLE VALLEY, CA 92307

VALENCIA M.D.,RAINILDA
12677 HESPERIA ROAD
STE 160
VICTORVILLE, CA 92392

VALLEY REAL ESTATE HOLDINGS-DESERT
18564 HIGHWAY 18
SUITE 110
APPLE VALLEY, CA 92307

VELASQUEZ M.D.,JOEL
12677 HESPERIA RD
STE 130
VICTORVILLE, CA 92395

VERTEX INC
1041 OLD CASSATT RD
BERWYN, PA 19312

VICTOR VALLEY COMMUNITY COLLEGE
18422 BEAR VALLEY RD
VICTORVILLE, CA 92395

VICTOR VALLEY MEMORIAL PARK
15609 ELEVENTH STREET
MISSION HILLS, CA 91395

VICTOR VALLEY UNION HIGH SCHOOL
601 NORTH E STREET
SAN BERNARDINO, CA 92410

VIEWPOINT MEDICAL CENTER
15366 11TH STREET, SUITE Y
VICTORVILLE, CA 92392

VILLAROSA M.D.,DANIEL
18145 HIGHWAY 18
STE F
APPLE VALLEY, CA 92307

WEBER STATE UNIVERSITY
3901 UNIVERSITY CIRCLE
OGDEN, UT 84408

WEEDEN, GLENN MD
15248 ELEVENTH STREET
VICTORVILLE, CA 92395

WEEDEN, GLENN MD
15248 ELEVENTH STREET
VICTORVILLE, CA 92395

WEST COAST ULTRASOUND INSTITUTE
3700 E INLAND EMPIRE
SUITE 550
ONTARIO, CA 91764

WEST COAST UNIVERSITY
200 EAST BAKER STREET
COSTA MESA, CA 92626

WESTCLIFF MEDICAL LAB, INC
1821 E DYER RD
SUITE 100
SANTA ANA, CA 92705

WHITE DOVE PROFESSIONAL BUILDING
15203 11TH ST
SUITE A
VICTORVILLE, CA 92392

WHITE DOVE PROFESSIONAL BUILDING
15203 11TH ST
SUITE A
VICTORVILLE, CA 92392

WHITE, FLORENCE
NON PROFIT DEVELOPMENT SERVICES
15490 CIVIC CENTER DRIVE
SUITE 106
VICTORVILLE, CA 92392

WHITE, PAUL M.D.
15247 ELEVENTH ST
STE 100
VICTORVILLE, CA 92395

WIKA ENDOSCOPY CENTER
18056 ENDOSCOPY CENTER
APPLE VALLEY, CA 92307

WILBURN M.D.,WANDA
16000 APPLE VALLEY RD
STE C3
APPLE VALLEY, CA 92307

WINGATE DUNROSS, INC.
28632 ROADSIDE DR
SUITE 203
AGOURA HILLS, CA 91301

WONG M.D.,WILLIAM KONG D.
15203 ELEVENTH STREET
SUITE B
VICTORVILLE, CA 92392

WRIGHT, WILLLIAM
4450 CALIFORNIA AVENUE
SUITE 295
BAKERSFIELD, CA 93309

YELLOW CAB OF VICTORVILLE
12171 PLUTO DRIVE
92395

**TAXING AGENCIES**

ANNETTE KERBER-ASST
TREASURER-TAX COLL
ASSISTANT TREASURER-TAX
COLLECTOR
172 W THIRD ST, 1ST FLR
SAN BERNARDINO, CA 92415-0360

BOARD OF EQUALIZATION
PO BOX 942879
SACRAMENTO, CA 94279-8022

County of Riverside
Auditor-Controller
PO Box 1326 Lemon Street
11th Floor
Riverside, CA 92502

DEPARTMENT OF TREASURY
INTERNAL REVENUE SERVICE
OGDEN, UT 84201-0039

Employment Development Department
Bankruptcy Group
PO Box 826880
Sacramento, CA 94280

EMPLOYMENT DEVELOPMENT DEPT.
PO BOX 826846
SACRAMENTO, CA 94246-0001

Franchise Tax Board
Attention Bankruptcy
PO Box 2952
Sacramento, CA 95812

INTERNAL REVENUE SERVICE
PO BOX 24017
FRESNO, CA 93779

Internal Revenue Service
PO Box 21126
Philadelphia, PA 19114

INTERNAL REVENUE SERVICE-ACS
P.O. BOX 145566
CINCINNATI, OH 45214

INTERNAL REVENUE SERVICES
PO BOX 660264
DALLAS, TX 75266-0264

Riverside County Treasurer
PO Box 12005
Riverside, CA 92502

DOCS_LA:224968.1 90231-001